# 21-0636-CV

## United States Court of Appeals
### for the
### Second Circuit

---

NATIONAL RIFLE ASSOCIATION OF AMERICA,

*Plaintiff-Appellee,*

— v. —

MARIA T. VULLO, both individually and in her former official capacity,

*Defendant-Appellant,*

ANDREW CUOMO, both individually and in his official capacity, THE NEW YORK STATE DEPARTMENT OF FINANCIAL SERVICES,

*Defendants.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

## JOINT APPENDIX
### Volume 1 of 2 (Pages A-1 to A-208)

SARAH B. ROGERS
BREWER, ATTORNEYS & COUNSELORS
*Attorneys for Plaintiff-Appellee*
750 Lexington Avenue, 14th Floor
New York, New York 10022
(212) 489-1400

ANDREW G. CELLI JR.
DEBRA L. GREENBERGER
EMERY CELLI BRINCKERHOFF ABADY
   WARD & MAAZEL LLP
*Attorneys for Defendant-Appellant*
600 Fifth Avenue, 10th Floor
New York, New York 10020
(212) 763-5000

**i**

# TABLE OF CONTENTS

**Page**

District Court Docket Entries ..................................... A-1

Decision and Order of the Honorable Thomas J. McAvoy, dated November 6, 2018 ....................... A-64

Redacted Second Amended Complaint and Jury Demand, filed June 20, 2020 ............................... A-135

Exhibit A to Second Amended Complaint - Cuomo Press Release, dated April 19, 2018.......... A-179

Exhibit B to Second Amended Complaint - Memorandum, dated April 19, 2018..................... A-182

Exhibit C to Second Amended Complaint - Memorandum, dated April 19, 2018..................... A-185

Exhibit D to Second Amended Complaint - Consent Order under Articles 21, 23 and 34 of the Insurance Law, dated May 2, 2018 ................. A-188

Exhibit E to Second Amended Complaint - Consent Order under Sections 1102 and 3420 of the Insurance Law, dated May 7, 2018 ................. A-209

Exhibit F to Second Amended Complaint - Sealed Exhibit B - Letter from Matthew L. Levine to Joseph Gunset, dated April 11, 2018 (Filed Under Seal) (Reproduced in Confidential Appendix at pp. CA-45-CA-51) ........................... A-222

Exhibit G to Second Amended Complaint - Sealed Exhibit C - Minutes of the Board Meeting, dated May 1, 2018 (Filed Under Seal) (Reproduced in Confidential Appendix at pp. CA-52-CA-65) ........................... A-224

**Page**

Exhibit H to Second Amended Complaint - Sealed Exhibit D - E-mail Correspondence, dated May 9, 2018 (Filed Under Seal) (Reproduced in Confidential Appendix at pp. CA-66-CA-67) ........................... A-226

Exhibit I to Second Amended Complaint - Consent Order under Sections 1102 and 3420 of the Insurance Law, dated December 20, 2018 ....... A-228

Exhibit J to Second Amended Complaint - Supplemental Consent Order under Articles 21, 23 and 34 of the Insurance Law, dated January 31, 2019 .................................................. A-255

Notice of Appeal of the Grant of Plaintiff's Motion to Amend and Motion to Dismiss the Second Amended Complaint, by Defendant Maria T. Vullo, dated June 23, 2020 .................................. A-265

Memorandum of Law, by Defendant Maria T. Vullo, in Support of Motion and Appeal, dated June 23, 2020 ........................................................ A-267

Memorandum of Law, by Plaintiff, in Opposition to Defendant Vullo's Appeal and Motion to Dismiss, dated July 13, 2020 ................................ A-310

Reply Memorandum of Law, by Defendant Maria T. Vullo, in Further Support of Motion and Appeal, dated July 27, 2020 ................................................ A-343

Notice of Appeal, dated March 22, 2021 ................... A-362

Order on Plaintiff's Motion to file documents Under Seal, dated April 22, 2020 ...................................... A-364

**Query   Reports   Utilities   Help   Log Out**

APPEAL,MOTREF,SM

# U.S. District Court
# Northern District of New York - Main Office (Syracuse) [NextGen CM/ECF Release 1.5 (Revision 1.5.3)] (Albany)
# CIVIL DOCKET FOR CASE #: 1:18-cv-00566-TJM-CFH

| | |
|---|---|
| National Rifle Association of America v. Cuomo et al | Date Filed: 05/11/2018 |
| Assigned to: Senior Judge Thomas J. McAvoy | Jury Demand: Plaintiff |
| Referred to: Magistrate Judge Christian F. Hummel | Nature of Suit: 440 Civil Rights: Other |
| Cause: 42:1983 Civil Rights Act | Jurisdiction: Federal Question |

**Special Master**

**Benjamin W. Hill**
Capezza Hill, LLP
50 State Street
Ste. Second Floor
Albany, NY 12207

**Plaintiff**

**National Rifle Association of America**     represented by     **Sarah Rogers**
Brewer Attorneys & Counselors
750 Lexington Avenue, Floor 14
New York, NY 10022
212-489-1400
Email: sbr@brewerattorneys.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William A Brewer , III**
Brewer, Attorneys & Counselors
1717 Main Street
Suite 5900
Dallas, TX 75201
214-653-4000
Email: wab@brewerattorneys.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Charles J. Cooper**
Cooper & Kirk, PLLC

1523 New Hampshire Avenue, N.W.
Washington, DC 20036
202-220-9600
Email: ccooper@cooperkirk.com
*TERMINATED: 09/11/2019*

**Harold S. Reeves**
Cooper & Kirk, PLLC
1523 New Hampshire Avenue, N.W.
Washington, DC 20036
202-220-9620
Email: hreeves@cooperkirk.com
*TERMINATED: 09/11/2019*

**John C. Canoni**
Stanton LLP
1717 Main Street
Suite 3800
Dallas, TX 75201
214-276-0539
Fax: 972-692-6812
Email: jcanoni@stantonllp.com
*TERMINATED: 03/17/2021*

**Jose Joel Alicea**
Cooper & Kirk, PLLC
1523 New Hampshire Avenue, N.W.
Washington, DC 20036
202-220-9600
Email: jalicea@cooperkirk.com
*TERMINATED: 09/11/2019*

**Michael W. Kirk**
Cooper & Kirk, PLLC
1523 New Hampshire Avenue, N.W.
Washington, DC 20036
202-220-9600
Email: mkirk@cooperkirk.com
*TERMINATED: 09/11/2019*

**Michelle Joanna Martin**
Brewer Attorneys & Counselors
750 Lexington Avenue, Floor 14
New York, NY 10022
646-388-0750
Fax: 212-684-6224
Email: mym@brewerattorneys.com

*ATTORNEY TO BE NOTICED*

**Mordechai Geisler**
Brewer, Attorneys & Counselors
750 Lexington Avenue
New York, NY 10271
212-489-1400
Email: mxg@brewerattorneys.com
*(Inactive)*
*ATTORNEY TO BE NOTICED*

**Nicole Frazer Reaves**
Cooper & Kirk, PLLC
1523 New Hampshire Avenue, N.W.
Washington, DC 20036
202-220-9600
Email: nreaves@cooperkirk.com
*TERMINATED: 09/11/2019*

**Stephanie L Gase**
Leader Berkon Colao & Silverstein
LLP
8117 Preston Road
Suite 300
Dallas, TX 75225
469-482-5227
Fax: 212-486-3099
Email: sgase@leaderberkon.com
*TERMINATED: 04/15/2019*

V.

**Defendant**

**Andrew Cuomo**
*both individually and in his official
capacity*

represented by **Adrienne J. Kerwin**
Office of Attorney General - Albany
State of New York
The Capitol
Albany, NY 12224
518-776-2608
Fax: 518-473-1572
Email: Adrienne.Kerwin@ag.ny.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William A. Scott**
New York State Attorney General -

Albany
The Capitol
Albany, NY 12224
518-776-2255
Email: william.scott@ag.ny.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Helena O. Pederson**
New York State Attorney General -
Albany
The Capitol
Albany, NY 12224
518-776-2596
Fax: 518-915-7738
Email: helena.pederson@ag.ny.gov
*ATTORNEY TO BE NOTICED*

**Michael G. McCartin**
Office of Attorney General - Albany
The Capitol
Albany, NY 12224
518-776-2620
Fax: 518-915-7738
Email: michael.mccartin@ag.ny.gov
*ATTORNEY TO BE NOTICED*

**Ryan L. Abel**
Burke, Scolamiero & Hurd, LLP
7 Washington Square
P.O. Box 15085
Albany, NY 12212-5085
518-862-1386
Fax: 518-862-1393
Email: Ryan.Abel@ag.ny.gov
*ATTORNEY TO BE NOTICED*

## Defendant

**Maria T. Vullo**                represented by  **Adrienne J. Kerwin**
*both individually and in her former*                (See above for address)
*official capacity*                          *LEAD ATTORNEY*
                                        *ATTORNEY TO BE NOTICED*

                                        **William A. Scott**
                                        (See above for address)
                                        *LEAD ATTORNEY*
                                        *ATTORNEY TO BE NOTICED*

**Andrew G. Celli , Jr.**
Emery Celli Brinckerhoff, Abady,
Ward & Maazel LLP
600 Fifth Avenue, 10th Floor
New York, NY 10020
212-763-5000
Fax: 212-763-5001
Email: acelli@ecbalaw.com
*ATTORNEY TO BE NOTICED*

**Debra L. Greenberger**
Emery Celli Brinckerhoff, Abady,
Ward & Maazel LLP
600 Fifth Avenue, 10th Floor
New York, NY 10020
212-763-5000
Email: dgreenberger@ecbawm.com
*ATTORNEY TO BE NOTICED*

**Elizabeth S. Saylor**
Emery Celli Brinckerhoff, Abady,
Ward & Maazel LLP
600 Fifth Avenue, 10th Floor
New York, NY 10020
212-763-5000
Fax: 212-763-5001
Email: esaylor@ecbalaw.com
*TERMINATED: 09/18/2020*

**Helena O. Pederson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Marissa Benavides**
Emery Celli Brinckerhoff, Abady,
Ward & Maazel LLP
600 Fifth Avenue, 10th Floor
New York, NY 10020
212-763-5000
Email: mbenavides@ecbalaw.com
*ATTORNEY TO BE NOTICED*

**Michael G. McCartin**
(See above for address)
*ATTORNEY TO BE NOTICED*

## A-6

**Defendant**

**The New York State Department of Financial Services**

represented by **Adrienne J. Kerwin**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kevin John Bishop**
NYS Department of Financial
Services
One State Street
19th Floor
New York, NY 10004
212-709-1664
Email: kevin.bishop@dfs.ny.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Nathaniel J. Dorfman**
New York State Department of
Financial Services
One State Street
New York, NY 10004-1511
518-473-4824
Fax: 212-709-5538
Email: nathaniel.dorfman@dfs.ny.gov
*TERMINATED: 06/22/2020*
*LEAD ATTORNEY*

**William A. Scott**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Eamon G. Rock**
New York State Department of
Financial Services
One Commerce Plaza
Albany, NY 12257
518-402-3386
Email: eamon.rock@dfs.ny.gov
*ATTORNEY TO BE NOTICED*

**Helena O. Pederson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michael G. McCartin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ryan L. Abel**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

| **American Civil Liberties Union Foundation**<br>125 Broad Street<br>18th Floor<br>New York<br>New York, NY 10004<br>2125492604 | represented by | **Brian Matthew Hauss**<br>American Civil Liberties Union - New York Office<br>125 Broad Street, 18th Floor<br>New York, NY 10004<br>212-549-2604<br>Email: bhauss@aclu.org<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
|---|---|---|

**Amicus**

| **Texas Public Policy Foundation** | represented by | **Chance Weldon**<br>Texas Public Policy Foundation<br>901 Congress Avenue<br>Austin, TX 78701<br>512-472-2700<br>Email: cweldon@texaspolicy.com<br>*ATTORNEY TO BE NOTICED*<br><br>**Keisha Russell**<br>First Liberty Institute<br>2001 W. Plano Pkwy. - Suite 1600<br>Plano, TX 75075<br>972-941-4444<br>Fax: 972-941-4457<br>Email: krussell@firstliberty.org<br>*ATTORNEY TO BE NOTICED* |
|---|---|---|

| Date Filed | # | Docket Text |
|---|---|---|
| 05/11/2018 | 1 | COMPLAINT WITH JURY DEMAND against Andrew Cuomo, The New York State Department of Financial Services and Maria T. Vullo (Filing fee $400 receipt number ANYNDC-4383332) filed by National Rifle Association of America. (Attachments: # 1 Civil Cover Sheet, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit F)(jlb) (Entered: 05/11/2018) |

| 05/11/2018 | 2 | Summons Issued as to Andrew Cuomo. (Attachments: # 1 Summons Issued as to New York State Department of Financial Services, # 2 Summons Issued as to Maria T. Vullo)(jlb) (Entered: 05/11/2018) |
|---|---|---|
| 05/11/2018 | 3 | G.O. 25 FILING ORDER ISSUED: Initial Conference set for 8/9/2018 09:00 AM in Albany before Magistrate Judge Christian F. Hummel. Civil Case Management Plan must be filed and Mandatory Disclosures are to be exchanged by the parties on or before 8/2/2018. (Pursuant to Local Rule 26.2, mandatory disclosures are to be exchanged among the parties but are NOT to be filed with the Court.) (jlb) (Entered: 05/11/2018) |
| 05/11/2018 | 4 | NOTICE of Admission Requirement as to Party National Rifle Association of America; Attorney Charles J. Cooper (ccooper@cooperkirk.com), Michael W. Kirk (mkirk@cooperkirk.com), and J. Joel Alicea. Phone number is 202-220-9660. Admissions due by 5/25/2018. Notice sent via regular mail 5/11/2018.(jlb) (Entered: 05/11/2018) |
| 05/11/2018 | 5 | FRCP 7.1 CORPORATE DISCLOSURE STATEMENT by National Rifle Association of America. (Brewer, William) (Entered: 05/11/2018) |
| 05/18/2018 | 6 | MOTION for Limited Admission Pro Hac Vice of MICHAEL W. KIRK Filing fee $100, receipt number ANYNDC-4391357. filed by National Rifle Association of America. Motions referred to Christian F. Hummel. (Brewer, William) (Entered: 05/18/2018) |
| 05/18/2018 | 7 | MOTION for Limited Admission Pro Hac Vice of CHARLES J. COOPER Filing fee $100, receipt number ANYNDC-4391379. filed by National Rifle Association of America. Motions referred to Christian F. Hummel. (Brewer, William) (Entered: 05/18/2018) |
| 05/18/2018 | 8 | MOTION for Limited Admission Pro Hac Vice of JOSE J. ALICEA Filing fee $100, receipt number ANYNDC-4391396. filed by National Rifle Association of America. Motions referred to Christian F. Hummel. (Rogers, Sarah) (Entered: 05/18/2018) |
| 05/18/2018 | 9 | MOTION for Limited Admission Pro Hac Vice of HAROLD S. REEVES Filing fee $100, receipt number ANYNDC-4391400. filed by National Rifle Association of America. Motions referred to Christian F. Hummel. (Rogers, Sarah) (Entered: 05/18/2018) |
| 05/21/2018 | 10 | ORDER granting 6 Motion for Limited Admission Pro Hac Vice of Michael W. Kirk, Esq. Counsel is hereby advised that as of January 16, 2018, the NYND has converted to NextGen. Due to this conversion, you must now register for Pro Hac Vice access through your PACER account. **This is the only notice you will receive concerning this requirement. <u>You will not have access to electronically file in this case until your Pro Hac Vice request has been processed through the PACER system.</u>** Step-by-step instructions on how to complete this process are available at http://www.nynd.uscourts.gov/attorney-admissions-nextgen. Authorized |

A-9

| | | |
|---|---|---|
| | | by Magistrate Judge Christian F. Hummel on 5/21/2018. (tab) (Entered: 05/21/2018) |
| 05/21/2018 | 11 | ORDER granting 7 Motion for Limited Admission Pro Hac Vice of Charles J. Cooper, Esq. Counsel is hereby advised that as of January 16, 2018, the NYND has converted to NextGen. Due to this conversion, you must now register for Pro Hac Vice access through your PACER account. **This is the only notice you will receive concerning this requirement. You will not have access to electronically file in this case until your Pro Hac Vice request has been processed through the PACER system.** Step-by-step instructions on how to complete this process are available at http://www.nynd.uscourts.gov/attorney-admissions-nextgen. Authorized by Magistrate Judge Christian F. Hummel on 5/21/2018. (tab) (Entered: 05/21/2018) |
| 05/21/2018 | 12 | ORDER granting 8 Motion for Limited Admission Pro Hac Vice of Jose J. Alicea, Esq. Counsel is hereby advised that as of January 16, 2018, the NYND has converted to NextGen. Due to this conversion, you must now register for Pro Hac Vice access through your PACER account. **This is the only notice you will receive concerning this requirement. You will not have access to electronically file in this case until your Pro Hac Vice request has been processed through the PACER system.** Step-by-step instructions on how to complete this process are available at http://www.nynd.uscourts.gov/attorney-admissions-nextgen. Authorized by Magistrate Judge Christian F. Hummel on 5/21/2018. (tab) (Entered: 05/21/2018) |
| 05/21/2018 | 13 | ORDER granting 9 Motion for Limited Admission Pro Hac Vice of Harold S. Reeves, Esq. Counsel is hereby advised that as of January 16, 2018, the NYND has converted to NextGen. Due to this conversion, you must now register for Pro Hac Vice access through your PACER account. **This is the only notice you will receive concerning this requirement. You will not have access to electronically file in this case until your Pro Hac Vice request has been processed through the PACER system.** Step-by-step instructions on how to complete this process are available at http://www.nynd.uscourts.gov/attorney-admissions-nextgen. Authorized by Magistrate Judge Christian F. Hummel on 5/21/2018. (tab) (Entered: 05/21/2018) |
| 05/22/2018 | 14 | NOTICE of Appearance by Charles J. Cooper on behalf of National Rifle Association of America (Cooper, Charles) (Entered: 05/22/2018) |
| 05/22/2018 | 15 | NOTICE of Appearance by Michael W. Kirk on behalf of National Rifle Association of America (Kirk, Michael) (Entered: 05/22/2018) |
| 05/22/2018 | 16 | NOTICE of Appearance by Harold S. Reeves on behalf of National Rifle Association of America (Reeves, Harold) (Entered: 05/22/2018) |
| 05/22/2018 | 17 | NOTICE of Appearance by Jose Joel Alicea on behalf of National Rifle Association of America (Alicea, Jose) (Entered: 05/22/2018) |

| 05/22/2018 | 18 | NOTICE by National Rifle Association of America re 4 Notice of Admission Requirement, (Cooper, Charles) (Entered: 05/22/2018) |
|---|---|---|
| 05/25/2018 | 19 | *Notice of Appearance and* Letter Motion from Adrienne J. Kerwin for Andrew Cuomo, The New York State Department of Financial Services, Maria T. Vullo requesting extension of time to respond to the complaint submitted to Judge Hummel . (Kerwin, Adrienne) (Entered: 05/25/2018) |
| 05/25/2018 | 20 | TEXT ORDER granting in part and denying in part 19 Letter Request to extend answer deadline. Answer deadline is extended to 7/2/2018. Andrew Cuomo answer due 7/2/2018; The New York State Department of Financial Services answer due 7/2/2018; Maria T. Vullo answer due 7/2/2018. Authorized by Magistrate Judge Christian F. Hummel on 5/25/2018. (tab) (Entered: 05/25/2018) |
| 06/14/2018 | 21 | MOTION for ORDER TO SHOW CAUSE FOR EXPEDITED DISCOVERY by National Rifle Association of America. (Attachments: # 1 Memorandum of Law in Support of Order to Show Cause for Expedited Discovery, # 2 Affidavit of John C. Frazer In Support of Order to Show Cause, # 3 Declaration of Sarah B. Rogers in Support of Order to Show Cause)(Brewer, William) Modified text to reflect motion was an order to show cause on 6/15/2018 (jlb). (Entered: 06/14/2018) |
| 06/18/2018 | 22 | ORDER Setting Hearing on Show Cause Motion 21 *For Expedited Discovery* : Defendant's Response to Motion due by 7/2/2018; any Reply to Response to Motion due by 7/9/2018 and is limited to five pages. An IN-PERSON Show Cause Motion Hearing has been set for Wednesday, 7/11/2018 @ 11:00 AM in Albany before Magistrate Judge Christian F. Hummel. Signed by Magistrate Judge Christian F. Hummel on 6/18/2018. (tab) (Entered: 06/18/2018) |
| 06/28/2018 | 23 | Letter Motion from Adrienne J. Kerwin for Andrew Cuomo, The New York State Department of Financial Services, Maria T. Vullo requesting permission to file memoranda in excess of 25 pages submitted to Judge Hummel . (Kerwin, Adrienne) (Entered: 06/28/2018) |
| 06/29/2018 | 24 | TEXT ORDER GRANTING 23 Letter Request for (1) permission to file a memorandum up to forty (40) pages in length in support of defendants motion to dismiss the complaint; and (2) permission to file a memorandum up to (35) pages in length in opposition to plaintiffs application for expedited discovery. Authorized by Magistrate Judge Christian F. Hummel on 6/29/2018. (tab) (Entered: 06/29/2018) |
| 06/29/2018 | 25 | NOTICE of Appearance by Michael G. McCartin on behalf of Andrew Cuomo, The New York State Department of Financial Services, Maria T. Vullo (McCartin, Michael) (Entered: 06/29/2018) |
| 07/02/2018 | 26 | NOTICE of Appearance by Helena O. Pederson on behalf of Andrew Cuomo, The New York State Department of Financial Services, Maria T. |

| | | Vullo (Pederson, Helena) (Entered: 07/02/2018) |
|---|---|---|
| 07/02/2018 | 27 | MOTION to Dismiss for Failure to State a Claim Motion Hearing set for 8/3/2018 09:30 AM in Albany before Senior Judge Lawrence E. Kahn Response to Motion due by 7/17/2018 Reply to Response to Motion due by 7/23/2018. filed by Andrew Cuomo, The New York State Department of Financial Services, Maria T. Vullo. (Attachments: # 1 Memorandum of Law, # 2 Appendix A, # 3 Appendix B, # 4 Appendix C) (Kerwin, Adrienne) (Entered: 07/02/2018) |
| 07/02/2018 | 28 | RESPONSE in Opposition re 21 MOTION for Preliminary Injunction *For Expedited Discovery (NOT Preliminary Injunction)* filed by Andrew Cuomo, The New York State Department of Financial Services, Maria T. Vullo. (Attachments: # 1 Declaration)(Kerwin, Adrienne) (Entered: 07/02/2018) |
| 07/03/2018 | 29 | Letter Motion from Stephanie L. Gase for National Rifle Association of America requesting permission to file memoranda in excess of page limits submitted to Judge Hummel . (Gase, Stephanie) (Entered: 07/03/2018) |
| 07/03/2018 | 30 | ORDER FOR TRANSFER. Case reassigned to Senior Judge Thomas J. McAvoy for all further proceedings. Senior Judge Lawrence E. Kahn no longer assigned to case. Signed by Senior Judge Lawrence E. Kahn on 7/3/2018. (jlb) (Entered: 07/03/2018) |
| 07/05/2018 | 31 | TEXT ORDER granting in part and deferring decision in part 29 Letter Request: The Court GRANTS Plaintiff's request for permission to file a memorandum of up to thirty-five (35) pages in opposition to Defendants motion to Dismiss and is DEFERRING decision on Plaintiff's request for permission to file a reply memorandum up to fifteen (15) pages in length in support of their motion for expedited discovery. Plaintiff's Motion for Expedited Discovery is hereby STAYED pending a Decision by Senior Judge Thomas J. McAvoy on Defendant's Motion to Dismiss. SO ORDERED by Magistrate Judge Christian F. Hummel on 7/5/2018. (tab) (Entered: 07/05/2018) |
| 07/05/2018 | 32 | TEXT ORDER: The Motion for Expedited Discovery is STAYED, and the Motion hearing scheduled for 7/11/2018 @ 11:00 AM is ADJOURNED, pending a decision on the pending Motion to Dismiss. The Rule 16 Initial Conference scheduled for 8/6/2018 at 9:00 am before Magistrate Judge Christian F. Hummel and the deadline to submit a proposed Civil Case Management Plan and exchange Mandatory Disclosures are ADJOURNED without date pending a decision on the dispositive motion. SO ORDERED by Magistrate Judge Christian F. Hummel on 7/5/2018. (tab) (Entered: 07/05/2018) |
| 07/05/2018 | 33 | TEXT ORDER: Given the allegations of irreparable harm, the Court will address Defendants' 27 MOTION to Dismiss on an expedited basis. Plaintiff is ordered to file its opposition to the 27 motion by 12:00 noon on 7/11/2018; Defendants are ordered to file their reply, if any, by 4:00 PM on |

| | | |
|---|---|---|
| | | 7/16/2018. The motion is scheduled for oral argument at 2:00 PM on 7/24/2018 at the U.S. Courthouse in Binghamton, NY. Authorized by Senior Judge Thomas J. McAvoy on 7/5/2018. (amt) (Entered: 07/05/2018) |
| 07/09/2018 | | COURT TEXT NOTICE scheduling a Telephone Pretrial Conference for 7/12/2018 at 03:00 PM before Senior Judge Thomas J. McAvoy. Plaintiff's counsel is directed to place the conference call.(amt) (Entered: 07/09/2018) |
| 07/10/2018 | 34 | Letter Motion from Stephanie Gase for National Rifle Association of America requesting Guidance regarding briefing schedule in light of forthcoming amended complaint submitted to Judge Thomas J. McAvoy . (Gase, Stephanie) (Entered: 07/10/2018) |
| 07/11/2018 | 35 | Letter Motion from Sarah B. Rogers for National Rifle Association of America requesting Opposition-briefing deadline modification submitted to Judge Thomas J. McAvoy . (Rogers, Sarah) (Entered: 07/11/2018) |
| 07/11/2018 | 36 | TEXT ORDER: In light of Plaintiff's 34 Letter indicating it intends to file an amended complaint, briefing on Defendants' 27 Motion is suspended. If an amended complaint is filed, the Court will address a briefing schedule for any motion to dismiss the amended complaint. Authorized by Senior Judge Thomas J. McAvoy on 7/11/2018. (amt) (Entered: 07/11/2018) |
| 07/12/2018 | | Minute Entry for proceedings held before Senior Judge Thomas J. McAvoy; Pretrial Telephone Conference held on 7/12/2018; App: S. Rogers, S. Gase, and M. Kirk, Esqs., for Pltf; A. Kerwin and J. Dvorin, AAGs, for Defts; Court Reporter: J. Stroffolino; Court advised counsel re: past representation of Chubb insurers and his ownership of guns; Counsel advised to make recusal motion if they deem appropriate. (amt) (Entered: 07/12/2018) |
| 07/20/2018 | 37 | AMENDED COMPLAINT *with Jury Demand* against All Defendants filed by National Rifle Association of America. (Attachments: # 1 Exhibit(s) Exhibit A, # 2 Exhibit(s) Exhibit B, # 3 Exhibit(s) Exhibit C, # 4 Exhibit(s) Exhibit D, # 5 Exhibit(s) Exhibit E, # 6 Exhibit(s) Exhibit F) (Rogers, Sarah) (Entered: 07/20/2018) |
| 07/23/2018 | | ***Answer to the Amended Complaint due date updated for Andrew Cuomo answer due 8/3/2018; The New York State Department of Financial Services answer due 8/3/2018; Maria T. Vullo answer due 8/3/2018. (see) (Entered: 07/23/2018) |
| 07/27/2018 | 38 | Letter Motion from Adrienne J. Kerwin for Andrew Cuomo, The New York State Department of Financial Services, Maria T. Vullo requesting permission to file a memorandum of law up to 50 pages submitted to Judge Hummel . (Kerwin, Adrienne) (Entered: 07/27/2018) |
| 07/31/2018 | 39 | TEXT ORDER GRANTING the 38 Letter Request for leave to file a 50 |

| | | |
|---|---|---|
| | | page Memorandum of law and DENYING AS MOOT the 27 Motion to Dismiss for Failure to State a Claim. Authorized by Senior Judge Thomas J. McAvoy on 7/31/2018. (amt) (Entered: 07/31/2018) |
| 08/03/2018 | 40 | MOTION to Dismiss for Failure to State a Claim Motion Hearing set for 9/10/2018 10:00 AM in Albany before Senior Judge Thomas J. McAvoy Response to Motion due by 8/24/2018 Reply to Response to Motion due by 8/30/2018. filed by Andrew Cuomo, The New York State Department of Financial Services, Maria T. Vullo. (Attachments: # 1 Memorandum of Law, # 2 Appendix A, # 3 Appendix B, # 4 Appendix C) (Kerwin, Adrienne) (Entered: 08/03/2018) |
| 08/06/2018 | 41 | Letter Motion from Stephanie L. Gase for National Rifle Association of America requesting permission to file a memorandum in excess of page limits submitted to Judge Hummel . (Gase, Stephanie) (Entered: 08/06/2018) |
| 08/07/2018 | 42 | TEXT ORDER granting 41 Letter Request to file a 50 page response memorandum re: 40 Motion. Authorized by Senior Judge Thomas J. McAvoy on 8/7/18. (sfp, ) (Entered: 08/07/2018) |
| 08/23/2018 | 43 | MOTION for Limited Admission Pro Hac Vice of Brian Hauss Filing fee $100, receipt number ANYNDC-4488216. filed by National Rifle Association of America. (Attachments: # 1 Declaration of sponsor, Christopher Dunn, # 2 Exhibit(s) Brian Hauss Attorney Registration Form, # 3 Exhibit(s) Brian Hauss Petition for Admission to Practice, # 4 Exhibit(s) Brian Hauss Certificate of Good Standing) Motions referred to Christian F. Hummel. (Dunn, Christopher) (Entered: 08/23/2018) |
| 08/24/2018 | 44 | LETTER BRIEF by American Civil Liberties Union Foundation. (Dunn, Christopher) (Entered: 08/24/2018) |
| 08/24/2018 | 45 | ORDER granting 43 Motion for Limited Admission Pro Hac Vice for Brian Hauss, Esq. Counsel is hereby advised that as of January 16, 2018, the NYND has converted to NextGen. Due to this conversion, you must now register for Pro Hac Vice access through your PACER account. **This is the only notice you will receive concerning this requirement. <u>You will not have access to electronically file in this case until your Pro Hac Vice request has been processed through the PACER system.</u>** Step-by-step instructions on how to complete this process are available at http://www.nynd.uscourts.gov/attorney-admissions-nextgen. Authorized by Magistrate Judge Christian F. Hummel on 8/24/2018. (tab) (Entered: 08/24/2018) |
| 08/24/2018 | 46 | Letter Motion from Texas Public Policy Foundation for Texas Public Policy Foundation requesting Leave to Participate as Amicus Curiae . (Attachments: # 1 Exhibit(s) Exhibit A, # 2 Exhibit(s) Exhibit B)(Russell, Keisha) (Entered: 08/24/2018) |
| 08/24/2018 | 47 | NOTICE of Appearance by Brian Matthew Hauss on behalf of American |

| | | |
|---|---|---|
| | | Civil Liberties Union Foundation (Hauss, Brian) (Entered: 08/24/2018) |
| 08/24/2018 | 48 | RESPONSE in Opposition re 40 MOTION to Dismiss for Failure to State a Claim filed by National Rifle Association of America. (Attachments: # 1 Declaration of Stephanie Gase in Support of Memorandum of Law In Opposition to Motion to Dismiss)(Brewer, William) (Entered: 08/24/2018) |
| 08/24/2018 | 49 | First MOTION for Leave to File *Amicus Curiae Brief* filed by American Civil Liberties Union Foundation. (Attachments: # 1 Exhibit(s) Proposed Amicus Brief, # 2 Exhibit(s) Proposed Order) Motions referred to Christian F. Hummel. (Hauss, Brian) (Entered: 08/24/2018) |
| 08/27/2018 | 50 | TEXT ORDER granting the 46 and 49 Requests for leave to file amicus briefs. Authorized by Senior Judge Thomas J. McAvoy on 8/27/2018. (amt) (Entered: 08/27/2018) |
| 08/30/2018 | | TEXT NOTICE advising parties that the Court will entertain oral argument on 9/10/18, at 10 AM in Albany, from the parties' attorney's as related to those parts of the pending 40 motion seeking to dismiss the First, Second, Third, and Sixth Counts. Each side will be limited to 30 minutes to present their arguments. (sfp, ) (Entered: 08/30/2018) |
| 08/30/2018 | 51 | REPLY to Response to Motion re 40 MOTION to Dismiss for Failure to State a Claim filed by Andrew Cuomo, The New York State Department of Financial Services, Maria T. Vullo. (Kerwin, Adrienne) (Entered: 08/30/2018) |
| 09/10/2018 | | Minute Entry for 9/10/2018 Motion Calendar held before Senior Judge Thomas J. McAvoy; App: S. Rogers, S. Gase, W. Brewer, C. Cooper, J. Reeves, J. Alicea, and M. Kirk, Esqs., for Plaintiff; A. Kerwin, J. Pederson and D. Dorfman, AAGs, for Defendants; Court Reporter: J. Stroffolino; Parties are heard re: Defendants' 40 MOTION to Dismiss; Court reserves decision; Written decision will be issued. (amt) (Entered: 09/10/2018) |
| 09/17/2018 | 52 | TRANSCRIPT of Proceedings: Oral Argument held on 9/10/2018 before Judge Thomas J. McAvoy, Court Reporter: Jacqueline Stroffolino, Telephone number: (518) 257-1894. **IMPORTANT NOTICE - REDACTION OF TRANSCRIPTS:** In order to remove personal identifier data from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within 5 business days of this date. The policy governing the redaction of personal information is located on the court website at www.nynd.uscourts.gov. Read this policy carefully. If no Notice of Intent to Redact is filed within 5 business days of this date, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available on the web 90 days from today's date. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 10/9/2018. Redacted Transcript Deadline set for 10/18/2018. Release of Transcript Restriction |

| | | |
|---|---|---|
| | | set for 12/17/2018. Notice of Intent to Redact due by 9/24/2018 (jxs, ) (Entered: 09/17/2018) |
| 09/18/2018 | 53 | MOTION for Limited Admission Pro Hac Vice of Chance Dean Weldon Filing fee $100, receipt number ANYNDC-4511351. filed by Texas Public Policy Foundation. (Attachments: # 1 Declaration of sponsor, Keisha Russell, # 2 Exhibit(s) Chance Weldon Attorney Registration Form, # 3 Exhibit(s) Chance Weldon Petition for Admission to Practice, # 4 Exhibit(s) Chance Weldon Certificate of Good Standing) Motions referred to Christian F. Hummel. (Russell, Keisha) (Entered: 09/18/2018) |
| 09/19/2018 | 54 | ORDER granting 53 Motion for Limited Admission Pro Hac Vice of Chance Dean Weldon, Esq. Counsel is hereby advised that as of January 16, 2018, the NYND has converted to NextGen. Due to this conversion, you must now register for Pro Hac Vice access through your PACER account. **This is the only notice you will receive concerning this requirement. <u>You will not have access to electronically file in this case until your Pro Hac Vice request has been processed through the PACER system.</u>** Step-by-step instructions on how to complete this process are available at http://www.nynd.uscourts.gov/attorney-admissions-nextgen. Authorized by Magistrate Judge Christian F. Hummel on 9/19/2018. (tab) (Entered: 09/19/2018) |
| 09/25/2018 | 55 | NOTICE of Appearance by Chance Weldon on behalf of Texas Public Policy Foundation (Weldon, Chance) (Entered: 09/25/2018) |
| 11/06/2018 | 56 | DECISION & ORDER: Granting in part and denying in part Defendant's 40 Motion to Dismiss for Failure to State a Claim. Signed by Senior Judge Thomas J. McAvoy on 11/6/2018. (jdp, ) (Entered: 11/06/2018) |
| 11/07/2018 | 57 | Letter Motion from Stephanie Gase for National Rifle Association of America requesting a hearing date and permission to file memorandum in excess of page limit submitted to Judge Christian F. Hummel . (Gase, Stephanie) (Entered: 11/07/2018) |
| 11/13/2018 | 58 | TEXT ORDER granting 57 Letter Request for a Rule 16 conference to be set and for permission to file a reply to Dkt. No. 21, Motion for Expedited Discovery. Plaintiff is permitted to file a reply of no more than ten (10) pages on or before 11/26/2018. The hearing date for oral argument on the Motion for Expedited Discovery will be addressed at the Rule 16 conference. **The IN-PERSON Initial Conference has been set for Thursday, 12/13/2018 @ 10:30 AM in Albany before Magistrate Judge Christian F. Hummel.** The Civil Case Management Plan must be filed and Mandatory Disclosures are to be exchanged by the parties on or before 12/6/2018. (Pursuant to Local Rule 26.2, mandatory disclosures are to be exchanged among the parties but are NOT to be filed with the Court.) [Andrew Cuomo answer due 11/20/2018; The New York State Department of Financial Services answer due 11/20/2018; Maria T. Vullo answer due |

| | | |
|---|---|---|
| | | 11/20/2018]. SO ORDERED by Magistrate Judge Christian F. Hummel on 11/13/2018. (tab) (Entered: 11/13/2018) |
| 11/20/2018 | 59 | ANSWER to 37 Amended Complaint, by Andrew Cuomo, The New York State Department of Financial Services, Maria T. Vullo. (Attachments: # 1 Certificate of Service)(Pederson, Helena) (Entered: 11/20/2018) |
| 11/26/2018 | 60 | REPLY to Response to Motion re 21 MOTION for Preliminary Injunction *For Expedited Discovery (NOT Preliminary Injunction)* filed by National Rifle Association of America. (Gase, Stephanie) (Entered: 11/26/2018) |
| 12/06/2018 | 61 | CIVIL CASE MANAGEMENT PLAN by National Rifle Association of America. (Gase, Stephanie) (Entered: 12/06/2018) |
| 12/13/2018 | 62 | NOTICE of Appearance by William A. Scott on behalf of Andrew Cuomo, The New York State Department of Financial Services, Maria T. Vullo (Scott, William) (Entered: 12/13/2018) |
| 12/13/2018 | | Text Minute Entry for proceedings held before Magistrate Judge Christian F. Hummel: Initial Pretrial Conference held on 12/13/2018. Pretrial deadlines are established. A Scheduling Order to be issued. This case is opted out of Mandatory ADR. A briefing schedule for a preliminary injunction motion is set. A Text Order setting the briefing schedule to be issued. (tab) (Entered: 12/27/2018) |
| 12/19/2018 | 63 | MOTION to Dismiss for Failure to State a Claim *pursuant to FRCP 12(c)* Motion Hearing set for 1/25/2019 10:00 AM in Binghamton before Senior Judge Thomas J. McAvoy Response to Motion due by 1/8/2019 Reply to Response to Motion due by 1/14/2019. filed by Andrew Cuomo, The New York State Department of Financial Services, Maria T. Vullo. (Attachments: # 1 Memorandum of Law) (Kerwin, Adrienne) (Entered: 12/19/2018) |
| 12/27/2018 | 64 | TEXT ORDER: The Court held a Rule 16 Initial Conference with the parties on 12/13/2018. The Court, sua sponte, exempts this matter from the Mandatory Mediation Program. SO ORDERED. Authorized by Magistrate Judge Christian F. Hummel on 12/27/2018. (tab) (Entered: 12/27/2018) |
| 12/27/2018 | 65 | TEXT ORDER setting briefing schedule for Preliminary Injunction Motion as set forth during the Initial Conference held on 12/13/2018. The Preliminary Injunction Motion to be filed by 1/31/2019. Response to the motion due by 2/21/2019. A Reply, limited to no more than 10 pages, is due by 2/28/2019. Authorized by Magistrate Judge Christian F. Hummel on 12/27/2018. (tab) (Entered: 12/27/2018) |
| 12/27/2018 | 66 | UNIFORM PRETRIAL SCHEDULING ORDER: Anticipated length of trial: 5 days (Jury Trial). Preferred Trial Location: Albany, NY. Joinder of Parties due by 1/31/2019. Amended Pleadings due by 1/31/2019. Discovery due by 6/17/2019. Motions to be filed by 7/22/2019. Status |

| | | |
|---|---|---|
| | | Report due by 3/25/2019. Signed by Magistrate Judge Christian F. Hummel on 12/27/2018. (tab) (Entered: 12/27/2018) |
| 01/07/2019 | 67 | Letter Motion from Stephanie L. Gase for National Rifle Association of America requesting Court Conference Regarding Proposed Discovery Motion submitted to Judge Hummel . (Gase, Stephanie) (Entered: 01/07/2019) |
| 01/08/2019 | 68 | TEXT ORDER granting 67 Letter Request for a Court Conference Regarding Proposed Discovery Motion. Defendants are directed to file a written response to Plaintiff's Dkt. No. 67 Letter Request by Friday, 1/11/2019. A Discovery Hearing has been set for Thursday, 1/17/2019 @ 11:00 AM in Albany before Magistrate Judge Christian F. Hummel. Counsel are permitted to appear by telephone or in person for this conference. For counsel opting to appear by telephone, dial in instructions will be issued under separate notice. Authorized by Magistrate Judge Christian F. Hummel on 1/8/2019. (tab) (Entered: 01/08/2019) |
| 01/08/2019 | 69 | RESPONSE in Opposition re 63 MOTION to Dismiss for Failure to State a Claim *pursuant to FRCP 12(c)* filed by National Rifle Association of America. (Gase, Stephanie) (Entered: 01/08/2019) |
| 01/11/2019 | 70 | RESPONSE in Opposition re 67 Letter Motion from Stephanie L. Gase for National Rifle Association of America requesting Court Conference Regarding Proposed Discovery Motion submitted to Judge Hummel filed by Andrew Cuomo, The New York State Department of Financial Services, Maria T. Vullo. (Attachments: # 1 Exhibit(s) A, B & C)(Scott, William) (Entered: 01/11/2019) |
| 01/14/2019 | 71 | RESPONSE in Support re 63 MOTION to Dismiss for Failure to State a Claim *pursuant to FRCP 12(c)* filed by Andrew Cuomo, The New York State Department of Financial Services, Maria T. Vullo. (Scott, William) (Entered: 01/14/2019) |
| 01/17/2019 | | Text Minute Entry for proceedings held before Magistrate Judge Christian F. Hummel: Discovery Hearing held on 1/17/2019. Appearances (by telephone) by Sarah Rogers, Esq., Stephanie L. Gase, Esq., and Harold S. Reeves, Esq. on behalf of Plaintiff; AAG William Scott (in person), on behalf of Defendants. Discovery issues are briefly discussed and the Court sets a briefing schedule for both parties to file discovery motions. Plaintiff is not prepared to withdraw the Motion for expedited Discovery, Dkt. 21, at this time. Plaintiff intends to file a Motion to Compel and Defendants will respond and file Motion for Protective Order. Text Orders setting those Motion briefing schedules will be issued. (Court Reporter FTR Recorded) (tab) (Entered: 01/17/2019) |
| 01/17/2019 | 72 | TEXT ORDER SETTING BRIEFING SCHEDULES FOR INTENDED MOTIONS. As set forth, on the record, during the 1/17/2019 Discovery Conference, the following briefing schedule has been set for Plaintiff's Motion to Compel and for Defendant's Motion for Protective Order: |

| | | |
|---|---|---|
| | | Plaintiff's Motion to Compel to be filed by 1/22/2019. Defendant's Response is to be filed by 2/4/2019, any reply by Plaintiff is to be limited to 10 pages and is to be filed by 2/8/2019. Defendant's Motion for Protective Order is to be filed by 2/4/2019. Plaintiff is to file a response to Defendant's Motion by 2/15/2019. Any reply to response by Defendant is limited to 10 pages and is to be filed by 2/20/2019. At this time, both Plaintiff's Motion to Compel and Defendant's Motion for Protective Order will be taken on submit. Counsel will be notified and a hearing will be scheduled if the Court decides to hear oral argument on either motion. So Ordered by Magistrate Judge Christian F. Hummel on 1/17/2019. (tab) (Entered: 01/17/2019) |
| 01/17/2019 | | TEXT NOTICE to parties advising that Defts' 63 MOTION to Dismiss for Failure to State a Claim that is on Judge McAvoy's 1/25/19 Motion Calendar is on submit basis. Appearances are not required. (sfp, ) (Entered: 01/17/2019) |
| 01/22/2019 | 73 | MOTION to Compel *the Production of Documents* filed by National Rifle Association of America. (Attachments: # 1 Memorandum of Law in Support of Plaintiff's Motion to Compel the Production of Documents, # 2 Declaration of Stephanie L. Gase in Support of Plaintiff's Motion to Compel the Production of Documents) Motions referred to Christian F. Hummel. (Gase, Stephanie) (Entered: 01/22/2019) |
| 01/24/2019 | 74 | Letter Motion from Stephanie Gase for National Rifle Association of America requesting Confirmation of Deadline Extension submitted to Judge Hummel . (Gase, Stephanie) (Entered: 01/24/2019) |
| 01/25/2019 | | Minute Entry for proceedings held before Senior Judge Thomas J. McAvoy; Motion Hearing held on 1/25/2019; App: NONE; Court Reporter: V. Theleman; Defendants' 63 MOTION to Dismiss for Failure to State a Claim - TAKEN ON SUBMIT. (amt) (Entered: 01/25/2019) |
| 01/29/2019 | 75 | *Unopposed* Letter Motion from Stephanie Gase for National Rifle Association of America requesting extension of the deadline for filing a motion for a preliminary injunction submitted to Judge Hummel . (Gase, Stephanie) (Entered: 01/29/2019) |
| 01/30/2019 | 76 | TEXT ORDER granting in part and denying in part 74 Letter Motion from Stephanie Gase, Esq. for National Rifle Association of America requesting Confirmation of Deadline Extension. At this time, the deadline for filing a Motion to Amend Pleadings or for Joinder of Parties is extended to March 1, 2019. [Amended Pleadings due by 3/1/2019; Joinder of Parties due by 3/1/2019]. Authorized by Magistrate Judge Christian F. Hummel on 1/30/2019. (tab) (Entered: 01/30/2019) |
| 01/30/2019 | 77 | TEXT ORDER granting 75 Unopposed Letter Motion from Stephanie Gase, Esq. for National Rifle Association of America requesting extension of the deadline for filing a motion for a preliminary injunction. The briefing schedule set forth in Text Order, Dkt. No. 65, are stayed and the |

| | | |
|---|---|---|
| | | Court will reset the briefing schedule on any Motion for a Preliminary Injunction, after a decision on the Motion to Dismiss, Dkt. No. 63, and the Motion to Compel, Dkt. No. 73 are rendered. Authorized by Magistrate Judge Christian F. Hummel on 1/30/2019. (tab) (Entered: 01/30/2019) |
| 02/04/2019 | 78 | MOTION for Protective Order Motion Hearing set for 2/21/2019 09:30 AM in Albany before Magistrate Judge Christian F. Hummel Response to Motion due by 2/4/2019 filed by Andrew Cuomo, The New York State Department of Financial Services, Maria T. Vullo. (Attachments: # 1 Memorandum of Law, # 2 Affirmation of William A. Scott, # 3 Declaration of Matthew Levine, # 4 Exhibit(s) A: to Declaration of Matthew Levine, # 5 Exhibit(s) B: to Declaration of Matthew Levine, # 6 Exhibit(s) C: to Declaration of Matthew Levine, # 7 Exhibit(s) D: to Declaration of Matthew Levine, # 8 Declaration of Nathaniel Dorfman, # 9 Declaration of Tanisha Edwards) Motions referred to Christian F. Hummel. (Scott, William) (Entered: 02/04/2019) |
| 02/04/2019 | 79 | RESPONSE in Opposition re 73 MOTION to Compel *the Production of Documents* filed by Andrew Cuomo, The New York State Department of Financial Services, Maria T. Vullo. (Attachments: # 1 Affirmation of William A. Scott, # 2 Declaration of Matthew Levine, # 3 Exhibit(s) A: to Declaration of Matthew Levine, # 4 Exhibit(s) B: to Declaration of Matthew Levine, # 5 Exhibit(s) C: to Declaration of Matthew Levine, # 6 Exhibit(s) D: to Declaration of Matthew Levine, # 7 Declaration of Nathaniel Dorfman, # 8 Declaration of Tanisha Edwards)(Scott, William) (Entered: 02/04/2019) |
| 02/08/2019 | 80 | MOTION for Limited Admission Pro Hac Vice of Nicole Frazer Reaves Filing fee $100, receipt number ANYNDC-4645891. filed by National Rifle Association of America. Motions referred to Christian F. Hummel. (Rogers, Sarah) (Entered: 02/08/2019) |
| 02/08/2019 | 81 | REPLY to Response to Motion re 73 MOTION to Compel *the Production of Documents* filed by National Rifle Association of America. (Gase, Stephanie) (Entered: 02/08/2019) |
| 02/12/2019 | 82 | TEXT ORDER granting 80 Motion for Limited Admission Pro Hac Vice for Nicole Frazer Reaves, Esq. Counsel is hereby advised that as of January 16, 2018, the NYND has converted to NextGen. Due to this conversion, you must now register for Pro Hac Vice access through your PACER account. **This is the only notice you will receive concerning this requirement. You will not have access to electronically file in this case until your Pro Hac Vice request has been processed through the PACER system.** Step-by-step instructions on how to complete this process are available at http://www.nynd.uscourts.gov/attorney-admissions-nextgen. Authorized by Magistrate Judge Christian F. Hummel on 2/12/2019. (tab) (Entered: 02/12/2019) |
| 02/15/2019 | 83 | RESPONSE in Opposition re 78 MOTION for Protective Order filed by |

| | | National Rifle Association of America. (Attachments: # 1 Declaration of Stephanie L. Gase in Support of Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for a Protective Order)(Gase, Stephanie) (Entered: 02/15/2019) |
|---|---|---|
| 02/20/2019 | 84 | REPLY to Response to Motion re 78 MOTION for Protective Order filed by Andrew Cuomo, The New York State Department of Financial Services, Maria T. Vullo. (Scott, William) (Entered: 02/20/2019) |
| 03/06/2019 | 85 | COURT NOTICE of Telephonic Hearing: A telephonic Discovery Hearing has been set for Friday, 3/8/2019 @ 3:00 PM in Albany before Magistrate Judge Christian F. Hummel. Parties are directed to dial in at 1-888-684-8852, enter access code 9772719 # and security code 1234 # to join the call. (tab) (Entered: 03/06/2019) |
| 03/08/2019 | | Text Minute Entry for proceedings held before Magistrate Judge Christian F. Hummel: Discovery Hearing held on 3/8/2019. Appearances by telephone by Stephanie L. Gase, Esq. and Jose Joel Alicea, Esq. for plaintiff; AAG William Scott, for Defendants. The Court inquires about the Motion regarding expedited discovery and what issues remain pending in that motion. Plaintiff advises the Court that generally one issue remains, and defendant indicates that they take the same position and oppose the relief sought. (regarding Vullo deposition) The Court schedules in-person oral argument on the issue on 3/13/2019 @ 11:00 am in Albany. Court concludes. (Court Reporter Jacqueline Stroffolino) (tab) (Entered: 03/08/2019) |
| 03/08/2019 | 86 | NOTICE of Hearing on Motion 21 MOTION for Preliminary Injunction *For Expedited Discovery (NOT Preliminary Injunction)* : Oral Argument/Motion Hearing is set for Wednesday, 3/13/2019 @ 11:00 AM in Albany before Magistrate Judge Christian F. Hummel. (tab) (Entered: 03/08/2019) |
| 03/13/2019 | | Text Minute Entry for proceedings held before Magistrate Judge Christian F. Hummel: Motion Hearing held on 3/13/2019 re 21 MOTION *For Expedited Discovery* filed by National Rifle Association of America. Appearances by Stephanie Gase, Esq. and Jose Joel Alicea, Esq. for Plaintiff; AAG William Scott for Defendants. Oral argument is heard. The Court takes a 10 minute recess; Court resumes and additional inquiries by the Court are made. The Court reserves decision and will issue a written Order by the end of the month. (Court Reporter: Theresa Casal) (tab) (Entered: 03/14/2019) |
| 03/14/2019 | 87 | STIPULATION *ESI Order* by National Rifle Association of America submitted to Judge McAvoy. (Gase, Stephanie) (Entered: 03/14/2019) |
| 03/14/2019 | 88 | ORDER APPROVING 87 Stipulation filed by National Rifle Association of America (Stipulated ESI Order). Signed by Magistrate Judge Christian F. Hummel on 3/14/2019. (tab) (Entered: 03/14/2019) |

| 03/20/2019 | 89 | MEMORANDUM-DECISION & ORDER: Ordered that plaintiff's 21 Order to Show Cause is granted in part as plaintiff will be permitted to depose defendant Maria T. Vullo otherwise plaintiff's Order to Show Cause is denied. Signed by Magistrate Judge Christian F. Hummel on 3/20/2019. (jdp, ) (Entered: 03/20/2019) |
|---|---|---|
| 03/20/2019 | 90 | TRANSCRIPT of Proceedings: Oral Argument held on March 13, 2019 before Judge Christian F. Hummel, Court Reporter: Theresa J. Casal, Telephone number: 518-257-1897. **IMPORTANT NOTICE - REDACTION OF TRANSCRIPTS:** In order to remove personal identifier data from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within 5 business days of this date. The policy governing the redaction of personal information is located on the court website at www.nynd.uscourts.gov. Read this policy carefully. If no Notice of Intent to Redact is filed within 5 business days of this date, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available on the web 90 days from today's date. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 4/10/2019. Redacted Transcript Deadline set for 4/22/2019. Release of Transcript Restriction set for 6/18/2019. Notice of Intent to Redact due by 3/25/2019 (tjc, ) (Entered: 03/20/2019) |
| 03/22/2019 | 91 | TRANSCRIPT REQUEST by Andrew Cuomo, The New York State Department of Financial Services, Maria T. Vullo for proceedings held on 03/13/2019 before Judge Hummel.. (Scott, William) (Entered: 03/22/2019) |
| 03/25/2019 | 92 | STATUS REPORT *to Judge Hummel* by National Rifle Association of America. (Gase, Stephanie) (Entered: 03/25/2019) |
| 04/01/2019 | 93 | Letter Motion from Sarah Rogers for National Rifle Association of America requesting Court Conference Regarding Proposed Motion for a Confidentiality and Protective Order submitted to Judge Hummel . (Gase, Stephanie) (Entered: 04/01/2019) |
| 04/03/2019 | 94 | TEXT ORDER granting 93 Letter Request from Sarah Rogers for National Rifle Association of America requesting Court Conference Regarding Proposed Motion for a Confidentiality and Protective Order; Defendants are directed to file a response to Dkt. No. 93 by 4/10/2019; An IN-PERSON Discovery Hearing has been set for Friday, 4/12/2019 @ 2:00 PM in Albany before Magistrate Judge Christian F. Hummel. So Ordered by Magistrate Judge Christian F. Hummel on 4/3/2019. (tab) (Entered: 04/03/2019) |
| 04/03/2019 | 95 | MOTION for Reconsideration re 89 Order on Motion for Preliminary Injunction, Motion Hearing set for 5/16/2019 09:30 AM in Albany before Magistrate Judge Christian F. Hummel Response to Motion due by |

| | | |
|---|---|---|
| | | 4/29/2019 filed by Andrew Cuomo, The New York State Department of Financial Services, Maria T. Vullo. (Attachments: # 1 Memorandum of Law, # 2 Exhibit(s) A: Transcript of Argument) (Scott, William) (Entered: 04/03/2019) |
| 04/05/2019 | 96 | Letter Motion from Sarah Rogers for National Rifle Association of America requesting Court Conference Regarding Request for Briefing Schedule on Motion for Contempt submitted to Judge Hummel . (Gase, Stephanie) (Entered: 04/05/2019) |
| 04/08/2019 | 97 | MOTION to Withdraw as Attorney filed by National Rifle Association of America. (Attachments: # 1 Proposed Order/Judgment) Motions referred to Christian F. Hummel. (Gase, Stephanie) (Entered: 04/08/2019) |
| 04/10/2019 | 98 | LETTER BRIEF by Andrew Cuomo, The New York State Department of Financial Services. (McCartin, Michael) (Entered: 04/10/2019) |
| 04/12/2019 | | Text Minute Entry for proceedings held before Magistrate Judge Christian F. Hummel: Discovery Hearing held on 4/12/2019. Appearances by Sarah Rogers, Esq. for Plaintiff; AAG William Scott for the Defendants, Nathan Dorfman, Esq. for DFS appearing. Arguments are heard on issues as set forth by plaintiff in Dkt. No. 93, Dkt. No. 97, Dkt. No. 98 and Dkt. No. 96. The Court advises counsel that Attorney Gase's letter motion to withdraw from the case will be granted. The Court sets the following briefing schedule for Plaintiff's Motions: Plaintiff's Motion for the Court to approve the proposed confidentiality/protective Order to be filed by 4/17/2019. Defendants' Response due 5/1/2019, and any reply, if needed, to be filed by 5/6/2019 and the reply is limited to 5 pages. Plaintiff's Motion to Compel Lloyds of London to respond to subpoenas or in the Alternative for DFS to accept service is to be filed by 4/19/2019, Defendants' response due by 5/3/2019 and any reply by 5/9/2019. (Court Reporter Theresa Casal) (tab) (Entered: 04/16/2019) |
| 04/15/2019 | 99 | ORDER granting 97 Motion to Withdraw as Attorney. Attorney Stephanie L Gase terminated. Signed by Magistrate Judge Christian F. Hummel on 4/12/2019. (tab) (Entered: 04/15/2019) |
| 04/19/2019 | 100 | MOTION to Compel *Lloyd's Entities to Comply with Non-Party Subpoenas, or Alternatively, to Compel the DFS to Effectuate Service* filed by National Rifle Association of America. (Attachments: # 1 Memorandum of Law in Support of Motion to Compel, # 2 Declaration of Sarah B. Rogers, # 3 Exhibit(s) A - Consent Order Among Lloyds Entities and DFS dated December 20, 2018, # 4 Exhibit(s) B - NRAs Notice of Intent to Request for Production of Documents, # 5 Exhibit(s) C - Affidavit of Service on Superintendent of DFS, # 6 Exhibit(s) D - Federal Express receipts re transmission of Subpoenas to Lloyds Entities, # 7 Exhibit(s) E - Email from Stephanie Gase to Michael Hynes dated March 28, 2019, # 8 Exhibit(s) F - Letter from Michael Hynes to Stephanie Gase dated March 28, 2019, # 9 Exhibit(s) G - Letter from Michael Hynes to |

| | | |
|---|---|---|
| | | Stephanie Gase dated April 2, 2019, # [10] Exhibit(s) H - Letter from Michael Hynes to William Scott dated April 8, 2019, # [11] Exhibit(s) I - Excerpts from Lloyds Master Policy) Motions referred to Christian F. Hummel. (Rogers, Sarah) Modified on 4/22/2019 to re-number entry as Dkt. No. 100(tab). (Entered: 04/20/2019) |
| 04/22/2019 | | CLERK'S CORRECTION OF DOCKET ENTRY re [100] Motion to Compel filed by National Rifle Association of America. Clerk removed a duplicative filing of Plaintiff's Motion to Compel. After removing the first, incomplete filing, Dkt. No. 100, the clerk renumbered the correct and complete Motion to Compel, originally assigned Dkt. No. 101, as Dkt. No. 100 in order to maintain a sequential docket number. (tab) (Entered: 04/22/2019) |
| 04/23/2019 | [101] | STIPULATION *Stipulated Confidentiality and Protective Order* by National Rifle Association of America submitted to Judge Hummel. (Rogers, Sarah) (Entered: 04/23/2019) |
| 04/24/2019 | [102] | STIPULATED CONFIDENTIALITY AND PROTECTIVE ORDER (approved). Signed by Magistrate Judge Christian F. Hummel on 4/24/2019. (tab) (Entered: 04/24/2019) |
| 04/29/2019 | [103] | RESPONSE in Opposition re [95] MOTION for Reconsideration re [89] Order on Motion for Preliminary Injunction, *Memorandum of Law in Opposition of Defendants' Motion for Reconsideration* filed by National Rifle Association of America. (Rogers, Sarah) (Entered: 04/29/2019) |
| 05/01/2019 | [104] | NOTICE of Appearance by Debra L. Greenberger on behalf of Maria T. Vullo (Greenberger, Debra) (Entered: 05/01/2019) |
| 05/01/2019 | [105] | NOTICE of Appearance by Elizabeth S. Saylor on behalf of Maria T. Vullo (Saylor, Elizabeth) (Entered: 05/01/2019) |
| 05/02/2019 | [106] | Letter Motion from Debra L. Greenberger for Maria T. Vullo requesting Extension of Time to Reply In Further Support of Defendants' Motion for Reconsideration, from May 6, 2019 to May 13, 2019 submitted to Judge Hon. Christina F. Hummel . (Greenberger, Debra) (Entered: 05/02/2019) |
| 05/03/2019 | [107] | NOTICE of Appearance by Eamon G. Rock on behalf of The New York State Department of Financial Services (Rock, Eamon) (Entered: 05/03/2019) |
| 05/03/2019 | [108] | NOTICE by The New York State Department of Financial Services *of Appearance by Nathaniel J. Dorfman on behalf of The New York State Department of Financial Services* (Rock, Eamon) (Entered: 05/03/2019) |
| 05/03/2019 | [109] | RESPONSE in Opposition re [100] MOTION to Compel *Lloyd's Entities to Comply with Non-Party Subpoenas, or Alternatively, to Compel the DFS to Effectuate Service* filed by The New York State Department of Financial Services. (Attachments: # [1] Attorney Affirmation)(Rock, Eamon) (Entered: 05/03/2019) |

| 05/06/2019 | 110 | TEXT ORDER re 106 : Counsel for defendant Maria T. Vullo filed a letter request dated May 2, 2019, seeking an extension of time to file a reply to plaintiffs Motion for Reconsideration (dkt. no. 95). Dkt. No. 106. The letter request (dkt. no. 106) is GRANTED. Defendant Vullo has until May 13, 2019 to file a reply. SO ORDERED. Authorized by Magistrate Judge Christian F. Hummel on 5/6/19. (Entered: 05/06/2019) |
|---|---|---|
| 05/09/2019 | 111 | REPLY to Response to Motion re 100 MOTION to Compel *Lloyd's Entities to Comply with Non-Party Subpoenas, or Alternatively, to Compel the DFS to Effectuate Service* filed by National Rifle Association of America. (Rogers, Sarah) (Entered: 05/09/2019) |
| 05/10/2019 | 112 | DECISION AND ORDER granting in part and denying in part, as stated within, Defendants' 63 Motion to Dismiss. Signed by Senior Judge Thomas J. McAvoy on 5/9/19. (sfp, ) (Entered: 05/10/2019) |
| 05/10/2019 | 113 | NOTICE of Appearance by Andrew G. Celli, Jr on behalf of Maria T. Vullo (Celli, Andrew) (Entered: 05/10/2019) |
| 05/13/2019 | 114 | MEMORANDUM OF LAW re 95 Motion for Reconsideration, *Defendants' Reply Memorandum of Law In Further Support of Their Motion for Reconsideration* filed by Maria T. Vullo. (Celli, Andrew) (Entered: 05/13/2019) |
| 06/26/2019 | 115 | TRANSCRIPT REQUEST by National Rifle Association of America for proceedings held on 4/12/19 before Judge Hummel.. (Attachments: # 1 Exhibit(s) AO435 Form)(Rogers, Sarah) (Entered: 06/26/2019) |
| 07/30/2019 | 116 | NOTICE of Appearance by John C. Canoni on behalf of National Rifle Association of America (Canoni, John) (Entered: 07/30/2019) |
| 07/30/2019 | 117 | Letter Motion from John Canoni for National Rifle Association of America requesting Modification of Scheduling Order submitted to Judge Hummel . (Canoni, John) (Entered: 07/30/2019) |
| 08/01/2019 | 118 | TEXT ORDER granting 117 Letter Request from John Canoni for National Rifle Association of America requesting Modification of Scheduling Order. The Discovery deadline is extended to 10/15/2019. The motion filing deadline will be reset after decisions on the pending motions are issued. Authorized by Magistrate Judge Christian F. Hummel on 8/1/2019. (tab) (Entered: 08/01/2019) |
| 08/06/2019 | 119 | Letter Motion from John Canoni for National Rifle Association of America requesting Conference Request re Motion for Letter of Request submitted to Judge Hummel . (Canoni, John) (Entered: 08/06/2019) |
| 08/07/2019 | 120 | TEXT ORDER granting 119 Letter Request from John Canoni for National Rifle Association of America requesting Conference. A Telephone Conference has been set for Thursday, 8/15/2019 @ 11:00 AM in Albany before Magistrate Judge Christian F. Hummel. Parties are |

| | | directed to dial in at 1-888-684-8852, enter access code 9772719# and security code 1234# to join the call. Authorized by Magistrate Judge Christian F. Hummel on 8/7/2019. (tab) (Entered: 08/07/2019) |
|---|---|---|
| 08/08/2019 | 121 | MEMORANDUM-DECISION & ORDER denying 73 Motion to Compel; Pltf's request for sanctions is DENIED; denying without prejudice and with leave to renew, following the Court's in camera review, the 78 Motion for Protective Order; that, within 21 days from the filing date of this MDO, defts are to provide to the Court, a detailed privilege log, addressing any documents it seeks to withhold on the basis of any privilege, along with all documents responsive to the following categories of demands as (noted in 1-3 of the Order); that within 14 days from the filing date of this MDO, defts are to provide to the Court a signed affidavit indicating that they conducted a diligent search but do not possess responsive documents, or have already provided all responsive documents, for the following categories of material (as listed in the Order); and that, if the Court determines, following in camera review, that any supplemental briefing is required, the Court shall notify the parties and provide such opportunity for additional briefing on any claims raised within the Motion to Compel and Motion for Protective Order than have been dismissed without prejudice. Signed by Magistrate Judge Christian F. Hummel on 8/8/2019. (see) (Entered: 08/09/2019) |
| 08/13/2019 | 122 | NOTICE of Appearance by Nicole Frazer Reaves on behalf of National Rifle Association of America (Frazer Reaves, Nicole) (Entered: 08/13/2019) |
| 08/15/2019 | | Text Minute Entry for proceedings held before Magistrate Judge Christian F. Hummel: Telephone Conference held on 8/15/2019 re Dkt. No. 119. Appearances by telephone: John Canoni, Esq. and Nicole Frazer Reaves, Esq. for Plaintiff; William Scott, AAG for Defendants, Debra Greenberger, Esq. for Vullo, Eamon Rock, Esq. for NYS DFS. Defendants advise the Court that they have no issue with Plaintiff's submitting the motion for the issuance of letters of request for international judicial assistance under the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters, but request an opportunity to file a response. The Court sets a briefing schedule for plaintiffs to file. A Text Order setting the briefing schedule to be issued. (Court Reporter FTR Recorded) (tab) (Entered: 08/16/2019) |
| 08/16/2019 | 123 | TEXT ORDER setting a briefing schedule for Plaintiff's request/motion for the issuance of letters of request for international judicial assistance under the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters. Plaintiff to file papers by 8/23/2019. Defendants are directed to respond by 9/9/2019. Any reply by Plaintiffs to be filed by 9/16/2019. Authorized by Magistrate Judge Christian F. Hummel on 8/16/2019. (tab) (Entered: 08/16/2019) |
| 08/21/2019 | 124 | Letter Motion from William A. Scott for Andrew Cuomo, The New York |

| | | State Department of Financial Services requesting Extension of Time to Comply with Court's Order submitted to Judge Hummel . (Scott, William) (Entered: 08/21/2019) |
|---|---|---|
| 08/21/2019 | 125 | *Response* Letter Motion from John Canoni for National Rifle Association of America requesting Response to August 21 Letter from William Scott submitted to Judge Hummel . (Canoni, John) (Entered: 08/21/2019) |
| 08/22/2019 | 126 | TEXT ORDER granting in part and denying in part 124 Letter Request from William A. Scott for Andrew Cuomo, The New York State Department of Financial Services requesting Extension of Time to Comply with Court's Order: Defendant is granted an extension until September 20th, 2019 to comply. [Denying 125 Responsive Letter Request from John Canoni for National Rifle Association of America. Authorized by Magistrate Judge Christian F. Hummel on 8/22/2019. (tab) (Entered: 08/22/2019) |
| 08/22/2019 | 127 | STATUS REPORT *with Declarations per Court's Order Regarding Discovery* by Andrew Cuomo, The New York State Department of Financial Services. (Attachments: # 1 Declaration of Tanisha Edwards, # 2 Declaration of Kevin Bishop)(Scott, William) (Entered: 08/22/2019) |
| 08/22/2019 | 128 | AFFIDAVIT - *Declaration of Maria T. Vullo Pursuant to Court Order Regarding Discovery* by Maria T. Vullo. (Greenberger, Debra) (Entered: 08/22/2019) |
| 08/23/2019 | 129 | MOTION for Issuance of Letters Rogatory /*Issuance of Letters of Request* filed by National Rifle Association of America. (Attachments: # 1 Memorandum of Law Memorandum of Law In Support of Motion for Letters of Request, # 2 Declaration Declaration of John C. Canoni In Support of Motion for Letters of Request, # 3 Exhibit(s) Exhibit A- Request for International Judicial Assistance- Corporation of Lloyd's, # 4 Exhibit(s) Exhibit B- Request for International Judicial Assistance- AmTrust Syndicates Limited, # 5 Exhibit(s) Exhibit C- Request for International Judicial Assistance- Argo Managing Agency Limited, # 6 Exhibit(s) Exhibit D- Request for International Judicial Assistance- Atrium Underwriters Limited, # 7 Exhibit(s) Exhibit E- Request for International Judicial Assistance- Brit Syndicates Limited, # 8 Exhibit(s) Exhibit F- Request for International Judicial Assistance- Canopius Managing Agents, # 9 Exhibit(s) Exhibit G- Request for International Judicial Assistance- Chaucer Syndicates Limited, # 10 Exhibit(s) Exhibit H- Request for International Judicial Assistance- Liberty Managing Agency Limited, # 11 Exhibit(s) Exhibit I- Request for International Judicial Assistance- S.A. Meacock & Company Limited, # 12 Exhibit(s) Exhibit J- Tokio Marine Kiln Syndicates Limited, # 13 Exhibit(s) Exhibit K- Request for International Judicial Assistance- Inga Beale, # 14 Exhibit(s) Exhibit L- Request for International Judicial Assistance- Charles Franks, # 15 Exhibit(s) Exhibit M- Request for International Judicial Assistance- Jon Hancock, # 16 Exhibit(s) Exhibit N- Request for |

| | | |
|---|---|---|
| | | International Judicial Assistance- Mark Cloutier, # 17 Proposed Order/Judgment Proposed Order- Motion for Letters of Request) (Canoni, John) (Entered: 08/23/2019) |
| 08/23/2019 | 130 | APPEAL OF MAGISTRATE JUDGE DECISION to District Court by National Rifle Association of America re 121 Order on Motion to Compel,,,,, Order on Motion for Protective Order,,,, Motion Hearing set for 9/27/2019 10:00 AM in Binghamton before Senior Judge Thomas J. McAvoy Response to Motion due by 9/10/2019 (Attachments: # 1 Memorandum of Law In Support of Plaintiff's Objections to Magistrate Judge's Ruling on Motion to Compel, # 2 Declaration Declaration of John C. Canoni In Support of Plaintiff's Objections to Magistrate Judge's Ruling on Motion to Compel, # 3 Exhibit(s) A- NRA's First Requests For Production to Defendant Maria T. Vullo, # 4 Exhibit(s) B- NRA's First Requests for Production to Defendant Andrew Cuomo, # 5 Exhibit(s) C- NRA's First Requests for Production to Defendant New York Department of Financial Services, # 6 Proposed Order/Judgment Proposed Order- Plaintiff's Objections to Magistrate Judge's Ruling on Motion to Compel) (Canoni, John) (Entered: 08/23/2019) |
| 08/27/2019 | 131 | TRANSCRIPT of Proceedings: Oral Argument held on April 12, 2019 before Judge Christian F. Hummel, Court Reporter: Theresa J. Casal, Telephone number: 518-257-1897. **IMPORTANT NOTICE - REDACTION OF TRANSCRIPTS:** In order to remove personal identifier data from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within 5 business days of this date. The policy governing the redaction of personal information is located on the court website at www.nynd.uscourts.gov. Read this policy carefully. If no Notice of Intent to Redact is filed within 5 business days of this date, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available on the web 90 days from today's date. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 9/17/2019. Redacted Transcript Deadline set for 9/27/2019. Release of Transcript Restriction set for 11/25/2019. Notice of Intent to Redact due by 9/3/2019 (tjc, ) (Entered: 08/27/2019) |
| 08/28/2019 | 132 | MOTION to Withdraw as Attorney filed by National Rifle Association of America. (Attachments: # 1 Proposed Order/Judgment) Motions referred to Christian F. Hummel. (Cooper, Charles) (Entered: 08/28/2019) |
| 09/05/2019 | | TEXT NOTICE to parties advising that Plaintiff's 130 APPEAL OF MAGISTRATE JUDGE 121 DECISION that is on Judge McAvoy's 9/27/19 Motion Calendar is on submit basis. Appearances are not required. (sfp, ) (Entered: 09/05/2019) |
| 09/09/2019 | 133 | RESPONSE in Opposition re 129 MOTION for Issuance of Letters |

| | | |
|---|---|---|
| | | Rogatory *Issuance of Letters of Request* filed by Andrew Cuomo, The New York State Department of Financial Services. (Scott, William) (Entered: 09/09/2019) |
| 09/10/2019 | [134](#) | RESPONSE in Opposition re [130](#) APPEAL OF MAGISTRATE JUDGE DECISION to District Court by National Rifle Association of America re [121](#) Order on Motion to Compel,,,,, Order on Motion for Protective Order,,,, filed by Andrew Cuomo, The New York State Department of Financial Services. (Scott, William) (Entered: 09/10/2019) |
| 09/11/2019 | [135](#) | ORDER granting [132](#) Motion to Withdraw as Attorneys. Attorney Nicole Frazer Reaves; Michael W. Kirk; Harold S. Reeves; Jose Joel Alicea and Charles J. Cooper terminated. Signed by Magistrate Judge Christian F. Hummel on 9/11/2019. (tab) (Entered: 09/11/2019) |
| 09/16/2019 | [136](#) | REPLY to Response to Motion re [129](#) MOTION for Issuance of Letters Rogatory *Issuance of Letters of Request* filed by National Rifle Association of America. (Canoni, John) (Entered: 09/16/2019) |
| 09/20/2019 | [137](#) | STATUS REPORT *re Material for Court's In Camera Review* by Andrew Cuomo, The New York State Department of Financial Services. (Scott, William) (Entered: 09/20/2019) |
| 09/27/2019 | 138 | TEXT ORDER: The parties are directed to appear for a telephone conference on Wednesday, 10/2/2019 at 9:30 AM before Magistrate Judge Christian F. Hummel. Due to the voluminous nature of the documents disclosed for in camera review, the Court is considering the appointment of a special master to assist the Court with reviewing the in camera disclosures. Pursuant to Fed. R. Civ. P. 53(b)(1), the parties are being provided with notice and an opportunity to be heard. As is also required under Rule 53, parties will be permitted an opportunity to suggest candidates for appointment. The Court will provide dial-in instructions for those parties who wish to appear by phone. Authorized by Magistrate Judge Christian F. Hummel on 9/27/2019. (tab) (Entered: 09/27/2019) |
| 10/02/2019 | | Text Minute Entry for proceedings held before Magistrate Judge Christian F. Hummel: Telephone Conference held on 10/2/2019. Appearances by Sarah Rogers, Esq. and John C. Canoni, Esq. for plaintiff; AAG William Scott, on behalf of State defendants; Debra L. Greenberger, Esq. for Maria T. Vullo. The Court advises counsel of it's intention to appoint a Special Master to review all of the in camera submissions. The Court hears from each party as to their position on the Special Master appointment. Counsel are directed to meet and confer and by 10/11/2019, make in-camera submissions of potential Special Master names, indicating whether or not any one person is a agreed to by all parties, or if not, a list of names for the Court to consider. (Court Reporter Theresa Casal) (tab) (Entered: 10/07/2019) |
| 10/18/2019 | 139 | COURT NOTICE of Teleconference: A Telephone Conference has been set for Tuesday, 10/22/2019 @ 10:00 AM before Magistrate Judge |

| | | |
|---|---|---|
| | | Christian F. Hummel. Dial-In instructions will be provided to counsel under separate notice.(tab) (Entered: 10/18/2019) |
| 10/22/2019 | | Text Minute Entry for proceedings held before Magistrate Judge Christian F. Hummel: Status Conference held on 10/22/2019. Appearances by telephone by: John C. Canoni, Esq. for plaintiff; AAG William Scott, on behalf of State defendants; Debra L. Greenberger, Esq. for Maria T. Vullo. The Court inquires about any additional progress made toward agreeing on a Special Master. All parties advise that they will defer to the Court to select a Special Master. Parties will be informed by the Court once a Special Master has been selected and how the process will proceed. (Court Reporter Jacqueline Stroffolino) (tab) (Entered: 10/22/2019) |
| 11/13/2019 | [140](#) | AFFIDAVIT OF BENJAMIN W. HILL (tab) (Entered: 11/13/2019) |
| 11/13/2019 | [141](#) | ORDER APPOINTING Special Master. Benjamin W. Hill, Esq. appointed. Signed by Magistrate Judge Christian F. Hummel on 11/13/2019. (tab) (Entered: 11/13/2019) |
| 11/15/2019 | [142](#) | Letter Motion from John Canoni for National Rifle Association of America requesting Conference Request to Discuss NRA Motion for Leave to Amend its Complaint to Replead its Selective Enforcement Claim submitted to Judge Hummel . (Canoni, John) (Entered: 11/15/2019) |
| 11/18/2019 | 143 | TEXT ORDER granting [142](#) Letter Request from John Canoni for National Rifle Association of America requesting Conference Request to Discuss NRA Motion for Leave to Amend its Complaint to Replead its Selective Enforcement Claim. A Pre-Motion Filing Conference set for Monday, 11/25/2019 @ 9:30 AM in Albany before Magistrate Judge Christian F. Hummel. Counsel are permitted to appear by telephone or in person. For counsel opting to appear by telephone, dial-in instructions will be issued under separate notice. Authorized by Magistrate Judge Christian F. Hummel on 11/18/2019. (tab) (Entered: 11/18/2019) |
| 11/25/2019 | | Text Minute Entry for proceedings held before Magistrate Judge Christian F. Hummel: Telephonic Pre-Motion Conference held on 11/25/2019. Appearances by Sarah Rogers, Esq. and John Canoni, Esq. for plaintiff; AAG William Scott and AAG Ryan Abel, for Defendant NYS. Debra Greenberger, Esq. for Defendant Vullo. Plaintiff's request to file a motion to amend the complaint is briefly discussed. The Court directs an in-person hearing be held and schedules the hearing for 12/4/2019 @ 1:00 pm in Albany. The Court also directs parties to file letter briefs by 5pm today (plaintiff) and a response by 5pm tomorrow (Defendants). (Court Reporter Theresa Casal) (tab) (Entered: 11/25/2019) |
| 11/25/2019 | 144 | COURT NOTICE of Hearing: An in-person, Pre-Motion Argument Hearing has been set for 12/4/2019 @ 1:00 PM in Albany before Magistrate Judge Christian F. Hummel. (tab) (Entered: 11/25/2019) |
| 11/25/2019 | [145](#) | LETTER BRIEF *per Judge Hummel's direction of 11-25-19* by National |

| | | Rifle Association of America. (Rogers, Sarah) (Entered: 11/25/2019) |
|---|---|---|
| 11/26/2019 | 146 | RESPONSE TO LETTER BRIEF filed by Andrew Cuomo, The New York State Department of Financial Services as to 145 LETTER BRIEF filed by National Rifle Association of America . (Attachments: # 1 Exhibit(s) NRA/Lloyd's Agreement)(Scott, William) (Entered: 11/26/2019) |
| 11/26/2019 | 147 | RESPONSE TO LETTER BRIEF filed by Maria T. Vullo as to 145 LETTER BRIEF filed by National Rifle Association of America . (Greenberger, Debra) (Entered: 11/26/2019) |
| 12/04/2019 | | Text Minute Entry for proceedings held before Magistrate Judge Christian F. Hummel: Pre-Motion Conference held on 12/4/2019. Appearances by John Canoni, Esq. for plaintiff (assisted by Brittany Cisco, Esq.) AAG William Scott on behalf of NYS Defendants/Cuomo; Debra Greenberger, Esq. for Defendant Vullo. Arguments are heard by all parties regarding Plaintiff's request to file a Motion to Amend the Complaint. The Court grants Plaintiff's request to file a Motion to Amend. Motion is to be filed by 12/20/2019; Responses to be filed by 1/20/2020 and any Reply to be filed by 1/27/2020. Parties are to file a letter to the Court regarding their positions with working with the Special Master for the Court to consider and address. (Court Reporter Lisa Tennyson) (tab) (Entered: 12/04/2019) |
| 12/04/2019 | 148 | TEXT ORDER setting briefing schedule for Plaintiff's Motion to Amend: Motion to be filed by 12/20/2019; Response to Motion to be filed by 1/20/2020; any reply to response to Motion to be filed by 1/27/2020. The Motion will be noticed before Magistrate Judge Hummel and will be taken on submit unless or until, otherwise directed. Authorized by Magistrate Judge Christian F. Hummel on 12/4/2019. (tab) (Entered: 12/04/2019) |
| 12/06/2019 | 149 | TRANSCRIPT REQUEST by Maria T. Vullo for proceedings held on 12/4/2019 before Judge - Magistrate Judge Christian F. Hummel.. (Greenberger, Debra) (Entered: 12/06/2019) |
| 12/17/2019 | 150 | Letter Motion from John Canoni for National Rifle Association of America requesting Special Master Suggestion submitted to Judge Christian F. Hummel . (Canoni, John) (Entered: 12/17/2019) |
| 12/18/2019 | 151 | TRANSCRIPT of Proceedings: Pre-Motion Conference held on December 4, 2019, before Judge Christian F. Hummel, Court Reporter: Lisa L. Tennyson, Telephone number: (518) 257-1823. **IMPORTANT NOTICE - REDACTION OF TRANSCRIPTS:** In order to remove personal identifier data from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within 5 business days of this date. The policy governing the redaction of personal information is located on the court website at www.nynd.uscourts.gov. Read this policy carefully. If no Notice of Intent to Redact is filed within 5 business days of this date, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available on the web 90 days from today's date. Transcript may be viewed at the court |

| | | |
|---|---|---|
| | | public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 1/8/2020. Redacted Transcript Deadline set for 1/21/2020. Release of Transcript Restriction set for 3/17/2020. Notice of Intent to Redact due by 12/23/2019 (lt, ) (Entered: 12/18/2019) |
| 12/20/2019 | 152 | TRANSCRIPT REQUEST *Pre-Motion Conference* by National Rifle Association of America for proceedings held on 12/04/2019 before Judge Christian F. Hummel.. (Canoni, John) (Entered: 12/20/2019) |
| 12/20/2019 | 153 | MOTION *to File Documents Under Seal* filed by National Rifle Association of America. (Attachments: # 1 Exhibit(s) A, # 2 Exhibit(s) B, # 3 Exhibit(s) C, # 4 Exhibit(s) D, # 5 Proposed Order/Judgment Proposed Order) Motions referred to Christian F. Hummel. (Brewer, William) (Entered: 12/20/2019) |
| 12/20/2019 | 154 | NOTICE by National Rifle Association of America *Notice of motion by Plaintiff for Leave to File Second Amended Complaint and Jury Demand* (Attachments: # 1 Exhibit(s) 1, # 2 Exhibit(s) A, # 3 Exhibit(s) B, # 4 Exhibit(s) C, # 5 Exhibit(s) D, # 6 Exhibit(s) E, # 7 Exhibit(s) F, # 8 Exhibit(s) G, # 9 Exhibit(s) H, # 10 Exhibit(s) I, # 11 Exhibit(s) J, # 12 Exhibit(s) 2)(Brewer, William) Modified on 12/23/2019 (tab). (Entered: 12/20/2019) |
| 12/20/2019 | 155 | MOTION for Leave to File *Memorandum of Law in Support of the National Rifle Association of America's Motion for Leave to File Second Amended Complaint and Jury Demand* filed by National Rifle Association of America. Motions referred to Christian F. Hummel. (Brewer, William) (Entered: 12/20/2019) |
| 01/06/2020 | 156 | DECISION AND ORDER: It is hereby ORDERED, that defendants' # 95 Motion for Reconsideration is DENIED. Signed by Magistrate Judge Christian F. Hummel on 1/6/2020. (pjh) (Entered: 01/06/2020) |
| 01/06/2020 | 157 | TEXT ORDER re 150 Letter Motion from John Canoni for National Rifle Association of America requesting Special Master Suggestion submitted to Judge Christian F. Hummel filed by National Rifle Association of America. Defendants are directed to file a response to Dkt. No. 150 within seven days of this Order and no more than three pages. So Ordered. Authorized by Magistrate Judge Christian F. Hummel on 1/6/2020. (response due by 1/14/2020)(tab) (Entered: 01/06/2020) |
| 01/13/2020 | 158 | MOTION for Extension of Time to File *Defendants' Opposition to Plaintiff's Motion to Amend from January 20, 2020 to January 27, 2020* filed by Maria T. Vullo. Motions referred to Christian F. Hummel. (Greenberger, Debra) (Entered: 01/13/2020) |
| 01/13/2020 | 159 | TEXT ORDER granting 158 Motion for Extension of Time to File Defendants' Opposition to Plaintiff's Motion to Amend from January 20, |

| | | |
|---|---|---|
| | | 2020 to January 27, 2020 filed by Maria T. Vullo. Authorized by Magistrate Judge Christian F. Hummel on 1/13/2020. (tab) (Entered: 01/13/2020) |
| 01/14/2020 | 160 | RESPONSE TO LETTER BRIEF filed by Andrew Cuomo, The New York State Department of Financial Services as to 150 Letter Request/Motion filed by National Rifle Association of America . (Scott, William) (Entered: 01/14/2020) |
| 01/21/2020 | 161 | TEXT ORDER : On December 17, 2019, plaintiff filed a letter motion seeking to confer with the Special Master and submit short briefings and make arguments on determinative issues, so that the Special Master can make informed decisions in his report and recommendation to your Honor. Dkt. No. 150 Letter Request. Defendants opposed that request. Dkt. No. 160. Plaintiffs request insofar as it seeks to communicate with the Special Master and/or submit additional briefing, is DENIED with leave to renew should the Special Master inform the Court that communication and/or briefing on one or more issues would be of benefit to him during his review. So Ordered. Authorized by Magistrate Judge Christian F. Hummel on 1/21/2020. (tab) (Entered: 01/21/2020) |
| 01/27/2020 | 162 | RESPONSE in Opposition re 155 MOTION for Leave to File *Memorandum of Law in Support of the National Rifle Association of America's Motion for Leave to File Second Amended Complaint and Jury Demand* filed by Andrew Cuomo, The New York State Department of Financial Services. (Attachments: # 1 Exhibit(s) A: Transcript of Proceedings, # 2 Exhibit(s) B: Plaintiff's Interrogatories)(Scott, William) (Entered: 01/27/2020) |
| 01/27/2020 | 163 | MOTION to File Opposition Under Seal filed by Maria T. Vullo. (Attachments: # 1 Exhibit(s) A - Redacted Pages, # 2 Proposed Order/Judgment - Proposed Order on Defendant Maria T. Vullo's Motion to File Opposition Under Seal) Motions referred to Christian F. Hummel. (Greenberger, Debra) (Entered: 01/27/2020) |
| 01/27/2020 | 164 | RESPONSE in Opposition re 155 MOTION for Leave to File *Memorandum of Law in Support of the National Rifle Association of America's Motion for Leave to File Second Amended Complaint and Jury Demand* filed by Maria T. Vullo. (Attachments: # 1 Declaration of Debra L. Greenberger, # 2 Exhibit(s) 1 - Transcript of Proceedings Before the Honorable Christian F. Hummel Held on December 4, 2019, # 3 Exhibit(s) 2 - Plaintiff National Rifle Association of America's Objections to Defendant Maria T. Vullo's First Set of Interrogatories, dated January 6, 2020)(Greenberger, Debra) (Entered: 01/27/2020) |
| 02/04/2020 | 165 | MOTION for Extension of Time to File Response/Reply as to 155 MOTION for Leave to File *Memorandum of Law in Support of the National Rifle Association's Motion for Leave to File Second Amended Complaint and Jury Demand* filed by National Rifle Association |

| | | |
|---|---|---|
| | | of America. Motions referred to Christian F. Hummel. (Canoni, John) (Entered: 02/04/2020) |
| 02/04/2020 | 166 | TEXT ORDER granting 165 Motion for Extension of Time to File Response/Reply re 155 MOTION for Leave to File *Second Amended Complaint and Jury Demand*. Plaintiff's Reply to Response to Motion due by 2/14/2020. Authorized by Magistrate Judge Christian F. Hummel on 2/4/2020. (tab) (Entered: 02/04/2020) |
| 02/04/2020 | 167 | ORDER: It is hereby ORDERED, that within seven (7) days of the filing date of this Order, defendants are to provide to the Court for in camera review either a supplement to the Executive Chambers documents which includes bate-stamped documents Chambers 0000601-0000764 that were not included in the USB drive provided to the Court or an explanation as to why these documents were omitted; and it is further ORDERED, that within twenty-one (21) days of the filing date of this Order, defendants are to provide for in camera review the remainder of the information requested herein. Signed by Magistrate Judge Christian F. Hummel on 2/4/2020. (pjh) (Entered: 02/04/2020) |
| 02/13/2020 | 168 | TEXT ORDER: The Special Master has submitted to the Court his first billing statement. The Court will provide the billing statement to the parties. The Special Masters billing is to be split equally between plaintiff and defendants. The parties will have ten days from the issuing date of this text order to file with the Court, for in camera review, objections to the Special Masters billing statement, along with any argument as to whether the billing statement need be released to the public docket. Submissions are to be limited to five pages in length. So Ordered. Authorized by Magistrate Judge Christian F. Hummel on 2/13/2020. (tab) (Entered: 02/13/2020) |
| 02/14/2020 | 169 | REPLY to Response to Motion re 155 MOTION for Leave to File *Memorandum of Law in Support of the National Rifle Association of America's Motion for Leave to File Second Amended Complaint and Jury Demand* filed by National Rifle Association of America. (Brewer, William) (Entered: 02/14/2020) |
| 02/18/2020 | 170 | MEMORANDUM-DECISION AND ORDER: It is hereby ORDERED, that Plaintiff's # 100 Motion to Compel is DENIED; and it is further ORDERED, that the Clerk of the Court serve this Memorandum-Decision & Order on parties in accordance with Local Rules. Signed by Magistrate Judge Christian F. Hummel on 2/18/2020. (pjh) (Entered: 02/18/2020) |
| 02/21/2020 | 171 | Pre-Motion Letter by Maria T. Vullo requesting a pre-motion conference submitted to Judge Christian F. Hummel. (Greenberger, Debra) Modified on 2/25/2020 to reflect that this Letter is being submitted to Judge Hummel not Judge D'Agostino (pjh). (Entered: 02/21/2020) |
| 02/24/2020 | 172 | Letter Motion from William A. Scott for Andrew Cuomo, The New York State Department of Financial Services requesting Extension of time to |

| | | comply with Court's Order [Dkt. 167] submitted to Judge Hummel . (Scott, William) (Entered: 02/24/2020) |
|---|---|---|
| 02/24/2020 | 173 | TEXT ORDER granting 172 Letter Request from William A. Scott for Andrew Cuomo, The New York State Department of Financial Services requesting Extension of time to comply with Court's Order [Dkt. 167]. Deadline to comply is reset to 3/3/2020. Authorized by Magistrate Judge Christian F. Hummel on 2/24/2020. (tab) (Entered: 02/24/2020) |
| 02/24/2020 | 174 | *Response to ECF #171* Letter Motion from John Canoni for National Rifle Association of America requesting Response to February 21, 2020 Letter submitted to Judge Christian F. Hummel . (Canoni, John) (Entered: 02/24/2020) |
| 02/25/2020 | | CLERK'S CORRECTION OF DOCKET ENTRY: Attorney Debra Greenberger inadvertently referred the # 171 Pre-Motion Letter Request to Judge D'Agostino who is not assigned to this case. Clerk corrected the docket text to reflect that the request was referred to Judge Hummel. (pjh) (Entered: 02/25/2020) |
| 02/26/2020 | 175 | TEXT ORDER granting 171 Letter Request by Maria T. Vullo requesting a pre-motion conference: A Discovery Conference has been set for Thursday, 3/5/2020 @ 1:30 PM in Albany before Magistrate Judge Christian F. Hummel. Counsel are permitted to appear by telephone for this conference. Personal appearances is always permitted. For Counsel opting to participate by telephone dial-in instructions will post under a separate notice on the docket. Authorized by Magistrate Judge Christian F. Hummel on 2/26/2020. (tab) (Entered: 02/26/2020) |
| 02/28/2020 | 176 | MOTION for Preliminary Injunction by National Rifle Association of America. (Attachments: # 1 Memorandum of Law Memorandum of Law, # 2 Declaration Rogers Declaration, # 3 Exhibit(s) A, # 4 Exhibit(s) B, # 5 Exhibit(s) C, # 6 Exhibit(s) D, # 7 Exhibit(s) E, # 8 Exhibit(s) F, # 9 Exhibit(s) G, # 10 Exhibit(s) H, # 11 Exhibit(s) I, # 12 Exhibit(s) J, # 13 Exhibit(s) K, # 14 Exhibit(s) L, # 15 Exhibit(s) M, # 16 Exhibit(s) N, # 17 Exhibit(s) O, # 18 Exhibit(s) P, # 19 Exhibit(s) Q, # 20 Exhibit(s) R, # 21 Exhibit(s) S, # 22 Exhibit(s) T, # 23 Exhibit(s) U, # 24 Declaration Miller Declaration, # 25 Exhibit(s) A, # 26 Declaration Cashin Declaration) (Rogers, Sarah) (Entered: 02/28/2020) |
| 02/28/2020 | 177 | Letter Motion from William A. Scott for Andrew Cuomo, The New York State Department of Financial Services requesting That the Court Decline to Entertain the Plaintiff's Order to Show Cause submitted to Judge Hummel . (Attachments: # 1 Exhibit(s) Notice of Charges)(Scott, William) (Entered: 02/28/2020) |
| 02/28/2020 | 178 | ORDER Setting Show Cause Hearing re: 176 MOTION for Preliminary Injunction: Show Cause Hearing set for 3/23/2020 at 01:30 PM in Albany before Senior Judge Thomas J. McAvoy. Response to Motion due by |

| | | |
|---|---|---|
| | | 4:00pm on 3/11/2020. Signed by Senior Judge Thomas J. McAvoy on 2/28/2020. (amt) (Entered: 02/28/2020) |
| 03/02/2020 | 179 | TEXT ORDER with attached Invoice of Special Master: The Court is in receipt of a fee request from the Special Master. See Dkt. No. 168. Having received no objection from either party, the Special Masters fee request is approved. The parties have thirty days to remit payment to the Special Master. The payment to be split equally between plaintiff and defendant 50% to be paid by plaintiff, and 50% to be paid by defendants. So Ordered. Authorized by Magistrate Judge Christian F. Hummel on 3/2/2020. (tab) (Entered: 03/02/2020) |
| 03/05/2020 | 180 | TEXT ORDER: Relative to Plaintiffs motion for a preliminary injunction [Doc. # 176], Plaintiff is directed to deliver to the United States District Court Clerk's Office in Albany, NY, by 1:00 PM on March 9, 2020, chamber's copies of its memorandum of law, declarations, exhibits, and other documents filed in connection with the motion. These documents must be contained in three-ring binders (or otherwise bound), and must be tabbed & identified in a manner that will assist the Court's review of the material. In addition, Plaintiff is directed to provide the Court with a DVD containing, in Microsoft Word, Wordperfect, or pdf format, copies of its memorandum of law, declarations, and expert witness reports (including rebuttal expert witness report) filed relative to the motion. Authorized by Senior Judge Thomas J. McAvoy on 3/5/20. (sfp, ) (Entered: 03/05/2020) |
| 03/05/2020 | | Text Minute Entry for proceedings held before Magistrate Judge Christian F. Hummel: Discovery Hearing held on 3/5/2020. Appearances by John C. Canoni, Esq. for plaintiff; AAG William Scott for State Defts.; Andrew G. Celli, Jr., Esq. and Debra L. Greenberger, Esq. for Deft Vullo. Counsel are heard on the issue of taking Deft Vullo's deposition early on in discovery. Parties' positions are clearly stated and memorialized on the record during the conference. The Court allows the taking of Deft Vullos deposition at this time, but advises counsel that any attempt to take a further deposition of Deft Vullo would require a formal motion before the Court. Plaintiff inquires about extending of deadlines while the various motions are pending. The Court directs plaintiff file a letter request with the Court and deadlines can be extended accordingly. (Court Reporter Theresa Casal) (tab) (Entered: 03/05/2020) |
| 03/06/2020 | 181 | MEMORANDUM-DECISION AND ORDER denying 129 Plaintiff's Motion for Issuance of Letters Rogatory without prejudice to renew under the circumstances specifically set forth herein. Signed by Magistrate Judge Christian F. Hummel on 3/6/2020. (tab) (Entered: 03/06/2020) |
| 03/10/2020 | 182 | TRANSCRIPT REQUEST by Maria T. Vullo for proceedings held on 3/5/2020 before Judge - Magistrate Judge Christian F. Hummel.. (Greenberger, Debra) (Entered: 03/10/2020) |
| 03/11/2020 | 183 | RESPONSE in Opposition re 176 MOTION for Preliminary Injunction |

| | | |
|---|---|---|
| | | filed by Andrew Cuomo, The New York State Department of Financial Services. (Attachments: # 1 Declaration of Hadas Jacobi)(Scott, William) (Entered: 03/11/2020) |
| 03/16/2020 | 184 | TEXT ORDER: The Court will consider the 176 motion without oral argument. Plaintiff is granted leave to file a reply memorandum of law not to exceed ten (10) pages that must be filed by 2:00pm on March 18, 2020. Authorized by Senior Judge Thomas J. McAvoy on 3/16/2020. (amt) (Entered: 03/16/2020) |
| 03/17/2020 | 185 | Letter Motion from William A. Brewer III for National Rifle Association of America requesting Hearing on OSC submitted to Judge Thomas J. McAvoy . (Brewer, William) (Entered: 03/17/2020) |
| 03/18/2020 | 186 | TEXT ORDER granting in part the 185 Letter Request for an extension of time to file Reply papers. Reply papers shall be filed by 2:00pm on 3/19/2020. The 176 MOTION for Preliminary Injunction is adjourned to the Court's 6/8/2020 motion calendar. The Court will revisit the request for oral argument closer to the 6/8/2020 return date. Authorized by Senior Judge Thomas J. McAvoy on 3/18/2020. (amt) (Entered: 03/18/2020) |
| 03/18/2020 | | Reset Motion Deadlines: Pltf's 176 MOTION for Preliminary Injunction is adjourned to Judge McAvoy's 6/8/20 Motion Calendar. Reply to Response to Motion is due by 3/19/2020 at 2:00 PM. This motion will be on submit basis unless otherwise directed by the Court. [This entry is to set the motion deadlines in the system.](sfp, ) (Entered: 03/18/2020) |
| 03/19/2020 | 187 | REPLY to Response to Motion re 176 MOTION for Preliminary Injunction *Reply Memorandum of Law* filed by National Rifle Association of America. (Attachments: # 1 Declaration Sarah Rogers)(Brewer, William) (Entered: 03/19/2020) |
| 03/31/2020 | 188 | ***VACATED PURSUANT TO 324 Decision and Order*** DECISION & ORDER - Plaintiff's 130 Appeal of Magistrate Judge Hummel's discovery determinations, Dkt. No. 121, is **GRANTED**. Documents should be produced to Magistrate Judge Hummel for *in camera* review in accordance with this Decision and Order. Signed by Senior Judge Thomas J. McAvoy on 3/31/2020. (jel, ) Modified on 3/22/2021 (jel, ). (Entered: 03/31/2020) |
| 03/31/2020 | 189 | Letter Motion from John Canoni for National Rifle Association of America requesting Renewing Hague Discovery Motion submitted to Judge Christian F. Hummel . (Canoni, John) (Entered: 03/31/2020) |
| 04/02/2020 | 190 | COURT NOTICE of Hearing: A Telephone Conference has been set for Friday, 4/10/2020 @ 11:00 AM before Magistrate Judge Christian F. Hummel. Dial in instructions for this conference will be provided, under separate entry, on the case docket.(tab) (Entered: 04/02/2020) |
| 04/09/2020 | 191 | Letter Motion from William A. Scott for Andrew Cuomo, The New York |

| | | |
|---|---|---|
| | | State Department of Financial Services requesting Extension of Time to File Motion for Reconsideration submitted to Judge McAvoy . (Scott, William) (Entered: 04/09/2020) |
| 04/09/2020 | 192 | RESPONSE TO LETTER BRIEF filed by National Rifle Association of America as to 191 Letter Request/Motion filed by The New York State Department of Financial Services, Andrew Cuomo . (Rogers, Sarah) (Entered: 04/09/2020) |
| 04/10/2020 | 193 | TRANSCRIPT of Proceedings: Conference held on March 5, 2020 before Judge Christian F. Hummel, Court Reporter: Theresa J. Casal, Telephone number: 518-257-1897. **IMPORTANT NOTICE - REDACTION OF TRANSCRIPTS:** In order to remove personal identifier data from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within 5 business days of this date. The policy governing the redaction of personal information is located on the court website at www.nynd.uscourts.gov. Read this policy carefully. If no Notice of Intent to Redact is filed within 5 business days of this date, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available on the web 90 days from today's date. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 5/1/2020. Redacted Transcript Deadline set for 5/11/2020. Release of Transcript Restriction set for 7/9/2020. Notice of Intent to Redact due by 4/15/2020 (tjc, ) (Entered: 04/10/2020) |
| 04/10/2020 | | Text Minute Entry for proceedings held before Magistrate Judge Christian F. Hummel: Telephone Conference held on 4/10/2020. Appearances by Sarah Rogers, Esq. and Bill Brewer, Esq. for Plaintiff; Debra Greenberger, Esq. and Andrew Celli, Esq. for Defendant Vullo; AAG Bill Scott and AAG Ryan Abel for Gov. Cuomo remaining defendants. The Court addresses Defendant's request for a 2 week extension of time to consider whether a Motion for reconsideration of Judge McAvoy's Order is appropriate. Plaintiff's do not object to the extension but would like Defendants to begin the process of ascertaining the scope of these documents. The Court grants the request, Dkt. no. 191, but directs defendants to begin efforts to ascertain the scope of the newly ordered documents. The Court advises parties of the status of the Special Master's progress. (Court Reporter Jacqueline Stroffolino) (tab) (Entered: 04/13/2020) |
| 04/13/2020 | 194 | TEXT ORDER granting 191 Letter Request from William A. Scott for Andrew Cuomo, The New York State Department of Financial Services requesting Extension of Time to File Motion for Reconsideration until 4/28/2020. Authorized by Magistrate Judge Christian F. Hummel on 4/13/2020. (tab) (Entered: 04/13/2020) |
| 04/13/2020 | 195 | TEXT ORDER: The Special Master has submitted to the Court his second |

| | | |
|---|---|---|
| | | billing statement. The Court will provide the billing statement to the parties. The Special Masters billing is to be split equally between plaintiff and defendants. The parties will have ten days from the issuing date of this text order to file with the Court, for in camera review, objections to the Special Masters billing statement, along with any argument as to whether the billing statement need be released to the public docket. Submissions are to be limited to five pages in length. So Ordered. Authorized by Magistrate Judge Christian F. Hummel on 4/13/2020. (tab) (Entered: 04/13/2020) |
| 04/22/2020 | 196 | ORDER granting 153 Motion to File certain documents under Seal by National Rifle Association of America. Signed by Magistrate Judge Christian F. Hummel on 4/22/2020. (tab) Modified on 4/22/2020: Sealed documents received in chambers on 12/20/2019 (tab). (Entered: 04/22/2020) |
| 04/22/2020 | 197 | ORDER granting 163 Motion to file certain documents under Seal by Maria T. Vullo. Signed by Magistrate Judge Christian F. Hummel on 4/22/2020. (tab) Modified on 4/22/2020: Sealed documents received in chambers on 1/29/2020 (tab). (Entered: 04/22/2020) |
| 04/27/2020 | 198 | TEXT ORDER with attached Invoice of Special Master: The Court is in receipt of the 2nd fee request from the Special Master. See Dkt. No. 195. Having received no objection from either party, the Special Masters fee request is approved. The parties have thirty days to remit payment to the Special Master. The payment to be split equally between plaintiff and defendant 50% to be paid by plaintiff, and 50% to be paid by defendants. So Ordered. Authorized by Magistrate Judge Christian F. Hummel on 4/27/2020. (tab) (Entered: 04/27/2020) |
| 04/28/2020 | 199 | MOTION for Reconsideration re 188 Order on Appeal of Magistrate Judge Decision to District Court, Motion Hearing set for 6/8/2020 10:00 AM in Albany before Senior Judge Thomas J. McAvoy Response to Motion due by 5/22/2020 filed by Andrew Cuomo, The New York State Department of Financial Services. (Attachments: # 1 Memorandum of Law) (Scott, William) (Entered: 04/28/2020) |
| 05/22/2020 | 200 | RESPONSE in Opposition re 199 MOTION for Reconsideration re 188 Order on Appeal of Magistrate Judge Decision to District Court, filed by National Rifle Association of America. (Attachments: # 1 Declaration of Sarah Rogers)(Rogers, Sarah) (Entered: 05/22/2020) |
| 05/26/2020 | 201 | TEXT ORDER: The Special Master has submitted to the Court his third billing statement. The Court will provide the billing statement to the parties, directly. The Special Master's billing is to be split equally between plaintiff and defendants. The parties will have ten days from the issuing date of this text order to file with the Court, for in camera review, objections to the Special Master's billing statement, along with any argument as to whether the billing statement need be released to the public |

| | | |
|---|---|---|
| | | docket. Submissions are to be limited to five pages in length. So Ordered. Authorized by Magistrate Judge Christian F. Hummel on 5/26/2020. (tab) (Entered: 05/26/2020) |
| 06/01/2020 | 202 | MEMORANDUM-DECISION AND ORDER granting in part and denying in part 155 Motion for Leave to File Second Amended Complaint. Signed by Magistrate Judge Christian F. Hummel on 6/1/2020. (tab) (Entered: 06/01/2020) |
| 06/02/2020 | 203 | AMENDED COMPLAINT *SECOND AMENDED COMPLAINT* against All Defendants filed by National Rifle Association of America. (Attachments: # 1 Exhibit(s) A, # 2 Exhibit(s) B, # 3 Exhibit(s) C, # 4 Exhibit(s) D, # 5 Exhibit(s) E, # 6 Exhibit(s) F, # 7 Exhibit(s) G, # 8 Exhibit(s) H, # 9 Exhibit(s) I, # 10 Exhibit(s) J)(Martin, Michelle) (Entered: 06/02/2020) |
| 06/03/2020 | 204 | Letter Motion from Sarah B. Rogers for National Rifle Association of America requesting Renewing Hague Discovery Motion submitted to Judge Christian F. Hummel . (Martin, Michelle) (Entered: 06/03/2020) |
| 06/05/2020 | | COURT TEXT NOTICE advising the 199 MOTION for Reconsideration will be ON SUBMIT; No appearances are necessary.(amt) (Entered: 06/05/2020) |
| 06/11/2020 | 205 | Letter Motion from Debra L. Greenberger for Maria T. Vullo requesting Extension of Time to File and Leave to File Excess Pages submitted to Judge Thomas J. McAvoy . (Greenberger, Debra) (Entered: 06/11/2020) |
| 06/12/2020 | | COURT TEXT NOTICE scheduling a hearing re: the 176 MOTION for Preliminary Injunction. The hearing scheduled for 6/24/2020 at 10:00 AM by VIDEO before Senior Judge Thomas J. McAvoy. (amt) (Entered: 06/12/2020) |
| 06/12/2020 | 206 | TEXT ORDER granting 205 Letter Request. Authorized by Senior Judge Thomas J. McAvoy on 6/12/20. (sfp, ) (Entered: 06/12/2020) |
| 06/17/2020 | 207 | TEXT ORDER: Pursuant to this Court's November 13, 2019 Order, Dkt. No. 141, parties will have twenty-one (21) days from the date of this Text Order to submit objections relating to the Special Master's Report. Objections, if any, are to be submitted in camera. The Special Master's Report and any accompanying documentation provided to parties is to be considered CONFIDENTIAL unless and until the Court otherwise orders and may not be shared or distributed beyond the parties and counsel. SO ORDERED.Signed by Magistrate Judge Christian F. Hummel on 6/17/2020. (tab) (Entered: 06/17/2020) |
| 06/20/2020 | 208 | NOTICE of Appearance by Kevin John Bishop on behalf of The New York State Department of Financial Services (Bishop, Kevin) (Entered: 06/20/2020) |
| 06/23/2020 | 209 | NOTICE of Appearance by Marissa Benavides on behalf of Maria T. |

A-40

|  |  | Vullo (Benavides, Marissa) (Entered: 06/23/2020) |
|---|---|---|
| 06/23/2020 | 210 | MOTION to Dismiss for Failure to State a Claim Motion Hearing set for 7/24/2020 10:00 AM in Albany before Senior Judge Thomas J. McAvoy Response to Motion due by 7/7/2020 Reply to Response to Motion due by 7/13/2020. filed by Andrew Cuomo, The New York State Department of Financial Services. (Attachments: # 1 Memorandum of Law) (Scott, William) (Entered: 06/23/2020) |
| 06/23/2020 | 211 | MOTION to Dismiss for Failure to State a Claim *and Notice of Appeal of the Grant of Plaintiff's Motion to Amend.* Motion Hearing set for 7/24/2020 10:00 AM in Binghamton before Senior Judge Thomas J. McAvoy Response to Motion due by 7/7/2020 Reply to Response to Motion due by 7/13/2020. filed by Maria T. Vullo. (Attachments: # 1 Memorandum of Law - Defendant Vullo's Combined Brief in Support of Appeal of the Grant of Plaintiff's Motion to Amend and Motion to Dismiss the Second Amended Complaint) (Celli, Andrew) (Entered: 06/23/2020) |
| 06/24/2020 |  | Minute Entry for proceedings held before Senior Judge Thomas J. McAvoy; Motion Hearing held on 6/24/2020; App: S. Roger and W. Brewer, Esqs., for Plaintiff; W. Scott and D. Greenberger, Esqs., for Defts; Court Reporter: L. Tennyson; Court hears arguments from the parties re: the Plaintiff's 176 MOTION for Preliminary Injunction; Court reserves decision; Written decision will be issued. (amt) (Entered: 06/24/2020) |
| 07/01/2020 | 212 | Letter Motion from W. Scott for Andrew Cuomo, The New York State Department of Financial Services requesting extension of time to file objections to the Special Master's Report and Recommendation No. 1 submitted to Judge Hummel . (Abel, Ryan) (Entered: 07/01/2020) |
| 07/01/2020 | 213 | TEXT ORDER GRANTING (IN PART) 212 Letter Request from W. Scott for Andrew Cuomo, The New York State Department of Financial Services requesting extension of time to file objections to the Special Master's Report and Recommendation No. 1. **ALL PARTIES now have until July 23, 2020 to file objections.** So Ordered. Authorized by Magistrate Judge Christian F. Hummel on 7/1/2020. (tab) (Entered: 07/01/2020) |
| 07/02/2020 | 214 | Letter Motion from Sarah B. Rogers for National Rifle Association of America requesting Letter Request from S. Rogers for National Rifle Association of America requesting extension of time to file response to Motion to Dismiss submitted to Judge Thomas J. McAvoy and Christian F. Hummel *(Response to ECF 210 and ECF 211)*. (Rogers, Sarah) (Entered: 07/02/2020) |
| 07/02/2020 | 215 | RESPONSE TO LETTER BRIEF filed by Andrew Cuomo, The New York State Department of Financial Services as to 214 Letter Request/Motion, filed by National Rifle Association of America . (Scott, William) (Entered: 07/02/2020) |

| 07/02/2020 | 216 | RESPONSE TO LETTER BRIEF filed by Maria T. Vullo as to 214 Letter Request/Motion, filed by National Rifle Association of America . (Greenberger, Debra) (Entered: 07/02/2020) |
|---|---|---|
| 07/06/2020 | 217 | TEXT ORDER granting 214 Letter Request from National Rifle Association of America requesting extension of time to file responses to Motion to Dismiss, 210 MOTION to Dismiss for Failure to State a Claim , 211 MOTION to Dismiss for Failure to State a Claim *and Notice of Appeal of the Grant of Plaintiff's Motion to Amend.* : Motion Hearing is reset for 8/10/2020 @ 10:00 AM in Binghamton before Senior Judge Thomas J. McAvoy. Responses to Motions due by 7/13/2020 and Replies to Response to Motions due by 7/27/2020. Authorized by Senior Judge Thomas J. McAvoy on 7/6/2020. (tab) (Entered: 07/06/2020) |
| 07/13/2020 | 218 | DECISION & ORDER - Plaintiff's 176 motion for a preliminary injunction staying the New York State Department of Financial Services administrative hearing to determine whether Plaintiff violated various provisions of the New York Insurance Law is **DENIED**. Signed by Senior Judge Thomas J. McAvoy on 7/13/2020. (jel, ) (Entered: 07/13/2020) |
| 07/13/2020 | 219 | RESPONSE in Opposition re 210 MOTION to Dismiss for Failure to State a Claim filed by National Rifle Association of America. (Rogers, Sarah) (Entered: 07/13/2020) |
| 07/13/2020 | 220 | RESPONSE in Opposition re 211 MOTION to Dismiss for Failure to State a Claim *and Notice of Appeal of the Grant of Plaintiff's Motion to Amend.* filed by National Rifle Association of America. (Rogers, Sarah) (Entered: 07/13/2020) |
| 07/14/2020 | 221 | Letter Motion from R. Abel for Andrew Cuomo, The New York State Department of Financial Services requesting Rule 26 conference to request stay of discovery submitted to Judge Christian F. Hummel . (Abel, Ryan) (Entered: 07/14/2020) |
| 07/14/2020 | 222 | Letter Motion from Debra L. Greenberger for Maria T. Vullo requesting Rule 26 conference to request stay of discovery submitted to Judge Christian F. Hummel . (Greenberger, Debra) (Entered: 07/14/2020) |
| 07/14/2020 | 223 | TEXT ORDER re 222 Letter Motion from Debra L. Greenberger for Maria T. Vullo requesting Rule 26 conference to request stay of discovery and, 221 Letter Motion from R. Abel for Andrew Cuomo, The New York State Department of Financial Services requesting Rule 26 conference to request stay of discovery . Plaintiff is directed to file a response to Defendant's Dkt No. 221, and Dkt. No. 222 on or before close of business on 7/17/2020. A Telephone Conference has been set for Monday, 7/20/2020 @ 11:30 AM. The parties' time to respond to the Special Masters first Report is STAYED pending the conference on 7/20/2020. This Court conference will be conducted telephonically and the parties are directed to dial in at 1-888-684-8852, enter Access code 9772719#, and |

| | | |
|---|---|---|
| | | use Security code 1234# to join the call. Authorized by Magistrate Judge Christian F. Hummel on 7/14/2020. (tab) (Entered: 07/14/2020) |
| 07/16/2020 | 224 | TEXT ORDER with attached Invoice of Special Master: The Court is in receipt of the 3rd fee request from the Special Master. See Dkt. No. 201. Having received no objection from either party, the Special Masters fee request is approved. The parties have thirty days to remit payment to the Special Master. The payment to be split equally between plaintiff and defendant 50% to be paid by plaintiff, and 50% to be paid by defendants. So Ordered. Authorized by Magistrate Judge Christian F. Hummel on 7/16/2020. (tab) (Entered: 07/16/2020) |
| 07/17/2020 | 225 | RESPONSE TO LETTER BRIEF filed by National Rifle Association of America as to 222 Letter Request/Motion filed by Maria T. Vullo, 221 Letter Request/Motion filed by The New York State Department of Financial Services, Andrew Cuomo . (Rogers, Sarah) (Entered: 07/17/2020) |
| 07/20/2020 | | Text Minute Entry for proceedings held before Magistrate Judge Christian F. Hummel: Telephone Conference held on 7/20/2020 by telephone. Appearances by Sarah Rogers, Esq. and Michelle Martin, Esq. for Plaintiff; AAG William Scott and AAG Ryan Abel for State Defts; Debra Greenberger, Esq. and Andrew Celli, Esq. for Deft. Vullo. Parties are heard on issue of staying discovery pending decisions on various pending motions before the Court. Judge Hummel advises parties that the Court is in receipt of and is reviewing the Special Master's 2nd Report and Recommendation and that Report will be provided to parties by week's end. In light of the Special Master's 2nd report being completed, parties are given until close of business on 7/21/2020 to file a letter to the Court, indicating their client's position on the stay request. (Court Reporter Jacqueline Stroffolino) (tab) (Entered: 07/21/2020) |
| 07/21/2020 | 226 | Letter Motion from R. Abel for Andrew Cuomo, The New York State Department of Financial Services requesting stay of discovery pending dispositive motions submitted to Judge Christian F. Hummel . (Abel, Ryan) (Entered: 07/21/2020) |
| 07/21/2020 | 227 | RESPONSE TO LETTER BRIEF filed by National Rifle Association of America as to 222 Letter Request/Motion filed by Maria T. Vullo, 221 Letter Request/Motion filed by The New York State Department of Financial Services, Andrew Cuomo *In opposition to Defendants Request for Stay of Discovery*. (Rogers, Sarah) (Entered: 07/21/2020) |
| 07/21/2020 | 228 | Letter Motion from Debra L. Greenberger for Maria T. Vullo requesting temporary stay of discovery in this matter submitted to Judge Hon. Christian F. Hummel . (Greenberger, Debra) (Entered: 07/21/2020) |
| 07/22/2020 | 229 | TEXT ORDER: Parties are being provided with the Special Masters second Report and Recommendation directly, and in the same manner as the first Report and Recommendation. Pursuant to this Court's November |

| | | 13, 2019 Order, Dkt. No. 141, the Special Master's Report and any accompanying documentation provided to parties is to be considered CONFIDENTIAL unless and until the Court otherwise orders and may not be shared or distributed beyond the parties and counsel. **The deadline for parties to submit objections to the Special Masters first and second Report and Recommendation will be set by the Court in a written Order to be issued.** Objections, if any, are to be submitted *in camera*. SO ORDERED. Authorized by Magistrate Judge Christian F. Hummel on 7/22/2020. (tab) (Entered: 07/22/2020) |
|---|---|---|
| 07/24/2020 | 230 | Letter Motion from Debra L. Greenberger for Maria T. Vullo requesting Leave to File Excess Pages submitted to Judge Christian F. Hummel . (Greenberger, Debra) (Entered: 07/24/2020) |
| 07/24/2020 | 231 | TEXT ORDER granting 230 Letter Request from Debra L. Greenberger for Maria T. Vullo requesting Leave to File Excess Pages. Authorized by Magistrate Judge Christian F. Hummel on 7/24/2020. (tab) (Entered: 07/24/2020) |
| 07/27/2020 | 232 | REPLY to Response to Motion re 210 MOTION to Dismiss for Failure to State a Claim filed by Andrew Cuomo, The New York State Department of Financial Services. (Scott, William) (Entered: 07/27/2020) |
| 07/27/2020 | 233 | REPLY to Response to Motion re 211 MOTION to Dismiss for Failure to State a Claim *and Notice of Appeal of the Grant of Plaintiff's Motion to Amend.* filed by Maria T. Vullo. (Celli, Andrew) (Entered: 07/27/2020) |
| 07/28/2020 | 234 | ORDER - Defendants' request for a stay of discovery between the parties (Dkt. Nos. 221, 222, 226, and 228), is **GRANTED** to the extent that such discovery is stayed until September 30, 2020. The Court will schedule a telephone conference at that time to address the issue of discovery between the parties. The parties are directed to file any objections to the Special Master's First Report *in camera* by August 17, 2020. The parties are directed to file any objections to the Special Master's Second Report *in camera* by September 14, 2020. The Court continues to be concerned about the pace of this litigation and the extraordinary legal and other expenses being incurred by each of the parties. The Court strongly urges the parties to see if this matter may be resolved by way of settlement. The Court is available at any time to assist the parties in such efforts. Signed by Magistrate Judge Christian F. Hummel on 7/28/2020. (jel, ) (Entered: 07/28/2020) |
| 07/30/2020 | 235 | COURT NOTICE of Conference: A Telephone Status Conference (re: stay of discovery) has been set for Wednesday, 10/7/2020 @ 11:00 AM before Magistrate Judge Christian F. Hummel. This Court conference will be conducted telephonically and the parties are directed to dial in at 1-888-684-8852, enter Access code 9772719 #, and use Security code 1234# to join the call.(tab) (Entered: 07/30/2020) |
| 07/31/2020 | 236 | Letter Motion from Michelle J. Martin for National Rifle Association of |

| | | America requesting Pre-Motion Conference and Renewing Hague Discovery Motion submitted to Judge Christian F. Hummel . (Martin, Michelle) (Entered: 07/31/2020) |
|---|---|---|
| 08/03/2020 | 237 | TEXT ORDER re 236 Letter Motion from Michelle J. Martin for National Rifle Association of America requesting Pre-Motion Conference and Renewing Hague Discovery Motion submitted to Judge Christian F. Hummel **Defendants are directed to file a response to Dkt. No. 236 by 8/7/2020**. A Telephone Discovery Hearing has been set for Monday, 8/10/2020 @ 11:00 AM. Parties are directed to dial in at 1-888-684-8852, enter access code 9772719# and security code 1234# to join the call. Authorized by Magistrate Judge Christian F. Hummel on 8/3/2020. (tab) (Entered: 08/03/2020) |
| 08/04/2020 | 238 | TEXT ORDER: The Special Master has submitted to the Court his fourth billing statement. The Court will provide the billing statement to the parties, directly. The Special Master's billing is to be split equally between plaintiff and defendants. The parties will have ten days from the issuing date of this text order to file with the Court, for in camera review, objections to the Special Master's billing statement, along with any argument as to whether the billing statement need be released to the public docket. Submissions are to be limited to five pages in length. So Ordered. Authorized by Magistrate Judge Christian F. Hummel on 8/4/2020. (tab) (Entered: 08/04/2020) |
| 08/07/2020 | | COURT TEXT NOTICE advising the 210 and 211 Motions, currently returnable before Senior Judge McAvoy on 8/10/2020, will be ON SUBMIT; No appearances are necessary. (amt) (Entered: 08/07/2020) |
| 08/07/2020 | 239 | RESPONSE TO LETTER BRIEF filed by Andrew Cuomo, The New York State Department of Financial Services as to 236 Letter Request/Motion filed by National Rifle Association of America . (Scott, William) (Entered: 08/07/2020) |
| 08/07/2020 | 240 | RESPONSE TO LETTER BRIEF filed by Maria T. Vullo as to 236 Letter Request/Motion filed by National Rifle Association of America . (Greenberger, Debra) (Entered: 08/07/2020) |
| 08/10/2020 | | Text Minute Entry for proceedings held before Magistrate Judge Christian F. Hummel: Pre-Motion/Discovery Hearing held on 8/10/2020 by telephone. Appearances by Sarah Rogers, Esq. and Michelle Martin, Esq. for Plaintiff; AAG William Scott and AAG Ryan Abel, for State/Cuomo Defendants; Debra Greenberger, Esq. and Andrew Celli, Esq. for Defendant Vullo. Arguments are heard on Plaintiff's request @ Dkt. no 236 and in regard to what discovery can/should continue. Plaintiff is permitted to file a motion by 8/17/2020; Defendant's response to be filed by 9/7/2020. (Court Reporter Theresa Casal) (tab) (Entered: 08/11/2020) |
| 08/11/2020 | 241 | TEXT ORDER granting 236 Letter Request from Michelle J. Martin for National Rifle Association of America requesting Pre-Motion Conference: |

| | | |
|---|---|---|
| | | A Court Conference was held on 8/10/2020, and as directed in that conference: Plaintiff is permitted to file a renewed motion to compel third-party Everytown For Gun Safety (Everytown) to comply with a subpoena that the NRA issued on January 28, 2019; renew the NRAs motion for the issuance of Letters of Request for International Judicial Assistance to compel the production of documents by, and the taking of depositions of, the Corporation of Lloyds (Lloyds) and certain of its Managing Agents, and to renew its previously-filed motion to commence the Hague process with respect to key Lloyds entities. Motion to be filed by 8/17/2020. Defendant's response deadline is set for 9/7/2020. So Ordered. Authorized by Magistrate Judge Christian F. Hummel on 8/11/2020. (tab) (Entered: 08/11/2020) |
| 08/13/2020 | 242 | TRANSCRIPT REQUEST by National Rifle Association of America for proceedings held on 8/10/2020 before Judge Christian F. Hummel.. (Attachments: # 1 FORM AO 435)(Martin, Michelle) (Entered: 08/13/2020) |
| 08/13/2020 | 243 | TRANSCRIPT REQUEST dated August 12, 2020 from Caroline H. Zalka, Esq., for proceedings held on August 10, 2020 before Magistrate Judge Christian F. Hummel. (jel, ) (Entered: 08/13/2020) |
| 08/17/2020 | 244 | TRANSCRIPT of Proceedings: Teleconference held on August 10, 2020 before Judge Christian F. Hummel, Court Reporter: Theresa J. Casal, Telephone number: 518-257-1897. **IMPORTANT NOTICE - REDACTION OF TRANSCRIPTS:** In order to remove personal identifier data from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within 5 business days of this date. The policy governing the redaction of personal information is located on the court website at www.nynd.uscourts.gov. Read this policy carefully. If no Notice of Intent to Redact is filed within 5 business days of this date, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available on the web 90 days from today's date. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 9/8/2020. Redacted Transcript Deadline set for 9/17/2020. Release of Transcript Restriction set for 11/16/2020. Notice of Intent to Redact due by 8/24/2020 (tjc, ) (Entered: 08/17/2020) |
| 08/17/2020 | 245 | CERTIFICATE OF SERVICE by National Rifle Association of America *of Plaintiff's Objections to Special Master's First Report and Recommendation* (Martin, Michelle) (Entered: 08/17/2020) |
| 08/17/2020 | 246 | MOTION for Issuance of Letters Rogatory *Renewed Motion for Issuance of Letters of Request* filed by National Rifle Association of America. (Attachments: # 1 Memorandum of Law) (Martin, Michelle) (Entered: 08/17/2020) |

| | | |
|---|---|---|
| 08/18/2020 | 247 | TEXT ORDER with attached Invoice of Special Master: The Court is in receipt of the 4th fee request from the Special Master. See Dkt. No. 238. Having received no objection from either party, the Special Masters fee request is approved. The parties have thirty days to remit payment to the Special Master. The payment to be split equally between plaintiff and defendant 50% to be paid by plaintiff, and 50% to be paid by defendants. So Ordered. Authorized by Magistrate Judge Christian F. Hummel on 8/18/2020. (tab) (Entered: 08/18/2020) |
| 08/19/2020 | 248 | Letter Motion from Sarah B. Rogers for National Rifle Association of America requesting an extension of time to file motion to compel submitted to Judge Christian F. Hummel . (Rogers, Sarah) (Entered: 08/19/2020) |
| 08/20/2020 | 249 | TEXT ORDER granting 248 Letter Request for an extension of time to file a renewed motion to compel third-party Everytown For Gun Safety (Everytown) to comply with a subpoena that the NRA issued on January 28, 2019: Motion to Compel to be filed by 8/27/2020; Response deadline is set for 9/17/2020 and any reply will be due by 9/28/2020. So Ordered. Authorized by Magistrate Judge Christian F. Hummel on 8/20/2020. (tab) (Entered: 08/20/2020) |
| 08/25/2020 | 250 | Letter Motion from Debra L. Greenberger for Maria T. Vullo requesting Pre-Motion Conference submitted to Judge Hummel . (Attachments: # 1 Attachment A, # 2 Attachment B, # 3 Attachment C, # 4 Attachment D) (Greenberger, Debra) (Entered: 08/25/2020) |
| 08/27/2020 | 251 | NOTICE of MOTION TO COMPEL by National Rifle Association of America *Motion to Compel Everytown for Gun Safety to Comply with Subpoena* (Attachments: # 1 Declaration Michelle J. Martin, # 2 Exhibit(s) 1, # 3 Exhibit(s) 2, # 4 Exhibit(s) 3, # 5 Exhibit(s) 4, # 6 Exhibit(s) 5, # 7 Exhibit(s) 6, # 8 Exhibit(s) 7, # 9 Exhibit(s) 8, # 10 Exhibit(s) 9, # 11 Exhibit(s) 10, # 12 Exhibit(s) 11, # 13 Exhibit(s) 12, # 14 Exhibit(s) 13, # 15 Exhibit(s) 14, # 16 Exhibit(s) 15, # 17 Exhibit(s) 16, # 18 Exhibit(s) 17, # 19 Exhibit(s) 18, # 20 Exhibit(s) 19, # 21 Exhibit(s) 20, # 22 Exhibit(s) 21, # 23 Exhibit(s) 22, # 24 Exhibit(s) 23, # 25 Exhibit(s) 24, # 26 Exhibit(s) 25, # 27 Memorandum of Law)(Rogers, Sarah) Modified on 8/28/2020 to set gavel and indicate this filing as a pending motion (tab). (Entered: 08/27/2020) |
| 08/28/2020 | 252 | TEXT ORDER granting 250 Letter Request from Debra L. Greenberger for Maria T. Vullo requesting Pre-Motion Conference. Parties are directed to file a Response to Defendant Vullo's Dkt. no. 250 by 9/4/2020. A Pre-Motion Filing Telephone Conference has been set for Wednesday, 9/9/2020 @ 11:00 AM. Parties are directed to dial in at 1-888-684-8852, enter access code 9772719# and security code 1234# to join the call. Signed by Magistrate Judge Christian F. Hummel on 8/28/2020. (tab) (Entered: 08/28/2020) |

| 08/31/2020 | 253 | TRANSCRIPT REQUEST by Maria T. Vullo for proceedings held on August 10, 2020 before Judge - Magistrate Judge Christian F. Hummel.. (Greenberger, Debra) (Entered: 08/31/2020) |
| 09/03/2020 | 254 | NOTICE of Appearance by David Yohai on behalf of Everytown for Gun Safety (Yohai, David) (Entered: 09/03/2020) |
| 09/03/2020 | 255 | Letter Motion from David Yohai for Everytown for Gun Safety requesting an Order setting its deadline to respond to the Motion to Compel to October 1, 2020 submitted to Judge Christian F. Hummel . (Yohai, David) (Entered: 09/03/2020) |
| 09/04/2020 | 256 | TEXT ORDER granting 255 Letter Request from David Yohai for Everytown for Gun Safety requesting an Order setting its deadline to respond to the Motion to Compel to October 1, 2020. 251 MOTION to Compel : Response to Motion due by 10/1/2020; Reply to Response to Motion due by 10/13/2020. Authorized by Magistrate Judge Christian F. Hummel on 9/4/2020. (tab) (Entered: 09/04/2020) |
| 09/04/2020 | 257 | RESPONSE TO LETTER BRIEF filed by National Rifle Association of America as to 252 Order on Letter Request, *from Debra L. Greenberger for Maria T. Vullo requesting Pre-Motion Conference*. (Martin, Michelle) (Entered: 09/04/2020) |
| 09/08/2020 | 258 | RESPONSE in Opposition re 246 MOTION for Issuance of Letters Rogatory *Renewed Motion for Issuance of Letters of Request* filed by Andrew Cuomo, The New York State Department of Financial Services. (Scott, William) (Entered: 09/08/2020) |
| 09/08/2020 | 259 | RESPONSE in Opposition re 246 MOTION for Issuance of Letters Rogatory *Renewed Motion for Issuance of Letters of Request* filed by Maria T. Vullo. (Greenberger, Debra) (Entered: 09/08/2020) |
| 09/09/2020 | | Text Minute Entry for proceedings held before Magistrate Judge Christian F. Hummel: Pre-Motion Conference held on 9/9/2020 by telephone. Appearances by Sarah Rogers, Esq. and Michele Martin, Esq. for Plaintiff; AAG William Scott for Cuomo Defendants; Debra Greenberger, Esq. Andrew Celli, Esq. and Marissa Benavides, Esq. for Defendant Vullo. The discovery issues are set forth and all parties are heard. The Court advises parties that as the Stay of Discovery expires on 9/30/2020, Defendant Vullo can file a Motion to Compel anytime after 9/30/2020 and Plaintiff NRA can file discovery demands after 9/30/2020. (Court Reporter Lisa Tennyson) (tab) (Entered: 09/10/2020) |
| 09/10/2020 | 260 | TRANSCRIPT REQUEST by Maria T. Vullo for proceedings held on September 9, 2020 before Judge - Magistrate Judge Christian F. Hummel.. (Attachments: # 1 Transcript Order Form AO 435)(Greenberger, Debra) (Entered: 09/10/2020) |
| 09/11/2020 | 261 | TRANSCRIPT REQUEST by National Rifle Association of America for |

|            |     | proceedings held on 9/9/2020 before Judge Christian F. Hummel.. (Attachments: # [1] ao435 form)(Martin, Michelle) (Entered: 09/11/2020) |
|------------|-----|----------------------------------------------------------------------|
| 09/14/2020 | 262 | CERTIFICATE OF SERVICE by National Rifle Association of America *Certificate of Mailing of Plaintiffs Objections to Special Master's Second Report and Recommendation* (Rogers, Sarah) (Entered: 09/14/2020) |
| 09/15/2020 | 263 | MOTION to Withdraw as Attorney - *Elizabeth S. Saylor* filed by Maria T. Vullo. (Attachments: # [1] Affirmation in Support of Motion to Withdraw Appearance) Motions referred to Christian F. Hummel. (Saylor, Elizabeth) (Entered: 09/15/2020) |
| 09/18/2020 | 264 | TEXT ORDER granting [263] Motion to Withdraw as Attorney. Attorney Elizabeth S. Saylor terminated. Authorized by Magistrate Judge Christian F. Hummel on 9/18/2020. (tab) (Entered: 09/18/2020) |
| 09/18/2020 | 265 | TRANSCRIPT REQUEST by National Rifle Association of America for proceedings held on 7/20/2020 before Judge Christian F. Hummel.. (Attachments: # [1] FORM AO 435)(Martin, Michelle) (Entered: 09/18/2020) |
| 09/18/2020 | 266 | TRANSCRIPT REQUEST by National Rifle Association of America for proceedings held on 6/24/2020 before Judge Thomas J. McAvoy.. (Attachments: # [1] FORM AO 435)(Martin, Michelle) (Entered: 09/18/2020) |
| 09/18/2020 | 267 | TRANSCRIPT REQUEST by National Rifle Association of America for proceedings held on 4/10/2020 before Judge Christian F. Hummel.. (Attachments: # [1] FORM AO 435)(Martin, Michelle) (Entered: 09/18/2020) |
| 09/18/2020 | 268 | TRANSCRIPT REQUEST by National Rifle Association of America for proceedings held on 11/25/2019 before Judge Christian F. Hummel.. (Attachments: # [1] FORM AO 435)(Martin, Michelle) (Entered: 09/18/2020) |
| 09/18/2020 | 269 | TRANSCRIPT REQUEST by National Rifle Association of America for proceedings held on 10/22/2019 before Judge Christian F. Hummel.. (Attachments: # [1] FORM AO 435)(Martin, Michelle) (Entered: 09/18/2020) |
| 09/18/2020 | 270 | TRANSCRIPT REQUEST by National Rifle Association of America for proceedings held on 10/2/2019 before Judge Christian F. Hummel.. (Attachments: # [1] FORM AO 435)(Martin, Michelle) (Entered: 09/18/2020) |
| 09/18/2020 | 271 | TRANSCRIPT REQUEST by National Rifle Association of America for proceedings held on 3/8/2019 before Judge Christian F. Hummel.. (Attachments: # [1] FORM AO 435)(Martin, Michelle) (Entered: 09/18/2020) |

| 09/18/2020 | 272 | TRANSCRIPT REQUEST by National Rifle Association of America for proceedings held on 7/12/2018 before Judge Thomas J. McAvoy.. (Attachments: # 1 FORM AO 435)(Martin, Michelle) (Entered: 09/18/2020) |
|---|---|---|
| 09/29/2020 | 273 | MOTION for Limited Admission Pro Hac Vice of Jonathan D. Polkes Filing fee $100, receipt number ANYNDC-5260599. filed by Everytown for Gun Safety. (Attachments: # 1 Sponsor Declaration of David Yohai, # 2 Petition for PHV, # 3 Attachment to Petition for Additional Admissions, # 4 SDNY Certificate of Good Standing, # 5 Proposed Order, # 6 ECF Attorney Registration Form) Motions referred to Christian F. Hummel. (Yohai, David) (Entered: 09/29/2020) |
| 09/29/2020 | 274 | TRANSCRIPT of Proceedings: Telephone Conference held on 7/12/2018 before Judge Thomas J. McAvoy, Court Reporter: Jacqueline Stroffolino, Telephone number: (518) 257-1894. **IMPORTANT NOTICE - REDACTION OF TRANSCRIPTS:** In order to remove personal identifier data from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within 5 business days of this date. The policy governing the redaction of personal information is located on the court website at www.nynd.uscourts.gov. Read this policy carefully. If no Notice of Intent to Redact is filed within 5 business days of this date, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available on the web 90 days from today's date. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 10/20/2020. Redacted Transcript Deadline set for 10/30/2020. Release of Transcript Restriction set for 12/28/2020. Notice of Intent to Redact due by 10/5/2020 (jxs, ) (Entered: 09/29/2020) |
| 09/29/2020 | 275 | TRANSCRIPT of Proceedings: Telephone Conference held on 3/8/2019 before Judge Christian F. Hummel, Court Reporter: Jacqueline Stroffolino, Telephone number: (518) 257-1894. **IMPORTANT NOTICE - REDACTION OF TRANSCRIPTS:** In order to remove personal identifier data from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within 5 business days of this date. The policy governing the redaction of personal information is located on the court website at www.nynd.uscourts.gov. Read this policy carefully. If no Notice of Intent to Redact is filed within 5 business days of this date, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available on the web 90 days from today's date. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 10/20/2020. Redacted Transcript Deadline set for 10/30/2020. Release of Transcript Restriction |

| | | |
|---|---|---|
| | | set for 12/28/2020. Notice of Intent to Redact due by 10/5/2020 (jxs, ) (Entered: 09/29/2020) |
| 09/29/2020 | [276](#) | TRANSCRIPT of Proceedings: Telephone Conference held on 10/22/2019 before Judge Christian F. Hummel, Court Reporter: Jacqueline Stroffolino, Telephone number: (518) 257-1894. **IMPORTANT NOTICE - REDACTION OF TRANSCRIPTS:** In order to remove personal identifier data from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within 5 business days of this date. The policy governing the redaction of personal information is located on the court website at www.nynd.uscourts.gov. <u>Read this policy carefully.</u> If no Notice of Intent to Redact is filed within 5 business days of this date, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available on the web 90 days from today's date. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 10/20/2020. Redacted Transcript Deadline set for 10/30/2020. Release of Transcript Restriction set for 12/28/2020. Notice of Intent to Redact due by 10/5/2020 (jxs, ) (Entered: 09/29/2020) |
| 09/29/2020 | [277](#) | TRANSCRIPT of Proceedings: Telephone Conference held on 4/10/2020 before Judge Christian F. Hummel, Court Reporter: Jacqueline Stroffolino, Telephone number: (518) 257-1894. **IMPORTANT NOTICE - REDACTION OF TRANSCRIPTS:** In order to remove personal identifier data from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within 5 business days of this date. The policy governing the redaction of personal information is located on the court website at www.nynd.uscourts.gov. <u>Read this policy carefully.</u> If no Notice of Intent to Redact is filed within 5 business days of this date, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available on the web 90 days from today's date. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 10/20/2020. Redacted Transcript Deadline set for 10/30/2020. Release of Transcript Restriction set for 12/28/2020. Notice of Intent to Redact due by 10/5/2020 (jxs, ) (Entered: 09/29/2020) |
| 09/29/2020 | [278](#) | TRANSCRIPT of Proceedings: Telephone Conference held on 7/20/2020 before Judge Christian F. Hummel, Court Reporter: Jacqueline Stroffolino, Telephone number: (518) 257-1894. **IMPORTANT NOTICE - REDACTION OF TRANSCRIPTS:** In order to remove personal identifier data from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within 5 business days of this date. The policy governing the redaction of personal |

| | | |
|---|---|---|
| | | information is located on the court website at www.nynd.uscourts.gov. <u>Read this policy carefully.</u> If no Notice of Intent to Redact is filed within 5 business days of this date, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available on the web 90 days from today's date. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 10/20/2020. Redacted Transcript Deadline set for 10/30/2020. Release of Transcript Restriction set for 12/28/2020. Notice of Intent to Redact due by 10/5/2020 (jxs, ) (Entered: 09/29/2020) |
| 09/30/2020 | | **Notice of Filing Deficiency** re: 273 Motion for Limited Admission Pro Hac Vice Jonathan D. Polkes. Pursuant to LR 83.1(d), the sponsor and/or applicant **MUST** provide the following required documents: Petition for Admission to Practice form published by the Court 12/2019. The corrected documents should be electronically filed with the Court by selecting the 'Supplemental Admission documents' event, which is found under the 'Other Documents' menu. Once all requirements under LR 83.1(d) have been met, the motion will be forwarded to the assigned Magistrate Judge for consideration. (tad, ) (Entered: 09/30/2020) |
| 09/30/2020 | 279 | Supplemental Admission documents re: 273 Motion for Limited Admission Pro Hac Vice,. (Yohai, David) (Entered: 09/30/2020) |
| 09/30/2020 | 280 | Letter Motion from Debra L. Greenberger for Maria T. Vullo requesting permission to file a Rule 26 motion for a protective order staying discovery until the Court resolves Ms. Vullo's motion to dismiss. submitted to Judge Christian F. Hummel . (Greenberger, Debra) (Entered: 09/30/2020) |
| 09/30/2020 | 281 | MOTION for Limited Admission Pro Hac Vice of Caroline Hickey Zalka Filing fee $100, receipt number ANYNDC-5262198. filed by Everytown for Gun Safety. (Attachments: # 1 Sponsor Declaration of David Yohai, # 2 Petition for PHV, # 3 Petition for Admission to Practice, # 4 Attachment to Petition for Additional Admissions, # 5 SDNY Certificate of Good Standing, # 6 Proposed Order, # 7 ECF Attorney Registration Form) Motions referred to Christian F. Hummel. (Yohai, David) (Entered: 09/30/2020) |
| 09/30/2020 | 282 | TEXT ORDER denying as moot the 177 Letter Motion. Authorized by Senior Judge Thomas J. McAvoy on 9/30/2020. (amt) (Entered: 09/30/2020) |
| 09/30/2020 | 283 | TRANSCRIPT of Proceedings: Pre-motion Teleconference held on September 9, 2020, before Judge Christian F. Hummel, Court Reporter: Lisa L. Tennyson, Telephone number: (518) 257-1823. **IMPORTANT NOTICE - REDACTION OF TRANSCRIPTS:** In order to remove personal identifier data from the transcript, a party must electronically file |

| | | |
|---|---|---|
| | | a Notice of Intent to Request Redaction with the Clerk's Office within 5 business days of this date. The policy governing the redaction of personal information is located on the court website at www.nynd.uscourts.gov. <u>Read this policy carefully.</u> If no Notice of Intent to Redact is filed within 5 business days of this date, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available on the web 90 days from today's date. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 10/21/2020. Redacted Transcript Deadline set for 11/2/2020. Release of Transcript Restriction set for 12/29/2020. Notice of Intent to Redact due by 10/5/2020 (lt, ) (Entered: 09/30/2020) |
| 09/30/2020 | 284 | TEXT ORDER granting 273 Motion for Limited Admission Pro Hac Vice for Jonathan D. Polkes, Esq. Counsel is hereby advised that as of January 16, 2018, the NYND has converted to NextGen. Due to this conversion, you must now register for Pro Hac Vice access through your PACER account. **This is the only notice you will receive concerning this requirement. <u>You will not have access to electronically file in this case until your Pro Hac Vice request has been processed through the PACER system.</u>** Step-by-step instructions on how to complete this process are available at http://www.nynd.uscourts.gov/attorney-admissions-nextgen. Authorized by Magistrate Judge Christian F. Hummel on 9/30/2020. (tab) (Entered: 09/30/2020) |
| 10/01/2020 | 285 | TEXT ORDER granting 281 Motion for Limited Admission Pro Hac Vice of Caroline Hickey Zalka, Esq. Counsel is hereby advised that as of January 16, 2018, the NYND has converted to NextGen. Due to this conversion, you must now register for Pro Hac Vice access through your PACER account. **This is the only notice you will receive concerning this requirement. <u>You will not have access to electronically file in this case until your Pro Hac Vice request has been processed through the PACER system.</u>** Step-by-step instructions on how to complete this process are available at http://www.nynd.uscourts.gov/attorney-admissions-nextgen. Authorized by Magistrate Judge Christian F. Hummel on 10/1/2020. (tab) (Entered: 10/01/2020) |
| 10/01/2020 | 286 | TRANSCRIPT of Proceedings: Conference held on October 2, 2019 before Judge Christian F. Hummel, Court Reporter: Theresa J. Casal, Telephone number: 518-257-1897. **IMPORTANT NOTICE - REDACTION OF TRANSCRIPTS:** In order to remove personal identifier data from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within 5 business days of this date. The policy governing the redaction of personal information is located on the court website at www.nynd.uscourts.gov. <u>Read this policy carefully.</u> If no Notice of Intent to Redact is filed within 5 business days of this date, the court will assume redaction of personal |

| | | |
|---|---|---|
| | | identifiers is not necessary and the transcript will be made available on the web 90 days from today's date. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 10/22/2020. Redacted Transcript Deadline set for 11/2/2020. Release of Transcript Restriction set for 12/30/2020. Notice of Intent to Redact due by 10/6/2020 (tjc, ) (Entered: 10/01/2020) |
| 10/01/2020 | 287 | TRANSCRIPT of Proceedings: Teleconference held on November 25, 2019 before Judge Christian F. Hummel, Court Reporter: Theresa J. Casal, Telephone number: 518-257-1897. **IMPORTANT NOTICE - REDACTION OF TRANSCRIPTS:** In order to remove personal identifier data from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within 5 business days of this date. The policy governing the redaction of personal information is located on the court website at www.nynd.uscourts.gov. Read this policy carefully. If no Notice of Intent to Redact is filed within 5 business days of this date, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available on the web 90 days from today's date. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 10/22/2020. Redacted Transcript Deadline set for 11/2/2020. Release of Transcript Restriction set for 12/30/2020. Notice of Intent to Redact due by 10/6/2020 (tjc, ) (Entered: 10/01/2020) |
| 10/01/2020 | 288 | NOTICE of Appearance by Jonathan D. Polkes on behalf of Everytown for Gun Safety (Polkes, Jonathan) (Entered: 10/01/2020) |
| 10/01/2020 | 289 | RESPONSE in Opposition re 251 MOTION to Compel filed by Andrew Cuomo, The New York State Department of Financial Services. (Scott, William) (Entered: 10/01/2020) |
| 10/01/2020 | 290 | RESPONSE in Opposition re 251 MOTION to Compel filed by Everytown for Gun Safety. (Attachments: # 1 Declaration of Eric Tirschwell, # 2 Declaration of Caroline Hickey Zalka, # 3 Declaration of Jenna R. Harris)(Polkes, Jonathan) (Entered: 10/01/2020) |
| 10/01/2020 | 291 | RESPONSE in Opposition re 251 MOTION to Compel filed by Maria T. Vullo. (Greenberger, Debra) (Entered: 10/01/2020) |
| 10/02/2020 | 292 | TEXT ORDER re 280 Letter Motion from Debra L. Greenberger for Maria T. Vullo requesting permission to file a Rule 26 motion for a protective order staying discovery until the Court resolves Ms. Vullo's motion to dismiss. Parties are directed to file a response to Defendant Vullo's Dkt. No. 280 letter motion by close of business, 10/6/2020 and to be prepared to discuss the topic at the October 7th conference. Authorized |

| | | |
|---|---|---|
| | | by Magistrate Judge Christian F. Hummel on 10/2/2020. (tab) (Entered: 10/02/2020) |
| 10/05/2020 | 293 | MOTION to Compel *Plaintiff's Interrogatory Answers.* Motion Hearing set for 11/19/2020 09:30 AM in Albany before Magistrate Judge Christian F. Hummel Response to Motion due by 11/2/2020 filed by Maria T. Vullo. (Attachments: # 1 Memorandum of Law - Defendant Vullo's Brief in Support of Motion to Compel Plaintiff's Interrogatory Answers, # 2 Exhibit(s) A - March 2019 Pl.'s Resp. & Obj. Defs.' Interrogatories, # 3 Exhibit(s) B - March 11, 2020 and April 1, 2020 Emails, # 4 Exhibit(s) C - April 16, 2020 Pl.'s Supp. Resp. & Obj., # 5 Exhibit(s) D - Pl. Resp. to Def. Vullo May 1, 2020 Letter, # 6 Exhibit(s) E - Pl. Resp. & Obj. Def. Vullo's Second Set of Interrogatories) Motions referred to Christian F. Hummel. (Celli, Andrew) (Entered: 10/05/2020) |
| 10/06/2020 | 294 | Letter Motion from R. Abel for Andrew Cuomo, The New York State Department of Financial Services requesting permission to join Rule 26 motion by Defendant Vullo submitted to Judge Christian F. Hummel . (Abel, Ryan) (Entered: 10/06/2020) |
| 10/06/2020 | 295 | RESPONSE TO LETTER BRIEF filed by National Rifle Association of America as to 280 Letter Request/Motion, filed by Maria T. Vullo . (Martin, Michelle) (Entered: 10/06/2020) |
| 10/07/2020 | | Text Minute Entry for proceedings held before Magistrate Judge Christian F. Hummel: Status Conference held on 10/7/2020 by telephone. Appearances by Sarah Rogers, Esq. and Michele Martin, Esq. for Plaintiff; AAG William Scott for Cuomo Defendants; Debra Greenberger, Esq. Andrew Celli, Esq. The Court hears arguments from all parties regarding Deft. Vullo's request to file a Rule 26 motion for a protective order staying discovery until the Court resolves Ms. Vullo's motion to dismiss and Deft Cuomo's request to join on that motion. Defendants are permitted to file that motion by 10/19/2020. Plaintiff is directed to respond by 11/3/2020. The Court directs that no depositions are to be taken until there is a decision on this anticipated motion. The Court indicates that the motion will be addressed by chambers out of order and expedited. (Court Reporter Jacqueline Stroffolino) (tab) (Entered: 10/13/2020) |
| 10/09/2020 | 296 | Letter Motion from Michelle J. Martin for National Rifle Association of America requesting permission to file reply brief in support of the NRAs Motion to Compel Everytown For Gun Safety to comply with non-party subpoena in excess of 10 pages submitted to Judge Christian F. Hummel . (Martin, Michelle) (Entered: 10/09/2020) |
| 10/13/2020 | 297 | TRANSCRIPT REQUEST by National Rifle Association of America for proceedings held on 10/7/2020 before Judge Christian F. Hummel.. (Attachments: # 1 FORM AO 435)(Martin, Michelle) (Entered: 10/13/2020) |
| 10/13/2020 | 298 | TEXT ORDER granting 296 Letter Request from Michelle J. Martin for |

| | | |
|---|---|---|
| | | National Rifle Association of America requesting permission to file reply brief in support of the NRAs Motion to Compel Everytown For Gun Safety to comply with non-party subpoena in excess of 10 pages. Authorized by Magistrate Judge Christian F. Hummel on 10/13/2020. (tab) (Entered: 10/13/2020) |
| 10/13/2020 | 299 | TEXT ORDER re 280 Letter requesting permission to file a Rule 26 motion for a protective order staying discovery until the Court resolves Ms. Vullo's motion to dismiss and 294 Letter Request from R. Abel for Andrew Cuomo, The New York State Department of Financial Services requesting permission to join Rule 26 motion by Defendant Vullo. Motions are to be filed by 10/19/2020 and Responses are due by 11/3/2020, as was directed during the 10/7/2020 court conference. Authorized by Magistrate Judge Christian F. Hummel on 10/13/2020. (tab) (Entered: 10/13/2020) |
| 10/13/2020 | 300 | REPLY to Response to Motion re 251 MOTION to Compel *Everytown for Gun Safety to Comply with Non-Party Subpoena* filed by National Rifle Association of America. (Attachments: # 1 Declaration Of John Canoni in Support of Motion to Compel)(Rogers, Sarah) (Entered: 10/13/2020) |
| 10/19/2020 | 301 | TRANSCRIPT of Proceedings: Telephone Conference held on 10/7/2020 before Judge Christian F. Hummel, Court Reporter: Jacqueline Stroffolino, Telephone number: (518) 257-1894. **IMPORTANT NOTICE - REDACTION OF TRANSCRIPTS:** In order to remove personal identifier data from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within 5 business days of this date. The policy governing the redaction of personal information is located on the court website at www.nynd.uscourts.gov. Read this policy carefully. If no Notice of Intent to Redact is filed within 5 business days of this date, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available on the web 90 days from today's date. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 11/9/2020. Redacted Transcript Deadline set for 11/19/2020. Release of Transcript Restriction set for 1/19/2021. Notice of Intent to Redact due by 10/26/2020 (jxs, ) (Entered: 10/19/2020) |
| 10/19/2020 | 302 | MOTION for Protective Order *staying discovery during pendency of Defendants' motion to dismiss the Second Amended Complaint* Motion Hearing set for 11/19/2020 09:30 AM in Albany before Magistrate Judge Christian F. Hummel Response to Motion due by 11/2/2020 filed by Andrew Cuomo, The New York State Department of Financial Services. (Attachments: # 1 Affirmation, # 2 Memorandum of Law) Motions referred to Christian F. Hummel. (Abel, Ryan) (Entered: 10/19/2020) |
| 10/19/2020 | 303 | MOTION to Stay *Discovery.* Motion Hearing set for 11/19/2020 09:30 |

| | | |
|---|---|---|
| | | AM in Albany before Magistrate Judge Christian F. Hummel Response to Motion due by 11/2/2020 filed by Maria T. Vullo. (Attachments: # 1 Memorandum of Law - Defendant Vullo's Brief in Support of Motion to Stay Discovery) Motions referred to Christian F. Hummel. (Celli, Andrew) (Entered: 10/19/2020) |
| 10/29/2020 | 304 | Letter Motion from Michelle J. Martin for National Rifle Association of America requesting extension of the deadline to file response to Defendant Maria T. Vullos Motion to Compel Plaintiffs Interrogatory Answers submitted to Judge Christian F. Hummel . (Martin, Michelle) (Entered: 10/29/2020) |
| 11/02/2020 | 305 | TEXT ORDER: Plaintiff NRA's letter request (Dkt. No. 304) seeking an extension of time to respond to defendant Vullo's Motion to Compel is GRANTED. Plaintiff is permitted a one week extension. The response is due by November 9, 2020. So Ordered. Authorized by Magistrate Judge Christian F. Hummel on 11/2/20. (Entered: 11/02/2020) |
| 11/03/2020 | 306 | RESPONSE in Opposition re 302 MOTION for Protective Order *staying discovery during pendency of Defendants' motion to dismiss the Second Amended Complaint*, 303 MOTION to Stay *Discovery.* filed by National Rifle Association of America. (Martin, Michelle) (Entered: 11/03/2020) |
| 11/09/2020 | 307 | RESPONSE in Opposition re 293 MOTION to Compel *Plaintiff's Interrogatory Answers.* filed by National Rifle Association of America. (Rogers, Sarah) (Entered: 11/09/2020) |
| 11/11/2020 | 308 | Letter Motion from R. Abel for Andrew Cuomo, The New York State Department of Financial Services requesting leave to file reply on Defendants' motion for a stay of discovery submitted to Judge Christian F. Hummel . (Abel, Ryan) (Entered: 11/11/2020) |
| 11/11/2020 | 309 | RESPONSE TO LETTER BRIEF filed by National Rifle Association of America as to 308 Letter Request/Motion, filed by The New York State Department of Financial Services, Andrew Cuomo . (Martin, Michelle) (Entered: 11/11/2020) |
| 11/15/2020 | 310 | TEXT ORDER denying 308 Letter Motion from R. Abel for Andrew Cuomo, The New York State Department of Financial Services requesting leave to file reply on Defendants' motion for a stay of discovery. Authorized by Magistrate Judge Christian F. Hummel on 11/15/2020. (tab) (Entered: 11/15/2020) |
| 11/16/2020 | 311 | COURT NOTICE regarding Hearing on Motions: 293 MOTION to Compel *Plaintiff's Interrogatory Answers*, 302 MOTION for Protective Order *staying discovery during pendency of Defendants' motion to dismiss the Second Amended Complaint*, 303 MOTION to Stay *Discovery* : **Motions will be considered fully briefed as of 11/19/2020 before Magistrate Judge Christian F. Hummel. These motions will be taken ON SUBMIT with no oral argument being scheduled at this time. No** |

| | | appearances in person or by telephone are scheduled for 11/19/2020. (tab) (Entered: 11/16/2020) |
|---|---|---|
| 11/23/2020 | 312 | LETTER BRIEF *to supplement Ms. Vullo's pending motion to dismiss (Dkt. 211) to draw the Court's attention to the Plaintiff NRA's recent entry into a Consent Order with the Department of Financial Services* by Maria T. Vullo. (Attachments: # 1 Exhibit(s) 1 - Consent Order)(Celli, Andrew) (Entered: 11/23/2020) |
| 12/01/2020 | 313 | RESPONSE TO LETTER BRIEF filed by National Rifle Association of America as to 312 LETTER BRIEF, filed by Maria T. Vullo . (Rogers, Sarah) (Entered: 12/01/2020) |
| 12/14/2020 | 314 | MEMORANDUM-DECISION and ORDER - That defendant Department of Financial Services and defendant Governor Andrew Cuomo's 302 motion for a protective order staying discovery pending the Court's consideration of their motion to dismiss is **GRANTED**. That defendant Maria T. Vullo's 303 Motion for a protective order staying discovery pending the Court's consideration of her motion to dismiss is **GRANTED**. That all discovery in this case is **STAYED** pending the District Judge's decision on the pending motions to dismiss, dkt. nos. 210, 211. **IT IS SO ORDERED**. Signed by Magistrate Judge Christian F. Hummel on 12/14/2020. (jel, ) (Entered: 12/14/2020) |
| 12/28/2020 | 315 | APPEAL OF MAGISTRATE JUDGE DECISION to District Court by National Rifle Association of America re 314 Order on Motion for Protective Order,,, Order on Motion to Stay,, Motion Hearing set for 1/28/2021 10:00 AM in Binghamton before Senior Judge Thomas J. McAvoy Response to Motion due by 1/11/2021 (Attachments: # 1 Memorandum of Law)(Rogers, Sarah) (Entered: 12/28/2020) |
| 12/31/2020 | 316 | LETTER BRIEF *to inform the Court of a recent Second Circuit decision which supports Ms. Vullo's pending motion to dismiss the NRA's selective-enforcement claim* by Maria T. Vullo. (Attachments: # 1 Exhibit(s) A - Second Circuit Decision, Tangreti v. Bachmann (2d Cir. Dec. 28, 2020)) (Greenberger, Debra) (Entered: 12/31/2020) |
| 12/31/2020 | 317 | Letter Motion from Debra L. Greenberger for Maria T. Vullo requesting extension of time to file Ms. Vullo's response to the NRA's December 28, 2020 objections to the Magistrate Judge's Order staying discovery (Dkt. 315) to January 19, 2021 submitted to Judge Hon. Thomas J. McAvoy . (Greenberger, Debra) (Entered: 12/31/2020) |
| 01/05/2021 | | COURT TEXT NOTICE advising the pending motion(s) before Senior Judge Thomas J. McAvoy will be ON SUBMIT; No appearances are necessary. (amt) (Entered: 01/05/2021) |
| 01/06/2021 | 318 | TEXT ORDER granting the 317 Letter requesting an extension of time to respond to the 315 APPEAL OF MAGISTRATE JUDGE DECISION. |

| | | |
|---|---|---|
| | | Response to Motion due by 1/19/2021. Authorized by Senior Judge Thomas J. McAvoy on 1/56/2021. (amt) (Entered: 01/06/2021) |
| 01/19/2021 | [319](#) | MEMORANDUM OF LAW *in opposition to Plaintiff's appeal of the Magistrate Judge's Decision and Order staying discovery* filed by Andrew Cuomo, The New York State Department of Financial Services. (Abel, Ryan) (Entered: 01/19/2021) |
| 01/19/2021 | [320](#) | MEMORANDUM OF LAW *in Opposition to Plaintiff's Appeal of the Magistrate Judge's Decision and Order Staying Discovery* filed by Maria T. Vullo. (Celli, Andrew) (Entered: 01/19/2021) |
| 02/24/2021 | [321](#) | Letter Motion from William A. Brewer for National Rifle Association of America requesting The court to lift confidentiality orders with respect to the Special Masters first and second report and recommendation submitted to Judge Hon. Christian F. Hummel . (Brewer, William) (Entered: 02/24/2021) |
| 03/15/2021 | [322](#) | DECISION and ORDER - That DFS and Gov. Cuomo in his official capacity [210](#) motion to dismiss claims in the Second Amended Complaint is **GRANTED**. Plaintiff's claims in the Second Amended Complaint against DFS, Gov. Cuomo in his official capacity, and Supt. Lacewell in her official capacity, including the claims for injunctive and declaratory relief, are **DISMISSED** as barred by the Eleventh Amendment. Ms. Vullo's [211](#) motion appealing Magistrate Judge Hummel's decision granting leave to amend, and seeking to dismiss the claims against her in the Second Amended Complaint is **GRANTED in part** and **DENIED in part**. The selective enforcement claim against Ms. Vullo is **DISMISSED**, the motion is denied as to the First Amendment claims, and the appeal of Judge Hummel's decision granting leave to amend is denied. Signed by Senior Judge Thomas J. McAvoy on 3/15/2021. (jel, ) (Entered: 03/15/2021) |
| 03/16/2021 | 323 | COURT NOTICE of Video Hearing: A video Status Conference (RE: Discovery) has been set for Friday, 3/26/2021 @ 11:00 AM before Magistrate Judge Christian F. Hummel. This hearing will be conducted remotely by video and a Microsoft TEAMS video link will be provided to parties by the Court. (tab) (Entered: 03/16/2021) |
| 03/22/2021 | [324](#) | DECISION and ORDER - That the Court **GRANTS** the Defendants' [199](#) Motion for Reconsideration; **VACATES** the Court's Decision and Order on the NRA's appeal of Judge Hummel's discovery determinations, Dkt. No. 188; and **REMANDS** the case to Judge Hummel to make determinations on the NRA's Motion to Compel in light of the narrowing case. Signed by Senior Judge Thomas J. McAvoy on 3/22/2021. (jel, ) (Entered: 03/22/2021) |
| 03/22/2021 | [325](#) | NOTICE OF APPEAL as to [322](#) Order on Motion to Dismiss for Failure to State a Claim,,,,,,, by Maria T. Vullo. Filing fee $ 505, receipt number ANYNDC-5465068. (Celli, Andrew) (Entered: 03/22/2021) |

| 03/22/2021 | 326 | ELECTRONIC NOTICE AND CERTIFICATION sent to US Court of Appeals re 325 Notice of Appeal (jel, ) (Entered: 03/22/2021) |
|---|---|---|
| 03/26/2021 | | Text Minute Entry for proceedings held before Magistrate Judge Christian F. Hummel: Discovery Hearing held on 3/26/2021 by video in accordance with G.O. 59. Appearances by Sarah Rogers, Esq. and Michelle Martin, Esq. for Plaintiff; AAG William Scott, AAG Ryan Abel for Cuomo/NY Defendants; Debbie Greenberger, Esq., Marissa Benavides, Esq. for Defendant Vullo. Non Party "Everytown" counsel, Jonathan Polkes, Esq. present. Non-party DFS represented by Eamon Rock, Esq. After hearing from all parties, the Court lifts the Stay of Discovery. Various pending motions are denied without prejudice to renew with a narrowed scope and in accordance with Judge McAvoy's recent decisions. Deft Vullo to file a motion seeking a Stay pending her appeal. Plaintiff's discovery motions to be renewed. Briefing schedules are set for those anticipated motions. (Court Reporter Theresa Casal) (tab) (Entered: 03/29/2021) |
| 03/29/2021 | 327 | TRANSCRIPT of Proceedings: Discovery/Status Hearing held on 3/26/2021 before Judge Christian F. Hummel **IMPORTANT NOTICE - REDACTION OF TRANSCRIPTS:** In order to remove personal identifier data from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within 5 business days of this date. The policy governing the redaction of personal information is located on the court website at www.nynd.uscourts.gov. Read this policy carefully. If no Notice of Intent to Redact is filed within 5 business days of this date, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available on the web 90 days from today's date. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 4/19/2021. Redacted Transcript Deadline set for 4/29/2021. Release of Transcript Restriction set for 6/28/2021. Notice of Intent to Redact due by 4/5/2021 (tab) (Main Document 327 replaced on 3/30/2021 with typographical errors, corrected) (tab). (Entered: 03/29/2021) |
| 03/29/2021 | 328 | ORDER - 1) On the review of the Court's decision on the motions to dismiss filed by defendants (Dkt. Nos. 210 and 211), the stay of discovery previously issued by the Court (Dkt. No. 314) is lifted. 2) As the Court has lifted the stay of discovery, plaintiff's motion appealing the Court's decision staying discovery (Dkt. No. 315) is withdrawn at plaintiff's request. 3) Plaintiff's letter motions dated March 31, 2020 (Dkt. No. 189) and June 3, 2020 (Dkt. No. 204), are dismissed without prejudice. 4) Plaintiff's motion seeking Hague discovery shall be filed by April 2, 2021. A response shall be filed by April 23, 2021. 5) on review of the Court's decision on the motions to dismiss (Dkt. No. 322), plaintiff's motion for the Issuance of Letters Rogatory (Dkt. No. 246) is dismissed without |

| | | |
|---|---|---|
| | | prejudice. 6) Plaintiff's motion seeking the Issuance of Letter's Rogatory shall be filed by April 2, 2021. A response shall be filed by April 23, 2021. 7) On review of the Court's decision on the motions to dismiss (Dkt. No. 322), plaintiff's motion to compel nonparty Everytown for Gun Safety to respond to a subpoena (Dkt. No. 251) is dismissed without prejudice. 8) Plaintiff's motion to compel nonparty Everytown for Gun Safety to comply with a subpoena shall be filed by April 23, 2021. A response to that motion shall be filed by May 23, 2021. Plaintiff may file a reply by June 1, 2021. Signed by Magistrate Judge Christian F. Hummel on 3/29/2021. (jel, ) (Entered: 03/29/2021) |
| 03/29/2021 | 329 | TRANSCRIPT REQUEST by Maria T. Vullo for proceedings held on March 26, 2021 before Judge - Magistrate Judge Christian F. Hummel.. (Attachments: # 1 Transcript Order Form AO 435)(Greenberger, Debra) (Entered: 03/29/2021) |
| 03/30/2021 | 330 | COURT NOTICE SETTING BRIEFING SCHEDULE FOR DEFT VULLO's **Motion to Stay Discovery pending the Appeal**. As was directed during the 3/26/2021 court conference, Defendant Vullo's Motion to be filed by 4/9/2021; Response to Motion due by 5/7/2021. (tab) (Entered: 03/30/2021) |
| 04/02/2021 | 331 | MOTION for Issuance of Letters Rogatory *Renewed Motion for Issuance of Letters Rogatory* filed by National Rifle Association of America. Motion returnable before Judge Christian Hummel Response to Motion due by 4/23/2021 (Attachments: # 1 Memorandum of Law, # 2 Declaration of Sarah B. Rogers, # 3 Exhibit(s) A, # 4 Exhibit(s) B, # 5 Exhibit(s) C, # 6 Exhibit(s) D, # 7 Exhibit(s) E, # 8 Exhibit(s) F, # 9 Exhibit(s) G, # 10 Exhibit(s) H, # 11 Exhibit(s) I, # 12 Exhibit(s) J, # 13 Exhibit(s) K, # 14 Exhibit(s) L, # 15 Exhibit(s) M, # 16 Exhibit(s) N, # 17 Proposed Order/Judgment) (Rogers, Sarah) (Entered: 04/03/2021) |
| 04/05/2021 | 332 | TRANSCRIPT REQUEST by National Rifle Association of America for proceedings held on 3/26/2021 before Judge Christian F. Hummel.. (Attachments: # 1 Exhibit(s) FORM AO 435)(Martin, Michelle) (Entered: 04/05/2021) |
| 04/05/2021 | 333 | TRANSCRIPT REQUEST by Everytown for Gun Safety for proceedings held on March 26, 2021 before Judge Christian F. Hummel.. (Attachments: # 1 Exhibit(s) FORM AO 435)(Polkes, Jonathan) (Entered: 04/05/2021) |
| 04/07/2021 | 334 | TEXT ORDER Setting Hearing on Motion 293 MOTION to Compel *Plaintiff's Interrogatory Answers.* : A Motion Hearing (Oral Argument) has been set for Thursday, 4/22/2021 @ 11:00 AM. This hearing will be conducted remotely by video and a Microsoft TEAMS connection link will be provided to all participants by the Court. Authorized by Magistrate Judge Christian F. Hummel on 4/7/2021. (tab) (Entered: 04/07/2021) |
| 04/07/2021 | 335 | Letter Motion from William A. Scott for Andrew Cuomo requesting Extension of Time to Answer Second Amended Complaint submitted to |

| | | Judge Hummel . (Scott, William) (Entered: 04/07/2021) |
|---|---|---|
| 04/07/2021 | 336 | TEXT ORDER granting 335 Letter Request from William A. Scott for Andrew Cuomo requesting Extension of Time to Answer Second Amended Complaint. Andrew Cuomo answer now due by 4/16/2021. Authorized by Magistrate Judge Christian F. Hummel on 4/7/2021. (tab) (Entered: 04/07/2021) |
| 04/09/2021 | 337 | MOTION to Stay *Discovery Pending Appeal* filed by Maria T. Vullo. Response to Motion due by 4/30/2021 (Attachments: # 1 Defendant Vullo's Memorandum of Law in Support of Motion to Stay Discovery Pending Appeal) Motions referred to Christian F. Hummel. (Celli, Andrew) (Entered: 04/09/2021) |
| 04/12/2021 | 338 | Letter Motion from Sarah B. Rogers for National Rifle Association of America requesting letter requesting adjournment of April 22, 2021 hearing on Defendant Maria T. Vullo's motion to compel (ECF No. 293) submitted to Judge Magistrate Judge Christian F. Hummel . (Rogers, Sarah) (Entered: 04/12/2021) |
| 04/12/2021 | 339 | TEXT ORDER granting 338 Letter Request from Sarah B. Rogers for National Rifle Association of America requesting adjournment of April 22, 2021 hearing on 293 MOTION to Compel *Plaintiff's Interrogatory Answers.* : Motion Hearing is Re-set for Monday, 4/26/2021 @ 11:00 AM. This hearing will be conducted remotely by video and a Microsoft TEAMS connection link will be provided to all participants by the Court. Authorized by Magistrate Judge Christian F. Hummel on 4/12/2021. (tab) (Entered: 04/12/2021) |
| 04/12/2021 | | Set/Reset Deadlines as to 337 MOTION to Stay *Discovery Pending Appeal* filed by Maria T. Vullo.. Response to Motion due by 5/7/2021 pursuant to the March 30, 2021 Court Notice. (jel, ) (Entered: 04/12/2021) |
| 04/12/2021 | 340 | Letter Motion from Non-Party Department of Financial Services in Response to DKT 331 for The New York State Department of Financial Services submitted to Judge Hummel . (Rock, Eamon) (Entered: 04/12/2021) |
| 04/13/2021 | 341 | TEXT ORDER re 340 Letter Motion from Non-Party Department of Financial Services in Response to DKT 331 for The New York State Department of Financial Services submitted to Judge Hummel filed by The New York State Department of Financial Services. Plaintiff is directed to respond to Dkt. no. 340 on or before 4/23/2021. So Ordered. Authorized by Magistrate Judge Christian F. Hummel on 4/13/2021. (tab) (Entered: 04/13/2021) |
| 04/16/2021 | 342 | ANSWER to 203 Amended Complaint, by Andrew Cuomo.(Scott, William) (Entered: 04/16/2021) |
| 04/23/2021 | 343 | NOTICE of Appearance by Mordecai Geisler on behalf of National Rifle |

| | | Association of America (Geisler, Mordecai) (Entered: 04/23/2021) |
|---|---|---|
| 04/23/2021 | 344 | RESPONSE in Opposition re 331 MOTION for Issuance of Letters Rogatory *Renewed Motion for Issuance of Letters Rogatory* filed by National Rifle Association of America. Motion returnable before Judge Christian Hummel filed by Andrew Cuomo. (Scott, William) (Entered: 04/23/2021) |
| 04/23/2021 | 345 | RESPONSE in Opposition re 331 MOTION for Issuance of Letters Rogatory *Renewed Motion for Issuance of Letters Rogatory* filed by National Rifle Association of America. Motion returnable before Judge Christian Hummel filed by Maria T. Vullo. (Greenberger, Debra) (Entered: 04/23/2021) |
| 04/23/2021 | 346 | RESPONSE TO LETTER BRIEF filed by National Rifle Association of America as to 340 Letter Request/Motion filed by The New York State Department of Financial Services . (Rogers, Sarah) (Entered: 04/23/2021) |
| 04/23/2021 | 347 | MOTION to Compel *renewed motion to compel Everytown for Gun Safety* filed by National Rifle Association of America. Response to Motion due by 5/14/2021 (Attachments: # 1 Declaration Rogers Declaration, # 2 Exhibit(s) 2020-09-30 Letter from C. - Zalka to S. Rogers and M. Martin, # 3 Memorandum of Law) Motions referred to Christian F. Hummel. (Rogers, Sarah) (Entered: 04/23/2021) |
| 04/26/2021 | | TEXT ONLY NOTICE of Hearing on Motion 347 MOTION to Compel *renewed motion to compel Everytown for Gun Safety* filed by National Rifle Association of America. : Response to Motion due by 5/23/2021. Reply to Response to Motion due by 6/1/2021 pursuant to Judge Hummel's March 29, 2021 328 Order.(jel, ) (Entered: 04/26/2021) |
| 04/26/2021 | | Text Minute Entry for proceedings held before Magistrate Judge Christian F. Hummel: Motion Hearing held on 4/26/2021 (by Video) re 293 MOTION to Compel *Plaintiff's Interrogatory Answers.* filed by Maria T. Vullo. Appearances by Mordecai Geisler, Esq. and Michelle Martin, Esq. for plaintiff; AAG William Scott for Deft, Cuomo; Debra Greenberger, Esq. and Andrew Celli, Esq. for Deft Vullo. The Court sets forth the history of the case and filings, to put this motion in context. Arguments are heard and the Court makes it's ruling. A written Order will be issued and the transcript of this hearing will be annexed as part of that written order. (Court Reporter Jacqueline Stroffolino) (tab) (Entered: 04/26/2021) |
| 04/26/2021 | 348 | TRANSCRIPT of Proceedings: Oral Argument on a Motion held on 4/26/2021 before Judge Christian F. Hummel, **IMPORTANT NOTICE - REDACTION OF TRANSCRIPTS:** In order to remove personal identifier data from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within 5 business days of this date. The policy governing the redaction of personal information is located on the court website at www.nynd.uscourts.gov. Read this policy carefully. If no Notice of Intent to Redact is filed within 5 |

| | | business days of this date, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available on the web 90 days from today's date. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 5/17/2021. Redacted Transcript Deadline set for 5/27/2021. Release of Transcript Restriction set for 7/26/2021. Notice of Intent to Redact due by 5/3/2021 (tab) (Entered: 04/26/2021) |
|---|---|---|
| 04/27/2021 | 349 | TRANSCRIPT REQUEST by National Rifle Association of America for proceedings held on 4/26/2021 before Judge Christian F. Hummel.. (Attachments: # 1 FORM AO 435)(Martin, Michelle) (Entered: 04/27/2021) |
| 04/28/2021 | 350 | ORDER - That Defendant Vullo's 293 motion to compel is **GRANTED**. Plaintiff shall serve supplemental interrogatory responses as directed by the Court by May 26, 2021. Signed by Magistrate Judge Christian F. Hummel on 4/28/2021. (Attachments: # 1 Transcript of April 26, 2021 on-the-record conference) (jel, ) (Entered: 04/28/2021) |
| 05/07/2021 | 351 | RESPONSE in Support re 337 MOTION to Stay *Discovery Pending Appeal* filed by Maria T. Vullo. filed by Andrew Cuomo. (Scott, William) (Entered: 05/07/2021) |
| 05/07/2021 | 352 | RESPONSE in Opposition re 337 MOTION to Stay *Discovery Pending Appeal* filed by Maria T. Vullo. filed by National Rifle Association of America. (Geisler, Mordechai) (Entered: 05/07/2021) |

| **PACER Service Center** | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 05/10/2021 09:08:29 | | | |
| **PACER Login:** | cpnycpara16 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:18-cv-00566-TJM-CFH |
| **Billable Pages:** | 30 | **Cost:** | 3.00 |

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**NATIONAL RIFLE ASSOCIATION OF AMERICA,**

                                                                    **Plaintiff,**

     **-against-**                                                                    **1:18-CV-0566**

**ANDREW CUOMO, both individually and in his official**
**capacity;  MARIA T. VULLO, both individually and in**
**her official capacity;  and THE NEW YORK STATE**
**DEPARTMENT OF FINANCIAL SERVICES,**

                                                                    **Defendants.**
_____

**THOMAS J. McAVOY,**
**Senior United States District Judge**

**DECISION & ORDER**

**I.      INTRODUCTION**

          Plaintiff the National Rifle Association of America ("Plaintiff" or "the NRA")

commenced this action against defendants New York Governor Andrew Cuomo, both

individually and in his official capacity ("Gov. Cuomo"); Superintendent of the New York

State Department of Financial Services Maria T. Vullo, both individually and in her official

capacity  ("Supt. Vullo"); and the New York State Department of Financial Services ("DFS")

(collectively, "Defendants").  In the Amended Complaint, Plaintiff asserts several federal and

New York state constitutional claims, and a New York common law tort claim. *See* Am.

Compl., Dkt. No. 37, *passim.*  Presently before the Court is Defendants' motion pursuant to

Fed. R. Civ. P. 12(b)(6) to dismiss the Amended Complaint for failure to state claims upon

1

which relief can be granted.  Dkt. No. 40.  The Court has considered the parties' briefs, *see*

Dkt. Nos. 40, 48, 51; the briefs of amici curiae the Texas Public Policy Foundation and the

American Civil Liberties Union Foundation, *see* Dkt. Nos. 46, 49; and entertained oral

argument from the parties related to claims asserting freedom of speech and due process

violations. Oral Arg. Trans., Dkt. No. 52.  For the reasons that follow, Defendants' motion is

granted in part and denied in part.

## II.    STANDARD OF REVIEW

On a Fed. R. Civ. P. 12(b)(6) motion, the Court must accept "all factual allegations in

the complaint as true, and draw[] all reasonable inferences in the plaintiff's favor." *Holmes v.*

*Grubman*, 568 F.3d 329, 335 (2d Cir. 2009) (internal quotation marks omitted).  This tenet

does not apply to legal conclusions. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Similarly,

"[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory

statements ... are not entitled to the assumption of truth." *Id.; see also Bell Atl. Corp. v.*

*Twombly*, 550 U.S. 544, 555 (2007)(stating that a court is "not bound to accept as true a

legal conclusion couched as a factual allegation").

In considering a Rule 12(b)(6) motion, the Court "may consider the facts alleged in

the complaint, documents attached to the complaint as exhibits, and documents

incorporated by reference in the complaint." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104,

111 (2d Cir. 2010).  "To survive a motion to dismiss, a complaint must contain sufficient

factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Iqbal*,

556 U.S. at  678 (quoting *Twombly*, 550 U.S. at  570).  A claim will only have "facial

plausibility when the plaintiff pleads factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged." *Id*.   "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).   "Determining whether a complaint states a plausible claim for relief [is] ... a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id*. at 679.   Plausibility is "a standard lower than probability." *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 184 (2d Cir. 2012).   "[A] given set of actions may well be subject to diverging interpretations, each of which is plausible," and "[t]he choice between or among plausible inferences or scenarios is one for the factfinder." *Id.*   A court "may not properly dismiss a complaint that states a plausible version of the events merely because the court finds that a different version is more plausible." *Id.* at 185.   "The role of the court at this stage of the proceedings is . . . merely to determine whether the plaintiff's factual allegations are sufficient to allow the case to proceed." *Doe v. Columbia Univ.*, 831 F.3d 46, 59 (2d Cir. 2016).

III.   **BACKGROUND**

   a. **DFS Investigation into the Carry Guard Insurance Program**

   In October 2017, DFS initiated an investigation of the NRA's affinity Carry Guard insurance program,[1] focusing on two insurance companies, Chubb Ltd. ("Chubb") and Lockton Affinity, LLC ("Lockton"), for underwriting and administering this program.   Dkt. Nos.

---

[1] Affinity insurance programs are insurance programs endorsed by a membership organization for use by its members.

37-4; 37-5.[2]  The Carry Guard program provided, among other policy coverages, (1) liability insurance to gun owners for acts of intentional wrongdoing, and (2) legal services insurance for any costs and expenses incurred in connection with a criminal proceeding resulting from acts of self-defense with a legally possessed firearm, in violation of New York Insurance Law.  Dkt. Nos. 37-4; 37-5.  The policies issued through the Carry Guard program were underwritten by Chubb and offered by Lockton through New York's excess line market. Dkt. Nos. 37-4 at p. 4; 37-5 at ¶ 13.  As part of its investigation, DFS learned that, although it did not have an insurance producer license from DFS, the NRA engaged in marketing of, and solicitation for, the Carry Guard program. Dkt. Nos. 37-4 at pp. 4-6; 37-5 at pp. 3-5.  DFS also found that Lockton and the NRA together offered at least eleven additional insurance programs (collectively "additional NRA programs")[3] to new and existing NRA members in New York and elsewhere.  Dkt. No. 37-4 at pp. 6-7.  Pursuant to written agreements with Lloyd's of London ("Lloyd's") and the NRA, Lockton served as the administrator for these additional NRA programs, carrying out such functions as marketing the insurance, binding the insurance, collecting and distributing premiums, and delivering policies to insureds.  *Id.* ¶ 16.  Lloyd's and Alea London Ltd. ("Alea") served as the underwriters for these additional NRA programs, which Lockton placed through New York's excess line market. *Id.* ¶ 17.

Following initiation of the DFS investigation, Lockton suspended the Carry Guard

---

[2]Dkt. Nos. 37-4 and 37-5 are the Lockton and Chubb Consent Orders entered with DFS on May 2, 2018 and May 7, 2018, respectively, which are appended to the Amended Complaint as Exhibits D and E.

[3]The additional NRA programs included: "Retired Law Enforcement Officer Self-Defense Insurance;" "ArmsCare Plus Firearms Insurance;" "No Cost ArmsCare Firearms Insurance;" "Firearms Instructor Plus Liability Insurance;" "Personal Firearms Protection Insurance;" "Gun Collector Insurance;" "Gun Club Insurance;" "Hunt Club Insurance;" "NRA Business Alliance Insurance;" "Gun Show Insurance;" and "Home-based Federal Firearms License Insurance." Dkt. No. 37-4 at pp. 5-6.

program on November 17, 2017 and is no longer making Carry Guard policies available to New York residents to purchase. *Id.* ¶ 32.  DFS's investigation revealed that Lockton and Chubb violated numerous provisions of the New York Insurance Law in connection with the Carry Guard program and the additional NRA programs. *See* Dkt. Nos. 37-4, ¶¶ 34-40; 37-5, ¶¶ 18-19 (discussed below).

The NRA alleges that throughout the investigation, DFS communicated "backchannel threats" to banks and insurers with ties to the NRA that they would face regulatory action if they failed to terminate their relationships with the NRA.  Am. Compl. ¶¶ 38, 45.   According to the NRA, the Chairman of Lockton called the NRA on February 25, 2018 and confided that Lockton would need to "drop" the NRA entirely for fear of losing its license to operate in New York, and the next day Lockton tweeted it would discontinue providing brokerage services for all NRA-endorsed insurance programs. *Id.* ¶¶ 42–43.  The NRA alleges that, days later, its corporate insurance carrier severed ties with it and said it would not renew coverage at any price. *Id.* ¶ 44. The NRA alleges that the corporate carrier severed its ties with the NRA "because it learned of Defendants' threats directed at Lockton, and feared it would be subject to similar reprisals."  *Id.*

### b.  Cuomo Press Release

On April 19, 2018, Gov. Cuomo issued a press release indicating that he was directing DFS to communicate with insurance companies and financial institutions licensed or doing business in New York and urge them to review their relationships with the NRA and similar gun promotion organizations, and consider whether such relationships "harm their corporate reputations and jeopardize public safety."  Dkt. No. 37-1  ("Cuomo Press

A-69

Release").   Gov. Cuomo is quoted as stating:

> New York may have the strongest gun laws in the country, but we must push further to ensure that gun safety is a top priority for every individual, company, and organization that does business across the state. I am directing the Department of Financial Services to urge insurers and bankers statewide to determine whether any relationship they may have with the NRA or similar organizations sends the wrong message to their clients and their communities who often look to them for guidance and support. This is not just a matter of reputation, it is a matter of public safety, and working together, we can put an end to gun violence in New York once and for all.

*Id.*

The press release states that "DFS is encouraging regulated entities to consider reputational risk and promote corporate responsibility in an effort to encourage strong markets and protect consumers."  *Id.*  Then, following a statement that "[a] number of businesses have ended relationships with the NRA following the Parkland, Florida school shooting in order to realign their company's values," Supt. Vullo is quoted as stating:

> Corporations are demonstrating that business can lead the way and bring about the kind of positive social change needed to minimize the chance that we will witness more of these senseless tragedies. DFS urges all insurance companies and banks doing business in New York to join the companies that have already discontinued their arrangements with the NRA, and to take prompt actions to manage these risks and promote public health and safety.

*Id.*

**c. Guidance Letters**

Also on April 19, 2018, Supt. Vullo issued "Guidance[s] on Risk Management Relating to the NRA and Similar Gun Promotion Organizations" ("Guidance Letters"), which encouraged financial institutions and insurance companies to consider their relationships with the NRA. Dkt. Nos. 37-2 (Guidance Letter to all insurers doing business in New York); 37-3 (Guidance Letter to the chief executive officers of all New York state chartered or

licensed financial institutions). The Guidance Letter to all insurers doing business in New

York is prefaced with reference to gun violence tragedies occurring at Marjory Stoneman

Douglas High School, Columbine High School, Sandy Hook, Pulse night club, and the Las

Vegas music festival, and indicates that there is a social backlash against the NRA and

similar organizations "that promote guns that lead to senseless violence" and that "[o]ur

insurers are, and have been, vital to the communities they serve for generations and are

guided by their commitment to corporate social responsibility, including public safety and

health." Dkt. No. 37-2, at 1.  This Guidance Letter further indicates:

> Insurers' engagement in communities they serve is closely tied to the business
> they do with their clients and customers and its impact on such communities.
> Often insurers report to their stakeholders that their performance is based on
> both their strategic business vision as well as on a commitment to society as a
> whole. There is a fair amount of precedent in the business world where firms
> have implemented measures in areas such as the environment, caring for the
> sick, and civil rights in fulfilling their corporate social responsibility. The recent
> actions of a number of financial institutions that severed their ties with the
> NRA after the AR-15 style rifle killed 17 people in the school in Parkland,
> Florida is an example of such a precedent.
>
> The tragic devastation caused by gun violence that we have regrettably been
> increasingly witnessing is a public safety and health issue that should no
> longer be tolerated by the public and there will undoubtedly be increasing
> public backlash against the NRA and like organizations.
>
> Our insurers are key players in maintaining and improving public health and
> safety in the communities they serve. They are also in the business of
> managing risks, including their own reputational risks, by making risk
> management decisions on a regular basis regarding if and how they will do
> business with certain sectors or entities. In light of the above, and subject to
> compliance with applicable laws, the Department encourages its insurers to
> continue evaluating and managing their risks, including reputational risks, that
> may arise from their dealings with the NRA or similar gun promotion
> organizations, if any, as well as continued assessment of compliance with
> their own codes of social responsibility. The Department encourages regulated
> institutions to review any relationships they have with the NRA or similar gun
> promotion organizations, and to take prompt actions to managing these risks
> and promote public health and safety.

*Id.,* at 1-2.  The Guidance Letter to the chief executive officers of all New York state chartered or licensed financial institutions contains nearly identical language. *See* Dkt. No. 37-3.

### d.  Gov. Cuomo's Tweet

On April 20, 2018, Gov. Cuomo publicly tweeted: "The NRA is an extremist organization. I urge companies in New York State to revisit any ties they have to the NRA and consider their reputations, and responsibility to the public." Am. Compl. ¶ 51.

### e.  Consent Orders

In early May 2018, DFS entered consent orders with Chubb and Lockton related to its investigation ("Consent Orders"). *See* Dkt. Nos. 37-4; 37-5.  In the Consent Orders, Lockton and Chubb admitted to various violations of the New York Insurance Law.  Dkt. No. 37-4, ¶¶ 34-40;[4] Dkt. No. 37-5, ¶¶ 18-19.[5]  Lockton agreed to, *inter alia*, pay a monetary fine

---

[4]Lockton admitted that it:
   (1) compensated the NRA based on the actual premiums collected when the NRA was acting as an unlicensed insurance broker by selling and soliciting insurance in New York, in violation of New York insurance Law § 2116;
   (2) acted for and aided an unauthorized Chubb insurer, Illinois Union, in connection with Illinois Union's issuing or delivering policies in New York State, or otherwise issuing policies covering New York State residents, which provided insurance coverage that may not be offered in the New York State excess line market, specifically:
   (a) defense coverage in a criminal proceeding that is not permitted by law;
   (b) liability coverage for bodily injury or property damage expected or intended from the insured's standpoint in an insurance policy limited to use of firearms and that was beyond the use of reasonable force to protect persons or property; and
   (c) coverage for expenses incurred by the insured for psychological counseling support, in violation of New York insurance Law § 2117;
   (3) gave, or offered to give, a free one-year NRA membership if a person purchased the Carry Guard Program insurance policy, when the NRA membership benefit was not specified in the policy and exceeded $25 in market value, in violation of New York Insurance Law § 2324(a);
   (4) gave, or offered to give, the No Cost Arms Care Firearms Insurance at no cost to NRA members in good standing, in violation of New York Insurance Law § 2324(a);
   (5) advertised the financial condition of a Chubb insurer by referring to the insurer's AM Best rating, in violation of New York insurance Law § 2122(a)(1);
   (6) called attention to an unauthorized Chubb insurer by advertising Chubb's participation in the Carry Guard Program on the Carry Guard website, in violation of New York Insurance Law § 2122(a)(2); and
                                                                                      (continued...)

of $7,000,000; take specific actions to remedy ongoing violations of the New York Insurance

Law; not participate in the future in any Carry Guard or similar programs that violate the

New York Insurance Law; and not "enter into any agreement or program with the NRA to

underwrite or participate in any affinity-type insurance program involving any line of

insurance to be issued or delivered in New York State or to anyone known to Lockton to be

a New York State resident."  Dkt. No. 37-4 at pp. 12-15.  The Lockton Consent Order

expressly allowed Lockton to assist the NRA in procuring insurance for the NRA's own

corporate operations. Dkt. No. 37-4 at p. 14, ¶ 43.

Plaintiff asserts that "DFS and Vullo have no legal basis to restrict Lockton's

involvement with insurance programs that do not violate New York's Insurance Law; nor do

they have authority to regulate insurance transactions outside of New York. Nevertheless,

DFS mandated that Lockton never enter into any future agreements with the NRA for

legitimate and fully Complaint insurance programs in New York."  Am. Compl. ¶ 56.  Plaintiff

maintains that Lockton would violate the Lockton Consent Order "if it markets an ordinary

property, casualty, or life insurance policy in the State of New York that was accompanied

---

[4](...continued)
(7) failed to properly secure declinations from authorized insurers for each insured, in violation of New York Insurance Law § 2118. Dkt. No. 37-4, ¶¶ 34-40.

[5]Chubb admitted that:
(1) through Illinois Union, it engaged in the business of insurance without a license by issuing or delivering policies in New York State, or otherwise issuing policies covering New York State residents, which provided insurance coverage that may not be offered in the New York State excess line market, specifically:
(a) defense coverage in a criminal proceeding that is not permitted by law;
(b) liability coverage for bodily injury or property damage expected or intended from the insured's standpoint in an insurance policy limited to use of firearms and that was beyond the use of reasonable force to protect persons or property; and
(c) coverage for expenses incurred by the insured for psychological counseling support, in violation of New York Insurance Law § 1102; and
(2) through Illinois Union, it issued liability insurance coverage to New York residents that failed to contain required liability insurance policy provisions, in violation of New York Insurance Law § 3420.  Dkt. No. 37-5, ¶¶ 18-19.

9

by an NRA logo or endorsement —notwithstanding that a comparable logo or endorsement referencing any other affinity or common-cause organization is permissible," and contends that "[t]his provision . . .  is deliberate and intended to impair the NRA's ability to negotiate insurance benefits for its members, damage the NRA's goodwill among its membership, and unconstitutionally restrict the NRA's speech on the basis of political animus."  *Id.* ¶ 57. The NRA further maintains that several of the violations assessed in the Lockton Consent Order "concern programs commonly engaged in by numerous additional affinity associations that do not publicly advocate for Second Amendment rights" but that were "not targets of Defendants' unconstitutional conduct."  *Id.* ¶ 57; *see id.* ¶ 58 (citing similar actions by Lockton related to affinity programs by organizations that do not advocate Second Amendment rights). The NRA asserts that even if Lockton's conduct identified in the Consent Order "does violate insurance law, DFS's selective enforcement of such offenses as to NRA-endorsed policies—but not as to other policies marketed by Lockton in an identical fashion—constitutes impermissible viewpoint discrimination and a denial of equal protection under the law." *Id.* ¶ 60

Chubb agreed to, *inter alia*, pay a monetary fine of $1,300,000; not participate in the future in any Carry Guard, or similar programs that violate the New York Insurance Law; and not to "enter into any agreement or program with the NRA to underwrite or participate in any affinity-type insurance program involving any line of insurance."  Dkt. No. 37-5, pp. 6-7. The Chubb Consent Order expressly allowed Chubb to issue insurance policies to the NRA for the NRA's own corporate operations. Dkt. No. 37-5 at ¶ 22.

The NRA maintains that "[a]lthough DFS restricts Lockton from participating in any

affinity-type insurance programs with the NRA in New York or with New York residents, Defendants' restrictions in the Chubb Consent Order contain no geographic constraint whatsoever. Instead, the Chubb Consent Order purports to limit Chubb's involvement with the NRA anywhere, and everywhere, in the world." Am. Compl. ¶ 63. Plaintiff contends that "DFS allows Chubb to continue to underwrite affinity-type insurance programs with other affinity or common-cause organizations that do not publicly advocate for Americans' Second Amendment rights, so long as Chubb undertakes 'reasonable due diligence to ensure that any entity involved . . . is acting in compliance with the Insurance Law . . . .' The only plausible explanation for the DFS's complete exclusion of NRA-endorsed policies, even those 'in compliance with the Insurance Law,' is that Defendants seek to misuse DFS's power to deprive the NRA of insurance and financial services, on the sole ground that Defendants disapprove of the NRA's viewpoint regarding gun control." *Id.* ¶ 64 (quoting Dkt. No. 37-5 at ¶ 22).

### f. May 2018 Press Releases

Also in May 2018, DFS issued two press releases detailing its investigation into the Carry Guard program, the violations of the New York Insurance Law, and the Consent Orders ("DFS Press Releases"). Def. App. at A & B.[6] In its May 2, 2018 Press Release announcing that Lockton had agreed to pay a $7 million fine, DFS states that the NRA Carry Guard insurance program unlawfully provided liability insurance to gun owners for certain acts of intentional wrongdoing and improperly provided insurance coverage for criminal

---

[6] Defendants' Appendixes A and B are the May 2, 2018 and May 7, 2018 DFS Press Releases referenced in the Amended Complaint. Because they are not annexed as exhibits to the Amended Complaint, Defendants appended them to their motion.

defense in a crime involving a firearm.  Def. App. at A.  The press release also indicates that the NRA, "which does not have a license from DFS to conduct insurance business in New York, actively marketed and solicited for the Carry Guard program . . . ."  *Id.*  It further indicates that "DFS will not tolerate conduct by any entity, licensed or otherwise, in contravention of New York Insurance Law, especially when that conduct is such an egregious violation of public policy designed to protect all citizens," and that the Consent Order with Lockton was part of DFS's continuing efforts to "uphold and preserve the integrity of New York law."  *Id.*

The May 7, 2018 Press Release announcing that Chubb had agreed to pay a $1.3 million fine contains language identical to that in the Stockton press release related to the illegality of the Carry Guard insurance program and the NRA's active marketing and solicitation for the Carry Guard program even though it is not licensed to conduct insurance business in New York.  Def. App. at B.  DFS describes the Consent Order with Chubb as "another step in addressing the unlicensed and improper activity connected with the NRA's unlawful Carry Guard program," and states that DFS will "continue its comprehensive investigation into [the] matter to ensure that the New York Insurance Law is enforced and that consumers are no longer conned into buying so-called 'self-defense' insurance coverage."  *Id.*  The press release also indicates that Chubb has agreed to refrain from, *inter alia*, "[e]ntering into any other agreement or arrangement, including any affinity type insurance program involving any line of insurance involving a contract of insurance involving the NRA, directly or indirectly."  *Id.*

    **g.  Response to Guidance Letters and Consent Orders**

Shortly after the Consent Orders were made public, Lloyd's announced that it would terminate all affinity insurance programs associated with the NRA, citing the DFS investigations.  Am. Compl. ¶ 65.  The NRA alleges that it also encountered "serious difficulties" replacing its corporate insurance carrier, and that "nearly every" potential replacement carrier "has indicated that it fears transacting with the NRA specifically in light of DFS's actions against Lockton and Chubb." *Id.* ¶ 66.  The NRA further alleges that following the Guidance Letters, "multiple  banks" withdrew their bids in the NRA's Request for Proposal ("RFP") process[7] "based on concerns that any involvement with the NRA . . . would expose them to regulatory reprisals." *Id.* ¶ 67.  Plaintiff contends: "Defendants' campaign is achieving its intended chilling effect on banks throughout DFS's jurisdiction. Speaking 'on the condition of anonymity,' one community banker from Upstate New York told *American Banker* magazine that in light of the apparent 'politically motivated' nature of the DFS guidance, '[i]t's hard to know what the rules are' or whom to do business with, because bankers must attempt to anticipate 'who is going to come into disfavor with the New York State DFS' or other regulators.  Other industry sources told *American Banker* that, 'such regulatory guidelines are frustratingly vague, and can effectively compel institutions to cease catering to legal businesses.'" *Id.* ¶ 68 (quoting Neil Haggerty, *Gun issue is a lose-lose for banks (whatever their stance)*, AMERICAN BANKER (Apr. 26, 2018). The NRA asserts that it suffered tens of millions of dollars in damages as a result of Defendants' actions, which "includ[es], without limitation, damages due to reputational

---

[7]The NRA alleges that "during February 2018, the NRA issued a Request for Proposal ("RFP") to multiple banks, inviting them to submit bids to provide depository services, cash-management services, and other basic wholesale banking services necessary to the NRA's advocacy. The NRA received enthusiastic responses from several banks." Am. Compl. ¶ 40.

harm, increased development and marketing costs for any potential new NRA-endorsed insurance," *id.* ¶ 69, ¶ 111 (same), and "lost royalty amounts owed to the NRA." *Id.* ¶ 80. The NRA further asserts that without access to essential banking and insurance services, "it will be unable to exist as a not-for-profit or pursue its advocacy mission." *Id.* ¶ 70.

## IV.   DISCUSSION

### 1. Freedom of Speech

Count One alleges that "Defendants' actions—including but not limited to the issuance of the April 2018 [Guidance] Letters and the accompanying backroom exhortations, the imposition of the Consent Orders upon Chubb and Lockton, and the issuance of the Cuomo Press Release—established a 'system of informal censorship' designed to suppress the NRA's speech." Am. Compl. ¶ 75 (quoting *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 71 (1963)).  Plaintiff asserts that Defendants took these actions "with the intent to obstruct, chill, deter, and retaliate against the NRA's core political speech." *Id.* ¶ 76.   Plaintiff contends that these actions "constitute a concerted effort to deprive the NRA of its freedom of speech by threatening with government prosecution services critical to the survival of the NRA and its ability to disseminate its message," and amount to "an 'implied threat[ ] to employ coercive state power' against entities doing business with the NRA.*" Id.* ¶ 77 (quoting *Okwedy v. Molinari*, 333 F.3d 339, 342 (2d Cir. 2003)).  Plaintiff maintains that Defendants' actions have caused "financial institutions doing business with the NRA to end their business relationships, or explore such action, due to fear of monetary sanctions or expensive public investigations." *id.* ¶ 78, and, in turn, "resulted in significant damages to the NRA, including but not limited to damages due to reputational harm, increased

14

development and marketing costs for any potential new NRA-endorsed insurance programs, and lost royalty amounts owed to the NRA." *Id.* ¶ 80.

Count Two alleges that these same actions by Defendants "were in response to and substantially caused by the NRA's political speech regarding the right to keep and bear arms.  Defendants' actions were for the purpose of suppressing the NRA's pro-Second Amendment viewpoint.  Defendants undertook such unlawful conduct with the intent to obstruct, chill, deter, and retaliate against the NRA's core political speech." *Id.* ¶ 86.  Like with Count One, Plaintiff alleges that Defendants' actions have "caused financial institutions doing business with the NRA to end their business relationships, or explore such action, due to fear of monetary sanctions or expensive public investigations," *id.* ¶ 87, and caused the same damages to the NRA as alleged in Count One.  *Id.* ¶ 90.

Because the alleged "censorship campaign" challenged in Count One, and the alleged illegal retaliation asserted in Count Two, are based upon the same conduct, caused the same response from regulated entities doing business with the NRA, and resulted in the same damages, and because the lion's share of the parties' First Amendment freedom-of-speech arguments are addressed to both causes of action, *see e.g.* Def. Mem. L. pp. 17-30; Pl. Mem. L. pp. 6-21; Pl. Mem. L. p. 9 ("Taken together, Defendants' threatened and actual regulatory reprisals constitute a cohesive censorship-and-retaliation campaign."), the Court addresses these counts together.

The First Amendment[8] guards against government action "targeted at specific

---

[8]Because violations of Article 1, § 8 of the New York State Constitution are subject to the same analysis as claims bought pursuant to the First Amendment, *see, e.g., Martinez v. Sanders*, 307 F. App'x 467, 468 n.2 (2d Cir. 2008)(citing *Pico v. Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26*, 638 F.2d 404 (2d Cir. 1980), *aff'd*, 457 U.S. 853 (1982)); *Congregation Rabbinical College of Tartikov, Inc. v. Vill. of*
(continued...)

15

subject matter," a form of speech suppression known as content based discrimination. *Reed v. Town of Gilbert, Ariz.*, 135 S. Ct. 2218, 2230 (2015); *see Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 829-30 (1995) (Government action aimed at the suppression of "particular views ... on a subject," and which discriminates based on viewpoint, is "presumptively unconstitutional."). The Guidance Letters and the Cuomo Press Release indisputably are directed at the NRA and similar groups based on their "gun promotion" advocacy. However controversial it may be, "gun promotion" advocacy is core political speech entitled to constitutional protection. The Guidance Letters and Cuomo Press Release's comments directed to this protected speech provides a sufficient basis to invoke the First Amendment on these claims.

Defendants argue that the Guidance Letters and Cuomo Press Release are merely government advocacy protected under the government-speech doctrine. The government-speech doctrine provides that the government does not need to be viewpoint-neutral when it chooses to express its own viewpoint on a topic of public interest. *Matal v. Tam*, 137 S. Ct. 1744, 1758 (2017). But while "the government-speech doctrine is important—indeed, essential—it is a doctrine that is susceptible to dangerous misuse." *Matal*, 137 S. Ct. at 1758. If read to allow not only government advocacy, but also government action, it could be used to "silence or muffle the expression of disfavored viewpoints." *Id.* For this reason, courts "must exercise great caution" in applying this doctrine. *Id.*

The Guidance Letters and Cuomo Press Release, read in isolation, clearly fit into the

---

[8](...continued)
*Pomona*, 138 F. Supp. 2d 352, 445 (S.D.N.Y. Sept. 29, 2005), the Court relies upon First Amendment freedom of speech jurisprudence in analyzing Counts One and Two.

government-speech doctrine as they address matters of public importance on which New York State has a significant interest. *See Centro De La Comunidad Hispana De Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 115 (2d Cir. 2017) (public safety is a significant governmental interest); *British Int'l Ins. Co. v. Seguros La Republica, S.A.*, 212 F.3d 138, 143 (2d Cir. 2000) ("New York shares with its citizens a significant interest in ensuring that businesses in the heavily regulated insurance industry have sufficient funds within the state where they conduct business to fulfill each individual insurance claim."); *see also* Def. Mem. L., at 31 ("[T]he Guidance Letters were issued to advance the State's interest in ensuring that insurers and financial institutions doing business in New York consider whether business relationships with the NRA, and other similar groups, may jeopardize their corporate reputations and public safety. . . .  Management of corporate reputations and risks to New York State businesses, and promotion of public safety and corporate responsibility in an effort to encourage strong markets and protect consumers are certainly significant government interests." ); Oral Arg. Trans. at 33 ("[The NRA] agree[s] that risks that affect the soundness of financial institutions are the type that DFS is properly charged with regulating, and reputation risks can even do that in some situations.")  Yet Plaintiff does not cite the Guidance Letters and Cuomo Press Release in isolation, but rather contends that these documents, when read in the context in which they were issued, amount to "threats that deliberately invoked DFS's 'risk management' authority to warn of adverse action if institutions failed to support Defendants' efforts to stifle the NRA's speech and to retaliate against the NRA based on its viewpoint." Am. Compl. ¶ 48.  For the reasons that follow, the Court finds that Plaintiff has stated plausible First Amendment freedom of

speech claims.

"'First Amendment rights may be violated by the chilling effect of governmental action that falls short of a direct prohibition against speech.'" *Zieper v. Metzinger*, 474 F.3d 60, 65 (2d Cir. 2007)(quoting *Aebisher v. Ryan*, 622 F.2d 651, 655 (2d Cir.1980)); *see also Dorsett v. Cty. of Nassau*, 732 F.3d 157, 160 (2d Cir. 2013)("To plead a First Amendment retaliation claim a plaintiff must show: (1) he has a right protected by the First Amendment; (2) the defendant's actions were motivated or substantially caused by his exercise of that right; and (3) the defendant's actions caused him some injury.")).  As applicable to the allegations in Counts One and Two, "the First Amendment prohibits government officials from encouraging the suppression of speech in a manner which 'can reasonably be interpreted as intimating that some form of punishment or adverse regulatory action will follow the failure to accede to the official's request.'" *Zieper*, 474 F.3d at 65-66 (quoting *Hammerhead Enters., Inc. v. Brezenoff*, 707 F.2d 33, 39 (2d Cir.1983)).  In determining whether government statements impede upon First Amendment rights, "what matters is the 'distinction between attempts to convince and attempts to coerce.'" *Id.*, at 66 (quoting *Okwedy v. Molinari*, 333 F.3d 339, 344 (2d Cir. 2003) *(per curiam)*.

The NRA's First Amendment freedom-of-speech claims turn on the allegations that Defendants issued threats to financial institutions and insurers "that DFS . . . will exercise its extensive regulatory power against those entities that fail to sever ties with the NRA." Am. Compl. at p. 2.  The First Amendment "require[s] courts to draw fine lines between permissible expressions of personal opinion [by public officials] and implied threats to employ coercive state power to stifle protected speech." *Hammerhead*, 707 F.2d at 39.  On

the one hand, public officials are free to promote their views about public welfare, including by using their bully pulpits to "cajole[] and exhort" others to repudiate positions or groups the officials view as pernicious. *Gravel v. United States*, 408 U.S. 606, 625 (1972); *see X–Men Sec., Inc. v. Pataki*, 196 F.3d 56, 70 (2d Cir. 1999) ("[W]e have noted that where a public official, without engaging in any threat, coercion, or intimidation, 'exhort[ed]' private entities not to distribute a board game whose ideas the official viewed as pernicious, the official's speech did not violate any constitutional right of the game's authors.") (quoting *Hammerhead*, 707 F.2d at 39 & n.6).  On the other hand, "oral or written statements made by public officials' could give rise to a valid First Amendment claim where comments of a government official can reasonably be interpreted as intimating that some form of punishment or adverse regulatory action will follow the failure to accede to the official's request." *Okwedy*, 333 F.3d at 342 (internal quotation marks, brackets, and citation omitted). Thus, the critical question here is whether Defendants' statements, including the Guidance Letters and Cuomo Press Release, threatened adverse action against banks and insurers that did not disassociate with the NRA.

When a question exists whether government speech contains a threat of future enforcement action, the First Amendment requires the Court to "look through forms to the substance." *Bantam Books,* 372 U.S. at 67.  "While the precise language" of the Cuomo Press Release and Guidance Letters "is certainly important," the Second Circuit has "never held that it is the only relevant factor in determining whether a public official has crossed the line 'between attempts to convince and attempts to coerce.'" *Zieper*, 474 F.3d at 66 (quoting *Okwedy*, 333 F.3d at 344).  Rather, the First Amendment requires the Court to consider all

19

the circumstances, including "the entirety of the defendants' [alleged] words and actions," to

determine "whether they could reasonably be interpreted as an implied threat." *Id.* In

making this determination, the Court examines a number of factors, including: (1) the

Defendants' regulatory or other decisionmaking authority over the targeted entities, *see*

*Okwedy*, 333 F.3d at 343 ("[T]he existence of regulatory or other direct decisionmaking

authority is certainly relevant to the question of whether a government official's comments

were unconstitutionally threatening or coercive...."); (2) whether the government actors

actually exercised regulatory authority over targeted entities, *see Bantam Books*, 372 U.S.

at 68–69 (the fact that the defendant's notices were "invariably followed up by police

visitations" as one factor that was relevant in determining that the notices "serve[d] as

instruments of regulation")*; Rattner v. Netburn*, 930 F.2d 204, 210 (2d Cir. 1991)

(suggesting that "unannounced visits by police personnel" might be relevant in determining

whether the defendants' actions could be reasonably viewed as an implicit threat), (3)

whether the language of the allegedly threatening statements could  reasonably be

perceived as a threat;  *Zieper*, 474 F.3d at 66 (citing *Rattner*, 930 F.2d at 210 (noting that "a

threat was perceived and its impact was demonstrable")); *Backpage.com, LLC v. Dart*, 807

F.3d 229, 233–35 (7th Cir. 2015); and (4) whether any of the targeted entities reacted in a

manner evincing the perception of an implicit threat. *See Bantam Books*, 372 U.S. at 68

("The Commission's notices, phrased virtually as orders, reasonably understood to be such

by the distributor, invariably followed up by police visitations, in fact stopped the circulation

of the listed publications *ex proprio vigore*.")*; Rattner*, 930 F.2d at 205–10 (holding that a

village trustee's letter to the village's chamber of commerce expressing concern about the

20

plaintiff's political advertisement in the chamber's newsletter and containing a list of businesses at which the trustee shopped, which the chamber's directors viewed as threatening boycott or other retaliatory action by the Village, could "reasonably be viewed as an implicit threat," largely because "a threat was perceived and its impact was demonstrable").  When Defendants' statements and alleged conduct is examined in its totality, there are sufficient allegations to state plausible freedom-of-speech claims.

Supt. Vullo and DFS clearly have regulatory authority over the targeted entities. Supt. Vullo is charged by the New York Financial Services Law with taking all actions that she "believes necessary to … ensure the continued solvency, safety, soundness and prudent conduct of the providers of financial products and services" in the State of New York to "encourage high standards of honesty, transparency, fair business practices and public responsibility." N.Y. Fin. Serv. L. §201(b)(2), (5).  "Reputational risk – the risk that negative publicity regarding an institution's business practices will lead to a loss of revenue or litigation – is just one of the threats to a bank or insurer's safety and soundness on which the Superintendent has previously issued guidance."  Def. Reply Mem. L., at 7 (citation omitted).  While it is within Supt. Vullo's province to issue the Guidance Letters, she also has the authority to initiate investigations and civil enforcement actions against regulated entities, as well as the power to refer matters to the attorney general for criminal enforcement. N.Y. Fin. Serv. L., Art. 3, § 301(b), (c)(4).  The authority to institute enforcement proceedings is one factor supporting a plausible contention that the Guidance Letters are part of an attempt to convey implied threats of coercive action against regulated entities doing business with the NRA.

Further, the government actor need not have direct power to take adverse action

21

over a targeted entity for comments to constitute a threat, provided the government actor has the power to direct or encourage others to take such action. *See Bantam Books*, 372 U.S. at 66–68 (observing that, although the Rhode Island Commission to Encourage Morality in Youth lacked the "power to apply formal legal sanctions," it had the authority to initiate investigations and recommend prosecutions, thereby imbuing the Commission's "advisory notices" with extra weight, since "[p]eople do not lightly disregard public officers' thinly veiled threats to institute criminal proceedings against them if they do not come around"); *Okwedy*, 333 F.3d at 344 ("Even though Molinari lacked direct regulatory control over billboards, [PNE Media, LLC ("PNE"), a company that produces and displays billboards,] could reasonably have feared that Molinari would use whatever authority he does have, as Borough President, to interfere with the 'substantial economic benefits' PNE derived from its billboards in Staten Island."). Based on Gov. Cuomo's press release wherein he indicates he is directing DFS to issue the Guidance Letters, it is a reasonable inference that he has the power to direct DFS take other official action, including the commencement of enforcement investigations against regulated institutions. Thus, there is a reasonable basis to conclude that he has the power to effectuate regulatory action against entities doing business with the NRA.

DFS actually exercised regulatory authority over Chubb and Lockton, two regulated entities that fall within the same scope of DFS's authority as the entities addressed in the Guidance Letters and Cuomo Press Release. But this fact, by itself, does not help Plaintiff's claims because Chubb and Lockton admitted violations of New York insurance laws. There are also no allegations that DFS exercised regulatory authority over entities other than Chubb and Lockton. Nevertheless, the Amended Complaint asserts that, during

A-86

the course of the DFS investigations into Chubb and Lockton, "DFS communicated to banks and insurers . . . that they would face regulatory action if they failed to terminate their relationships with the NRA, . . . indicating that any business relationship whatsoever with the NRA would invite adverse action." Am. Compl. ¶ 38.  This is a powerful factual allegation linking the recommendations in the Guidance Letters and Cuomo Press Release that regulated entities consider (and possibly end) their associations with the NRA, and the enforcement actions carried out by DFS against Chubb and Lockton.  At this stage of the litigation, the Court must accept this factual allegation as true.  Further, the NRA notes that the Chubb and Lockton Consent Orders, which imposed several million dollars in monetary penalties and permanently prohibited those entities from participating in any NRA-endorsed insurance program in New York State, were announced just two weeks after the Cuomo Press Release and Guidance Letters were issued. *Id.* ¶ 54.  Viewing the allegations in the light most favorable to the NRA, and drawing reasonable inferences in its favor, the temporal proximity between the Cuomo Press Release, the Guidance Letters, and the Consent Orders plausibly suggests that the timing was intended to reinforce the message that insurers and financial institutions that do not sever ties with the NRA will be subject to retaliatory action by the state. *See Wrobel v. Cnty. of Erie*, 692 F.3d 22, 32 (2d Cir. 2012)("A causal relationship can be demonstrated either indirectly by means of circumstantial evidence, including that the protected speech was followed by adverse treatment, or by direct evidence of animus."); *see also Catanzaro v. City of New York*, 486 Fed. Appx. 899, 902 (2d Cir.2012) ("Where a plaintiff has not alleged a specific connection between protected speech and an adverse action, 'causality can be shown through a close temporal proximity between the employer's awareness of protected conduct and the adverse

23

action.'")(quoting *Nagle v. Marron*, 663 F.3d 100, 110 (2d Cir. 2011));  *Housing Works, Inc. v. City of New York,* 72 F. Supp.2d 402, 424 (S.D.N.Y.1999) (concluding that the proximity in time between the plaintiff's protected speech and the defendants' conduct constituted indirect evidence of an improper motive).  The backroom exhortations combined with the timing of the publically announced Consent Orders provides strong support for Plaintiff's claims.

The Court must also assess whether the language of the Cuomo Press Release and the Guidance Letters could reasonably be perceived as a threat.  In the Cuomo Press Release, insurance companies and financial institutions are "urged" to "consider reputational risk that may arise from their dealings with the NRA or similar gun promotion organizations," "take prompt actions to manag[e] these risks," and "join the companies that have already discontinued their arrangements with the NRA."  The Guidance Letters contain similar language, "encourag[ing] regulated institutions to review any relationships they have with the NRA or similar gun promotion organizations, and to take prompt actions to managing these risks and promote public health and safety."  While neither the Guidance Letters nor the Cuomo Press Release specifically directs or even requests that insurance companies and financial institutions sever ties with the NRA, a plausible inference exists that a veiled threat is being conveyed.  Viewed in the light most favorable to the NRA, and given DFS's mandate—"effective state regulation of the insurance industry" and the "elimination of fraud, criminal abuse and unethical conduct by, and with respect to, banking, insurance and other financial services institutions," N.Y. Fin. Servs. Law § 102(e), (k) — , the Cuomo Press Release and the Guidance Letters, when read objectively and in the context of DFS's regulatory enforcement actions against Chubb and Lockton and the

24

backroom exhortations, could reasonably be interpreted as threats of retaliatory enforcement against regulated institutions that do not sever ties with the NRA. *See Okwedy*, 333 F.3d at 344 ("Because the district court was considering a motion to dismiss, it should have viewed the language of Molinari's letter in the light most favorable to plaintiffs."); *id.* at 342 (holding that a jury could find that the defendant's letter contained an implicit threat of retaliation where it invoked the defendant's position as the Borough President of Staten Island, pointed out that the targeted company "owns a number of billboards on Staten Island and derives economic substantial benefits from them," and directed the company to contact the defendant's legal counsel and chair of his anti-bias task force); *Rattner*, 930 F.2d at 206–10 (holding, on motion for summary judgment, that there were genuine issues of material fact about whether Defendant's letter—stating that Plaintiff's publication "raises significant questions and concerns about the objectivity and trust which we are looking for from our business friends"—was "threatening or coercive").

Finally, targeted entities' reactions to the perception of an implicit threat is a factor the Court should consider.  Defendants argue that no individual company was singled out or coerced as a result of Defendants' public statements, Def. Mem., L., at 22, but such specific targeting is not required in order to make out a First Amendment claim in these circumstances. *See Hammerhead*, 707 F.2d at 39 (noting that "not a single store was influenced by [defendant's allegedly threatening] correspondence").  The Amended Complaint includes numerous allegations regarding the perception of a threat by New York insurers and financial institutions, and its impact on the NRA's ability to procure insurance

25

and banking services from target entities. *See* Am. Compl. ¶¶ 42, 44, 65-68.[9]  These

allegations sufficiently support the contention that New York insurers and financial

institutions took specific actions in response to their perceptions of a threat.

The allegations in the Amended Complaint are sufficient to create a plausible

inference that the Guidance Letters and Cuomo Press Release, when read together and in

the context of the alleged backroom exhortations and the public announcements of the

Consent Orders, constituted implicit threats of adverse action against financial institutions

and insurers that did not disassociate from the NRA.

Contrary to Defendants' argument, actual chilled speech is not necessary to make

out a plausible First Amendment claim.  "Chilled speech is not the *sine qua non* of a First

Amendment claim.  A plaintiff has standing if he can show either that his speech has been

adversely affected by the government retaliation or that he has suffered some other

concrete harm.  Various non-speech harms are sufficient to give a plaintiff standing."

*Dorsett v. Cty. of Nassau*, 732 F.3d 157, 160 (2d Cir. 2013).  The NRA's allegations of

---

[9]The NRA alleges that: during DFS's investigation into Lockton, Lockton's chair "confided [to the NRA] that Lockton would need to 'drop' the NRA—entirely—for fear of 'losing [our] license' to do business in New York," Am. Compl. ¶ 42; a week after the Chubb and Lockton consent decrees were entered, Lloyd's of London "announced . . . that it would 'terminate all insurance offered, marketed, endorsed, or otherwise made available' through the NRA in light of the DFS Investigation," *id.* ¶ 65; the NRA's corporate insurance carrier "severed mutually beneficial business arrangements with the NRA because it learned of Defendants' threats directed at Lockton, and feared it would be subject to similar reprisals," *id.* ¶ 44; the "NRA has encountered serious difficulties obtaining [replacement] corporate insurance coverage" because "nearly every carrier has indicated that it fears transacting with the NRA specifically in light of DFS's actions against Lockton and Chubb," *id.* ¶ 66; "[m]ultiple banks withdrew their bids in the NRA's RFP process following the issuance of the April 2018 Letters, based on concerns that any involvement with the NRA—even providing the organization with basic depository services—would expose them to regulatory reprisals," *id.* ¶ 67; and "one community banker from Upstate New York told American Banker magazine that in light of the apparent 'politically motivated' nature of the DFS guidance, '[i]t's hard to know what the rules are' or whom to do business with, because bankers must attempt to anticipate 'who is going to come into disfavor with the New York State DFS' or other regulators," *id.* ¶ 68.

A-90

significant interference with its business relationships, *see* Am. Compl. ¶¶ 65-67, 69-70,[10]

and the damages caused by Defendants' actions, *id.* ¶¶ 80, 87, are sufficient to establish a

First Amendment injury. *See, e.g., Bantam Books*, 372 U.S. at 64 n.6 ("Appellants' standing

has not been, nor could it be, successfully questioned. The appellants have in fact suffered

a palpable injury as a result of the acts alleged to violate federal law, and at the same time

their injury has been a legal injury. The finding that the Commission's notices impaired sales

of the listed publications, which include two books published by appellants, establishes that

appellants suffered injury.")(citation omitted); *see also Burwell v. Hobby Lobby Stores, Inc.*,

134 S. Ct. 2751, 2770 (2014) ("[A] law that operates so as to make…beliefs more expensive

in the context of business activities imposes a burden on [First Amendment Rights].")*;*

*Zherka v. Amicone*, 634 F.3d 642, 646 (2d Cir. 2011) ("Allegations of loss of business or

some other tangible injury as a result of a defendant's [retaliatory] statements would suffice

to establish concrete harm."); *Davis v. Vill. Park II Realty Co.*, 578 F.2d 461, 463 (2d Cir.

1978) (reversing dismissal of a complaint by president of a tenants' association who

claimed that the owner of a federally funded housing project had threatened her with

eviction in retaliation for her advocacy of tenants' rights).

The fact that the alleged impact of Defendants' statements and actions was

commercial in nature does not remove the case from the First Amendment's protections, or

---

[10]The Amended Complaint alleges that Defendants' statements are causing "insurance, banking, and financial institutions doing business with the NRA . . . to rethink their mutually beneficial business relationships with the NRA for fear of monetary sanctions or expensive public investigations." Am. Compl. ¶ 65.  As a result, the NRA states that it is at risk of losing "access to basic banking services," that it "has encountered serious difficulties obtaining corporate insurance coverage to replace coverage withdrawn by the Corporate Carrier," and that "there is a substantial risk that NRATV will be forced to cease operating" if it cannot "obtain insurance in connection with media liability." *Id.* ¶¶ 66, 67.  The NRA claims it has incurred "tens of millions of dollars in damages based on Defendants' conduct," and that it "will be unable to exist as a not-for-profit or pursue its advocacy mission" if it is unable to obtain basic insurance and financial services. *Id.* ¶¶ 69, 70.

necessarily require a lesser level of scrutiny.  *See Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 566 (2011) (Commercial activity is "no exception" to the principle that the First Amendment "requires heightened scrutiny whenever the government creates a regulation of speech because of disagreement with the message it conveys.")(internal quotation marks omitted). While commercial speech may generally be subject to intermediate scrutiny, "viewpoint discrimination is scrutinized closely whether or not it occurs in the commercial speech context." *Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 39 (2d Cir. 2018). The Amended Complaint contains sufficient allegations plausibly supporting the conclusion that Defendants' actions were taken in an effort to suppress the NRA's gun promotion advocacy. *See* Am. Compl. at ¶¶ 21, 76, 78, 86.  Moreover, the NRA's allegations that Defendants' enforcement actions against Lockton and Chubb impeded the NRA's ability to enter contracts for lawful affinity insurance plans, but did not take similar action against other membership organizations that did not engage in gun promotion advocacy, *see* Am. Compl. at ¶¶ 36-37, provides a plausible basis to conclude that Defendants sought to impose a content-based restriction on NRA-affiliated businesses based on viewpoint animus that serves no substantial government interest.

In the end, the allegations of direct and implied threats to insurers and financial institutions because of these entities' links with the NRA, and the allegations of resulting harm to the NRA's operations, are sufficient to make out plausible First Amendment freedom-of-speech claims.  While the NRA may not be able to establish the factual predicates for these claims, it has presented sufficient allegations to allow them to go forward.  Accordingly, those portions of Defendants' motion directed to Counts One and Two are denied.

**b. Freedom of Association**

Count Three alleges a violation of the NRA's rights to freedom of association as protected by the First and Fourteenth Amendments to the United States Constitution, and by Article 1, Section 8 of the New York Constitution.  Am. Compl. ¶¶ 93-106.  In this regard, the NRA alleges that "Defendants' actions—including but not limited to the issuance of the April 2018 [Guidance] Letters and the accompanying backroom exhortations, the imposition of the Consent Orders upon Chubb and Lockton, and the issuance of the Cuomo Press Release—are, in effect, limiting the NRA's ability to continue to operate as an ongoing entity and engage in political advocacy." *Id.* ¶ 96.  Plaintiff contends that "financial institutions previously doing business with the NRA . . . are ending their business relationships, or exploring such action, due to fear of monetary sanctions or expensive public investigations." *Id.*, ¶ 97.  In this regard, the NRA contends that it "has spoken to numerous carriers in an effort to obtain replacement corporate insurance coverage; nearly every carrier has indicated that it fears transacting with the NRA specifically in light of DFS's actions against Lockton and Chubb.  Furthermore, multiple banks withdrew their bids following the issuance of the April 2018 Letters, based on concerns that any involvement with the NRA—even providing the organization with bank-depository services—would expose them to regulatory reprisals." *Id.*   The NRA maintains that without appropriate insurance and banking services, it will be unable to continue "its existence as a not-for-profit organization and fulfill its advocacy objectives."  *Id.* ¶ 98; *see id.* ¶ 99.  Plaintiff asserts that "Defendants' actions were taken to specifically target the NRA's and its members' right to associate and express their political beliefs in order to banish pro-Second Amendment views from New York.  Believing they could not directly bar the NRA from operating in New York, Defendants instead

A-93

engaged in a censorship scheme to directly, substantially, and significantly infringe the NRA's and its members' right to associate by depriving it of critical insurance and banking services." *Id.* ¶ 100.

The First Amendment[11] protects association "for the purpose of engaging in . . . activities protected by the First Amendment." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 617–18, 104 S. Ct. 3244, 82 L. Ed.2d 462 (1984). The NRA associates with its members for the purpose of engaging in political advocacy advancing Second Amendment rights, including through letter-writing campaigns, peaceable public gatherings, and other grassroots "lobbying" activities. *See* Am. Compl. at ¶ 95. Association for purposes of Second Amendment advocacy is an activity protected by the First Amendment. *See Smith v. Arkansas State Highway Employees*, 441 U.S. 463, 464 (1979) (The First Amendment "protects the right of associations to engage in advocacy on behalf of their members."); *NAACP v. Alabama*, 357 U.S. 449, 462 (1958)(the First Amendment protects the right "to engage in association for the advancement of beliefs and ideas"); *Tabbaa v. Chertoff*, 509 F.3d 89, 101 (2d Cir. 2007)("Plaintiffs unquestionably had a protected right to express themselves through association at the [Reviving the Islamic Spirit] Conference."); *Brady v. Colchester*, 863 F.2d 205, 217 (2d Cir. 1988)("[t]he Supreme Court has recognized a freedom to associate with others to pursue goals independently protected by the first amendment—such as political advocacy...," )(internal quotation marks and citation omitted).

The "first question [the Court] must answer" in determining whether Plaintiff states viable freedom-of-association claims "is whether and to what extent [D]efendants' actions

---

[11]The New York State Constitution claims at issue here are subject to the same standards as the First Amendment claims. *See* fn. 8, *supra*.

burdened" Plaintiff's right to associate for the purpose of engaging in Second Amendment advocacy. *Tabbaa*, 509 F.3d at 101. "To be cognizable, the interference with [Plaintiff's] associational rights must be 'direct and substantial' or 'significant.'" *Fighting Finest, Inc. v. Bratton*, 95 F.3d 224, 228 (2d Cir. 1996) (quoting *Lyng v. Int'l Union*, 485 U.S. 360, 366, 367 & n. 5, 108 S .Ct. 1184, 99 L. Ed.2d 380 (1988)). "Mere incidental burdens on the rig ht to associate do not violate the First Amendment." *Tabbaa*, 509 F.3d at 101.

Plaintiff's allegations, accepted as true for purposes of this motion, indicate that "nearly" every insurance carrier, and "multiple" banks have expressed a fear of transacting with the NRA or withdrawn their bids for services to the NRA because of Defendants' actions as discussed above. While the Court accepts, at it must, that many insurance carriers and banks have refused to offer services to the NRA, and that insurance coverage and banking services are necessary for the NRA to continue its advocacy activities, Plaintiff has not asserted that it is unable to obtain any insurance coverage or any banking services so it can continue its operations. Moreover, even accepting the allegations that multiple insurers and banking institutions have expressed an unwillingness to offer services to the NRA due to Defendants' actions, there are no allegations plausibly supporting the conclusion that Defendants' actions directly and substantially, or significantly, interfered with the NRA's associational rights. Rather, the Amended Complaint alleges that the Guidance Letters, Consent Orders, press releases, and "backchannel threats" affect insurers and banking institutions' willingness to offer services to the NRA which, in turn, creates a "risk" that the NRA might not be able to offer associational activities such as (1) media coverage through NRATV, (2) circulation of publications and magazines, (3) meetings, rallies, conventions and assemblies, (4) educational programs, Am. Compl. ¶ 98, and (5) letter-

writing campaigns. *Id.* at ¶ 95.  But the Amended Complaint fails to sufficiently allege that Defendants' actions directly and significantly, or substantially, hampered the NRA's right to associate with its members.  While the NRA's ability to obtain insurance coverage and banking services from entities regulated in New York state may be impaired by Defendants' actions, this imposes only an incidental burden on the NRA's right to engage in expressive association. *Cf. Lyng*, 485 U.S. at 367, 108 S. Ct. 1184 (concluding that a burden is merely incidental when it is "exceedingly unlikely" that a defendant's actions would prevent someone from exercising his or her associational rights) (internal quotation marks omitted).

The cases of *Healy v. James*, 408 U.S. 169 (1972), and *Tabbaa*, *supra*, cited by Plaintiff in support of its freedom of association claims, are clearly distinguishable. In *Healy*, the Supreme Court held that a college's denial of official recognition to a student organization constituted a substantial burden on association.  408 U.S. at 183.  Here, Defendants took no action like the college in *Healy* that directly impacted the NRA's right to meet with its members for expressive association.  In *Tabbaa*, the Second Circuit held that the "plaintiffs suffered a significant penalty, or disability, solely by virtue of associating at the [Reviving the Islamic Spirit] Conference" because they were detained for lengthy periods of time, interrogated, fingerprinted, and photographed when others, who had not attended the conference, did not have to endure these measures. *Tabbaa*, 509 F.3d at 102.  Here, there are no allegations that Defendants imposed a penalty upon NRA members who participated in NRA advocacy events.  Similarly, there are no plausible allegations that the Defendants imposed a penalty upon the NRA for associating with its members for Second Amendment advocacy purposes.  While the NRA argues that the Consent Orders were the result of speech-motivated regulatory decisions, the Consent Orders indicate that Chubb and

32

Stockton agreed that their conduct related to NRA insurance programs violated New York insurance law. The fact that these insurance companies agreed that *their* conduct violated New York law does not support a plausible claim that the Defendants imposed a penalty upon the NRA for associating with its members.  *See e.g. Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 707 (1986)(The "First Amendment is not implicated by the enforcement of laws directed at unlawful conduct having nothing to do with…expressive activity.").  Further, the Lockton Consent Order provides that "Lockton may assist the NRA in procuring insurance for the NRA's own corporate operations, " Dkt. No. 37-4 at ¶ 43, and the Chubb Consent Order provides that "the NRA may itself purchase insurance from Chubb for the sole purpose of obtaining insurance for the NRA's own corporate operations." Dkt. No. 37-5 at ¶ 22.  These two clauses undermine the NRA's claim that DFS intended to coerce insurers and banks into not doing business with the NRA and thereby penalized the NRA.

The allegations in the Amended Complaint are, at most, that the Defendants' actions "make it more difficult" for the NRA "to exercise [its] freedom of association" through NRA activities, but "did not prevent [the NRA] . . . from associating [with its members] nor burden in any significant manner [its] ability to do so." *Fighting Finest*, 95 F.3d at 228.  This fails to state plausible freedom-of-association claims.  Accordingly, Defendants' motion directed to Count Three is granted.  If Plaintiff seeks leave to amend this claim, it should be done through a formal Rule 15 motion.[12]

_____

[12]At the end of the NRA's brief, it generically asks that if any claims are dismissed, it be given leave to amend. Pl. Mem. L., at 48.  But without providing proposed factual allegations that would support legally plausible freedom-of-association claims, the Court is unable to determine whether to grant such leave.  *See Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 119 (2d Cir. 2012)("In assessing whether the proposed complaint states a claim, we consider the proposed amendments along with the remainder of the complaint, accept as true all non-conclusory factual allegations therein, and draw all reasonable inferences in

(continued...)

### d.  Equal Protection

Count Four alleges that Defendants engaged in selective enforcement of the New York insurance laws in violation of the NRA's rights to equal protection of law as secured by the Fourteenth Amendment to the United States Constitution, and by Article 1, Section 11 of the New York Constitution.  Am. Compl. ¶¶ 108-113.  In this regard, the NRA alleges that Defendants "knowingly and willfully violated the NRA's equal protection rights by seeking to selectively enforce certain provisions of the Insurance Law against Lockton's affinity-insurance programs for the NRA.  Meanwhile, other affinity-insurance programs that were identically (or at least similarly) marketed by Lockton, but not endorsed by 'gun promotion' organizations, have not been targeted by DFS's investigation." *Id.* at ¶ 107.  Plaintiff further contends that "Defendants' selective enforcement of the Insurance Law against the NRA and its business partners is based on the NRA's political views and speech relating to the Second Amendment."  *Id.* ¶ 110.  Plaintiff maintains that "Defendants' actions have resulted in significant damages to the NRA, including but not limited to damages due to reputational harm, increased development and marketing costs for any potential new NRA-endorsed insurance programs, and lost royalty amounts owed to the NRA." *Id.* ¶ 111.  Plaintiff seeks (a) "an order preliminarily and permanently enjoining Cuomo and Vullo (in their official capacities) and DFS . . . from selectively enforcing the Insurance Law by requiring Lockton or Chubb, through their respective consent orders, to forbear from doing

---

[12](...continued)
plaintiff's favor to determine whether the allegations plausibly give rise to an entitlement to relief.")(interior quotation marks, alterations, and citations omitted); *Johnson v. City of New York*, No. 16-CV-6426 (KAM)(VMS), 2018 WL 5282874, at *4 (E.D.N.Y. Oct. 24, 2018)("A party seeking leave to amend under Rule 15 must establish that amendment is not futile, is not the product of undue delay or bad faith, and would not overly prejudice the non-movant.")(interior quotation marks and citations omitted).

business with the NRA which they could otherwise permissibly conduct with other affinity organizations," *id.* ¶ 113; (b) an injunction to enjoin Defendants "from further selective enforcement of the Insurance Laws to the NRA endorsed policies," *id.,* p. 44 ("Request for Relief"), ¶ a(3); and (c) monetary damages. *Id.* ¶ c.

Defendants argue that Plaintiff fails to allege facts supporting standing for selective enforcement equal protection claims because the Amended Complaint alleges that DFS "selectively" enforced the New York Insurance Law against Lockton and Chubb, but "does not allege that DFS has taken any enforcement action against the NRA at all."  Def. Mem. L. at 39 (citing Am. Compl. at ¶¶ 54-64, 107-113).[13]  Defendants maintain that the Court should not allow the NRA "to attempt a collateral attack on the Consent Orders, to which they are not a party, and to which the parties voluntarily waived any objection or challenge." *Id.*  They argue that to do so would be improper "under the established law of standing," and "would hamper the current and future law enforcement efforts of DFS, by casting a shadow over the finality that regulated parties obtain when they enter into consent orders." *Id.* Plaintiff counters that it has standing to bring these claims because, "[b]y prohibiting Lockton and Chubb from engaging in lawful insurance business with the NRA, Defendants have selectively enforced the State's insurance laws against the NRA, not just against Lockton and Chubb." Pl. Mem. L. at 25.

### 1. Standing

---

[13]Defendants note in two footnotes, however, that the NRA is under investigation for unlicensed insurance activities. Def. Mem. L., at 38, n. 16 ("While the NRA is under investigation for its unlicensed insurance activities and other violations of the Insurance Law, that investigation is ongoing and has not, to date, resulted in any enforcement action against the NRA."); *id.* at 39, n. 17 ("It should be noted that, while the NRA's own violations of the Insurance Law are under investigation by DFS, no enforcement action has yet been taken against it.").

"A complaint must contain specific allegations that 'plausibly suggest [Plaintiff has] standing to sue.'" *Ctr. for Bio-Ethical Reform, Inc. v. Black*, 234 F. Supp. 3d 423, 431 (W.D.N.Y. 2017)(quoting *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011)). "And because standing is essential to a court's power to entertain suit, courts must refrain from drawing inferences to find standing." *Id.* (citing *Atlantic Mut. Ins. Co. v. Balfour Maclaine Int'l Ltd.*, 968 F.2d 196, 198 (2d Cir. 1992)). At the pleading stage, a plaintiff must "clearly allege facts demonstrating each element" of standing. *Spokeo, Inc. v. Robins*, ⸺ U.S. ⸺, 136 S. Ct. 1540, 1547, 194 L. Ed. 2d 635 (2016). "[A] plaintiff must demonstrate standing separately for each form of relief sought." *Friends of the Earth, Inc. v. Laidlaw Envt'l Servs., Inc.*, 528 U.S. 167, 185 (2000); *see Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 404 (2d Cir. 2011)(Standing must be demonstrated "for each claim and form of relief sought.").

Article III of the United States Constitution limits the jurisdiction of federal courts to "Cases" or "Controversies." U.S. Const. art. III, § 2. "The purpose of Article III is to limit federal judicial power 'to those disputes which confine federal courts to a role consistent with a system of separated powers and which are traditionally thought to be capable of resolution through the judicial process.'" *Montesa v. Schwartz*, 836 F.3d 176, 195 (2d Cir. 2016)(quoting *Valley Forge Christian Coll. v. Ams. United For Separation of Church and State, Inc.*, 454 U.S. 464, 472(1982)). Standing is a doctrine rooted in the traditional understanding of the case-or-controversy limitation on federal judicial power. *Burgin v. Brown*, No. 15-CV-201S, 2018 WL 1932598, at *4 (W.D.N.Y. Apr. 24, 2018)(citing *Spokeo*, 136 S. Ct. at 1547). "As recently explained in *Spokeo*, constitutional standing developed 'to ensure that federal courts do not exceed their authority as it has been traditionally

understood' by limiting 'the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong.'" *Id.* (quoting *Spokeo,* 136 S. Ct. at 1547).

The "irreducible constitutional minimum" of standing requires Plaintiff to show three elements: 1) that it suffered an "injury in fact;" 2) a causal connection between the injury and the conduct of which Plaintiff complains; and 3) that it is likely rather than speculative that the injury will be "redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). To be sufficient for purposes of standing, an injury must be "an invasion of a legally protected interest which is (a) concrete and particularized ... and (b) actual or imminent, not conjectural or hypothetical[.]" *Lujan*, 504 U.S. at 560 (internal quotations, citations, and footnote omitted); *see Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 125 ("The plaintiff must have suffered or be imminently threatened with a concrete and particularized 'injury in fact' that is fairly traceable to the challenged action of the defendant and likely to be redressed by a favorable judicial decision.")(citing *Lujan*, 504 U.S. at 560). A "concrete" injury is one that is "'de facto'[,] that is, it must actually exist ... [it is] 'real' and not 'abstract,'" although an injury need not be tangible to be concrete. *Spokeo*, 136 S. Ct. at 1548. To be "particularized," an injury "must affect the plaintiff in a personal and individual way." *Id.* at n.1.

To have standing to seek injunctive relief, a plaintiff must establish a real or immediate threat of injury that is caused by the challenged conduct. *City of Los Angeles v. Lyons*, 461 U.S. 95, 101-02 (1983); *see Cacchillo*, 638 F.3d at 404 (A plaintiff seeking injunctive relief "must show the three familiar elements of standing: injury in fact, causation, and redressability." )(citing *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009)); *Greene v. Gerber Prod. Co.*, 262 F. Supp. 3d 38, 54 (E.D.N.Y. 2017)("'[T]o meet the

constitutional minimum of standing' for injunctive relief, a plaintiff 'must carry the burden of establishing that [it] has sustained or is immediately in danger of sustaining some direct injury as the result of the challenged official conduct.'")(quoting *Shain v. Ellison*, 356 F.3d 211, 215 (2d Cir. 2004)); *see also Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 239 (2d Cir. 2016) ("Plaintiffs lack standing to pursue injunctive relief where they are unable to establish a real or immediate threat of injury.")(interior quotation marks and citations omitted).  Thus, to obtain an injunction, Plaintiff "must show, *inter alia*, 'a sufficient likelihood that [it] will again be wronged" in a way similar to the way it has already been wronged. *Marcavage v. City of New York*, 689 F.3d 98, 103 (2d Cir. 2012)(quoting *Lyons*, 461 U.S. at 111).  The Supreme Court has "repeatedly reiterated that 'threatened injury must be *certainly impending* to constitute injury in fact,' and that '[a]llegations of *possible* future injury' are not sufficient.'" *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)(quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990))(emphasis added in *Clapper*); *see Pungitore v. Barbera*, 506 Fed. Appx. 40, 41 (2d Cir. 2012) ("[W]hen seeking prospective injunctive relief, the plaintiff must prove the likelihood of future or continuing harm."); *Burgin*, 2018 WL 1932598, at *5 ("For prospective relief, 'a plaintiff must show a likelihood that he will be injured in the future,' and that the future injury is 'certainly impending, and real and immediate.'")(quoting *Carver v. City of N.Y.*, 621 F.3d 221, 228 (2d Cir. 2010) and *Lee v. Bd. of Governors of the Fed. Reserve Sys.*, 118 F.3d 905, 912 (2d Cir. 1997)).   While past injuries may be relevant to the issue of whether future injury is impending, and may support a claim for monetary damages, "such evidence 'does not in itself show a present case or controversy regarding injunctive relief ... if unaccompanied by any continuing, present adverse effects.'" *Pungitore*, 506 Fed. Appx. at 42 (quoting *Lyons*, 461 U.S. at 102)); *see*

*Casey v. Odwalla, Inc.*, No. 17-CV-2148 (NSR), 2018 WL 4500877, at *9 (S.D.N.Y. Sept. 19, 2018) ("Although 'past injuries' can support a claim for 'money damages,' a party cannot rely on past injury alone to provide a basis for standing to seek injunctive relief.")(citing *Nicosia*, 834 F.3d at 239; *Shain v. Ellison*, 356 F.3d 211, 215 (2d Cir. 2004); *Deshawn E. ex rel. Charlotte E. v. Safir*, 156 F.3d 340, 344 (2d Cir. 1998)).  Rather, to establish a certainly impending future injury, a plaintiff must show ""how [it] will be injured prospectively and that the injury would be prevented by the equitable relief sought."" *Greene v. Gerber Prod. Co.*, 262 F. Supp. 3d 38, 54–55 (E.D.N.Y. 2017)(quoting *Marcavage*, 689 F.3d at 103 (collecting cases)).

In addition to constitutional standing, there is a prudential branch of standing "which embodies 'judicially self-imposed limits on the exercise of federal jurisdiction.'" *Montesa*, 836 F.3d at 195 (quoting *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 11 (2004) *abrogated on other grounds by Lexmark*, 134 S. Ct. at 1387).  Prudential standing acts as a limitation on constitutional standing and consists of "the general prohibition on a litigant's raising another person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked." *Lexmark Int'l*,  572 U.S. at 126 (internal quotation marks and citations omitted).

To satisfy prudential standing, a "plaintiff generally must assert [its] own legal rights and interests, and cannot rest [its] claim to relief on the rights or interests of third parties." *Warth*, 422 U.S. at  499.  "Though this limitation is not dictated by the Article III case or controversy requirement, the third-party standing doctrine has been considered a valuable prudential limitation, self-imposed by the federal courts." *Kane v. Johns-Manville Corp.*, 843

A-103

F.2d 636, 643 (2d Cir. 1988).  The Supreme Court articulated two important policies justifying this limitation: "first, the courts should not adjudicate [third-party] rights unnecessarily, and it may be that in fact the holders of those rights either do not wish to assert them, or will be able to enjoy them regardless of whether the in-court litigant is successful or not.  Second, third parties themselves usually will be the best proponents of their own rights." *Singleton v. Wulff*, 428 U.S. 106, 113–14 (1976)(citations omitted).

   "Although the Supreme Court has 'adhered to the rule that a party generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties,' this rule is not absolute, and 'there may be circumstances where it is necessary to grant a third party standing to assert the rights of another.'" *Greene*, 262 F. Supp. 3d at 55 (quoting *Kowalski v. Tesmer*, 543 U.S. 125, 129–30 (2004) (internal quotation marks and citation omitted)).  "These circumstances are 'well-recognized, prudential exceptions to the injury-in-fact requirement' that 'permit third-party standing where the plaintiff can demonstrate (1) a close relationship to the injured party and (2) a barrier to the injured party's ability to assert its own interests.'" *Id.* (quoting *W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP*, 549 F.3d 100, 109–10 (2d Cir. 2008)); *see also Powers v. Ohio*, 499 U.S. 400, 410-11 (1991)(A plaintiff can assert claims on behalf of a third party if three criteria are met: "[1] the litigant must have suffered an 'injury in fact,' thus giving him or her a 'sufficiently concrete interest' in the outcome of the issue in dispute; [2] the litigant must have a close relation to the third party; and [3] there must exist some hindrance to the third party's ability to protect his or her own interests." )(citation omitted); *Mid–Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168, 174 (2d Cir. 2005) ("[A] plaintiff seeking third-party standing in federal court must ... demonstrat[e] a

40

close relation to the injured third party and a hindrance to that party's ability to protect its own interests." (internal quotation marks omitted)).

### 2. Sought-After Injunction, Am. Compl. ¶ 113.

The NRA lacks standing for the injunction sought in paragraph 113. *See* Am. Compl. ¶ 113.[14]  Plaintiff fails to allege facts clearly demonstrating a sufficient likelihood that it will again be wronged in a manner similar to the way it was harmed by entry of the Lockton and Chubb Consent Orders.  The Consent Orders were entered following a DFS investigation yielding admissions from Lockton and Chubb that they were involved in numerous illegal insurance activities related to NRA programs. The NRA has not alleged that these activities were legal under New York law, or that the applicable New York insurance laws are unconstitutional or were improperly applied.  Thus, there are insufficient allegations supporting a plausible contention that all of the NRA's past damages will be, or could be, repeated.  To the extent the NRA alleges that it was harmed by provisions of the Consent Orders that prohibit Lockton and Chubb from participating with the NRA to offer legal affinity insurance programs, Plaintiff fails to allege facts plausibly indicating that, if the injunction was granted, either Lockton or Chubb would agree to participate in these programs in the future.  Further, nothing in the Lockton or Chubb Consent Orders prohibits other insurance companies from participating in these services, yet Plaintiff has not alleged that another insurance company is planning to participate in NRA-endorsed affinity insurance programs. Thus, the  "threatened injury" occasioned by the Consent Orders is not "*certainly*

---

[14](Seeking "an order preliminarily and permanently enjoining Cuomo and Vullo (in their official capacities) and DFS . . . from selectively enforcing the Insurance Law by requiring Lockton or Chubb, through their respective consent orders, to forbear from doing business with the NRA which they could otherwise permissibly conduct with other affinity organizations.").

*impending*," but rather is, at most*, "a possible* future injury." *Clapper*, 568 U.S. at 409.  This is insufficient to confer constitutional standing for the injunction sough in paragraph 113.

Further, Plaintiff fails to satisfy prudential standing for this relief, which seeks to enjoin Defendants from enforcing the Lockton and Chubb Consent Orders.  This requested injunctive relief is, essentially, a third-party challenge to the stipulated settlements contained in those Consent Orders.  It relies upon the rights and interests of Lockton and Chubb to resolve claims against those parties.  Lockton and Chubb may not desire to vacate their consent agreements and/or do business with the NRA related to affinity insurance programs, and even if they wanted to do both, those are matters that should be advocated by Stockton and Chubb - not the NRA.  Moreover, Plaintiff has not alleged facts plausibly indicting that either Lockton or Chubb are hindered in some manner in asserting their rights affected by the Consent Orders.

The cases cited by Plaintiff for the proposition that "a plaintiff has standing to challenge laws enforced against another party where the plaintiff is injured by such enforcement," Pl. Mem. L. at 26,[15] are misplaced.  While these cases stand for the cited proposition, they do reach the issue raised by the injunction sought in paragraph 113 – that is, whether a plaintiff can vacate an agreement reached by a third party following enforcement of a challenged law.  Here, prudential considerations limit Plaintiff's ability to challenge third-party agreements having only a consequential affect on Plaintiff. *See e.g. Hillside Metro Assocs., LLC v. JPMorgan Chase Bank, Nat. Ass'n*, 747 F.3d 44, 48–49 (2d

---

[15](citing *Doe v. Bolton*, 410 U.S. 179, 187–89 (1973); *H.L. v. Matheson*, 450 U.S. 398, 400–01, 405–07 (1981); *Virginia State Bd. of Pharm. v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 753, 757 (1976); *NRA v. ATF*, 700 F.3d 185, 191–92 (5th Cir. 2012); *Dearth v. Holder*, 641 F.3d 499, 502 (D.C. Cir. 2011)).

Cir. 2014)("We conclude that Hillside does not have prudential standing in this case because it cannot enforce the terms of the PAA, as to which it is neither a party nor a third-party beneficiary, but the enforcement of which is a necessary component of its claim."); *Premium Mortg. Corp. v. Equifax, Inc.*, 583 F.3d 103, 108 (2d Cir. 2009) (holding that a non-party to a contract lacks standing in a contract proceeding to enforce the agreement unless unequivocal terms clearly evidence an intent to permit such standing); *In re Motors Liquidation Co.*, 580 B.R. 319, 340 (Bankr. S.D.N.Y. 2018)("In the context of a contract dispute, only parties to the contract and intended third-party beneficiaries of the contract have prudential standing to appear and enforce agreements."); *Tamir v. Bank of N.Y. Mellon*, 2013 WL 4522926, at *3 (E.D.N.Y. Aug. 27, 2013) (stating that "a non-party to a contract lacks standing to challenge an agreement in the absence of terms demonstrating that it is a third-party beneficiary").

Furthermore, the case of *Safelite Group, Inc. v. Rothman*, 229 F. Supp.3d 859 (D. Minn. 2017), cited by Plaintiff for the proposition that a party can challenge a consent order to which it was not a party, is distinguishable.  In *Safelite*, the District of Minnesota found that the plaintiff had standing to challenge the enforcement of a consent order entered between Auto Club Group, Inc. ("AAA"), a third-party insurer for whom Safelite served as claims administrator, and the Commissioner of the Minnesota Department of Commerce (DOC).   Safelite challenged on First Amendment grounds the DOC's enforcement of a Minnesota statute that prohibits insurers from making statements that could pressure, coerce, or induce an insured to choose a particular glass vendor.  *Safelite*, 229 F. Supp. 3d at 866 (citing Minn. Stat. § 72A.201, subd. 6(14)(the Mandatory Advisory) and 6(16) (the Anti–Coercion Provision).  The facts of the case indicate that "Safelite, in conjunction with

the insurers for whom it provides claims administration services, develop[ed] scripts to use when insureds call to report an auto-glass claim." *Id.* The Consent Order was based on DOC's investigation finding that: (a) "[AAA's] glass administrator and its affiliated entities (collectively, "Safelite"), while administrating automobile glass claims, failed to provide the required advisory to insureds before recommending the use of [AAA's] network of preferred glass vendors;" and (b) "[AAA's] glass administrator Safelite, while administering automobile glass claims, advised that insureds may be balance billed[16] by non-preferred glass vendors," in violation of Minn. Stat. § 72A.201, subd. 6(14) and 6(16). *Safelite*, 229 F. Supp. 3d at 870. "In exchange for the DOC not pursuing an enforcement action against it, AAA agreed to drop Safelite as its claims administrator in Minnesota and 'cease and desist from informing insureds they ... may be balance-billed by non-preferred glass vendors, unless [AAA] [has] specific information proving the assertion(s) to be true for a certain vendor.'" *Id.* (quoting the Consent Order). Although the Consent Order "specifically address[ed] Safelite's suggestions that insureds 'may' be balance billed, . . . [t]he DOC never involved Safelite in its negotiations regarding the Consent Order . . . [and] Safelite did not learn about the Consent Order until weeks after it was executed." *Id.*

In finding that Safelite had standing to challenge the Consent Order, the District Court wrote:

> The Consent Order required that AAA drop Safelite as its claims administrator, undoubtedly causing economic "injury in fact" to Safelite. Moreover, the practical effect of the Consent Order is that Safelite must cease using any "may be balance billed" language if it wants to act as a claims administrator in Minnesota. The imminent threat of future prosecution and the self-censorship—or chilling effect—such a threat creates provides standing for

---

[16]"Balance billed" means the insured is billed for the difference between the amount paid by the insurer and total fee charged by the glass installer.

as-applied First Amendment challenges. Safelite's commercial speech rights have thus been impaired by the Consent Order, giving it standing.

Furthermore, as the DOC itself acknowledges, Safelite is the agent of AAA and the Consent Order had a "negative impact" on Safelite because of that relationship. Injury incurred indirectly, such as through an agency relationship, may still impart standing. The DOC's efforts to avoid "the elephant in the room" by going after Safelite's insurer-clients "one by one" do not deprive Safelite of standing to bring its First Amendment claim.

*Id.*, at 875 (citations omitted).

Here, by contrast, the NRA has not challenged the New York insurance laws that Stockton and Chubb agreed they violated. There is also no plausible basis to conclude that enforcement of the New York insurance laws identified in the Chubb and Lockton Consent Orders would prevent another insurer from offering NRA lawful affinity insurance programs. Thus, unlike the Consent Order in *Safelite*, the Consent Orders here do not prevent the NRA from offering lawful affinity insurance programs to its members. While Defendants indicate that the NRA is under investigation for its unlicensed insurance activities, Def. Mem. L., at 38, n. 16; *id.* at 39, n. 17, the Amended Complaint fails to provide allegations plausibly suggesting that either Lockton or Chubb were in an agency relationship with the NRA such that the Consent Orders inhibit the NRA's ability to engage in lawful insurance activities. Simply stated, the Consent Orders address Lockton and Chubb's activities, and do not directly inhibit the NRA from engaging in lawful activities.

For the reasons discussed above, the Court finds that Plaintiff lacks standing for the injunctive relief requested in paragraph 113. Therefore, Defendants' motion to dismiss the equal protection selective enforcement claims is granted to the extent Plaintiff seeks an order enjoining Gov. Cuomo, Supt. Vullo, and DFS from requiring Lockton and Chubb to abide by their respective Consent Orders. Because this standing deficiency is substantive

and would not be cured by better pleading, *see Cusamano v. Sobek*, 604 F. Supp. 2d 416, 462 (N.D.N.Y. 2009)("Of course, an opportunity to amend is not required where the problem with plaintiff's causes of action is substantive such that better pleading will not cure it.")(*Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) and *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991))(interior quotation marks and brackets omitted), Plaintiff is denied leave to amend to challenge the Consent Orders on equal protection grounds.

### 3. Sought-After Injunction, Am. Compl. p. 44, ¶ a(3).

Plaintiff also seeks to enjoin Defendants "from further selective enforcement of the Insurance Laws to the NRA endorsed policies." Am. Compl. p. 44, ¶ a(3).[17]  Like with the injunction sought in paragraph 113, Plaintiff fails to allege facts clearly demonstrating a sufficient likelihood that it will be injured in the future by selective enforcement of the New York insurance laws to lawful NRA-affinity insurance programs, or that such future injury is certainly impending, real, and immediate.  Therefore, Defendants' motion to dismiss the equal protection selective enforcement claims is granted to the extent Plaintiff seeks an order enjoining Defendants from selectively enforcing the New York insurance laws against the NRA.  Because it is possible that Plaintiff could allege facts demonstrating future selective enforcement of the New York insurance laws to the NRA, or to lawful NRA-endorsed affinity programs, dismissal in this regard is without prejudice.

### 4. Monetary Damages, Am. Compl. p. 44, ¶ c

Plaintiff also seeks monetary recovery for Defendants' alleged selective enforcement.

---

[17]The Court notes that Plaintiff also seeks injunctive relief in relation to Counts 1, 2, 3, and 6. Because Defendants have not specifically challenged standing for injunctive relief related to these counts, the Court offers no opinion on the subject.

Defendants' challenge to the selective enforcement claims is addressed only to standing. Thus, the Court examines only whether Plaintiff has pled sufficient allegations to confer standing to seek monetary recovery.  *See Burgin*, 2018 WL 1932598, at *5 ("When assessing constitutional standing, courts do not examine the merits of the claims, but rather, determine 'whether the plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant his invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf.'") (quoting *Warth*, 422 U.S. at 498-99; *see also Montesa*, 836 F.3d at 195 (In determining whether a party has standing, the focus is on "'the party seeking to invoke federal jurisdiction, rather than the justiciability of the issue at stake in the litigation.'")(quoting *Fulani v. Bentsen*, 35 F.3d 49, 51 (2d Cir.1994)).  The Court finds that it has.

First, the Amended Complaint  alleges that the NRA suffered concrete and particularized injury by, among other things, losing royalty amounts owed to it under its contract with Lockton and experiencing increased costs associated with the potential development of new NRA-endorsed insurance programs not through Lockton, Chubb, or Lloyd's.  *See* Am. Compl. at ¶ 111.  It can also be presumed that Plaintiff suffered a sufficient injury-in-fact due to the alleged equal protection violations.  *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 262–63 (1977) (finding injury-in-fact based on alleged equal protection violations);  *Doe v. Sch. Bd. of Ouachita Parish*, 274 F.3d 289, 292 (5th Cir. 2001) ("Impairments to constitutional rights are generally deemed adequate to support a finding of 'injury' for purposes of standing." ); *accord Council of Ins. Agents & Brokers v. Molasky–Arman*, 522 F.3d 925, 931 (9th Cir. 2008)(same).  Second, the Amended Complaint plausibly alleges that the NRA's injury would not have occurred but

for Defendants' selective enforcement of certain New York insurance laws against the NRA's affinity insurance program and, through the Lockton Consent Order, termination of all affinity insurance programs and the NRA's business relationship with Lockton.  *See id.* at ¶¶ 108-111.  This satisfies the second *Lujan* element.  Third, the alleged past harm provides a sufficient basis for monetary damages. *See Casey*, 2018 WL 4500877, at *9.

### 5.  Conclusion - Selective Enforcement Claims

Accordingly, Defendants' motion to dismiss the equal protection selective enforcement claims is granted to the extent Plaintiff seeks an order enjoining Defendants from requiring Lockton and Chubb to abide by their respective Consent Orders, and enjoining Defendants from future New York Insurance Law enforcement actions.  The motion is denied to the extent Plaintiff seeks to recover monetary damages for alleged past selective enforcement actions.

### e.  Due Process

Count Six alleges that Defendants violated the NRA's rights to due process as guaranteed by the Fourteenth Amendment of the United States Constitution and Article 1, Section 6 of the New York Constitution.  Am. Compl. ¶¶ 121-132.   Plaintiff argues that it has adequately pled two distinct due process claims - deprivation of its liberty interest "in its good name, reputation, honor, integrity, and its ability to endorse insurance products to its membership," *id.* ¶ 125,  and deprivation of its property interest in its agreements with financial institutions and insurance companies to provide the NRA with banking services and insurance coverage. *Id.* ¶¶ 125-126; *see also* Pl. Mem. L., at 28;[18]  Trans. of Oral Arg.,

---

[18]("The NRA adequately pleads two distinct claims under the Due Process Clause of the Fourteenth Amendment. First, Defendants violated the Due Process Clause by stigmatizing the NRA in the course of
(continued...)

at p. 44.[19]  For the reasons that follow, these claims are dismissed.

### 1. Stigma-Plus Claim

The Fourteenth Amendment's Due Process Clause[20] prohibits a state actor from depriving a citizen of her life, liberty, or property without due process of law. U.S. Const. amend. XIV, § 1.  "A person's interest in his or her good reputation alone, apart from a more tangible interest, is not a liberty or property interest sufficient to invoke the procedural protections of the Due Process Clause to create a cause of action under § 1983." *Patterson v. City of Utica*, 370 F.3d 322, 329–30 (2d Cir. 2004) (citing *Paul v. Davis*, 424 U.S. 693, 701 (1976)).  "Loss of one's reputation can, however, invoke the protections of the Due Process Clause if that loss is coupled with the deprivation of a more tangible interest." *Id.* at 330 (citing *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 572–73 (1972)). Referred to as a "stigma-plus" claim, it involves "'injury to one's reputation (the stigma) coupled with the deprivation of some 'tangible interest' or property right (the plus), without adequate process.'" *LoPorto v. County of Rensselaer*, 115CV0866LEKDJS, 2018 WL 4565768, at *15 (N.D.N.Y. Sept. 24, 2018)(quoting *DiBlasio v. Novello*, 344 F.3d 292, 302 (2d Cir. 2003)).  To prevail on such a claim, Plaintiff must show  "'(1) [stigma—] the utterance of a statement sufficiently derogatory to injure [plaintiff's] reputation, that is

---

[18](...continued)
instructing financial institutions to cease doing business with the NRA. Second, Defendants violated the NRA's due process rights when they coerced Lockton and Chubb to end their relationships with the NRA without affording the NRA any procedural protections.")

[19]("I would like to address now the due process claim. So the NRA alleges two separate due process claims, stigma plus and the deprivation of contract rights without due process of law.")

[20]Due process claims under the New York State Constitution similar to those alleged here are subject to the same analysis as federal due process claims. *Gilmoe v. Bouboulis*, No. 3:15-CV-0686 (GTS/DEP), 2016 U.S. Dist. LEXIS 115315, **35-36, n. 7 (N.D.N.Y. Aug. 29 2016).

capable of being proved false, and that he or she claims is false, and (2) [a plus—] a material state-imposed burden or state-imposed alteration of the plaintiff's status or rights.'" *Paterno v. City of New York*, No. 17 CIV. 8278 (LGS), 2018 WL 3632526, at *3 (S.D.N.Y. July 31, 2018)(quoting *Vega v. Lantz*, 596 F.3d 77, 81 (2d Cir. 2010) (internal punctuation omitted)).

"In order to survive a motion to dismiss on a 'stigma-plus' claim, the complaint must plead the particulars of a 'statement sufficiently derogatory to injure' the plaintiff's reputation; not merely general characterizations or summaries of those statements." *Id.*, at *4  (quoting *Vega*, 596 F.3d at 81).   Courts look to state substantive law of defamation in analyzing the "stigma" component of a "stigma-plus" claim. *Id.*  (citing *Sharpe v. City of New York*, No. 11 Civ. 5494, 2013 WL 2356063, at *6 n. 10 (E.D.N.Y. May 29, 2013), *aff'd*, 560 Fed. Appx. 78 (2d Cir. 2014) ("federal courts in New York often look to New York defamation law when analyzing a "stigma-plus" claim.").   "The gravamen of 'stigma' as part of a due process violation is the making under color of law of a reputation-tarnishing statement that is false." *Doe v. Dep't of Pub. Safety ex rel. Lee*, 271 F.3d 38, 47–48 (2d Cir. 2001)*, rev'd on other grounds Conn. Dep't of Public Safety v. Doe*, 538 U.S. 1 (2003).

The Amended Complaint asserts that "Defendants, in their April 2018 Letters and in other public pronouncements, have made stigmatizing statements, including that the NRA represents a potential reputation risk to insurance companies and financial institutions, that the NRA is responsible for 'senseless violence,' and that the NRA is a threat to the public health and safety, that call into question the NRA's good name, reputation, honor, and integrity.   These stigmatizing statements are false and capable of being proved false." Am. Compl. ¶ 127.   In support of these claims, Plaintiff argues that "Defendants publicly

branded the NRA a 'reputational risk' to the safety and soundness of financial institutions,

warned those financial institutions that having the NRA as a customer may send the 'wrong

message to their clients and their communities,' insinuated that having 'ties' to the NRA

'jeopardize[s] public safety,' stated that the NRA has 'caused carnage in this nation,' and

urged them to drop the NRA in order to 'promote public health and safety.'" Pl. Mem. L. at

29 (citing Dkt. 37-1 (Cuomo Press Release); Am. Compl. at ¶ 45 (referencing the Guidance

Letters); Gase Decl., Ex. D).  These statements fail to satisfy the "stigma" component of the

stigma-plus claims.

The statements in the Cuomo Press Release and the Guidance Letters are purely

government speech relaying New York's opinions about public safety, gun regulation, and

the role that insurance companies and financial institutions play in shaping public opinion in

this public debate.  Whether the NRA represents a potential reputational risk to insurance

companies and financial institutions is clearly a matter of opinion.  Further, the Guidance

Letters do not state that the NRA is responsible for senseless violence.  Rather, they state

that there is a "social backlash against [the NRA] and similar organizations that promote

guns that lead to senseless violence," and then go on to state that "the nature and the

intensity of the voices now speaking out . . . is a strong reminder that such voices can no

longer be ignored and that society, as a whole, has a responsibility to act and is no longer

willing to stand by and wait and witness more tragedies caused by gun violence, but instead

is demanding change now." Dkt. # 37-2; *see* Dkt. # 37-3 (same).  These statements express

New York's opinion of societal views related to the availability of guns, of organizations that

promote access to guns, and whether the availability of guns leads to senseless violence.

No statement is made that the NRA directly causes violence, and any inference that the

Guidance Letters imply that the NRA's gun promotion advocacy leads to violence is based on opinions articulated in the documents.  Similarly, the Guidance Letters do not state that the NRA is a threat to public health and safety.  Rather, they reference public health and safety in the context of the perceived role that insurance companies and financial institutions play in shaping public opinion, *see* Dkt. # 37-2;[21]  Dkt. # 37-3,[22] and encourage these entities "to continue evaluating and managing their risks, including reputational risks, that may arise from their dealings with the NRA or similar gun promotion organizations, if any, as well as continued assessment of compliance with their own codes of social responsibility." Dkt. # 37-2;  Dkt. # 37-3.  While the Guidance Letters encourage insurance companies and financial institutions "to review any relationships they have with the NRA or similar gun promotion organizations, and to take prompt actions to managing [their reputational risks] and promote public health and safety," Dkt. # 37-2;  Dkt. # 37-3, they do not state that the NRA is a threat to the public health and safety.  Any inference that the Guidance Letters imply that the NRA's gun promotion advocacy is contrary the public health and safety is based on the opinions expressed in these two documents.

Likewise, the Cuomo Press Release is government speech relaying opinions about public safety, gun regulation, and the role that insurance companies and financial

---

[21]("Our insurers are, and have been, vital to the communities they serve for generations and are guided by their commitment to corporate social responsibility, including public safety and health. Insurers' engagement in communities they serve is closely tied to the business they do with their clients and customers and its impact on such communities. . . . Our insurers are key players in maintaining and improving public health and safety in the communities they serve.")

[22]("Our financial institutions, whether depository or non-depository, are, and have been, the cornerstone of the communities they serve for generations and are guided by their commitment to corporate social responsibility, including public safety and health. . . . Our financial institutions can play a significant role in promoting public health and safety in the communities they serve, thereby fulfilling their corporate social responsibility to those communities.")

institutions play in shaping public opinion in this public debate.  While the press release encourages insurers and bankers "to consider whether [their ties to the NRA or other similar organizations] harm their corporate reputations and jeopardize public safety," Dkt. # 37-1, it does not state that the NRA is responsible for  violence, or that it jeopardizes public health and safety.  Again, the statements are made in the context of a statement about gun violence in general, and asks the targeted entities to examine their connections to the NRA and other gun promotion organizations to determine for themselves whether continued association with gun promotion organizations harms their reputations and benefits the communities they serve.  Any inference that the press release implies that the NRA promotes gun violence or is harmful to public safety is based only on the opinions expressed in the press release.

Thus, the statements in the Guidance Letters and Cuomo Press Release are not actionable on the stigma-plus claims because, as opinions, they are not "capable of being proved false." *Vega*, 596 F.3d at 81; *see, e.g.*, *Paterno*, 2018 WL 3632526, at *5 ("The first two statements—referencing 'a terrible chapter' and 'fundamental principles'—are not actionable because they are opinions, which are not 'capable of being proved false.'")(citing *Vega*, 596 F.3d at 81; *Sharpe*, 2013 WL 2356063, at *6 ("a statement of opinion, rather than fact ... is not actionable as a stigmatizing remark."); *Wiese v. Kelley*, No. 08 Civ. 6348, 2009 WL 2902513, at *6 (S.D.N.Y. Sept. 10, 2009) ("The Attorney General's description of the conduct resulting in the loss of data as 'extremely troubling' is a statement of opinion, rather than fact, and as such is not actionable as a stigmatizing remark.")); *cf. Enigma Software Grp. USA, LLC v. Bleeping Computer LLC*, 194 F. Supp. 3d 263, 281 (S.D.N.Y. 2016) ("'New York law absolutely protects statements of pure opinion, such that they can

never be defamatory.'"); *Sorvillo v. St. Francis Prep. Sch.*, No. 13-CV-3357 (SJ/MDG), 2014 U.S. Dist LEXIS 186923, **12-13 (E.D.N.Y. Aug. 12, 2014) (granting motion to dismiss because alleged statements were opinions); *Apionishev v. Columbia Univ. in City of New York*, No. 09 Civ. 6471, 2012 WL 208998, at *10 (S.D.N.Y. Jan. 23, 2012) (dismissing a libel claim, because "[e]xpressions of opinion are not actionable").

Plaintiff does not specifically point to Gov. Cuomo's April 20, 2018 tweet in support of the stigma-plus claim. Nonetheless, Gov. Cuomo's statement that the "[t]he NRA is an extremist organization" is clearly an expression of his opinion and, therefore, is insufficient to support the first element of the stigma-plus claim.

Plaintiff's reference to a statement that the NRA has "caused carnage in this nation" is from a transcript of Gov. Cuomo's August 6, 2018 guest appearance on CNN's *New Day with Allisyn Camerota and John Berman*. Gase Decl., Ex. D. Because the transcript is not attached to the Amended Complaint or referenced therein, and because the matter is before the Court on a Rule 12(b)(6) motion, Gov. Cuomo's statements while on CNN cannot properly be considered in determining whether Plaintiff states a plausible stigma-plus claim. Nevertheless, because Plaintiff requests leave to amend if a claim is dismissed, the Court reviews the transcript to determine whether adding the "caused carnage" statement would provide an actionable stigmatizing statement. In the transcript, Gov. Cuomo is quoted as stating:

> [The NRA is] making a different point, which is, I have been a longtime opponent of the NRA, I plead guilty. I believe the NRA represents an extremist group. I believe they've been counterproductive for gun owners in this country. I believe their politics seeks them [*sic*] to stop any common sense gun reform because then, John, they would be out of business. Most gun owners support some type of reasonable gun control. 90 percent of Americans support background checks. The NRA has always been against any progress whatsoever. They're oblivious to the facts. They've

> caused carnage in this nation.  They've done gun owners a disservice because there is a common sense compromise if the NRA wasn't always threatening politicians who went anywhere near reasonableness.  If you remember President Trump after the Parkland shooting, spoke in the White House conference room and asked reasonable questions.  He seemed reasonable. "Why can't we raise the purchase age?  Why can't we raise the age for assault weapons?"  He met with the NRA and did a total 180 the next day and was absolutely against any reform, and this nation still has done nothing on guns.

Gase Decl., Ex. D, p. 3.

Read in context, Gov. Cuomo's "caused carnage" statement is clearly an expression of his, or New York's, opinion as to the connection between the NRA's political positions and the numerous incidents of mass shootings in the Country.  For the reasons just discussed, such an opinion does not support a plausible stigma-plus claim.  Therefore, leave to amend to add this statement is denied.

Plaintiff also does not point to the alleged "backroom exhortations [made] during the DFS Investigation" to support its stigma-plus claim. *See* Am. Compl. ¶ 127 ("Defendants, in their April 2018 Letters *and in other public pronouncements*, have made stigmatizing statements . . . .")(emphasis added); *see also id.* ¶ 126 (referencing these backroom statements in support of the property deprivation claim).  Even if it did, however, Plaintiff has not pled the particulars of these statements such to allow a determination whether the statements are "sufficiently derogatory to injure the plaintiff's reputation" and capable of being proved false.  *See Vega*, 596 F.3d at 81; *Paterno*, 2018 WL 3632526, at *4.  Thus, this conclusory allegation provides an insufficient basis to avoid dismissal of the stigma-plus claims. *See, e.g., Filteau v. Prudenti*, 161 F. Supp.3d 284, 293 (S.D.N.Y. 2016)(dismissing a "stigma-plus" complaint where the allegations of "stigma" were "conclusory and speculative"); *Miley v. Hous. Auth. of City of, Bridgeport*, 926 F. Supp.2d 420, 432 (D. Conn.

2013) (dismissing a complaint where the "allegations are devoid of specific factual content to state a claim to relief for a stigma-plus violation that is plausible on its face"); *see also Moy v. Perez*, 712 F. App'x 38, 39 (2d Cir. 2017)("[B]ald assertions and conclusions of law will not suffice to avoid dismissal, nor will factual allegations that are wholly conclusory[.]")(internal quotation marks and citations omitted).

Inasmuch as Plaintiff fails to point to statements plausibly supporting the first element of its stigma-plus due process claims, these claims are dismissed without prejudice.

### 2. Deprivation of Property Interest in Business Relationships

The Amended Complaint also alleges that "Defendants' actions have deprived the NRA of its constitutionally protected interests in engaging in core political advocacy and pursuing revenue opportunities free from unreasonable government interference by coercing financial institutions to cease providing essential services to the NRA and other 'gun promotion' organizations." Am. Compl. ¶ 122.   Specifically, Plaintiff alleges that the NRA has a property interest in its agreements with financial institutions to provide the NRA with banking services and corporate insurance coverage, *id.* at ¶¶ 124-125, and that:

> Defendants' April 2018 Letters, backroom exhortations during the DFS Investigation, and public statements caused, at a minimum, Lockton Affinity, Lockton Companies, and Chubb to discontinue their NRA-endorsed insurance options in New York or (in Chubb's case) nationwide and to never again participate in such programs, thus depriving the NRA of its property interest without due process of law. Furthermore, Defendants' actions have interfered with and deprived the NRA of its tangible property interests in accessing banking and insurance products on equal terms with other citizens.

*Id.* ¶ 126.   Plaintiff contends that Defendants' actions violate the NRA's substantive and procedural due process rights. Pl. Mem. L. at 31.

"In order to demonstrate a violation of either substantive or procedural due process

56

rights, the plaintiff must first demonstrate the possession of a federally protected property right to the relief sought." *Donohue v. Cuomo*, No. 111CV1530MADCFH, 2018 WL 4565765, at *17 (N.D.N.Y. Sept. 24, 2018)(citations omitted).  Property interests "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law-rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Bd. of Regents of State Coll. v. Roth*, 408 U.S. 564, 577 (1972).  "A person's interest in a benefit is a 'property' interest for due process purposes if there are such rules or mutually explicit understandings that support his claim of entitlement to the benefit." *Perry v. Sindermann*, 408 U.S. 593, 601 (1972)(citing *Roth*, 408 U.S. at 577).  However, "[t]he mere identification of a state law right does not necessarily require a finding that the right identified is protected by the Constitution." *Barnes v. Pilgrim Psychiatric Ctr.*, 860 F. Supp. 2d 194, 201 (E.D.N.Y. 2012).  Rather, in order to have a protected property interest in a benefit, "a person clearly must have more than an abstract need for it.  He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Roth*, 408 U.S. at  577; *see Sindermann*, 408 U.S. at 603 (A mere subjective expectancy of receiving a benefit is not enough);  *Local 342, Long Island Pub. Serv. Emp., UMD, ILA, AFL-CIO v. Town Bd. of the Town of Huntington*, 31 F.3d 1191, 1194 (2d Cir. 1994)("In order for a person to have a property interest in a benefit such as the right to payment under a contract, [h]e must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it.")(citations omitted).  "When determining whether a plaintiff has a claim of entitlement, we focus on the applicable statute, contract or regulation that purports to establish the benefit." *Martz v. Vill. of Valley Stream*, 22 F.3d 26, 30 (2d Cir.1994).

Plaintiff asserts that it was deprived of its agreements with financial institutions and insurers to provide the NRA with banking services and corporate insurance coverage, and argues that "valid current contracts and goodwill are the exact type of property interests that courts routinely recognize qualify for protection under the Due Process Clause."  Pl. Mem. L., p. 31.  However, the instant case is distinguishable from the cases Plaintiff cites to support this argument. *See id.,* at  n. 161.  In these cases, rules or mutually explicit understandings supported the plaintiffs' claims of entitlement to the benefits they were denied. *See Lynch v. United States*, 292 U.S. 571, 578-81 (1934)(Addressing plaintiffs' entitlement to enforce War Risk Insurance policies, through which the United States insured the lives of veterans, finding that "the due process clause prohibits the United States from annulling [the policies], unless . . . the action taken falls within the federal police power or some other paramount power.");  *Branum v. Clark*, 927 F.2d 698, 705 (2d Cir. 1991)(Finding that a dematriculated graduate student had a procedural due process right to an unbiased hearing because New York law recognizes "an implied contract between [a college or university] and its students," requiring the "academic institution [to] act in good faith in its dealing with its students.")(interior quotation marks and citations omitted); *Ezekwo v. N.Y.C. Health & Hospitals Corp.*, 940 F.2d 775, 783 (2d Cir. 1991)(finding that a physician had a reasonable expectation of being appointed as the position of Chief Resident at a public hospital because the hospital had an established policy and practice, highlighted in its informational documents, of awarding the position of Chief Resident to all third year residents on a rotating basis, and because the plaintiff was verbally advised that she would be Chief Resident during a specific period of time and, in that position, would receive a salary differential).  Here, by contrast, Plaintiff fails to allege facts plausibly demonstrating

that rules or mutually explicit understandings support its claim of entitlement to the benefit of doing business with various financial institutions or insurance companies.

"[W]hile the Supreme Court has recognized that '[t]he assets of a business (including its good will) unquestionably are property, and any state taking of those assets is unquestionably a 'deprivation' under the Fourteenth Amendment ... business in the sense of the activity of doing business, or the activity of making a profit is not property in the ordinary sense.'" *Chrebet v. Cty. of Nassau*, 24 F. Supp. 3d 236, 245 (E.D.N.Y. 2014) (quoting *College Savings Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 675 (1999)), *aff'd sub nom. Chrebet v. Nassau Cty.*, 606 F. App'x 15 (2d Cir. 2015). Moreover,

> [d]ecisions by and within the Second Circuit indicate . . . that "the loss of a future business opportunity is not a protect[able] property interest." *Evac, LLC v. Pataki*, 89 F. Supp.2d 250, 258 (N.D.N.Y.2000) (citing *Asbestec Const. Servs., Inc. v. U.S. Envtl. Prot. Agency*, 849 F.2d 765, 770 (2d Cir.1988) ("Mere opportunity to obtain a federal contract is not a property right under the due process clause.")); *cf. Sanitation & Recycling Ind., Inc. v. City of New York*, 928 F. Supp. 407, 420–21 (S.D.N.Y.1996), *aff'd*, 107 F.3d 985 (2d Cir.1997) (right to continue business on same terms as in the past is not a protectable property interest under the Due Process Clause). Furthermore, decisions within this Circuit indicate that allegations of harm to a plaintiff's "business operations" may not form the basis of a due process claim. *Murtaugh v. New York*, 810 F. Supp.2d 446, 480 (N.D.N.Y. 2011) (finding that plaintiff's claim that defendants' actions effectively harmed plaintiff's business operations did not implicate a property interest for the purposes of a due process claim); *Tuchman v. Conn.*, 185 F. Supp.2d 169, 174 (D. Conn. 2002) (finding that harm to "ability to conduct business" was not a deprivation of due process).

*Id.*, at 245–46.

Plaintiff's allegations establish, at most, that it has "an abstract need for" and "a unilateral expectation" of receiving the business services from the institutions that have severed ties, or refused to associate, with the NRA. This includes Lockton and Chubb, who

agreed to refrain from offering insurance services to Plaintiff, including programs that violated New York insurance law.  Because Plaintiff does not present facts plausibly demonstrating that it has an entitlement to enter agreements with, or received services from, the financial institutions and insurance companies that have denied it services, it does not have a constitutionally protected property interest in its agreements with these entities. *See e.g., id.* at 246 ("In keeping with Second Circuit precedent, the Court will not recognize a protectable property interest in plaintiff's right to conduct his business and earn future profits from that business."). Therefore, the property deprivation due process claims are dismissed.  Because the deficiency with these claims is substantive and cannot be cure with better pleading, leave to amend the property deprivations due process claims is denied.

### f.  Conspiracy

Count Five alleges claims against Gov. Cuomo and Supt. Vullo in their individual capacities, brought pursuant to 42 U.S.C. § 1983, asserting that they "agreed with each other, and with others known and unknown, to deprive the NRA of rights secured and guaranteed by the First and Fourteenth Amendments to the United States Constitution and Sections Eight and Eleven of the New York Constitution."  Am. Compl. ¶ 115; *see id.* ¶¶ 114-120.  Defendants contend the claims must be dismissed because the Amended Complaint contains only conclusory allegations of a conspiracy.  Def. Mem. L., pp. 40-41. The Court agrees.

A § 1983 conspiracy claim requires "(1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999); *see also Ciambriello v.*

*Cty. of Nassau*, 292 F.3d 307, 324–25 (2d Cir. 2002) (same); *Galgano v. County of Putnam, N.Y.*, No. 16-CV-3572 (KMK), 2018 WL 4757968, at *32 (S.D.N.Y. Sept. 28, 2018)(same).   "[C]onspiracies are by their very nature secretive operations, and may have to be proven by circumstantial, rather than direct, evidence." *Pangburn*, 200 F.3d at 72 (internal quotation marks omitted).  However, to state a viable conspiracy claim, Plaintiff "'must provide some factual basis supporting a meeting of the minds'" of the alleged conspirators to carry out the unlawful plan. *Galgano*, 2018 WL 4757968, at *32 (quoting *Webb v. Goord*, 340 F.3d 105, 110 (2d Cir. 2003) (internal quotation marks omitted)). "Thus, Plaintiff must 'make an effort to provide some details of time and place and the alleged effects of the conspiracy ... [including] facts to demonstrate that the defendants entered into an agreement, express or tacit, to achieve the unlawful end.'" *Id.* (quoting *Warren v. Fischl*, 33 F. Supp. 2d 171, 177 (E.D.N.Y. 1999)(citations and internal quotation marks omitted)).  To avoid dismissal, Plaintiff must allege "'facts upon which it may be plausibly inferred that [Gov. Cuomo and Supt. Vullo] came to an agreement to violate [Plaintiff's] constitutional rights.'" *LoPorto*, 2018 WL 4565768, at *13  (quoting *Green v. McLaughlin*, 480 F. App'x 44, 46 (2d Cir. 2012) (citation omitted)); *see Phillips v. County of Orange*, 894 F. Supp. 2d 345, 383–84 (S.D.N.Y. 2012) ("Allegations of conspiracy must allege with at least some degree of particularity overt acts which defendants engaged in which were reasonably related to the promotion of the alleged conspiracy.")(internal quotation marks and citation omitted).  "[C]omplaints containing only conclusory, vague, or general allegations that the defendants have engaged in a conspiracy to deprive the plaintiff of [its] constitutional rights are properly dismissed; diffuse and expansive allegations are insufficient, unless amplified by specific instances of misconduct." *Ciambriello*, 292 F.3d at

325  (internal quotation marks omitted).

The allegations in Count Five are that Gov. Cuomo directed Supt. Vullo to issue the Guidance Letters "implicitly threatening DFS-regulated entities with potential prosecutorial action should they fail to sever ties with the NRA," Am. Compl. ¶ 116, and that Supt. Vullo "agreed to issue" the Guidance Letters "in an apparent effort to silence, intimidate, and deter those possessing a particular viewpoint from participating in the debate with respect to gun control." *Id.* ¶ 118.  Plaintiff also alleges that Supt. Vullo signed the Consent Orders "to carry out her agreement with Cuomo to stifle the NRA's political speech." *Id.* ¶ 117.  These allegations are insufficient to support plausible Section 1983 conspiracy claims.

The Guidance Letters, by themselves, constitute purely political speech.  While these letters, when viewed in the context of Defendants' other actions, may provide some inference supporting First Amendment freedom of speech and Fourteenth Amendment equal protection claims, Plaintiff provides insufficient factual allegations supporting the conclusion that Gov. Cuomo and Supt. Vullo reached an agreement to violate the NRA's constitutional rights, or had a meeting of minds to issue these letters to carry out such a plan. *See Hutchins v. Solomon*, No. 16-CV-10029 (KMK), 2018 WL 4757970, at *26 (S.D.N.Y. Sept. 29, 2018) ("Plaintiff neither properly alleges the required existence of an agreement, nor the required meeting of the minds, between [Defendants]."); *see also Baines v. City of New York*, No. 10-CV-9545, 2015 WL 3555758, at *12 (S.D.N.Y. June 8, 2015) ("Although [the] [p]laintiff repeatedly asserts that [the] [d]efendants entered an agreement to violate his civil rights ..., the [complaint] is devoid of facts that would render that allegation plausible as opposed to merely conceivable." (citation omitted)).   The fact that Supt. Vullo issued the Guidance Letters at Gov. Cuomo's direction is insufficient to

plausibly establish that the two agreed to violate the NRA's constitutional rights and attempted to carry out the plan by issuing the Guidance Letters.  *See Morales v. City of New York*, 752 F.3d 234, 237 (2d Cir. 2014) (finding claims that defendants worked together insufficient to suggest an improper motive); *Beechwood Restorative Care Center v. Leeds*, 436 F.3d 147, 154 (2d Cir. 2006) (finding that the fact that government employees from various federal and state agencies cooperated does not, without more, prove they conspired to violate plaintiff's rights); *Scotto v. Almenas*, 143 F.3d 105, 114–15 (2d Cir. 1998) (concluding that "several telephone calls and other communications" were not sufficient to show conspiracy); *Hutchins*, 2018 WL 4757970, at *26 ("The facts Plaintiff points to fail to do more than describe a group of police officers working on the same case and passing information on to a prosecutor. Plaintiff does not allege when or how any of the Defendants agreed to violate Plaintiff's rights, what the scope of the agreement was, or any other detail regarding the alleged agreement. Plaintiff thus fails to allege a factual basis supporting the existence of an agreement.");  *Zahrey v. City of New York*, No. 98-CV-4546, 2009 WL 1024261, at *11 (S.D.N.Y. Apr. 15, 2009) (dismissing conspiracy claim on summary judgment where the plaintiff "provide[d] no evidence, absent the fact that the [i]ndividual [d]efendants worked together, that ... an agreement existed").

Further, there is a complete dearth of plausible factual allegations supporting the conclusion that Supt. Vullo signed the Consent Orders as a way to carry out a purported agreement she had with Gov. Cuomo to violate the NRA's constitutional rights.  The Consent Orders were entered based on Lockton and Chubb's agreements that they violated New York insurance laws and were willing to pay substantial monetary penalties for their actions.  These agreements were plainly entered to resolve enforcement actions directed at

the admittedly unlawful insurance-related conduct by Lockton and Chubb.  There is no plausible basis to conclude that Supt. Vullo signed the Consent Orders to carry out a purported plan she and Gov. Cuomo had to violate the NRA's constitutional rights, as opposed to signing these documents in her role as DFS Superintendent.  *See Thomas v. Demeo*, No. 15-CV-9559, 2017 WL 3726759, at *12 (S.D.N.Y. Aug. 28, 2017) (dismissing § 1983 conspiracy claim because the complaint did not "provide even circumstantial allegations that the alleged conspiracy existed, much less any details as to the extent of the alleged agreement or how [the] [d]efendants collectively carried it out");  *Tavares v. New York City Health & Hosps. Corp.*, No. 13-CV-3148, 2015 WL 158863, at *7–8 (S.D.N.Y. Jan. 13, 2015) (dismissing a conspiracy claim where plaintiff failed to "put forward any facts supporting the inference that the ... [d]efendants acted in concert").

Equally unavailing are Plaintiff's contentions that the Amended Complaint "sets forth numerous factual allegations—supported by evidence—which demonstrate that Cuomo and Vullo reached an agreement to deprive the NRA of its rights under the Constitution and took overt acts to achieve that goal," and that it "extensively details the 'who,' 'what,' 'where,' and 'how' comprising Defendants' conspiracy."  Pl. Mem. L. at 35 (citing Am. Compl.  34-35;[23]

---

[23](alleging that DFS launched an investigation into the Carry Guard program because the Everytown for Gun Safety ("Everytown") activist organization contacted the New York County District Attorney's Office ("DA's Office") about the Carry Guard program, the DA's office contacted DFS, and Everytown took credit for instigating the investigation)

46;[24] 50-51;[25] 54;[26] 62.[27]   None of these allegations plausibly demonstrates an agreement between Gov. Cuomo and Supt. Vullo, or between either of these two and anyone else, to violate the NRA's constitutional rights.   Accordingly, the conspiracy claims alleged in Count Five are dismissed without prejudice.

### g.  Tortious Interference With Prospective Economic Advantage

Count Seven asserts state law claims of tortious interference with prospective economic advantage against Gov. Cuomo and Supt. Vullo in their individual capacities. Am. Compl. ¶¶ 133-141.  Plaintiff contends that Gov. Cuomo and Supt. Vullo interfered with the NRA's business relationship with Lockton by "convinc[ing] and induc[ing]" Lockton to enter a Consent Order, *id.* ¶ 138, that included provisions that Lockton would not participate in "any other NRA-endorsed programs with regard to New York State" and would not "enter into any agreement or program with the NRA to underwrite or participate in any affinity-type insurance program involving any line of insurance to be issued or delivered in New York State or to anyone known to Lockton to be a New York resident." *Id.* at ¶ 136 (quoting Lockton Consent Order, at ¶¶ 42-43).

"Under New York law, to state a claim for tortious interference with prospective economic advantage, the plaintiff must allege that '(1) it had a business relationship with a third party; (2) the defendant knew of that relationship and intentionally interfered with it; (3)

---

[24](alleging that Supt. Vullo issued the Guidance Letters)

[25](alleging that Gov. Cuomo and Supt. Vullo issued the Cuomo Press Release, and that Gov. Cuomo issued his April 20, 2018 tweet)

[26](alleging that Lockton entered its Consent Order, which restricts Lockton's participation in any NRA-endorsed insurance programs in New York State)

[27](alleging that Chubb entered its Consent Order, which restricts Chubb's participation in any affinity-type insurance program with the NRA)

65

the defendant acted solely out of malice, or used dishonest, unfair, or improper means; and

(4) the defendant's interference caused injury to the relationship.'" *Kirch v. Liberty Media*

*Corp.*, 449 F.3d 388, 400 (2d Cir. 2006)(quoting *Carvel Corp. v. Noonan*, 350 F.3d 6, 17 (2d

Cir. 2003), *certified question answered*, 3 N.Y.3d 182, 785 N.Y.S.2d 359, 818 N.E.2d 1100

(N.Y. 2004)); *see Posner v. Lewis*, 18 N.Y.3d 566, 570, n. 2 (N.Y. 2012)(In New York, "[t]o

state a cause of action for tortious interference with prospective contractual relations, a

plaintiff must plead that the defendant directly interfered with a third party and that the

defendant either employed wrongful means or acted 'for the sole purpose of inflicting

intentional harm on plaintiff[.]")(quoting *Carvel Corp.*, 3 N.Y.3d at 190)).  Defendants

challenge the claims on the third element.

The third element requires proof that Defendants interfered with the NRA's

prospective business relationship with Stockton solely out of malice or a desire to inflict

harm upon the Plaintiff, or used improper or illegal means to interfere with this prospective

business relationship. *See Catskill Dev., L.L.C. v. Park Place Entm't Corp.*, 547 F.3d 115,

132 (2d Cir. 2008)(stating the third element requires that "the defendant acted for a wrongful

purpose or used dishonest, unfair, or improper means");[28] *Gym Door Repairs, Inc. v. Young*

*Equip. Sales, Inc.,* No. 15-CV-4244 (JGK), 2018 WL 4489278, at *11 (S.D.N.Y. Sept. 19,

2018) ("To establish the third element of tortious interference, the plaintiffs must

demonstrate that the defendants acted solely out of malice or used improper or illegal

---

[28]Although *Catskill Dev.* states that the third element is satisfied where the defendant acted for a wrongful purpose, the case discusses the element as requiring that the defendant employed wrongful means to disrupt the subject business relationship. *See Catskill Dev.*, 547F.3d at 132 (citing *Guard–Life Corp. v. S. Parker Hardware Mfg. Corp.*, 50 N.Y.2d 183, 191 (N.Y. 1980) (describing the interference with business relations tort as "interference with prospective contractual relations," and describing element three as "wrongful means")).  Plaintiff cites cases addressing the "wrongful means" requirement. *See* Pl. Mem. L., at 37, fn. 184.

means that amounted to a crime or independent tort."); *see also Rockland Exposition, Inc.*

*v. Alliance of Automotive Serv. Providers of N.J.*, 894 F. Supp. 2d 288, 333 (S.D.N.Y.

2012)(plaintiff must demonstrate that the defendant committed a'crime or an independent

tort' or applied economic pressure 'for the sole purpose of inflicting intentional harm on the

plaintiff)(citation omitted). The allegations in the Amended Complaint fail to plausibly

support either of these requirements.

Here, even accepting Plaintiff's allegations as true, Plaintiff fails to assert facts

plausibly indicating that Defendants entered the Lockton Consent Order solely out of malice

or for the sole purpose of inflicting harm on Plaintiff. *See  R.M. Bacon, LLC v. Saint-Gobain*

*Performance Plastics Corp.*, No. 1:17-CV-0441 (LEK/DJS), 2018 WL 1010210, at *6

(N.D.N.Y. Feb. 20, 2018) ("[I]t is not enough simply to allege intentional interference.

Interference must be the defendant's sole objective.")(citations omitted). The Stockton

Consent Order, voluntarily entered by DFS and Lockton after a DFS investigation, provides

details of the numerous New York Insurance Law violations that Stockton admitted.  The

face of the Lockton Consent Order plainly indicates that it was entered, at least in part, for

the purpose of remedying Lockton's New York Insurance Law violations discovered during

the DFS investigation.  While the Amended Complaint asserts that Gov. Cuomo and Supt.

Vullo's "sole purpose for requiring Lockton to no longer participate in lawful insurance

programs with the NRA was to harm the NRA and drive it . . . out of New York state," Am.

Compl., ¶ 137, it is implausible to conclude that simply because Lockton could no longer

offer NRA affinity-type insurance programs that the NRA would be put out of business in

New York.[29]  Indeed, the Lockton Consent Order specifically allows Lockton to offer the NRA corporate insurance thereby signifying that the NRA could go about its other legitimate business activities, and nothing in the Lockton Consent Order prohibits or prevents other insurance companies from offering lawful affinity-type insurance programs to the NRA.

The Amended Complaint also fails to allege facts plausibly indicating that Defendants employed wrongful means in arriving at the Lockton Consent Order.  To satisfy the wrongful means requirement, Plaintiff must demonstrate that Defendants interfered with the NRA's prospective business relations with Stockton by conduct amounting to a crime or an independent tort.  *See* Carvel Corp., 3 N.Y.3d at 190.[30]  The wrongful means requirement "makes alleging and proving a tortious interference claim with business relations more demanding than proving a tortious interference with contract claim." *Catskill Dev.,* 547 F.3d at 132 (interior quotation marks and citation omitted).

Although the Amended Complaint alleges that Defendants "used dishonest, wrongful, and improper means when intentionally interfering with the NRA's business relationship with Lockton," and "took intentional steps to violate the NRA's rights afforded by the United States and New York Constitutions and committed independent tortious conduct," Am.

_____

[29]Further, the Lockton Consent Order plainly indicates a legitimate basis for including provisions prohibiting Lockton from engaging with the NRA to offer affinity-type insurance programs in New York.  Many of Lockton's admitted violations arose from its interactions with the NRA, and no inference of improper motivation arises from provisions that guard against similar future violations.

[30]As the New York Court of Appeals explained:

[W]here a suit is based on interference with a nonbinding relationship, the plaintiff must show that defendant's conduct was not "lawful" but "more culpable." The implication is that, as a general rule, the defendant's conduct must amount to a crime or an independent tort. Conduct that is not criminal or tortious will generally be "lawful" and thus insufficiently "culpable" to create liability for interference with prospective contracts or other nonbinding economic relations.

*Carvel Corp.*,  3 N.Y.3d at 190.

Compl. ¶ 37, these conclusory allegations are insufficient.  The Lockton Consent Order was entered following a DFS investigation, and is based upon Lockton's admission of numerous insurance law violations. *See generally*,  Dkt. No. 37-4.  Plaintiff fails to identify how it was that Defendants engaged in dishonest, wrongful, and improper means to get Lockton to enter its Consent Order.

Further, Plaintiff fails to allege facts plausibly indicating that Defendants engaged in tortious conduct to convince or induce Lockton to enter this Consent Order.  As indicated, the Lockton Consent Order was arrived at following a DFS investigation.  There are no allegations that Defendants engaged in threats, fraud, or misrepresentations during the investigation, or to support the conclusion that the DFS investigation amounted to meritless litigation intended to harass Lockton. *See Carvel Corp.,* 3 N.Y.3d at 192 ("Carvel did not drive the franchisees' customers away by physical violence, or lure them by fraud or misrepresentation, or harass them with meritless litigation.")(citation omitted).  As stated, Lockton admitted numerous violations of New York Insurance Law and agreed to pay a hefty penalty.   Whether the entry of the Lockton Consent Order amount to, or was a part of, a constitutional tort against the NRA is of no moment.  The pertinent inquiry is whether Defendants employed wrongful means to disrupt Plaintiff's potential business with Lockton, *see R.M. Bacon*, 2018 WL 1010210, at *5 ("To state a claim for interference with prospective relations, a plaintiff must also allege that the defendant employed 'wrongful means' to disrupt the plaintiff's potential business.")(quoting *Ullmannglass v. Oneida, Ltd.*, 927 N.Y.S.2d 702, 705–06 (3d Dept. 2011)), which Plaintiff asserts was accomplished by the Lockton Consent Order.  There are insufficient allegations that Defendants engaged in tortious conduct as a means to compel Lockton to enter its Consent Order.

69

In the end, Plaintiff's tortious interference with prospective economic advantage claims must be dismissed because the NRA fails to allege facts plausibly demonstrating that Defendants acted solely out of malice, or used improper means to harm the NRA by the entry of the Lockton Consent Order. *See, e.g.*, *Silver v. Kuehbeck*, 217 F. App'x 18, 21 (2d Cir. 2007) (affirming dismissal where the complaint "failed to allege that defendants interfered with plaintiff's business relationship *solely* to harm him or that he used wrongful means in doing so") (citation omitted) (emphasis in original); *R.M. Bacon,* 2018 WL 1010210, at *6 (concluding that plaintiff's tortious interference claims failed because the amended complaint did not allege that defendants "acted with the sole purpose of harming" the plaintiff) (citations omitted); *MVB Collision, Inc. v. Progressive Ins. Co.*, 13 N.Y.S.3d 139, 140 (2nd Dept. 2015) (affirming dismissal of a tortious interference claim where the defendant's "conduct was, at least in part, to advance its own interests, not solely for the purpose of harming the plaintiff"); *Besicorp Ltd. v. Kahn*, 736 N.Y.S.2d 708, 711–12 (3rd Dept. 2002) (affirming dismissal of a prospective business claim because "[r]ather than alleging that defendants' conduct was motivated solely by malice or a desire to inflict injury by unlawful or wrongful means as required, plaintiff alleges that defendants were motivated by their desire to maximize their financial gain")(emphasis omitted).  Because the deficiency in Plaintiff's tortious interference with prospective economic advantage claims cannot be cured by better pleading, leave to amend these claims is denied.

## V.    CONCLUSION

For the reasons set forth above, Defendants' motion to dismiss the Amended Complaint [Dkt. No. 40] is **GRANTED in part and DENIED in part**.  In this regard,

-Defendants' motion to dismiss Counts One and Two is denied;

-Defendants' motion to dismiss Count Three is granted, and the freedom-of-association claims asserted in Count Three are dismissed without prejudice;

-Defendants' motion to dismiss Count Four is granted in part and denied in part. The motion is granted to the extent Plaintiff seeks an order enjoining Gov. Cuomo, Supt.  Vullo, and DFS from requiring Lockton and Chubb to abide by their respective Consent Orders, and that much of Count Four seeking the injunctive relief requested in paragraph 113 is dismissed with prejudice.  The motion is also granted to the extent that Plaintiff seeks an order enjoining Defendants from selectively enforcing the New York insurance laws against the NRA, and that much of Count Four seeking the injunctive relief requested in the Amended Complaint, "Request for Relief,"  ¶ a(3), is dismissed without prejudice.  The motion is denied to the extent Plaintiff seeks monetary damages for Defendants' past acts of selective enforcement;

-Defendants' motion to dismiss Count Five is granted, and the conspiracy claims against Gov. Cuomo and Supt. Vullo are dismissed without prejudice;

-Defendants' motion to dismiss Count Six is granted, and the stigma-plus due process claims are dismissed without prejudice, and the property deprivation due process claims are dismissed with prejudice; and

-Defendants' motion to dismiss Count Seven is granted, and the tortious interference with prospective economic advantage claims against Gov. Cuomo and Supt. Vullo are dismissed with prejudice.

**IT IS SO ORDERED.**

Dated:November 6, 2018

Thomas J. McAvoy
Senior, U.S. District Judge

71

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| NATIONAL RIFLE ASSOCIATION OF AMERICA, | § § § | |
| Plaintiff, | § § § | CIVIL CASE NO. 18-CV-00566-TJM-CFH |
| v. | § § | |
| ANDREW CUOMO, both individually and in his official capacity; MARIA T. VULLO, both individually and in her official capacity; and THE NEW YORK STATE DEPARTMENT OF FINANCIAL SERVICES, | § § § § § § § § | |
| Defendants. | § § | |

## NATIONAL RIFLE ASSOCIATION OF AMERICA'S
## SECOND AMENDED COMPLAINT AND JURY DEMAND

Plaintiff the National Rifle Association of America (the "NRA") files this Second Amended Complaint and Jury Demand ("Complaint") against defendants New York Governor Andrew Cuomo ("Cuomo"), both individually and in his official capacity; Maria T. Vullo ("Vullo"), both individually and in her former official capacity; and the New York State Department of Financial Services ("DFS") (collectively, "Defendants"), upon personal knowledge of its own actions, and upon information and belief as to all others matters, as follows:

## I.

## PRELIMINARY STATEMENT

This case is necessitated by an overt viewpoint-based discrimination campaign against the NRA and the millions of law-abiding gun owners that it represents. Directed by Governor Andrew Cuomo and former DFS Superintendent Maria Vullo, this campaign involves selective prosecution, backroom exhortations, and public threats with a singular goal – to deprive the NRA

A-136

and its constituents of their First Amendment rights to speak freely about gun-related issues and defend their Second Amendment freedoms against encroachment.

Defendants' retaliation and selective-enforcement campaign surfaced with a series of threats to financial institutions that DFS, an agency created to ensure the integrity of financial markets after the 2008 credit crisis, will exercise its extensive regulatory power against those entities that have ties with the NRA. To commence their sweeping agenda, Defendants issued public demands that put DFS-regulated institutions on notice that they should avoid "arrangements with the NRA" and other "gun promotion organizations" if they planned to do business in New York.

At the same time, Defendants engaged in back-channel communications to reinforce their threats. Thus, in a stunning display of unconstitutional overreach, Defendants made it clear to banks and insurers that it is bad business in New York to do business with the NRA. Moreover, Defendants knowingly targeted NRA-related insurance programs for violations not regularly enforced and not enforced against other similarly situated insurance programs.

As a direct result of this coercion, multiple financial institutions have succumbed to Defendants' threats and determined not to do business with the NRA. Others, who were already doing business with the NRA yielded to Defendants' demands and agreed to terminate longstanding, beneficial business relationships with the NRA, in New York and elsewhere. Of course, Defendants' abuses were intended to deprive the NRA of basic bank-depository services, corporate insurance coverage, and other financial services essential to the NRA's corporate existence and its advocacy mission.

Absent relief, Defendants' blacklisting campaign will continue to damage the NRA and its members, as well as endanger the free speech and association rights guaranteed by the constitutions

of the United States and the State of New York. It is well-settled that viewpoint discrimination applied through "threat[s] of invoking legal sanctions and other means of coercion, persuasion, and intimidation" violates the United States Constitution where, as here, such measures chill protected First Amendment activities.[1] Defendants' *de facto* censorship scheme cannot survive judicial scrutiny. Nor should it.

## II.

## PARTIES

1.      Plaintiff the National Rifle Association of America is a nonprofit corporation organized under the laws of the State of New York with its principal place of business in Fairfax, Virginia. The NRA is America's leading provider of gun-safety and marksmanship education for civilians and law enforcement. It is also the foremost defender of the Second Amendment to the United States Constitution. The NRA has over five million members, and its programs reach millions more.

2.      Defendant New York State Department of Financial Services is an agency of the State of New York that regulates financial services firms operating in New York in order to guard against financial crises and to protect New York consumers and markets from fraud. DFS has a regional office at One Commerce Plaza, Albany, New York 12257. Its main office is located at One State Street, New York, New York 10004-1511. It regulates more than 1,400 insurance companies with assets in excess of $4.3 trillion, including 200 life insurers, 1,100 property casualty insurers, and 100 health insurance companies. DFS also regulates over 1,900 banking and other financial institutions with assets over $2.9 trillion.

---

[1] *See, e.g.*, *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 72 (1963).

A-138

3.      Defendant Maria T. Vullo is the former Superintendent of the New York State Department of Financial Services and, at all times relevant to the Complaint, was acting under color of state law. Her principal place of business is 40 West 77th Street, Apt. 16B, New York, New York 10024. Vullo is sued in her individual and official capacities.

4.      Defendant Andrew Cuomo is the Governor of the State of New York and, at all times relevant to the Complaint, was acting under color of state law. His principal place of business is The State Capitol Building, Albany, New York 12224. Cuomo is sued in his individual and official capacities.

### III.

### JURISDICTION AND VENUE

5.      Pursuant to 28 U.S.C. § 1331, the Court has subject matter jurisdiction over the claims asserted in this action because this action involves claims based on the First and Fourteenth Amendments to the United States Constitution (U.S. Const. amend. I, XIV), and because the action seeks to prevent state officials from interfering with federal rights. Further, subject matter jurisdiction is conferred on this Court by 28 U.S.C. § 1343(a)(3) because this action is brought to redress deprivations under color of state law of rights, privileges, and immunities secured by the United States Constitution. This Court has supplemental jurisdiction over all state-law claims asserted in this action under 28 U.S.C. § 1367.

6.      Pursuant to 28 U.S.C. § 1391(b), venue is properly vested in this Court because defendant Cuomo resides in this judicial district.

7.      There is a present and actual controversy between the parties.

8.      The relief requested is authorized pursuant to 28 U.S.C. § 1343(a)(4) (recovery of damages or equitable relief or any other such relief for the protection of civil rights), 28 U.S.C. § 1651(a) (injunctive relief), 28 U.S.C. §§ 2201 and 2202 (declaratory and other appropriate relief),

A-139

42 U.S.C. § 1983 (deprivation of rights, privileges, and immunities secured by the Constitution), and 42 U.S.C. § 1988 (awards of attorneys' fees and costs).

**IV.**

**STATEMENT OF RELEVANT FACTS**

**A.      The NRA: History Of Dedicated Support For Gun Safety And A Commitment To Core Political Speech.**

9.      After the Civil War, two Union Army officers created a private association to promote marksmanship among the citizenry. Many officers believed that the war would have ended significantly sooner if the Union troops had been able to shoot as well as the Confederate soldiers. Therefore, a group of them obtained a charter from the State of New York in November of 1871; thereafter, the National Rifle Association built a proud legacy in the State of New York.

10.      From the NRA's inception, it received praise from the State of New York for its many public contributions. In 1872, the New York State legislature and the NRA jointly dedicated funds for the creation of a rifle range on Creed Farm, in what is now Queens Village, Queens, New York. For many decades, the NRA partnered with the State to advance firearms safety, education, conservation, and other laudable public policy goals. For example, when New York City public schools sought to educate boys in marksmanship and gun safety, NRA co-founder Gen. George Wingate designed and headed the resulting Public Schools Athletic League (PSAL) marksmanship program.[2] Likewise, in 1949, the NRA worked with the State of New York to create the nation's first hunter education program. Similar courses were subsequently adopted by state fish and game

---

[2] *See, e.g.*, STEVEN A. RIESS, SPORTS IN AMERICA FROM COLONIAL TIMES TO THE TWENTY-FIRST CENTURY: AN ENCYCLOPEDIA 736 (Steven A. Riess ed., 2015); ROBERT PRUTER, THE RISE OF AMERICAN HIGH SCHOOL SPORTS AND THE SEARCH FOR CONTROL, 1880-1930 122 (1st ed. 2013); Robert Pruter, *Boys Rifle Marksmanship*, ILLINOIS HIGH SCHOOL ASSOCIATION, http://www.ihsa.org/archive/hstoric/marksmanship_boys.htm?NOCACHE=5:53:58%20PM (last visited May 11, 2018).

departments across the country and in Canada and help make hunting among the safest sports in existence.

11.     First among the "Purposes and Objectives" contained in the NRA's bylaws is "[t]o protect and defend the Constitution of the United States." That is not surprising, because political speech is a major purpose of the NRA, as it engages in extensive advocacy at all levels of government to promote the rights of its members and all Americans.

12.     The NRA spends tens of millions of dollars annually distributing pamphlets, fact sheets, articles, electronic materials, and other literature to advocate for its views on the Second Amendment and to assist NRA members engaging in national, state, and local firearm dialogue. The NRA's direct mail, television, radio, and digital communications seek to educate the public about issues bearing on the Second Amendment, defend the NRA and its members against political and media attacks, and galvanize participation in the political process by NRA members and supporters.

13.     To its critics, the NRA is best known as a "superlobby – one of the largest and most truly effective lobbying organizations in the country," able to mobilize its millions of members in concerted efforts to protect the Second Amendment rights of all Americans.[3] Of course, the NRA's letter-writing campaigns, peaceable public gatherings, and other grassroots "lobbying" activities constitute precisely the type of political speech which rests "[a]t the core of the First Amendment."[4]

_____

[3] CHRISTINA ROBB, *HANDGUNS AND THE AMERICAN PSYCHE THE ATTEMPTED ASSASSINATION OF A PRESIDENT BRINGS THE ISSUE INTO SHARP FOCUS ONCE AGAIN. HANDGUNS – WHAT DO THEY MEANS TO AMERICANS? TO THE NRA, THEY ARE A SYMBOL OF FREEDOM; TO THOSE FRIGHTENED OF CRIME, THEY REPRESENT SAFETY – EVEN IF THE OWNER DOESN'T KNOW HOW TO USE THEM; TO GUN CONTROL ADVOCATES, THEY ARE SYMBOLS OF ULTIMATE EVIL.*, BOSTON GLOBE, 1981 WLNR 68847 (June 7, 1981).

[4] *See Brown v. Hartlage*, 456 U.S. 45, 52 (1982).

B.     **Cuomo's Political Vendetta Against The NRA.**

14.     Andrew Cuomo has criticized the political speech and influence of "Second Amendment types"[5] generally, and the NRA specifically, for decades. In fact, Cuomo has a history of abusing his regulatory power to retaliate against his political opponents on gun control issues.

15.     The son of former Governor Mario Cuomo, Cuomo is a political opportunist who consistently seeks to gain political capital by attacking the NRA. During his tenure as Housing and Urban Development ("HUD") Secretary in the 1990s, Cuomo famously coordinated a campaign of lawsuits (nearly all dismissed) against gunmakers that purported to hold them liable for crimes committed in public housing projects by criminals using illegally obtained firearms. Later, Cuomo admitted that his real aim was to coerce, via settlement, the "voluntary" industrywide adoption of certain equipment and sale restrictions, and warned that any manufacturer who refused to settle would suffer "death by a thousand cuts."[6] Decried by even gun-control supporters as "wrong" and

---

[5] On February 15, 2018, Cuomo appeared on the MSNBC program "The Beat," where he discussed championing legislation that some believed "trampled the Second Amendment." YOUTUBE, Gov. *Andrew Cuomo On Background Checks: "Bunch Of Boloney" | The Beat With Ari Melber | MSNBC*, https://www.youtube.com/watch?v=Tz8X07fZ39o (last visited May 7, 2018). However, Cuomo lamented that his "favorability rating" had thereafter dropped due to "backlash from conservatives and Second Amendment types." *Id.*

[6] Bill McAllister, *Gun Industry Rejects Settlement Effort*, THE DENVER POST (Feb. 1, 2000), http://www.wagc.com/gun-industry-rejects-settlement-effort/.

an abuse of agency authority,[7] the HUD effort failed after the NRA and other pro-gun groups organized legislative and grassroots opposition.[8]

16.    Cuomo blamed "gun lobby extremists" for the collapse of his efforts at HUD.[9] At a press conference on June 20, 2000, he referred to gun-rights supporters as "the enemy," and announced a blueprint for defeating the NRA and its allies that would emphasize the use of state and municipal retaliatory authority: "If we engage the enemy in Washington we will lose. They will beat us in this town. They are too strong in this town. Their fortress is within the Beltway. We're going to beat them state by state, community by community."[10]

17.    As governor of New York, Cuomo has loudly supported the enactment of some of the nation's harshest gun-control laws.[11] But rather than debate opponents of his anti-gun

---

[7] In an editorial dated December 17, 1999, the Washington Post described the Cuomo campaign as "disquieting even for those who, like us, strongly support rigorous controls on handguns." *The HUD Gun Suit*, THE WASHINGTON POST (Dec. 17, 1999), https://www.washingtonpost.com/archive/opinions/1999/12/17/the-hud-gun-suit/48ee0a45-18da-4e8d-9b86-b9512172ae09/?utm_term=.9a74ce83f538. Anticipating themes that would continue to characterize Cuomo's gun-control efforts over the next nineteen years, the editorial board stated that "it . . . seems wrong for an agency of the federal government" to put "pressure on an industry . . . to achieve policy results the administration has not been able to achieve through normal legislation or regulation." *Id.*

[8] *See, e.g.*, *House Blocks Money For Gun Pact*, CBS NEWS (June 21, 2000, 11:58 PM), https://www.cbsnews.com/news/house-blocks-money-for-gun-pact/.

[9] *HUD Archives: News Releases, HUD No. 00-150, COMMUNITIES FOR SAFER GUNS COALITION JOINS CUOMO IN CRITICIZING EFFORT IN CONGRESS TO KILL THE COALITION*, U.S. DEP'T OF HOUS. AND URBAN DEV. (June 27, 2000, archived Dec. 13, 2009).

[10] *Remarks by Secretary Andrew Cuomo Handgun Control, Inc, Washington, D.C. Tuesday, June 20, 2000*, U.S. DEP'T OF HOUS. AND URBAN DEV. (Jan. 20, 2009), https://archives.hud.gov/remarks/cuomo/speeches/handguncontrl.cfm.

[11] *See, e.g.*, Teri Weaver, *Judge: NY must release Safe Act stats from assault weapons registry*, SYRACUSE (May 7, 2015, 9:09 PM), http://www.syracuse.com/news/index.ssf/2015/05/judge_ny_must_release_safe_act_data_on_assault_weapons_registry.html.

initiatives, he declared that conservative firearms advocates "have no place in the state of New York."[12] Accordingly, Cuomo has sought to banish "the enemy" from public discourse altogether, and remains dissatisfied with what he perceives to be the excessive political influence of "conservatives and the Second Amendment types."[13]

18.    In truth, Cuomo bears distinct animus toward the NRA, which he accuses of exerting a "stifl[ing] . . . stranglehold" over national gun policy.[14] For Cuomo, weakening the political advocacy of the NRA is a career strategy.

**C.    Defendants Attempt To Chill The NRA's Political Speech In Support Of Americans' Second Amendment Rights.**

19.    Against the backdrop of recent tragedies and a polarized public gun-control debate, Cuomo and the other Defendants have abused their authority in an overt effort to stifle the NRA's political advocacy and to retaliate against the NRA for the effectiveness of that advocacy.

20.    Together with former DFS Superintendent Vullo, his longtime lieutenant,[15] Cuomo embarked on a campaign to chill the political speech of the NRA and other so-called "gun

---

[12] Heather Long, *Conservatives aren't welcome in New York, according to Governor Cuomo*, THE GUARDIAN (Jan. 14, 2014, 8:49 AM), https://www.theguardian.com/commentisfree/2014/jan/24/governor-cuomo-conservatives-not-welcome-new-york.

[13] YOUTUBE, *Gov. Andrew Cuomo On Background Checks: "Bunch Of Boloney" | The Beat With Ari Melber | MSNBC*, https://www.youtube.com/watch?v=Tz8X07fZ39o (last visited December 9, 2019).

[14] Kenneth Lovett, *Exclusive: Cuomo fires back at Jeb Bush for 'stupid' and 'insensitive' gun tweet*, NY DAILY NEWS (Feb. 17, 2016), http://www.nydailynews.com/news/politics/cuomo-blasts-jeb-stupid-insensitive-gun-tweet-article-1.2534528.

[15] Cuomo and Vullo have worked together since at least 2006 when Vullo served as a "top aide" to Cuomo in his role as attorney general. Cuomo nominated Vullo to be DFS Superintendent approximately ten years later. Jimmy Vielkind, *Cuomo nominates ex-aide to head Department of Financial Services*, POLITICO (Jan. 21, 2016, 5:14 AM), https://www.politico.com/states/new-york/albany/story/2016/01/cuomo-nominates-ex-aide-to-head-department-of-financial-services-030286.

promotion" organizations by leveraging state power to punishing financial institutions which maintain "business arrangements with the NRA." To achieve this, Defendants draw upon the formidable regulatory powers of DFS—an agency charged with ensuring the stability and integrity of New York's financial markets.

21.     At Cuomo's behest, Vullo and DFS have threatened regulated institutions with costly investigations, increased regulatory scrutiny and penalties should they fail to "discontinue[] . . . their arrangements with the NRA."[16] Many of the most pernicious of these threats occurred privately. For example, beginning in February 2018, Vullo met personally with executives of regulated institutions, including Lloyd's.[17] During the meetings she discussed an array of technical regulatory infractions plaguing the affinity-insurance marketplace. Vullo made it clear, however, that DFS was less interested in pursuing the infractions of which she spoke, so long as Lloyd's ceased providing insurance to gun groups, especially the NRA. The threat was clear and unambiguous. Shortly thereafter, Defendants began to deliver on it. Within a single week, DFS levied multi-million dollar fines against two insurance-industry firms that dared to do business with the NRA. Under intense scrutiny, both firms, and later a third (together comprising all the issuers of NRA-related policies for the NRA and its members), were coerced to terminate their business arrangements with the NRA and its members—including arrangements having nothing to do with the allegedly unlawful conduct cited by DFS.

---

[16] *GOVERNOR CUOMO DIRECTS DEPARTMENT OF FINANCIAL SERVICES TO URGE COMPANIES TO WEIGH REPUTATIONAL RISK OF BUSINESS TIES TO THE NRA AND SIMILAR ORGANIZATIONS*, N.Y. STATE GOVERNOR ANDREW M. CUOMO (Apr. 19, 2018), https://www.governor.ny.gov/news/governor-cuomo-directs-department-financial-services-urge-companies-weigh-reputational-risk.

[17] Vullo met with, and threatened, executives of Lloyd's of London ("Lloyd's") and its United States affiliate, Lloyd's America, Inc, ("LAI").

22.     Importantly, Defendants were fully aware by at least March 2018 (and likely earlier) that non-NRA insurance policies exhibiting the same features were being marketed on behalf of other affinity organizations. Defendants intentionally ignored such knowledge and did not undertake enforcement actions relating to these other similarly constructed programs because enforcing the Insurance Law was never their goal. Instead, as DFS explained to Lloyd's in closed-door meetings, the Cuomo administration sought to focus on "gun programmes" and gun advocacy groups generally.

23.     A DFS press release publicizing one enforcement action makes clear the gravamen of Defendants' campaign: financial institutions regulated by DFS must refrain from "[e]ntering into any . . . agreement or arrangement," which "involv[es] the NRA, directly or indirectly"[18]—or face the consequences.

1.     **DFS And Its Regulatory Mission.**

24.     In 2011, as part of his state budget, Cuomo announced the merger of the New York State Insurance Department and the Banking Department to create DFS. The mandate of the new agency, which consolidated supervisory and enforcement powers previously vested in separate departments, is to "reform the regulation of financial services in New York to keep pace with the

---

[18] *DFS FINES LOCKTON COMPANIES $7 MILLION FOR UNDERWRITING NRA-BRANDED "CARRY GUARD" INSURANCE PROGRAM IN VIOLATION OF NEW YORK INSURANCE LAW*, N.Y. STATE DEP'T OF FIN. SERVS. (May 2, 2018), https://www.dfs.ny.gov/about/press/pr1805021.htm; *see also* DFS FINES CHUBB SUBSIDIARY ILLINOIS UNION INSURANCE COMPANY $1.3 MILION FOR UNDERWRITING NRA-BRANDED "CARRY GUARD" INSURANCE PROGRAM IN VIOLATION OF NEW YORK INSURANCE LAW, N.Y. STATE DEP'T OF FIN. SERVS. (May 7, 2018), https://www.dfs.ny.gov/about/press/pr1805071.htm.

rapid and dynamic evolution of these industries, to guard against financial crises and to protect consumers and markets from fraud."[19]

25.     The Superintendent of DFS has broad regulatory and enforcement powers, which encompass the ability to initiate civil and criminal investigations and enforcement actions. In addition, pursuant to Financial Services Law, Article 3, § 301, the DFS superintendent has the power to refer matters to the attorney general for criminal enforcement. The creation of an agency with such expansive prerogatives and capabilities "grab[bed] power and headlines," and the New York Times reported in 2015 that the first DFS superintendent, Benjamin Lawsky, was popularly caricatured as "the new sheriff of Wall Street" and an all-powerful monarch ("King Lawsky").[20]

26.     New York Financial Services Law, Article 2, § 201, provides the superintendent of DFS with formidable authority to, among other things, "ensure the continued solvency, safety, [and] soundness" of banks and insurance companies.[21] Accordingly, DFS directives regarding "risk management" must be taken seriously by financial institutions—as risk-management deficiencies can result in fines of hundreds of millions of dollars.

27.     DFS's regulatory mandate does not include setting gun-control policy. Nor does any statute or other authority empower DFS to blacklist, from receipt of insurance or banking services, speakers with political viewpoints objectionable to the governor or DFS superintendent. In addition, DFS has no authority to engage in unlawful viewpoint discrimination.

_____

[19] N.Y. STATE DEP'T OF FIN. SERVS. (Dec. 12, 2017), https://www.dfs.ny.gov/about/mission.htm.

[20] Jessica Silver-Greenberg and Ben Protess, *Benjamin Lawsky, Sheriff of Wall Street, Is Taking Off His Badge*, THE NEW YORK TIMES (May 20, 2015), https://www.nytimes.com/2015/05/21/business/dealbook/benjamin-lawsky-to-step-down-as-new-yorks-top-financial-regulator.html.

[21] New York Financial Services Law Article 2, § 201 ("Declaration of Policy").

2.      **The NRA Depends Upon Essential Financial Services to Fulfill Its Advocacy Mission**

28.      The NRA's direct-mail campaigns, digital media broadcasts, television and radio communications, grassroots organizing, membership recruitment, and other core political speech and associational activities are carried out by a combination of volunteers, employees, and independent contractors engaged by the NRA and its affiliates. To meet payroll obligations, purchase mailing materials and media airtime, maintain its Internet presence, and otherwise continue to advocate for the Second Amendment of the United States Constitution, the NRA must have the ability to process and retain cash, check, wire-transfer, and other donations from members and events throughout the country, as well as transmit and apply these funds to meet operational needs. Accordingly, the NRA relies upon depository services, cash management services, lockbox services, disbursement services, wire-transfer services, and remote banking services of the type generally offered by major wholesale banking institutions.

29.      To continue its existence as a not-for-profit organization and fulfill its advocacy objectives, the NRA also must maintain various corporate insurance coverage. General liability and related "umbrella" coverage allow the NRA to maintain physical premises, convene off-site meetings and events, and operate educational programs promoting the safe use of firearms which are vital to the NRA's mission. For its Annual Meeting, Great American Outdoor Show, and other major rallies, conventions and assemblies with explicitly expressive purposes, the NRA generally must also purchase event-specific coverage. Absent such coverage, the NRA could be forced to cease circulation of various print publications and magazines.

30.      In addition, like many affinity groups and organizations nationwide, the NRA seeks to make life, health, and other insurance coverage available to its members on affordable, tailored terms. To this end, the NRA contracted with multiple insurance-industry firms to develop, market,

and underwrite insurance programs endorsed by the NRA. Pursuant to these arrangements, the NRA performs none of the functions of an insurer. It does lend its valuable logos, marks, and endorsements to insurance programs brokered and serviced by others. Such "affinity" insurance plans are common and believed by many to be a suitable substitute for employer-based coverage.[22]

31.     From 2000 onward, the NRA contracted with affiliates of the world's largest privately held insurance broker, Lockton Companies, LLC (collectively with pertinent affiliates, "Lockton"),[23] for affinity-program brokerage and administration services. Lockton has provided services in the affinity-insurance market for decades and caters to a wide array of industries and clients including franchises, professional and trade organizations, fraternal organizations, and common-cause groups such as the NRA. For roughly seventeen years, Lockton entities administered and marketed NRA-endorsed insurance in New York State and across the nation without incident. In addition to its affinity-insurance transactions with the NRA, Lockton has also served for decades as the NRA's trusted insurance broker for various corporate coverage—such as general liability, umbrella and director and officer insurance.

32.     The NRA-endorsed affinity-insurance administered by Lockton consists primarily of life, health, property, and casualty policies that mirror policies offered by Lockton to other affinity groups. In addition, Lockton administers certain products, including a product known as "Carry Guard," that provide coverage for expenses arising out of the lawful self-defense use of a

_____

[22] *See, e.g.*, Rachel Louise Ensign, *Affinity-Group Plans*, THE WALL STREET JOURNAL (Sept. 11, 2011), http://online.wsj.com/article/SB10001424053111904836104576563341 686006336.html.

[23] In particular, the NRA contracted with Lockton Affinity Series of Lockton Affinity, LLC (f/k/a Lockton Risk Services, Inc.) ("Lockton Affinity") and Kansas City Series of Lockton Companies, LLC ("Lockton KC").

legally possessed firearm. Illinois Union Insurance Company ("Illinois Union"), a subsidiary of Chubb Ltd., underwrote Carry Guard while doing business under the name "Chubb."

33.     The NRA has been the target of activist boycott efforts in the past, including campaigns that urged insurance companies and other private actors to cease doing business with the NRA. However, because these campaigns were carried out by non-governmental activist groups who lack the government's power to punish those who refused to join the boycott, their methods have centered on persuasion—not coercion. Unaided by the brute force of state power, activists never successfully persuaded the NRA's banking or insurance partners to sever ties with the NRA. This changed in 2017, when one activist organization successfully enlisted Defendants in a joint effort to silence the NRA.

**3.     DFS Commences A Politically Motivated Investigation Focused Ostensibly on NRA-Endorsed "Affinity" Insurance.**

34.     During or about September 2017, a non-governmental activist organization known as Everytown for Gun Safety ("Everytown") contacted the New York County District Attorney's Office (the "DA's Office"), as well as state and municipal authorities in other jurisdictions, in an effort to prompt a crackdown by sympathetic government officials that would target alleged compliance infirmities in Carry Guard. Notably, Everytown is not an organization dedicated to insurance compliance; instead, its explicit political mission is to oppose the NRA.[24] On September 13, 2017, representatives from the DA's Office met with DFS to effectuate Everytown's agenda.

_____

[24]  Aaron Blake, *Bloomberg launches new $50 Million gun control effort*, THE WASHINGTON POST (Apr. 16, 2014), https://www.washingtonpost.com/news/post-politics/wp/2014/04/16/bloomberg-aims-to-spend-50-million-on-gun-control/?noredirect=on&utm_term=.703fe67ee197 (explaining that Everytown "will attempt to combat the vast influence of the National Rifle Association").

35.      As a result, in October 2017, DFS launched an investigation that focused ostensibly on Carry Guard and was directed in the first instance at Lockton. On its website, Everytown took credit for instigating the inquiry[25]—but even if it had not, the political underpinnings and selective focus of the investigation were clear. The investigation was chronicled in the national media before the NRA received official notice of it, and it targeted none of the available self-defense insurance products except Carry Guard, which was endorsed by the NRA.

36.      Of course, Carry Guard was not Defendants' true focus, and the scope of the DFS investigation rapidly expanded. At first, Defendants purported to target a discrete subset of so-called "excess line" property and casualty policies relating to firearms—a category that encompassed Carry Guard, but also included policies such as Gun Club Insurance and Hunt Club Insurance. However, Defendants' goal, from the outset, was to disrupt any and all business arrangements between the NRA and any insurance administrator, broker, or underwriter—indeed, any financial institution. Within weeks of commencing its investigation, DFS began to target insurance programs that had nothing to do with firearms, and instead provided coverage similar or identical to coverage endorsed by other New York affinity organizations such as the New York State Bar Association, the New York City Bar, the National Association for the Self-Employed, the New York Association of Professional Land Surveyors, and the New York State Psychological Association.

37.      DFS has not announced—even to this day—similar inquiries concerning any of these other membership organizations, although their affinity programs involve most, if not all, of

---

[25] *Everytown, Moms Demand Action Statements Responding to Report That New York Department of Financial Services is Investigating NRA Carry Guard Insurance*, EVERYTOWN FOR GUN SAFETY (Oct. 25, 2017), https://everytown.org/press/everytown-moms-demand-action-statements-responding-to-report-that-new-york-department-of-financial-services-is-investigating-nra-carry-guard-insurance/.

A-151

the practices and features referenced by DFS in its investigation of the NRA's affinity programs. Instead, Defendants selectively targeted the NRA because of the NRA's constitutionally protected legislative and grassroots advocacy activities. Defendants specifically intend to undermine the NRA's ability to conduct its affairs in New York—and to advance Cuomo's anti-NRA political agenda.

**4.    Over The Course Of The Investigation, Cuomo And DFS Exhort Firms To Sever Ties With The NRA.**

38.    Throughout its purported investigation of Carry Guard in late 2017 and early 2018, DFS communicated to banks and insurers with known or suspected ties to the NRA that they would face regulatory action if they failed to terminate their relationships with the NRA. These exhortations extended far beyond Carry Guard (the policy purportedly raising regulatory concerns), indicating that any business relationship whatsoever with the NRA would invite adverse action.

39.    The impact of Defendants' campaign on the NRA's ability to access essential financial services has been far greater than—and, clearly distinct from—the impact of any public controversy relating to recent tragedies.

40.    For example, during February 2018, the NRA issued a Request for Proposal ("RFP") to multiple banks, inviting them to submit bids to provide depository services, cash-management services, and other basic wholesale banking services necessary to the NRA's advocacy. The NRA received enthusiastic responses from several banks.

41.    Likewise, in early January 2018, the NRA began negotiating with a major DFS-regulated insurance carrier (the "Corporate Carrier") to renew its General Liability, Umbrella, and Media Liability insurance coverage policies, which were set to expire during Spring 2018. Those

negotiations remained on-course until the final days of February 2018, when Defendants sharply escalated their threats.

42.     On or about February 25, 2018, the Chairman of Lockton Companies, placed a distraught telephone call to the NRA. Lockton had been a close business partner of the NRA for nearly twenty years; its commitment to the parties' business relationship had not wavered in connection with the Parkland tragedy, nor the prior Sandy Hook tragedy, nor any previous wave of public controversy relating to gun control. Nonetheless, although he expressed that Lockton privately wished to continue doing business with the NRA, the chairman confided that Lockton would need to "drop" the NRA—entirely—for fear of "losing [our] license" to do business in New York.

43.     On February 26, 2018, Lockton publicly tweeted that it would discontinue providing brokerage services for **all** NRA-endorsed insurance programs.

44.     Days later, the Corporate Carrier abruptly reversed its position in its corporate-insurance-renewal negotiations with the NRA. Although it had previously indicated it would be willing to extend the NRA's General Liability and Umbrella coverage on favorable terms consistent with the NRA's favorable claims history, the Corporate Carrier now stated that it was ***unwilling to renew coverage at any price.*** The Corporate Carrier severed mutually beneficial business arrangements with the NRA because it learned of Defendants' threats directed at Lockton and feared it would be subject to similar reprisals.

45.     Defendants soon supplemented their backchannel threats with official regulatory "guidance." In April 2018, Cuomo directed DFS to publicly "urge insurers and bankers statewide to determine whether any relationship they may have with the NRA or similar organizations sends

the wrong message to their clients and their communities who often look to them for guidance and support."[26]

46.     On April 19, 2018, Vullo, as Superintendent of DFS, issued a pair of ominous "guidance" letters (the "April 2018 Letters") directed at the chief executive officers, or equivalents, of all New York State chartered or licensed financial institutions and all insurers doing business in New York. The April 2018 Letters urged recipients to sever ties with the NRA and other "gun promotion organizations."[27] The directive was packaged in a sharply worded media advisory meant to generate headlines—and apply maximum public pressure to the NRA and those with whom it associates.

47.     The April 2018 Letters are suffused with political concerns far afield from DFS's mandate to prevent financial crises and financial fraud. For example, they urge banks and insurers to heed "the voices of the passionate, courageous, and articulate young people" speaking out in favor of gun control, and to reconsider any business relationships with "the [NRA], and similar organizations that promote guns and lead to senseless violence." However, the April 2018 Letters do not merely express Defendants' own political opinions: they invoke the "risk management"

_____

[26] *GOVERNOR CUOMO DIRECTS DEPARTMENT OF FINANCIAL SERVICES TO URGE COMPANIES TO WEIGH REPUTATIONAL RISK OF BUSINESS TIES TO THE NRA AND SIMILAR ORGANIZATIONS*, N.Y. STATE GOVERNOR ANDREW M. CUOMO (Apr. 19, 2018), https://www.governor.ny.gov/news/governor-cuomo-directs-department-financial-services-urge-companies-weigh-reputational-risk, attached hereto as Exhibit A (the "Cuomo Press Release").

[27] Maria T. Vullo, *Guidance on Risk Management Relating to the NRA and Similar Gun Promotion Organizations*, N.Y. STATE DEP'T OF FIN. SERVS. (Apr. 19, 2018), https://www.dfs.ny.gov/legal/dfs/DFS_Guidance_Risk_Management_NRA_Gun_Manufacturers -Insurance.pdf (addressed to the CEOs or equivalents of insurers doing business in the State of New York), attached hereto as Exhibit B; Maria T. Vullo, *Guidance on Risk Management Relating to the NRA and Similar Gun Promotion Organizations*, N.Y. STATE DEP'T OF FIN. SERVS. (Apr. 19, 2018), https://www.dfs.ny.gov/legal/dfs/DFS_Guidance_Risk_Management_NRA_ Gun_Manufacturers-Banking.pdf (addressed to the CEOs or equivalents of New York State chartered or licensed financial institutions), attached hereto as Exhibit C.

obligations of recipients, and direct banks and insurers to "take prompt actions to manage" purported "reputational risks" arising from "dealings with the NRA or similar gun promotion organizations."

48.     Read in the context of the preceding months' private communications—as well as disclosures that would soon follow concerning consequences imposed on firms doing business with the NRA—the April 2018 Letters were threats that deliberately invoked DFS's "risk management" authority to warn of adverse action if institutions failed to support Defendants' efforts to stifle the NRA's speech and to retaliate against the NRA based on its viewpoint.

49.     Importantly, the April 2018 Letters contain no language clarifying that DFS would forebear from directly enforcing the letters' terms. Nor do the April 2018 Letters provide regulated institutions with any objective criteria for measuring the "reputational risks" imposed by dealings with entities that "promote guns that lead to senseless violence." This is because Defendants intended the April 2018 Letters to intimidate institutions into acceding to a political blacklisting campaign and have nothing to do with the types of market "risks" properly regulated by DFS.

50.     To further dispel any ambiguity surrounding the April 2018 Letters, Cuomo and Vullo issued the contemporaneous Cuomo Press Release, containing and endorsing a statement by Vullo that directly "urge[s] all insurance companies and banks doing business in New York to join the companies that have already discontinued their arrangements with the NRA."[28]

---

[28] Ex. A.

51.     Likewise, on April 20, 2018, Cuomo publicly tweeted: "The NRA is an extremist organization. I urge companies in New York State to revisit any ties they have to the NRA and consider their reputations, and responsibility to the public."[29]

52.     The intended and actual effect of the April 2018 Letters, and the actions by Cuomo and Vullo, is to coerce insurance agencies, insurers, and banks into terminating business relationships with the NRA that were necessary to the survival of the NRA as a charitable organization.

53.     Third-party commentators immediately raised concerns about the First Amendment implications of DFS's actions. For example, on April 22, 2018, shortly after issuance of the April 2018 Letters, Brian Knight, a Senior Research Fellow and financial regulation expert at George Mason University, published an article expressing alarm that the April 2018 Letters "appear[ed] to be *inherently* about political speech," and should be immediately withdrawn.[30] In the face of such criticism (and this litigation), Cuomo doubled down, declaring that a lawsuit which alleges unconstitutional censorship of the NRA's "dangerous agenda" means "you know you're doing something right."[31]

---

[29] Andrew Cuomo (@NYGovCuomo), TWITTER (Apr. 20, 2018, 8:58 AM), https://twitter.com/NYGovCuomo/status/987359763825614848.

[30] Brian Knight, *Is New York using bank regulation to suppress speech?*, FINREGRAG (Apr. 22, 2018), https://finregrag.com/is-new-york-using-bank-regulation-to-suppress-speech-ac61a7cb3bf.

[31] Kenneth Lovett, *NRA slapping Cuomo with lawsuit over blacklisting campaign, violating First Amendment rights*, NEW YORK DAILY NEWS (May 11, 2018), http://www.nydailynews.com/news/politics/nra-slapping-cuomo-lawsuit-blacklisting-campaign-article-1.3984861#; Andrew Cuomo (@NYGovCuomo), TWITTER (May 12, 2018, 8:50 AM), https://twitter.com/NYGovCuomo/status/995330370592632832.

**D.**     **The Damage Done.**

**1.**     **DFS Permanently Restricts Lockton From Doing Business With The NRA In New York.**

54.     On May 2, 2018, two weeks after Vullo issued the April 2018 Letters, Lockton entered into a consent order Under Articles 21, 23, and 34 of the Insurance Law (the "Lockton Consent Order") with DFS—signed by Vullo—which imposes a civil monetary penalty of $7 million.[32] Although the Lockton Consent Order ostensibly addresses discrete violations by specific Lockton entities of New York's Insurance Law, its provisions go much further. Most notably, the Lockton Consent Order purports to restrict Lockton's participation in *any* NRA-endorsed insurance programs in New York State, irrespective of whether such programs comply with the Insurance Law.

55.     Specifically, the Lockton Consent Order requires that Lockton agree "not to participate in . . . any other NRA-endorsed programs with regard to New York State." Nor may Lockton "enter into any agreement or program with the NRA to underwrite or participate in any affinity-type insurance program involving any line of insurance to be issued or delivered in New York State or to anyone known to Lockton to be a New York resident." As a result, Lockton is prohibited from selling NRA affinity-insurance outside New York to any individual who maintains a New York residence.

56.     DFS and Vullo have no legal basis to restrict Lockton's involvement with insurance programs that do not violate New York's Insurance Law; nor do they have authority to regulate insurance transactions outside of New York. Nevertheless, DFS mandated that Lockton never enter

---

[32] The Lockton Consent Order is attached hereto as Exhibit D.

into any future agreements with the NRA for legitimate and fully compliant insurance programs in New York.

57.     Furthermore, Lockton would violate the Lockton Consent Order if it markets an ordinary property, casualty, or life insurance policy in the State of New York that was accompanied by an NRA logo or endorsement—notwithstanding that a comparable logo or endorsement referencing any other affinity or common-cause organization is permissible. This provision of the Lockton Consent Order is deliberate and intended to impair the NRA's ability to negotiate insurance benefits for its members, damage the NRA's goodwill among its membership, and unconstitutionally restrict the NRA's speech on the basis of political animus.

58.     Several of the purported "violations" assessed pursuant to the Lockton Consent Order concern programs commonly engaged in by numerous additional affinity associations that do not publicly advocate for Second Amendment rights and, therefore, are not targets of Defendants' unconstitutional conduct. Several such organizations are clients of Lockton—yet the Consent Order does not compel Lockton to discontinue its purportedly unlawful conduct with respect to these clients.

59.     For example:

- DFS claims that Lockton Affinity violated Insurance Law § 2122(a)(1) by referring to the insurer's AM Best rating. Yet, at the time this lawsuit was filed, Lockton Affinity's affinity program for the American Optometric Association through AOAExcel ("AOAExcel") touted the "backing of a carrier that is rated A+ (Superior) by A.M. Best.[33] Similarly, Lockton Affinity currently advertises that coverage for the affinity programs designed for the Veterans of Foreign Wars

---

[33]     *Questions?   We   have   answers   for   you.*,   AOAINSURANCEALLIANCE, http://aoainsurancealliance.com/faq/ (last visited May 7, 2018).

("VFW") and Moose International Inc. ("Moose") was through companies "rated 'Excellent' or higher by A.M. Best."[34]

- DFS claims that Lockton Affinity violated Insurance Law § 2324(a) by giving or offering to give no cost insurance to NRA members in good standing. Yet, Lockton Affinity currently made that same offer to members of both the Professional Photographers of America ("PPA")[35] and the VFW.[36]

- DFS claims that Lockton Affinity violated Insurance Law § 2116 by compensating the NRA based on actual premiums collected. Yet, Lockton Affinity paid AOAExcel, Moose, the VFW, the PPA, and dozens of other clients in the same or similar manner.

60.    Even if such conduct does violate insurance law, DFS's selective enforcement of such offenses as to NRA-endorsed policies—but not as to other policies marketed by Lockton in an identical fashion—constitutes impermissible viewpoint discrimination and a denial of equal protection under the law.

61.    Despite the backlash concerning the expansive coercive scope and clear political agenda of the April 2018 Letters, Defendants remained undaunted in their effort to deprive the NRA of such services; as such, their overall messaging to financial institutions remained unaffected. Indeed, the DFS press release publicizing the Lockton Consent Order trumpeted the same concession by Lockton that had inspired its chairman's furtive telephone call months before:

---

[34] *FVW Post Insurance Program, Program Information*, VFW INSURANCE, http://vfwinsurance.com/wp-content/uploads/sites/29/2017/12/VFW_Post_Insurance_Information_Packet.pdf (last visited May 7, 2018); MOOSE INSURANCE PROGRAM, http://mooseinsuranceprogram.com/ (last visited May 7, 2018).

[35] INSURANCE FOR PPA, https://insuranceforppa.com/ (last visited May 7, 2018).

[36] VFW INSURANCE, http://vfwinsurance.com/life-insurance/#no-cost (last visited May 7, 2018).

Lockton must "refrain from [e]ntering into any other agreement or arrangement . . . involving the NRA, directly or indirectly"—including, but not limited to, affinity-insurance.[37]

**2.    DFS Purports To Prohibit Chubb From Doing Business With The NRA Anywhere.**

62.    On May 7, 2018, Chubb Group Holdings, Inc. and Illinois Union (together, "Chubb") entered into a Consent Order Under Sections 1101 and 3420 of the Insurance Law (the "Chubb Consent Order") with DFS—signed by Vullo—which imposes a civil monetary penalty of $1.3 million.[38] Similar to the Lockton Consent Order, in the Chubb Consent Order, DFS overextends its authority and purports to restrict Chubb's participation in *any* affinity-type insurance program with the NRA, irrespective of whether such programs comply with the Insurance Law.

63.    Although DFS restricted Lockton from participating in any affinity-type insurance programs with the NRA in New York or with New York residents, Defendants' restrictions in the Chubb Consent Order contain no geographic constraint whatsoever. Instead, the Chubb Consent Order purports to limit Chubb's involvement with the NRA anywhere, and everywhere, in the world.

64.    Nevertheless, DFS allows Chubb to continue to underwrite affinity-type insurance programs with other affinity or common-cause organizations that do not publicly advocate for Americans' Second Amendment rights, so long as Chubb undertakes "reasonable due diligence to

---

[37] *DFS FINES LOCKTON COMPANIES $7 MILLION FOR UNDERWRITING NRA-BRANDED "CARRY GUARD" INSURANCE PROGRAM IN VIOLATION OF NEW YORK INSURANCE LAW*, N.Y. STATE DEP'T OF FIN. SERVS. (May 2, 2018), https://www.dfs.ny.gov/about/press/pr1805021.htm.

[38] The Chubb Consent Order is attached hereto as Exhibit E.

ensure that any entity involved . . . is acting in compliance with the Insurance Law . . . ."[39] The only plausible explanation for the DFS's complete exclusion of NRA-endorsed policies, even those "in compliance with the Insurance Law," is that Defendants seek to misuse DFS's power to deprive the NRA of insurance and financial services, on the sole ground that Defendants disapprove of the NRA's viewpoint regarding gun control.

   3.   **Ignoring Identical Features of Comparable Affinity-Insurance Programs, Defendants Impermissibly Targeted the NRA.**

   65.   Beginning during the Fall of 2017, including through a subpoena issued to Lockton and research supplied by Everytown, Defendants became aware of pervasive, colorable regulatory infirmities affecting numerous affinity-insurance programs. For example, brokers such as Lockton frequently paid success-based royalties to their affinity clients, which DFS would later assert violated New York Insurance Law § 2116. Insurance coverage for the cost of psychological counseling had become increasingly pervasive outside a standard health-insurance context, yet DFS argues that providing such insurance violates New York Insurance Law § 2117. Similarly, DFS takes the position that the financial condition or "rating" of an out-of-state, excess-line insurer may not be advertised as a means to promote the policy—but this practice was common in the affinity-insurance marketplace in 2017. And although New York Insurance Law § 3420 sets forth various minimum requirements for liability insurance which protects persons and property, many policies failed to meet those requirements. It is clear that confusion existed among brokers regarding the mechanics of compliance with New York Insurance Law § 2118, which requires brokers to secure declinations from authorized insurers before placing surplus-line insurance.

---

   [39] *See* Ex. E at ¶ 22.

66.     Confronted with a marketplace where brokerage practices frequently departed from the regulators' preferred reading of certain statutes, Defendants could have issued informative guidance, or adopted an even-handed enforcement approach. Instead, Defendants selectively used these purported infractions to target the NRA, while disregarding other instances of the same conduct of which they were aware. (When Defendants did issue guidance letters to regulated institutions in April 2018, the letters reflected their enforcement approach: ignore excess-line declinations, out-of-state-carrier ratings, and other technical insurance-policy features while "urging" financial institutions to cut ties with gun groups).

67.     Although DFS's investigation of the NRA, launched at Cuomo and Everytown's behest, had originally focused on Carry Guard, that changed by February 2018. In the aftermath of the Parkland tragedy, Vullo met with senior executives of Lloyd's and LAI, and presented Defendants' views on gun control and their desire to leverage their powers to combat the availability of firearms, including specifically by weakening the NRA. These backchannel meetings began on or about February 27, 2018, after Vullo spoke at a breakfast meeting of the New York City Bar Association; participants included Vullo herself, along with Inga Beale of Lloyd's and Joseph Gunset of LAI.

68.     Sometimes referred to as an insurance underwriter, Lloyd's is actually an insurance marketplace, composed of "members which underwrite insurance (each for their own account) as members of syndicates."[40] Various supervisory bodies and boards within Lloyd's set policies for

---

[40] *See Lloyd's of London in Study for N.Y. Insurance Market*, DealBook, N.Y. TIMES (March 25, 2010), https://dealbook.nytimes.com/2010/03/25/lloyds-of-london-in-study-for-n-y-insurance-market/; *see also The Lloyd's Market*, LLOYD'S, https://www.lloyds.com/about-lloyds/what-is-lloyds/the-lloyds-market (last visited April 18, 2019), https://www.lloyds.com/about-lloyds/what-is-lloyds/the-lloyds-market (describing the structure of the Lloyd's market). Entities known as "managing agents" manage the Lloyd's syndicates on

the Lloyd's syndicates, and can issue directives that shape the availability of different types of

insurance worldwide. Like most of the insurance industry, Lloyd's generally does not shy away

from providing insurance that may be controversial—for example, to this day, Lloyd's syndicates

are permitted to underwrite coverage for religious sexual abuse liability.[41] However, despite being

based in London, Lloyd's is extremely sensitive to pressure from the New York regulators, and

concerned about "reputational risks" that may incur DFS's disfavor. Since World War II, when

Lloyd's sought to protect policyholders from the consequences of German attacks on England, all

premiums paid by Lloyd's policyholders have deposited into trust funds in the State of New York,

through a structure known as the Lloyd's America Trust Fund ("LATF"). The LATF is directly

regulated by DFS, and totals tens of billions of dollars—providing massive collateral for whatever

demands DFS may impose.[42]

69.     During her surreptitiously held meetings with Lloyd's executives that commenced

in February 2018, Vullo acknowledged the widespread regulatory issues in the excess-line

marketplace. Vullo and DFS made clear that Lloyd's could avoid liability for infractions relating

to other, similarly situated insurance policies, so long as it aided DFS's campaign against gun

---

behalf of Lloyd's members. The individual Lloyd's syndicates and managing agents that served
the NRA, and were targeted by DFS are: AUW 0609; BRT 2987; CNP 0958; CNP 4444; CSL
1084; GER 1206; KLN 0510; LIB 4472; ROC 1200; SAM 0727; AmTrust Syndicates Limited;
Argo Managing Agency Limited; Atrium Underwriters Limited; Brit Syndicates Limited;
Canopius Managing Agents Limited; Chaucer Syndicates Limited; Liberty Managing Agency
Limited; S.A. Meacock & Company Limited; Tokio Marine Kiln Syndicates Limited. All are
located in the United Kingdom.

[41] *See, e.g.*, http://www.britinsurance.com/~/media/files/us%20flyers%20new/public%20
entity%20%20non%20profit%20sir%20package.ashx.

[42] *See In re Lloyd's Am. Tr. Fund Litig.*, 928 F. Supp. 333, 336 (S.D.N.Y. 1996) (discussing
the LATF structure and certain relevant regulations administered by DFS's predecessor agency,
the New York Department of Insurance).

groups. Against the specter of this bold abuse of her position, Lloyd's agreed that it would instruct its syndicates to cease underwriting firearm-related policies and would scale back its NRA-related business; in exchange, DFS would focus its forthcoming affinity-insurance enforcement action solely on those syndicates which served the NRA, and ignore other syndicates writing similar policies. The first step of this choreographed process was a letter from DFS to Gunset, an LAI executive, sent on April 11, 2018.[43]

70.     On May 1, 2018, Lloyd's held a meeting of its Board of Directors. Among the topics discussed at the meeting were ████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

█████ █████████████████████████████████████████████████████████

███████████████████ ██████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████.[46]

71.     On May 9, 2018, Lloyd's sent a notice to its managing agents who are responsible for all insurance policies written through the Lloyd's marketplace (the "May 9 Notice").[47] The

_____

[43] Ex. F and Sealed Exhibit B.

[44] Ex. G and Sealed Exhibit C.

[45] Id.

[46] Id.

[47] Ex. H and Sealed Exhibit D.

May 9 Notice ███████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████[48]

72.    Also on May 9, 2018, Lloyd's publicly announced that it had directed its underwriters to terminate all insurance related to the NRA and not to provide any insurance to the NRA in the future, in the wake of DFS's investigations into the NRA and its business partners.[49]

73.    By June 30, 2018, the Lloyd's managing agents and syndicates had provided materials to DFS that DFS requested in the April 11, 2018 letter.

74.    On December 20, 2018, ten Lloyd's underwriters, acting through their managing agents, entered into a Consent Order Under Sections 1102 and 3420 of the Insurance Law (the "Lloyd's Consent Order") with DFS—signed by Vullo—which imposes a civil monetary penalty of $5 million.[50] Similar to the Lockton and Chubb Consent Orders, in the Lloyd's Consent Order, DFS overextends its authority and purports to restrict Lloyd's participation in *any* affinity-type insurance program with the NRA, irrespective of whether such programs comply with the Insurance Law.[51]

---

[48] *Id.*

[49] *See, e.g.*, *Lloyd's Underwriters Told to Stop Insurance Linked to NRA*, THE NEW YORK TIMES (May 9, 2018), https://www.nytimes.com/reuters/2018/05/09/business/09reuters-lloyds-of-london-nra.html.

[50] The Lloyd's Consent Order is attached hereto as Exhibit I.

[51] *See* Ex. I at ¶ 20.

NATIONAL RIFLE ASSOCIATION OF AMERICA'S
SECOND AMENDED COMPLAINT AND JURY DEMAND                                    Page 30

75.     Pursuant to the conversations between Vullo and DFS with senior officials at Lloyd's and LAI described above, Lloyd's was not subjected to any enforcement action and/or penalties for any violation of the New York Insurance Law related to affinity-insurance programs, other than in connection with the NRA-related insurance programs.

76.     Importantly, Lloyd's was not the only entity with direct exposure to DFS's selective enforcement scheme. DFS also became specifically cognizant of non-NRA policies that exhibited the same purported defects as NRA policies—and chose to ignore those violations, targeting solely the NRA—in the context of its Lockton investigation. ██████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████ DFS verbally conveyed to Lockton that it was only interested in pursuing the NRA. Other programs exhibiting the same issues, DFS explained, could be quietly remediated by Lockton after consent order and penalty targeting NRA programs had been publicized.

77.     Consistent with this agreement, on July 2, 2018, Lockton provided a report to DFS regarding the status of its remediation efforts for non-NRA programs. ███████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

78.   ███████████████████████████████████████████

████████████████████████████████████████████████████. In response, DFS took no action whatsoever against any of Lockton's non-NRA clients. On January 31, 2019, almost three months after this Court had sustained the NRA's selective-enforcement claims and permitted discovery regarding them, DFS entered into a Supplemental Consent Order with Lockton that purported to admonish violations of the same statutes by Lockton's non-NRA clients, yet did not identify the clients by name or require Lockton to cease doing business with them.[52]

79.     DFS's selective enforcement continues to this day. While taking no action against any of Lockton's other affinity clients, or the underwriters involved in those policies, DFS recently subpoenaed an underwriter known as AGIA which backs health-insurance policies administered and brokered by Lockton for the NRA. These policies have nothing to do with firearms and are identical in all material respects to policies administered and brokered by Lockton on behalf of non-NRA clients.

---

[52] Ex. J.

4.      **Defendants' Actions Are Causing Other Financial Institutions To Re-Evaluate Their Relationships With The NRA For Fear Of Significant Adverse Action By Defendants.**

80.      Defendants' concerted efforts to stifle the NRA's freedom of speech and to retaliate against the NRA based on its viewpoints are causing other insurance, banking, and financial institutions doing business with the NRA to rethink their mutually beneficial business relationships with the NRA for fear of monetary sanctions or expensive public investigations.

81.      The NRA has encountered serious difficulties obtaining corporate insurance coverage to replace coverage withdrawn by the Corporate Carrier. The NRA has spoken to numerous carriers in an effort to obtain replacement corporate insurance coverage; nearly every carrier has indicated that it fears transacting with the NRA specifically in light of DFS's actions against Lockton, Chubb, and Lloyd's.

82.      Defendants' threats have also imperiled the NRA's access to basic banking services, despite the absence of any alleged regulatory violations in connection with the NRA's banking activities. Multiple banks withdrew their bids in the NRA's RFP process following the issuance of the April 2018 Letters, based on concerns that any involvement with the NRA—even providing the organization with basic depository services—would expose them to regulatory reprisals.

83.      Defendants' campaign is achieving its intended chilling effect on banks throughout DFS's jurisdiction. Speaking "on the condition of anonymity," one community banker from Upstate New York told *American Banker* magazine that in light of the apparent "politically motivated" nature of the DFS guidance, "[i]t's hard to know what the rules are" or whom to do business with, because bankers must attempt to anticipate "who is going to come into disfavor

with the New York State DFS" or other regulators.[53] Other industry sources told *American Banker* that, "such regulatory guidelines are frustratingly vague, and can effectively compel institutions to cease catering to legal businesses."[54]

84.     The NRA has suffered tens of millions of dollars in damages based on Defendants' conduct described above. Such damages include, without limitation, damages due to reputational harm, increased development and marketing costs for any potential new NRA-endorsed insurance programs, and lost royalty amounts owed to the NRA, as well as attorneys' fees, legal expenses, and other costs.

85.     If the NRA is unable to collect donations from its members, safeguard the assets endowed to it, apply its funds to cover media buys and other expenses integral to its political speech, and obtain basic corporate insurance coverage, it will be unable to exist as a not-for-profit or pursue its advocacy mission. Defendants seek to silence one of America's oldest constitutional rights advocates. If their abuses are not enjoined, they will soon, substantially, succeed.

## V.

## CLAIMS

A.     **Count One: Violation Of The NRA's First And Fourteenth Amendment Rights Under 42 U.S.C. § 1983, And Article 1, Section 8 Of The New York Constitution By The Establishment Of An Implicit Censorship Regime (As To All Defendants).**

86.     The NRA repeats and re-alleges each and every allegation in the preceding paragraphs as though fully set forth herein.

---

[53] Neil Haggerty, *Gun issue is a lose-lose for banks (whatever their stance)*, AMERICAN BANKER (Apr. 26, 2018, 1:11 PM), https://www.americanbanker.com/news/gun-issue-is-a-lose-lose-for-banks-whatever-their-stance.

[54] *Id.*

87.     The First Amendment, which applies to Defendants by operation of the Fourteenth Amendment, and Section Eight of the New York Constitution secure the NRA's right to free speech, including its right to express its viewpoints and political beliefs regarding the constitutionally protected right to keep and bear arms.

88.     The NRA has a longstanding history of political advocacy advancing the Second Amendment rights of all Americans. Although Cuomo and Vullo disagree with and oppose the NRA's political views, the NRA's freedom to express its views with respect to the gun-control debate is a fundamental right protected by the First Amendment.

89.     Defendants have regulatory authority over financial institutions and insurance entities that have done or are doing business with or are otherwise associated with the NRA, including Chubb, Lockton, and Lloyd's.

90.     Defendants' actions—including but not limited to the issuance of the April 2018 Letters and the accompanying backroom exhortations, the imposition of the Consent Orders upon Chubb, Lockton and Lloyd's, and the issuance of the Cuomo Press Release—established a "system of informal censorship" designed to suppress the NRA's speech.[55]

91.     Defendants' actions were for the purpose of suppressing the NRA's pro-Second Amendment viewpoint. Defendants undertook such unlawful conduct with the intent to obstruct, chill, deter, and retaliate against the NRA's core political speech.

92.     Defendants' unlawful exhortations to New York insurance companies, banks, and financial institutions that they, among other things, "manag[e] their risks, including reputational risks, that may arise from their dealings with the NRA . . ., as well as continued assessment of compliance with their own codes of social responsibility[,]" as well as "review any relationships

---

[55] *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 71 (1963).

they have with the NRA[,]" and "take prompt actions to managing these risks and promote public health and safety[,]" constitute a concerted effort to deprive the NRA of its freedom of speech by threatening with government prosecution services critical to the survival of the NRA and its ability to disseminate its message. Far from protected government speech, Defendants' actions constitute an "implied threat[ ] to employ coercive state power" against entities doing business with the NRA, and they are reasonably interpreted as such.[56]

93.     Defendants' concerted efforts to stifle the NRA's freedom of speech caused financial institutions doing business with the NRA to end their business relationships, or explore such action, due to fear of monetary sanctions or expensive public investigations. For example, Defendants coerced and caused Lockton, Chubb, and Lloyd's to cease their participation in NRA-endorsed insurance programs, regardless of whether the insurance programs met all legal qualifications under New York's Insurance Law.

94.     Defendants' unlawful and intentional actions are not justified by a substantial or compelling government interest and are not narrowly tailored to serve any such interest.

95.     Defendants' intentional actions resulted in significant damages to the NRA, including but not limited to damages due to reputational harm, increased development and marketing costs for any potential new NRA-endorsed insurance programs, and lost royalty amounts owed to the NRA.

96.     The NRA is also entitled to an award of attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and New York Civil Practice Law and Rules § 8601.

97.     In addition to the above-described damages, absent an injunction against Defendants, the NRA will suffer irrecoverable loss and irreparable harm if it is unable to acquire

---

[56] *Okwedy v. Molinari*, 333 F.3d 339, 342 (2d Cir. 2003).

insurance or other banking services due to Defendants' actions. Accordingly, the NRA seeks an

order preliminarily and permanently enjoining Cuomo and Vullo (in their official capacities) and

DFS—including its officers, agents, servants, employees, and all persons in active concert or

participation with them who receive actual notice of the injunction—from threatening or

encouraging insurance companies, banks, or financial institutions to sever ties with or discontinue

services to the NRA.

**B.      Count Two: Violation Of The NRA's First And Fourteenth Amendment Rights Under 42 U.S.C. § 1983 And Article 1, Section 8 Of The New York Constitution By Retaliating Against The NRA Based On Its Speech (As To All Defendants).**

98.     The NRA repeats and re-alleges each and every allegation in the preceding

paragraphs as though fully set forth herein.

99.     The First Amendment, which applies to Defendants by operation of the Fourteenth

Amendment, and Section Eight of the New York Constitution, secures the NRA's right to free

speech, including its right to express its viewpoints and political beliefs regarding the

constitutionally protected right to keep and bear arms.

100.    The NRA has a longstanding history of political advocacy advancing the Second

Amendment rights of all Americans. Although Cuomo and Vullo disagree with and oppose the

NRA's political views, the NRA's freedom to express its views with respect to the gun-control

debate is a fundamental right protected by the First Amendment.

101.    Defendants' actions—including but not limited to the issuance of the April 2018

Letters and the accompanying backroom exhortations, the imposition of the Consent Orders upon

Chubb, Lockton and Lloyd's, and the issuance of the Cuomo Press Release—were in response to

and substantially caused by the NRA's political speech regarding the right to keep and bear arms.

Defendants' actions were for the purpose of suppressing the NRA's pro-Second Amendment

viewpoint. Defendants undertook such unlawful conduct with the intent to obstruct, chill, deter, and retaliate against the NRA's core political speech.

102.    Defendants' actions have concretely harmed the NRA by causing financial institutions doing business with the NRA to end their business relationships, or explore such action, due to fear of monetary sanctions or expensive public investigations. For example, Defendants coerced and caused Lockton, Chubb, and Lloyd's to cease their participation in NRA-endorsed insurance programs in New York and elsewhere, regardless of whether the insurance programs met all legal qualifications under New York's Insurance Law.

103.    Defendants had discretion in deciding whether and how to carry out their actions, including but not limited to the types of demands imposed on Chubb, Lockton and Lloyd's in the Consent Orders, whether to issue the Cuomo Press Release, and the type of guidance provided in the April 2018 Letters. They exercised this discretion to harm the NRA because of the NRA's speech regarding the Second Amendment.

104.    Defendants' unlawful and intentional actions are not justified by a substantial or compelling government interest and are not narrowly tailored to serve any such interest.

105.    Defendants' intentional actions resulted in significant damages to the NRA, including but not limited to damages due to reputational harm, increased development and marketing costs for any potential new NRA-endorsed insurance programs, and lost royalty amounts owed to the NRA.

106.    The NRA is also entitled to an award of attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and New York Civil Practice Law and Rules § 8601.

107.    In addition to the above-described damages, absent an injunction against Defendants, the NRA will suffer irrecoverable loss and irreparable harm if it is unable to acquire

insurance or other financial services due to Defendants' actions. Accordingly, the NRA seeks an order permanently enjoining Cuomo, Vullo, and DFS—including its officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction—from threatening or encouraging insurance companies, banks, or financial institutions to sever ties with or discontinue services to the NRA.

**C.     Count Three: Violation Of The Equal Protection Clause Of The Fourteenth Amendment Under 42 U.S.C. § 1983, And Article 1, Section 11 Of The New York Constitution (As To Vullo).**

108.     The NRA repeats and re-alleges each and every allegation in the preceding paragraphs as though fully set forth herein.

109.     Vullo knowingly and willfully violated the NRA's equal protection rights by seeking to selectively enforce certain provisions of the Insurance Law against Lockton's affinity-insurance programs for the NRA. Meanwhile, other affinity-insurance programs that were identically (or at least similarly) marketed by Lockton, but not endorsed by "gun promotion" organizations, have not been targeted by DFS's investigation.

110.     Vullo was aware during the investigations of the NRA and its business partners that these other identical (or at least similar in all material respects) affinity-insurance programs had the same legal infirmities that resulted in the penalties against Lockton, Chubb, and Lloyd's related solely to the NRA-related affinity-insurance programs. Specifically, Vullo was aware of these comparators from her involvement in the conversations she had with senior officials of Lloyd's in the spring of 2018 described above.

111.     Alternatively, Vullo should have known of similarly situated individuals at the time DFS launched its investigation and any purported lack of knowledge was due to a "see-no-evil" policy of enforcement, which Vullo and DFS abandoned solely to further their vendetta against

the NRA. The "see-no-evil" enforcement policy was confirmed by DFS's continued ignorance toward the violations of the similarly situated comparators.

112.    By virtue of the position held by Vullo at the time DFS launched its investigation, Vullo knew the actions taken by DFS against NRA affinity insurance programs were unprecedented. No other similarly situated programs have faced even close to the same treatment for analogous violations. However, Vullo and DFS failed to inquire about whether there were any other similarly situated affinity programs when the investigation was launched.

113.    There is an extremely high level of similarity between the NRA-related affinity-insurance programs and those of the comparator affinity-insurance programs, including AOAExcel, Moose, the VFW, and the PPA, such that no rational person would perceive the NRA-related programs to be different enough to justify the differential treatment by Vullo and DFS.

114.    Vullo and DFS discriminated against the NRA and its business partners because of Vullo's personal animus toward the NRA and its Second Amendment advocacy.

115.    The similarity between the NRA-related programs and the comparators and the sharp differences in Vullo's and DFS's treatment of them are sufficient to exclude the possibility that Vullo and DFS acted on the basis of a mistake.

116.    Alternatively, there is at least a reasonably close resemblance between the NRA-related affinity-insurance programs and those of the comparator affinity-insurance programs, including AOAExcel, Moose, the VFW, and the PPA.

117.    The disparate treatment of the NRA-related programs and the comparators was caused by Vullo's intent to punish and/or inhibit the NRA because of the NRA's constitutionally protected speech.

118.    Vullo's selective enforcement of the Insurance Law against the NRA and its business partners has been knowing, willful, arbitrary, capricious, unreasonable, discriminatory, and undertaken in bad faith and without a rational basis. Vullo's conduct does not further any legitimate government interest.

119.    Vullo's selective enforcement of the Insurance Law against the NRA and its business partners is based on the NRA's political views and speech relating to the Second Amendment. These considerations are impermissible bases for an enforcement action.

120.    Vullo's actions have resulted in significant damages to the NRA, including but not limited to damages due to reputational harm, increased development and marketing costs for any potential new NRA-endorsed insurance programs, and lost royalty amounts owed to the NRA.

121.    The NRA is also entitled to an award of attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and New York Civil Practice Laws and Rules § 8601.

## VI.

## DEMAND FOR JURY TRIAL

122.    The NRA hereby demands a trial by jury on all issues so triable.

## VII.

## REQUEST FOR RELIEF

WHEREFORE the NRA respectfully requests that the Court enter judgment in the NRA's favor and against Defendants, as follows:

a.      Declaring, pursuant to 28 U.S.C. § 2201, that Defendants have violated the NRA's rights to free speech and equal protection under both the Federal and New York Constitutions;

b.      Granting a preliminary and permanent injunction, pursuant to 28 U.S.C. § 1651(a), 42 U.S.C. § 1983, and Rule 65 of the Federal Rules of Civil Procedure, ordering DFS, its agents, representatives, employees and servants and all persons and entities in concert or participation with

it, Cuomo (in his official capacity) and the current Superintendent of DFS (in her/his official capacity):

    (1)    to immediately cease and refrain from engaging in any conduct or activity which has the purpose or effect of interfering with the NRA's exercise of the rights afforded to it under the First and Second Amendment to the United States Constitution and Section 8 to the New York Constitution; and

    (2)    to immediately cease and refrain from engaging in any conduct or activity which has the purpose or effect of interfering with, terminating, or diminishing any of the NRA's contracts and/or business relationships with any organizations;

    b.    Granting such other injunctive relief to which the NRA is entitled;

    c.    Awarding the NRA actual damages, including compensatory and consequential damages, in an amount to be determined at trial;

    d.    Awarding the NRA exemplary or punitive damages;

    e.    Awarding the NRA pre-judgment and post-judgment interest at the highest lawful rates;

    f.    Awarding the NRA such costs and disbursements as are incurred in prosecuting this action, including reasonable attorneys' and experts' fees; and

    g.    Granting the NRA such other and further relief as this Court deems just and proper.

Respectfully submitted,

By:   /s/ Sarah B. Rogers               
    William A. Brewer III (Bar No. 700217)
    wab@brewerattorneys.com
    Sarah B. Rogers (Bar No. 700207)
    sbr@brewerattorneys.com

A-177

BREWER, ATTORNEYS & COUNSELORS
750 Lexington Avenue, 14th Floor
New York, New York 10022
Telephone: (212) 489-1400
Facsimile: (212) 751-2849

**ATTORNEYS FOR THE NATIONAL RIFLE
ASSOCIATION OF AMERICA**

**CERTIFICATE OF SERVICE**

I certify that on June 2, 2020, I caused a copy of the foregoing to be served upon the following counsel electronically through the ECF system:

William A. Scott
Assistant Attorney General, Of Counsel
New York State Attorney General's Office
Albany Office, The Capitol
Albany, New York 12224-0341
Email: William.Scott@ag.ny.com

Debra L. Greenberger
EMERY CELLI BRINCKERHOFF & ABADY LLP
600 Fifth Avenue,
New York, New York 10020
dgreenberger@ecbalaw.com

/s/ Sarah B. Rogers
Sarah B. Rogers

A-179

# EXHIBIT A



**APRIL 19, 2018** Albany, NY

# Governor Cuomo Directs Department of Financial Services to Urge Companies to Weigh Reputational Risk of Business Ties to the NRA and Similar Organizations

## Insurance Companies, Banks, and Other Financial Institutions Encouraged to Review Relationships with the NRA and Similar Organizations

Governor Andrew M. Cuomo today directed the Department of Financial Services to urge insurance companies, New York State-chartered banks, and other financial services companies licensed in New York to review any relationships they may have with the National Rifle Association and other similar organizations. Upon this review, the companies are encouraged to consider whether such ties harm their corporate reputations and jeopardize public safety.

"New York may have the strongest gun laws in the country, but we must push further to ensure that gun safety is a top priority for every individual, company, and organization that does business across the state," **Governor Cuomo said.** "I am directing the Department of Financial Services to urge insurers and bankers statewide to determine whether any relationship they may have with the NRA or similar organizations sends the wrong message to their clients and their communities who often look to them for guidance and support. This is not just a matter of reputation, it is a matter of public safety, and working together, we can put an end to gun violence in New York once and for all."

DFS is encouraging regulated entities to consider reputational risk and promote corporate responsibility in an effort to encourage strong markets and protect consumers. A number of businesses have ended relationships with the NRA following the Parkland, Florida school shooting in order to realign their company's values. MetLife, a major insurer regulated by DFS, recently announced it was ending a discount program it offered with the NRA and Chubb, another DFS-regulated insurer, recently stopped underwriting the NRA-branded "Carry Guard" insurance program.

**Financial Services Superintendent Maria T. Vullo said,** "Corporations are demonstrating that business can lead the way and bring about the kind of positive social change needed to minimize the chance that we will witness more of these senseless tragedies. DFS urges all insurance companies and banks doing business in New York to join the companies that have already discontinued their arrangements with the NRA, and to take prompt actions to manage these risks and promote public health and safety.

DFS regulates more than 1,400 insurance companies with assets of $4.3 trillion. These include 200 life insurers, 1,100 property casualty insurers, and 100 health insurance companies.

Click here for a copy of the DFS guidance that was sent to all DFS-regulated insurers and here for guidance sent to all DFS-regulated banks.

# Contact the Governor's Press Office

**Contact us by phone:**

Albany:  (518) 474 - 8418

New York City:  (212) 681 - 4640

**Contact us by email:**

Press.Office@exec.ny.gov

A-182

# EXHIBIT B

A-183

 **MEMORANDUM**

| | |
|---|---|
| **TO:** | The Chief Executive Officers or Equivalents of All Insurers Doing Business in the State of New York |
| **FROM:** | Maria T. Vullo, Superintendent of Financial Services |
| **DATE:** | April 19, 2018 |
| **RE:** | Guidance on Risk Management Relating to the NRA and Similar Gun Promotion Organizations |

The New York State Department of Financial Services is issuing this guidance in the wake of several recent horrific shootings, including in Parkland, Florida that left 17 students and staff members at Marjory Stoneman Douglas High School dead. This was only one of many prior gun violence tragedies, including those in Columbine High School, Sandy Hook, Pulse night club, and the Las Vegas music festival, that left many innocent people dead.

While the social backlash against the National Rifle Association (the "NRA"), and similar organizations that promote guns that lead to senseless violence, has in the past been strong, the nature and the intensity of the voices now speaking out, including the voices of the passionate, courageous, and articulate young people who have experienced this recent horror first hand, is a strong reminder that such voices can no longer be ignored and that society, as a whole, has a responsibility to act and is no longer willing to stand by and wait and witness more tragedies caused by gun violence, but instead is demanding change now.

Our insurers are, and have been, vital to the communities they serve for generations and are guided by their commitment to corporate social responsibility, including public safety and health. Insurers' engagement in communities they serve is closely tied to the business they do with their clients and customers and its impact on such communities. Often insurers report to their stakeholders that their performance is based on both their strategic business vision as well as on a commitment to society as a whole. There is a fair amount of precedent in the business world where firms have implemented measures in areas such as the environment, caring for the sick, and civil rights in fulfilling their corporate social responsibility. The recent actions of a number of financial institutions that severed their ties with the NRA after the AR-15 style rifle killed 17 people in the school in Parkland, Florida is an example of such a precedent.

The tragic devastation caused by gun violence that we have regrettably been increasingly witnessing is a public safety and health issue that should no longer be tolerated by the public and there will undoubtedly be increasing public backlash against the NRA and like organizations.

Our insurers are key players in maintaining and improving public health and safety in the communities they serve. They are also in the business of managing risks, including their own reputational risks, by making risk management decisions on a regular basis regarding if and how

they will do business with certain sectors or entities.  In light of the above, and subject to compliance with applicable laws, the Department encourages its insurers to continue evaluating and managing their risks, including reputational risks, that may arise from their dealings with the NRA or similar gun promotion organizations, if any, as well as continued assessment of compliance with their own codes of social responsibility.  The Department encourages regulated institutions to review any relationships they have with the NRA or similar gun promotion organizations, and to take prompt actions to managing these risks and promote public health and safety.

Maria T. Vullo
Superintendent of Financial Services

A-185

# EXHIBIT C

A-186

 **MEMORANDUM**

| | |
|---|---|
| **TO:** | The Chief Executive Officers or Equivalents of New York State Chartered or Licensed Financial Institutions |
| **FROM:** | Maria T. Vullo, Superintendent of Financial Services |
| **DATE:** | April 19, 2018 |
| **RE:** | Guidance on Risk Management Relating to the NRA and Similar Gun Promotion Organizations |

The New York State Department of Financial Services is issuing this guidance in the wake of several recent horrific shootings, including in Parkland, Florida that left 17 students and staff members at Marjory Stoneman Douglas High School dead.  This was only one of many prior gun violence tragedies, including those in Columbine High School, Sandy Hook, Pulse night club, and the Las Vegas music festival, that left many innocent people dead.

While the social backlash against the National Rifle Association (the "NRA") and similar organizations that promote guns that lead to senseless violence has in the past been strong, the nature and the intensity of the voices now speaking out, including the voices of the passionate, courageous, and articulate young people who have experienced this recent horror first hand, is a strong reminder that such voices can no longer be ignored and that society, as a whole, has a responsibility to act and is no longer willing to stand by and wait and witness more tragedies caused by gun violence, but instead is demanding change now.

Our financial institutions, whether depository or non-depository, are, and have been, the cornerstone of the communities they serve for generations and are guided by their commitment to corporate social responsibility, including public safety and health.  The manner by which financial institutions engage in communities they serve is closely tied to the business they do with their clients and customers and its impact on such communities.  In fact, a review of performance reports of many firms to their stakeholders demonstrates how their performance is based on both their strategic business vision as well as on a commitment to society as a whole.  There is a fair amount of precedent in the business world where firms have implemented measures in areas such as the environment, healthcare, and civil rights in fulfilling their corporate social responsibility.  The recent actions of a number of financial institutions that severed their ties with the NRA and have taken other actions after the AR-15 style rifle killed 17 people in the school in Parkland, Florida is an example of such a precedent.

The tragic devastation caused by gun violence that we have regrettably been increasingly witnessing is a public safety and health issue.  Our financial institutions can play a significant role in promoting public health and safety in the communities they serve, thereby fulfilling their corporate social responsibility to those communities.  They are also in the business of managing risks, including their own reputational risks, by making risk management decisions on a regular

basis regarding if and how they will do business with certain sectors or entities.  In light of the above, and subject to compliance with applicable laws, the Department encourages its chartered and licensed financial institutions to continue evaluating and managing their risks, including reputational risks, that may arise from their dealings with the NRA or similar gun promotion organizations, if any, as well as continued assessment of compliance with their own codes of social responsibility.   The Department encourages regulated institutions to review any relationships they have with the NRA or similar gun promotion organizations, and to take prompt actions to managing these risks and promote public health and safety.

Maria T. Vullo
Superintendent of Financial Services

A-188

# EXHIBIT D

A-189

NEW YORK STATE DEPARTMENT
OF FINANCIAL SERVICES

---

In the Matter of

LOCKTON AFFINITY, LLC and
LOCKTON COMPANIES, LLC

---

**CONSENT ORDER UNDER**
**ARTICLES 21, 23 AND 34 OF THE INSURANCE LAW**

Lockton Affinity, LLC, on behalf of each of its separate operating series, one of which, Lockton Affinity Series of Lockton Affinity, LLC, is the successor entity to Lockton Risk Services, Inc. ("Lockton Affinity"), Lockton Companies, LLC, on behalf of each of its separate operating series ("Lockton Companies") (together, Lockton Affinity and Lockton Companies, "Lockton"), and the New York Department of Financial Services (the "Department") (collectively, the "Parties") are willing to resolve the matters described herein without further proceedings.

**THE DEPARTMENT'S FINDINGS FOLLOWING INVESTIGATION**

1.      Lockton, together with its affiliates, is the world's largest privately owned, independent insurance brokerage firm, offering customers risk management, insurance and employee benefits services.  At least one Lockton affiliate has been licensed by the Department since approximately 1987, and Lockton Affinity has been licensed by the Department to act as an insurance producer, including as an excess line broker, since at least 2013.

2.      Illinois Union Insurance Company ("Illinois Union") is an unauthorized insurer eligible to write excess lines insurance in New York State.  It is a subsidiary of Chubb Ltd., and

1

in connection with the "Carry Guard" program discussed herein, Illinois Union held itself out to the public simply as "Chubb" (hereinafter, "Chubb").

3.      Lloyd's of London is an insurance market encompassing more than 50 insurance companies, over 200 registered brokers, and global network of over 4,000 local agents who manage these arrangements, known as "coverholders."[1]  The Lloyd's market is backed by the Lloyd's Corporation (hereinafter, together with Lloyd's of London, collectively referred to as "Lloyd's").

4.      The National Rifle Association of America ("NRA") is a New York not-for-profit corporation incorporated in 1871.  The NRA describes its mission as "firearms safety, education, and training and advocacy on behalf of safe and responsible gun owners."  The NRA is not licensed by the Department.

**The Carry Guard Program**

5.      From approximately April through November 2017, Lockton Affinity and the NRA offered an insurance program to new and existing NRA members in New York and elsewhere called "Carry Guard."  During that time, the NRA's website described the program as follows:

> *NRA Carry Guard is a two-pronged program.  It was created to provide dynamic, state-of-the-art insurance protection to those who legally defend themselves with a firearm, and to offer an elite, one-stop training option.  The insurance provides a cutting edge set of features that will help gun owners mitigate the potentially costly financial and legal consequences flowing from armed encounters, even if they did everything right.*

6.      The NRA website further described the Carry Guard program as "the only membership carry program ***developed and supported by the National Rifle Association***, the

---

[1] A "coverholder" in the Lloyd's syndicate is an insurance intermediary authorized by a managing agent to enter into contracts of insurance to be underwritten by the members of a syndicate managed by it, in accordance with the terms of a binding authority.  *See* https://www.lloyds.com/lloyds-around-the-world/europe/switzerland/becoming-an-intermediary-and-coverholder.

A-191

most powerful civil rights organization in American history." The website further stated that Carry Guard was "*created by the NRA*."

      7.     Additional promotional materials disseminated by the NRA stated:

> **Why do I need Carry Guard**? Although millions of Americans are prepared to use a firearm in self-defense, very few families can withstand the financial consequences that may come next. The legal fees to clear your good name could be enormous. Likewise, the costs of defending and potentially losing a civil lawsuit could cripple your finances for the rest of your life. *And many homeowners' policies have severe limitations or exclusions related to intentional acts such as self-defense.*

These materials stated at the bottom of the page: "NRA CARRY GUARD™ Insurance Program Administered by Lockton Affinity, LLC • D/B/A/ Lockton Affinity Insurance Brokers, LLC."

      8.     Pursuant to written agreements with Chubb and the NRA, Lockton Affinity served as the administrator for the Carry Guard program, carrying out such functions as marketing the insurance, binding the insurance, collecting and distributing premiums, and delivering policies to insureds.

      9.     Pursuant to written agreements with Lockton Affinity, Chubb -- through its Illinois Union subsidiary -- served as the underwriter for the Carry Guard insurance program, providing insurance policies to individuals who purchased Carry Guard insurance. According to the marketing and promotion website for the Carry Guard program, www.nracarryguard.com (in effect from April to mid-December 2017), the Carry Guard insurance program "*is backed by insurance leader Chubb*" and is underwritten by a "*group within Chubb the world's largest publicly traded property and casualty insurance company*." The Carry Guard insurance program is referred to herein as the "Carry Guard Program."

      10.     The Carry Guard Program tied insurance to free NRA membership, in violation of the New York Insurance Law (the "Insurance Law"). When purchasing Carry Guard insurance, members would also receive one year of free NRA membership. The NRA membership benefit

was not specified in the insurance policy, and one year of membership exceeded $25 in market value. The NRA directly managed the membership aspect of the Carry Guard program.[2]

11.   Lockton Affinity placed these insurance policies through New York's excess line market. Excess line coverage offers policyholders an opportunity to obtain insurance that could not be procured from an authorized insurer. An "authorized insurer" is an insurance company that has received a license from the Department to provide specified types of insurance to customers in New York. Authorized insurers are fully regulated by the Department in order to ensure solvency and adherence to consumer protection standards.

12.   Excess line insurers are not licensed or authorized by the Department, but are permitted to do business in New York through an excess line broker. Unless another exemption applies, an insurance policy may be procured from an excess line insurer only after an excess line broker has obtained declinations of coverage from three authorized insurers.

13.   The Carry Guard insurance program, as underwritten by Chubb and administered, solicited and marketed by Lockton Affinity, provided insurance coverage that may not be offered in the New York State excess line market, specifically: (a) defense coverage in a criminal proceeding that is not permitted by law; (b) liability coverage for bodily injury or property damage expected or intended from the insured's standpoint in an insurance policy limited to use of firearms and that was beyond the use of reasonable force to protect persons or property; and (c) coverage for expenses incurred by the insured for psychological counseling support.

14.   Moreover, although it did not possess an insurance producer license from the Department, the NRA nonetheless engaged in aggressive marketing of and solicitation for the Carry Guard Program. For example (and without limitation):

---

[2] In the event the purchaser was already an NRA member, the Carry Guard program allowed the member to carry a credit for a free one year membership forward, or allowed a transfer of the credit to a family member for use in obtaining NRA membership at no cost.

o  The NRA broadcasted NRA-produced videos promoting the Carry Guard Program on YouTube;

o  The NRA solicited participation in the Carry Guard Program through mass e-mail marketing, direct mail, banner ads, and articles in NRA publications;

o  The NRA heavily promoted the Carry Guard Program at its 2017 "Carry Guard Expo" and its annual meetings;

o  The NRA operated the website "www.nracarryguard.com," which was an important marketing portal for the Carry Guard Program and linked to a website operated by Lockton Affinity (www.lockton.nracarryguard.com), which provided additional information about the Carry Guard Program;

o  The NRA promoted Carry Guard insurance on its main website, www.nra.org, which, among other things, featured an NRA spokesperson making claims such as, "*We're proud to have developed* the one carry membership program that stands above all others – NRA Carry Guard"; and "I will never carry a gun without carrying this."

o  "Pop-up" internet advertising for the Carry Guard Program that featured one or more NRA spokespersons.

**Other NRA-Endorsed Programs**

15.     From approximately January 2000 through March 2018, Lockton Affinity and the NRA together offered at least 11 additional insurance programs to new and existing NRA members in New York and elsewhere, including:

a.  "Retired Law Enforcement Officer Self-Defense Insurance," which provided coverage for criminal and civil defense costs, and bodily injury and damage caused by the use of a firearm;

b.  "ArmsCare Plus Firearms Insurance," which provided coverage for legal firearms and attached accessories against loss, damage, flood, fire, and theft (including theft from a locked vehicle);

c.  "No Cost ArmsCare Firearms Insurance," which provided free coverage to NRA members in good standing for legal firearms and their attached accessories, up to $2,500 in value, against loss, damage, flood, fire, and theft (including theft from a locked vehicle);

d.  "Firearms Instructor Plus Liability Insurance," which provided coverage for injuries or damage the insured causes while acting as an instructor during a lesson, medical expenses up to $5,000, legal expenses from lawsuits related to the injuries or damage,

5

and professional liability coverage that protects the member from allegations of negligent training;

e. "Personal Firearms Protection Insurance," which provided coverage for any unintentional injuries or damage an insured causes while hunting or trapping on public or private land, shooting in competitions, or shooting at private shooting ranges, with a firearm, air gun, bow and arrow, or trapping equipment, and coverage for lawsuit defense costs;

f. "Gun Collector Insurance," which provided coverage for certain firearms and their attached accessories against loss, damage, fire, and theft (including theft from a locked vehicle);

g. "Gun Club Insurance," which provided coverage for loss or damage to any assets the gun club rents, leases or owns, coverage for general liability plus medical payments, coverage for claims of false advertising, and optional coverage for business income, boiler and machinery, glass, computers, valuable papers and records, and accounts receivable;

h. "Hunt Club Insurance," which provided coverage for hunt clubs and the landowners to protect against injury and damage, provides host liquor coverage, and provided hired and non-owned auto coverage. In addition, an insured could select coverage for "personal and advertising," products/completed operations, and medical expenses up to $5,000 for any one person;

i. "NRA Business Alliance Insurance," which provided coverage for a firearms-related business, including coverage for loss or damage to any assets the insured business rents, leases or owns, coverage for general liability plus medical payments, coverage for claims of false advertising, gunsmith coverage, and optional coverage for business income, boiler and machinery, glass, computers, valuable papers and records, and accounts receivable;

j. "Gun Show Insurance," which provided coverage for the insured's liability arising out of the insured's occupation as a gun show promoter; and

k. "Home-Based Federal Firearms License Insurance" for gun dealers and gunsmiths, which provided coverage for the insured's business location, equipment and tools, and gear entrusted to the insured by the insured's clients, against theft, damage and other loss, and provides general liability coverage, including products/completed liability to insure the insured's finished work against later claims.

Together, these Lockton Affinity-administered Lloyd's insurance programs (and for a brief period, Lockton Affinity-administered Alea London Ltd. ("Alea") insurance programs), are referred to herein as the "Other NRA Programs."

6

16.     Pursuant to written agreements with Lloyd's and the NRA, Lockton Affinity served as the administrator for the Other NRA Programs, carrying out such functions as marketing the insurance, binding the insurance, collecting and distributing premiums, and delivering policies to insureds.

17.     Pursuant to written agreements with Lockton Affinity, Lloyd's and Alea served as the underwriters for the Other NRA Programs, providing insurance policies to individuals who purchased NRA-sponsored insurance.  Lockton Affinity also placed these insurance policies through New York's excess line market.

**Lockton Affinity's NRA Programs Violated New York Laws and Regulations**

18.     In violation of the Insurance Law, the Carry Guard Program, as brokered, administered, solicited and marketed by Lockton Affinity, provided insurance coverage that may not be offered in the New York State excess line market, specifically:  (a) defense coverage in a criminal proceeding that is not permitted by law; (b) liability coverage for bodily injury or property damage expected or intended from the insured's standpoint in an insurance policy limited to use of firearms and that was beyond the use of reasonable force to protect persons or property; and (c) coverage for expenses incurred by the insured for psychological counseling support.

19.     Similarly, the NRA Retired Law Enforcement Officer Self-Defense Insurance Program provided insurance coverage that may not be offered in the New York State excess line market, specifically:  (a) defense coverage in a criminal proceeding that is not permitted by law; and (b) liability coverage for bodily injury or property damage expected or intended from the insured's standpoint in an insurance policy limited to use of firearms and that was beyond the use of reasonable force to protect persons or property.

20.     Additionally, the Carry Guard insurance program, as administered by Lockton Affinity, failed to comply with Section 3420 of the Insurance Law, which sets forth minimum requirements for liability insurance policies.

21.     Lockton Affinity also violated the Insurance Law by giving or offering to give: (a) the No Cost ArmsCare Firearms Insurance for free to NRA members in good standing; and (b) free NRA membership, which the insured could use him or herself, or transfer to a family member, if a person purchased the Carry Guard insurance, when the free NRA membership was not specified in the insurance policy and exceeded $25 in market value.

22.     Lockton has represented to the Department that, between approximately April and November 2017, 680 Carry Guard insurance policies were issued to New York residents. Lockton has further represented to the Department that no claims have been submitted under the New York Carry Guard insurance policies to date.

23.     Lockton has also represented to the Department that, for the period January 2000 through March 25, 2018, 28,015 insurance policies were issued to New York residents under the Other NRA Programs.

24.     Under written agreements between Lockton Affinity and the NRA, as of March 25, 2018, Lockton has represented that the NRA received royalties on the Carry Guard Program in the amount of about $21,198, an amount based on a percentage of the actual premiums collected by Lockton Affinity under the Carry Guard Program from New York residents, in violation of the Insurance Law.  Similarly, under written agreements between Lockton Affinity and the NRA, the NRA received additional royalties under the Other NRA Programs based on a percentage of premiums collected by Lockton Affinity from New York residents, similarly violating the Insurance Law.

8

25.     Lockton has represented to the Department that revenue to the NRA from the Carry Guard Program and the Other NRA Programs in New York totaled approximately $1,872,737 for the period January 2000 through March 25, 2018.  Under written agreements between Lockton Affinity and the NRA, the NRA also received profit-sharing disbursements from Lockton Affinity based on a schedule agreed to by the parties in conjunction with the Other NRA Programs.

26.     Between January 2000 and March 25, 2018, Lockton has represented to the Department that Lockton Affinity collected premiums from the Carry Guard Program and the Other NRA Programs in New York amounting to approximately $12,056,627.  Lockton has also represented that it collected approximately $785,460 in administrative fees from insureds under the Carry Guard Program and the Other NRA Programs in New York during this time period.

**Lockton Affinity Submitted Inaccurate Affidavits Required By the**
**Insurance Law Pertaining to Excess Lines Insurance Coverage**

27.     Lockton Affinity, through one or more of its sublicensees, submitted affidavits to the Excess Line Association of New York ("ELANY") required by Insurance Law § 2118 in connection with the Carry Guard Program and the Other NRA Programs.  As set forth below, those affidavits contained inaccurate information concerning compliance with the Insurance Law and regulations promulgated thereunder.

28.     As noted above, an authorized insurer is an insurance company that is licensed by the Department to write certain kinds of insurance in New York, as specified in Insurance Law § 1113(a).  Authorized insurers are fully regulated by the Department in order to ensure solvency and adherence to consumer protection standards.  An unauthorized insurer is an insurer not licensed by the Department to write insurance in New York, and may be an insurer that provides "excess line" insurance only under prescribed rules.

29.     Under the Insurance Law, unless another exemption applies, an excess line broker like Lockton Affinity that seeks to procure excess line insurance must first approach three separate authorized insurers to determine if any one of those insurers will write coverage for the risk.  If all three authorized insurers decline to provide the requested coverage, only then may the excess line broker place the insurance with an unauthorized insurer like Chubb.  An excess line broker must seek three declinations for each insured; the broker may not rely upon declinations obtained with respect to other insureds.

30.     In placing the Carry Guard Program and Other NRA Program insurance policies, Lockton Affinity only obtained declinations from three authorized insurers once annually for a single policy for each of these insurance programs, and then relied upon the single annual declination with respect to all other insureds who received policies under these programs.  At least one Lockton Affinity sublicensee affirmed that, to the best of his knowledge and belief, every policy procured by the sublicensee on behalf of Lockton Affinity was in full compliance with the Insurance Law and regulations promulgated thereunder, when, in truth and in fact, the sublicensee had not secured such declinations in compliance with the Insurance Law.

**The Department's Investigation**

31.     Since October 2017, the Department has been conducting an investigation of the involvement of Chubb, Lloyd's, Lockton and the NRA in the Carry Guard Program, the Other NRA Programs, and other matters, including review of thousands of pages of documents obtained from Chubb, Lockton and the NRA, and review of other information obtained from investigative resources (the "DFS Investigation").

32.     Lockton has represented to the Department that, following initiation of the DFS Investigation in October 2017, which included information requests sent to Lockton in October

10

2017, Lockton Affinity suspended the Carry Guard Program on or about November 17, 2017, no longer making Carry Guard policies available for New York residents to purchase.

33.   **NOW THEREFORE**, to resolve this matter without further proceedings, pursuant to Articles 21, 23 and 34 of the Insurance Law, Lockton Affinity, Lockton Companies, and the Department hereby stipulate and agree as follows:

<u>**VIOLATIONS OF LAW AND REGULATIONS**</u>

34.   Lockton Affinity compensated the NRA based on actual premium collected when the NRA was acting as an unlicensed insurance broker by selling and soliciting insurance in New York, in violation of Insurance Law § 2116.

35.   Lockton Affinity acted for and aided an unauthorized Chubb insurer, Illinois Union, in connection with Illinois Union's issuing or delivering policies in New York State, or otherwise issuing policies covering New York State residents, which provided insurance coverage that may not be offered in the New York State excess line market, specifically:  (a) defense coverage in a criminal proceeding that is not permitted by law; (b) liability coverage for bodily injury or property damage expected or intended from the insured's standpoint in an insurance policy limited to use of firearms and that was beyond the use of reasonable force to protect persons or property; and (c) coverage for expenses incurred by the insured for psychological counseling support, in violation of Insurance Law § 2117.

36.   Lockton Affinity gave, or offered to give, a free one-year NRA membership if a person purchased the Carry Guard Program insurance policy, when the NRA membership benefit was not specified in the policy and exceeded $25 in market value, in violation of Insurance Law § 2324(a).

37.     Lockton Affinity gave, or offered to give, the No Cost ArmsCare Firearms Insurance at no cost to NRA members in good standing, in violation of Insurance Law § 2324(a).

38.     Lockton Affinity advertised the financial condition of a Chubb insurer by referring to the insurer's AM Best rating, in violation of Insurance Law § 2122(a)(1).

39.     Lockton Affinity called attention to an unauthorized Chubb insurer by advertising Chubb's participation in the Carry Guard Program on the Carry Guard website, in violation of New York Insurance Law § 2122(a)(2).

40.     Lockton Affinity failed to properly secure declinations from authorized insurers for each insured, in violation of Insurance Law § 2118.

**SETTLEMENT PROVISIONS**

**Civil Monetary Penalty**

41.     Lockton Affinity shall pay a civil monetary penalty to the Department pursuant to Articles 21, 23 and 34 of the Insurance Law in the amount of $7,000,000. Lockton Affinity shall pay the entire amount within ten days of executing this Consent Order. Lockton Affinity agrees that it will not claim, assert, or apply for a tax deduction or tax credit with regard to any U.S. federal, state, or local tax, directly or indirectly, for any portion of the civil monetary penalty paid pursuant to this Consent Order. Lockton further agrees that it will not claim, seek, or receive indemnification of the civil monetary penalty from any other person or entity. This provision is not intended, and shall not be construed, to prohibit Lockton affiliates from funding inter-company transfers to Lockton Affinity.

**Prohibition on NRA-Endorsed Insurance Programs**

42.     Lockton agrees not to participate in the Carry Guard Program, any similar programs, or any other NRA-endorsed programs with regard to New York State, including,

without limitation, (a) by agreeing not to provide Carry Guard or other insurance policies specific to firearm usage that provides liability coverage for bodily injury or property damage from use of a firearm, whether they are written or issued in New York State or elsewhere; and (b) by agreeing not to provide liability coverage for bodily injury or property damage expected or intended from the insured's standpoint in general liability policies that is not limited to those occasions where bodily injury results from the use of reasonable force to protect persons or property, whether they are written or issued in New York State or elsewhere; provided, however, that Lockton Affinity may provide runoff administration for any in-force policies not cancelled pursuant to Paragraph 46. Furthermore, Lockton agrees not to issue or deliver any Carry Guard or similar insurance policies in New York State, regardless of the residence of the insured. For the avoidance of doubt, Lockton shall not be prohibited from procuring homeowners, renters or general liability insurance in New York State or for New York residents that includes personal injury liability insurance or property damage liability insurance for loss, damage, or expense that results from the negligent use of a firearm.

43.     Lockton agrees that it shall not enter into any agreement or program with the NRA to underwrite or participate in any affinity-type insurance program involving any line of insurance to be issued or delivered in New York State or to anyone known to Lockton to be a New York resident; provided, however, that Lockton may assist the NRA in procuring insurance for the NRA's own corporate operations.

44.     Lockton confirms and represents to the Department that, between approximately April and November 2017, 680 Carry Guard insurance policies were issued to New York residents. Lockton confirms and hereby represents to the Department that no claims have been submitted under the New York Carry Guard insurance policies to date.

45.   Lockton confirms and represents to the Department that:

    a.   for the period January 2000 through March 25, 2018, 28,015 insurance policies were issued to New York residents under the Other NRA Programs;

    b.   Under written agreements between Lockton Affinity and the NRA, as of March 25, 2018, the NRA received royalties from the Carry Guard Program in New York in the amount of approximately $21,198;

    c.   Total revenue to the NRA from the Carry Guard Program and the Other NRA Programs in New York totaled approximately $1,872,737 for the period January 2000 through March 25, 2018;

    d.   Lockton Affinity collected premiums from the Carry Guard Program and the Other NRA Programs in New York amounting to approximately $12,056,627 for the period January 2000 through March 25, 2018;

    e.   Lockton Affinity collected approximately $785,460 in administrative fees from insureds under the Carry Guard Program and the Other NRA Programs in New York during the period January 2000 through March 25, 2018.

46.   Lockton agrees to fully cooperate with Chubb, Lloyd's and Alea (the "Underwriters") to effect any cancellation initiated by an Underwriter of Carry Guard insurance policies issued to New York residents, NRA Retired Law Enforcement Officer Self-Defense Insurance policies issued to New York residents, and any other NRA-related insurance policies issued to New York residents that provide coverage for intentional acts or legal services insurance that were procured by Lockton Affinity, such cancellation to be effective 90 days from the date of such notice. Lockton agrees to cooperate with the Underwriters in submitting any such draft notices to the Department for the Department's review and approval prior to the

mailing or delivery of such notices by the Underwriters. Lockton Affinity also agrees to fully cooperate in refunding the insurance premiums for the cancelled policies. Thereafter, Lockton Affinity shall promptly file a certification with the Department that sets forth its compliance with this Paragraph 46.

47.     Lockton Affinity agrees not to procure from an unauthorized insurer any insurance policy to be issued or delivered in New York State, or to anyone known to Lockton Affinity to be a New York resident, in the New York State excess line market that provides:  (a) defense coverage in a criminal proceeding; (b)(i) liability coverage for bodily injury or property damage expected or intended from the insured's standpoint in an insurance policy limited to use of firearms and that is beyond the use of reasonable force to protect persons or property, or (ii) liability coverage for bodily injury or property damage expected or intended from the insured's standpoint in general liability policies that is not limited to those occasions where bodily injury results from the use of reasonable force to protect persons or property; and (c) coverage for expenses incurred by the insured for psychological counseling support.  For the avoidance of doubt, Lockton shall not be prohibited from procuring homeowners, renters or general liability insurance in New York State or for New York residents that includes personal injury liability insurance or property damage liability insurance for loss, damage, or expense that results from the negligent use of a firearm.

**Full and Complete Cooperation of Lockton**

48.     Lockton commits and agrees to fully cooperate with the DFS Investigation and all terms of this Consent Order.  Such cooperation shall include, without limitation:

a.  producing all non-privileged documents and other materials to the
Department, as requested, wherever located in Lockton's possession, custody,
or control;

b.  requiring employees or agents to appear for interviews, at such reasonable
times and places, as requested by the Department;

c.  responding fully and truthfully in a prompt manner to all inquiries when
requested to do so by the Department; and

d.  testifying at hearings, trials and other judicial, administrative or other
proceedings, when requested to do so by the Department, in connection with
its investigation of matters relating to any NRA-endorsed insurance program.

**Compliance Review**

49.     Lockton agrees to fully and completely cooperate with the DFS Investigation by
providing a truthful, accurate and complete report to the Department, within 60 days of the
execution of this Consent Order (the "Compliance Review"), that reports on:

a.  any additional violations of the Insurance Law, or regulations promulgated
thereunder, that Lockton has identified;

b.  any actions undertaken by Lockton to identify any violations of the Insurance
Law, or the regulations promulgated thereunder; and

c.  a plan for remediation of any violation of the Insurance Law, or regulations
promulgated thereunder, identified in connection with the Carry Guard
Program, the Other NRA Programs, or any other insurance program or
conduct that violates the Insurance Law, or regulations promulgated
thereunder.

16

The Department may, in its sole regulatory discretion, accept, reject, or modify any plan of remediation submitted by Lockton.

**Breach of Consent Order**

50.     If the Department believes Lockton or Lockton Affinity to be in material breach of this Consent Order, the Department will provide written notice to Lockton and/or Lockton Affinity and Lockton and/or Lockton Affinity (as the case may be) must, within ten business days of receiving such notice, or on a later date if so determined in the Department's sole discretion, appear before the Department to demonstrate that no material breach has occurred or, to the extent pertinent, that the breach is not material or has been cured.

51.     The Parties understand and agree that Lockton's and/or Lockton Affinity's failure to make the required showing within the designated time period shall be presumptive evidence of such party's breach.  Upon a finding that Lockton and/or Lockton Affinity has breached this Consent Order, the Department has all the remedies available to it under the New York Insurance and Financial Services Laws and may use any evidence available to the Department in any ensuing hearings, notices, or orders.

**Waiver of Rights**

52.     The Parties understand and agree that no provision of this Consent Order is subject to review in any court or tribunal outside the Department.

**Parties Bound by the Consent Order**

53.     This Consent Order is binding on the Parties, as well as any successors and assigns.  This Consent Order does not bind any federal or other state agency or any law enforcement authority.

54.     No further action will be taken by the Department against Lockton in connection with the Carry Guard Program and the Other NRA Programs for the period January 1, 2000 through March 31, 2018, provided that Lockton complies fully with the terms of this Consent Order, including Paragraphs 48 and 49 above.

55.     Notwithstanding any other provision contained in this Consent Order, the Department may undertake action against Lockton for transactions or conduct that Lockton did not disclose to the Department in the written materials that Lockton submitted to the Department in connection with this matter, including, without limitation, any transactions or conduct that Lockton identifies to the Department pursuant to the Compliance Review that it will undertake as set forth in Paragraph 49 of this Consent Order.

**Notices**

56.     All notices or communications regarding this Consent Order shall be sent to:

For the Department:

> For the Department:
>
> Hadas Jacobi
> Assistant Deputy Superintendent
>   for Enforcement
> New York State Department of Financial Services
> One State Street
> New York, NY 10004
>
> Megan Prendergast
> Deputy Superintendent for Enforcement
> New York State Department of Financial Services
> One State Street
> New York, NY 10004
>
> Connor Mealey
> Excelsior Fellow
> New York State Department of Financial Services
> One State Street
> New York, NY 10004

18

For Lockton Companies, LLC:

William Humphrey
Secretary
Lockton Companies
444 West 47th Street
Kansas City, MO 64112

Scott A. Edelman
Milbank, Tweed, Hadley & McCloy
28 Liberty Street
New York, NY 10005

Andrew R. Holland
Sidley Austin
787 Seventh Avenue
New York, NY 10019

For Lockton Affinity, LLC:

William Humphrey
Secretary
Lockton Affinity
444 West 47th Street
Kansas City, MO 64112

Scott A. Edelman
Milbank, Tweed, Hadley & McCloy
28 Liberty Street
New York, NY 10005

Andrew R. Holland
Sidley Austin
787 Seventh Avenue
New York, NY 10019

**Miscellaneous.**

57.     Each provision of this Consent Order shall remain effective and enforceable until stayed, modified, suspended, or terminated by the Department.

58.     No promise, assurance, representation, or understanding other than those contained in this Consent Order has been made to induce any party to agree to the provisions of the Consent Order.

**IN WITNESS WHEREOF, the parties have caused this Consent Order to be signed this 2nd day of May, 2018.**

LOCKTON COMPANIES, LLC, on
behalf of each of its separate operating series,

By: _____
WILLIAM HUMPHREY
Secretary

LOCKTON AFFINITY, LLC, on
behalf of each of its separate operating series,

By: _____
WILLIAM HUMPHREY
Secretary

NEW YORK STATE DEPARTMENT OF
FINANCIAL SERVICES

By: _____
MARIA T. VULLO
Superintendent of Financial Services

By: _____
MATTHEW L. LEVINE
Executive Deputy Superintendent for
Enforcement

20