# 21-0636-cv

## United States Court of Appeals

*for the*

## Second Circuit

———————◆———————

NATIONAL RIFLE ASSOCIATION OF AMERICA,

*Plaintiff-Appellee,*

— v. —

MARIA T. VULLO, both individually and in her former official capacity,

*Defendant-Appellant,*

ANDREW CUOMO, both individually and in his official capacity, THE NEW YORK STATE DEPARTMENT OF FINANCIAL SERVICES,

*Defendants.*

———————————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

## JOINT APPENDIX
### Volume 2 of 2 (Pages A-209 to A-365)

SARAH B. ROGERS
BREWER, ATTORNEYS & COUNSELORS
*Attorneys for Plaintiff-Appellee*
750 Lexington Avenue, 14th Floor
New York, New York 10022
(212) 489-1400

ANDREW G. CELLI JR.
DEBRA L. GREENBERGER
MARISSA R. BENAVIDES
EMERY CELLI BRINCKERHOFF ABADY
    WARD & MAAZEL LLP
*Attorneys for Defendant-Appellant*
600 Fifth Avenue, 10th Floor
New York, New York 10020
(212) 763-5000

i

# TABLE OF CONTENTS

                                                                    **Page**

District Court Docket Entries ..................................... A-1

Decision and Order of the Honorable Thomas J.
    McAvoy, dated November 6, 2018 ........................ A-64

Redacted Second Amended Complaint and Jury
    Demand, filed June 20, 2020 ............................... A-135

Exhibit A to Second Amended Complaint -
    Cuomo Press Release, dated April 19, 2018 .......... A-179

Exhibit B to Second Amended Complaint -
    Memorandum, dated April 19, 2018 ..................... A-182

Exhibit C to Second Amended Complaint -
    Memorandum, dated April 19, 2018 ..................... A-185

Exhibit D to Second Amended Complaint -
    Consent Order under Articles 21, 23 and 34 of
    the Insurance Law, dated May 2, 2018 ................. A-188

Exhibit E to Second Amended Complaint -
    Consent Order under Sections 1102 and 3420 of
    the Insurance Law, dated May 7, 2018 ................. A-209

Exhibit F to Second Amended Complaint -
    Sealed Exhibit B - Letter from Matthew L.
    Levine to Joseph Gunset, dated April 11, 2018
    (Filed Under Seal) (Reproduced in Confidential
    Appendix at pp. CA-45-CA-51) ........................... A-222

Exhibit G to Second Amended Complaint -
    Sealed Exhibit C - Minutes of the Board Meeting,
    dated May 1, 2018
    (Filed Under Seal) (Reproduced in Confidential
    Appendix at pp. CA-52-CA-65) ........................... A-224

ii

**Page**

Exhibit H to Second Amended Complaint -
Sealed Exhibit D - E-mail Correspondence, dated
May 9, 2018
(Filed Under Seal) (Reproduced in Confidential
Appendix at pp. CA-66-CA-67) .......................... A-226

Exhibit I to Second Amended Complaint -
Consent Order under Sections 1102 and 3420 of
the Insurance Law, dated December 20, 2018 ....... A-228

Exhibit J to Second Amended Complaint -
Supplemental Consent Order under Articles 21,
23 and 34 of the Insurance Law, dated
January 31, 2019 ................................................... A-255

Notice of Appeal of the Grant of Plaintiff's Motion
to Amend and Motion to Dismiss the Second
Amended Complaint, by Defendant Maria T.
Vullo, dated June 23, 2020 ................................... A-265

Memorandum of Law, by Defendant Maria T. Vullo,
in Support of Motion and Appeal, dated
June 23, 2020 ........................................................ A-267

Memorandum of Law, by Plaintiff, in Opposition to
Defendant Vullo's Appeal and Motion to
Dismiss, dated July 13, 2020 ................................ A-310

Reply Memorandum of Law, by Defendant Maria T.
Vullo, in Further Support of Motion and Appeal,
dated July 27, 2020 ............................................... A-343

Notice of Appeal, dated March 22, 2021 ................... A-362

Order on Plaintiff's Motion to file documents Under
Seal, dated April 22, 2020 .................................... A-364

A-209

# EXHIBIT E

NEW YORK STATE DEPARTMENT
OF FINANCIAL SERVICES

In the Matter of

CHUBB GROUP HOLDINGS INC. and
ILLINOIS UNION INSURANCE COMPANY.

## CONSENT ORDER UNDER
## SECTIONS 1102 AND 3420 OF THE INSURANCE LAW

Chubb Group Holdings Inc., its subsidiary, Illinois Union Insurance Company ("Illinois Union") (together, "Chubb") and the New York Department of Financial Services (the "Department") are willing to resolve the matters described herein without further proceedings.

### THE DEPARTMENT'S FINDINGS FOLLOWING INVESTIGATION

1.   Chubb is the world's largest publicly-traded property and casualty insurance company, and the largest commercial insurer in the United States.   Chubb has operations in 54 countries and territories, providing commercial and personal property and casualty insurance, personal accident and supplemental health insurance, reinsurance and life insurance to customers. Several Chubb subsidiaries have been licensed by the Department to conduct certain types of insurance business in the State of New York since at least 1922.   Illinois Union, a Chubb subsidiary, is an unauthorized insurer that is eligible to write excess line insurance in New York State.

2.   In connection with the "Carry Guard" insurance program discussed herein, Illinois Union held itself out to the public simply as "Chubb."

3.   Lockton Companies, LLC ("Lockton") is the world's largest privately owned, independent insurance brokerage firm, offering customers risk management, insurance and

1

employee benefits services. At least one of its affiliates has been licensed by the Department since approximately 1987. Lockton Affinity, LLC ("Lockton Affinity") is an affiliate of Lockton Companies, and has been licensed by the Department to act as an excess line insurance broker since at least 2013.

4.   The National Rifle Association of America ("NRA") is a New York not-for-profit corporation incorporated in 1871. The NRA describes its mission as "firearms safety, education, and training and advocacy on behalf of safe and responsible gun owners." The NRA is not licensed by the Department.

5.   From approximately April through November 2017, the NRA offered an insurance program to new and existing members resident in New York called "Carry Guard." According to the NRA's website:

> *NRA Carry Guard is a two-pronged program. It was created to provide dynamic, state-of-the-art insurance protection to those who legally defend themselves with a firearm, and to offer an elite, one-stop training option. The insurance provides a cutting edge set of features that will help gun owners mitigate the potentially costly financial and legal consequences flowing from armed encounters, even if they did everything right.*

The NRA website further described the Carry Guard program as "the only membership carry program *developed and supported by the National Rifle Association*, the most powerful civil rights organization in American history." The website further stated that Carry Guard was "*created by the NRA*."

6.   Additional promotional materials disseminated by the NRA stated:

**Why do I need Carry Guard**? Although millions of Americans are prepared to use a firearm in self-defense, very few families can withstand the financial consequences that may come next. The legal fees to clear your good name could be enormous. Likewise, the costs of defending and potentially losing a civil lawsuit could cripple your finances for the rest of your life. *And many homeowners' policies have severe limitations or exclusions related to intentional acts such as self-defense.*

A-212

These materials stated at the bottom of the page: "NRA CARRY GUARD™ Insurance Program Administered by Lockton Affinity, LLC • D/B/A/ Lockton Affinity Insurance Brokers, LLC."

      7.    Pursuant to written agreements with Lockton, Chubb -- through Illinois Union -- served as the underwriter for the Carry Guard insurance program, providing insurance policies to individuals who purchased Carry Guard insurance.  Lockton Affinity placed these insurance policies through New York's excess line insurance market.

      8.    Pursuant to written agreements between Chubb/Illinois Union and Lockton Affinity, and between Lockton Affinity and the NRA, Lockton Affinity served as the administrator for the insurance program, carrying out such functions as marketing the insurance, binding the insurance, collecting and distributing premiums, and delivering policies to insureds.

      9.    Without a license by the Department, the NRA engaged in aggressive marketing of and solicitation for the Carry Guard insurance program.  For example (and without limitation):

      ▪    The NRA broadcasted NRA-produced videos promoting the Carry Guard insurance program on YouTube;

      ▪    The NRA solicited participation in the Carry Guard insurance program through mass e-mail marketing, direct mail, banner ads, and articles in NRA publications;

      ▪    The NRA heavily promoted the Carry Guard insurance program at its 2017 "Carry Guard Expo" and its annual meetings;

      ▪    The NRA operated the website "www.nracarryguard.com," which was an important marketing portal for the Carry Guard insurance program and linked to a website operated by Lockton Affinity (www.lockton.nracarryguard.com), which provided additional information about the Carry Guard insurance program;

3

- The NRA promoted Carry Guard insurance on its main website, www.nra.org, which, among other things, featured an NRA spokesperson making claims such as, "*We're proud to have developed* the one carry membership program that stands above all others – NRA Carry Guard"; and "I will never carry a gun without carrying this."; and

- "Pop-up" internet advertising for the Carry Guard insurance program that featured one or more NRA spokespersons.

10.     The Carry Guard insurance program, as underwritten by Chubb/Illinois Union and administered, solicited and marketed by Lockton Affinity, unlawfully provided insurance coverage that may not be offered in the New York State excess line market, specifically:  (a) defense coverage in a criminal proceeding that is not permitted by law; (b) liability coverage for bodily injury or property damage expected or intended from the insured's standpoint in an insurance policy limited to use of firearms and that was beyond the use of reasonable force to protect persons or property; and (c) coverage for expenses incurred by the insured for psychological counseling support.

11.     The Carry Guard insurance program, as underwritten by Chubb/Illinois Union and administered by Lockton Affinity, failed to comply with Section 3420 of the Insurance Law, which sets forth minimum requirements for liability insurance policies.

12.     Moreover, in underwriting and administering the Carry Guard insurance program at the behest of the NRA, with knowledge that the NRA did not have a license to conduct insurance business from the Department, Chubb/Illinois Union and Lockton Affinity engaged in practices with an unlicensed party, the NRA, in a manner that resulted in violations of the Insurance Law.

13.     Chubb/Illinois Union has represented to the Department that, between approximately April and November 2017, 681 Carry Guard insurance policies were issued to New York

4

residents; and has represented to the Department that no claims have been submitted under the Carry Guard insurance policies to date by New York residents.

14.     Under the written agreements between Lockton Affinity and the NRA, the NRA was entitled to and did receive a variety of compensation in connection with the Carry Guard insurance program, even though it had no license from the Department, including as follows:

▪       The NRA was entitled to be paid half of the "administrative fee" collected by Lockton Affinity from Carry Guard insureds for purported but unspecified services;

▪       The NRA was entitled to receive certain royalties from Lockton Affinity for use of the NRA's name in conjunction with the Carry Guard insurance program; and

▪       The NRA was entitled to receive 100 percent of certain "profit sharing" awards arising out any funds generated and paid from a certain Lloyd's insurance policy.

15.     Since October 2017, the Department has been conducting an investigation of the involvement of Chubb, Lockton and the NRA in the Carry Guard insurance program and other matters, including a review of thousands of pages of documents obtained from Chubb, Lockton and the NRA, as well as other information obtained from investigative resources (the "DFS Investigation").

16.     Following initiation of the DFS Investigation in October 2017, which included document and information requests sent to Chubb in October 2017, Chubb and Illinois Union suspended participation in the Carry Guard program on or about November 17, 2017, and ceased making available Carry Guard policies for New York residents to purchase.

17.     **NOW THEREFORE**, to resolve this matter without further proceedings, pursuant to Sections 1102 and 3420 of the Insurance Law, Chubb, Illinois Union, and the Department (collectively, the "Parties") hereby stipulate and agree as follows:

5

## VIOLATIONS OF LAW AND REGULATIONS

18.    Chubb, through Illinois Union, engaged in the business of insurance without a license by issuing or delivering policies in New York State, or otherwise issuing policies covering New York State residents, which provided insurance coverage that may not be offered in the New York State excess line market, specifically:  (a) defense coverage in a criminal proceeding that is not permitted by law; (b) liability coverage for bodily injury or property damage expected or intended from the insured's standpoint in an insurance policy limited to use of firearms and that was beyond the use of reasonable force to protect persons or property; and (c) coverage for expenses incurred by the insured for psychological counseling support, in violation of Insurance Law § 1102.

19.    Chubb, through Illinois Union, issued liability insurance coverage to New York residents that failed to contain required liability insurance policy provisions, in violation of Insurance Law § 3420.

## SETTLEMENT PROVISIONS

### Civil Monetary Penalty

20.    Chubb shall pay a civil monetary penalty to the Department pursuant to Sections 1102 and 3420 of the Insurance Law in the amount of $1,300,000.  Chubb shall pay the entire amount within ten days of executing this Consent Order.  Chubb agrees that it will not claim, assert, or apply for a tax deduction or tax credit with regard to any U.S. federal, state, or local tax, directly or indirectly, for any portion of the civil monetary penalty paid pursuant to this Consent Order.  Chubb further agrees that it will not claim, seek, or receive indemnification of the civil monetary penalty from any other person or entity.

6

A-216

**Prohibition on Carry Guard and Other Insurance Programs**

21.     Chubb and Illinois Union agree not to participate in the Carry Guard insurance program or any similar program with regard to New York State, including, without limitation, by agreeing not to provide Carry Guard or other insurance policies specific to firearm usage that provide liability coverage for bodily injury or property damage from use of a firearm; and by agreeing not to provide liability coverage for bodily injury or property damage expected or intended from the insured's standpoint in general liability policies that is not limited to those occasions where bodily injury results from the use of reasonable force to protect persons or property, whether they are written or issued in New York State or elsewhere.  Furthermore, Chubb and Illinois Union agree not to issue or deliver any Carry Guard or similar insurance policies in New York State, regardless of the residence of the insured.  For the avoidance of doubt, Chubb and Illinois Union shall not be prohibited from providing homeowners, renters or general liability insurance in New York State or for New York residents that includes personal injury liability insurance or property damage liability insurance for loss, damage, or expense that results from the negligent use of a firearm.

22.     Chubb and Illinois Union agree that they shall not enter into any agreement or program with the NRA to underwrite or participate in any affinity-type insurance program involving any line of insurance; provided, however, that the NRA may itself purchase insurance from Chubb for the sole purpose of obtaining insurance for the NRA's own corporate operations. Chubb and Illinois Union further agree that they shall not enter into any affinity-type insurance program without undertaking reasonable due diligence to ensure that any entity involved in the issuance, brokering, administration or marketing of such affinity insurance program is acting in compliance with the Insurance Law and the regulations promulgated thereunder, including but

7

not limited to, any licensure requirements of the Insurance Law or regulations promulgated thereunder.

23.    Chubb/Illinois Union has represented to the Department that, between approximately April and November 2017, 681 Carry Guard insurance policies were issued to New York residents; and has represented to the Department that no claims have been submitted under the Carry Guard insurance policies to date by New York residents.

24.    Within 10 business days of the execution of this Consent Order, Illinois Union shall mail or deliver to all New York State insureds notice stating that Illinois Union is canceling the insured's Carry Guard insurance policy effective 90 days from the date of notice.  Illinois Union agrees to submit the draft notices to the Department for the Department's review and approval prior to Illinois Union mailing or delivering such notices.  Illinois Union also agrees to fully refund the insurance premiums for the cancelled policies.  Thereafter, Illinois Union shall promptly file a certification with the Department that sets forth its compliance with this Paragraph 24.

25.    Chubb and Illinois Union agree not to issue or deliver in New York State an insurance policy, or otherwise issue an insurance policy covering a New York State resident, that provides defense coverage in a criminal proceeding unless expressly permitted by law.

26.    Illinois Union and any other unauthorized Chubb insurer agree not to issue or deliver in New York State an insurance policy, or otherwise issue an insurance policy covering a New York State resident, that provides insurance for expenses incurred for psychological counseling support because such conduct violates the Insurance Law.

A-218

**Full and Complete Cooperation of Chubb**

27.    Chubb and Illinois Union commit and agree to fully cooperate with the DFS Investigation and all terms of this Consent Order.  Such cooperation shall include, without limitation:

      a.  producing all non-privileged documents and other materials to the Department, as requested, wherever located in the possession, custody, or control of Chubb or Illinois Union;

      b.  requiring employees or agents to appear for interviews, at such reasonable times and places, as requested by the Department;

      c.  responding fully and truthfully in a prompt manner to all inquiries when requested to do so by the Department; and

      d.  testifying at hearings, trials and other judicial, administrative or other proceedings, when requested to do so by the Department, in connection with its investigation of matters relating to the Carry Guard insurance program.

**Breach of Consent Order**

28.    If the Department believes Chubb or Illinois Union to be in material breach of this Consent Order, the Department will provide written notice to Chubb or Illinois Union and Chubb or Illinois Union must, within ten business days of receiving such notice, or on a later date if so determined in the Department's sole discretion, appear before the Department to demonstrate that no material breach has occurred or, to the extent pertinent, that the breach is not material or has been cured.

29.    The parties understand and agree that the failure of Chubb or Illinois Union to make the required showing within the designated time period shall be presumptive evidence of Chubb's

9

**A-219**

or Illinois Union's breach. Upon a finding that Chubb or Illinois Union has breached this Consent Order, the Department has all the remedies available to it under New York Insurance and Financial Services Law and may use any evidence available to the Department in any ensuing hearings, notices, or orders.

## Waiver of Rights

30.     The parties understand and agree that no provision of this Consent Order is subject to review in any court or tribunal outside the Department.

## Parties Bound by the Consent Order

31.     This Consent Order is binding on the Department, Chubb and Illinois Union, as well as any successors and assigns. This Consent Order does not bind any federal or other state agency or any law enforcement authority.

32.     No further action will be taken by the Department against Chubb for the specific conduct set forth in this Consent Order, provided that Chubb complies fully with the terms of this Consent Order, including paragraph 27 above.

33.     Notwithstanding any other provision contained in this Consent Order, the Department may undertake action against Chubb or Illinois Union for transactions or conduct that Chubb or Illinois Union did not disclose to the Department in the written materials that Chubb and Illinois Union submitted to the Department in connection with this matter.

## Notices

34.     All notices or communications regarding this Consent Order shall be sent to:

For the Department:

10

A-220

For the Department:

Hadas Jacobi
Assistant Deputy Superintendent
  for Enforcement
New York State Department of Financial Services
One State Street
New York, NY 10004

Megan Prendergast
Deputy Superintendent for Enforcement
New York State Department of Financial Services
One State Street
New York, NY 10004

Connor Mealey
Excelsior Fellow
New York State Department of Financial Services
One State Street
New York, NY 10004

For Chubb:

Kevin Rampe
General Counsel
Chubb Group
1133 Avenue of the Americas
New York, NY 10036

John P. Mulhern
Drinker, Biddle & Reath LLP
1177 Avenue of the Americas
New York, NY 10036

For Illinois Union:

Kevin Rampe
General Counsel
Chubb Group
1133 Avenue of the Americas
New York, NY 10036

John P. Mulhern
Drinker, Biddle & Reath LLP
1177 Avenue of the Americas
New York, NY 10036

11

A-221

**Miscellaneous**

35.    Each provision of this Consent Order shall remain effective and enforceable until stayed, modified, suspended, or terminated by the Department.

36.    No promise, assurance, representation, or understanding other than those contained in this Consent Order has been made to induce any party to agree to the provisions of the Consent Order.

**IN WITNESS WHEREOF,** the parties have caused this Consent Order to be signed this 7ᵗʰ day of May, 2018.

**CHUBB GROUP HOLDINGS INC.**

By: _____
**JOSEPH WAYLAND**
Executive Vice President and
General Counsel

**ILLINOIS UNION INSURANCE
COMPANY**

By: _____
**JOSEPH WAYLAND**
_____

**NEW YORK STATE DEPARTMENT OF
FINANCIAL SERVICES**

By: _____
**MARIA T. VULLO**
Superintendent of Financial Services

By: _____
**MATTHEW L. LEVINE**
Executive Deputy Superintendent for
Enforcement

12

A-222

# EXHIBIT F

A-223

# SEALED EXHIBIT B

A-224

# EXHIBIT G

A-225

# SEALED EXHIBIT C

A-226

# EXHIBIT H

A-227

# SEALED EXHIBIT D

# EXHIBIT I

NEW YORK STATE DEPARTMENT
OF FINANCIAL SERVICES

In the Matter of

**CERTAIN UNDERWRITERS AT LLOYD'S,
LONDON SUBSCRIBING TO INSURANCE
POLICIES ISSUED TO THE NATIONAL RIFLE
ASSOCIATION OF AMERICA**

**CONSENT ORDER UNDER
SECTIONS 1102 AND 3420 OF THE INSURANCE LAW**

The following underwriters at the Lloyd's London market, which are subject to this Consent Order, acting through the undersigned managing agents:  KLN 0510, managing agent Tokio Marine Kiln Syndicates Limited; AUW 0609, managing agent Atrium Underwriters Limited; SAM 0727, managing agent S.A. Meacock & Company Limited; CNP 0958, managing agent Canopius Managing Agents Limited; CSL 1084, managing agent Chaucer Syndicates Limited; ROC 1200, managing agent Argo Managing Agency Limited; GER 1206, managing agent AmTrust Syndicates Limited; BRT 2987, managing agent Brit Syndicates Limited; CNP 4444, managing agent Canopius Managing Agents Limited; and LIB 4472, managing agent Liberty Managing Agency Limited (together, the "Underwriters"), and the New York State Department of Financial Services (the "Department") are willing to resolve the matters described herein without further proceedings.  This Order is entered into by the undersigned managing agents, who execute this Order on behalf of Underwriters.

**THE DEPARTMENT'S FINDINGS FOLLOWING INVESTIGATION**

1.      Lloyd's of London is an insurance market encompassing underwriting syndicates managed by more than 50 managing agents with whom over 200 registered brokers do business,

1

some of which involves a global network of over 4,000 local agents, known as "coverholders," which have underwriting authority on behalf of the underwriting syndicates.[1]  The Lloyd's market is overseen by the U.K.-based Corporation of Lloyd's.

2.      An "admitted" insurer is an insurance company that has received a license from the Department to provide specified types of insurance to customers in New York.  Admitted insurers are fully regulated by the Department in order to ensure solvency and adherence to consumer protection standards.  A non-admitted insurer is an insurer not licensed by the Department, and may be an insurance carrier that provides "excess line" insurance only under prescribed rules.

3.      Excess line coverage offers policyholders an opportunity to obtain insurance that could not be procured through admitted insurance carriers.  Excess line carriers are not licensed by the Department but are permitted to do business in New York through a licensed excess line broker.  Generally, an excess line policy can be written only after it has been declined by at least three admitted carriers.

4.      Lockton Companies, LLC ("Lockton") is the world's largest privately owned, independent insurance brokerage firm, offering customers risk management, insurance and employee benefits services.  At least one of its affiliates has been licensed by the Department since approximately 1987.  Lockton Affinity, LLC ("Lockton Affinity") is an affiliate of Lockton Companies, and has been licensed by the Department to act as an excess line insurance broker since at least 2013.

5.      The National Rifle Association of America ("NRA") is a New York not-for-profit corporation incorporated in 1871.  The NRA describes its mission as "firearms safety, education,

---

[1] A "coverholder" in the Lloyd's market is an insurance intermediary authorized by a managing agent to enter into contracts of insurance to be underwritten by the members of a syndicate managed by it, in accordance with the terms of a binding authority.  *See* https://www.lloyds.com/lloyds-around-the-world/europe/switzerland/becoming-an-intermediary-and-coverholder.

A-231

and training and advocacy on behalf of safe and responsible gun owners." The NRA is not and has never been licensed by the Department.

6.    From approximately January 2000 through March 2018 (or, for certain insuring agreements, for shorter time periods within this span), the NRA (through Lockton Affinity) offered 15 insurance programs to new and existing NRA members in New York and elsewhere that were underwritten by Underwriters, including, *inter alia*:

a.    "Self-Defense Insurance," which provided coverage for criminal and civil defense costs, and bodily injury and damage caused by the use of a firearm;

b.    "Retired Law Enforcement Officer Self-Defense Insurance," which provided coverage for criminal and civil defense costs, and bodily injury and damage caused by the use of a firearm;

c.    "Second-Call Defense Insurance," which provided coverage for criminal and civil defense costs, and bodily injury and damage caused by the use of a firearm;

d.    "ArmsCare Plus Firearms Insurance," which provided coverage for legal firearms and attached accessories against loss, damage, flood, fire, and theft (including theft from a locked vehicle);

e.    "No Cost ArmsCare Firearms Insurance," which provided free coverage to NRA members in good standing for legal firearms and their attached accessories, up to $2,500 in value, against loss, damage, flood, fire, and theft (including theft from a locked vehicle);

f.    "Firearms Instructor Plus Liability Insurance," which provided coverage for injuries or damage the insured causes while acting as an instructor during a lesson, medical expenses up to $5,000, legal expenses from lawsuits related to the injuries or damage, and professional liability coverage that protects the member from allegations of negligent training;

g.    "Personal Firearms Protection Insurance," which provided coverage for any unintentional injuries or damage an insured causes while hunting or trapping on public or private land, shooting in competitions, or shooting at private shooting ranges, with a firearm, air gun, bow and arrow, or trapping equipment, and coverage for lawsuit defense costs;

3

h. "Gun Collector Insurance," which provided coverage for certain firearms and their attached accessories against loss, damage, fire, and theft (including theft from a locked vehicle);

i. "Gun Club Insurance," which provided coverage for loss or damage to any assets the gun club rents, leases or owns, coverage for general liability plus medical payments, coverage for claims of false advertising, and optional coverage for business income, boiler and machinery, glass, computers, valuable papers and records, and accounts receivable;

j. "Hunt Club Insurance," which provided coverage for hunt clubs and the landowners to protect against injury and damage, provided host liquor coverage, and provides hired and non-owned auto coverage. In addition, an insured may select coverage for "personal and advertising", products/completed operations, and medical expenses up to $5,000 for any one person;

k. "NRA Business Alliance Insurance," which provided coverage for a firearms-related business, including coverage for loss or damage to any assets the insured business rents, leases or owns, coverage for general liability plus medical payments, coverage for claims of false advertising, gunsmith coverage, and optional coverage for business income, boiler and machinery, glass, computers, valuable papers and records, and accounts receivable;

l. "Gun Show Insurance," which provided coverage for the insured's liability arising out of the insured's occupation as a gun show promoter; and

m. "Home-Based Federal Firearms License Insurance" for gun dealers and gunsmiths, which provided coverage for the insured's business location, equipment and tools, and gear entrusted to the insured by the insured's clients, against theft, damage and other loss, and provided general liability coverage, including products/completed liability to insure the insured's finished work against later claims.

Together, these insurance programs are referred to herein as the "NRA Programs."[2]

7.      Pursuant to written agreements with Lockton, Underwriters served as the underwriters for the NRA Programs, providing insurance policies to individuals and organizations

---

[2] This paragraph includes summary descriptions obtained from the NRA website of coverage provided under the pertinent insurance agreements. The specific operative terms and conditions of these coverages are set forth in the actual insuring agreements identified.

4

who purchased NRA-sponsored insurance. Lockton Affinity placed coverage for individuals whose home state is New York with Underwriters as part of a group policy issued to the NRA in Virginia. Lockton also procured from Underwriters individual policies covering organizations, such as gun clubs, whose home state is New York.

8.    Pursuant to written agreements between Underwriters and Lockton Affinity, and between Lockton Affinity and the NRA, Lockton Affinity served as the administrator for the NRA Programs, carrying out such functions as marketing the insurance, binding the insurance, collecting and distributing premiums, and delivering policy documents to insureds.

9.    The NRA Programs, as underwritten by Underwriters and administered by Lockton Affinity, unlawfully provided insurance coverage that may not be offered in the New York State excess line market, specifically: (a) defense coverage in a criminal proceeding that is not permitted by law; and (b) liability coverage for bodily injury or property damage expected or intended from the insured's standpoint in an insurance policy limited to use of firearms and that was beyond the use of reasonable force to protect persons or property.

10.    The NRA Programs, as underwritten by Underwriters and administered by Lockton Affinity, further failed to comply with Section 3420 of the Insurance Law, which sets forth minimum requirements for liability insurance policies.

11.    Moreover, Underwriters issued to the NRA impermissible group policies covering insureds whose home state is New York State, as neither Insurance Law Article 34 nor Insurance Regulation 135 (11 N.Y.C.R.R. § 153) authorize Underwriters to write this type of group property or casualty insurance.

12.    Underwriters have represented to the Department that, between approximately January 2000 and May 31, 2018, (a) 24,637 insurance policies or insuring agreements were issued

to persons or entities with a New York address in connection with the NRA Programs; and (b) 401 claims for payment have been filed by persons or entities whose home state is New York for the NRA Programs as of December 18, 2018.

13.    Since October 2017, the Department has been conducting an investigation of the involvement of the Corporation of Lloyd's, Underwriters, Lockton and the NRA in the NRA Programs and other matters, including a review of thousands of pages of documents obtained from the Corporation of Lloyd's, Underwriters, Lockton Affinity and the NRA, as well as other information obtained from relevant sources (the "DFS Investigation").

14.    Underwriters have represented to the Department that, following initiation of the DFS Investigation, Underwriters suspended their participation in the NRA Programs as of June 1, 2018 with respect to persons or entities whose home state is New York.

15.    **NOW THEREFORE**, to resolve this matter without further proceedings, pursuant to Sections 1102 and 3420 of the Insurance Law, Underwriters and the Department (collectively, the "Parties") hereby stipulate and agree as follows:

### VIOLATIONS OF LAW AND REGULATIONS

16.    Underwriters engaged in the business of insurance without a license by issuing or delivering policies in New York, or otherwise issuing policies covering insureds whose home state is New York State, which provided insurance coverage that may not be offered in the New York State excess line market, specifically:  (a) defense coverage in a criminal proceeding that is not permitted by law; and (b) liability coverage for bodily injury or property damage expected or intended from the insured's standpoint in an insurance policy limited to use of firearms and that was beyond the use of reasonable force to protect persons or property, in violation of Insurance Law § 1102.

6

17. Underwriters issued liability insurance coverage to insureds whose home state is New York that failed to contain required liability insurance policy provisions, in violation of Insurance Law § 3420.

## SETTLEMENT PROVISIONS

### Civil Monetary Penalty

18. Underwriters shall pay a civil monetary penalty to the Department pursuant to Sections 1102 and 3420 of the Insurance Law in the amount of $5,000,000. Underwriters shall pay the entire amount within ten days of executing this Consent Order. Underwriters agree that they will not claim, assert, or apply for a tax deduction or tax credit with regard to any U.S. federal, state, or local tax, directly or indirectly, for any portion of the civil monetary penalty paid pursuant to this Consent Order. Underwriters further agree that they will not claim, seek, or receive indemnification of the civil monetary penalty from any other person or entity.

### Prohibition on Certain Insurance Programs

19. Underwriters agree not to issue or deliver in New York State any insurance policies specific to firearm usage that provide liability coverage for bodily injury or property damage from use of a firearm, including, but not limited to, (a) the NRA "Self-Defense Insurance" policy, (b) the NRA "Retired Law Enforcement Officer Self-Defense Insurance" policy and (c) the NRA "Second-Call Defense Insurance" policy; and agree not to provide, to persons or entities whose home state is New York, liability coverage for bodily injury or property damage expected or intended from the insured's standpoint in general liability coverage that is not limited to those occasions where bodily injury results from the use of reasonable force to protect persons or property, whether they are written or issued in New York State or elsewhere including, but not limited to, (a) the NRA "Self-Defense Insurance" policy, (b) the NRA "Retired Law Enforcement

7

Officer Self-Defense Insurance" policy and (c) the NRA "Second-Call Defense Insurance" policy. For the avoidance of doubt, Underwriters shall not be prohibited from providing homeowners, renters or general liability insurance in New York State, or for New York persons or entities whose home state is New York, that includes bodily injury liability insurance or property damage liability insurance for loss, damage, or expense that results from the negligent use of a firearm.

20.     Underwriters agree that they shall not enter into any agreement or program with the NRA to underwrite or participate in any affinity-type insurance program involving any line of insurance covering persons or entities whose home state is New York; provided, however, that the NRA may itself purchase insurance from Underwriters for the sole purpose of obtaining insurance for the NRA's own corporate operations.  Underwriters further agree that they shall not enter into any affinity-type insurance program, involving any line of insurance covering persons or entities whose home state is New York, without undertaking reasonable due diligence to ensure that any person or entity involved in the issuance, brokering, administration or marketing of such affinity insurance program is acting in compliance with the Insurance Law and the regulations promulgated thereunder, including but not limited to, any licensure requirements of the Insurance Law or regulations promulgated thereunder.

21.     Underwriters agree not to issue or deliver in New York State any group insurance policy, or issue any group insurance policy covering an insured whose home state is New York State, unless the Insurance Law or regulations promulgated thereunder authorize the Underwriters to write the group insurance policy in the New York State excess line market.

22.     Within 10 business days of the full execution of this Order, Underwriters shall cause Lockton Affinity to mail or deliver, within 30 days of the full execution of this Order, to all insureds whose home state is New York under the NRA "Self-Defense Insurance," NRA "Retired

8

Law Enforcement Officer Self-Defense Insurance," and NRA "Second-Call Defense Insurance" programs a notice stating that Underwriters are canceling the insurance coverage provided under these specific NRA Programs effective 90 days from the date of notice. Underwriters agree to cause Lockton to submit the draft notices to the Department for the Department's review and approval prior to the mailing or delivering such notices. Underwriters further agree to fully refund the insurance premiums for the specific coverages canceled under these NRA Programs. Thereafter, Underwriters shall promptly file a certification with the Department that sets forth their compliance with this Paragraph 22.

23.     Also within 10 business days of the full execution of this Order, Underwriters shall cause Lockton Affinity (a) to mail or deliver, within 30 days of the full execution of this Order, to the NRA a notice stating that Underwriters are cancelling the insurance coverage provided under the NRA "No Cost ArmsCare Firearms Insurance Policy" to all insureds whose home state is New York effective 90 days from the date of notice and (b) to direct the NRA to notify such insureds (by the prescribed notice methods set forth in the "No Cost ArmsCare Firearms Insurance Policy") that this coverage has been cancelled. Underwriters agree to cause Lockton Affinity to submit the draft notice(s) required by Paragraph 23(a) to the Department for the Department's review and approval prior to the mailing or delivering of such notices. If the NRA does not provide, by the prescribed notice methods set forth in the "No Cost ArmsCare Firearms Insurance Policy," notice to all insureds whose home state is New York that the "No Cost ArmsCare Firearms Insurance Policy" coverage has been cancelled within the specified (or, if not specified, reasonable) time period, then at the Department's direction, Underwriters shall take and/or cause Lockton Affinity to take, such further action as reasonably may be required to notify the insureds of the cancellation including, without limitation, publication of notice of cancellation in relevant newspapers,

9

periodicals or other media, subject to the Department's prior approval.   Thereafter, Underwriters shall promptly file a certification with the Department that sets forth their compliance with this Paragraph 23.

24.      Underwriters shall direct Lockton Affinity to non-renew any of the NRA Programs, other than the NRA Programs specified in Paragraphs 22 and 23 of this Order, issued under the group policy to an insured whose home state is New York, at the end of the coverage term for that insured.   After Lockton Affinity has non-renewed all insureds whose home state is New York, Underwriters shall promptly file a certification with the Department that sets forth their compliance with this Paragraph 24.

25.      Underwriters agree not to issue or deliver in New York State an insurance policy, or otherwise issue an insurance policy covering an insured whose home state is New York, that provides legal services coverage, including, but not limited to, defense coverage in a criminal proceeding.

26.      Underwriters agree not to issue or deliver in New York State an insurance policy, or otherwise issue an insurance policy covering an insured whose home state is New York, that compensates any broker, agent or other entity in a manner that would constitute either an illegal inducement to the making of insurance or after insurance has been effected, an illegal rebate from the premium which is not specified in the insurance policy, or illegal valuable consideration or inducement of any kind, directly or indirectly, which is not specified in the insurance policy.

**Full and Complete Cooperation of Underwriters**

27.      Underwriters commit and agree to fully cooperate with the DFS Investigation and all terms of this Consent Order.  Such cooperation shall include, without limitation:

    a.  producing all non-privileged documents and other materials to the Department, as requested, wherever located in the possession, custody, or control of Underwriters;

    b.  requiring employees or agents to appear for interviews, at such reasonable times and places, as requested by the Department;

    c.  responding fully and truthfully in a prompt manner to all inquiries when requested to do so by the Department; and

    d.  testifying at hearings, trials and other judicial, administrative or other proceedings, when requested to do so by the Department, in connection with its investigation of matters relating to the NRA Programs.

**Breach of Consent Order**

28.    If the Department believes Underwriters, or any individual Underwriter, to be in material breach of this Consent Order, the Department will provide written notice to such Underwriter or Underwriters, and such Underwriter or Underwriters must, within ten business days of receiving such notice, or on a later date if so determined in the Department's sole discretion, appear before the Department to demonstrate that no material breach has occurred or, to the extent pertinent, that the breach is not material or has been cured.

29.    The parties understand and agree that the failure of Underwriters or such Underwriter to make the required showing within the designated time-period shall be presumptive evidence of any such Underwriter's breach.  Upon a finding that an Underwriter or Underwriters have breached this Consent Order, the Department has all the remedies available to it under New York Insurance and Financial Services Law and may use any evidence available to the Department in any ensuing hearings, notices, or orders.

**Waiver of Rights**

30.     The parties understand and agree that no provision of this Consent Order is subject to review in any court or tribunal outside the Department.

**Parties Bound by the Consent Order**

31.     This Consent Order is binding on the Department and Underwriters, as well as any successors and assigns.  This Consent Order does not bind any federal or other state agency or any law enforcement authority.

32.     No further action will be taken by the Department against Underwriters for the specific conduct set forth in this Consent Order, provided that Underwriters comply fully with the terms of this Consent Order, including Paragraph 27 above.

33.     Notwithstanding any other provision contained in this Consent Order, the Department may undertake action against any Underwriter for transactions or conduct that such Underwriter did not disclose to the Department in the written materials that such Underwriter submitted to the Department in connection with this matter.

**Notices**

34.     All notices or communications regarding this Consent Order shall be sent to:


For the Department:

Hadas Jacobi
Assistant Deputy Superintendent
  for Enforcement
New York State Department of Financial Services
One State Street
New York, NY 10004

Connor Mealey
Excelsior Fellow
New York State Department of Financial Services

12

One State Street
New York, NY 10004


For Underwriters:

Michael P. Murphy
Partner, Global Chair, Insurance and Reinsurance
DLA Piper LLP (US)
1251 Avenue of the Americas
New York, NY 10020

Catherine Marshall
Head of Compliance
Tokio Marine Kiln
20 Fenchurch Street
London, EC3M 3BY
United Kingdom
For the Members of Lloyd's Syndicate No. 0510 acting through their managing
agent, Tokio Marine Kiln Syndicates Limited.


James Cox
Compliance Director
Lloyd's Building
1 Lime Street
London, EC3M 7DQ
United Kingdom
For the Members of Lloyd's Syndicate No. 0609 acting through their managing
agent, Atrium Underwriters Ltd.

David Jones
Compliance Director
Hasilwood House
60 Bishopsgate
London, EC2N 4AW
United Kingdom
For the Members of Lloyd's Syndicate No. 0727 acting through their managing
agent, S.A. Meacock & Company Limited.


The Company Secretary
Gallery 9
One Lime Street
London, EC3M 7HA

13

United Kingdom
For the Members of Lloyd's Syndicate No. 0958 acting through their managing
agent, Canopius Managing Agents Limited.


Paul Armfield
Compliance Manager
Chaucer Syndicates
Plantation Place
30 Frenchurch Street
London EC3M 3AD
For the Members of Lloyd's Syndicate No. 1084 acting through their managing
agent, Chaucer Syndicates Limited.

Toby Mills
Head of Compliance - EMEA
ArgoGlobal
1 Fen Court
London, EC3M 5BN
United Kingdom
For the Members of Lloyd's Syndicate No. 1200 acting through their managing
agent, Argo Managing Agency Limited.

General Counsel
Exchequer Court
33 St Mary Axe
London EC3A 8AA
United Kingdom
For the Members of Lloyd's Syndicate No. 1206 acting through their managing
agent, AmTrust Syndicates Limited.

Tim Harmer, Group Director of Legal and Compliance
Brit Insurance
122 Leadenhall Street
London, EC3V 4AB
United Kingdom
For the Members of Lloyd's Syndicate No. 2987 acting through their managing
agent, Brit Syndicates Limited.

The Company Secretary
Gallery 9
One Lime Street
London, EC3M 7HA
United Kingdom
For the Members of Lloyd's Syndicate No. 4444 acting through their managing
agent, Canopius Managing Agents Limited.

14

A-243

Nigel Davenport, Group General Counsel
Liberty Specialty Markets
20 Fenchurch Street,
London, EC3M 3AW
United Kingdom
For the Members of Lloyd's Syndicate No. 4472 acting through their managing
agent, Liberty Managing Agency Limited.

**Miscellaneous**

35.   Each provision of this Consent Order shall remain effective and enforceable until

stayed, modified, suspended, or terminated by the Department.

36.   No promise, assurance, representation, or understanding other than those contained

in this Consent Order has been made to induce any party to agree to the provisions of the Consent

Order.

*[remainder of page intentionally left blank]*

15

A-244

IN WITNESS WHEREOF, the parties have caused this Consent Order to be signed this **20th** day of December, 2018.

UNDERWRITERS AT LLOYD'S, LONDON

By: _____

CHARLES FRANKS

Group Chief Executive Officer

**For the Members of Lloyd's Syndicate No. 0510 acting through their managing agent, Tokio Marine Kiln Syndicates Limited.**

NEW YORK STATE DEPARTMENT OF FINANCIAL SERVICES

By: _____

MARIA T. VULLO
Superintendent of Financial Services

By: _____

MATTHEW L. LEVINE
Executive Deputy Superintendent for Enforcement

16

A-245

**IN WITNESS WHEREOF**, the parties have caused this Consent Order to be signed this \_\_\_

day of December, 2018.

**UNDERWRITERS AT LLOYD'S, LONDON**

By: _____

CHARLES FRANKS

Group Chief Executive Officer

**For the Members of Lloyd's Syndicate No. 0510 acting through their managing agent, Tokio Marine Kiln Syndicates Limited.**

**NEW YORK STATE DEPARTMENT OF FINANCIAL SERVICES**

By: _____
MARIA T. VULLO
Superintendent of Financial Services

By: _____
MATTHEW L. LEVINE
Executive Deputy Superintendent for Enforcement

16

By: _____

**RICHARD HARRIES**

Chief Executive Officer

For the Members of Lloyd's Syndicate No.
0609 acting through their managing agent,
Atrium Underwriters Ltd.

17

By:

KARL W. JARVIS

Chief Executive Officer

For the Members of Lloyd's Syndicate No.
0727 acting through their managing agent, S.A.
Meacock & Company Limited.

By: _____

**MIKE DUFFY**

**Chief Executive Officer**

**For the Members of Lloyd's Syndicate No.
0958 acting through their managing agent,
Canopius Managing Agents Limited.**

By: _R.N. Barnett_

**RICHARD BARNETT**

**Company Secretary and General Counsel**

**For the Members of Lloyd's Syndicate No.
1084 acting through their managing agent,
Chaucer Syndicates Limited.**

A-250

By: _____

**DOMINIC KIRBY**

**Managing Director**

**For the Members of Lloyd's Syndicate No.
1200 acting through their managing agent,
Argo Managing Agency Limited.**

A-251

By:

**SHELDON LACY**

**Chief Risk Officer**

**For the Members of Lloyd's Syndicate No.
1206 acting through their managing agent,
AmTrust Syndicates Limited.**

22

By: _____

**TIM HARMER**

**Group Director of Legal and Compliance**

**For the Members of Lloyd's Syndicate No.
2987 acting through their managing agent, Brit
Syndicates Limited.**

23

A-253

By: _____

**MIKE DUFFY**

**Chief Executive Officer**

**For the Members of Lloyd's Syndicate No.
4444 acting through their managing agent,
Canopius Managing Agents Limited.**

24

A-254

By:

**NIGEL DAVENPORT**

**Group General Counsel**

**For the Members of Lloyd's Syndicate No.
4472 acting through their managing agent,
Liberty Managing Agency Limited.**

25

A-255

# EXHIBIT J

A-256

NEW YORK STATE DEPARTMENT
OF FINANCIAL SERVICES

In the Matter of

LOCKTON AFFINITY, LLC and
LOCKTON COMPANIES, LLC

## SUPPLEMENTAL CONSENT ORDER UNDER
## ARTICLES 21, 23 AND 34 OF THE INSURANCE LAW

Lockton Affinity, LLC, on behalf of each of its separate operating series, one of which, Lockton Affinity Series of Lockton Affinity, LLC, is the successor entity to Lockton Risk Services, Inc. ("Lockton Affinity"), Lockton Companies, LLC, on behalf of each of its separate operating series ("Lockton Companies") (together, Lockton Affinity and Lockton Companies, "Lockton"), and the New York State Department of Financial Services (the "Department") (collectively, the "Parties") are willing to resolve the matters described herein without further proceedings.

**WHEREAS**, the Parties entered into a Consent Order on May 2, 2018 (the "2018 Consent Order"), pursuant to which Lockton conducted a Compliance Review and, since May 2, 2018, has reported to the Department on the results of the Compliance Review;

**WHEREAS**, as a result of the Compliance Review, Lockton has identified to the Department certain additional violations of New York laws and regulations, which are set forth below in the "Violations" section of this Supplemental Consent Order (the "Additional Violations");

**NOW THEREFORE**, to resolve this matter without further proceedings, pursuant to Articles 21, 23 and 34 of the Insurance Law, Lockton Affinity, Lockton Companies, and the Department hereby stipulate and agree as follows:

1

A-257

## VIOLATIONS OF LAW AND REGULATIONS

1.     Lockton Affinity compensated certain unlicensed entities, in violation of Insurance Law § 2116.

2.     Lockton acted for and aided unauthorized insurers in connection with these insurers issuing policies in New York State, or otherwise issuing policies covering insureds whose home state is New York, that provided coverage that may not be offered in the New York State excess line market, including punitive damage coverage, psychological counseling expenses, and defense coverage in a criminal proceeding in violation of Insurance Law § 2117, except that unlike the policies addressed in the 2018 Consent Order, none of the policies covered by this Supplemental Consent Order were specific to firearm usage that provides liability coverage for bodily injury or property damage from use of a firearm, or for liability coverage for bodily injury or property damage expected or intended from the insured's standpoint to extend beyond those occasions where bodily injury results from the use of reasonable force to protect persons or property.

3.     Lockton procured from unauthorized insurers impermissible group policies covering insureds whose home state is New York, as neither Insurance Law Article 34 nor Insurance Regulation 135 (11 N.Y.C.R.R. § 153) authorize the insurers to write the group property/casualty insurance procured by Lockton Affinity and Lockton Companies.

4.     Lockton Affinity advertised the financial condition of unauthorized insurers, in violation of Insurance Law § 2122(a)(1).

5.     Lockton Affinity called attention to unauthorized insurers by issuing advertising materials that reference the unauthorized insurers by name, in violation of Insurance Law § 2122(a)(2).

2

A-258

6.      Lockton failed to properly secure declinations from authorized insurers, in violation of Insurance Law § 2118(b)(3).

7.      Lockton failed to make the required disclosure and obtain the required writing when an insured was an exempt commercial purchaser, in violation of Insurance Law § 2118(b)(3)(F).

8.      Lockton Affinity failed to properly pay excess line premium taxes with respect to certain group policies, in violation of § 2118(d).

## SETTLEMENT PROVISIONS

### Civil Monetary Penalty

9.   .   Lockton shall pay a civil monetary penalty to the Department pursuant to Articles 21, 23 and 34 of the Insurance Law in the amount of $400,000.00.  Lockton shall pay the entire amount within ten days of executing this Consent Order.  Lockton agrees that it will not claim, assert, or apply for a tax deduction or tax credit with regard to any U.S. federal, state, or local tax, directly or indirectly, for any portion of the civil monetary penalty paid pursuant to this Consent Order.  Lockton further agrees that it will not claim, seek, or receive indemnification of the civil monetary penalty from any other person or entity.  This provision is not intended, and shall not be construed, to prohibit Lockton affiliates from funding inter-company transfers to Lockton.

### Remediation

10.      To the extent not previously submitted in connection with the 2018 Consent Order, Lockton shall submit a plan for remediation of any of the Additional Violations identified by Lockton.

11.      All other terms and conditions of the 2018 Consent Order remain in full force and effect.

3

12.     Lockton agrees that if the Department makes a determination that any sponsor of an affinity group illegally marketed an affinity-type policy sold or underwritten by Lockton that includes criminal defense coverage that may not be offered in New York, Lockton will not enter into any agreement or program with the sponsor to sell, underwrite, or otherwise participate in any affinity-type insurance program involving any line of insurance to be issued or delivered in New York State.

**Breach of Consent Order**

13.     If the Department believes Lockton Companies or Lockton Affinity to be in material breach of this Supplemental Consent Order, the Department will provide written notice to Lockton Companies and/or Lockton Affinity and Lockton Companies and/or Lockton Affinity (as the case may be) must, within ten business days of receiving such notice, or on a later date if so determined in the Department's sole discretion, appear before the Department to demonstrate that no material breach has occurred or, to the extent pertinent, that the breach is not material or has been cured.

14.     The Parties understand and agree that Lockton Companies' and/or Lockton Affinity's failure to make the required showing within the designated time period shall be presumptive evidence of such party's breach.  Upon a finding that Lockton Companies and/or Lockton Affinity has breached this Supplemental Consent Order, the Department has all the remedies available to it under the New York Insurance and Financial Services Laws, and any other law, and may use any evidence available to the Department in any ensuing hearings, notices, or orders.

4

**Waiver of Rights**

15.     The Parties understand and agree that no provision of this Supplemental Consent Order is subject to review in any court or tribunal outside the Department.

**Parties Bound by the Consent Order**

16.     This Supplemental Consent Order is binding on the Parties, as well as any successors and assigns.  This Supplemental Consent Order does not bind any federal or other state agency or any law enforcement authority.

17.     No further action will be taken by the Department against Lockton arising out of the Additional Violations.

18.     Notwithstanding any other provision contained in this Supplemental Consent Order, the Department may undertake action against Lockton for transactions or conduct to the extent that transactions or conduct of that type were not disclosed by Lockton to the Department in connection with the Compliance Review.

**Notices**

19.     All notices or communications regarding this Supplemental Consent Order shall be sent to:

> For the Department:
>
> Hadas Jacobi
> Assistant Deputy Superintendent
>  for Enforcement
> New York State Department of Financial Services
> One State Street
> New York, NY 10004
>
> Megan Prendergast
> Deputy Superintendent for Enforcement
> New York State Department of Financial Services
> One State Street
> New York, NY 10004

Connor Mealey
Attorney and Excelsior Fellow
New York State Department of Financial Services
One State Street
New York, NY 10004

For Lockton Companies, LLC:

William Humphrey
Secretary
Lockton Companies
444 West 47th Street
Kansas City, MO 64112

Scott A. Edelman
Milbank, Tweed, Hadley & McCloy
28 Liberty Street
New York, NY 10005

Andrew R. Holland
Sidley Austin
787 Seventh Avenue
New York, NY 10019

For Lockton Affinity, LLC:

William Humphrey
Secretary
Lockton Affinity
444 West 47th Street
Kansas City, MO 64112

Scott A. Edelman
Milbank, Tweed, Hadley & McCloy
28 Liberty Street
New York, NY 10005

Andrew R. Holland
Sidley Austin
787 Seventh Avenue
New York, NY 10019

A-262

**Miscellaneous**

20.     Each provision of this Supplemental Consent Order shall remain effective and enforceable until stayed, modified, suspended, or terminated by the Department.

21.     No promise, assurance, representation, or understanding other than those contained in this Supplemental Consent Order has been made to induce any party to agree to the provisions of the Supplemental Consent Order.

*[remainder of page intentionally left blank]*

A-263

**IN WITNESS WHEREOF**, the parties have caused this Consent Order to be signed this 31st day

of January, 2019.

**LOCKTON COMPANIES, LLC, on**
**behalf of each of its separate operating**
**series,**

By: _____
**WILLIAM HUMPHREY**
Secretary


**LOCKTON AFFINITY, LLC, on**
**behalf of each of its separate operating**
**series,**
By: _____
**WILLIAM HUMPHREY**
Secretary

**NEW YORK STATE DEPARTMENT OF**
**FINANCIAL SERVICES**

By: _____
**MARIA T. VULLO**
**Superintendent of Financial Services**


By: _____
**MATTHEW L. LEVINE**
**Executive Deputy Superintendent for**
**Enforcement**

8

**IN WITNESS WHEREOF**, the parties have caused this Consent Order to be signed this 31st day of January, 2019.

**LOCKTON COMPANIES, LLC, on behalf of each of its separate operating series,**

By: _____
**WILLIAM HUMPHREY**
Secretary

**LOCKTON AFFINITY, LLC, on behalf of each of its separate operating series,**

By: _____
**WILLIAM HUMPHREY**
Secretary

**NEW YORK STATE DEPARTMENT OF FINANCIAL SERVICES**

By: _____
**MARIA T. VULLO**
**Superintendent of Financial Services**

By: _____
**MATTHEW L. LEVINE**
**Executive Deputy Superintendent for Enforcement**

8

A-265

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

NATIONAL RIFLE ASSOCIATION OF
AMERICA,

                  Plaintiff,

    -against-

ANDREW CUOMO, both individually and in his
official capacity; MARIA T. VULLO, both
individually and in her official capacity; and THE
NEW YORK STATE DEPARTMENT OF
FINANCIAL SERVICES,

                Defendants.

18-cv-00566 (TJM/CFH)

**NOTICE OF APPEAL OF THE
GRANT OF PLAINTIFF'S
MOTION TO AMEND AND
MOTION TO DISMISS THE
SECOND AMENDED
COMPLAINT**

      **PLEASE TAKE NOTICE** that pursuant to Federal Rules of Civil Procedure

12(b)(6) and 72(a) and upon the accompanying memorandum of law and all prior papers and

proceedings in this matter, Defendant Maria T. Vullo, by and through her attorneys, Emery Celli

Brinckerhoff & Abady LLP, on July 24, 2020 at 10:00 A.M., at the United States Courthouse for

the Northern District of New York, located at 15 Henry Street, Room 441, Binghamton, New

York, will appeal, pursuant to Rule 72(a), the magistrate judge's grant of Plaintiff's motion to

amend its complaint at Docket No. 202 and will move this Court, pursuant to Rule 12(b)(6),  to

dismiss Plaintiff's Second Amended Complaint as against Defendant Vullo, together with such

other or further relief as may be just.

      **PLEASE TAKE FURTHER NOTICE** that, answering papers, if any, shall be

filed in accordance with Local Rule 7.1 or pursuant to order of the Court.

A-266

Dated: June 23, 2020
       New York, New York

                               EMERY CELLI BRINCKERHOFF
                               & ABADY LLP


                               By:   /s/                     
                                   Andrew G. Celli, Jr.
                                   Debra Greenberger
                                   600 Fifth Ave., 10th Floor
                                   New York, NY 10020
                                   (212) 763-5000

TO:    William A. Brewer III
       Sarah B. Rogers
       BREWER, ATTORNEYS & COUNSELORS
       750 Lexington Avenue, 14th Floor
       New York, New York 10022

       William A. Scott
       Assistant Attorney General
       New York State Attorney General's Office
       Albany Office, The Capitol
       Albany, New York 12224

A-267

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

NATIONAL RIFLE ASSOCIATION OF
AMERICA,

                    Plaintiff,

         v.

ANDREW CUOMO, both individually and in his
official capacity; MARIA T. VULLO, both
individually and in her official capacity; and
THE NEW YORK STATE DEPARTMENT OF
FINANCIAL SERVICES,

                    Defendants.

Case No. 18 Civ. 566 (TJM)(CFH)


**DEFENDANT VULLO'S COMBINED BRIEF IN SUPPORT OF
APPEAL OF THE GRANT OF PLAINTIFF'S MOTION TO AMEND AND
MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**


Emery Celli Brinckerhoff & Abady LLP
600 Fifth Avenue, 10th Floor
New York, New York 10020
(212) 763-5000

*Attorneys for Defendant Maria Vullo*

A-268

TABLE OF CONTENTS

PAGE NO.

TABLE OF AUTHORITIES ...................................................................................iii-vi

PRELIMINARY STATEMENT ................................................................................1

PROCEDURAL HISTORY.......................................................................................4

    I.     THE COURT DISMISSED THE NRA'S SELECTIVE ENFORCEMENT
           CLAIMS AGAINST MS. VULLO LAST MAY ....................................................4

    II.    THE NRA'S SHIFTING BASES FOR AMENDMENT ......................................5

ARGUMENT .............................................................................................................6

    I.     THE MAGISTRATE JUDGE ERRED IN GRANTING AMENDMENT
           WARRANTING REVERSAL UNDER RULE 72(A)..........................................6

           A.    The NRA Did Not Establish Diligence Because It Did Not Present
                 Any Basis to Allege that Ms. Vullo Had the Requisite Knowledge............7

           B.    The NRA Acted in Bad Faith in Seeking Amendment...............................8

           C.    Ms. Vullo Is Prejudiced by This Untimely Amendment ..........................10

    II.    THE COMPLAINT FAILS TO STATE A CLAIM FOR SELECTIVE
           ENFORCEMENT WARRANTING DISMISSAL UNDER RULE 12(B)(6) ......11

           A.    Ms. Vullo Is Absolutely Immune from the NRA's Selective
                 Enforcement Claim ...................................................................................12

                1.    Quasi-Prosecutorial Activity, Including Bringing
                        Enforcement Proceedings and Negotiating Consent Orders,
                        Is Protected By Absolute Immunity.................................................12

                2.    Ms. Vullo Was Engaged in a Function Analogous to That
                        of a Prosecutor When Enforcing New York Law Against
                        Lockton, Lloyd's, and Chubb ........................................................15

            B.    The NRA Has Still Not Alleged that Defendants Had Knowledge of
                 the Purported Insurance Law Violations by the Comparators Before
                 DFS Launched the Carry Guard Investigation.........................................17

                  1.    The NRA Makes No Allegations About Ms. Vullo's
                        Knowledge of the Lockton Affinity Violations Highlighted
                        by the Dismissal Decision..............................................................18

i

2.   The NRA Cannot Allege Similar Violations that DFS
Did Not Prosecute ..........................................................................21

3.   The NRA Has Not Established that Lloyd's Is a Similarly
Situated Comparator ......................................................................21

4.   The NRA's Vague Allegations Do Not Speak to Ms. Vullo's
Knowledge When DFS "Commenced" the Investigation,
as this Court Required....................................................................24

5.   The NRA Cannot Ignore its Obligation to Plead Knowledge
By Making a Conclusory Allegation about "See-No-Evil"...........25

C.   Even if Not Absolutely Immune, Ms. Vullo Has Qualified Immunity......27

1.   It Is Not Clearly Established that an Entity that
Is Not Enforced Against Can Bring a Selective
Enforcement Claim ........................................................................28

2.   It Is Not Clearly Established that a Selective Enforcement
Claim Can Be Based on Purported Comparators
that Only Committed *Less Serious* Violations...............................30

3.   Ms. Vullo's Conduct Was Objectively Reasonable......................32

III.   THE NRA'S FIRST AMENDMENT CLAIM AGAINST MS. VULLO IS
BARRED BY QUALIFIED IMMUNITY.............................................................33

CONCLUSION.................................................................................................................35

A-270

TABLE OF AUTHORITIES

PAGE NO.

**Cases**

*Anderson v. Creighton*,
　483 U.S. 635, 638 (1987) ............................................................................ 28

*Ashcroft v. al-Kidd*,
　563 U.S. 731 (2011) ............................................................................. 27, 30

*Ashcroft v. Iqbal*,
　556 U.S. 662 (2009) ............................................................. 11, 20, 26, 27

*Bell Atl. Corp. v. Twombly*,
　550 U.S. 544 (2007) ..................................................................... 11, 26

*Berg v. Kelly*,
　897 F.3d 99 (2d Cir. 2018) ............................................................... 31

*Bernstein v. Village of Wesley Hills*,
　95 F. Supp. 3d 547 (S.D.N.Y. 2015) ....................................... 25, 26

*Brookhaven Aggregates, Ltd. v. Williams*,
　No. 85–CV–0355, 1985 WL 6062 (E.D.N.Y. July 24, 1985) .......... 13

*Butz v. Economou*,
　438 U.S. 478 (1978) ........................................................... 13, 14, 15

*Casciani v. Nesbitt*,
　659 F. Supp. 2d 427 (W.D.N.Y. 2009) ........................................... 29

*Cine SK8, Inc. v. Town of Henrietta*,
　507 F.3d 778 (2d Cir. 2007) ........................................................... 22

*Council of Ins. Agents & Brokers v. Molasky–Arman*,
　522 F.3d 925 (9th Cir. 2008) ......................................................... 30

*Cresswell v. Sullivan & Cromwell*,
　922 F.2d 60 (1990) ............................................................................ 8

*Davidson v. Culver City*,
　No. CV04–2220, 2004 WL 5361378 (C.D. Cal. July 28, 2004) .......... 29

*Diesel v. Town of Lewisboro*,
　232 F.3d 92 (2d Cir. 2000) ...................................................... 32, 33

*Doe v. Sch. Bd. of Ouachita Parish*,
　274 F.3d 289 (5th Cir. 2001) ....................................................... 30

iii

*Dory v. Ryan*,
  25 F.3d 81 (2d Cir. 1994) ......................................................................... 13, 14

*Douglas v. New York State Adirondack Park Agency*,
  895 F. Supp. 2d 321 (N.D.N.Y. 2012)........................................................... 13

*Goldstein v. Galvin*,
  719 F.3d 16 (1st Cir. 2013).......................................................................... 14

*Hammerhead Enterprises, Inc. v. Brezenoff*,
  707 F.2d 33 (2d Cir. 1983)........................................................................... 34

*Hunter v. Bryant*,
  502 U.S. 224 (1991)...................................................................................... 27

*Imbler v. Pachtman*,
  424 U.S. 409 (1976)................................................................................ 12, 14

*Kamholtz v. Yates Cty.*,
  No. 08-CV-6210, 2008 WL 5114964 (W.D.N.Y. Dec. 3, 2008),
  *aff'd*, 350 F. App'x 589 (2d Cir. 2009) ......................................................... 22

*Kaminsky v. Rosenblum*,
  929 F.2d 922 (2d Cir.1991).......................................................................... 33

*Kassner v. 2nd Ave. Delicatessen Inc.*,
  496 F.3d 229 (2d Cir. 2007)........................................................................... 7

*Knowlton v. Shaw*,
  704 F.3d 1 (1st Cir. 2013)................................................................... 1, 13, 16

*Lash v. City of Union*,
  No. C–3–98–045, 1999 WL 33127974 (S.D. Ohio Sept. 27, 1999)................ 29

*LaTrieste Restaurant v. Village of Port Chester*,
  188 F.3d 65 (2d Cir. 1999)..................................................................... 25, 32

*LeClair v. Saunders*,
  627 F.2d 606 (2d Cir. 1980)......................................................................... 33

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) , *aff'd*, 159 F. App'x 756 (9th Cir.2005.......................... 29

*Mangiafico v. Blumenthal*,
  471 F.3d 391 (2d Cir. 2006)................................................................... 13, 14

*Musso v. Hourigan*,
  836 F.2d 736 (2d Cir. 1988)......................................................................... 33

iv

*New Creation Fellowship of Buffalo v. Town of Cheektowaga, N.Y.*,
    No. 99-CV-460A(F), 2004 WL 1498190 (W.D.N.Y. July 2, 2004),
    *aff'd sub nom. New Creation Fellowship of Buffalo v. Town of Cheektowaga,*
    164 F. App'x 5 (2d Cir. 2005) ...................................................................... 30

*Orgain v. City of Salisbury*,
    521 F. Supp. 2d 465 (D. Md. 2007) ............................................................ 29

*Penthouse Int'l, Ltd. v. Meese*,
    939 F.2d 1011 (D.C. Cir. 1991) .................................................................. 34

*Powers v. Coe*,
    728 F.2d 97 (2d Cir.1984).......................................................................... 17

*Reichle v. Howards*,
    566 U.S. 658 (2012) .................................................................................. 27

*Rindley v. Gallagher*,
    890 F. Supp. 1540 (S.D. Fla. 1995) ............................................................ 14

*Schloss v. Bouse*,
    876 F.2d 287 (2d Cir.1989)........................................................................ 14

*Singleton v. City of New York*,
    632 F.2d 185 (2d Cir. 1980)....................................................................... 30

*Spear v. Town of West Hartford*,
    954 F.2d 63 (2d Cir. 1992).......................................................................... 12

*Taravella v. Town of Wolcott*,
    599 F.3d 129 (2d Cir. 2010)................................................................. 27, 32

*Taylor v. Barkes*,
    575 U.S. 822 (2015) .................................................................................. 27

*Taylor v. Kavanagh*,
    640 F.2d 450 (2d Cir.1981)........................................................................ 17

*U.S. v. Armstrong*,
    517 U.S. 456 (1996) .................................................................................. 26

*Verbeek v. Teller*,
    158 F. Supp. 2d 267 (E.D.N.Y. 2001) ........................................................ 14

*Verdone v. Am. Greenfuels, LLC*,
    No. 3:16-CV-01271 (VAB), 2017 WL 3668596 (D. Conn. Aug. 24, 2017)..................... 7

*Village of Arlington Heights v. Metropolitan Housing Development Corp.*,
    429 U.S. 252 (1977)..................................................................................... 30

*Wandering Dago, Inc. v. Destito*,
    879 F.3d 20 (2d Cir. 2018)................................................................... 12, 21

*Ying Jing Gan v. City of New York*,
    996 F.2d 522 (2d Cir. 1993).......................................................................... 17

**Statutes and Rules**

23 NYCRR § 2.10............................................................................................. 15

23 NYCRR § 2.2(c)........................................................................................... 15

23 NYCRR Part 2............................................................................................. 16

Fed. R. Civ. P. 12(b)(6)......................................................................... 11, 12, 29

Fed. R. Civ. P. 72(a) ......................................................................................... 6, 7

N.Y. Fin. Servs. Law § 305 ......................................................................... 15, 16

N.Y. Fin. Servs. Law § 306 ............................................................................... 16

N.Y. Fin. Servs. Law § 308 ......................................................................... 15, 16

N.Y. Fin. Servs. Law § 404 ............................................................................... 16

N.Y. Fin. Servs. Law § 408 ............................................................................... 16

N.Y. Ins. Law § 2102(g) ................................................................................... 16

N.Y. Ins. Law § 2110 ........................................................................................ 16

N.Y. Ins. Law § 2116 ........................................................................................ 17

N.Y. Ins. Law § 2117(g) ................................................................................... 16

N.Y. Ins. Law § 2127 ........................................................................................ 16

N.Y. Ins. Law § 2212(a)(1)............................................................................... 17

N.Y. Ins. Law § 2324(a) ................................................................................... 17

N.Y. Ins. Law. § 2405(a) .................................................................................. 16

A-274

## PRELIMINARY STATEMENT

The NRA's re-pleaded selective enforcement claim against Maria Vullo, the former Superintendent of the New York State Department of Financial Services, fares no better than the claim this Court dismissed over a year ago.   In May 2019, this Court found that the NRA had failed to allege the facts essential to a claim of selective enforcement, namely, that Ms. Vullo was specifically aware of and knowingly failed to prosecute violations of the Insurance Law similar to those committed by the NRA's business partners, only committed by entities that were *not* involved in firearm-related advocacy.   The NRA's amended complaint suffers from exactly the same deficiency.   And the NRA's selective enforcement claim must be dismissed for a more fundamental reason as well.   The gravamen of this claim are the enforcement decisions that Ms. Vullo made in her quasi-prosecutorial capacity as Superintendent.   For this reason, Ms. Vullo is entitled to absolute prosecutorial immunity.   Her enforcement of the State's insurance and banking laws against entities affiliated with the NRA, and the negotiation of consent orders to resolve those cases without an adversarial hearing, are prosecutorial acts that cannot give rise to personal liability.   *See Knowlton v. Shaw*, 704 F.3d 1 (1st Cir. 2013).

More prosaically, the Second Amended Complaint ("SAC") simply does not state a claim for selective enforcement under this Court's standard.   As Superintendent, Ms. Vullo ran a 1400+ person agency, tasked with regulating tens of thousands of insurance companies and banks doing business throughout the state and enforcing laws and regulations against those who violate the law.   She did not—and could not—be expected to know what every DFS employee knew or about every insurance violation in this massive marketplace.   This Court has appropriately required specific allegations of Ms. Vullo's knowledge of comparator violations to ground a claim alleging a *conscious* decision to selectively not enforce the law.   The NRA has *no greater factual basis now* to bring this claim against Ms. Vullo than it did in the last go-round.

1

A-275

Amending a complaint two years into a litigation should not be treated as a game of pleading legerdemain; the record of the NRAs shifting arguments for late amendment are the picture of gamesmanship.   A cause of action must be grounded in *facts* pleaded in *good faith*, not, as here, suspicions backed by . . . well . . . nothing.   Lacking evidence implicating Ms. Vullo—because none exists—the NRA seeks to obfuscate the SAC's inadequacy behind a veil of broad and unsupported statements.   The selective enforcement standard is a high one: to be viable, a selective enforcement claim must allege facts sufficient to show that the defendant "consciously applied a different standard of enforcement to similarly-situated entities . . . [i.e., that] the defendant was aware of similarly-situated entities, and failed to take comparable action against them."   Dkt. 112 ("Dismissal Decision") at 8.   The NRA does not and cannot meet that standard.

*First*, the NRA still has not alleged knowledge of lawlessness by the only entities this Court held were valid comparators.   In its ruling last year, this Court pointed to paragraph 59 of the First Amended Complaint ("FAC"), and held that three specific instances of Lockton allegedly violating the Insurance Law unrelated to the NRA were "similarly situated "to the NRA-related violations that DFS prosecuted.   But the FAC made no allegation that Ms. Vullo *knew about* these three violations, and that's why the selective enforcement claim was dismissed at that time.   The SAC contains no allegation that Ms. Vullo knew of, and ignored, the paragraph 59 violations involving Lockton.

*Second*, the Complaint does not plead Ms. Vullo's knowledge of *any* unenforced violations by *any* similarly-situated entities—Lockton or otherwise.[1]   It does *not* allege that Ms.

---

[1] In fact, the SAC admits, as it must, that DFS *did* enforce against Lockton's non-NRA violations, and it attaches the consent order so demonstrating.   SAC ¶ 78 and Ex. J.

2

A-276

Vullo knew of any *other* specific unenforced violations by a non-NRA-related entity—and it certainly does not allege that she knew of such conduct on or before October 2017, when DFS launched the Carry Guard investigation, as this Court specifically required.   Instead, the Complaint makes generic—indeed, conclusory—statements about Ms. Vullo's supposed general knowledge of "infractions plaguing the affinity-insurance marketplace."   SAC ¶ 21.   This is not nearly enough.   Absent a detailed pleading of *who* allegedly violated *which* provision of the Insurance Law—and that Ms. Vullo specifically knew about it—the Court cannot determine whether these are fair comparators for a selective enforcement claim—and thus, it cannot uphold the claim for selective enforcement.   The NRA also fails to allege, because it cannot, that Ms. Vullo was equally capable of prosecuting such claims—i.e., that she had the same or similar level of knowledge, evidence, resources, time, etc. about any alleged non-NRA-related violators —which is crucial to determining if an entity is a fair comparator who is similarly situated.[2]

  *Third,* even if the NRA had pleaded a plausible selective enforcement claim that was not barred by absolute immunity, in this case, qualified immunity mandates dismissal.   The NRA's selective enforcement claim is novel at every turn: The NRA is not claiming that DFS selectively enforced against the NRA; it claims selective enforcement against *third parties*—all of whom *admit* the validity of the enforcement in consent orders.   And it is premised on purported comparators that did not commit the most serious violations that undergirded the enforcement— illegal insurance for firearms usage.   There is no Supreme Court or Second Circuit case clearly establishing liability under remotely similar circumstances.   It was objectively reasonable for a

---

[2]  It also bears stating clearly that the NRA's scurrilous allegations about Ms. Vullo are completely false: Ms. Vullo never knew of any other similar violations by comparators that DFS did not prosecute, and, two years into this litigation, not a single document has been produced, and not a single witness has been identified, to say otherwise.   The NRA simply has offered no factual basis for making these allegations— because it does not have one.

A-277

regulator, when *presented* with evidence of serious violations of the Insurance Law by the

Manhattan District Attorney's office, to prosecute those violations and also to address, by way of

the same consent orders, additional Insurance Law violations DFS uncovered, instead of

devoting scarce agency resources to investigating the vast affinity insurance marketplace in

hopes of catching a different fish.   Qualified immunity exists to protect those reasonable

decisions by regulators tasked with enforcing the state's laws.

Qualified immunity also defeats the NRA's First Amendment claims.   As this Court

noted when upholding the NRA's First Amendment claims, courts have drawn a "fine line"

between permissible government speech, which is a crucial part of our democracy, and

impermissible government overstepping.   Qualified immunity exists to protect government

officials who are walking those fine lines.   It is simply not "clearly established," under even

remotely similar facts, that a government official making statements, as the NRA alleges, in the

context of an ongoing prosecution, transforms permissible statements into coercive ones.   The

law just has not recognized such a claim.

The NRA's Second Amended Complaint against Ms. Vullo should be dismissed.

## PROCEDURAL HISTORY

### I.      THE COURT DISMISSED THE NRA'S SELECTIVE ENFORCEMENT CLAIMS AGAINST MS. VULLO LAST MAY

On May 9, 2019, this Court dismissed the NRA's selective enforcement claim against

Ms. Vullo "because the [First] Amended Complaint lacks plausible allegations that Defendants

had knowledge of the purported Insurance Law violations by the comparators."   Dkt. 112 at 8.

Having found that the NRA failed to state a claim, this Court did not reach Defendants' absolute

immunity and qualified immunity arguments.   *Id.* at 11.

The Dismissal Decision allowed the NRA to re-plead its selective enforcement claim, *if* it

4

A-278

could specifically allege that "Vullo knew of non-firearm-related Insurance Law violations by the comparators when DFS commenced its investigation in the NRA's insurance programs, or allege facts plausibly supporting the conclusion that these defendants were aware of such violations by the comparators yet consciously declined to enforce the Insurance Law against the comparators." *Id.*   For months, Plaintiff failed to even attempt to re-plead the claim—until its discovery efforts were limited by the District Court's rulings.

## II.    THE NRA'S SHIFTING BASES FOR AMENDMENT

The NRA's stated basis for amendment has "shifted," repeatedly, since it first sought amendment in November 2019, as the magistrate judge found.   Dkt. 202 at 14.

In a hearing before the magistrate, the NRA's counsel first asserted that "the Lloyd's documents [and] . . . DFS' recent hostilities against yet another NRA-related insurance underwriter" provided a factual basis for amendment—with no explanation about how documents from *Lloyd's* could fit this Court's mandate to allege knowledge of *Lockton's* violations.[3]   Dkt. 145 at 2–3.   In response, Defendants pointed out that the Lloyd's documents—which had been in the NRA's custody for *over five months* by that point—in no way implicated Ms. Vullo, and that the "recent hostilities" long post-dated Ms. Vullo's departure from DFS.   *See* Dkt. 146; Dkt. 147.   When pressed by the magistrate judge, the NRA admitted that the organization "couldn't just amend on the basis of the documents [from Lloyd's] themselves" and that the NRA was "not able" "to get that information [about whether Ms. Vullo has knowledge about any competitors' violations] from Lloyd's."   Dkt. 164-2 at 5, 14–15.

---

[3] "Lloyd's" is used in this brief to refer to Lloyd's of London, its United States affiliate, Lloyd's America, Inc., and the Lloyd's syndicates who were parties to the DFS consent order.

A-279

Stymied in their effort to pin a new selective enforcement claim on the Lloyd's documents, the NRA shifted gears, and asserted, for the first time, that it had obtained new, allegedly incriminating information about Ms. Vullo through "investigative efforts from non-parties," which it also described as a "consulting individual." *Id.*  Yet the NRA refused to identify its "consultant" either in the conference or in response to Ms. Vullo's specific interrogatory. *Id.* at 14; Dkt. 164-3 at 2–3.   To date, the NRA has not named *any person* with personal knowledge—of either the percipient or the hearsay variety—of *any* of the allegations in support of its selective enforcement claim.

In its formal motion to amend, the NRA asserted that an additional basis for its assertion that Ms. Vullo "knew," Dkt. 112 at 8, was the word of "a consulting expert [the NRA retained] to assist in interpreting the Lloyd's documents," Dkt. 155 at 7.   In the vaguest terms that one can conjure, the NRA also claimed that it had "engaged in additional investigative work to uncover the factual allegations in the Second Amended Complaint regarding Vullo's knowledge." *Id.* It did not detail what this investigative work entailed, who the "consulting expert" was, or what his or her factual basis was for (falsely) alleging that Ms. Vullo knew about and had failed to act on other similar violations.

After Magistrate Judge Hummel granted amendment on June 1, 2020, the NRA filed its Second Amended Complaint on June 2, 2020.   This motion followed.

## ARGUMENT

### I.    THE MAGISTRATE JUDGE ERRED IN GRANTING AMENDMENT WARRANTING REVERSAL UNDER RULE 72(A)

Judge Hummel correctly found that the NRA had not acted diligently in seeking amendment, finding that the NRA has "presented shifting reasons as the basis for its Motion to Amend" and stating that he "is not without concern" about the NRA's "varied" bases for

amendment.   Dkt. 202 at 13–14.   Nonetheless, he permitted the NRA to amend.   He held that Defendants had failed to demonstrate the NRA's "bad faith." *Id.*

Judge Hummel's grant of amendment was clearly erroneous for two reasons: *first*, he committed legal error in finding that he could not consider documents attached to the proposed Complaint—documents that, on their face, failed to support the very allegations that the NRA sought belatedly to add; and, *second*, he erroneously required Defendants to prove the NRA's bad faith, instead of requiring the NRA to prove its absence.   *See* Fed. R. Civ. P. 72(a).   This Court should reverse.

### A.    The NRA Did Not Establish Diligence Because It Did Not Present Any Basis to Allege that Ms. Vullo Had the Requisite Knowledge

It wasn't until ten months after the deadline set by the Court's scheduling order—and more than a year-and-a-half into the litigation—that the NRA sought to amend its complaint for the second time.   Accordingly, by rule, it needed to satisfy Rule 16's exacting "good cause" standard, as Judge Hummel recognized.   Dkt. 202 at 4 (citing cases).   The "primary consideration" in determining "good cause" is "whether the moving party can demonstrate diligence," *Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 244 (2d Cir. 2007), "based on information that the party knew, or should have known," *Verdone v. Am. Greenfuels, LLC*, No. 3:16-CV-01271 (VAB), 2017 WL 3668596, at *2 (D. Conn. Aug. 24, 2017) (internal quotation marks omitted).   Here, the NRA, as moving party, bears the burden of showing diligence.   *Id.*

Judge Hummel correctly held that "plaintiff has not shown that it acted with due diligence," in "obtaining or 'interpreting' the information upon which it now purports to rely in seeking to replead."   Dkt. 202 at 13.   For over five months after the Dismissal Decision, the NRA sat on its hands and did nothing to re-assert a selective prosecution claim.   Then, when it belatedly did seek amendment, the NRA provided only a *single sentence* describing its ostensible

A-281

basis for amendment without offering *any* evidence of its diligence.   The sum-total of the NRA's stated basis to amend was: (i) documents the NRA obtained from Lloyd's in June 2019; (ii) a "consulting expert" who "interpret[ed]" those documents in an unspecified timeframe; and (iii) unspecified "additional investigative work" the NRA did.   Dkt. 155 at 7.   No details of the NRA's "diligence" were provided in the NRA's moving or reply brief.   *Id.*; Dkt. 169 at 3–4. Moreover, the NRA has no documents that provide a basis to amend; it has identified no witnesses who can support its latest allegations.   And the NRA has never claimed that it obtained a basis to allege knowledge of *Lockton's* violations, as the Dismissal Decision required.

Judge Hummel appropriately concluded that the NRA did not meet its burden to affirmatively demonstrate diligence because the Lloyd's documents were in the NRA's possession five months before it surfaced the proposed amendment and the NRA provided absolutely no detail to support its other two purported bases—the "consulting expert" and the "investigation" that the NRA references.

### B.    The NRA Acted in Bad Faith in Seeking Amendment

But Judge Hummel permitted amendment nevertheless, holding that Defendants had not "demonstrate[d] that plaintiff's delay was done in bad faith."   Dkt. 202 at 14.   But, under Rule 16, it was Plaintiff's burden to establish an absence of bad faith, not Defendant's burden to prove the opposite.   *See Cresswell v. Sullivan & Cromwell*, 922 F.2d 60, 72 (1990) ("The burden is on the party who wishes to amend to provide a satisfactory explanation for the delay.").   Judge Hummel's ruling to the contrary is legally erroneous.

Moreover, the NRA cannot prove the absence of bad faith as a matter of *fact*.   Not only did the NRA "present[] shifting reasons as the basis for its Motion to Amend," as Judge Hummel found—itself evidence of bad faith.   Dkt. 202 at 14.   But, none of the NRA's three stated bases for amendment—the Lloyd's documents, the mysterious "consulting expert," or so-called

8

"investigative work"—provide *any* factual basis to support the new allegations against Ms.

Vullo.   The Lloyd's documents make no reference to Ms. Vullo *or to any non-prosecuted*

*violations by comparators at all*.   *See* Dkt. 154-7–154-9 (hereinafter "Sealed Exs. B, C, and D").

Although the NRA had attached those documents as exhibits to its proposed SAC, so they are "a

part of the pleading for all purposes" under Rule 10(c), Judge Hummel did not review these

documents.   Dkt. 202 at 18.   This too was error.   *See* Sealed Exs. B, C, and D; *see also* Dkt.

203-8–203-10 (same sealed exhibits attached to filed SAC).   Had Judge Hummel reviewed these

documents, he would have seen that, on their face, they fail to support the allegations that the

NRA sought belatedly to add.   They would surely have given him even more "concern" about

the NRA's basis to amend.   Dkt. 202 at 14.

The Lloyd's documents do not mention Maria Vullo—much less her state of mind—at

all.   The NRA itself admitted that it obtained *no* "information from Lloyd's" to make allegations

about Ms. Vullo's knowledge.   Dkt. 164-2 at 5–6, 14–15.   The NRA admits that the "consulting

expert" it relies on—who it refuses to name—only "*interpret[ed]* the Lloyd's documents."   Dkt.

155 at 7 (emphasis added).   A witness who "interprets" documents does not have personal

knowledge.   There is no way to "interpret" the Lloyd's documents to claim that Ms. Vullo made

statements evidencing knowledge of comparators—because the documents do not even mention

Ms. Vullo *at all*.   Sealed Exs. B, C, and D.   It beggars the imagination how a stranger could

"interpret documents" to determine what was in Ms. Vullo's *mind* at any point.

That leaves only the NRA's unspecified "additional investigative work."   Dkt. 155 at 7.

But, other than those three words, the NRA provided absolutely no information about what the

"work" was, how it provided a basis to amend, how it claims to relate to Ms. Vullo's purported

knowledge, or, critically, *when* the investigation occurred.   The NRA cannot meet its burden

with empty words.   How can an "investigation" that apparently did not involve a single

9

A-283

percipient witness provide a basis for making allegations about a defendant's knowledge and statements?   Why has the NRA's basis for amendment repeatedly changed?   The NRA offers answers to none of these questions.

The NRAs shifting rationales and empty statements are, in the end, the very definition of "bad faith."   And a look at the *timing* of the motion reinforces that conclusion.   For months after it obtained the Lloyd's documents in early June 2019, the NRA sat on its hands.   Then Judge Hummel, on August 8, 2019, denied several of the NRA's discovery demands because their relevance rested upon a selective enforcement claim that this Court had dismissed.   Dkt. 121.   Upset by that decision, the NRA promptly appealed the discovery ruling to this Court. When the NRA moved to amend its complaint in November 2019, the NRA knew it was at risk of having its then-pending appeal denied—a ruling which would have cut off the broad discovery it had sought to support its fishing expedition for evidence of selective enforcement.   So the NRA gambled, filing a motion to amend, not because it believed it had a basis to make fresh allegations—it didn't—but to buttress its claim to wide-ranging discovery.

This is the very essence of bad faith.

The NRA should not be permitted to revive a baseless selective enforcement claim— despite the NRA's lack of witnesses or documentary support for its false allegations—when it has demonstrated *no factual basis whatsoever* for amendment, has failed to demonstrate that it acted with diligence, and where there is ample evidence of the NRA's bad faith.

### C.    Ms. Vullo Is Prejudiced by This Untimely Amendment

Years into this case, the NRA still has no evidence to support its claims; instead, it propounds an amended complaint that provides no specific allegations of comparators and is rife with falsehoods.   Ms. Vullo is prejudiced by additional unnecessary motion practice that further delays resolution of this case—a case concerning her time as a public servant which ended 17

10

months ago.   She is prejudiced by permitting the NRA to make claims based on false allegations the NRA has no basis to make.   She is prejudiced by permitting a selective prosecution claim that has no basis in fact or law.   She is prejudiced by the ongoing harm that flows from this baseless lawsuit, and the additional baseless and scurrilous allegations in the amended complaint.

## II.     THE COMPLAINT FAILS TO STATE A CLAIM FOR SELECTIVE ENFORCEMENT WARRANTING DISMISSAL UNDER RULE 12(B)(6)

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."   *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see* Fed. R. Civ. P. 12(b)(6).   A claim will only have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."   *Id.*   "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief."   *Id.* (internal quotations omitted). "Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."   *Id.* at 679.   "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements . . . are not entitled to the assumption of truth."   *Id.*; *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (a court is "not bound to accept as true a legal conclusion couched as a factual allegation").

A plaintiff alleging a selective enforcement claim must demonstrate that: (1) "[it] was treated differently from other similarly situated businesses;" and (2) "such differential treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the

11

A-285

exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 40 (2d Cir. 2018) (internal quotation marks omitted).[4]

### A.   Ms. Vullo Is Absolutely Immune from the NRA's Selective Enforcement Claim

As Superintendent of DFS, Ms. Vullo was charged with enforcing the State's banking and insurance laws.   Her function was akin to that of a prosecutor: bringing charges, attempting to negotiate resolutions (i.e. the Consent Orders), and preparing for trial (DFS hearings) before an adjudicator if a negotiated resolution is not reached.   Because Ms. Vullo's function in enforcing the state's insurance laws against Lockton, Lloyd's, and Chubb was prosecutorial in nature, she is entitled to absolute immunity.   Absolute immunity protects from review a target's displeasure about *how* a prosecutor exercised her prosecutorial power and, specifically, who she chose to charge and not charge.   "[A]bsolute immunity defeats a suit at the outset." *Imbler v. Pachtman*, 424 U.S. 409, 419 (1976).   Count three should be dismissed.

### 1.   Quasi-Prosecutorial Activity, Including Bringing Enforcement Proceedings and Negotiating Consent Orders, Is Protected By Absolute Immunity

It is well established that an executive official who initiates and brings administrative enforcement proceedings as part of her prosecutorial function is afforded absolute immunity from suit based on those proceedings.   *Spear v. Town of West Hartford*, 954 F.2d 63, 66 (2d Cir. 1992).   Absolute immunity protects executive officials engaged in the enforcement of statutes— and prosecution of violations—within their legally prescribed mandate, regardless of any administrative work that is also part of the official's role.   *Butz v. Economou*, 438 U.S. 478, 515

---

[4] While Judge Hummel considered some of these arguments in his grant of the motion to amend under the frame of "futility," Ms. Vullo is not appealing those portions of his decision and is instead moving before this Court, in the first instance, under Rule 12(b)(6).

(1978) (absolute immunity applies to administrative officials who are "performing certain

functions analogous to those of a prosecutor"); *Buckley v. Fitzsimmons*, 509 U.S. 259, 269

(1993) (absolute immunity based on "the nature of the function performed, not the identity of the

actor who performed it"); *Dory v. Ryan*, 25 F.3d 81, 83 (2d Cir. 1994) (same).

Courts have repeatedly held that officials who instigate and bring administrative

enforcement proceedings in a manner analogous to prosecutors receive absolute immunity.  *See*

*Mangiafico v. Blumenthal*, 471 F.3d 391, 395–96 (2d Cir. 2006) ("[A]gency officials who

perform functions analogous to those of a prosecutor are entitled to absolute immunity from such

liability for their participation in the decision to initiate or to continue agency proceedings."

(citing *Butz*, 438 U.S. at 512–13 (1978)).

*Knowlton v. Shaw*, 704 F.3d 1, 3-4, 9 (1st Cir. 2013) is squarely on point.   There, the

First Circuit held, on a motion to dismiss, that absolute immunity protected a state insurance

regulator's enforcement of insurance law.   The Maine insurance regulator investigated an

insurance company's improper marketing tactics and entered into a consent order requiring the

termination of Mr. Knowlton, a branch manager.   The Court *rejected* Knowlton's claim that

"negotiating and executing the consent agreements to resolve the civil violations" was

investigative conduct, holding that absolute immunity applies because the "state officials took

these actions in preparing for the initiation of the enforcement proceeding—a proceeding that

would have surely followed had no consent agreement been executed."   *Id.* at 6; *see also*

*Douglas v. New York State Adirondack Park Agency*, 895 F. Supp. 2d 321, 340 (N.D.N.Y. 2012)

(absolute immunity for park agency officials' initiation of an agency enforcement proceeding);

*Brookhaven Aggregates, Ltd. v. Williams,* No. 85–CV–0355, 1985 WL 6062, at *2–4 (E.D.N.Y.

July 24, 1985) (absolute immunity for a New York state park agency commissioner's issuance of

13

A-287

an order of suspension); *Rindley v. Gallagher*, 890 F. Supp. 1540, 1554 (S.D. Fla. 1995) (absolute immunity for state dental industry regulators' imposition of discipline on a dentist).

Absolute prosecutorial immunity encompasses *"*actions preliminary to the initiation of a prosecution," as well as the decision to initiate a proceeding or, conversely, decline to bring a proceedings.  *Mangiafico*, 471 F.3d at 396; *see Butz*, 438 U.S. at 516 (absolute immunity encompasses "decision to initiate or continue a proceeding subject to agency adjudication"); *Schloss v. Bouse*, 876 F.2d 287, 290 (2d Cir.1989) (absolute immunity protects against "suit for not prosecuting"); *Goldstein v. Galvin*, 719 F.3d 16, 26 (1st Cir. 2013) (state official's statutory mandate to "determine whether grounds exist to believe that any person has violated" certain statutory provisions, when part of "acts that collectively comprise the pursuit of an enforcement action[,] fit snugly within the realm of prosecutorial functions").

Because the focus of absolute immunity is on the function being performed, and not the identity or motivations of the actor, once absolute immunity is established, the Court does not consider allegations of ill intent or discriminatory enforcement.  *Dory*, 25 F.3d at 84 (absolute immunity applies "regardless of motivation"); *see also Verbeek v. Teller*, 158 F. Supp. 2d 267, 282 (E.D.N.Y. 2001) (granting motion to dismiss claims against prosecutorial official because conspiracy allegation does not "negate her entitlement to absolute immunity").

*Butz* identified a host of non-exhaustive characteristics to guide a court's determination that administrative enforcement is entitled to absolute immunity, and no one factor controls. *See Butz*, 438 U.S. at 515 (describing the factors).  Here, those factors compel a finding of absolute immunity.  The targets of a DFS enforcement action—banks and insurance companies—are well resourced and inclined to bring suit; without the protection absolute immunity affords, a DFS superintendent's "discretion" in initiating "proceedings might be distorted" due to litigation for purposes of "harassment or intimidation."  *Id.*; *see also Imbler*,

14

424 U.S. at 438 (White, J. concurring) (absolute immunity particularly necessary to protect against "vexatious suit" "where powerful men are involved").   The DFS proceeding process is an "adversary[ial] process" with ample "safeguards": an impartial hearing officer who has not been involved in the investigation holds an adversarial evidentiary hearing; a charged entity can be represented by counsel, present evidence, and cross-examine witnesses in that adversarial hearing; and, if the charged party is displeased with the results of that hearing, there is an opportunity for "correctability of error on appeal," through a challenge in state supreme court. *Butz*, 438 U.S. at 512; *see* N.Y. Fin. Servs. Law §§ 305, 308; 23 NYCRR § 2.10; 23 NYCRR § 2.2(c).

Absolute prosecutorial immunity serves crucial policy goals.   The "public prosecutor, in deciding whether a particular prosecution shall be instituted or followed up," should not be "biased with the fear of being harassed by a vicious suit for acting according to their consciences (the danger of which might easily be insinuated where powerful men are warmly engaged in a cause and thoroughly prepossessed of the justice of the side which they espouse)."   *Butz*, 438 U.S. at 510–11.   "The loser in one forum will frequently seek another, charging the participants in the first with unconstitutional animus."   So too here.   Ms. Vullo is being "harassed by a vicious suit," brought by a "powerful" adversary charging "unconstitutional animus."   *Id* at 512. DFS entered into consent orders with a wealth of powerful banks and insurance companies under Ms. Vullo's watch; absolute immunity is necessary to protect DFS's critical work from disgruntled adversaries.

> **2.    Ms. Vullo Was Engaged in a Function Analogous to That of a Prosecutor When Enforcing New York Law Against Lockton, Lloyd's, and Chubb**

As the head of the agency tasked with bringing administrative enforcement proceedings against regulated entities doing business in New York, the Superintendent of DFS is responsible

15

for the enforcement of the New York Financial Services Law, Banking Law, and Insurance Law. The DFS Superintendent, "in the enforcement of relevant statutes and regulations, may undertake an investigation" into activities that may constitute violations of, *inter alia*, the Financial Services Law, N.Y. Fin. Servs. Law § 404, and/or the Insurance Law. N.Y. Ins. Law. § 308.   If a violation is found, the Superintendent is authorized to bring a statement of charges and initiate a hearing.   N.Y. Ins. Law. § 2405(a); N.Y. Fin. Servs. Law §§ 305, 306.   The Superintendent presents evidence of a violation of any of these laws at an administrative hearing in which the alleged violator is given an opportunity to be heard.   23 NYCRR Part 2; N.Y. Fin. Servs. Law § 305.   Where the hearing officer finds that a violation has occurred, the Superintendent may impose civil penalties and other remedies.   *See* N.Y. Ins. Law §§ 2102(g), 2110, 2117(g), 2127; N.Y. Fin. Servs. Law § 408.

These statutory responsibilities are directly analogous to those of a prosecutor.   Pursuant to this mandate, the Superintendent determines if there has been a violation under New York law, negotiates potential resolutions, and brings potential charges before an adjudicator.   *See Knowlton*, 704 F.3d at 6 (holding that state insurance regulators engaged in prosecutorial conduct as part of their "duty and authority to enforce Maine's insurance laws").

Here, DFS enforced against Lockton, Lloyd's, and Chubb for their violations of New York Insurance Law.   After months of review, DFS—and Ms. Vullo, per standard DFS practice—entered into the Consent Orders with these entities for violations of various provisions of the Insurance Law.   The entities agreed to pay civil monetary penalties and withdraw their illegal products from the insurance marketplace.   A Consent Order is analogous to a guilty plea in the criminal context, and the decision whether to enter into one from the government side is like that of a prosecutor in offering a plea.   *See Taylor v. Kavanagh,* 640 F.2d 450, 453 (2d

16

A-290

Cir.1981) (absolute immunity for negotiating a guilty plea); *Powers v. Coe,* 728 F.2d 97, 103–04 (2d Cir.1984) (absolute immunity for entering an agreement not to prosecute).

The NRA's selective enforcement claim is premised on two prosecutorial actions, not investigative conduct:   First, the decision to enter into the Lockton, Lloyd's and Chubb Consent Orders—and their precise terms.   *See* Dkt. 56 at 35 (plaintiff's selective enforcement claim is premised on the consent orders' terms "prohibiting Lockton and Chubb from engaging in lawful insurance business with the NRA").   The NRA's purported comparators are based on the violations agreed to in those Consent Orders.   Were it not for those Consent Orders, the NRA could not even *allege* harm from Ms. Vullo's conduct.   Second, the alleged (conclusorily pleaded) decision *not* to bring charges against those so-called comparators.   But the decision *not* to prosecute is equally immunized.   *See Ying Jing Gan v. City of New York*, 996 F.2d 522, 531 (2d Cir. 1993) ("whether or not to institute a prosecution" is "plainly" absolutely immune).

Because Ms. Vullo's decisions to enforce against Lockton, Lloyd's, and Chubb and enter in the Consent Orders and allegedly not enforce against comparators were pursuant to her prosecutorial powers as Superintendent, she is entitled to absolute immunity.

**B.      The NRA Has Still Not Alleged that Defendants Had Knowledge of the Purported Insurance Law Violations by the Comparators Before DFS Launched the Carry Guard Investigation**

The NRA still cannot allege that "Supt. Vullo had knowledge of the specific violations identified in paragraph 59 of the Amended Complaint," as this Court required.   Dkt. 112 at 9. Paragraph 59 made *specific* allegations about Lockton's violations of three specified provisions of the Insurance Law—¶¶ 2212(a)(1), 2324(a), and 2116 (collectively the "Additional Provisions")—violations that DFS allegedly has not prosecuted: (1) referring to the "insurer's AM Best rating" for the affinity programs for the American Optometric Association ("AOAExcel"), the Veterans of Foreign Wars ("VFW"), and Moose, (2) offering to give no-cost

17

insurance to members of the Professional Photographers of America ("PPA") and the VFW, and (3) paying AOAExcel, Moose, VFW, and PPA based on actual premiums collected.   The Court held, at the pleading stage, that these comparator organizations were "similarly situated" to the NRA "at least to the extent they all maintained affinity insurance programs that violate certain non-firearm-related Insurance Law regulations."   Dkt. 112 at 7.[5]   This Court dismissed the selective enforcement claim because there was no allegation that Ms. Vullo knew about these comparator violations and consciously declined to prosecute them.   *Id.*

          **1.**      **The NRA Makes No Allegations About Ms. Vullo's Knowledge of the Lockton Affinity Violations Highlighted by the Dismissal Decision**

The Second Amended Complaint does not allege that Ms. Vullo knew of the Lockton-related violations that this Court held might serve as valid comparators.   There is no evidence— zero—that she did.   In an effort to fill this yawning gap in their pleadings, the NRA makes three related factual assertions, and none reference the affinity groups that this Court held were appropriate comparators to the violations in the Lockton consent order.[6]   They are as follows:

- ¶ 21: "For example, beginning in February 2018, Vullo met personally with executives of regulated institutions, including Lloyd's.[17]   Vullo met with, and threatened, executives of Lloyd's of London ('Lloyd's' and its United States affiliate, Lloyd's America, Inc, ('LAI').)   During the meetings she discussed an array of technical regulatory infractions plaguing the affinity-

---

[5]   While the Court held that "non-firearm-related Insurance Law violations" are the appropriate comparator, Ms. Vullo maintains that the appropriate comparison is with other illegal firearm-related policies, as those are serious violations concerning the sale of an illegal insurance product that created a moral hazard risk and thus cannot be sold in New York, in contrast with the less serious "add on" violations in the Lockton consent order (e.g., improperly marketing an insurer's rating for the legal insurance AOAExcel sold, *see* SAC ¶ 59).   The NRA has never claimed that there is a comparator to the illegal insurance product for the use of a firearm beyond the reasonable use of force.   At a minimum, as detailed below, there is no law clearly establishing that a plaintiff can focus on only a subset of violations to fashion a comparator.   *See infra* Section II.C.2.

[6]   In the prior amended complaint, Plaintiff's comparator violations focused on the Lockton consent order's violations related to commissions, free membership, and advertisements.   The Lloyd's consent order, however, does not contain those same violations.   This is because Lockton is a broker and Lloyd's is an insurance carrier, and insurance law responsibilities differ as to each.

18

A-292

insurance marketplace. Vullo made it clear, however, that DFS was less interested in pursuing the infractions of which she spoke, so long as Lloyd's ceased providing insurance to gun groups, especially the NRA."

- ¶ 67: "In the aftermath of the Parkland tragedy, Vullo met with senior executives of Lloyd's and LAI, and presented Defendants' views on gun control and their desire to leverage their powers to combat the availability of firearms, including specifically by weakening the NRA. These backchannel meetings began on or about February 27, 2018, in the wake of a speech by Vullo at a breakfast meeting of the New York City Bar Association; participants included Vullo herself, along with Joseph Gunset of LAI."

- ¶ 69: "Vullo and DFS made clear that Lloyd's could avoid liability for infractions relating to other, similarly situated insurance policies, so long as it aided DFS's campaign against gun groups."

These allegations do not speak of Lockton's violations at all; they speak to the conduct of *Lloyd's*.[7]   As the magistrate judge found, the NRA added only "one paragraph" about Ms. Vullo's knowledge.   Dkt. 202 at 21 (citing SAC ¶ 110: count three's allegation regarding allegation conversation with *Lloyd's*).   The SAC simply does not allege that Ms. Vullo knew of *any* of the specific violations by the Lockton "comparators" identified by the Court, as detailed in paragraph 59.   Dkt. 112 at 11.   The NRA is attempting a "bait and switch" on its selective enforcement claim.

Recognizing that it has virtually nothing to allege about Lockton or Ms. Vullo specifically, the NRA aims to distract the reader with allegations that either are conclusory and vague or simply do not answer the key question on a claim for selective enforcement, which is whether "Vullo knew of non-firearm-related Insurance Law violations by the comparators when

---

[7] We note that each of these allegations is emphatically false and the NRA has no basis to make these allegations.   Ms. Vullo ardently denies these allegations.

19

DFS commenced its investigation in the NRA's insurance programs."   *Id*.   To begin, it is

notable, as the magistrate judge held, that the SAC's allegations of "knowledge" are vague and

non-specific—they speak only of "*Defendants*" or "*DFS*" *generally* having had "knowledge,"

but never allege that about Ms. Vullo *specifically*: ¶¶ 22 ("Defendants were fully aware"), 65

("Defendants became aware"), 66 ("they knew"), 76 ("DFS also became specifically cognizant";

"DFS verbally conveyed"), 77 ("provided a report to DFS"), 78 ("DFS already knew"), 79

("DFS recently subpoenaed"); Dkt. 202 at 21 (complaint has "only one paragraph" about Vullo's

knowledge).

Instead, the NRA hangs its hat on generic allegations that Ms. Vullo had general

knowledge of infractions "plaguing the affinity-insurance marketplace."   SAC ¶ 21.   Such

conclusory allegations are not enough, as this Court already held, *see* Dkt. 112 at 9 ("conclusory

statements of Defendants' scienter," "naked assertions" and "formulaic recitations," do not

suffice).   Indeed, some of these allegations involve events that occurred *after* Ms. Vullo's

departure from DFS—and thus they are irrelevant under *any* reading.   *See, e.g.*, SAC ¶ 79.[8]

Ms. Vullo ran a 1,400+ person agency with oversight over New York's immense

insurance (and banking) industry.   She did not, and could not, know about every possible law

violation in the industry or all the activity the agency may have been involved in on a daily basis.

The NRA cannot plausibly allege that she did.   *See Iqbal,* 556 U.S. at 680–81 (holding

insufficient allegations that Attorney General Ashcroft "knew of" and "was the 'principal

architect' of this invidious policy, and that Mueller was 'instrumental' in adopting and executing

---

[8] In the "Claims" section at the end of the SAC, the NRA relies on boilerplate language to plead its
selective enforcement claim.   SAC ¶¶ 110-12 (claiming that Ms. Vullo "was aware" that "other identical
(or at least similar in all material respects) affinity-insurance programs had the same legal infirmities").
Such "naked assertions devoid of further factual enforcement" are "conclusory statements" which are
entitled to no weight.   Dkt. 112 at 9 (quotations omitted).

it," as these were "formulaic" "bare assertions" (internal citations omitted)).   Even ascribing to

her some form of "general knowledge" of the industry (if that even exists and is provable) is not

sufficient to allege the specific knowledge required for a selective enforcement claim, much less

a "conscious decision" on her part not to prosecute certain violations.

### 2.   The NRA Cannot Allege Similar Violations that DFS Did Not Prosecute

Not only does the NRA not identify a specific violation that Ms. Vullo knew about and

ignored, *it admits* that DFS *did* enforce against similar (non-firearms) violations unconnected to

the NRA.   The Complaint admits that DFS investigated Lockton's NRA *and* non-NRA

violations of the rules governing affinity insurance.   SAC ¶ 78.   Under Ms. Vullo's tenure, DFS

then entered into a Supplemental Consent Order with Lockton in January 2019 (Ex. J to the

SAC) to remedy its violations for affinity programs Lockton brokered that were wholly unrelated

to the NRA.   *Id.*; *see also* Rule 10(c) (exhibits are part of pleadings for all purposes).[9]   The

NRA's selective enforcement claim is disproved by its own pleadings.

### 3.   The NRA Has Not Established that Lloyd's Is a Similarly Situated Comparator

This Court found that the NRA had demonstrated that the specific paragraph 59 affiliate

program violations (connected to Lockton Affinity) were a fair comparator, but, as detailed

above, the NRA's new allegations about Ms. Vullo's purported knowledge of violations concern

violations by Lloyd's, *not* Lockton.   Accordingly, the NRA has not sufficiently pleaded that the

(alleged) non-enforcement concerned entities that were "similarly situated."   *Wandering Dago*,

879 F.3d at 40 (internal quotations omitted).   "[T]he level of similarity between plaintiffs and

---

[9] Ms. Vullo is entitled to absolute immunity as against the NRA's challenge (SAC ¶ 78) to the *terms* of the Supplemental Consent Order.   *See supra* II.A.

21

the persons with whom they compare themselves must be extremely high."   *Kamholtz v. Yates Cty.*, No. 08-CV-6210, 2008 WL 5114964, at *5 (W.D.N.Y. Dec. 3, 2008), *aff'd*, 350 F. App'x 589 (2d Cir. 2009); *see also Cine SK8, Inc. v. Town of Henrietta*, 507 F.3d 778, 791 (2d Cir. 2007) (dismissing selective enforcement claim where the purported comparators did not have the same permit as plaintiff and did not suffer from similar "overcrowding" issues as plaintiff).

The distinction between Lloyd's and Lockton is material.   The NRA's selective enforcement claim is based only on violations of the Additional Provisions—*non-firearms* related violations of the insurance laws relating to commissions, free membership, and advertisements.   But DFS did not enforce against Lloyd's for such violations; the *only* violations in the Lloyd's consent order are for selling a firearms insurance policy that contained provisions that are illegal under New York law.   SAC Ex. I ¶ 16-17.   Put another way, the NRA itself admits that *no entity similarly situated to Lloyd's was not enforced against*.   This is consistent with the entities' differing role: Lockton is an insurance *broker*, which administered the affinity program, marketed the product, and collected the premiums; Lockton, therefore, was responsible for the violations of the Additional Provisions.   In contrast, Lloyd's is an excess lines insurance *carrier* that underwrote the insurance policies.   As a result, the violations in the Lloyd's consent order relate to the illegal insurance policy provisions, and not the Additional Provisions.   Given this, there is no viable selective-enforcement claim as to Lloyd's under the NRA's own theory.

Moreover, the NRA's three Vullo-related allegations concerning Lloyd's are so vague as to be meaningless.   Unlike the Lockton-related violations described in paragraph 59, these new allegations do not describe specific provisions of the Insurance Law, or specific product offerings, or specific affiliate relationships.   The NRA merely alleges that Ms. Vullo discussed "an array of technical regulatory infractions plaguing the affinity-insurance marketplace" and refers generally to "infractions relating to other, similarly situated insurance policies."   SAC ¶¶

22

21, 69; *see also* SAC ¶¶ 110 (referring to that alleged discussion).   There is no factual allegation about what these "other infractions" were, and none about what the "other, similarly situated insurance policies" might be.   Plainly, such loose and non-specific allegations cannot ground a selective prosecution claim.   Were it otherwise, a police officer who was told *generally* that speeding is "plaguing" the New York State Thruway could be accused of selective enforcement for pulling over any specific speeder caught by his radar gun.

These paragraphs are in marked contrast to the specifics in paragraph 59 which this Court relied on in determining that the Lockton affiliate programs were valid comparators.   Without an allegation that Ms. Vullo knew about *a specific violation*, *by a specific violator*, the Court cannot even begin to assess whether those violators are "similarly-situated entities."   Dkt. 112 at 8. The NRA's claim that the other policies are "similarly situated" are "[m]ere labels and conclusions" and "naked assertions" which are entitled to no weight.   *Id.* at 9.

The unspecified lawbreakers in "the affinity marketplace" are not similarly situated for a second, independent reason: just as the police officer will pursue the speeder who is in front of him and picked up on his radar gun, regulators with limited resources will pursue lawbreakers when the evidence of law-breaking is available or presented to it.   A lawbreaker who has not yet been identified, for whom documents probative of a violation have not made their way into the enforcement agency's hands, and who has not yet been investigated, is *not* "similarly situated" to one whose legal violations were brought to DFS for investigation.   That is the situation here. Here, the Manhattan DA's Office brought evidence of serious violations by the Carry Guard program to DFS's attention, and DFS pursued them.   *See* SAC ¶¶ 34–35 (alleging Manhattan DA's office met with DFS to launch investigation into "compliance infirmities with Carry Guard"); *id.* ¶ 65 (alleging DFS's investigation relied on "research supplied by Everytown").

23

A-297

The Carry Guard investigation produced evidence of other insurance law violations, including violations of the Additional Provisions.   DFS followed the evidence where it took it, prosecuting Lockton's violation of the Additional Provisions in brokering the NRA's insurance products *and,* as the SAC admits, enforcing against violations of the Additional Provisions *unrelated* to the NRA.   *See* SAC ¶ 78.   No conscientious law enforcer would ignore evidence of wrongdoing as the NRA asks this Court to hold; when law enforcement searching for a murder weapon finds a stolen bike, they properly charge the suspect with both murder and robbery.   *See infra* Section II.C.2 (law is not clearly established that less serious violations are fair comparators).   Here, there is no evidence that Ms. Vullo had evidence of either the "stolen bike," or the "murder," except as to the entities she actually enforced against.

This Court provided the NRA with a clear roadmap of how it should seek to amend, *if* it had the factual basis to do so.   Because the NRA's allegations do not meet the specific standard for what is necessary to bring a selective enforcement claim against a high-level official under the law of this case, its selective enforcement claims must be dismissed.

4.   **The NRA's Vague Allegations Do Not Speak to Ms. Vullo's Knowledge When DFS "Commenced" the Investigation, as this Court Required**

The NRA also did not comply with the *timing* requirement set forth in this Court's Dismissal Decision, *i.e.,* that the NRA must plead that Ms. Vullo knew of comparators' violations at the time "when DFS commenced its investigation in the NRA's insurance programs."   *Id.*   The NRA pleads that the DFS investigation "launched" in "October 2017." SAC ¶ 35.   Yet the Vullo-related allegations (bare bones as they are) reference alleged communications that began four months *later*—in February 2018.   *Id.* ¶¶ 21, 67, 69.   Because Ms. Vullo did not (even-allegedly) know about the purported comparators when DFS launched the investigation, she cannot be said to have "consciously decline[d]" to enforce against them.

24

A-298

Dkt. 112 at 11.   Even crediting the vague and conclusory allegation that Ms. Vullo learned of other violations in February 2018, by that point DFS was well into its investigation and had devoted its resources into that investigation; any newly-discovered infractions are not similarly situated to infractions that were already well into being investigated and prosecuted.

> **5.    The NRA Cannot Ignore its Obligation to Plead Knowledge By Making a Conclusory Allegation about "See-No-Evil"**

Effectively admitting it cannot plead Ms. Vullo's knowledge, the NRA makes a bare-bones and conclusory allegation that her "lack of knowledge was due to a 'see-no-evil' policy of enforcement."   SAC ¶ 111.   In exceptional circumstances, a "see-no-evil" approach *might* obviate a plaintiff's need to prove knowledge (though the law is unclear, warranting qualified immunity, *see infra* Section II.C.2).   Nonetheless, here, the NRA makes no specific allegations plausibly suggesting that Ms. Vullo pursued a see-no-evil policy—and the NRA cannot overcome its failure to plead a similarly situated comparator.

As this Court already held, to prevail on a selective enforcement claim, a plaintiff must generally show that the enforcing party had "knowledge of similarly situated entities" and applied a different enforcement standard to those comparators.   *LaTrieste Restaurant v. Village of Port Chester*, 188 F.3d 65, 70 (2d Cir. 1999); *see also Bernstein v. Village of Wesley Hills*, 95 F. Supp. 3d 547, 571–72 (S.D.N.Y. 2015) (collecting cases in which selective enforcement claim was dismissed on plaintiff's failure to demonstrate knowledge of other violations).

*LaTrieste* suggested a potential narrow exception to the knowledge requirement, stating in dicta in a footnote, that it was "*conceivable* that selective treatment could be shown where, for example, proof was offered that a municipality did not know of prior violations because it adhered to a see-no-evil policy of not enforcing an ordinance, and then abandoned that policy." *Id.* at 70 n.1 (emphasis added).   Subsequent courts have similarly emphasized the extraordinary

25

nature of this potential "see-no-evil" exception, and the heightened burden of proof to establish such a theory.   *See, e.g.*, *Bernstein*, 95 F. Supp. 3d at 572 n.33 (collecting cases in which the "see-no-evil" theory was rejected for lack of evidence).

The SAC fails to set forth even a plausible ground for a "see-no-evil" selective enforcement claim, if such a claim even exists.   The NRA has not alleged any *specific* violations by *similarly-situated* comparators that were routinely ignored.   Instead, the NRA's allegations are "sparse," Dkt. 202 at 27, bereft of specifics, and conclusory, i.e., that "Vullo knew the actions taken by DFS against NRA affinity insurance programs were unprecedented" and she "should have known of similarly-situated individuals," SAC ¶ 111.   The NRA offers no factual basis for its conclusory claims that these actions were "unprecedented."   It offers no factual basis why the then-head of a 1,400-person state agency charged with enforcing literally hundreds of regulations, ranging from health insurance to banking to mortgages to annuities, would be aware of specific purported violations among "similarly situated individuals."   SAC ¶ 111.   Not only are these conclusory allegations barebones and factually unsupported, they are wholly implausible.   *See Iqbal*, 556 U.S. at 678-79; *Twombley,* 550 U.S. at 555.

As for the NRA's allegation that Ms. Vullo "failed to inquire about whether there were any similarly situated affinity programs when the investigation was launched," *id.*, that turns the selective enforcement standard on its head.   Courts do not require regulators to *inquire* about other programs or face civil liability for selective enforcement, they require that regulators be found to have known about the violations and, in similar circumstances, refused to move against them.   *See, e.g.*, *U.S. v. Armstrong*, 517 U.S. 456, 470 (1996) (plaintiff must show defendant knew of other violations but declined to prosecute them).

Finally, the (false) allegation that Ms. Vullo admitted *general* knowledge of industry violations does not cut it.   As detailed above, the NRA did not plead "sufficient factual matter"

26

A-300

as *Iqbal* requires, 556 U.S. at 678, to establish that Ms. Vullo knew of any *specific* violations or that specific violations were committed by similarly situated entities; in any case, those alleged admissions were *after* DFS commenced its investigation.   *See supra* Sections II.B.1 and B.4.

**C.      Even if Not Absolutely Immune, Ms. Vullo Has Qualified Immunity**

Government officials can only be sued in their personal capacity if they are violating a right that is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right."   *Taylor v. Barkes*, 575 U.S. 822, 825 (2015) (internal citation omitted).   Because qualified immunity "is an *immunity from suit* rather than a mere defense to liability, [courts] repeatedly have stressed the importance of resolving immunity questions at the earliest possible stage in litigation."   *Hunter v. Bryant*, 502 U.S. 224, 227 (1991).

"To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right."   *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (alterations and internal quotation marks omitted).   In other words, "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).   The Supreme Court has repeatedly cautioned courts not to define clearly established law at "a high level of generality." *Id.* at 742.

The second prong of the qualified immunity analysis is "whether a reasonable official would reasonably believe his conduct did not violate a clearly established right."   *Taravella v. Town of Wolcott*, 599 F.3d 129, 134 (2d Cir. 2010) (internal quotations and alterations omitted). "Even where the law is clearly established and the scope of an official's permissible conduct is 'clearly defined,' the qualified immunity defense also protects an official if it was objectively reasonable for him at the time of the challenged action to believe his acts were lawful."   *Id.* at 139 (internal citation omitted).

27

A-301

Here, the policy considerations underlying qualified immunity are at their apex. Qualified immunity exists to ensure that damages suits do not "unduly inhibit officials in the discharge of their duties" by burdening officers with "personal monetary liability and harassing litigation."  *Anderson v. Creighton*, 483 U.S. 635, 638 (1987).

The implications of the NRA's claim are chilling indeed.   As head of a state agency, Ms. Vullo made public statements—*months after* launching the Carry Guard investigation, unrelated to that investigation, and prompted by the Parkland shooting—decrying the scourge of gun violence.   These statements "clearly fit into the government-speech doctrine," an "essential" doctrine that permits government officers to "address matters of public importance on which New York State has a significant interest."   Dkt. 56 at 16–17.   The agency Ms. Vullo ran, DFS, ensures compliance with the Insurance Law and discovered serious violations of that law by entities that had contracted with the NRA.   If the NRA's selective enforcement theory stands, political foes of government regulators could simply flout state insurance laws, knowing they can cry "selective enforcement" when regulators charged with prosecuting such laws seek to stop their illegal conduct.   Government officials who speak on matters of "public importance" would be inhibited in prosecuting lawbreakers.   Qualified immunity exists to avoid that result.

### 1.   It Is Not Clearly Established that an Entity that Is Not Enforced Against Can Bring a Selective Enforcement Claim

Although you wouldn't know this from the calumny that the NRA has heaped on her, Ms. Vullo never took or ordered any enforcement action against the NRA.[10]   The NRA's selective enforcement claim is based on DFS's enforcement against Lockton, Lloyd's, or Chubb—not

---

[10] Ms. Vullo left office on February 1, 2019.   The pending DFS charges against the NRA were brought *a year later*—in February 2020.   Dkt 176-1 at 9.   To the extent there is any equal protection claim stemming out of that enforcement proceeding, Vullo would be the wrong defendant.

against the NRA, because there never was such enforcement under Mr. Vullo's watch.   But it is not clearly established that a party who is not the subject of an enforcement proceeding at all can even pursue a selective enforcement claim.   While this Court found, on the prior Rule 12(b)(6) motion, that the NRA had standing to bring such a claim, it did not hold that clearly-established law so required, nor did it cite binding precedent requiring that outcome.   Numerous courts have held otherwise, evidencing that the law in this area is unclear and that, accordingly, qualified immunity warranted.

As this Court recognized, *"a party generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties."*   Dkt. 56 at 14.   Many courts have held that a plaintiff *cannot* assert a selective enforcement claim when it is not the party subject to enforcement by the defendant.   *Casciani v. Nesbitt*, 659 F. Supp. 2d 427, 449–50 (W.D.N.Y. 2009) ("[T]here is no evidence—indeed, there is no allegation in the complaint—that plaintiff has ever been sanctioned under the ordinance, or that defendants have otherwise 'enforced' the ordinance against him. In the absence of such evidence, a claim of selective enforcement cannot stand.").[11]

Nor is the law clearly established that a third party can bring a selective enforcement claim where the entities actually enforced against *admitted* that their (NRA-branded) insurance products violated the Insurance Law.   *See New Creation Fellowship of Buffalo v. Town of*

---

[11] *See also Davidson v. Culver City*, No. CV04–2220, 2004 WL 5361378, at *14 (C.D. Cal. July 28, 2004) ("Neither fear nor the mere possibility of discriminatory enforcement creates a concrete cognizable injury in fact required to satisfy Article III's case and controversy requirement for standing") (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 605–06, (1992)), *aff'd*, 159 F. App'x 756 (9th Cir.2005); *Lash v. City of Union*, No. C–3–98–045, 1999 WL 33127974, at *6 (S.D. Ohio Sept. 27, 1999) ("[C]ourts have concluded that the plaintiffs did not have standing to assert a selective enforcement claim, when the defendants had not enforced the ordinance in question against them."); *Orgain v. City of Salisbury*, 521 F. Supp. 2d 465, 476 n.34 (D. Md. 2007) (finding that nightclub LLC's financial losses stemming from suspension of liquor license did not bestow selective enforcement standing on LLC, as individual club owners—not LLC—were licensees and the parties enforced against).

29

*Cheektowaga, N.Y.*, No. 99-CV-460A(F), 2004 WL 1498190, at *21 (W.D.N.Y. July 2, 2004),

*aff'd sub nom. New Creation Fellowship of Buffalo v. Town of Cheektowaga*, 164 F. App'x 5 (2d

Cir. 2005) ("A § 1983 complaint must still allege a wrong to plaintiff.   This requirement is not

met by a claim seeking federal review of a state prosecution on grounds of unfairness, absent

proof of denial of due process or a finding that the defendant was maliciously prosecuted upon a

charge of which he was found not guilty." (quoting *Singleton v. City of New York*, 632 F.2d 185,

192–93, 195 (2d Cir. 1980)).

While this Court previously found that Plaintiff had standing to bring a selective

enforcement claim, the cases it relied upon did not place this question "beyond debate."   *al-

Kidd*, 563 U.S. at 741.   None involved a claim for selective enforcement.   And none involved a

claim by a third-party to a property interest in admitted illegal products, as the NRA claims

here.[12]

Given the numerous cases holding that third parties like the NRA cannot bring a selective

enforcement challenge, the law is not clearly established, and qualified immunity applies.

> **2.     It Is Not Clearly Established that a Selective Enforcement Claim Can
> Be Based on Purported Comparators that Only Committed *Less
> Serious* Violations**

The NRA's selective enforcement claim is based on a wholly novel—indeed, contorted—

theory: it alleges that DFS's enforcement effort was focused on Carry Guard (an admittedly

*illegal* insurance product providing covering for use of a firearm *beyond* reasonable use of

_____

[12] *See* Dkt. 56 at 47 (citing *Village of Arlington Heights v. Metropolitan Housing Development Corp.*,
429 U.S. 252, 262–63 (1977) (third-party development corporation had standing to challenge a village's
racist zoning decision that affected developer); *Doe v. Sch. Bd. of Ouachita Parish*, 274 F.3d 289, 292
(5th Cir. 2001) (public school students had standing to challenge state statute allowing prayer in schools);
*Council of Ins. Agents & Brokers v. Molasky–Arman*, 522 F.3d 925, 931 (9th Cir. 2008) (nonresident
insurance agent had Article III standing to challenge state's "countersignature" statute prohibiting
nonresident agents from finalizing policy without countersignature of resident agent)).

force), and admits no other entity offered a product like Carry Guard with its significant moral

hazard concerns.   It thus admits it could not allege a similarly-situated comparator that was not

enforced against.   So instead the NRA's selective enforcement claim ignores the heart of DFS's

enforcement effort which was to stop an *illegal* insurance product.   It seeks to focus only on

DFS's enforcement against Lockton of violations of the Additional Provisions (marketing,

advertising, commission structure, *see* SAC ¶ 59) that DFS discovered during the Carry Guard

investigation.   And it claims that (unidentified) Lockton affinity programs that allegedly

violated only those Additional Provisions—that did not sell an illegal insurance product—are

similarly situated (though the NRA's own Complaint admits DFS enforced against Lockton's

violations of the Additional Provisions for all its affinity programs, SAC ¶ 78 & Ex. J).

There is no Supreme Court or Second Circuit case clearly establishing that a regulator

must treat less serious violations discovered during an ongoing enforcement proceeding similarly

to serious violations that motivate an enforcement action.   *See Berg v. Kelly*, 897 F.3d 99, 114

(2d Cir. 2018) (qualified immunity protects against selective enforcement claim where

"reasonable officer could believe that [plaintiff] protesters were engaged in conduct different

from that of regular pedestrians and that the protesters therefore were not similarly situated to

those pedestrians").   All regulators have limited resources.   A regulator acts reasonably in

focusing its limited resources on matters brought to its attention.   If, in the midst of that

enforcement action, other violations are discovered it is reasonable for a regulator to address

them without focusing limited enforcement resources to attempt to discover similar violations by

unnamed *third parties* "in the industry."   That is particularly true here, where the violations of

the Additional Provisions, though serious, did not present the grave safety concerns attendant to

the sale of an insurance product that removed the law's intended consequences from improper

firearms use.   Moreover, while the NRA claims in paragraph 59 that DFS overlooked Lockton's

31

A-305

Insurance Law violations connected to other affinity groups, its own complaint alleges that DFS required Lockton to self-report them and entered into a Supplemental Consent Order to resolve those violations.   SAC ¶ 78 and Ex. J.

Second, there is similarly no case clearly establishing that the "see no evil" theory is a basis for a selective enforcement claim.   *See supra* II.B.5.   The leading Second Circuit case, *LaTrieste,* only "left open the possibility," in a footnote, that "selective treatment could be shown" under "a see-no-evil policy of not enforcing an ordinance."   *Diesel v. Town of Lewisboro*, 232 F.3d 92, 105 (2d Cir. 2000) (quoting *LaTrieste*, 188 F.3d at 70 n. 1).   Leaving "open" that a claim may exist is the opposite of clearly establishing the existence of the claim.

The question is not, at a high level of generality, whether the right to be free from selective enforcement is clearly established, but rather whether it is clearly established that an entity that was *not* enforced against by a defendant, can bring a claim where it admits that its comparators did not commit the most serious misconduct that warranted the enforcement—the sale of an illegal insurance product—and admits there was a consent order addressing the less serious misconduct.   Ms. Vullo is protected by qualified immunity because there is no clearly established law that would put all reasonable officials on notice that her conduct was unlawful.

### 3.   Ms. Vullo's Conduct Was Objectively Reasonable

Even if the law were "clearly established," it still was "objectively reasonable" for Vullo to believe her "conduct did not violate a clearly established right."   *Taravella*, 599 F.3d at 135. Government regulators cannot pursue law-breakers unless they are presented with, or otherwise discover, *specific* violations.   When she was Superintendent, the District Attorney presented DFS with evidence of Carry Guard's very serious violations of the Insurance Law.   SAC ¶¶ 34-35.   It is reasonable for her to focus on investigating violations that were squarely presented to DFS, rather than unearth *unknown* violations by *unknown* violators that—crediting the NRA's

A-306

allegations—were generally "plaguing the affinity-insurance marketplace." *Id.* ¶ 21. "[E]qual protection does not require that all evils of the same genus be eradicated or none at all." *LeClair v. Saunders*, 627 F.2d 606, 608 (2d Cir. 1980). DFS, like every state agency has limited resources, and if it invested those resources on attempting to discover every violation in the affinity insurance marketplace, it would have no resources left to regulate health insurance or banking or the many other areas DFS oversees. Indeed, with the two public Lockton Consent Orders, DFS broadly addressed concerns in the affinity marketplace.

Even taking the NRA's allegations as true, it was reasonable for Ms. Vullo to prosecute the violations that were squarely presented to DFS instead of using the agency's limited resources to uncover violations that were never presented to DFS. And when, during the Carry Guard investigation, DFS learned of *other,* less serious violations of Insurance Law, it was reasonable, lawful and prudent to remedy those *admitted* violations through Consent Orders. No competent regulator would sit on her hands faced with such evidence of unlawful conduct. *See, e.g.*, *Diesel*, 232 F.3d at 104 (denying selective enforcement claim where "[e]ssentially [plaintiff] claims that he was entitled to have his misconduct ignored or concealed").

## III.   THE NRA'S FIRST AMENDMENT CLAIM AGAINST MS. VULLO IS BARRED BY QUALIFIED IMMUNITY

Qualified immunity also warrants dismissal of Plaintiff's First Amendment retaliation claim. *See supra* section II.C (describing qualified immunity standard); *see also Musso v. Hourigan*, 836 F.2d 736, 743 (2d Cir. 1988) (holding that a government official is not liable for failing to prevent another from violating a party's First Amendment rights, unless the official is charged with an affirmative duty to act); *see also Kaminsky v. Rosenblum*, 929 F.2d 922, 925 (2d Cir.1991)) (granting qualified immunity to city officials on a motion to dismiss landlord's claim that enforcement action against tenant's topless bar violated his freedom of expression).

33

A-307

Ms. Vullo is protected by qualified immunity because it was objective reasonably for her to believe that when she engaged in protected—and "essential"—government speech to "address matters of public importance" her conduct was lawful.   Dkt. 56 at 16-17.   This Court appropriately held that the "Guidance Letters and Cuomo Press Release, read in isolation, clearly fit into the government-speech doctrine."   *Id*.   Nonetheless, the Court held that the NRA stated a First Amendment claim because when these documents are "read in the context in which they were issued, amount to 'threats that deliberately invoked DFS's 'risk management' authority to warn of adverse action."   *Id.*   Ms. Vullo is not asking this Court to revisit that decision, but the qualified immunity analysis is far different.

By the Court's own analysis, courts must draw "fine lines" between permissible government speech and impermissible threats.   Dkt. 56 at 18; *Hammerhead Enterprises, Inc. v. Brezenoff*, 707 F.2d 33, 39 (2d Cir. 1983) ("statements made by public officials will require courts to draw fine lines between permissible expressions of personal opinion and implied threats to employ coercive state power to stifle protected speech").   Qualified immunity exists to protect government officials where the exact contours of the law are unclear.   It protects officials who reasonably believe they are engaging in "essential" First-Amendment protected speech, even if a court were to find the speech crossed that "fine line."

In *Penthouse Int'l, Ltd. v. Meese*, 939 F.2d 1011, 1015 (D.C. Cir. 1991), the D.C. Circuit dismissed First Amendment claims against the Attorney General based on letters he sent to adult magazine publishers demanding a response to what he termed "allegations" of distributing pornography.   Qualified immunity applied though the recipients may have believed they were threatened with prosecution given the context, because the letters "contained no threat to prosecute."   *Id.* ("[T]he Supreme Court has never found a government abridgement of First Amendment rights in the absence of some actual or threatened imposition of governmental

34

A-308

power or sanction.").   It was objectively reasonable for Ms. Vullo to believe her statements in the Guidance Letters and press release were lawful.   There is no case clearly establishing that otherwise protected public statements transform into an unlawful "threat" because there is an ongoing (and unrelated) regulatory investigation.   Indeed, at the time of Ms. Vullo's public statements, DFS had made no public statements about the Carry Guard investigation.   Nor do the NRA's (false) allegations that Ms. Vullo coupled her public statements with "backroom exhortations"[13] change the analysis, because they are vague and conclusory—there is no specific allegation that Ms. Vullo directly threatened unlawful government enforcement.   Reasonable officials would believe it lawful to privately express the sentiments that are lawful to express publicly.

No case has resolved this "fine line" under analogous facts.   Qualified immunity requires dismissal of counts one and two.   *See* Dkt. 56 at 15 (addressing counts one and two together).

## CONCLUSION

For the reasons stated above, the magistrate judge's decision granted leave to replead should be overturned and the NRA's Second Amendment Complaint should be dismissed in its entirety as against Ms. Vullo.

Dated: New York, New York
      June 23, 2020

<div style="margin-left:40%">

EMERY CELLI BRINCKERHOFF
  & ABADY LLP

By:     */s/ Andrew G. Celli, Jr.*
      Andrew G. Celli, Jr.
      Debra L. Greenberger
      Marissa R. Benavides

</div>

---

[13] Notably when Defendants sought the details of these alleged "threats" and "backroom exhortations" in discovery, the NRA could identify no such secret threat or exhortation (because there are none), citing only the publicly-issued Guidance Letters and Press Release, and claiming any additional information was privileged.

A-309

600 Fifth Avenue
New York, New York 10020
(212) 763-5000

*Attorneys for Defendant Maria Vullo*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| NATIONAL RIFLE ASSOCIATION OF AMERICA, | § § | |
| Plaintiff, | § | |
| v. | § | |
| ANDREW CUOMO, both individually and in his official capacity; MARIA T. VULLO, both individually and in her official capacity; and THE NEW YORK STATE DEPARTMENT OF FINANCIAL SERVICES, | § § § § § § § | CIVIL CASE NO. 18-CV-00566-TJM-CFH |
| Defendants. | § | |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT
VULLO'S APPEAL OF THE GRANT OF PLAINTIFF'S MOTION TO AMEND AND
MOTION TO DISMISS TO SECOND AMENDED COMPLAINT**

William A. Brewer III (Bar No. 700217)
Sarah B. Rogers (Bar No. 700207)
BREWER, ATTORNEYS & COUNSELORS
750 Lexington Avenue, 14th Floor
New York, New York 10022
Telephone: (212) 489-1400
Facsimile: (212) 751-2849

**ATTORNEYS FOR THE NATIONAL RIFLE
ASSOCIATION OF AMERICA**

A-311

## TABLE OF CONTENTS

I. PRELIMINARY STATEMENT ............................................................................1

II. LEGAL STANDARD ....................................................................................3

III. ARGUMENTS AND AUTHORITIES.................................................................5

    A.   The Magistrate Judge Appropriately Granted The NRA's Motion To Amend..........................................................................................................5

        1.   The NRA Adequately Established Its Diligence, Especially In The Face of Significant Discovery Delays.........................................5

        2.   Vullo Bears The Burden To Show "Bad Faith"—And Fails. ......................7

        3.   Vullo Also Fails To Demonstrate Prejudice That Would Preclude An Amendment. .........................................................................9

    D.   The Second Amended Complaint More Than Sufficiently Pleads Selective Enforcement..........................................................................................9

        1.   Vullo Cannot Deny Knowledge Of, Or Escape Liability For, Actions Undertaken By DFS On Her Watch. ...............................9

        2.   The SAC Alleges That Vullo Knew of Comparator Programs And Leveraged That Knowledge To Coerce At Least One NRA Insurer. ........11

        3.   The Magistrate Judge Properly Sustained the NRA's "See-No-Evil" Claim........................................................................................16

    E.   Vullo Is Not Entitled to Absolute or Qualified Immunity on Any of the NRA's Claims..........................................................................................16

        1.   Vullo's Conduct Was Investigative In Nature ...........................17

        2.   Even If Vullo's Conduct Could Not Squarely Be Categorized As "Investigative," The Motion Fails To Demonstrate Vullo Engaged In A "Quasi-Judicial Function." ...............................................19

        3.   Any Ambiguity Regarding Absolute Immunity Should Be Resolved After Discovery..................................................................21

    F.   Vullo Is Not Entitled to Qualified Immunity. .........................................21

        1.   Qualified Immunity Is A Fact-Specific Inquiry That Should Be Undertaken After Fact Discovery. ............................................22

        2.   The Conduct Alleged By The NRA Was Not "Objectively Reasonable" But, Rather, Violated Clearly Established Constitutional Rights.....................24

IV. CONCLUSION....................................................................................25

i

A-312

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Abel v. Morabito*,
    2009 WL 321007 (S.D.N.Y. Feb. 10, 2009).............................................................13, 14

*Anilao v. Spota*,
    2018 WL 6190519 (E.D.N.Y. Nov. 28, 2018).......................................................16

*Anilao v. Spota*,
    774 F. Supp. 2d 457 (E.D.N.Y. 2011) ...............................................................19

*Aquastore, Inc. v. Pelseal Techn., LLC*,
    06–CV–0093, 2010 WL 610685 (N.D.N.Y. Feb. 17, 2010) (Scullin, J.) ................................1

*Astra Aktiebolag v. Andrx Pharm., Inc.*,
    208 F.R.D. 92 (S.D.N.Y. 2002) .........................................................................5

*Balakrishnan v. Kusel*,
    2009 WL 1291755 (E.D.N.Y. May 8, 2009) .........................................................22

*Balintulo v. Ford Motor Co.*,
    796 F.3d 160 (2d Cir. 2015)................................................................................2

*Bernstein v. City of N.Y.*,
    2007 WL 1573910 (S.D.N.Y. May 24, 2007) .........................................................21

*Bernstein v. Village of Wesley Hills*,
    95 F. Supp. 3d 547, 571 (S.D.N.Y. 2015) ..............................................................13

*Bertuglia v. City of N.Y.*,
    839 F. Supp. 2d 703 (S.D.N.Y. 2012)..................................................................19

*Block v. First Blood Assocs.*,
    763 F. Supp. 746 (S.D.N.Y. 1991), aff'd, 988 F.2d 344 (2d Cir. 1993)...................................7

*Boice v. M+W U.S., Inc.*,
    130 F. Supp. 3d 677, 685 (N.D.N.Y. 2015)............................................................1

*Burns v. Citarella*,
    443 F. Supp. 2d 464 (S.D.N.Y. 2006)..................................................................23

*Bush v. City of Utica, N.Y.*,
    558 F. App'x 131 (2d Cir. 2014) ........................................................................23

ii

**A-313**

*Children First Found., Inc. v. Martinez,*
  2005 WL 600283 (N.D.N.Y. Mar. 14, 2005) ........................................................22

*Cleavinger v. Saxner,*
  474 U.S. 193 (1985)............................................................................................18

*Contrera v. Langer,*
  314 F. Supp. 3d 562, 567 (S.D.N.Y. 2018)..........................................................5

*Cuoco v. Moritsugu,*
  222 F.3d 99 (2d Cir. 2000)..........................................................................22, 23

*DiBlasio v. Novello,*
  344 F.3d 292 (2d Cir. 2003)......................................................................18, 19

*Goel v. Bunge, Ltd.,*
  820 F.3d 554 (2d Cir. 2016) ................................................................................2

*Hafez v. City of Schenectady,*
  894 F. Supp. 2d 207 (N.D.N.Y. 2012) ................................................................13

*Harlow v. Fitzgerald,*
  457 U.S. 800 (1982)............................................................................................15

*Harris v. Mills,*
  572 F.3d 66 (2d Cir. 2009)...................................................................................2

*Hayes v. City of Amsterdam,*
  770 N.Y.S.2d 138 (2d Dep't 2003) .....................................................................21

*Helft v. Allmerica Fin. Life Ins.*
  *amd Annuity Co.,* No. 1:03-CV-35, 2006 WL 839528 (N.D.N.Y. Mar. 24,
  2006) .....................................................................................................................5

*Hemphill v. Schott,*
  141 F.3d 412 (2d Cir. 1998)...............................................................................22

*Hickey v. City of N.Y.,*
  2002 WL 1974058 (S.D.N.Y. Aug. 26, 2002) ....................................................19

*Hill v. City of New York,*
  45 F.3d 653 (2d Cir.1995)...........................................................................16, 19

*Holmes v. Grubman,*
  568 F.3d 329 (2d Cir. 2009)................................................................................8

*Imbler v. Pachtman,*
  424 U.S. 409 (1976).....................................................................................15, 21

*Jennings v. Hunt Companies, Inc.*,
  367 F. Supp. 3d 66, 69 (S.D.N.Y. 2019) ................................................2

*Knowlton v. Shaw*,
  704 F.3d 1 (1st Cir. 2013).................................................................17

*Lamothe v. Town of Oyster Bay*,
  2012 WL 6720781 (E.D.N.Y. Dec. 27, 2012) ....................................13

*LaTrieste Rest. v. Village of Port Chester*,
  188 F.3d 65 (2d Cir. 1999)................................................................14

*Massi v. Flynn*,
  254 F. App'x 84 (2d Cir. 2007) .........................................................23

*McKenna v. Wright*,
  386 F.3d 432 (2d Cir. 2004)..........................................................21, 22

*Munoz v. City of N.Y.*,
  2008 WL 464236 (S.D.N.Y. Feb. 20, 2008).......................................21

*Norton v. Town of Brookhaven*,
  33 F. Supp. 3d 215, 230-31 (E.D.N.Y. 2014) ....................................16

*Peters v. City of Buffalo*,
  848 F. Supp. 2d 378 (W.D.N.Y. 2012) ..............................................16

*Spiegel v. Adirondack Park Agency*,
  662 F. Supp. 2d 243 (N.D.N.Y. 2009)...........................................12, 13

*Spirit Master Funding, LLC v. Pike Nurseries Acquisition, LLC*,
  287 F.R.D. 680 (N.D. Ga. 2012)..........................................................5

*Taylor v. Kavanagh*,
  640 F.2d 450 (2d Cir. 1981)..........................................................15, 16

*Tompkins v. R.J. Reynolds Tobacco Co.*,
  92 F.Supp.2d 70 (N.D.N.Y.2000).........................................................2

*United States v. Isiofia*,
  370 F.3d 226 (2d Cir.2004)..................................................................2

*United States v. U.S. Gypsum Co.*,
  333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746 (1948) ...............................2

*Wandering Dago, Inc. v. N.Y. State Off. Of Gen'l Servs.*,
  2014 WL 12797920 (N.D.N.Y. July 28, 2014) ...............................8, 10

ii

A-315

*White v. Lee*,
227 F.3d 1214 (9th Cir. 2000) .........................................................................16, 24

**Other Authorities**

Fed. R. Civ. P. 15 ..............................................................................................................6

Fed. R. Civ. P. 72(a) ............................................................................................1, 2, 14

Fed. R. Civ. P. 12(b)(6)...................................................................................1, 2, 8, 21

A-316

By and through its undersigned counsel, Plaintiff the National Rifle Association of America (the "NRA" or "Plaintiff") hereby submits its Opposition to Defendant Vullo's Appeal of the Grant of Plaintiff's Motion to Amend and Motion to Dismiss the Second Amended Complaint (the "Motion"), as follows:

## I.
## PRELIMINARY STATEMENT

The core allegations in this case involve not only suppression of free speech, but malicious, discriminatory enforcement of otherwise-anodyne insurance regulations against the Governor's political enemies.  Specifically, the NRA alleges that Defendants, including Vullo, knew of widespread affinity-insurance market practices, to which they never gave any enforcement scrutiny until an opportunity arose to work in concert with an influential Democratic pressure group, Everytown for Gun Safety, to enforce technical purported insurance-market infractions in a manner calculated to harm the NRA.

Defendants moved repeatedly to dismiss the NRA's claims and, when such efforts failed, to stonewall discovery regarding their disparate enforcement approach.  On May 9, 2019, the Court granted dismissal of certain selective-enforcement claims without prejudice to re-pleading, explaining that although the NRA had adequately alleged unequal treatment, it must explicitly allege that Defendants "were aware of such violations by the comparators yet consciously declined" to treat those violators as harshly as the NRA.[1]

Thereafter, the NRA diligently sought discovery that would enable it to robustly re-plead its claims in the manner the Court outlined.  This process was not easy, particularly with regard to

---

[1] *See* ECF No. 112 at 11.

1

discovery from the Corporation of Lloyd's, an insurance marketplace which the NRA alleges was targeted by Defendants. Although DFS is a designated agent for service of process upon Lloyd's, DFS refused to deliver the NRA's subpoena,[2] and stridently opposed any discovery or depositions that would shed light on its interactions with Lloyd's syndicates.

In June of 2019, the NRA achieved a breakthrough: in an attempt to negotiate resolution of the NRA's pending subpoena, Lloyd's America, Inc. ("LAI") provided a small number of documents voluntarily to the NRA, subject to a strict confidentiality order.[3] Those documents, and additional details which have come to light since that time, paint a stark and troubling picture of Defendants' conduct. As described in the NRA's amended pleading, former DFS Superintendent Vullo was fully aware of identical market conduct by non-NRA entities, yet leveraged DFS's considerable power over Lloyd's to inflict harm on "gun programs"—irrespective of whether those programs violated the law. These threats were delivered in off-the-record conversations and surreptitious backroom meetings. Taken aback by such conduct, insurance-industry insiders privately predicted that the NRA would sue DFS. They were right.[4]

Noting that the NRA's proposed amended pleading (the now-operative Second Amended Complaint, or "SAC") satisfied the roadmap for amendment articulated by this Court in its May 9, 2019, Order, Magistrate Judge Hummel properly granted the NRA's motion to amend on June 1, 2020 (the "Decision").[5] The Decision was one of a succession of recent rulings chipping away at a longstanding discovery logjam in this case—coupled with the Court's grant of the NRA's

---

[2] *See, e.*g., ECF No. 101-1.

[3] Consistent with its agreement with LAI, the NRA filed copies of certain documents under seal when this matter was briefed before the Magistrate Judge and redacted details of their contents.

[4] *See* Sealed Exhibits B, C and D, filed respectively as Exhibits F, G and H to Plaintiffs' Motion to Amend, ECF 154-7, 154-8 and 154-9.

[5] *See* ECF No. 202.

2

A-318

appeal of a prior motion-to-compel ruling[6] and the Special Master's recent assessment of Defendants' unfounded privilege claims, the Decision dispels any doubt that Defendants, including Defendant Vullo, will rightly face discovery and scrutiny regarding when, how, and why they chose to target the NRA and its business partners for adverse regulatory action.  To forestall this outcome, Defendants have filed and intend to file a coordinated cluster of dilatory appeals and reconsideration requests,[7] including the instant Motion and the accompanying, simultaneously-filed motion by Defendants Cuomo and DFS.[8]  In addition to demanding reconsideration of Magistrate Judge Hummel's June 1, 2020, ruling under the deferential standard set forth in Fed. R. Civ. P. 72(a), Vullo argues yet again that the claims against her should be dismissed under Fed. R. Civ. P. 12(b)(6).  Both sets of arguments fail, for the reasons set forth below.

## II.
## LEGAL STANDARD

Under Fed. R. Civ. P. 72(a), "[w]hen considering an appeal from a magistrate judge's ruling on a non-dispositive matter, a district court will modify or set aside any portion of the magistrate judge's ruling that it finds to be 'clearly erroneous or contrary to law.'"[9]  This is an exacting standard, requiring the court to arrive at "the definite and firm conviction that a mistake has been

---

[6] *See* ECF No. 188.

[7] Defendants seek to challenge, at minimum, this Court's March 31, 2020 decision clarifying the scope of discovery, the Special Master's long-awaited report and recommendation rejecting several unfounded privilege claims, and Magistrate Judge Hummel's June 1, 2020, decision granting the NRA's motion to amend (which is one subject of this Motion).

[8] *See* ECF No. 210.

[9] *Aquastore, Inc. v. Pelseal Techn., LLC,* 06–CV–0093, 2010 WL 610685, at *2 (N.D.N.Y. Feb. 17, 2010) (Scullin, J.) (quoting 28 U.S.C. § 636[b][1][A]; Fed.R.Civ.P. 72[a] ); *see also Boice v. M+W U.S., Inc.,* 130 F. Supp. 3d 677, 685 (N.D.N.Y. 2015) (same).

3

A-319

committed,"[10] or else find that the challenged ruling "fails to apply or misapplies relevant statutes, case law, or rules of procedure."[11]

Just as Rule 72(a) accords substantial deference to a magistrate's determination, Fed. R. Civ. P. 12(b)(6) requires facts set forth to be construed "in the light most favorable to the plaintiff, taking its factual allegations to be true and drawing all reasonable inferences in the plaintiff's favor."[12]  Because a motion to dismiss tests only the legal sufficiency of a plaintiff's claims, inquiry into their substantive merits is inappropriate.[13]  Moreover, because Magistrate Judge Hummel already concluded that the NRA's amended claims would withstand a 12(b)(6) motion to dismiss (when he rejected Defendants' "futility" arguments)[14], the Court upon review must accord this determination the same deference demanded by Fed. R. Civ. P 72(a).  In other words, when evaluating Vullo's dismissal arguments under Fed. R. Civ. P. 12(b)(6), the Court should only grant relief if it assesses that Magistrate Judge Hummel committed clear error, or a mistake of law, when he determined that the NRA stated plausible claims.

---

[10] *United States v. U.S. Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948); *see also United States v. Isiofia,* 370 F.3d 226, 232 (2d Cir.2004).

[11] *Tompkins v. R.J. Reynolds Tobacco Co.,* 92 F.Supp.2d 70, 74 (N.D.N.Y.2000).

[12] *Jennings v. Hunt Companies, Inc.,* 367 F. Supp. 3d 66, 69 (S.D.N.Y. 2019), *citing Harris v. Mills*, 572 F.3d 66, 71 (2d Cir. 2009).

[13] *Goel v. Bunge, Ltd.*, 820 F.3d 554, 558-59 (2d Cir. 2016) (citing *Global Network Commc'ns, Inc. v. N.Y.C.*, 458 F.3d 150, 155 (2d Cir. 2006)).

[14] Vullo's Motion admits that these arguments overlap (s*ee* Motion note 4), and authorities in this Circuit confirm that the "futility" analysis conducted on a motion to amend incorporates, by definition, the application of the Fed. R. Civ. P. 12(b)(6) standard.  *See, e.g., Balintulo v. Ford Motor Co*., 796 F.3d 160, 164-65 (2d Cir. 2015) (quoting *Lucente v. IBM Corp*., 310 F.3d 243, 258 (2d Cir. 2002)).

A-320

## III.
## ARGUMENTS AND AUTHORITIES

**A.**   **The Magistrate Judge Appropriately Granted The NRA's Motion To Amend.**

**1.**   **The NRA Adequately Established Its Diligence, Especially In The Face of Significant Discovery Delays.**

As the Decision acknowledges, given that the Court's ruling dismissing the NRA's selective enforcement claim without prejudice to repleading did not occur until May 9, 2019—over three months after the scheduling-order deadline for amended pleadings—the NRA could not under any circumstances have amended its complaint subject to that deadline.  After its selective enforcement claims were dismissed without prejudice to re-pleading, the NRA pursued a swift, multi-pronged strategy to obtain documents and information that would substantiate the factual allegations this Court's order required.  Most significantly, the NRA sought both documents and deposition testimony from various nonparty underwriting syndicates, their managing agents, and affiliates that comprise and oversee the Lloyd's of London insurance marketplace ("Lloyd's").  Although Defendant DFS is a registered agent for service upon various overseas Lloyd's entities that do business in New York, DFS refused to effectuate service of the NRA's subpoenas, resulting in motion practice (the "Domestic Service Motion") that remained unresolved for nearly a year.[15]  During the time the Domestic Service Motion remained outstanding, the Magistrate Judge ruled on August 8, 2019, that much of the discovery sought by the NRA from Lloyd's was *per se* irrelevant to this case, which disrupted the NRA's third-party discovery efforts thereafter.  (The NRA's appeal of the August 2019 "relevance" ruling was granted on March 31, 2020).[16]

---

[15] *See* ECF No. 170 (Feb. 18, 2020 order denying motion to compel service upon Lloyd's filed Apr. 19, 2019).

[16] *See* ECF No. 188.

5

A-321

The NRA also sought discovery through two alternate channels: the Hague Convention, and a subpoena to the domestic Lloyd's affiliate Lloyd's America, Inc. ("LAI"). Unfortunately, LAI ceased complying with the NRA's discovery requests in the wake of the now-overruled "relevance" determination rendered in August 2019. The NRA's motion to serve discovery via the Hague (the "Hague Motion") likewise was not ruled upon until March 6, 2020 when the Magistrate Judge denied it (without prejudice to renewal) pending a ruling by this Court on the NRA's aforementioned appeal.[17] In short, the NRA only had access to a handful of documents which it obtained from LAI prior to the August 2019 "relevance" ruling, and which referenced internal Lloyd's procedures and governance mechanisms with which the NRA had little experience; the documents also referenced other, undisclosed documents and communications that the NRA was unable to obtain prior to the August 2019 "relevance" ruling and ensuing discovery stalemate. Facing these obstacles, and still awaiting resolution of its outstanding Domestic Service Motion and Hague Motion, the NRA undertook additional investigative efforts, including the retention of a consulting expert.[18] Fortunately, the NRA's efforts paid off, yielding proof that undergirds allegations with respect to which Defendants now seek to evade discovery at all costs.

The Decision suggests that the NRA could more forcefully demonstrate diligence if it could "explain . . . how any consulting or investigative work . . . discovered or revealed anything beyond the four corners of the documents" produced by LAI.[19] However, the investigative methods, findings, and opinions of counsel, or a consulting expert retained by counsel, are protected by the

---

[17] *See* ECF No. 181.

[18] *See* ECF No. 169 at 3.

[19] *See* Decision at 13.

6

A-322

work product doctrine.[20]  The Decision's analysis of the diligence issue also omits the subpoena to AGIA served just prior to the NRA's motion to amend its complaint, which the NRA cites in support of the allegation that selective enforcement "continues to this day." [21]  (Of course, subsequent developments since the NRA's motion to amend, including the institution of an enforcement proceeding against the NRA by DFS, likewise bolster this allegation).  In sum, in light of the significant discovery delays faced by the NRA on multiple fronts, the NRA was amply diligent in seeking its amendment.

### 2.   Vullo Bears The Burden To Show "Bad Faith"—And Fails.

Next, Vullo wrongly asserts that it is "[the NRA's] burden to establish an absence of bad faith, not Defendant's burden to prove the opposite;" accordingly, Vullo argues that Magistrate Judge Hummel committed clear error by requiring Vullo to substantiate her accusation of bad faith by the NRA.[22]  In truth, although "the party seeking to amend its pleadings must explain any delay, the party opposing the amendment bears the burden of showing prejudice, bad faith, and futility of the amendment."[23]  Vullo did not make the requisite showing before Magistrate Judge Hummel, nor can she do so now.

---

[20] *See, e.g.*, *Spirit Master Funding, LLC v. Pike Nurseries Acquisition, LLC*, 287 F.R.D. 680, 686 (N.D. Ga. 2012)(sustaining work product claim regarding investigative activities by consulting expert); *Astra Aktiebolag v. Andrx Pharm., Inc.*, 208 F.R.D. 92, 105 (S.D.N.Y. 2002) (same, regarding methods of scientific analysis by consulting expert).

[21] *See* SAC at ¶ 79.

[22] *See* Motion at 8.

[23] *See* *Contrera v. Langer,* 314 F. Supp. 3d 562, 567 (S.D.N.Y. 2018), (citing and quoting *United States ex rel. Raffington v. Bon Secours Health Sys., Inc.*, 285 F.Supp.3d 759, 766 (S.D.N.Y. 2018) (internal quotation marks and citations omitted)); *see also Helft v. Allmerica Fin. Life Ins. amd Annuity Co.*, No. 1:03-CV-35, 2006 WL 839528, at *8 (N.D.N.Y. Mar. 24, 2006) (granting motion to amend, where the defendants opposing the amendment "failed to come forth with specific evidence, as is their burden, demonstrating that plaintiffs [we]re acting in bad faith").

A-323

Although Vullo makes much of the purported "shifting" factual support for the NRA's selective-enforcement claim, Vullo cites no authority for the proposition that an expanded set of facts, set forth in an amended pleading, constitutes *per se* evidence of "bad faith" sufficient to bar an amendment and prevent adjudication of newly pleaded claims on their merits.  Moreover, through no fault of the NRA, considerable time elapsed between the filing of the NRA's prior operative pleading (the First Amended Complaint dated July 20, 2018) and the NRA's first inkling that an additional amendment might be required (which occurred when the Court dismissed the NRA's selective-enforcement claim without prejudice in May 2019).  It is no surprise, and no sign of "bad faith," that the long pendency of a high-profile case and the contemporaneous, continuing, diligent investigation by the NRA (including eventual access to third-party discovery) revealed facts which modified some details of the NRA's selective-enforcement allegations.  Given that the NRA's "underlying claim has not drastically changed," Vullo's allegation of bad faith fails.[24]

Nor can Vullo establish bad faith by insisting that certain documents produced by LAI (which Magistrate Judge Hummel did not review, let alone rely upon) fail to prove the NRA's allegations against her.  Although the LAI documents constituted a jumping-off-point for additional investigation and analysis by the NRA and its expert, and although they support the NRA's claims generally, nothing in Fed. R. Civ. P. 15 or 16 requires the NRA to attach, to a motion to amend, documentary evidence sufficient to prove its claims at trial.  Such a requirement would be especially nonsensical where, as here, the NRA's amended allegations against Vullo prominently feature of backroom, off-the-record conversations that would have been unlikely to

---

[24] *See* Decision at 14.

8

be transcribed in any document LAI produced.[25]  Certainly, Vullo cannot show that the contents of the LAI documents whatsoever suggest "bad faith" by the NRA.

### 3.  Vullo Also Fails To Demonstrate Prejudice That Would Preclude An Amendment.

To determine whether a party will be prejudiced by an amended pleading, courts "consider whether the assertion of the new claim[s] would (i) require the opponent to expend significant additional resources to conduct discovery and prepare for trial; (ii) significantly delay the resolution of the dispute; or (iii) prevent the plaintiff from bringing a timely action in another jurisdiction."[26]  Of course, the party opposing the amendment carries the burden to demonstrate the foregoing.[27]  The Motion's conclusory insistence that the Second Amended Complaint is "rife with falsehoods" (it is not) and that the amendment may invite "additional unnecessary motion practice" (which Vullo has already begun to instigate) do not amount to a showing of prejudice that precludes the NRA's amended claims.

### B.  The Second Amended Complaint More Than Sufficiently Pleads Selective Enforcement.

### 1.  Vullo Cannot Deny Knowledge Of, Or Escape Liability For, Actions Undertaken By DFS On Her Watch.

To the extent that it purports to address the SAC's allegations on their substantive merits (rather than invoking various forms of immunity), the Motion leans heavily on the premise that

---

[25] *See, e.g.*, SAC at ¶ 69 (describing "surreptitiously held meetings").

[26] *See, e.g.*, *Breyette v. Amedore*, 205 F.R.D. 416, 418 (N.D.N.Y. 2002) (internal citations and quotation marks omitted).

[27] *See, e.g.*, *Block v. First Blood Assocs.*, 763 F. Supp. 746, 747 (S.D.N.Y. 1991), *aff'd*, 988 F.2d 344 (2d Cir. 1993) (party opposing amendment did not "adduce[] evidence sufficient to prove" asserted prejudice, notwithstanding alleged delay).

Vullo "ran a 1400+ person agency"[28] and, therefore, cannot plausibly be inferred[29] to have known

about, or be liable for, selective enforcement by the staff she oversaw.  But as the NRA emphasized

in its briefing before Magistrate Judge Hummel, the Second Circuit has carefully delineated the

circumstances under which the head of an agency may be sued for constitutional violations it

committed.  Pursuant to a detailed, multi-pronged standard that the Motion does not even purport

to address, Vullo is:

> [P]ersonally involved in a constitutional deprivation within the meaning of § 1983
> if [s]he: (1) directly participated in the alleged infraction; (2) after learning of the
> violation, failed to remedy the wrong; (3) created a policy or custom under which
> unconstitutional practices occurred or allowed such policy or custom to continue;
> (4) was grossly negligent in managing subordinates who caused the unlawful
> condition or event; or (5) failure [sic] to act on information indicating that
> unconstitutional acts were occurring.[30]

The SAC satisfies all of these elements.  It alleges that Vullo coordinated closely with her

longtime mentor, Defendant Cuomo,[31] to direct a calculated campaign[32] to leverage DFS's

enforcement powers to unconstitutionally target and harm the NRA.  It alleges that Vullo

participated personally in the alleged infraction—delivering "backroom exhortations" in meetings

with Lloyd's[33]—and that she was instrumental in promulgating, and enacting, the "policy or

custom" set forth in the April 2018 Letters which she signed, and which ominously conveyed

---

[28] *See, e.g.*, Motion at 1; *id.* at 19 (discounting allegations of DFS's knowledge, where Superintendent Vullo is not identified by name).

[29] On a Rule 12(b)(6) motion to dismiss, the Court must draw every reasonable inference in the non-moving party's favor.  *See, e.g.*, *Holmes v. Grubman*, 568 F.3d 329, 335 (2d Cir. 2009).

[30] *See Wandering Dago, Inc. v. N.Y. State Off. Of Gen'l Servs.*, 2014 WL 12797920, at *10 (N.D.N.Y. July 28, 2014) (citing *Hernandez v. Keane*, 341 F.3d 137, 145 (2d Cir. 2003)).

[31] *See* SAC at ¶ 20.

[32] *See, e.g.*, SAC at ¶ 1.

[33] *See, e.g.*, SAC at ¶ 21.

A-326

DFS's disapproval of business ties to "gun promotion organizations."[34]  Moreover, Vullo certainly received "information that unconstitutional acts were occurring."  Not only must Vullo have known that covertly and coercively negotiating disparate treatment of comparator products for political reasons was unconstitutional—she was, at minimum, put on notice of DFS's unconstitutional conduct when the NRA filed this lawsuit in May 2018.  That lawsuit specifically identified comparator insurance products featuring the exact same promotional language as the NRA-related programs that Vullo targeted—yet Vullo's team continued its aggressive, exclusive pursuit of the NRA.[35]  Vullo also personally signed the consent orders coerced by DFS from major insurance-industry firms with which the NRA did business, and it is more than plausible to infer that Vullo understood the reasons for (and worked to advance) the disparate treatment afforded to NRA and non-NRA programs.  Having personally, publicly joined with Defendant Cuomo to spearhead a partisan misuse of state regulatory power, Vullo cannot now avoid liability for the awareness and actions of the agency she led.

> **2.**   **The SAC Alleges That Vullo Knew of Comparator Programs And Leveraged That Knowledge To Coerce At Least One NRA Insurer.**

Even excluding liability attributed to Vullo by reason of her leadership of DFS, the Magistrate Judge accurately noted that the SAC explicitly pleads Vullo's personal involvement in at least some of the "backroom exhortations" that lay at the heart of this case; of course, these allegations, when proven at trial, will establish Vullo's knowledge of similarly situated comparators.  In particular, the SAC alleges that Vullo met personally with executives of regulated institutions, including Lloyd's, to discuss certain alleged technical infractions that were common

---

[34] *See, e.g.*, SAC at ¶ 43.

[35] *See, e.g.*, SAC at ¶ 77-79.

11

in the affinity-insurance marketplace.[36]  Vullo "made [] clear . . . that DFS was less interested in

pursuing [non-NRA] infractions," so long as insurance relationships benefitting "gun groups,"

especially the NRA, could be diminished or severed.[37]  The SAC alleges a specific time and place

for at least one of these meetings, which occurred on or about February 27, 2018, after Vullo gave

a speech inveighing against the NRA.[38]

It is difficult to conceive of a more glaring selective-enforcement fact pattern than the one

alleged here.  In response, Vullo engages in sleight-of-hand, insisting that DFS's actions with

respect to Lockton, Lloyd's, and the NRA should be viewed as entirely disconnected from one

another, not as components of the cohesive scheme the NRA alleges; she also argues, confusingly,

that the Lloyd's insurance marketplace is not itself a "comparator."[39]

These arguments disingenuously miss the point: Lockton brokered and administered,[40] and

Lloyd's underwrote, the vast majority of non-Carry Guard policies offered to NRA members and

targeted by Defendants.  Thus, Lockton and Lloyd's performed complementary roles with respect

to many of the *same* insurance policies.  That the NRA's allegations prominently feature both

entities, and treat the enforcement efforts against them as interrelated, is an inevitable result of this

affinity-insurance structure—not a "bait-and-switch" as Vullo oddly claims.[41]  Moreover, it is

immaterial that "no entity similarly situated to Lloyd's [or Lockton] was not enforced against."[42]

Lloyd's and Lockton were middlemen serving a broad spectrum of non-NRA clients, and were

---

[36] *See* SAC at ¶ 21.

[37] *See id.*

[38] *See id.* at ¶ 67.

[39] *See* Motion at 21.

[40] *See* SAC at ¶ 31.

[41] *See* Motion at 19.

[42] *See* Motion at 22.

targeted by Vullo and the other Defendants *only* with respect to their NRA business.  Thus, the relevant "comparators" need not consist solely of non-Lockon brokers, or non-Lloyd's underwriters but, rather, include non-NRA policies and clients serviced by the same middleman firms.  Indeed, the SAC alleges that Vullo offered leniency to Lloyd's regarding its non-NRA business, so long as Lloyd's acceded to abandon even lawful NRA insurance policies.  Vullo's knowledge of the widespread use of near-identical contract language and affinity-insurance features[43] by Lockton and Lloyd's was an essential ingredient in these backroom conversations, and is more-than-adequately alleged in the SAC.

Vullo also challenges the time at which requisite awareness is attributed to her, insisting that the NRA fails to state a claim unless it can show detailed knowledge of *non-Carry Guard-related comparators* at the time the Carry Guard investigation "commenced" in October 2017.[44] But the SAC explicitly alleges that the scope of DFS's investigation changed after it was initially commenced, expanding from Carry Guard to encompass other NRA-related policies that "had nothing to do with firearms."[45]  Thus, even if the Equal Protection Clause required that a selective-enforcement defendant possess detailed knowledge of comparators at the earliest commencement of an investigation, the Court would need to determine *which investigation*—the inquiry ostensibly focused on self-defense features of Carry Guard, or the one focused on pricing and promotional features of life, health, property and casualty insurance which ensued later.  However, as detailed below, even this latter approach would create a higher pleading hurdle for the NRA than this Court's own precedent prescribes.

---

[43] *See, e.g.*, SAC ¶ 69, 72.

[44] *See* Motion at 24.

[45] *See* SAC at 36.

13

**A-329**

In *Spiegel v. Adirondack Park Agency*,[46] the Adirondack Park Agency (the "Agency") was alleged to have selectively enforced restrictions contained in an Agency Permit (the "Permit") against the plaintiffs.  The Agency was not aware of Permit violations by other homeowners until it began investigating a neighbor's complaint against the plaintiffs.[47] This was not fatal to the plaintiffs' selective enforcement claim in the least.  Instead, describing virtually the same circumstances found here, the Court noted:

> The parties also agree that after the Agency commenced an investigation into the Spiegel violations, the Spiegels brought other Permit violations to the Agency's attention. Although the Agency opened investigative files on each of the alleged violations, no other Fawn Ridge homeowner has received a cease and desist order, and no other enforcement proceedings have been brought.[48]

In denying the Agency's motion for summary judgment, the Court held:

> [E]vidence that the Agency consciously chose not to investigate or pursue Permit violations by similarly situated homeowners, essentially declining to take official action against the other Permit violators, could establish that the Spiegels were treated selectively. A reasonable jury could conclude that the Spiegels had received intentionally different treatment.[49]

The same result obtains here.  As the name of the claim implies, it is the adverse *enforcement* that gives rise to liability in a selective-enforcement case, and the moment of such enforcement is when knowledge of comparators must be assessed.[50]  Importantly, although this

---

[46] *Spiegel v. Adirondack Park Agency*, 662 F. Supp. 2d 243 (N.D.N.Y. 2009).

[47] *See id.* at 254.

[48] *See id.*

[49] *See id.*

[50] *See e.g., Abel v. Morabito*, 2009 WL 321007, at *6 (S.D.N.Y. Feb. 10, 2009) (plaintiff must allege "that defendants had knowledge of the similarly situated individuals *at the time they decided to sue him*.") (emphasis added); *Hafez v. City of Schenectady*, 894 F. Supp. 2d 207, 227 (N.D.N.Y. 2012) (plaintiff "failed to put forth any other similarly situated individuals whose property taxes were not increased (during the same time period)."); *Lamothe v. Town of Oyster Bay*, 2012 WL 6720781, at *9 (E.D.N.Y. Dec. 27, 2012) (defendant "was not aware of [other] building code violations" when it enforced the building code against the plaintiffs); *Bernstein v. Village of Wesley Hills*, 95 F. Supp. 3d 547, 571 (S.D.N.Y. 2015) ("plaintiff must demonstrate that the defendant was aware of similarly-situated entities, and failed to take comparable action against them.").

14

case is at an earlier procedural stage than *Spiegel* (a summary judgment decision), facts which have emerged to date already depict starker enforcement disparities than the *Spiegel* court confronted.  Unlike the Park Agency in *Spiegel*, Defendants here did not even open investigative files on non-NRA entities engaged in identical affinity-insurance market conduct.  In any event, the date that DFS opened its investigation into the NRA's insurance programs is irrelevant. The relevant date or dates is the date DFS took action against the NRA, or its business partners.

Here, the SAC alleges that DFS became aware of "pervasive" comparator market conduct "beginning during the Fall of 2017," at the same time its investigation of the NRA commenced; the SAC even details the nature of such market conduct, and why it was known to be pervasive.[51] The NRA alleges that DFS's knowledge of this pervasive comparator conduct surfaced in surreptitious meetings conducted beginning February 2018.[52]  As 2018 wore on, Defendants (including Vullo) continued to single out the NRA's business partners in preparation for an ultimate enforcement action against the NRA—which was the outcome that Defendants (including Vullo) target from the very beginning.  By the time DFS began entering into formal consent orders with middleman entities such as Lockton and Chubb in May 2019, Defendants, including Vullo, were fully apprised—via covert meetings, and in connection with the Lockton consent-order negotiations[53]—of the existence of comparator programs.  Defendants intentionally spared those programs the unconstitutional scrutiny leveled at the NRA, amounting to selective enforcement claim.

---

[51] *See* SAC at ¶ 65.

[52]  *See* SAC at ¶ 69

[53] *See* SAC at ¶¶ 22, 65-66, 110.

15

A-331

3.      **The Magistrate Judge Properly Sustained the NRA's "See-No-Evil" Claim.**

The Second Circuit has long recognized that even absent specific awareness of comparator conduct, a selective-enforcement claim arises where the government "did not know of prior violations because it adhered to a see-no-evil policy of not enforcing an ordinance, then abandoned that policy with respect to a violator engaged in protected activity."[54]  This standard is satisfied, as in *Abel v. Morabito*, where the government "fail[s] to ask whether there [a]re any other individuals who [a]re then similarly situated to the plaintiff" before targeting the plaintiff via a novel, harsh enforcement approach.[55]  The Motion utterly ignores the *Abel* and *Tower Properties*[56] decisions cited by the Magistrate Judge, and simply insists that the "see-no-evil" doctrine ought to be interpreted narrowly than those cases mandate.  But Vullo's disregard for the authorities on which Magistrate Judge Hummel relies does not make those authorities (or the Decision) clearly erroneous within the meaning of Fed. R. Civ. P. 72(a).

For the foregoing reasons, the NRA adequately alleges Vullo's knowledge for selective-enforcement purposes, and the arguments set forth in Section II.B of the Motion fail.

C.      **Vullo Is Not Entitled to Absolute or Qualified Immunity on Any of the NRA's Claims.**

Finally, Sections II.A, II.C, and III of the Motion assert various absolute-immunity and qualified-immunity arguments arising from Vullo's prior status as a state official.  None suffice to bar the NRA's claims.

---

[54] *See LaTrieste Rest. v. Village of Port Chester*, 188 F.3d 65, 70 n.1 (2d Cir. 1999). *See also Abel v. Morabito*, 2009 WL 321007, at *6 (S.D.N.Y. Feb. 10, 2009).

[55] *See* Decision at 26, citing *Abel*, 2009 WL 321007 at *6.

[56] *See Tower Properties LLC*, 2015 WL 4124499.

16

A-332

Public policy rarely countenances immunizing civil servants for unconstitutional discrimination.[57] Vullo insists that any official serving as a "prosecutor" must be impervious to constitutional recourse, but Vullo is wrong. Instead, even to the extent that an official may function as a prosecutor, her immunity from suit is "based upon the same considerations that underlie common-law immunities of judges": namely, those mandating the protection of the judicial process.[58] Thus, a prosecutor is only absolutely immune when she performs "quasi-judicial" activities that are "intimately associated with the judicial phase" of the enforcement process, such as "the initiation of a prosecution and the presentation of the government's case" before a court or administrative tribunal.[59] Because Vullo's challenged actions here, including her backroom meetings with Lloyd's, were investigative rather than quasi-judicial, no absolute immunity exists.

### 1.    Vullo's Conduct Was Investigative In Nature.

The Supreme Court has held that absolute immunity does not apply to functions typically performed by investigative agents, even if those functions are conducted by officials, such as prosecutors, who may enjoy immunity in other contexts.[60] The Second Circuit has made clear that prior to a "formal legal proceeding" being initiated and the existence of probable cause for the proceeding, officials' conduct is deemed to be investigative, and absolute immunity does not exist.[61] Nor does "the mere fact that a . . . later [proceeding is] convene[d] . . . automatically serve

---

[57] *See Harlow v. Fitzgerald*, 457 U.S. 800, 809 (1982) (rejecting the application of absolute immunity to high government officials because their "greater power . . . affords a greater potential for a regime of lawless conduct") (internal quotation marks omitted).

[58] *See e.g., Imbler v. Pachtman*, 424 U.S. 409, 431 (1976); *see also Taylor v. Kavanagh,* 640 F.2d 450, 452 (2d Cir. 1981).

[59] *See Kavanagh,* 640 F.2d at 452.

[60] *See id.*

[61] *See Hill v. City of New York*, 45 F.3d 653, 661 (2d Cir.1995); *see also Norton v. Town of Brookhaven*, 33 F. Supp. 3d 215, 230-31 (E.D.N.Y. 2014) (denying absolute immunity for the deputy town attorney with respect to investigative work prior to the filing of the formal complaint, including encouraging another defendant to file the

17

A-333

to cloak . . . prior investigatory actions with the protection of absolute immunity."[62]  Courts clearly distinguish between "'preparing for the presentation of an existing case,' on the one hand, and attempting to 'furnish evidence on which a prosecution could be based,' on the other hand—only the former entitles a prosecutor to absolute immunity."[63]  Only the latter category of conduct is at issue here.[64]  Therefore, with respect to absolute immunity, the Motion fails.

It is undisputed that no judicial or quasi-judicial enforcement proceeding commenced against the NRA during Vullo's tenure.  The NRA also alleges that Vullo violated its Equal Protection rights by selectively targeting the NRA in DFS's ***investigation*** of certain affinity programs, but failing to make similar inquiries into other similar membership affinity programs.[65]  Aware of this defect in her absolute-immunity argument, Vullo relies extensively on a non-binding First Circuit case, *Knowlton*,[66] which she contends is "squarely on point to" this case.[67]  In truth, the facts of *Knowlton* are not remotely identical to those here.[68]  Indeed, the *Knowlton* court expressly distinguished cases, like this one, which encompass "investigative steps taken to search

---

formal complaint); *Peters v. City of Buffalo*, 848 F. Supp. 2d 378, 386 (W.D.N.Y. 2012) (opining that "'[a]ctions taken prior to the start of a formal legal proceeding are not entitled to absolute immunity because prior to the start of such a formal proceeding, the prosecutor has not stepped into his role as an advocate.'") (quoting *Simon v. City of N.Y.*, 819 F. Supp. 2d 145, 149 (E.D.N.Y.2011)).

[62] *See Anilao v. Spota*, 2018 WL 6190519, at *16 (E.D.N.Y. Nov. 28, 2018).

[63] *See Norton*, 33 F. Supp. 3d at 231 (quoting *Smith v. Garretto*, 147 F.3d 91, 94 (2d Cir. 1998)).

[64] *Cf. White v. Lee*, 227 F.3d 1214, 1228-29 (9th Cir. 2000) (United States Department of Housing and Urban Development officials could be held liable for investigation that threatened free speech).

[65] *See* SAC at ¶¶ 36-37.

[66] *See* Motion at 13.

[67] *See id.*, at 8.

[68] In *Knowlton*, an insurance-company employee who had been terminated pursuant to a consent decree between his employer and a state insurance regulator challenged his dismissal, asserting civil rights violations and various torts.  Noting specifically that plaintiff "fail[ed] to fully develop th[e] argument" that state officials' actions were investigative rather than prosecutorial in nature, the First Circuit upheld dismissal on absolute-immunity grounds.  *See Knowlton v. Shaw*, 704 F.3d 1, 7 (1st Cir. 2013).

18

for 'clues and corroboration'" (such as the issuance of subpoenas)[69] or actions taken "during the preliminary investigation" of a potential offense (such as Vullo's alleged early coordination with Everytown and Cuomo, and later backroom meetings with Lloyd's, which sought to target the NRA for political reasons).[70]

### 2. <u>Even If Vullo's Conduct Could Not Squarely Be Categorized As "Investigative," The Motion Fails To Demonstrate Vullo Engaged In A "Quasi-Judicial Function."</u>

Although an executive official's exercise of her investigative function represents one clear situation where no "quasi-judicial function" (thus, no absolute immunity) exists, the inquiry does not end there.  Even if the actions challenged by the NRA were not obviously investigative (and they are), absolute immunity would require that Vullo prove her actions were "quasi-judicial" pursuant to a six-factor test established by the United States Supreme Court.  These factors, commonly known as the *Butz* factors, are:

> (1) the need to assure that the individual can perform his functions without harassment or intimidation; (2) the presence of safeguards that reduce the need for private damages actions as a means of controlling unconstitutional conduct; (3) insulation from political influence; (4) the importance of precedent; (5) the adversary nature of the process; and (6) the correctability of error on appeal.[71]

Defendants do not even mention these factors in their Motion, and factors two through six, in particular, show that absolute immunity cannot apply to Vullo in this action.

Although there are some safeguards to protect parties from unconstitutional conduct by the DFS Superintendent, the efficacy of those safeguards is diminished by other provisions of the

---

[69] *See id.* at 8 (internal citations omitted).

[70] *See id.*; SAC at ¶¶ 34-37.

[71] *See Cleavinger v. Saxner*, 474 U.S. 193, 202 (1985).

19

Financial Services Law.  Specifically, although a party is entitled to notice and a hearing, the "independence" of any hearing is severely undermined because it is held before the Superintendent or an individual directly designated by the Superintendent.  Additionally, the hearing officer only has the power to suggest a course of action, while the Superintendent has the final authority to reject the recommendation and issue whatever order she desires.[72]  In short, Vullo has virtually unfettered ability to act in an unconstitutional manner without appropriate safeguards.[73]

The third *Butz* factor, insulation from political influence, weighs heavily against absolute immunity because Vullo serves at the will of the Governor.[74]  Additionally, no provision of the Financial Services Law or the Insurance Law indicates that DFS or its Superintendent place any value on precedent when making decisions with respect to violations of the Insurance Law—nor has Vullo presented any such evidence.  Furthermore, the issuance of the Consent Orders (or any future order against the NRA) lacked key elements of an adversarial proceeding, such as a hearing in front of a "neutral decision maker and evidentiary rules."[75]

Finally, *Butz* also requires the Court to consider whether Vullo's actions are "correctabl[e] on appeal."  While an action taken by Vullo could be reviewed in an Article 78 proceeding, "in the context of determining whether absolute immunity is appropriate, Article 78 proceedings are generally not considered adequate avenues for 'appeal.'"[76]

---

[72] *See* N.Y. Fin. Serv. § 305 (McKinney).

[73] *See DiBlasio v. Novello*, 344 F.3d 292, 299 (2d Cir. 2003).

[74] *See* N.Y. Fin. Serv. § 202(a) (McKinney) ("The head of [DFS], . . . shall be appointed by the governor [and] . . . shall hold office *at the pleasure of the governor*.") (emphasis added); *see also DiBlasio*, 344 F.3d at 298 (holding that if "the commissioner of health 'serves at the will of the Governor,' . . . it would be improper to characterize the commissioner as insulated from political influence").

[75] *See DiBlasio*, 344 F.3d at 299; N.Y. Fin. Serv. § 305(e) (McKinney).

[76] *See DiBlasio*, 344 F.3d at 299 (quoting *Young v. Selsky*, 41 F.3d 47, 54 (2d Cir. 1994)).

20

Accordingly, even if the Court determines Vullo's action extend beyond mere investigatory functions, her conduct still does not entitle her to absolute immunity.

###    3.    Any Ambiguity Regarding Absolute Immunity Should Be Resolved After Discovery.

Finally, "when it may not be gleaned from the complaint whether the conduct objected to was performed by the prosecutor in an advocacy or an investigatory role, the availability of absolute immunity from claims based on such conduct cannot be decided as a matter of law on a motion to dismiss."[77]   The NRA believes that Vullo's contentions regarding absolute immunity can readily be rejected based on the four corners of the SAC.  However, to the extent that any doubt remains, the Court should defer resolution of this issue until after fact discovery.

### D.    Vullo Is Not Entitled to Qualified Immunity.

Next, Vullo invokes qualified immunity with respect to both the NRA's First Amendment and Equal Protection claims.  Vullo argues that because the extensive constellation of troubling facts alleged by the NRA includes public statements by Vullo expressing viewpoint-based animus against it, Vullo could not have known that Defendants' calculated campaign to deprive the NRA of insurance and banking services by threatening and punishing its business partners violated any clearly established First Amendment[78] or Equal Protection right.[79]   Vullo further argues that the implications of failing to immunize her are "chilling indeed":  under a regime where the

---

[77] *See Hill*, 45 F.3d at 663; *see also Bertuglia v. City of N.Y.,* 839 F. Supp. 2d 703, 732 (S.D.N.Y. 2012) (delaying decision on whether a prosecutor was immune in an abuse of process claim because the role the prosecutor played "is a factual dispute that cannot be resolved on this motion [to dismiss]"); *Anilao v. Spota*, 774 F. Supp. 2d 457, 485 (E.D.N.Y. 2011) (deferring judgment on whether the prosecutors were acting as investigators or advocates in Section 1983 case); *Hickey v. City of N.Y.*, 2002 WL 1974058, at *4 (S.D.N.Y. Aug. 26, 2002) (reserving judgment on whether prosecutors were immune from false arrest and conspiracy claims since "the presence or absence of absolute immunity turns on what the prosecutor is alleged to have done, and not on the legal theory advanced or the label attached to the cause of action").

[78] *See* Motion Section III.

[79] *See id.* Section II.C.

government's open, contemporaneous expression of political hostility toward an investigative

target can even be mentioned in a selective-enforcement or retaliation lawsuit, the Motion insists,

"political foes of government regulators could simply flout insurance laws."[80]  This is a meritless

red herring.  As the Court previously, rightly held, "Second Amendment viewpoint animus"[81] is

relevant to the NRA's constitutional claims, even if pure government speech expressing such

animus cannot be dispositive of those claims.  Thus, the fact that New York's head financial

regulator openly declared war on the NRA cannot immunize her from constitutional scrutiny

regarding her motives and methods.  Even the barest such scrutiny upholds the NRA's claims

against Vullo, especially at the pleading stage.

     **1.**     <u>**Qualified Immunity Is A Fact-Specific Inquiry That Should Be Undertaken
After Fact Discovery.**</u>

Qualified immunity rarely supports a motion to dismiss and does not do so here.[82]  Given

the nature of Defendants' attacks on the NRA, dismissal on grounds of qualified immunity would

be particularly inappropriate.  Understanding the nature of Vullo's decision-making, and the

circumstances and motivation giving rise to it, requires detailed factual analysis that cannot be

definitively ascertained at this stage.[83]  The Supreme Court has cautioned that "[t]he fate of an

---

[80] *See id.* at 28.

[81] *See* ECF No. 188 at 9.

[82] *See McKenna v. Wright*, 386 F.3d 432, 434 (2d Cir. 2004) (holding that a qualified immunity defense may
be presented during a motion to dismiss, but "the defense faces a formidable hurdle when advanced . . . at this
preliminary stage"); *see also Jones*, 465 F.3d at 63-64 (refusing to grant summary judgment on qualified immunity
grounds because of factual disputes); *Hayes v. City of Amsterdam*, 770 N.Y.S.2d 138, 140-41 (2d Dep't 2003) (same);
*Munoz v. City of N.Y.*, 2008 WL 464236, at *7 n.6 (S.D.N.Y. Feb. 20, 2008) (same).

[83] *See Munoz*, 2008 WL 464236, at *7 n.6 ("Clearly, without a factual resolution of the sharply conflicting
versions of these events, it is not possible to determine whether defendants are qualifiedly immune.") (internal
quotation marks omitted); *see also Bernstein v. City of N.Y.*, 2007 WL 1573910, at *9 (S.D.N.Y. May 24, 2007)
("Because the qualified immunity defense necessarily involves a fact-specific inquiry, '[i]t is generally premature to
address the defense of qualified immunity in a motion to dismiss pursuant to [Rule] 12(b)(6).'") (quoting *Walker v.
Mendoza*, 2000 WL 915070, at *7 (E.D.N.Y. June 27, 2000) (alterations in original)).

A-338

official with qualified immunity depends upon the circumstances and motivations of his actions, as established by the evidence *at trial*."[84]

The Second Circuit has explained that "a defendant presenting an immunity defense on a Rule 12(b)(6) motion instead of a motion for summary judgment must accept the more stringent standard applicable to this procedural route."[85]  "Not only must the facts supporting the defense appear on the face of the complaint, but . . . the motion may be granted *only where it appears beyond doubt* that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief."[86]  Therefore, the Court is bound to not only make all reasonable inferences in the NRA's favor, but may only rely on allegations in the SAC to *support* any application of qualified immunity.[87]  Defendants fail, however, to identify any allegations in the SAC that warrant granting qualified immunity.

It would be error for the Court to dismiss the NRA's Equal Protection or First Amendment claims on the grounds of qualified immunity because such a defense is highly fact specific.[88]  Accordingly, the Court should require them to prove entitlement to this defense at a later stage.[89]

---

[84] *See Imbler*, 424 U.S. at 419 n.13 (emphasis added).

[85] *See McKenna*, 386 F.3d at 436.

[86] *See id.* (internal quotation marks and citation omitted) (emphasis added).

[87] *See id.*

[88] *See Balakrishnan v. Kusel*, 2009 WL 1291755, at *9 (E.D.N.Y. May 8, 2009) (determining that "genuine issues of material fact preclude summary judgment on plaintiff's selective enforcement claim also preclude a grant of qualified immunity"); *see also Hemphill v. Schott*, 141 F.3d 412, 419 (2d Cir. 1998) (refusing to apply qualified immunity and explaining that "application of the doctrine [of qualified immunity] to claims in which an element of the violation is an unconstitutional motive or intent . . . creates the difficulty of . . . denying litigants the opportunity to present proof of that intent").

[89] *See Children First Found., Inc. v. Martinez*, 2005 WL 600283, at *3 (N.D.N.Y. Mar. 14, 2005) (determining that defendants "should assert qualified immunity in their answer and then proceed to a motion for summary judgment").

23

A-339

2. **The Conduct Alleged By The NRA Was Not "Objectively Reasonable" But, Rather, Violated Clearly Established Constitutional Rights**.

A defendant may not invoke qualified immunity with respect to violations of clearly established constitutional law.[90]  This standard does not require that an official commit specific acts which have "previously been held to be unlawful;"[91]  instead, wherever the unlawfulness of the alleged conduct would be "apparent" based on pre-existing law, qualified immunity vanishes.[92] Here, the NRA alleges that Vullo, in concert with the other Defendants, deliberately tailored New York's enforcement of its Insurance Law to target one of Cuomo's political adversaries, as part of a coordinated, multi-pronged campaign to suppress a disfavored political viewpoint.[93]  The SAC further alleges that Vullo conducted covert meetings conveying to regulated entities that comparator conduct (even if it violated the law) would continue to receive minimal or no scrutiny, so long as the NRA could be deprived even of lawful insurance services.[94]  Courts have routinely found that it is "clearly established that selective enforcement of a facially valid law based on an official's dislike of protected expression is unlawful;"[95] certainly, a sophisticated attorney and regulator like Vullo would have known that such conduct was improper.  Vullo insists that the

---

[90] *See Cuoco v. Moritsugu*, 222 F.3d 99, 109 (2d Cir. 2000) ("A government official is entitled to qualified immunity from suit for actions taken as a government official if (1) the conduct attributed to the official is not prohibited by federal law, constitutional or otherwise; (2) the plaintiff's right not to be subjected to such conduct by the official was not clearly established at the time of the conduct; or (3) the official's action was objectively legally reasonable in light of the legal rules that were clearly established at the time it was taken.").

[91] *See Anderson*, 483 U.S. at 640.

[92] *See id.*; *see also Saucier*, 533 U.S. at 201(opining that the legal right violated by the public official need not have been specifically articulated by a court to be clearly established at the time of the violation).

[93] *See* SAC at ¶¶ 20-23.

[94] *See e.g.*, SAC at ¶¶ 21, 67-69, 76.

[95] *See Burns v. Citarella*, 443 F. Supp. 2d 464, 470 (S.D.N.Y. 2006) (quoting *Field Day, LLC v. Cnty. of Suffolk*, 2005 WL 2445794, at *17 (E.D.N.Y. Sept. 30, 2005)); *see also Massi v. Flynn*, 254 F. App'x 84, 87 (2d Cir. 2007) (holding that "there can be no dispute" that the constitutional right to be free from selective treatment is clearly established); *Bush v. City of Utica, N.Y.*, 558 F. App'x 131, 134-35 (2d Cir. 2014) (same).

24

A-340

comparator conduct overlooked and excused at her direction was "less serious" than NRA-related conduct[96]—but Vullo and the other Defendants continue to stonewall discovery that would allow the fact-finder to assess the veracity of that claim.[97]   Vullo also argues that the NRA was not formally "enforced against" on her watch, but it is likewise clearly established that the conduct of an invasive, expensive investigation, even one which has not yet culminated in formal charges, may violate the target's constitutional rights if the investigation is discriminatory or retaliatory.[98]

**IV.**
**CONCLUSION**

For the foregoing reasons, the NRA respectfully requests that the Court affirm the Magistrate Judge's grant of leave to amend and deny Vullo's motion to dismiss the NRA's amended claims.

---

[96] *See* Motion at 30.

[97] Even at this stage, it is apparent that Vullo's emphasis on the "grave safety concerns" (Motion at 31)  posed by NRA-related insurance products will not hold water at trial: as the SAC alleges, Vullo's team aggressively targeted life, health, property and casualty policies that were marketed to NRA members, but had nothing to do with firearms, and were substantively identical to insurance products associated with other affinity groups. *See e.g.*, SAC ¶ 32, 59.

[98] *See e.g.*, *White v. Lee*, 227 F.3d 1214, 1228-29 (9th Cir. 2000).

25

A-341

Dated:  July 13, 2020                     Respectfully submitted,

                                          By:      /s/ Sarah B. Rogers
                                          _____

                                              William A. Brewer III (Bar No. 700217)
                                              wab@brewerattorneys.com
                                              Sarah B. Rogers (Bar No. 700207)
                                              sbr@brewerattorneys.com

                                          **BREWER, ATTORNEYS & COUNSELORS**
                                          750 Lexington Avenue, 14th Floor
                                          New York, New York 10022
                                          Telephone:  (212) 489-1400
                                          Facsimile:  (212) 751-2849

                                          **ATTORNEYS FOR THE NATIONAL RIFLE
                                          ASSOCIATION OF AMERICA**

26

A-342

**CERTIFICATE OF SERVICE**

I certify that on July 13, 2020, I caused a copy of the foregoing to be served upon the

following counsel electronically through the ECF system:

William A. Scott
Assistant Attorney General, Of Counsel
New York State Attorney General's Office
Albany Office, The Capitol
Albany, New York 12224-0341
Email:  William.Scott@ag.ny.com

Debra L. Greenberger
EMERY CELLI BRINCKERHOFF & ABADY LLP
600 Fifth Avenue
New York, New York 10020
Email:  dgreenberger@ecbalaw.com

/s/ Sarah B. Rogers
Sarah B. Rogers

2277-05
4835-2309-2674, v. 1

27

A-343

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

NATIONAL RIFLE ASSOCIATION OF AMERICA,

                    Plaintiff,

      v.

ANDREW CUOMO, both individually and in his
official capacity; MARIA T. VULLO, both
individually and in her official capacity; and
THE NEW YORK STATE DEPARTMENT OF
FINANCIAL SERVICES,

                    Defendants.

Case No. 18 Civ. 566 (TJM)(CFH)

**DEFENDANT VULLO'S REPLY IN FURTHER SUPPORT OF
APPEAL OF THE GRANT OF PLAINTIFF'S MOTION TO AMEND AND
MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**

Emery Celli Brinckerhoff & Abady LLP
600 Fifth Avenue, 10th Floor
New York, New York 10020
(212) 763-5000

*Attorneys for Defendant Maria Vullo*

A-344

TABLE OF CONTENTS

PAGE NO.

TABLE OF AUTHORITIES ................................................................................. ii – iv

PRELIMINARY STATEMENT ................................................................................1

ARGUMENT ............................................................................................................2

     I.     THE NRA DID NOT ESTABLISH A BASIS TO AMEND .................................3

     II.    THE NRA CONCEDES IT DID NOT PLEAD THE FACTS
           THIS COURT REQUIRED UPON DISMISSING
           THE SELECTIVE PROSECUTION CLAIM .........................................................3

     III.   ABSOLUTE IMMUNITY REQUIRES DISMISSAL OF
           THE NRA'S SELECTIVE ENFORCEMENT CLAIM ........................................7

     IV.   QUALIFIED IMMUNITY BARS THE SELECTIVE
           ENFORCEMENT CLAIM ......................................................................................11

     V.    QUALIFIED IMMUNITY ALSO BARS
           THE FIRST AMENDMENT CLAIM ...................................................................12

CONCLUSION.........................................................................................................13

A-345

TABLE OF AUTHORITIES

PAGE NO.

**Cases**

*Abel v. Morabito*,
  No. 04 Civ. 07284, 2009 WL 321007 (S.D.N.Y. Feb. 10, 2009) ...................................... 6

*Anderson v. Creighton*,
  483 U.S. 635 (1987) ............................................................................................................. 11

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ..................................................................................................... 1, 7, 11

*Bernstein v. Village of Wesley Hills*,
  95 F. Supp. 3d 547 (S.D.N.Y. 2015) ................................................................................... 6

*Bost v. Acevedo*,
  No. 9:12-CV-1548, 2015 WL 1201873 (N.D.N.Y. Mar. 16, 2015) ................................... 7

*Briscoe v. LaHue*,
  460 U.S. 325 (1983) ............................................................................................................. 11

*Burns* v. *Reed,*
  500 U.S. 478 (1991) ............................................................................................................... 8

*Butz v. Economou*,
  438 U.S. 478 (1978) ......................................................................................................... 9, 10

*Colon v. Coughlin*,
  58 F.3d 865 (2d Cir.1995) ..................................................................................................... 7

*DiBlasio v. Novello*,
  344 F.3d 292 (2d Cir. 2003) ................................................................................................. 9

*Harlow v. Fitzgerald*,
  457 U.S. 800 (1982) ....................................................................................................... 10, 13

*Hunter v. Bryant*,
  502 U.S. 224 (1991) ............................................................................................................. 10

*Knowlton v. Shaw*,
  704 F.3d 1 (1st Cir. 2013) ............................................................................................... 8, 10

*LaTrieste Restaurant v. Village of Port Chester*,
  188 F.3d 65 (2d Cir. 1999) ................................................................................................... 6

*Mangiafico v. Blumenthal*,
  471 F.3d 391 (2d Cir. 2006) ......................................................................................... 8, 9, 10

ii

*Mordukhaev v. Daus*,
   457 F. App'x 16 (2d Cir. 2012) ........................................................... 9

*Pabon v. Wright*,
   459 F.3d 241 (2d Cir. 2006) ............................................................. 11

*Pinaud v. County of Suffolk*,
   52 F.3d 1139 (2d Cir. 1995) ............................................................... 8

*Rubin v. Valicenti Advisory Servs., Inc.*,
   471 F. Supp. 2d 329 (W.D.N.Y. 2007) .............................................. 2

*Rudow v. City of New York*,
   822 F.2d 324 (2d Cir. 1987) ............................................................. 10

*Sash v. United States*,
   674 F. Supp. 2d 531 (S.D.N.Y. 2009) ................................................ 7

*Scott v. Fischer*,
   616 F.3d 100 (2d Cir. 2010) ............................................................. 11

*Spiegel v. Adirondack Park Agency*,
   662 F. Supp. 2d 243 (N.D.N.Y. 2009) ............................................... 5

*Sprecher v. Graber*,
   716 F.2d 968 (2d Cir. 1983) ............................................................. 10

*Stetz v. Reeher Enterprises, Inc.*,
   70 F. Supp. 2d 119 (N.D.N.Y. 1999) ................................................. 2

*Tower Properties LLC v. Village of Highland Falls*,
   No. 14-CV-04502, 2015 WL 4124499 (S.D.N.Y. July 7, 2015) ........ 6

*Uppal v. N.Y. State Dept. of Health*,
   No. 16-CV-3038, 2019 WL 4735385 (S.D.N.Y. Sept. 27, 2019) ....... 9

*Wood v. Moss*,
   572 U.S. 744 (2014) ......................................................................... 10

*Young v. Selsky*,
   41 F.3d 47 (2d Cir. 1994) ................................................................... 9

*Zieper v. Metzinger*,
   474 F.3d 60 (2d Cir. 2007) ............................................................... 12

**Statutes & Rules**

23 NYCRR § 2.10 ..................................................................................... 9

23 NYCRR § 2.2(c) ............................................................................................ 9

Fed. R. Civ. P. 12(b)(6) ..................................................................................... 2

Fed. R. Civ. P. 72(a) ......................................................................................... 2

Insurance Law § 2116 ........................................................................................ 4

Insurance Law § 2122(a)(1) ............................................................................... 4

Insurance Law § 2324(a) .................................................................................... 4

N.Y. Fin. Servs. § 305 ....................................................................................... 9

N.Y. Fin. Servs. § 305(b) ................................................................................... 9

N.Y. Fin. Servs. § 308 ....................................................................................... 9

**PRELIMINARY STATEMENT**

The NRA's opposition demonstrates that it has no more basis today to bring a selective prosecution claim against Ms. Vullo than it did when this Court last dismissed this claim. Indeed, the NRA concedes it cannot comply with this Court's order that it must allege Ms. Vullo's specific knowledge of the Lockton affinity violations this Court held were valid comparators, as Ms. Vullo had no such knowledge. On its "second bite" at a selective enforcement theory, the NRA changes its theory—*again*. The NRA's argument is now about a different company, claiming that evidence involving Lloyd's can somehow plug the "comparator" hole identified by this Court in Plaintiff's selective enforcement theory as to Lockton. It simply does not work. The SAC pleads *no specific* violations that Ms. Vullo supposedly knew about and ignored. The NRA's conclusory allegations amount to nothing more than "everyone does it"; it states no specific allegations that Ms. Vullo knew and failed to prosecute violations by a valid comparator. The *only* Lloyd's violations Ms. Vullo prosecuted are the very violations for which the NRA admits there is no non-NRA-related comparator: selling an illegal firearms-related insurance policy. The SAC fails to plead a valid selective prosecution claim.

What is more, because entering into consent orders is classic "prosecutorial activity," the NRA cannot overcome Ms. Vullo's absolute prosecutorial immunity on this claim. And its wholly novel selective prosecution claim—though Ms. Vullo never actually prosecuted the NRA, and the entities she did prosecute *admitted* liability—is also barred by qualified immunity.

More than fourteen months after dismissing the NRA's initial selective enforcement claim, the NRA *still* has not done what the Court demanded of it, which is to identify a valid, non-NRA-related comparator upon which a selective enforcement claim can rest. As *Ashcroft v. Iqbal*, 556 U.S. 662, 676–77 (2009)*, holds, in a case against a high official, motive cannot be imputed; it must be pled and shown. Here, the NRA's effort to impute to Ms. Vullo the

1

A-349

"knowledge" of a vast market marketplace, and of a 1400+-person state agency must be rejected. As DFS Superintendent, Ms. Vullo properly prosecuted significant violations of the Insurance Law by insurance entities who all *admitted* the misconduct. There being no valid comparator to assess, other conduct that was *not* prosecuted is simply beside the point.

The NRA's First Amendment claim fares no better: The NRA never even engages with Ms. Vullo's analysis that qualified immunity protects government officials engaging in protected government speech, where, as here, there is no "clearly established law" indicating that the conduct was unlawful. Particularly where, as this Court has recognized, there is a "fine line" between permissible and impermissible government speech, qualified immunity applies.

The NRA's complaint as to Ms. Vullo should be dismissed in its entirety.

## ARGUMENT

On this Rule 12(b)(6) motion, the Court should resolve the legal issues squarely presented before it, including the issues of absolute and qualified immunity, and the NRA's failure to satisfy this Court's May 2019 decision dismissing the NRA's prior selective prosecution claim. Contrary to the NRA's claim, this Court should not simply accept the magistrate judge's decision that the NRA properly alleged (albeit "sparse[ly]," Dkt. 202 at 27) Ms. Vullo's knowledge of comparators. Even if framed as a review of the magistrate judge's decision, a decision that is "contrary to law" requires reversal under any standard of review.[1] *Stetz v. Reeher Enterprises, Inc.*, 70 F. Supp. 2d 119, 121 (N.D.N.Y. 1999) (McAvoy, C.J.) (reversing magistrate judge's order allowing amendment due to futility of amendment). In any event, this Court can and must assess the validity of the NRA's amended pleadings independently, as the Rule 12(b)(6) motion was not before the magistrate judge.

---

[1] It remains an open question whether a motion to amend a pleading is a non-dispositive decision warranting Rule 72(a) "clear error" review. *Rubin v. Valicenti Advisory Servs., Inc.*, 471 F. Supp. 2d 329, 333 (W.D.N.Y. 2007).

## I.     THE NRA DID NOT ESTABLISH A BASIS TO AMEND

The NRA should not have been allowed to belatedly amend. The NRA attached certain documents it obtained from Lloyd's to its SAC as "proof" of Ms. Vullo's purported knowledge of comparators and, inferentially, of her alleged bias against the NRA. They show nothing of the kind. The Lloyd's documents make no mention of Ms. Vullo at all and do not indicate that she was aware of comparators that she declined to prosecute. Effectively admitting that the documents alone provide an insufficient substantive basis for its new allegations against Ms. Vullo, the NRA instead claims that an unnamed "consulting expert" somehow divined Ms. Vullo's state of mind from these same documents—although, citing the work-product doctrine, it declines to reveal how. NRA Br. at 6-7. This too is nonsense: No "expert" can divine Ms. Vullo's knowledge—and there is no evidence of her knowledge of any so-called comparators. *See* Dkt. 112 at 8 (requiring NRA to plead "Vullo knew of non-firearm-related Insurance Law violations by the comparators"). The NRA was required to establish a basis for its untimely amendment. It has none. Its amendment was in bad faith and should not have been permitted.

## II.     THE NRA CONCEDES IT DID NOT PLEAD THE FACTS THIS COURT REQUIRED UPON DISMISSING THE SELECTIVE PROSECUTION CLAIM

As this Court recently noted in its decision denying the NRA's preliminary injunction motion, the NRA's selective enforcement claim alleges that "Supt. Vullo violated the NRA's equal protection rights by *failing* to prosecute affinity-insurance programs similarly situated to the NRA-related programs addressed in the Consent Orders entered by Lockton, Chubb, and Lloyd's," and "the core issue" is whether "Supt. Vullo was aware of these similarly situated programs yet failed to prosecute them." Dkt. 218 at 19, 20. Yet the SAC *still* does not identify a single non-NRA affinity program which Vullo knew about and declined to prosecute. This alone requires dismissal of the NRA's repeat attempt to replead this failed claim.

3

A-351

The NRA admits that it did not plead that "Supt. Vullo had knowledge of the specific violations identified in paragraph 59 of the Amended Complaint," as this Court required. Dkt. 112 at 9. To the contrary, the NRA's own pleadings *admit*, SAC ¶ 78 & Ex. J, that Ms. Vullo *did* enforce against Lockton for its *non-NRA* affinity-insurance programs for "violat[ing] certain non-firearm-related Insurance Law regulations," SAC ¶ 7. The NRA instead conjures a *new* theory based only on its vague (and false) allegation in paragraph 21 that Ms. Vullo allegedly knew of "technical regulatory infractions plaguing the affinity-insurance marketplace." SAC ¶ 21. Unlike paragraph 59 which detailed specific statutory violations (Insurance Law §§ 2122(a)(1), 2324(a), and 2116) and specific affinity programs (AOAExcel, Moose, the VFW, the PPA)— paragraph 21 speaks in broad generalities, without listing any specific violations or affinity programs, but rather the entire "marketplace." The NRA cannot possibly satisfy this Court's command or Supreme Court caselaw requiring specifics by painting with broad (and vague) brushstrokes.

It was precisely the details that the SAC lacks that this Court held were essential to finding the entities similarly-situated: "The Amended Complaint details several affinity groups operating in New York whose insurance programs allegedly resemble those of the NRA, in some instances containing language identical to the allegedly-violative language associated with the NRA programs, that were not targeted by the DFS." Dkt. 112 at 6. When one looks at the SAC, one asks: which affinity programs, specifically, did Ms. Vullo know about but did *not* enforce against? And how can this Court determine whether the "affinity-insurance marketplace," SAC ¶ 21, in its entirety, is similarly situated to the NRA such that a valid equal protection claim can properly be alleged? The SAC offers no answers.[2]

---

[2] Having not timely sought reconsideration, the NRA improperly ignores this Court's holding that it must plead Ms. Vullo's knowledge "*when* DFS commenced its investigation." Dkt. 112 at 11 (emphasis added). But in *Spiegel v.*

4

A-352

The NRA ignores this Court's injunction that it plead Ms. Vullo's knowledge of *Lockton's* affinity violations—clearly, it cannot make such a claim consistent with Rule 11—and instead asserts generally that Superintendent Vullo "made clear" that "*Lloyd's* could avoid liability for infractions relating to other, similarly situated insurance policies, so long as it aided DFS's campaign against gun groups." SAC ¶ 69. Where are the *factual* allegations that support that Ms. Vullo knew of any specific affinity group that had committed similar infractions? They are not in the SAC—and they do not exist. If they did, the NRA would have pled them. Lacking *any* allegation of any *specific* violation that Ms. Vullo "consciously declined" to enforce, the SAC's selective enforcement claim is more deficient—*far* more deficient—that the one this Court dismissed in May 2019. Dkt. 112 at 8. In the end, the NRA leaves this Court with a baseless hodgepodge of conclusory allegations, none of which meets the standard.

The NRA's effort to use conclusory allegations involving *Lloyd's* to plug a hole in its selective enforcement claim left with respect to *Lockton* also fails because of the stark differences between the two entities and their conduct, rendering the claim further implausible. Lockton is an insurance broker—not an insurer—and, as such, it was found responsible for violating the so-called "Additional Provisions," which involve *broker-related* conduct. SAC Ex. D (first Lockton consent order). Lloyd's, by contrast, is an *insurer*, not a broker—and it had committed violations related to the insurance policy itself, namely that the policy coverage for the use of a firearm was illegal. *Id.* Ex. I (Lloyd's consent order). Lloyd's did not violate the "Additional Provisions" because it could not: As the insurer, it had nothing to do with administering the affinity program. *Id.* That was the business of the broker Lockton. The NRA

---

*Adirondack Park Agency*, which the NRA cites, the defendant never argued that the latter in time complaint made the comparator not similarly situated. 662 F. Supp. 2d 243, 254 (N.D.N.Y. 2009) (dismissing selective enforcement claim). Here, the NRA's bare-bones allegations speak only to Ms. Vullo's knowledge at a point when DFS was well into its investigation, further establishing that there were no similarly-situated entities not enforced against.

A-353

seeks to elide these crucial differences, but they are central to both the consent orders themselves and the respective roles that Lockton and Lloyd's play in the insurance business in New York. As such, the NRA cannot replace Lloyd's for Lockton under its selective prosecution theory about the Additional Provisions—even were its allegations about Ms. Vullo's knowledge specific enough. At bottom, all the NRA has is the prosecution of Lloyd's for admittedly illegal firearms insurance policies through a consent order involving admitted violations—as to which there is no comparator to the NRA.

The NRA cannot save its failure to plead Ms. Vullo's specific knowledge with a conclusory allegation of "see no evil"—a claim for which, in any event, Ms. Vullo is entitled to qualified immunity, *see* Dkt. 211-1 ("Op. Br.") at 8. Since the Circuit's first mention of the theoretical *possibility* of a "see-no-evil" theory, *LaTrieste Restaurant v. Village of Port Chester*, 188 F.3d 65, 70 n.1 (2d Cir. 1999), nearly every case squarely has rejected attempts to so plead. *See Bernstein v. Village of Wesley Hills*, 95 F. Supp. 3d 547, 572 n.33 (S.D.N.Y. 2015) (collecting cases). Plaintiff's two cases holding otherwise evidence the exceptional nature of this theory, as in each the villages *admitted to decades of non-enforcement* of similar violations.[3] The NRA has pleaded *no* facts establishing that DFS's enforcement was "unprecedented," and admits that DFS *did* enforce against similar non-NRA violations. Op. Br. at 21; Dkt. 218 at 8 n.5.

Finally, because the NRA has no basis to plead that Ms. Vullo decided to selectively not enforce the law, it makes a last-second assertion that she somehow is subject to a claim of individual liability as a "supervisor," even though she did not know of any specific unenforced violations. This new theory, absent from the SAC, is precluded by Supreme Court precedent. The

---

[3] *Tower Properties LLC v. Village of Highland Falls,* No. 14-CV-04502, 2015 WL 4124499, at *9 (S.D.N.Y. July 7, 2015) (parties agreed that the town had not enforced a curfew ordinance for at least the last forty years); *Abel v. Morabito*, No. 04 Civ. 07284, 2009 WL 321007, at *6 (S.D.N.Y. Feb. 10, 2009) (defendants confirmed under oath that the enforcement was unprecedented in the entire town's collective memory).

6

A-354

NRA cites a five-factor test from *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995). Since *Colon,* the Supreme Court expressly rejected the argument that "a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution." *Iqbal*, 556 U.S. at 676–77. Officials "cannot be held liable unless they themselves acted on account of a constitutionally protected characteristic"; a "subordinate's" alleged purpose is irrelevant. *Id.* at 683. As this Court held, to allege that Ms. Vullo "consciously declined" to enforce against comparators, Dkt. 112 at 11, the NRA must plead that Ms. Vullo *herself* knew of such comparators—not just that others in her large agency may have.[4]

This Court need go no further than its own May 2019 order: The NRA has not pled and cannot plead a specific, valid comparator upon which a selective enforcement claim can rest. The time has come to end the NRA's (harassing) efforts to assert claims against Ms. Vullo that they cannot now, and can never, support.

## III.   ABSOLUTE IMMUNITY REQUIRES DISMISSAL OF THE NRA'S SELECTIVE ENFORCEMENT CLAIM

Recognizing that entering into consent orders is classic "prosecutorial activity" entitling Ms. Vullo to absolute immunity, the NRA gamely recasts its failed claim as being based on "selective . . . *investigation*," NRA Br. at 18, even as it admits, as it must, that its selective enforcement claim is premised on DFS's acts of actual enforcement, not on DFS's pre-enforcement investigation: "the date that DFS opened its investigation into the NRA's insurance programs is irrelevant. The relevant date or dates is the date DFS took action against the NRA, or its business partners," NRA Br. at 15. *See infra* at 11 (no clearly established "selective investigation" claim). The only enforcement *action* Ms. Vullo took "against the NRA, or its

---

[4]  Whatever the continuing viability of the *Colon* factors after *Iqbal*—a debated question—supervisory liability cannot apply to constitutional claims requiring "discriminatory intent," as a selective enforcement claim requires. *Sash v. United States*, 674 F. Supp. 2d 531, 544 (S.D.N.Y. 2009), *cited in Bost v. Acevedo*, No. 9:12-CV-1548, 2015 WL 1201873 at *14 n. 5 (N.D.N.Y. Mar. 16, 2015) (McAvoy, J., adopting report and recommendation).

business partners" was the execution of the four consent orders with Lockton, Lloyd's, and Chubb.[5]  In entering into those four consent orders, Ms. Vullo exercised her prosecutorial authority as head of a state agency charged with enforcing the state's insurance law. For this, she is entitled to absolute immunity. Op. Br. at 19 (citing cases); *see also Pinaud v. County of Suffolk*, 52 F.3d 1139, 1149 (2d Cir. 1995) (collecting cases applying absolute immunity to "decision whether to commence a prosecution" and "plea bargaining").

The NRA seeks to avoid absolute immunity by claiming that prosecutorial immunity only attaches to "the initiation of a prosecution and the presentation of the government's case," and that Ms. Vullo's conduct here was "investigative." NRA Br. at 17. Binding caselaw holds otherwise. Prosecutorial immunity—distinct from the judicial immunity cases the NRA cites— protects conduct that occurs both before and alongside the judicial phase.[6]  A prosecutor's conduct in securing a plea bargain—the direct analogy to a consent order—is not "investigative"; it is quintessentially prosecutorial—a decision to reach a consented-to resolution rather than "commit the state's resources, reputation, and prestige to litigation." *Mangiafico v. Blumenthal*, 471 F.3d 391, 396 (2d Cir. 2006); *see Knowlton v. Shaw*, 704 F.3d 1, 7–8 (1st Cir. 2013) (in an insurance enforcement proceeding, entering into consent decrees is preparatory to "the initiation of the enforcement proceeding—a proceeding that would have surely followed had no consent agreement been executed" and not "investigative"). This conduct is immune, absolutely.

---

[5] Because it cannot plead sufficient allegations about Ms. Vullo's conduct, the NRA obfuscates by citing obviously irrelevant activity—the AG subpoena and "the institution of an enforcement proceeding against the NRA," NRA Br. at 7—by Ms. Vullo's successor. The magistrate judge properly criticized the NRA for not justifying "how this information supports its efforts to replead its selective enforcement claim against Vullo." Dkt. 202 at 13 n.5. The NRA also included in its SAC (false) allegations about "backroom meetings with Lloyd's," NRA Br. at 17—but no Fourteenth Amendment claim for disparate enforcement can arise from a meeting where no enforcement occurred.

[6] *See Burns* v. *Reed,* 500 U.S. 478, 492 (1991) (immunity protects pre-indictment search warrant application during the investigative stage); *Butz v. Economou,* 438 U.S. 478, 516 (1978) (immunity encompasses "decision to initiate" agency adjudication"); *Mangiafico v. Blumenthal,* 471 F.3d 391, 396 (2d Cir. 2006) (immunity encompasses "actions preliminary to the initiation of a prosecution").

8

A-356

The NRA's separate attempt to claim that a DFS Superintendent's conduct, no matter how prosecutorial, does not warrant immunity also fails. As in *Butz*, an entity charged by DFS has ample statutory due process rights in a DFS hearing, as set forth in the applicable statutes and regulations and SAPA. *See* Op. Br. at 15 (citing N.Y. Fin. Servs. §§ 305, 308; 23 NYCRR § 2.10; 23 NYCRR § 2.2(c)). Had Lockton, Lloyd's, or Chubb not admitted liability, each would have had the opportunity to proceed with a DFS evidentiary hearing, be represented by counsel in front of an impartial hearing officer not previously involved in the matter, present evidence, hold the state to its burden of proof, cross-examine witnesses, and dispute the hearing officer's findings, as well as appeal to the state Supreme Court. The NRA claims, without support, that the Superintendent can "issue whatever order she desires." NRA Br. at 20. To the contrary, the hearing officer must prepare a report detailing the findings from the adversarial hearing, N.Y. Fin. Servs. § 305(b); and even assuming the Superintendent were to make the decision rather than a designee, a Superintendent who disregarded that report for political reasons, as the NRA conjures, would, by definition, be acting arbitrarily and capriciously, warranting reversal by the state court. *See Mordukhaev v. Daus*, 457 F. App'x 16, 21 (2d Cir. 2012) ("[T]he availability of an Article 78 proceeding to challenge any alleged deficiencies in an administrative adjudication is sufficient to satisfy due process.").[7] This statutory framework supports immunity under *Butz*.[8]

In claiming otherwise, the NRA cites *DiBlasio v. Novello*, 344 F.3d 292, 299 (2d Cir. 2003), which held that the Department of Health Commissioner was not absolutely immune for

---

[7] While the NRA cites *Young v. Selsky*, 41 F.3d 47, 54 (2d Cir. 1994) to claim that Article 78 review is inadequate, *Young* held only that damages, which were the only viable remedy for that due process deprivation, were unavailable in an Article 78, rendering it inadequate for appellant. In contrast, an Article 78 proceeding following a DFS administrative proceeding could, if warranted, vacate the liability determination and any penalty imposed.
[8] Contrary to the NRA's claim, courts often grant immunity under *Butz*'s general "reasoning" without a factor-by-factor analysis and no one factor controls. *Mangiafico v. Blumenthal*, 471 F.3d 391, 396 (2d Cir. 2006) (finding absolute immunity without factor-by-factor analysis); *Uppal v. N.Y. State Dept. of Health*, No. 16-CV-3038, 2019 WL 4735385, at *11 (S.D.N.Y. Sept. 27, 2019) ("[one negative factor] . . . does not counsel against" immunity).

*summarily and unilaterally* suspending a medical license *before* a formal suspension hearing—a completely non-analogous situation. While summary suspensions based on investigators' recommendations, without a hearing, and over the objection of the target, do, as the Circuit held, "lack sufficient similarity to the judicial process to warrant absolute immunity," *id.* at 298, the comparison fails. Here, Lockton, Lloyd's and Chubb—major insurance entities represented by sophisticated counsel—chose to forego their rights to a full evidentiary hearing that mirrors a judicial one, with the significant due process protections described above, and instead entered into a plea deal with the agency.

Courts have repeatedly held that administrative enforcement activity is absolutely immune under similar facts.[9] No court has ever held that absolute immunity does not protect conduct connected to DFS enforcement proceedings. If accepted, this argument would expose DFS officials who must enforce the insurance and banking laws against well-resourced financial institutions to "intimidation or harassment" from disgruntled law-breakers. *Butz*, 438 U.S. at 515.

The NRA's request that this Court *defer* its immunity decision—two-plus years into the case—is both audacious and squarely contrary to binding precedent. Absolute immunity "defeats a suit at the outset." *Mangiafico*, 471 F.3d at 394. The Supreme Court "repeatedly [has] stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991); *see also Harlow v. Fitzgerald*, 457 U.S. 800, 817–18 (1982) (immunity shields officials from "the burdens of broad-reaching discovery"). Governing authority has repeatedly supported pre-discovery dismissals on immunity grounds. *E.g.*, *Wood v. Moss*, 572 U.S. 744, 755 (2014) (per curiam); *Briscoe v. LaHue*, 460 U.S. 325, 345

---

[9] Op. Br. at 13 (citing *Knowlton*, 704 F.3d at 3–4, 9, and other cases); *see also Rudow v. City of New York*, 822 F.2d 324, 327 (2d Cir. 1987) (absolute immunity protects Human Rights Commission attorney who prosecuted complaint in a hearing before ALJ because "conduct was at least colorably prosecutorial in nature); *Sprecher v. Graber*, 716 F.2d 968, 971 (2d Cir. 1983) (absolute immunity applied to SEC enforcement officials).

10

(1983); *Anderson v. Creighton*, 483 U.S. 635 (1987); *Scott v. Fischer*, 616 F.3d 100, 111 (2d Cir. 2010). The availability of immunity here is a legal question; it does not require discovery.

## IV.    QUALIFIED IMMUNITY BARS THE SELECTIVE ENFORCEMENT CLAIM

As set forth in Ms. Vullo's opening brief, there is no case—none!—that clearly establishes the novel selective enforcement claim the NRA conjured now on the second try. The NRA's opposition concedes, by its silence, that no "existing precedent" placed "beyond debate," *Iqbal*, 556 U.S. at 741, any of the following constitutional questions:

(1) that an entity not enforced against by Ms. Vullo (the NRA) can state a claim based on "selective enforcement" against third parties (Lockton, Lloyd's and Chubb) who *admit to* violating the law, *see* Op. Br. at 28–30;

(2) that a comparator can be similarly situated if it committed only less-serious violations (here, the non-firearm violations) but did not commit the most serious misconduct (selling an illegal insurance product), *see* Op. Br. at 30–32

(3) "see no evil" as a basis for a selective enforcement claim, *see* Op. Br. at 32; **or**

(4) that an entity that Ms. Vullo investigated but did not enforce against (the NRA) has a Fourteenth Amendment equal protection claim of "selective *investigation*."

The complete absence of clearly established law on each of the first three propositions above, alone, compels qualified immunity. As to the fourth, the one case the NRA cites, *White v. Lee*, 227 F.3d 1214, 1228 (9th Cir. 2000), does not establish, let alone "clearly establish," the existence of a "selective investigation" claim. *White* cannot establish binding law because: (i) it holds only that an intrusive investigation "chilled the plaintiffs' exercise of their *First Amendment* rights"—*not* that an investigation *alone*—without any enforcement—gives rise to a stand-alone *Fourteenth Amendment* equal protection claim, *id.*, as the NRA claims here; and (ii) it is outside this Circuit.[10]  Notably, the NRA has never alleged (nor could it) that its First Amendment speech was chilled by the DFS investigation.

---

[10] *Pabon v. Wright,* 459 F.3d 241, 255 (2d Cir. 2006) ("[T]he law of our sister circuits and the holdings of district courts cannot act to render [a] right clearly established within the Second Circuit.").

The NRA has no response to Ms. Vullo's arguments that she acted objectively reasonably in prosecuting both (admitted-to) insurance law violations squarely presented to DFS and similar violations *unrelated* to the NRA. The Complaint admits it. Op. Br. at 21, 32–33.

Finally, the NRA's claim that discovery is needed misunderstands Ms. Vullo's qualified immunity argument (and ignores that the NRA has not plausibly pleaded a selective enforcement claim worthy of discovery, *see supra* at 3). No case clearly establishes that a prosecutor should treat less serious violations unearthed during an enforcement proceeding similarly to more serious violations that motivated the enforcement in the first place. Legal research, not discovery, reveals the unprecedented nature of the NRA's claim. Where, as here, there are no disputed questions that must be resolved in defendant's favor to warrant qualified immunity, it must be resolved at the earliest possible opportunity. *See supra* at 10.

## V.    QUALIFIED IMMUNITY ALSO BARS THE FIRST AMENDMENT CLAIM

The NRA's First Amendment claim as against Ms. Vullo must be dismissed as well on the basis of qualified immunity. In its brief, the NRA does not engage substantively *at all* on the First Amendment qualified immunity analysis. It cites no case establishing that Ms. Vullo's protected public statements were transformed into an unlawful "threat" due to the DFS investigation that preceded them. It does not dispute that its (false) allegations of "backroom exhortations" are conclusory and non-specific. Op. Br. at 34. Qualified immunity is intended to give public officials breathing room to do their jobs. Public officials have First Amendment rights. And inasmuch as there may be "fine lines" between permissible government speech and impermissible threats that violate the First Amendment, as this Court has observed, that is precisely why qualified immunity exists to protect a government official like Maria Vullo. Op. Br. at 34; *Zieper v. Metzinger*, 474 F.3d 60, 68 (2d Cir. 2007) (granting qualified immunity

12

A-360

against First Amendment claim because not "apparent to a reasonable officer that defendants' actions crossed the line between an attempt to convince and an attempt to coerce").

Rather than contest any of this, the NRA instead resorts to platitudes about qualified immunity being disfavored at the pleading stage. It is not. Courts routinely dismiss claims based on qualified immunity at the pleadings where, as here, there are no facts necessary to resolve the qualified immunity inquiry. *Supra* at 10. While the NRA claims Ms. Vullo's "motivation" must be discovered, NRA Br. at 22, the law is clear that her motives are irrelevant to the qualified immunity inquiry, which is "objective," *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Under that objective analysis, Ms. Vullo is entitled to qualified immunity.

## CONCLUSION

The SAC should be dismissed in its entirety as against Ms. Vullo. Maria Vullo, now a private citizen, served her state honorably as the Superintendent of DFS. In that role, she enforced the state's insurance and banking laws, including in consent orders with Lockton, Lloyd's, and Chubb, and she pursued Lockton's violations related to its other (non-NRA) affinity group relationships. As a prosecutor enforcing state law, Ms. Vullo is entitled to immunity: absolute immunity for entering into consent orders, and qualified immunity from the NRA's novel selective enforcement claim. The NRA has now had multiple opportunities to plead that Ms. Vullo ignored specific insurance law violations of which she was aware, and it cannot so plead because she did not. Its First Amendment claim similarly must be dismissed because qualified immunity protects officials engaged in matters of public concern, particularly where no case clearly establishes the line beyond which vital speech becomes grounds for liability. After multiple attempts, the NRA has been unable to allege a viable claim against Ms. Vullo in her individual capacity, and the claims against her should be dismissed in their entirety.

13

A-361

Dated: New York, New York
     July 27, 2020

                      EMERY CELLI BRINCKERHOFF
                        & ABADY LLP

                    By:      */s/ Andrew G. Celli, Jr.*
                        Andrew G. Celli, Jr.
                        Debra L. Greenberger
                        Marissa R. Benavides
                        600 Fifth Avenue
                        New York, New York 10020
                        (212) 763-5000

                        *Attorneys for Defendant Maria Vullo*

14

A-362

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NATIONAL RIFLE ASSOCIATION OF AMERICA,<br><br>       Plaintiff,<br><br>  -against-<br><br>ANDREW CUOMO, both individually and in his official capacity; MARIA T. VULLO, both individually and in her official capacity; and THE NEW YORK STATE DEPARTMENT OF FINANCIAL SERVICES,<br><br>       Defendants. | 18-cv-00566 (TJM/CFH)<br><br>**<u>NOTICE OF APPEAL</u>** |

    **PLEASE TAKE NOTICE** that Defendant Maria T. Vullo appeals to the United States Court of Appeals for the Second Circuit from that portion of the Opinion and Order of the District Court for the Northern District of New York, decided and entered on March 15, 2021 (Dkt. No. 322), that denied Ms. Vullo's motion to dismiss the claims against her on qualified immunity grounds.

Dated: March 22, 2021
   New York, New York

            EMERY CELLI BRINCKERHOFF ABADY
            WARD & MAAZEL LLP


            By:   /s/        
              Andrew G. Celli, Jr.
              Debra Greenberger
              Marissa R. Benavides
              600 Fifth Ave., 10th Floor
              New York, NY 10020
              (212) 763-5000

TO:  William A. Brewer III
    Sarah B. Rogers

A-363

BREWER, ATTORNEYS & COUNSELORS
750 Lexington Avenue, 14th Floor
New York, New York 10022

William A. Scott
Assistant Attorney General
New York State Attorney General's Office
Albany Office, The Capitol
Albany, New York 12224

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK**

---

**NATIONAL RIFLE ASSOCIATION OF
AMERICA,**

        **Plaintiff,**

**v.**

**ANDREW CUOMO, both individually and
in his official capacity; MARIA T. VULLO,
both individually and in her official
capacity; and THE NEW YORK STATE
DEPARTMENT OF FINANCIAL
SERVICES,**

        **Defendants.**

**NO. 18-CV-00566-TJM-CFH**

---

**PROPOSED ORDER ON PLAINTIFF'S
MOTION TO FILE DOCUMENTS UNDER SEAL**

    The Court, having reviewed the Motion by Plaintiff the National Rifle Association of America to File Documents Under Seal, together with the exhibits annexed thereto, concludes that the filing of Exhibits A, B, C and D under seal is necessary to preserve commercially sensitive and confidential information that related third parties have designated to be confidential pursuant to the protective order and addendum entered into by Plaintiff and others in this case. The Court also concludes that the sealing requested by Plaintiff is no more extensive than is necessary to shield the legitimate interests of the related third parties in the confidentiality of the documents and information to be filed under seal. Accordingly, the Court:

    **HEREBY ORDERS THAT**:

    (1) Plaintiff's Motion to File Documents Under Seal is **GRANTED**;

A-365

(2) Plaintiff's unredacted proposed Second Amended Complaint and Jury Demand shall be filed under seal with this Court and remain under seal for the duration of this Order; and

(3) Exhibits A, B, C and D to Plaintiff's Motion shall be filed under seal with this Court and remain under seal for the duration of this Order.

Dated: _____April 22nd_____, 20_20_

SO ORDERED:

Christian F. Hummel
U.S. Magistrate Judge