# 21-0636-cv

## United States Court of Appeals

*for the*

## Second Circuit

NATIONAL RIFLE ASSOCIATION OF AMERICA,

*Plaintiff-Appellee*,

– v. –

MARIA T. VULLO, both individually and in her former official capacity,

*Defendant-Appellant*,

ANDREW CUOMO, both individually and in his official capacity, THE NEW YORK STATE DEPARTMENT OF FINANCIAL SERVICES,

*Defendants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

## BRIEF AND SPECIAL APPENDIX
## FOR DEFENDANT-APPELLANT

ANDREW G. CELLI JR.
DEBRA L. GREENBERGER
MARISSA R. BENAVIDES
EMERY CELLI BRINCKERHOFF ABADY
  WARD & MAAZEL LLP
*Attorneys for Defendant-Appellant*
600 Fifth Avenue, 10th Floor
New York, New York 10020
(212) 763-5000

TABLE OF CONTENTS

PAGE NO.

TABLE OF AUTHORITIES ...................................................................iii-v

INTRODUCTION AND STATEMENT OF THE CASE........................................1

JURISDICTIONAL STATEMENT ..........................................................8

QUESTION PRESENTED ...................................................................9

STATEMENT OF FACTS ...................................................................10

PROCEDURAL HISTORY..................................................................20

THE DECISION BELOW ..................................................................21

STANDARD OF REVIEW .................................................................23

SUMMARY OF ARGUMENT .............................................................23

ARGUMENT ..............................................................................25

    I.    THE SAC FAILS TO PLEAD SUFICIENT FACTS TO SUPPORT
        THE INFERENCE THAT MS. VULLO ENGAGED IN
        UNLAWFUL CONDUCT ................................................................25

    II.    QUALIFIED IMMUNITY PROTECTS MS. VULLO FROM
        THE NRA'S NOVEL FIRST AMENDMENT CLAIMS .................33

        A.    As DFS Superintendent, Ms. Vullo Had A First Amendment
            Right to Speak under the Government Speech Doctrine ..........34

        B.    The Guidance Letters and Press Release Do Not Use
            Coercive Language and are Well Established to be
            Constitutionally-Protected Speech............................................39

            1.    The Protected Guidance Letters/Release Do Not
                 "Become" Coercive or Threatening Because They
                 Are Made in the Context of an Ongoing, Unrelated
                 Investigation ..................................................................43

i

C.    The Alleged Private Indications Do Not Violate Clearly Established Law ........................................................................44

    1.    Caselaw Establishing *Generally* that Government Threats to Employ Coercive State Power to Stifle Protected Speech are Unlawful Is Not Sufficient to "Clearly Establish" A Violation on These Facts ........45

    2.    The NRA Cites No Case Establishing, Under the Particular Circumstances Here, that the Alleged Private Indications Are Unlawful ...................................48

CONCLUSION ........................................................................54

CERTIFICATE OF COMPLIANCE ....................................................56

TABLE OF AUTHORITIES

PAGE NO.

CASES

*American Fam. Ass'n, Inc. v. City and Cnty. of San Francisco*,
    277 F.3d 1114 (9th Cir. 2002) ........................................................................44

*Anderson v. Creighton*,
    483 U.S. 635 (1987).....................................................................................27

*Archer v. Chisholm*,
    191 F. Supp. 3d 932 (E.D. Wis. 2016) .........................................................51

*Ashcroft v. al-Kidd*,
    563 U.S. 731 (2011).................................................... 34, 35, 48, 54

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009).................................................................. *passim*

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007).....................................................................................26

*Bond v. Floyd*,
    385 U.S. 116 (1966)............................................................... 35, 40

*British Int'l Ins. Co. v. Seguros La Republica, S.A.*,
    212 F.3d 138 (2d Cir. 2000) .........................................................41

*Centro De La Comunidad Hispana De Locust Valley v. Town of Oyster Bay*,
    868 F.3d 104 (2d Cir. 2017) .........................................................41

*D.C. v. Wesby*,
    138 S. Ct. 577 (2018)............................................... 34, 35, 46, 48

*DiBlasio v. Novello*,
    344 F.3d 292 (2d Cir. 2003) .........................................................23

*Gardner v. Robinson*,
    No. 16-CIV-1548, 2018 WL 722858 (S.D.N.Y. Feb. 6, 2018).....................54

*Gravel v. United States*,
    408 U.S. 606 (1972)......................................................................36

*Hammerhead Enters., Inc. v. Brezenoff*,
    707 F.2d 33 (2d Cir. 1983) ................................................................. *passim*

*Hartman v. Moore*,
    547 U.S. 250 (2006).........................................................................51

*Hirsch v. Arthur Andersen & Co.*,
    72 F.3d 1085 (2d Cir. 1995) ...........................................................33

*In re Livent, Inc. Noteholders Sec. Lit*ig.,
    151 F. Supp. 2d 371 (S.D.N.Y. 2001) ............................................33

*Kramer v. Time Warner, Inc.*,
    937 F.2d 767 (2d Cir. 1991) ...........................................................11

*Looney v. Black*,
    702 F.3d 701 (2d Cir. 2012) ...........................................................24

Malley v. Briggs,
    475 U.S. 335 (1986)................................................................. 35, 54

*Mangiafico v. Blumenthal*,
    471 F.3d 391 (2d Cir. 2006) ...........................................................51

*McKenna v. Wright*,
    386 F.3d 432 (2d Cir. 2004) ...........................................................24

*Meese v. Keene*,
    481 U.S. 465 (1987).........................................................................43

Mullenix v. Luna,
    577 U.S. 7 (2015)................................................................... 34, 50

*Nat'l Rifle Ass'n of America v. Cuomo, et al.*,
    No. 18-cv-566, 2019 WL 2075879 (N.D.N.Y. May 10, 2019).............. 22, 51

*Pearson v. Callahan*,
    555 U.S. 223 (2009).........................................................................35

*Penthouse Int'l, Ltd. v. Meese*,
    939 F.2d 1011 (D.C. Cir. 1991)....................................... 5, 39, 43

*R.J. Reynolds Tobacco Co. v. Bonta*,
   272 F. Supp. 2d 1085 (E.D. Cal. 2003) .........................................................36

*Sound Aircraft Servs., Inc. v. Town of E. Hampton*,
   192 F.3d 329 (2d Cir. 1999) ..........................................................................24

*Sveaas v. Christie's Inc.*,
   452 F. App'x 63 (2d Cir. 2011).......................................................................33

*Tangreti v. Bachmann*,
   983 F.3d 609 (2d Cir. 2020) ..........................................................................32

*Taravella v. Town of Wolcott*,
   599 F.3d 129 (2d Cir. 2010) ..........................................................................35

*Vickery v. Jones*,
   100 F.3d 1334 (7th Cir. 1996) .......................................................................39

*Vickery v. Jones*,
   520 U.S. 1197 (1997) .....................................................................................39

*White v. Pauly*,
   137 S. Ct. 548 (2017).....................................................................................34

*X-Men Sec., Inc. v. Pataki*,
   196 F.3d 56 (2d Cir. 1999) ..................................................................... 37, 38

*Zieper v. Metzinger*,
   474 F.3d 60 (2d Cir. 2007) .................................................................. *passim*

**STATUTES & RULES**

28 U.S.C. § 1331 ....................................................................................................9

Fed. R. Civ. P. 12(b)(6)................................................................................ *passim*

Fed. R. Civ. P. 12(c)............................................................................................21

N.Y. Insurance Law § 1102 .................................................................................12

N.Y. Insurance Law § 2117 .................................................................................12

## INTRODUCTION AND STATEMENT OF THE CASE

For three years, Maria Vullo served as Superintendent of the New York State Department of Financial Services ("DFS"), the 1,400-employee state agency charged with regulating insurance businesses and state-chartered banks and financial institutions and enforcing New York's insurance and banking laws. Nominated by the Governor and confirmed by the New York State Senate, as Superintendent, Ms. Vullo wore several hats: policymaker, regulator, agency administrator, enforcement official, and voice of the gubernatorial administration on matters within the agency's jurisdiction. It was in this last role that, in early 2018—in the wake of the tragic school shooting in Parkland, Florida—Ms. Vullo spoke out against gun violence through industry-directed "guidance letters" and a quotation in a press statement from the Governor's office. Her statements—classic protected speech—called upon banks and insurance companies to consider and avoid the reputational risks of associating their services and products with gun advocacy groups like the National Rifle Association (the "NRA"). No threat of government action appears anywhere in these statements, and the agency's enforcement powers were nowhere even mentioned.

This case poses the question of whether the constitutionally-protected speech of a government official violates the First Amendment rights of a private party where—after three iterations of a complaint—the private party cannot in

good faith allege that the government official uttered even a single word that was threatening or coercive. The common-sense answer is "no"—and the doctrinal one is the same: under these circumstances, no First Amendment violation exists, and certainly none that is "clearly established" as is required to overcome qualified immunity, a critical backstop that protects government officials in the exercise of their discretionary duties.

Recognizing that a lawsuit on the basis of Ms. Vullo's press statement and guidance letters was doomed to fail, the NRA sought to bootstrap itself into a claim by tacking on allegations of conduct (loosely-defined) that occurred *before* Ms. Vullo's public statements, allegedly in a non-public setting, regarding an unrelated DFS investigation. The DFS investigation involved the sale in New York of the Carry Guard Program, an NRA-endorsed insurance product that, in its terms, was illegal under New York Law: it offered to insure gun owners who killed people with their firearms, even if they did so with criminal intent. The principal targets of the investigation were three DFS-regulated institutions—two insurers and one broker, including the insurance syndicate known as Lloyd's of London— each of which agreed to consent orders for violations of New York's Insurance Law. The Lloyd's Consent Order was executed in December 2018.

The NRA's Second Amended Complaint ("SAC") alleges that, at a meeting with Lloyd's executives in February 2018, Ms. Vullo "made clear" that

"DFS was less interested in pursuing" certain "technical regulatory infractions" that were prevalent in the so-called "affinity-insurance marketplace," "so long as Lloyd's ceased providing insurance to gun groups, especially the NRA." Joint Appendix ("JA") 144 (SAC ¶ 21). While Ms. Vullo denies the allegations, accepting them as true, the SAC does not allege that Ms. Vullo actually *said or did*—or threatened to do, or not do—*anything*, much less anything *coercive.*

        This vague, almost passing, assertion of an *implied* threat —and a separate one elsewhere in the complaint that is similar, and equally specious—constitutes the sum total of the NRA's allegations of coercive government speech. That is it, three years into this case. It is hard to imagine allegations that are more vague, or less specific.

        The SAC's operative phrases around Ms. Vullo's alleged conduct are a lawyer's cheat—the kind of phraseology that is employed when a lawyer cannot ethically plead a specific actual statement, action, or threat. The NRA tries to "plead around" this fatal defect by *characterizing* Ms. Vullo's conduct as "threats" and "coercion"—but the Supreme Court's decision in *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009), forbids such pleading legerdemain. Once one strips away the SAC's *conclusory* allegations, what remain are "factual" allegations that are either bereft of concrete meaning altogether, or that cannot plausibly be construed as

unlawful First Amendment conduct.  Under *Iqbal*, such a complaint cannot support a claim; it must be dismissed.  *See infra* Part I.

       At a more fundamental level, the proposition that constitutionally-protected statements of a government official somehow *become* "coercive," and thus violate the First Amendment, when they are coupled with vaguely-alleged, earlier-occurring, non-coercive activity during an unrelated and preexisting regulatory investigation, is simply unsupported in the annals of constitutional law. This is especially so when the alleged conduct that the plaintiff suggests renders the non-threatening public statement somehow "coercive" was directed towards an entity that would ultimately admit, in a consent order, that it violated state law.  To say that such a proposition was "not clearly established"—the touchstone of qualified immunity—at the time of Ms. Vullo's alleged conduct is to gravely understate the matter.  *No* case has *ever* held a public official liable in such circumstances.  It is emphatically *not* "clearly established" that a regulator's constitutionally-protected statements to its regulated industries on matters of public concern are "coercive"; that an implied threat to investigate indisputably-unlawful conduct can ground a claim for retaliation; or that an enforcement attorney suggesting that a target might be treated more leniently in exchange for cooperation has violated the Constitution.  *See infra* Part II.C.2.  Certainly, in the circumstances as alleged—where a high official was both exercising her right to

free speech and overseeing an unrelated regulatory investigation—an "objectively reasonable" government official would not have believed that she was acting unlawfully. Such an official—like Ms. Vullo—is entitled to qualified immunity. *See id.*

The caselaw is clear: government officials are entitled—indeed, expected and encouraged—to engage in robust speech on matters of public concern, and the First Amendment protects such speech so long as it is "convincing, but not coercive." *See Zieper v. Metzinger*, 474 F.3d 60, 66 (2d Cir. 2007). This protection extends not only to the speech of legislators, but to administrative agency heads as well, including those who, within the suite of their legal authority, possess prosecutorial and/or enforcement powers. The Attorney General of the United States is one such official. *See Penthouse Int'l, Ltd. v. Meese*, 939 F.2d 1011, 1015 (D.C. Cir. 1991). What is *absent* from the jurisprudence is *any* case where an official with both administrative and enforcement authority is found to have engaged in "coercive" speech—i.e., leveraging their law enforcement powers for an improper or retaliatory purpose— by virtue of having made *non-coercive* statements in public, and having allegedly met privately with the target of enforcement efforts where . . . well . . . *something* may have happened, but no one can really say what ("made clear," "less interested"). Such a case does not exist. If such conduct were actionable—and no

5

case has ever said it was—virtually *every* enforcement official who investigates a person or entity with whom they disagree politically will find themselves embroiled in pointless and enervating civil litigation, simply for doing their jobs. The answer *cannot* be that clear violations of law should not be prosecuted just because the target has political views.

Qualified immunity is designed to afford government officials the "breathing room" necessary to do *all* aspects of their jobs—administrative, policy-oriented, enforcement-related, and conduct on the bully pulpit, all at the same time. To hold that Ms. Vullo is not entitled to qualified immunity on these facts would be to expose every federal, state, and local agency head who both speaks on matters of public concern, makes policy, regulates, and oversees enforcement efforts—every official from the Attorney General of the United States all the way down to the local buildings department commissioner—to the experience that Maria Vullo has endured: years of litigation by a well-funded and politically-motivated party who offers not a scintilla of evidence of official misconduct, but who weaponizes its own speech rights to harass government officials for exercising theirs. Worse yet, routine and legitimate regulatory enforcement efforts against the most powerful in society—those who are moneyed and politically active or connected; everyone from real estate developers to trade unions, regulated

businesses to lobbying and advocacy groups—would be hampered, if not paralyzed, by the threat of retaliatory civil litigation like the NRA's here.

The District Court (McAvoy, J.) recognized that courts must rigorously police litigation brought against government officials. It dismissed the NRA's Equal Protection-based claim of "selective enforcement," on the basis that, as an enforcement official, the Superintendent of DFS enjoys the protection of absolute immunity just as would any prosecutor. This was correct. Where the District Court went astray was in its analysis of the related doctrine of qualified immunity on the First Amendment claims. The NRA has not pled and cannot plead plausible *facts*—as opposed to mere legal conclusions—sufficient to make out a First Amendment claim; the District Court ignored, or failed to recognize the significance of, that critical defect in the pleadings. And, even if the hollow words that the NRA has put to the page were somehow deemed to "count" as a pleading matter, the case still must be dismissed because such "facts" do not give rise to a "clearly established" constitutional claim under extant law. *See infra* Part II.C.

In the end, this appeal turns on two well-worn jurisprudential paths: one paved by the Supreme Court's decision in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and the other by this Court's decision in *Zieper v. Metzinger,* 474 F.3d 60 (2d Cir. 2007). Both paths lead to the same end-point: dismissal of the remaining claims in the case under the doctrine of qualified immunity.

7

## JURISDICTIONAL STATEMENT

The District Court had subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331.

On March 15, 2021, the United States District Court for the Northern District of New York, the Honorable Thomas J. McAvoy presiding, denied Defendant-Appellant Maria T. Vullo's motion to dismiss Count One (First Amendment and New York Constitution, alleging an "implicit censorship regime") and Count Two (First Amendment and New York Constitution, alleging retaliation based on protected speech) (collectively, the "First Amendment Claims") of Plaintiff-Appellee National Rifle Association of America's Second Amended Complaint ("SAC") pursuant to Fed. R. Civ. P. 12(b)(6) on the grounds of qualified immunity.[1]

Ms. Vullo timely filed a notice of appeal on March 22, 2021.

This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291 and the collateral order doctrine as set forth in *Ashcroft v. Iqbal*, 556 U.S. 662, 671-72 (2009). A district court's denial of an assertion of qualified immunity on a motion to dismiss is an immediately appealable order.

---

[1] The NRA also asserted the First Amendment Claims against Governor Cuomo in his individual and official capacity, DFS Superintendent Linda Lacewell in her official capacity, and DFS. It asserted Count Three against Ms. Vullo only. The District Court dismissed the First Amendment claims against Governor Cuomo in his official capacity, Supt. Lacewell, and DFS. The First Amendment Claims against Governor Cuomo in his individual capacity remain below.

## QUESTION PRESENTED

Whether the District Court (McAvoy, J.) erred in denying defendant Maria T. Vullo's motion to dismiss Counts One and Two of the Second Amended Complaint under Rule 12(b)(6), and specifically:

a. Whether the District Court erred in finding that, in the Second Amended Complaint, plaintiff National Rifle Association of America adequately pleaded that Ms. Vullo engaged in "coercive speech" sufficient to ground its claims under the First Amendment and state constitutional law (Counts One and Two).

b. Whether the District Court erred in holding that it was "clearly established" that, under these circumstances, Ms. Vullo's conduct would violate the First Amendment such that an objectively-reasonable government official in Ms. Vullo's position would have concluded that the conduct was unlawful, warranting the denial of qualified immunity.

# STATEMENT OF FACTS

Because this appeal is taken from the District Court's denial of Ms. Vullo's motion to dismiss, this statement refers only to the allegations set forth in the NRA's Second Amended Complaint and attached exhibits.[2]  JA 135-264.

## A.    The National Rifle Association's Carry Guard Program

Beginning in April 2017, the National Rifle Association, a gunowners' rights group, partnered with insurers, insurance brokers, and underwriters licensed by the New York State DFS ("regulated entities") to offer insurance to New York residents for losses caused by the use of a licensed firearm. Dubbed the Carry Guard Program,[3] the salient feature of this suite of products was coverage for criminal and civil defense costs, and bodily injury claims, arising

---

[2] The exhibits attached to the SAC are "part of the pleading for all purposes" pursuant to Fed. R. Civ. P. 10(c).  *See also Kramer v. Time Warner, Inc.*, 937 F.2d 767, 773 (2d Cir. 1991) ("In considering a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6), a district court must limit itself to facts stated in the complaint or in documents attached to the complaint as exhibits or incorporated in the complaint by reference.").

[3] Hereinafter, the terms "Carry Guard" and "Carry Guard Program" refer generically to the insurance programs endorsed by the NRA to provide coverage for the costs of criminal and civil defense, bodily injury, and property damage incurred due to the use of a firearm.  These NRA-endorsed insurance programs were administered by a broker, Lockton, and underwritten by insurer Chubb under the title "Carry Guard," and by insurer Lloyd's under various product titles, including "Self-Defense Insurance."  JA 191 (SAC Ex. D ("Lockton Consent Order") ¶¶ 8-9), 231 (SAC Ex. I ("Lloyd's Consent Order") ¶ 6(a)).  Lockton, Chubb, and Lloyd's each entered into Consent Orders with DFS while Ms. Vullo was Superintendent.  Lockton administered, and Lloyd's underwrote, a similar insurance program exclusively for retired law enforcement under the title "Retired Law Enforcement Officer Self-Defense Insurance."  JA 193 (Lockton Consent Order ¶ 15(a)), 231 (Lloyd's Consent Order ¶ 6(b)).

from the use of a licensed firearm—even if the insured is found to have acted with criminal intent.[4]

To the extent that it offers insurance to consumers for intentional, reckless, or criminally-negligent acts causing injury or death to another person— i.e., where the use of a firearm is found to have occurred beyond the reasonable use of force and thus with criminal intent— the Carry Guard and other similar NRA program provisions violate New York Insurance Law and are against public policy. *See* N.Y. Insurance Law §§ 1102, 2117. The marketing of the program similarly violated New York Insurance Law. JA 200 (Lockton Consent Order ¶¶ 38-39). As described more fully below, *infra* at 18, the broker and insurers would later acknowledge that the Carry Guard Program's provisions and implementation were illegal. The NRA does not contend or allege otherwise.

**B.** **October 2017: DFS Initiates an Investigation Into the Carry Guard Program**

In October 2017, DFS opened an investigation of the Carry Guard Program. The investigation was launched on a referral from the New York County District Attorney's Office ("DANY"), which in turn had learned about the program

---

[4] The NRA, without a license, "engaged in aggressive marketing of and solicitation for the Carry Guard Program" in New York. JA 192-93 (Lockton Consent Order ¶ 14). It broadcast promotional videos on YouTube; solicited customers by mass email, direct mail, and banner ads; operated the product-specific website www.nracarryguard.com; and promoted Carry Guard on its organizational website www.nra.org. *Id.*

from an advocacy organization known as Everytown for Gun Safety

("Everytown").  JA 149-50 (SAC ¶¶ 34-35).

DFS's investigation of the Carry Guard Program focused on three

regulated entities—insurance broker Lockton Companies, LLC ("Lockton");  the

insurer Chubb ("Chubb");  and, later, the insurance marketplace Lloyd's of London

and its related syndicates ("Lloyd's")—and the NRA.  All of these entities played

active roles in the sale of Carry Guard in New York.

Within a month of the DFS investigation being launched, Lockton and

Chubb suspended their involvement with the NRA's Carry Guard Program.  JA

198-99 (Lockton Consent Order ¶ 32), 214 (SAC Ex. E ("Chubb Consent Order")

¶ 16).

### C.    The Parkland Massacre, The Ensuing Public Controversy, and Public Remarks By Governor Cuomo and Superintendent Vullo

On February 14, 2018, a young man armed with a semi-automatic

weapon killed 17 high school students and staff at Marjory Stoneham Douglas

High School in Parkland, Fla ("Parkland" or "Parkland Massacre").  The Parkland

Massacre was a national tragedy, and it stimulated a national conversation on gun

safety and the influence of gun advocacy groups like the NRA.  National, state, and

local government officials weighed in on all sides.[5]  In addition, major American

---

[5] See Eric Ting, *NRA's LaPierre rips Kamala Harris during CPAC speech; Harris responds*, SF Gate (Feb. 22, 2018), https://www.sfgate.com/politics/article/Kamala-Harris-Wayne-LaPierre-NRA-CPAC-2018-guns-12660552.php (calling Cuomo and other Democrats "saboteurs who

businesses, including Delta Airlines, Avis Rental Cars, Best Western Hotels, MetLife, and First National Bank of Omaha, publicly announced that they would no longer offer affinity or rewards programs sponsored by the NRA.[6]  Bank of America simultaneously announced that it was reexamining its relationship with gun manufacturers.[7]  In short, in the period following the Parkland shooting, a major topic of political discourse in the United States was the relationship between consumer-facing businesses and the NRA and other gun groups.

New York Governor Andrew Cuomo, whose efforts in support of gun-control in New York and in opposition to the positions held by the NRA were well known since he served in the Clinton Administration, made public remarks on Parkland within days of the massacre.[8]  On April 19, 2018, approximately two months after Parkland, Governor Cuomo, through his Press Office, issued a press

---

don't believe in capitalism"). Michael D. Shear, *Trump Stuns Lawmakers with Seeming Embrace of Comprehensive Gun Control*, N.Y. Times (Feb. 28, 2018), https://www.nytimes.com/2018/02/28/us/politics/trump-gun-control.html.

[6] Amy Held, *One By One, Companies Cut Ties with the NRA*, NPR (Feb. 23, 2018), https://www.npr.org/sections/thetwo-way/2018/02/23/588233273/one-by-one-companies-cut-ties-with-nra, Avi Selk, *NRA lashes out at boycott movement as United, Delta and other corporations cut ties*, Wash. Post (Feb. 25, 2018), https://www.washingtonpost.com/news/morning-mix/wp/2018/02/24/united-and-delta-cut-ties-to-nra-as-boycott-movement-spreads-to-global-corporations/.

[7] Mike Allen, *Scoop: Bank of America to* review relationships with gunmakers, Axios (Feb. 24, 2018), https://www.axios.com/corporate-america-flexes-against-guns-1519482689-612f054b-6ea4-487a-b7fe-7bd36db6b446.html.

[8] Jimmy Vielkind, *After Florida* school shooting, Cuomo again touts SAFE Act, POLITICO (Feb. 15, 2018), https://www.politico.com/states/new-york/albany/story/2018/02/15/after-florida-school-shooting-cuomo-again-touts-safe-act-256104; JA 161 (SAC ¶ 67).

13

release announcing that he had "direct[ed] the Department of Financial Services to urge insurers and bankers statewide to determine whether any relationship they may have with the NRA or similar organizations sends the wrong message to their clients." JA 180 (the "Press Release"). In the Press Release, the Governor went on to describe New York as having "the strongest gun laws in the country;" he called gun safety a "top priority;" and he called for "an end to gun violence once and for all." The Press Release made no reference to regulatory enforcement or investigations by DFS.

The Governor's Press Release include a quote from Superintendent Vullo. There, she urged "business [to] lead the way and bring about social change needed to minimize the chance that we will witness more . . . senseless tragedies" caused by gun violence. Ms. Vullo cited the fact that, after Parkland, many businesses had "discontinued their arrangements with the NRA." And she concluded: "DFS urges all insurance companies and banks doing business in New York to join the companies that have already discontinued their arrangement with the NRA, and to take prompt actions to manage these risks and promote public health and safety." *Id.*

DFS simultaneously released two virtually-identical memoranda entitled, "Guidance on Risk Management Relating to the NRA and Similar Gun Promotion Organizations;" one was addressed to DFS-regulated insurance entities,

and the other to DFS-regulated banks and financial institutions.  JA 182-87 (collectively, the "Guidance Letters").  As was standard for such memoranda, the Guidance Letters were signed by Ms. Vullo as Superintendent.

The Guidance Letters reference the Parkland Massacre, as well as similar "horrific shootings," including those at Columbine High School, Sandy Hook School, the Pulse nightclub, and a Las Vegas music festival.  They call upon "society, as a whole . . .  to act" against gun violence, and they refer to a "social backlash against" the NRA and similar organizations in the wake of recent shootings.  The Guidance Letters cite the fact that "a number of financial institutions [had] severed their ties with the NRA" after Parkland, and they conclude as follows:

> In light of the above, and subject to compliance with applicable laws, the Department *encourages its [insurers and financial institutions] to continue evaluating and managing their risks, including reputational risks,* that may arise from their dealings with the NRA or similar gun promotion organizations, if any, as well as continued assessment of compliance with their own codes of social responsibility.  The Department encourages regulated institutions to review any relationships they have with the NRA or similar gun promotion organizations, and to take prompt actions to manage these risks and promote public health and safety.

*Id.* (emphasis added).

At no point do the Guidance Letters refer or allude to DFS's enforcement or regulatory powers, or the Carry Guard investigation then under way at DFS.

15

### D.     The SAC's Allegations: The Alleged Private Indications

The SAC baldly alleges that "Vullo and DFS . . . threatened regulated institutions with costly investigations, increased regulatory scrutiny and penalties should they fail to 'discontinue . . . their arrangements with the NRA'" and "coerced" regulated entities to "terminate their business arrangements with the NRA." JA 144 (SAC ¶ 21).  The only specific allegation as to Ms. Vullo is that, on or after February 27, 2018—i.e, immediately after the Parkland Massacre, and months after DFS's investigation of the Carry Guard Program had been launched—then-Superintendent Vullo allegedly privately met with Lloyd's executives and "presented Defendants' [Cuomo, Vullo, and DFS] views on gun control and their desire to leverage their powers to combat the availability of firearms, including specifically by weakening the NRA." JA 161 (SAC ¶ 67).  The SAC further alleges that Ms. Vullo "discussed an array of technical regulatory infractions plaguing the affinity-insurance marketplace" and "*made it clear* . . . that DFS was *less interested in pursuing* the infractions . . ., so long as Lloyd's ceased providing insurance to gun groups, especially the NRA." JA 144 (SAC ¶ 21) (emphases added).  Referring, it appears, to the same "meetings" (though only one meeting is specifically alleged), the NRA frames this allegation differently (though still with no specificity) at Paragraph 69: "During her surreptitiously held meetings with Lloyd's executives . . . Vullo *and* DFS *made clear* that Lloyd's could *avoid*

16

*liability* for infractions relating to other, similarly situated insurance policies, so long as it *aided DFS's campaign* against gun groups." JA 162-63 (SAC ¶ 69) (emphases added). The allegations at Paragraphs 21 and 69 are collectively referred to hereinafter as the "Alleged Private Indications."[9]

### E. May 2018 through December 2018: Lockton, Lloyd's, and Chubb Enter Into Consent Orders with DFS

On May 2, 2018, six months after the DFS investigation was launched, DFS and Lockton entered into a Consent Order resolving the agency's review of Lockton's involvement as a broker in connection with the Carry Guard Program. In the Consent Order, Lockton acknowledged that its administration of Carry Guard, among other acts, violated New York State Insurance Law, and agreed to a $7 million penalty. JA 199 (Lockton Consent Order ¶¶ 34-36). Lockton also agreed "not to participate in the Carry Guard Program, any similar programs, or any other NRA-endorsed programs with regard to New York State," going forward (except to "provide runoff administration for any in-force policies not cancelled" by the terms of the Consent Order). JA 200-01 (Lockton Consent

---

[9] In the extant posture, of course, the Court must accept all well-pleaded allegations as true. That said, and for the record, Ms. Vullo unconditionally denies having held any "surreptitious meetings" with Lloyd's or any other regulated entity, and denies saying anything of the sort alleged in Paragraphs 21 and 69. Further, the NRA refused to provide any information in support of its allegations in Paragraphs 21 and 69 in response to Ms. Vullo's discovery requests, invoking dubious privilege grounds to cover its insufficient basis for its allegations. JA 54 (Dkt. 293-6).

Order ¶ 42).[10]  The Consent Order notably acknowledged that Lockton may

continue to "assist the NRA in procuring insurance for the NRA's own corporate

operations."  JA 201 (Lockton Consent Order ¶ 43).

On May 7, 2018, DFS and Chubb, together with Chubb subsidiary

Illinois Union, also entered into a Consent Order with DFS arising out of their

roles in NRA-affiliated insurance products.  JA 209 (SAC Ex. E).  In the Consent

Order, Chubb admitted to violating the Insurance Law by underwriting the

Lockton-administered Carry Guard program and other illegal NRA insurance

programs.  Chubb agreed to pay a $1,300,000 penalty and not to participate in

Carry Guard or any other insurance policy with similar illegal firearms coverage.

JA 215-16 (Chubb Consent Order ¶¶ 20-21).  Like the Lockton Consent Order, the

Chubb Consent Order acknowledged that, going forward, "the NRA may itself

purchase insurance from Chubb for the sole purpose of obtaining insurance for the

NRA's own corporate operations."  JA 216 (Chubb Consent Order ¶ 22).

Finally, on December 20, 2018, DFS entered into a Consent Order

with Lloyd's. [11]  JA 228 (Lloyd's Consent Order).  Among other things, Lloyd's

---

[10] Lockton would later enter into a "Supplemental Consent Order" with DFS resolving additional
claims and agreeing to pay an additional $400,000 penalty.  JA 258-59 (SAC Ex. J ("Lockton
Supp. Consent Order") ¶¶ 9-12).

[11] After Ms. Vullo's departure from DFS in February 2019, her successor, Superintendent Linda
Lacewell, charged the NRA for its unlicensed role in the marketing and sale of these illegal
insurance products.  DFS and the NRA entered into a Consent Order on these charges on
November 13, 2020, with the NRA agreeing to pay $2.5 million.  *See DFS Superintendent Linda
A. Lacewell Announces Settlement with NRA to Resolve Case Involving Violations of New York*

agreed to cancel and no longer issue illegal NRA-endorsed insurance products in New York including the so-called "Self-Defense Insurance" (which contained illegal provisions similar to the Carry Guard Program). Lloyd's also agreed to pay a $5 million penalty.  Like the others, the Lloyd's Consent Order also "provided . . . that the NRA may itself purchase insurance from [Lloyd's] for the sole purpose of obtaining insurance for the NRA's own corporate operations."  JA 235-36 (Lloyd's Consent Order ¶¶ 18-20).[12]

### F.    The Remaining (Dismissed) Allegations

In the Second Amended Complaint, the NRA alleged Defendants "selectively enforced"—or threatened to selectively enforce—New York laws and regulations concerning affinity-insurance products, that is, insurance products associated with a membership organization such as the NRA or the Veterans of Foreign Wars (the so-called "technical regulatory violations" referred to elsewhere in the SAC).  These allegations were the basis for the Third Cause of Action, which asserted a violation of the Equal Protection Clause.  JA 173-75 (SAC ¶¶

---

*Insurance Law*, NY Dep't of Fin. Servs. (Nov. 18, 2020) https://www.dfs.ny.gov/reports_and_publications/press_releases/pr202011181#:~:text=In%20the %20consent%20order%2C%20DFS,market%20the%20sale%20of%20insurance.  The Court may take judicial notice of the entry of this Order.

[12] More broadly than the NRA-specific terms, Lloyd's agreed not to issue or deliver in New York State "*any* group insurance policy" unless authorized under the Insurance Law, any insurance policy "that provides legal services coverage . . . in a criminal proceeding," or an insurance policy that compensates any broker, agent or other entity in an illegal manner.  JA 236, 238 (Lloyd's Consent Order ¶¶ 21, 24-25) (emphasis added).

19

108-21). The District Court dismissed the Equal Protection claim based on absolute immunity and it is not the subject of this appeal.

### G. Vullo Did Not Act or Threaten to Act Against the NRA

The Second Amended Complaint does not allege that Ms. Vullo—or any DFS representative under Ms. Vullo's watch—commenced any enforcement action against the NRA itself.

## PROCEDURAL HISTORY

The NRA initially filed suit against the New York State Department of Financial Services, Governor Andrew Cuomo, and then-DFS Superintendent Maria Vullo on May 11, 2018. JA 1 (Dkt. 1). Ms. Vullo was sued in her individual and official capacities. *Id.* The NRA filed an Amended Complaint on July 20, 2018. In November 2018, on Rule 12(b)(6) motions by all defendants, the District Court dismissed four of the seven causes of action the NRA asserted in its Amended Complaint. Counts One and Two (for violations of the free-speech clauses of the federal and state constitutions) and Count Three (for violations of the Equal Protection Clause, based on a theory of selective enforcement) were not initially dismissed. JA 133 (Dkt. 56 at 70). Thereafter, Ms. Vullo and the other Defendants filed Answers (which include affirmative defenses), JA 16 (Dkt. 59), and then motions under Rule 12(c) for judgment on the pleadings seeking dismissal of Count Three. *Id.* (Dkt. 63). In May 2019, the District Court granted

20

those motions in part, dismissing all claims for money damages against Ms. Vullo in her official capacity and dismissing the selective enforcement claim (Count Three) with leave to replead. *Nat'l Rifle Ass'n of America v. Cuomo, et al.*, No. 18-cv-566, 2019 WL 2075879, at *6 (N.D.N.Y. May 10, 2019).

On June 2, 2020, the NRA filed its Second Amended Complaint. The SAC contained new "factual" allegations—including the Alleged Private Indications—in support of the three remaining claims against Ms. Vullo in her individual capacity: violation of the NRA's First Amendment rights by establishing an "implicit censorship regime" (Count One); violation of the NRA's First Amendment rights by retaliating against the NRA for its speech (Count Two); and violation of the Equal Protection Clause by engaging in selective enforcement (Count Three). JA 168-75 (SAC ¶¶ 86-121). Ms. Vullo moved under Rule 12(b)(6) to dismiss all three Counts against her under the doctrines of absolute and qualified immunity and a failure to state a claim.

### THE DECISION BELOW

The District Court granted Ms. Vullo's motion to dismiss the selective enforcement claim (Count Three) on the ground of absolute immunity. Special Appendix ("SPA") 22-23. The District Court held that Ms. Vullo's role and responsibilities as DFS Superintendent were "functionally comparable to [the actions] of a judge or a prosecutor." SPA 9-10 (quoting *DiBlasio v. Novello*, 344

F.3d 292, 297 (2d Cir. 2003)), and that her acts in "bringing charges, attempting to

negotiate resolutions (*i.e.* the Consent Orders), and preparing for trial . . ." were

fully protected by the doctrine of absolute immunity. SPA 15.

      The District Court denied Ms. Vullo's motion to dismiss the First

Amendment Claims (Counts One and Two) on qualified immunity grounds.

      The District Court analyzed the two First Amendment Claims in

tandem. It began by observing that, under settled law, government speech on

matters of public importance is protected under the First Amendment. SPA 23-24.

Citing its May 2019 decision, the court held "the Guidance Letters and Cuomo

Press Release, read in isolation, clearly fit into the government-speech doctrine as

they address matters of public importance on which New York State has a

significant interest." *Id.* (cleaned up). The District Court stated that it was

"inclined to agree with Ms. Vullo that there is no case clearly establishing that

otherwise protected public statements transform into an unlawful threat merely

because there is an ongoing, and unrelated, regulatory investigation." SPA 25.

      The District Court then discussed the Alleged Private Indications.

Without considering whether these allegations were factual or merely conclusory,

the District Court held that these "new allegations in the SAC . . . can be

reasonably interpreted as pre-Guidance Letters backroom threats by Ms. Vullo of

DFS enforcement against entities that did not disassociate with the NRA." SPA

26.  Finding that such allegations raise "a question of material fact" as to whether Ms. Vullo "explicitly threatened" Lloyd's—though the District Court did not cite any "explicit" words Ms. Vullo is alleged to have said—the District Court denied Ms. Vullo's motion to dismiss on the ground of qualified immunity.  SPA 27-28.

Ms. Vullo now appeals the District Court's decision.

## STANDARD OF REVIEW

The District Court's denial of a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) on qualified immunity grounds is reviewed *de novo.  Sound Aircraft Servs., Inc. v. Town of E. Hampton*, 192 F.3d 329, 333 (2d Cir. 1999).

Courts find that a defendant is entitled to qualified immunity at the motion-to-dismiss stage when the facts supporting the defense appear on the face of the complaint.  *Looney v. Black*, 702 F.3d 701, 710 (2d Cir. 2012) (citing *McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir. 2004)).

## SUMMARY OF ARGUMENT

Ms. Vullo is entitled to qualified immunity on the NRA's First Amendment Claims for two reasons:

**1.    The NRA has not plausibly alleged a First Amendment violation under the *Iqbal* pleading standard.**  The allegations against Ms. Vullo in the Second Amended Complaint are insufficient to make out a plausible violation of its First Amendment rights under the standard set forth in *Ashcroft v. Iqbal*.  The

Press Release and the Guidance Letters, while specifically pleaded, are not actionable as coercive government speech (as the District Court held), because they are hortatory and contain no express or implied threat of punishment or adverse regulatory action. And the Alleged Private Indications, pleaded at Paragraphs 21 and 69 of the SAC, simply do not constitute "threats" and "coercion," conclusory allegations to the contrary notwithstanding. There being insufficient well-pleaded facts in the SAC to support a plausible constitutional claim, the First Amendment claims should be dismissed.

**2. Ms. Vullo's alleged conduct, even if sufficiently pleaded and accepted as true, does not violate a clearly established constitutional right.**

The conduct that the SAC attributes to Ms. Vullo, even if plausibly pleaded and accepted as true, would not violate a clearly established constitutional right; as a consequence, Ms. Vullo is entitled to qualified immunity. *No* case has established that: (a) non-coercive, constitutionally-protected government speech—like the Press Release and the Guidance Letters here—can violate a private actor's First Amendment rights; (b) non-coercive speech by a government official somehow "becomes coercive" if it is made while the same official is also investigating unrelated unlawful conduct (conduct that results in admitted-to violations remedied in consent orders); (c) government speech is coercive if the government threatens to investigate undisputedly-unlawful conduct; (d) an enforcement official's offer

24

*not* to investigate known (less serious) unlawful conduct is coercive; or (e) an enforcement official's offer of leniency to the target of a regulatory investigation in exchange for  cooperation in that investigation is coercion or censorship of a third party.  Indeed, concluding otherwise here would upend governmental enforcement efforts across agencies well beyond DFS.

## ARGUMENT

### I.    THE SAC FAILS TO PLEAD SUFICIENT FACTS TO SUPPORT THE INFERENCE THAT MS. VULLO ENGAGED IN UNLAWFUL CONDUCT

If there is one lesson that *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), teach, it is that Rule 8 requires more than the rote presentation of legal buzzwords and conclusory allegations; the Supreme Court requires the good-faith pleading of plausible *facts*—facts that a party either knows or has reason to believe are true, and facts that can support a reasonable inference that the illegal conduct that the plaintiff seeks to prove might actually have occurred.  This is the foundational requirement of civil litigation—and it is this first requirement that the NRA's Second Amended Complaint fails to satisfy.

Because qualified immunity is designed to provide immunity from the burden of suit itself, its applicability must be determined at the earliest possible moment in the litigation—on the pleadings if at all possible.  *Anderson v.*

*Creighton*, 483 U.S. 635, 646 n.6 (1987) ("[W]e have emphasized that qualified immunity questions should be resolved at the earliest possible stage of a litigation."). As *Iqbal* made clear, where a qualified immunity defense has been asserted, courts must carefully parse the allegations as pleaded, and conscientiously separate the purely conclusory assertions—which are entitled to no weight in determining whether a cause of action has been pleaded—from the truly factual ones.[13] 556 U.S. at 678. In this case, the allegations in the SAC that are non-conclusory and truly factual in nature point exclusively to the conclusion that Ms. Vullo's speech was fully protected by the First Amendment and in no way coercive. The other allegations around Ms. Vullo's conduct—the Alleged Private Indications—are not factual at all, or, if they are, clearly do *not* allege coercive speech.

This is a case about the speech of a government official. Thus, the analysis of then-Superintendent Vullo's Rule 12 motion must begin with what the Second Amended Complaint says, specifically, about Ms. Vullo's speech. The SAC pleads the speech attributed to Ms. Vullo in the Press Release and the two Guidance Letters with absolute precision; the two written statements are attached

---

[13] In *Iqbal*, the Supreme Court considered an appeal from a lower court's denial of qualified immunity at the motion-to-dismiss stage and held that assessing the factual sufficiency of pleadings is paramount to assessing a qualified immunity interlocutory appeal. 556 U.S. at 673 ("[T]he sufficiency of respondent's pleadings is both inextricably intertwined with and directly implicated by the qualified-immunity defense.") (cleaned up).

to the SAC and their words are crystal clear.  There is no *pleading* defect with respect to what Ms. Vullo actually said in that context; the relevant speech is set forth in black and white.  As detailed below, and as the District Court held, Ms. Vullo's speech in the Press Release and the Guidance Letters is government speech on a matter of public concern which is fully protected by the First Amendment, and certainly does not violate clearly established law.  *See infra* Part II.B.

But the NRA's description of Ms. Vullo's alleged conduct during the alleged private "meetings" with Lloyd's—the Alleged Private Indications, set forth at SAC Paragraphs 21 and 69—is another matter altogether.  Far from articulating the speech it purports to condemn, these passages are the antithesis of factual pleading.  They are, upon even cursory inspection, lawyer's legerdemain—an artful effort to avoid saying anything substantive, verifiable, or concrete on what ought to be a central issue in plaintiff's case.

**Paragraph 21**

In Paragraph 21, the SAC alleges that Ms. Vullo "made clear" to Lloyd's executives that "DFS was less interested in pursuing" violations of the affinity-insurance rules "so long as Lloyd's ceased providing insurance to gun groups like the NRA."  This allegation does not even assert that Ms. Vullo made a verbal statement or even displayed some physical gesture to communicate a point: it says that she "made [something] clear"—but it doesn't say how.  We refer to

these allegations as "Alleged Private *Indications*" because it is not even alleged that they are intentional communications at all. For all we know, the NRA could be referring to Ms. Vullo's "body language" or involuntary eye movements. Far from pleading coercive speech, Paragraph 21 is an invitation to tea-leaf reading—which is precisely what *Iqbal* forbids.

And there's nothing even remotely coercive about what Paragraph 21 *does* plead. Consider the operative allegation that, under certain circumstances, "DFS was less interested in pursuing" certain kinds of infractions. "Less interested in pursuing" cannot be coercive because it has no fixed or ascertainable meaning. If the central question in this case is, "What was the government actor suggesting or threatening that she would actually *do*?", then having "interest in" the supposed phenomenon of "technical regulatory infractions in the affinity insurance marketplace" simply provides no answer. Indeed, Paragraph 21 studiously *avoids* alleging that Ms. Vullo stated or implied that DFS would or was threatening to take any action at all, much less coercive action. Three iterations of the complaint into the case, this failure to allege a *threat* of any specific *action* can only be understood as a deliberate choice on the part of the NRA. It reflects the *absence* of factual basis for such an allegation of threat in the first place.

The third element of Paragraph 21's operative language—the implied conditional demand that Lloyd's "cease providing insurance to gun groups,

including the NRA"—is fatally undermined (and thus rendered implausible) by the Consent Order that DFS and Lloyd's actually entered into. The Lloyd's Consent Order expressly *allowed* Lloyd's to continue to provide insurance to the NRA. JA 234-36 (Lloyd's Consent Order ¶¶ 16, 17, 20). Put simply, the Consent Order flatly disproves what Paragraph 21 alleges.

The NRA tries to cover these holes in its pleadings by doing precisely what *Iqbal* condemns: dressing up this critical paragraph with assertions that are conclusory—and thus unworthy of weight. Saying that "Vullo and DFS . . . *threatened* regulated institutions with costly investigations, increased regulatory scrutiny and penalties should they fail to 'discontinue . . . their arrangements with the NRA'" and "*coerced*" regulated entities to "terminate their business arrangements with the NRA"—and confusingly quoting from the Press Release in a paragraph purporting to refer to what happened in a private meeting that allegedly occurred two months earlier[14]—is nothing more than an effort to use conclusory statements to buttress the facially-insufficient Alleged Private

---

[14] In Paragraph 21, the NRA inappropriately conflates the Press Release (in which the Governor directed DFS to issue the Guidance Letters) and the Alleged Private Indicators to intimate a connection that does not exist. It quotes the April 19, 2018 Press Release as proof that "Vullo and DFS" were acting "at Cuomo's behest" to privately "threaten" regulated institutions to "discontinue their arrangements with the NRA." Yet the Alleged Private Indications are claimed to have occurred in February 2018, two months *before* the Press Release. To state the obvious, Ms. Vullo could not have acted on the basis of a gubernatorial direction that had not yet occurred, and Press Release that had not yet been published. And the NRA alleges no other directive or "behest" by Governor Cuomo prior to the Press Release.

Indications.  This is confirmed by the SAC's allegation that the Alleged Private

Indications are an "example" of the "threats" and "coerc[ion]" that Paragraph 21

purports to describe.  By any reasonable reading, the Alleged Private Indications

are neither threatening nor coercive; calling them "threatening" and "coercive"

does not make them so.

**Paragraph 69**

Paragraph 69 suffers from the same core pleading defect as Paragraph

21 (its sole active allegation being that Ms. Vullo had "made [something] clear" to

Lloyd's—a content-free allegation), plus other infirmities as well.  And it too fails

to allege any "coercive" language.

First, in Paragraph 69, the NRA alleges that the relevant conduct

directed to Lloyd's was carried out by "*Vullo and DFS*"—without distinguishing

between Ms. Vullo, the person, and the agency that she led.  The New York State

Department of Financial Services is a statewide agency of some 1,400 employees.

Saying that *the agency* "made [something] clear" to Lloyd's is a whole different

level of vague and non-specific allegations—and attributing to Ms. Vullo, on an

undifferentiated basis, the actions of an entire state agency does not remotely

satisfy the standards of *Iqbal*.  The claims at issue seek damages against Ms. Vullo

in her individual capacity, requiring that the alleged constitutional violations be *her*

conduct.  As the District Court correctly noted, Ms. Vullo is not responsible for

"DFS's conduct taken 'on her watch[,]'" under this Court's supervisory liability jurisprudence. SPA 12-13 n.11 (citing *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020)). Pleading otherwise renders the SAC's operative claim less plausible, not more.

Likewise, Paragraph 69 does not allege that Ms. Vullo (or anyone at DFS) actually stated that the agency would affirmatively do anything—much less that they would do anything coercive. The key allegation is made in the passive voice (that Lloyd's could "avoid liability") in an effort to sidestep what the NRA cannot in good faith plead: actual coercive speech (or conduct). One cannot draw an inference that certain speech was or was not "coercive" when, as here, there is no allegation that any speech actually occurred. Again, this lacuna in the SAC is clearly no accident: the NRA was trying to plead an enforcement threat—it just did not and does not have the facts to do so.[15]

Third, instead of adhering to the version of events set forth in Paragraph 21, Paragraph 69 describes something altogether different: an alleged demand by Ms. Vullo ("and DFS") that Lloyd's "aid[] DFS's campaign against gun groups." So, which is it? Did Ms. Vullo and her agency demand that Lloyd's

---

[15] Nor is any such allegation of a threat plausible in the context here, where Lloyd's later admitted to underwriting illegal insurance products in a consent order, which expressly permitted Lloyd's to provide insurance to the NRA. Indeed, the NRA's entire theory is implausible given the admittedly unlawful insurance products that were the subject of the DFS investigation, which was unrelated to the Guidance Letters.

31

"cease selling insurance" to the NRA (as Paragraph 21 asserts), or that it "aid[]
DFS's campaign against gun groups" (as Paragraph 69 states)? This
inconsistency—which is neither acknowledged nor explained[16]—aside, what is
clear is that the Paragraph 69 allegation, in context, is a routine exhortation that an
investigatory target, Lloyd's, cooperate in a regulatory investigation (here, DFS's
investigation of the NRA's Carry Guard and other firearms insurance programs)
and own up to its own clear violations of law. In as much as the allegation is far
more likely to refer to *lawful* conduct (seeking cooperation in the investigation)
than unlawful coercion, it cannot, under *Iqbal*, plausibly count as a well-pleaded
factual allegation sufficient to support an inference of illegal conduct. 556 U.S. at
678.

    *Iqbal* is clear: where a complaint fails to contain sufficient
nonconclusory factual allegations to support a reasonable and plausible inference
that illegal conduct occurred, dismissal is required. 556 U.S. at 678-79. This is
especially so when the defendant is a high-ranking government official who

---

[16] The inconsistency of the SAC on this point is not its only problem. The Consent Order that
Lloyd's entered into with DFS, and that is attached to the SAC, allows Lloyd's to provide
insurance to the NRA, disproving both allegations. *See supra* at 30. The NRA simply has not
plausibly alleged any misconduct by Ms. Vullo, which alone is ground for dismissal. *See Sveaas
v. Christie's Inc*., 452 F. App'x 63, 66 (2d Cir. 2011) (citing *In re Livent, Inc. Noteholders Sec.
Litig*., 151 F. Supp. 2d 371, 405 (S.D.N.Y. 2001) for the proposition that "a court need not feel
constrained to accept as truth . . . pleadings that . . . are contradicted either by statements in the
complaint itself or by documents upon which its pleadings rely"); *Hirsch v. Arthur Andersen &
Co.*, 72 F.3d 1085, 1095 (2d Cir. 1995) (sustaining dismissal of the complaint where "attenuated
allegations" supporting a claim "are contradicted" by other allegations in the complaint).

invokes the defense of qualified immunity. *Id.* Maria Vullo is just such a defendant; Counts One and Two of the SAC should be dismissed on this basis alone.

## II. QUALIFIED IMMUNITY PROTECTS MS. VULLO FROM THE NRA'S NOVEL FIRST AMENDMENT CLAIMS

Even if the SAC plausibly had pleaded a claim, Ms. Vullo still would be entitled to qualified immunity on the facts as alleged. Government officials are entitled to immunity from suit unless the constitutional violation alleged is "clearly established" such that it was objectively *un*reasonable for the official to believe the challenged conduct was lawful. This standard is not met here.

To be clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). The Supreme Court has repeatedly stressed that courts must not define clearly established law "at a high level of generality." *White v. Pauly*, 137 S. Ct. 548, 552 (2017). The law must "clearly prohibit" the official's relevant conduct "in the particular circumstances [presented to the officer]." *D.C. v. Wesby*, 138 S. Ct. 577, 590 (2018). Put another way, the context, scope, and means of the rule violation alleged must be described in the caselaw with a high "degree of specificity." *Mullenix v. Luna*, 577 U.S. 7, 13 (2015) (*per curiam*). A "rule is too general if the unlawfulness of the officer's conduct does not follow immediately

from the conclusion that the rule was firmly established." *Wesby*, 138 S. Ct. at 590 (cleaned up).

Separately, qualified immunity also protects an official who "reasonably believe[s] [her] conduct did not violate a clearly established right," even when the official is mistaken. *Taravella v. Town of Wolcott*, 599 F.3d 129, 134 (2d Cir. 2010) (cleaned up). "[A]ll but the plainly incompetent or those who knowingly violate the law" are entitled to this protection. *Malley v. Briggs,* 475 U.S. 335, 341 (1986). Qualified immunity serves important policy goals. It gives "government officials breathing room to make reasonable but mistaken judgments." *al-Kidd*, 563 U.S. at 743. And it "shield[s] officials from harassment, distraction, and liability"—what Ms. Vullo faces here—"when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

## A. As DFS Superintendent, Ms. Vullo Had A First Amendment Right to Speak under the Government Speech Doctrine

This case is unique in that the conduct alleged to have violated the NRA's rights—Ms. Vullo's speech—is itself protected under our Constitution. Just as the First Amendment protects the NRA, it equally protects government officials like Ms. Vullo who wish to speak on matters of public concern.

Government speech is protected under the First Amendment because a functioning democracy requires a robust marketplace of ideas, including from government officials. *See Bond v. Floyd*, 385 U.S. 116, 135-36 (1966) ("The

34

manifest function of the First Amendment in a representative government requires that [public officials] be given the widest latitude to express their views on issues of policy. . . .  The interest of the public in hearing all sides of a public issue is hardly advanced by extending more protection to citizen-critics than to legislators.").  Their speech is valued "as a part of the democratic process[;]" such officials "represent and [] espouse the views of a majority of their constituents.  With countless advocates outside of the government seeking to influence its policy, it would be ironic if those charged with making governmental decisions were not free to speak for themselves in the process."  *R.J. Reynolds Tobacco Co. v. Bonta*, 272 F. Supp. 2d 1085, 1102-03 (E.D. Cal. 2003), *aff'd sub nom. R.J. Reynolds Tobacco Co. v. Shewry*, 384 F.3d 1126 (9th Cir. 2004), *opinion amended and superseded on denial of reh'g,* 423 F.3d 906 (9th Cir. 2005).

Speech on hot-button topics can be incendiary, and government officials have a First Amendment right not just to speak, but to use their full persuasive powers as government officials to persuade the public of their views.  They can "exhort[]" the citizenry in favor of a particular policy position.  *Hammerhead Enters., Inc. v. Brezenoff*, 707 F.2d 33, 40 (2d Cir. 1983).  They may seek to "cajole" the public to support their desired political outcome.  *Gravel v. United States*, 408 U.S. 606, 625 (1972).  And they can express their opinion that a particular view expressed by private speakers is "distasteful and damaging."

35

*Hammerhead*, 707 F.2d at 40.  Put another way, government officials have as much a right to speak, and to speak forcefully, as private citizens.  And private parties have no more right to inhibit the protected speech of government officials than government officials have the right to inhibit the speech of private parties.  *X-Men Sec., Inc. v. Pataki*, 196 F.3d 56, 70 (2d Cir. 1999) ("We see no basis on which [a private corporation] could properly be found to have a constitutional right to prevent the legislators from exercising their own rights to speak.").

Of course, there are limits to government speech: "threats" and "coerc[ive]" statements by government officials open the door to suits for damages.  *X-Men*, 196 F.3d at 70-71.  It is here that courts must act as gate-keepers, "draw[ing] fine lines between permissible expressions of personal opinion and implied threats to employ coercive state power to stifle protected speech." *Hammerhead*, 707 F.2d at 39.  In policing these "fine lines," courts must protect government speakers from private overreaching as much as the other way around.

As this Court has held, private plaintiffs ought not be allowed to use free-speech claims to target government officials whose speech they find offensive: *Hammerhead* is instructive.  There, the plaintiff had distributed a board game entitled "Public Assistance—Why Bother Working for a Living" that mocked public assistance recipients.  *Hammerhead*, 707 F.2d at 39.  The administrator of the City's Human Resources Administration urged stores not to

carry the offensive game, *id.* at 35, and the game maker sued, alleging a First Amendment violation. This Court dismissed the case: "Apparently, appellants believe the First Amendment shields their own critique from any form of official criticism. In our view, this approach would stand the Constitution on its head." *Id.* Courts are not in the business of "rescu[ing plaintiffs] from the sparks of controversy they ignited." *Id.*; *see also X-Men*, 196 F.3d at 70 (plaintiff should not be able to "prevent the legislators from exercising their own rights to speak").

Like the plaintiff in *Hammerhead*, the NRA has "boldly entered the flames of public discussion the First Amendment specifically is designed to kindle[.]" 707 F.2d at 35. It should expect and be prepared to absorb a government response in kind. The First Amendment does not grant the NRA a "shield[] . . . from any form of official criticism." *Id.* The NRA has every right to strongly and publicly proclaim that gun control legislation is a scourge and that those who support it are misguided, or worse. But, as government officials, a governor and his agency head—following yet another national tragedy involving school violence—have every right under the First Amendment to assert the opposite—and to exhort the business community not to "stand by and wait and witness more tragedies caused by gun violence" but instead fulfill their "corporate social responsibility," as stated in the Guidance Letters. JA 182-87. Like any government official, Ms. Vullo had the right to use the bully pulpit to articulate her

37

"own political perspective[s]" (or those of her appointing authority, the governor).

*Hammerhead*, 707 F.2d at 38. In contrast to the generic case where the qualified

immunity analysis aims only to ensure that "high-level officials . . . must be neither

deterred nor detracted from the vigorous performance of their duties" (itself an

important consideration), *Iqbal*, 556 U.S. at 686, here qualified immunity must

*also* ensure that the government officials' own First Amendment rights are

protected and the officials are not chilled in the exercise of those rights.[17]

The protection of government officials' right to criticize is a

protection of good government itself. "If the First Amendment were thought to be

violated any time a private citizen's speech or writings were criticized by a

government official, those officials might be virtually immobilized." *Penthouse*,

939 F.2d at 1016. In this sense, qualified immunity's provision of "breathing

room" for government officials, *Iqbal*, 556 U.S. at 686, is a recognition that

officials frequently wear two hats—policy-maker or administrator, and speaker in

the public square; both roles are entitled to the "breathing room" that qualified

immunity affords.

---

[17] *Cf. Vickery v. Jones*, 100 F.3d 1334, 1345–46 (7th Cir. 1996) (recommending the hiring or non-hiring "of a specific person to perform a governmental function" is a constitutionally protected "political expression"; an "outcome to the contrary could have the effect of subjecting . . . legislators . . . to claims of unlawful conduct each time they advocated the hiring of a particular individual"), *cert. denied*, 520 U.S. 1197 (1997).

**B.** **The Guidance Letters and Press Release Do Not Use Coercive Language and are Well Established to be Constitutionally-Protected Speech**

Turning first to the Guidance Letters and Press Release, given extant Circuit precedent, there is no good-faith argument that these statements are anything other than fully protected government speech. *Bond*, 385 U.S. at 135-36. That said, this Court need not expressly determine whether those statements were affirmatively lawful under the First Amendment (although plainly they are). It is enough that the law did not, in 2018, "clearly establish" that the Guidance Letters and Press Release were *un*lawful.

The Guidance Letters and the Press Release are classic First Amendment protected speech. They were issued in the aftermath of the deadly school shooting in Parkland, Florida, and they address policy questions around gun violence. They castigate gun promotion organizations like the NRA for "promot[ing] guns that lead to senseless violence," including the AR-15 style rifle used in the Parkland Massacre (a style the NRA has opposed restricting). JA 183. And they urge insurers and banking institutions to consider their "commitment to society as a whole" in evaluating their dealings with the NRA and other similar organizations. *Id*. In sum, these statements discuss an appropriate societal response to gun violence, as well as how companies should manage risks to their reputation from doing business with organizations whose views on gun violence

are unacceptable to many, and they are consistent with the gubernatorial administration's long-held and widely-expressed views.[18]

The District Court recognized all of this, especially the hortatory nature of these statements, and so found: "[N]either the Guidance Letters nor the Cuomo Press Release specifically directs or even requests that insurance companies and financial institutions sever ties with the NRA." SPA 24. Accordingly, the District Court held, such statements are "protected public statements," and neither threatening nor coercive. SPA 25. The express language and non-binding nature of both statements confirm that.

The District Court's determination that the Guidance Letters and Press Release contain no threats or coercion was squarely correct. The Guidance Letters are what they are labeled: "guidance." JA 182-87. They use language of persuasion, not coercion, and they are in no way threatening. They say that: DFS "encourages" and "urges," not "orders" or "demands." *Id.* Indeed, while they criticize gun rights' groups, they do not even direct a specific result. They instead ask banks and insurance companies to "continue *evaluating* and *managing* their

---

[18] *See Centro De La Comunidad Hispana De Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 115 (2d Cir. 2017) (public safety is a significant governmental interest); *British Int'l Ins. Co. v. Seguros La Republica, S.A.*, 212 F.3d 138, 143 (2d Cir. 2000) ("New York State shares with its citizens a significant interest in ensuring that businesses in the heavily regulated insurance industry have sufficient funds within the state where they conduct business to fulfill each individual insurance claim.").

risks," to "consider" reputational risks in associating with a group whose views, in Governor Cuomo and Ms. Vullo's opinion, are inimical to public safety, and to "review any relationships." *Id.* (emphases added). Importantly, they neither state, nor imply, nor even refer to *any* regulatory consequences to those who disagree. *Id.* Nor could they, because DFS has no regulatory power to impose any consequence on an entity whose response to the Guidance Letters would be to ignore its entreaties and hit "delete." The Press Release is no different in kind on any of these fronts. JA 179-81. Neither document has any statutory or regulatory power behind it, and no penalty legally could flow from its "violation."

In *Hammerhead*, this Court held that a government official's non-public letter to stores stating "Your cooperation in keeping this game off the shelves of your stores would be a genuine public service" did not violate the board game-maker's First Amendment rights. 707 F.2d at 37. There was no dispute that the official wanted the game off store shelves *because of* its offensive (yet protected) content. Yet *Hammerhead* held the First Amendment was not violated because the official, *inter alia*, "refers to no adverse consequences that might be suffered by stores selling [the subject] games, nor does the HRA have the power to impose sanctions on merchants who did not respond to [defendant's] requests." *Id.* at 39. Identically, the Guidance Letters "refer[] to no adverse consequences" and

41

DFS has no "power to impose sanctions" on those who disregard DFS's guidance. *Id.*

That the NRA claims to perceive an *implied* threat in the Guidance Letters does not mean that one exists—much less that it is "clearly established" that such an alleged implication is coercive. *Meese v. Keene*, 481 U.S. 465, 484 (1987) (recipient's perception of the negative connotations of the government's speech does not transform the speech into censorship). In *Penthouse*, the D.C. Circuit dismissed First Amendment claims against the Attorney General based on letters he sent to adult magazine distributors concerning what he termed "allegations" of distributing pornography. 939 F.2d at 1015. Though the recipients may have *believed* that the letters threatened them with criminal prosecution, qualified immunity attached because the letters, in fact, "contained no threat to prosecute." *Id.* ("[T]he Supreme Court has never found a government abridgement of First Amendment rights in the absence of some actual or threatened imposition of governmental power or sanction."). *Penthouse* makes clear that the mere fact that the speaking government official also possesses enforcement powers—in that case, the power of criminal prosecution—does not convert protected government speech into coercive and illegal speech.

The NRA cannot identify any case—not one— establishing that a government official's criticism of private conduct or advocacy gives rise to a First

Amendment retaliation or censorship claim, in the absence of an actual threat of government action.  To the contrary, the appellate courts uniformly have determined that such criticism is protected.  *See supra* Part II.A; *see also American Fam. Ass'n, Inc. v. City and Cnty. of San Francisco*, 277 F.3d 1114, 1125 (9th Cir. 2002) (collecting cases) ("We agree with the host of other circuits that recognize that public officials may criticize practices that they would have no constitutional ability to regulate, so long as there is no actual or threatened imposition of government power or sanction.").

> ### 1.    The Protected Guidance Letters/Release Do Not "Become" Coercive or Threatening Because They Are Made in the Context of an Ongoing, Unrelated Investigation

As the District Court recognized, "there is no case clearly establishing that otherwise protected public statements transform into an unlawful threat merely because there is an ongoing, and unrelated, regulatory investigation."  SPA 25.  In this case, DFS investigated the Carry Guard and related illegal firearms insurance programs, and the marketing, sale, and underwriting of this unlawful insurance product; the result was a series of Consent Orders in which regulated entities admitted to violations of the New York Insurance Law.  *See supra* at 18.  DFS carried out its lawful mandate by protecting the public from an illegal insurance product and enforcing the Insurance Law.  No case has ever held that an enforcement official who makes statements protected by the First Amendment

faces heightened scrutiny—and legal exposure—because that official or the agency that official leads also investigates and resolves clear violations of law that the agency is charged with enforcing.

### C. The Alleged Private Indications Do Not Violate Clearly Established Law

The Alleged Private Indications set forth in Paragraphs 21 and 69 of the SAC, which the District Court incorrectly held gave rise to a fact question sufficient to deny Ms. Vullo qualified immunity, compel no different result. As detailed above, these Alleged Private Indications are conclusorily pleaded: they do not allege speech at all, much less coercive or threatening speech on the part of Ms. Vullo. The District Court's suggestion that the NRA has pleaded that Ms. Vullo made an "explicit[] threat[]" is unsupported by the words on the page. SPA 27; *see supra* Part I.

But even assuming that the SAC has somehow articulated a plausible First Amendment violation, no case has ever established that vague "indications" along the lines alleged in Paragraphs 21 and 69 are sufficient to establish "threats" or "coercive" speech—and certainly no case has established such a rule with the specificity necessary to defeat qualified immunity.

1.    **Caselaw Establishing *Generally* that Government Threats to Employ Coercive State Power to Stifle Protected Speech are Unlawful Is Not Sufficient to "Clearly Establish" A Violation on These Facts**

While "the First Amendment prohibits implied threats to employ coercive state power to stifle protected speech," that broad principle does not suffice to "clearly establish[]" the law in the "particular circumstances" of this case. *Zieper,* 474 F.3d at 67-68. Whether a principle of law is or is not "clearly established" is directly related to the question of whether a reasonable government official would or would not have been on notice that his or her conduct was unlawful at the time it occurred. This Court has been clear that a "general proposition" is not sufficient to establish the "contours of the right" for purposes of qualified immunity because general principles are not sufficient to put government officials on notice of what conduct violates the law. *Id.* (granting qualified immunity) (cleaned up). What is required to meet the "clearly established" threshold is something far more concrete: a holding that such conduct was unlawful in the "particular circumstances" at issue in the case. *Wesby*, 138 S. Ct. at 590.

In *Zieper*, this Court held that qualified immunity protected officers who had used implied threats to unlawfully coerce a filmmaker and distributor to take down protected content (a fictional film about a military takeover of Times Square), because no case had "made apparent" that defendants' *particular* actions

45

"crossed the line between an attempt to convince and an attempt to coerce." 474

F.3d at 68 (cleaned up). While prior caselaw did establish the *general proposition*

that threatening to use the state's coercive power was unlawful, this Court held that

such general authority did not suffice to defeat qualified immunity, because they

involved fact patterns that were markedly different from what happened to Mr.

Zieper, and "conduct more likely to be perceived as threatening." *Id.* at 68-69

(distinguishing a case where publishers were explicitly told that they would face

prosecution if they distributed First-Amendment-protected publications and a case

where defendant threatened a widespread commercial boycott as a "direct

economic sanction" for non-compliance to grant immunity to an officer who

demanded a target take down a lawful video).

       The conduct at issue in *Zieper* is quite different, and far worse, than

what the NRA alleges here, and still qualified immunity applied. In *Zieper*, law

enforcement officers were attempting to block the exhibition of—literally, to

*suppress*—a First Amendment-protected motion picture. Here, the allegation, such

as it is, is that the government official was using her power to investigate

commercial entities who were known to have violated the law, as indirect

"punishment" of a third-party advocacy group for its broad and unrelated speech

activities. Given *Zieper*, far more than protected hortatory public remarks, and

vague and passing private indications, is required to cross the line into patently-

unlawful conduct, where the connection between the conduct and the speech it purports to disfavor is so non-specific and highly attenuated. [19]

Since *Zieper*, the Supreme Court has strengthened and reaffirmed the requirement that, for a right to be "clearly established" for qualified immunity purposes, it cannot have been established at a general level, but instead must have been held unlawful under "the particular circumstances" presented to the government official, *Wesby*, 138 S. Ct. at 590. "[E]xisting law" at the time of the conduct at issue "must have placed the statutory or constitutional question [of the officer's conduct] beyond debate." *al-Kidd,* 563 U.S. at 741. This principle applies with particular force in light of this Court's wise injunction in *Zieper* that it is and should be "*more difficult* to sue public officials in the specific context of implied threats to speech than in other contexts" because officials are "forced to

---

[19] Importantly, *Zieper* itself did not clearly establish a violation as applied here, because *Zieper* involved allegations far more specific and threatening than the Alleged Private Indications. In *Zieper*, FBI agents and local police sought literally to block the dissemination of an indisputably lawful film by repeatedly visiting Plaintiff' home and calling him "twice in quick succession," to "prevent people from seeing the tape." 474 F.3d at 67. Then, when Plaintiff would not take down the video, defendants told him "this was not over" and warned that FBI agents were "heading to Zieper's home." *Id*. This Court held that a reasonable jury could find this conduct unlawful, but dismissed on qualified immunity grounds nonetheless, because there was no prior case on point. *Id.* at 68. *Zieper* does not clearly establish the unlawfulness of the Alleged Private Indications for qualified immunity purposes. In contrast to *Zieper*, the Alleged Private Indications involve admitted-to unlawful conduct which resulted in Consent Orders, a single pleaded meeting that occurred in a professional setting (not a home), and no specifically pleaded allegedly threatening or coercive language whatsoever. The conclusorily pleaded language in the SAC is far, far less than what occurred in *Zieper* because the implication from the Alleged Private Indications is (at best) that the government would *refrain* from taking action, not that it would be sending law enforcement agents to a person's home in a threatening manner. JA 144, 162 (SAC ¶¶ 21, 69).

47

walk a difficult line." 474 F.3d at 68, 71 (emphasis added). This case presents an even-more-sensitive situation of balancing the import of government speech—speech that the Constitution protects and encourages—as to a nationwide policy debate against the threat of civil litigation that might follow.

> **2. The NRA Cites No Case Establishing, Under the Particular Circumstances Here, that the Alleged Private Indications Are Unlawful**

The NRA can cite no case, from any court, that clearly establishes a constitutional violation where the "particular circumstances," *id.*, mirror—or are even remotely similar to—the Alleged Private Indications. Specifically, the NRA has cited no case where: (1) the allegedly coercive speech was not alleged as speech or communication at all—but rather only in vague and conclusory terms ("made clear," "less interested," etc.); (2) the implied threat was of an allegedly-retaliatory investigation of conduct that was known and alleged to have been unlawful; (3) the allegedly-coercive statement was a suggestion that the government would *refrain* from taking entirely lawful action, such as enforcing the law against "technical regulatory infractions;" or (4) an offer of leniency from a law enforcement officer in exchange for cooperation violates the First Amendment. In briefing before the District Court, the NRA did not cite a single case that it claimed "clearly established" the law in this context, let alone point to a case

whose facts are analogous with a high "degree of specificity," as the caselaw requires. *Mullenix,* 577 U.S. at 13.

Taking each of these propositions in turn:

*First*, the NRA cites no case—and there is none—that is anything like the facts as alleged in the SAC, where vague conclusory statements are used to substitute for a clear statement of coercive speech or conduct. "Made clear," "less interested," "pursue"/"avoid liability" do not allege speech at all, much less coercive speech; no case holds that such non-specific "indications" of the sort set forth in Paragraphs 21 and 69 constitute "coercive" speech.

*Second*, the NRA cites no case—and there is none—where a First Amendment retaliation claim stemmed from a threat to take *permissible* government enforcement action. The SAC alleges that the so-called threat involved enforcement against "technical regulatory infractions," JA 144 (SAC ¶ 21), and "infractions relating to other, similarly situated insurance policies," JA 162 (SAC ¶ 69). The crucial word is "infractions"—which means, actual, acknowledged violations of the state's Insurance Law. There is no case clearly establishing that investigating or enforcing the law against admitted lawbreakers can ever amount to a First Amendment violation, even if the threatened

enforcement is for supposedly nefarious purposes.[20]  No case has held that telling a

law enforcement target that consequences could follow for not following the law

violates the First Amendment.[21]  And, there is no clearly established claim for

retaliatory *investigation* (and, in any event, the NRA has not pleaded such a claim),

as distinct from retaliatory enforcement.  *See Hartman v. Moore*, 547 U.S. 250,

262 n.9 (2006) (stating that it was an open question whether "the expense or other

adverse consequences of a retaliatorily investigation would ever justify recognizing

such an investigation as a distinct constitutional violation").

The lack of cases establishing such a violation stands to reason.

Enforcement actions and decisions are typically protected by the separate doctrine

of absolute immunity.[22]  Indeed, the District Court dismissed Count Three of the

SAC, the NRA's selective enforcement claim against Ms. Vullo—premised in part

---

[20] To the extent that the NRA might suggest that DFS's enforcement is in some way discriminatory, such an allegation would fall within the doctrine of selective enforcement, a claim the District Court has dismissed on the ground of absolute immunity.  In any event, selective enforcement claims have very specific, sharply circumscribed pleading requirements— and, in this case, the NRA has repeatedly failed to plead a viable selective enforcement claim. *Nat'l Rifle Ass'n*, 2019 WL 2075879, at *6, SPA 22-23.  Plaintiff's First Amendment claims cannot serve as a Trojan horse for the selective enforcement claims that it cannot otherwise plead, and which have been dismissed.

[21] *See Archer v. Chisholm*, 191 F. Supp. 3d 932, 953 (E.D. Wis. 2016), *aff'd*, 870 F.3d 603 (7th Cir. 2017) (granting defendants "qualified immunity on the First Amendment retaliation claim" because "it is unclear whether a retaliatory investigation . . . rises to the level of a constitutional violation, and even if it does this was not clearly established at the time of the alleged violation," citing *Hartman*).

[22] *Mangiafico v. Blumenthal*, 471 F.3d 391, 396 (2d Cir. 2006) (A government official "is entitled to absolute immunity when functioning as an advocate of the state in a way that is intimately associated with the judicial process.").

on the same allegations that give rise to its First Amendment claims—on the basis

of absolute immunity.

*Third*, even crediting the NRA's conclusory allegations in Paragraphs

21 and 69, they amount to a proposal *not* to enforce the law. The allegations

describe an offer to allow Lloyd's to "avoid liability for infractions" or that "DFS

[would be] less interested in pursuing" them. JA 162 (SAC ¶ 69); JA 144 (SAC ¶

21). At worst, this amounts to an offer to ignore or reduce well-founded violations

of the Insurance Law if Lloyd's was willing to provide some (undefined) form of

assistance to DFS. No case clearly establishes that a law enforcement officer who

offers not to investigate or charge a known violation (regardless of motive or

allegedly coercive effect) violates the First Amendment.

*Fourth,* after DFS opened an investigation into Carry Guard in

October 2017 and before Lloyd's entered into a Consent Order more than a year

later in December 2018, the SAC alleges that Ms. Vullo met with Lloyd's

executives. As alleged,[23] the discussion had the essential qualities of an

enforcement negotiation: Ms. Vullo sought (unspecified) cooperation from a target

in exchange for not pursuing certain "technical regulatory infractions." JA 144

(SAC ¶ 21). This kind of thing happens every day in enforcement offices

nationwide. No case clearly establishes that the give-and-take of enforcement

---

[23] Ms. Vullo strongly denies that any such discussion ever took place.

51

negotiations can constitute coercive conduct in violation of a third party's First Amendment rights—it doesn't—or that such an officer would have believed that such conduct was unlawful—she wouldn't.  Nothing about the constitutionally-protected, later-delivered public statements—the Press Release or the Guidance Letters—changes any of that.

Holding that government enforcement officials could be held civilly liable under the First Amendment for remarks or indications made during private investigatory meetings or negotiations would have profoundly negative repercussions on our system of law enforcement and regulatory oversight. Government investigators and prosecutors have limited resources and a limited number of tools available to them.  Essential among these tools is negotiating for cooperation, including offering to ignore lesser violations ("infractions") in exchange for cooperation that may prove helpful in another matter.  Such negotiations are routine and deeply embedded in government enforcement work. No case has held that law enforcement must watch what they offer a target in such negotiations lest they be deemed to have coerced the target in violation of the First Amendment rights of a third party.

Given the lack of even remotely similar caselaw, a reasonable official in Ms. Vullo's position would have believed that her alleged actions were permissible under extant law.  Neither the Guidance Letters nor the Press Release

contain threats of prosecution.  And the Alleged Private Indications, at worst, merely represent an implied offer not to prosecute certain Insurance Law violations in return for Lloyd's providing (some undefined) form of assistance.  It would be objectively reasonable for a government official to believe such conduct was lawful.[24]

Courts have drawn a "fine line" between permissible government speech, which is a crucial part of our democracy, and impermissible government coercion.  *Hammerhead*, 707 F.2d at 39.  Qualified immunity exists to protect government officials who are walking that fine line in furtherance of their official duties.  Ms. Vullo's conduct is well within the ambit of the lawful, permissible, encouraged, and routine functioning of an appointed official at her level of responsibility.  Ms. Vullo is far from "plainly incompetent" and she certainly did not "knowingly violate the law,'" the standards necessary to overcome a claim of qualified immunity.  *al-Kidd*, 563 U.S. at 743 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).[25]  She is entitled to qualified immunity.

---

[24] The NRA's free speech claims based on the New York State constitution fail for the same reasons as its federal-based claims do.  As the District Court held, "New York common law provides comparable immunity from state law claims."  SPA 28 (citing *Gardner v. Robinson*, No. 16-CIV-1548, 2018 WL 722858, at *2–3 n.7 (S.D.N.Y. Feb. 6, 2018)).

[25] In fact, Ms. Vullo's record of public service, which also includes a high-level position at the Office of the Attorney General as well as at DFS, is unblemished.

## CONCLUSION

Government work is notoriously thankless, but rarely do its burdens follow those who have served *after* they leave office.  Not so for Maria Vullo.  In 2016, Ms. Vullo left a partnership in a major law firm to serve her State as Superintendent of DFS.  Her service lasted three full years, during which she served her State tirelessly and with honor and dedication—and yet, today, Ms. Vullo is about to enter Year Four of the meritless litigation brought against her by the National Rifle Association arising out of one part of her work and related public statements (among many) in that role.  In other words, Ms. Vullo has spent more time defending her government service than she did performing it.  This is precisely the situation that the doctrine of qualified immunity is intended to prevent.  The time has come for this case to end.

On the facts alleged in the SAC, Ms. Vullo is entitled to qualified immunity.  The District Court's decision denying Ms. Vullo's motion to dismiss the NRA's First Amendment Claims against her should be reversed and the First Amendment Claims should be dismissed with prejudice.

Dated: May 17, 2021
      New York, New York

                           EMERY CELLI BRINCKERHOFF
                           ABADY WARD & MAAZEL LLP

                           By:     /s/ Andrew G. Celli, Jr.
                                   Andrew G. Celli, Jr.

54

Debra L. Greenberger
Marissa R. Benavides
600 Fifth Avenue, 10th Floor
New York, New York 10020
(212) 763-5000

*Attorneys for Defendant-Appellant Maria*
*Vullo*

## <u>CERTIFICATE OF COMPLIANCE</u>

1.  This brief complies with the type-volume limitation of FRAP 32(a)(7)(B) and Second Circuit Local Rule 32.1(a)(4)(A).  It contains 13,153 words, excluding the parts of the brief exempted by FRAP 32(a)(7)(B)(f).

2.  This brief complies with the typeface requirements of FRAP 32(a)(5) and the type style requirements of FRAP 32(a)(6).  It has been prepared in a proportionally-spaced typeface using Microsoft Word in 14-point Times New Roman font.

<div align="right">

     /s/ Andrew G. Celli, Jr.   

Andrew G. Celli, Jr.

Attorney for Defendant-Appellant

</div>

Dated: May 17, 2021

# SPECIAL APPENDIX

**i**

**SPECIAL APPENDIX**
**TABLE OF CONTENTS**

**Page**

Decision and Order of the Honorable Thomas J.
McAvoy, dated March 15, 2021............................ SPA-1

SPA-1

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**NATIONAL RIFLE ASSOCIATION OF AMERICA,**

                                                        **Plaintiff,**

        **-against-**                                                                **1:18-CV-0566**

**ANDREW CUOMO, both individually and**
**in his official capacity; MARIA T. VULLO,**
**both individually and in her official**
**capacity; and THE NEW YORK STATE**
**DEPARTMENT OF FINANCIAL**
**SERVICES,**

                                                        **Defendants.**

_____

**THOMAS J. McAVOY,**
**Senior United States District Judge**


                                        **DECISION and ORDER**

**I.      INTRODUCTION**

        New York Governor Andrew Cuomo ("Gov. Cuomo"), the New York State

Department of Financial Services ("DFS"), and Linda A. Lacewell, the current DFS

superintendent ("Supt. Lacewell"), move to dismiss claims in the Second Amended

Complaint ("SAC"). *See* Dkt. No. 210.  Former DFS Superintendent Maria T. Vullo ("Ms.

Vullo") appeals Magistrate Judge Hummel's decision granting Plaintiff's motion to amend

the Complaint, and moves to dismiss the claims against her in the SAC.  *See* Dkt. No. 211.

Plaintiff National Rifle Association ("NRA" or "Plaintiff") opposes these motions.

**II.     PROCEDURAL BACKGROUND**

        The Court assumes the parties' familiarity with the procedural history of this case and

                                                1

SPA-2

the underlying claims.  It will not restate it here other than as necessary to review the pending motions.

### III.    DISCUSSION

#### a.  Ms. Vullo's Motion

**Rule 72 Objection**

In moving for leave to amend, Plaintiff asserted to Judge Hummel that it sought to amend to replead its selective enforcement claims, substitute Supt. Lacewell for Ms. Vullo in its claim for injunctive relief, and make minor, nonsubstantive changes to the pleading. Dkt. No. 202 at 4-5.  Judge Hummel found that Plaintiff did not exercise due diligence in moving to amend. *See* Dkt. No. 202.  But, because mere delay absent a showing of bad faith or undue prejudice does not provide a basis to deny the right to amend, he then preceded to addressed these issues. *Id.*  He declined to find that the motion to amend was brought in bad faith, and determined that Ms. Vullo had not established that she would be subjected to undo prejudice such to warrant outright denial of the motion to amend. *Id.*  He then preceded to determine whether the proposed repleaded selective enforcement claim against Ms. Vullo was futile, using a the Rule 12(b)(6) standard and the Court's prior decision on the selective enforcement claims to assess its plausibility. *Id.*  He determined that the proposed pleading plausibly alleged that Ms. Vullo had knowledge of similarly situated comparators, either directly or through a "see-no-evil" policy, and that she declined to prosecute these comparators. *Id.*  Thus, Judge Hummel granted the NRA's motion to

2

SPA-3

replead a selective enforcement claim against Ms. Vullo in her individual capacity. *Id.* [1]  He also granted Plaintiff's motion to the extent it substituted Supt. Lacewell for Ms. Vullo in Plaintiff's request for an injunction. *Id.*  He denied leave to amend to the extent Plaintiff sought to replead a selective enforcement claim against Gov. Cuomo, or to newly plead such a claim against DFS. *Id.*

Ms. Vullo challenges Judge Hummel's determinations relative to whether the NRA acted in bad faith in seeking to amend, and whether Ms. Vullo will be unduly prejudiced by amendment.  Whether applying the clearly erroneous or contrary to law standard of review set out in Rule 72(a), or the de novo standard of review set out in Rule 72(b), *see Sokol Holdings, Inc. v. BMB Munai, Inc*., No. 05 CV 3749 KMW DCF, 2009 WL 3467756, at *3-*4 (S.D.N.Y. Oct. 28, 2009),[2] the Court finds no error in Judge Hummel's assessment of bad faith and undue prejudice.  Ms. Vullo does not challenge under Rule 72 Judge Hummel's determination that the selective enforcement claim against her was non-frivolous, but rather challenges the legal viability of that claim under Rule 12(b)(6).  Because the Court finds, as addressed below, that Ms. Vullo is entitled to immunity on the selective enforcement claim in the SAC, it need not address her arguments directed to the plausibility of the factual allegations supporting this claim.

---

[1] Count Three of the SAC brought against Ms. Vullo in her individual capacity asserts a violation of the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution pursuant to 42 U.S.C. § 1983, and a violation of Article 1, Section 11 of the New York Constitution.  This claim is subject to the same substantive analysis under federal and state law, *see Selevan v. New York Thruway Auth*., 584 F.3d 82, 88 (2d Cir. 2009), and is referred to as Plaintiff's selective enforcement claim.

[2]("[S]ome uncertainty and arguable differences of opinion persist in this Circuit as to the proper standard of review of a Magistrate Judge's ruling denying a motion to amend."  In light of this uncertainty, "[s]ome courts have . . . considered a denial of a motion to amend to be a dispositive decision, subject to a de novo standard of review.")(internal quotation marks and citations omitted)

SPA-4

**Rule 12(b)(6) Motion**

On the Rule 12(b)(6) motion, Ms. Vullo argues that she is entitled to absolute and qualified immunity on the selective enforcement, and qualified immunity on the First Amendment claim.  The Court starts with the arguments addressed to the selective enforcement claim.

**Selective Enforcement Claim**

In the selective enforcement claim, Plaintiff asserts that DFS received information from the New York County District Attorney's Office that the NRA was offering an affinity insurance program known as Carry Guard that was illegal under New York Insurance Law ("Insurance Law").[3]  *See* SAC, Dkt. No. 203, ¶¶ 34-35.  The District Attorney's Office had received its information from an organization, Everytown for Gun Safety, which has an explicit political mission to oppose the NRA.  *Id.* ¶ 34.  The DFS investigation into the Carry Guard insurance program initially focused on insurance companies Chubb Group Holdings, Inc. and Illinois Union (together, "Chubb") and Lockton Affinity, LLC ("Lockton") for underwriting and administering this program.  The DFS investigation also looked into Lloyd's of London's ("Lloyd's") involvement in the NRA's affinity insurance programs. *See* Plt. Mem. L. in Opp., Dkt. 220, at 12 ("Lockton brokered and administered, and Lloyd's underwrote, the vast majority of non-Carry Guard policies offered to NRA members and targeted by Defendants.").   "Within weeks of commencing its investigation, DFS began to target insurance programs that had nothing to do with firearms, and instead provided coverage

---

[3]The Carry Guard program provided, among other policy coverages, (1) liability insurance to gun owners for acts of intentional wrongdoing, and (2) legal services insurance for any costs and expenses incurred in connection with a criminal proceeding resulting from acts of self-defense with a legally possessed firearm, in violation of New York Insurance Law.

4

SPA-5

similar or identical to coverage endorsed by other New York affinity organizations."  SAC ¶ 36.  Plaintiff asserts that "Defendants' goal, from the outset, was to disrupt any and all business arrangements between the NRA and any insurance administrator, broker, or underwriter—indeed, any financial institution." *Id.*

Chubb, Lockton, and Lloyd's entered into consent orders with DFS in which they agreed that some of the NRA insurance programs they were involved in violated New York Insurance Laws, agreed not to provide these and other insurance programs to the NRA, and agreed to pay substantial civil monetary penalties.  *See* SAC ¶ 62 and Ex. E (Chubb Consent Order); *id.* ¶¶ 54-55 and Ex. D (Lockton Consent Order); *id.* ¶ 74 and Ex. I (Lloyd's Consent Order); *see also id.* ¶ 78.[4]  Ms. Vullo signed the consent orders on behalf of DFS. Plaintiff contends that Chubb, Lockton, and Lloyd's "were coerced to terminate their business arrangements with the NRA and its members—including arrangements having nothing to do with the allegedly unlawful conduct cited by DFS." *Id.* ¶ 21; *see also id.* ¶ 93;[5] ¶ 102.[6]  Plaintiff asserts that "DFS has not announced—even to this day—similar inquiries concerning any" other membership organizations "although their affinity programs involve

---

[4]("On January 31, 2019, almost three months after this Court had [originally] sustained the NRA's selective-enforcement claims and permitted discovery regarding them, DFS entered into a Supplemental Consent Order with Lockton that purported to admonish violations of the same statutes by Lockton's non-NRA clients, yet did not identify the clients by name or require Lockton to cease doing business with them.")(citing Ex. J, Lockton Supplemental Consent Order).

[5]("Defendants' concerted efforts to stifle the NRA's freedom of speech caused financial institutions doing business with the NRA to end their business relationships, or explore such action, due to fear of monetary sanctions or expensive public investigations. For example, Defendants coerced and caused Lockton, Chubb, and Lloyd's to cease their participation in NRA endorsed insurance programs, regardless of whether the insurance programs met all legal qualifications under New York's Insurance Law.")

[6]("Defendants' actions have concretely harmed the NRA by causing financial institutions doing business with the NRA to end their business relationships, or explore such action, due to fear of monetary sanctions or expensive public investigations. For example, Defendants coerced and caused Lockton, Chubb, and Lloyd's to cease their participation in NRA endorsed insurance programs in New York and elsewhere, regardless of whether the insurance programs met all legal qualifications under New York's Insurance Law.")

5

SPA-6

most, if not all, of the practices and features referenced by DFS in its investigation of the NRA's affinity programs." *Id.* ¶ 37.  Plaintiff contends that "Defendants selectively targeted the NRA because of the NRA's constitutionally protected legislative and grassroots advocacy activities.  Defendants specifically intend to undermine the NRA's ability to conduct its affairs in New York—and to advance Cuomo's anti-NRA political agenda." *Id.*

Plaintiff asserts that based on the NRA's "political views and speech relating to the Second Amendment," SAC ¶ 119, Ms. Vullo "knowingly and willfully violated the NRA's equal protection rights by seeking to selectively enforce certain provisions of the Insurance Law against Lockton's affinity-insurance programs for the NRA.  Meanwhile, other affinity-insurance programs that were identically (or at least similarly) marketed by Lockton, but not endorsed by 'gun promotion' organizations, have not been targeted by DFS's investigation." *Id.* ¶ 109.  In this regard, the NRA asserts:

58. Several of the purported "violations" assessed pursuant to the Lockton Consent Order concern programs commonly engaged in by numerous additional affinity associations that do not publicly advocate for Second Amendment rights and, therefore, are <u>not</u> targets of Defendants' unconstitutional conduct. Several such organizations are clients of Lockton—yet the Consent Order does not compel Lockton to discontinue its purportedly unlawful conduct with respect to these clients.

59.  For example:

• DFS claims that Lockton Affinity violated Insurance Law § 2122(a)(1) by referring to the insurer's AM Best rating. Yet, at the time this lawsuit was filed, Lockton Affinity's affinity program for the American Optometric Association through AOAExcel ("AOAExcel") touted the "backing of a carrier that is rated A+ (Superior) by A.M. Best. Similarly, Lockton Affinity currently advertises that coverage for the affinity programs designed for the Veterans of Foreign Wars ("VFW") and Moose International Inc. ("Moose") was through companies "rated 'Excellent' or higher by A.M. Best."

• DFS claims that Lockton Affinity violated Insurance Law § 2324(a) by

6

giving or offering to give no cost insurance to NRA members in good
standing. Yet, Lockton Affinity currently made that same offer to
members of both the Professional Photographers of America ("PPA")
and the VFW.

• DFS claims that Lockton Affinity violated Insurance Law § 2116 by
compensating the NRA based on actual premiums collected. Yet,
Lockton Affinity paid AOAExcel, Moose, the VFW, the PPA, and
dozens of other clients in the same or similar manner.

*Id.* ¶¶ 58-59 (emphasis is original, footnotes omitted).   As is apparent, the Insurance Law

violations identified in paragraph 59 were insurance programs identified in the Lockton

Consent Order that had nothing to do with firearms (which the Court refers to as the

additional provisions of the Lockton Consent Order), and which purportedly  similarly existed

in other entities' affinity insurance programs.  Plaintiff asserts that "[e]ven if such conduct

does violate insurance law, DFS's selective enforcement of such offenses as to

NRA-endorsed policies—but not as to other policies marketed by Lockton in an identical

fashion—constitutes impermissible viewpoint discrimination and a denial of equal protection

under the law." *Id.* ¶ 60.

       To demonstrate Ms. Vullo's knowledge of comparator affinity programs,  Plaintiff

alleges that Vullo had conversations and meetings with senior officials of Lloyd's in the

spring of 2018 during which she learned of comparator programs.  *See Id.* ¶ 110.  Plaintiff

asserts that during these conversations and meetings, Ms. Vullo expressed an intention not

to prosecute violations provided Lloyd's stopped providing insurance to the NRA and other

SPA-8

gun promotion organizations.  *See id.* ¶ 21;[7] ¶ 67;[8] ¶ 69.[9]

As an alternative to Ms. Vullo's direct knowledge of comparators, the SAC asserts that "Vullo should have known of similarly situated individuals at the time DFS launched its investigation and any purported lack of knowledge was due to a 'see-no-evil' policy of enforcement, which Vullo and DFS abandoned solely to further their vendetta against the NRA."  SAC ¶ 111.  "The 'see-no-evil' enforcement policy was confirmed by DFS's continued ignorance toward the violations of the similarly situated comparators."  *Id.*  The NRA further alleges that "[b]y virtue of the position held by Vullo at the time DFS launched its investigation, Vullo knew the actions taken by DFS against NRA affinity insurance programs were unprecedented.  No other similarly situated programs have faced even close to the same treatment for analogous violations.  However, Vullo and DFS failed to inquire about whether there were any other similarly situated affinity programs when the investigation was launched."  *Id.* ¶ 112.

### Absolute Immunity

---

[7]("During the meetings [Vullo] discussed an array of technical regulatory infractions plaguing the affinity-insurance marketplace. Vullo made it clear, however, that DFS was less interested in pursuing the infractions of which she spoke, so long as Lloyd's ceased providing insurance to gun groups, especially the NRA.")

[8]("In the aftermath of the Parkland tragedy, Vullo met with senior executives of Lloyd's and [Lloyd's United States affiliate, Lloyd's America, Inc. (LAI)], and presented Defendants' views on gun control and their desire to leverage their powers to combat the availability of firearms, including specifically by weakening the NRA.")

[9]("During her surreptitiously held meetings with Lloyd's executives that commenced in February 2018, Vullo acknowledged the widespread regulatory issues in the excess-line marketplace. Vullo and DFS made clear that Lloyd's could avoid liability for infractions relating to other, similarly situated insurance policies, so long as it aided DFS's campaign against gun groups. Against the specter of this bold abuse of her position, Lloyd's agreed that it would instruct its syndicates to cease underwriting firearm-related policies and would scale back its NRA-related business; in exchange, DFS would focus its forthcoming affinity-insurance enforcement action solely on those syndicates which served the NRA, and ignore other syndicates writing similar policies.")

"Courts have recognized two forms of immunity: absolute and qualified." *DiBlasio v. Novello*, 344 F.3d 292, 296 (2d Cir. 2003)(citing *Buckley v. Fitzsimmons*, 509 U.S. 259, 268 (1993)).  "Absolute immunity gives 'public officials entrusted with sensitive tasks a protected area of discretion within which to carry out their responsibilities.'" *Mangiafico v. Blumenthal*, 471 F.3d 391, 394 (2d Cir. 2006)(quoting *Barr v. Abrams*, 810 F.2d 358, 361 (2d Cir.1987)).  "'The presumption is that qualified rather than absolute immunity is sufficient to protect government officials in the exercise of their duties,' and hence courts are generally 'quite sparing' in their recognition of absolute immunity." *DiBlasio*, 344 F.3d at 296 (quoting *Burns v. Reed*, 500 U.S. 478, 486–87 (1991) (citations omitted)).  However, "there are some officials whose special functions require a full exemption from liability." *Butz v. Economou*, 438 U.S. 478, 508 (1978).  "The Supreme Court has accorded absolute immunity to a limited range of government officials whose duties are deemed, as a matter of public policy, to require that protection to enable them to function without fear of undue interference or harassment." *Mangiafico*, 471 F.3d at 394.  "Absolute immunity is accorded to judges and prosecutors functioning in their official capacities and, under certain circumstances, is also extended to officials of government agencies 'performing certain functions analogous to those of a prosecutor' or a judge." *DiBlasio*, 344 F.3d at  296-97 (quoting *Butz*, 438 U.S. at 515).  "In considering whether the procedures used by [an] agency are sufficiently similar to judicial process to warrant a grant of absolute immunity," the Court employs a functional approach.  *Id.* at 297 (citing *Cleavinger v. Saxner*, 474 U.S. 193, 201–02 (1985), in turn citing *Harlow v. Fitzgerald*, 457 U.S. 800, 810 (1982)).  Under the functional approach, the Court looks "to whether the actions taken by the official are 'functionally comparable' to that

of a judge or a prosecutor." *Id.* (quoting *Butz*, 438 U.S. at 513, and citing *Imbler v. Pachtman*, 424 U.S. 409, 423 n. 20, (1976); *Young v. Selsky*, 41 F.3d 47, 51 (2d Cir.1994)). "Government actors who seek absolute immunity 'bear the burden of showing that public policy requires an exemption of that scope.'" *Id.* (quoting *Butz*, 438 U.S. at 506). "However, once a court determines that an official was functioning in a core judicial or prosecutorial capacity, absolute immunity applies 'however erroneous the act may have been, and however injurious in its consequences it may have proved to the plaintiff.'" *Id.* (quoting *Cleavinger*, 474 U.S. at 199–200, 106 S.Ct. 496 (internal quotations and citations omitted)). Further, because the focus of absolute immunity is on the function performed, once absolute immunity is established the Court does not consider allegations of ill intent or discriminatory enforcement. *See Dory v. Ryan*, 25 F.3d 81, 83 (2d Cir. 1994)("[The Supreme Court decision in *Buckley*] indicates that absolute immunity protects a prosecutor from § 1983 liability for virtually all acts, regardless of motivation, associated with his function as an advocate. This would even include, for purposes of this case, allegedly conspiring to present false evidence at a criminal trial."); *see also Verbeek v. Teller*, 158 F. Supp. 2d 267, 282 (E.D.N.Y. 2001) (granting motion to dismiss claims against prosecutorial official because conspiracy allegation does not "negate her entitlement to absolute immunity")(citing *Dory*, 25 F.3d at 83).  New York's state law absolute immunity is essentially the same as federal absolute immunity. *See Arteaga v. State*, 72 N.Y.2d 212, 216 (N.Y. 1988).[10]

---

[10] In *Arteaga*, the New York Court of Appeals wrote:

The absolute immunity for quasi-judicial discretionary actions is founded on public policy and is generally said to reflect the value judgment that the public interest in having officials free to

(continued...)

SPA-11

As a general principle, a government official "is entitled to absolute immunity when functioning as an advocate of the state in a way that is intimately associated with the judicial process." *Mangiafico*, 471 F.3d at 396 (citing *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976)).  By contrast, a government official "is entitled only to qualified immunity when functioning in an administrative or investigative capacity." *Id.* (citing *Mitchell v. Forsyth*, 472 U.S. 511, 520–21 (1985)(no absolute immunity for the Attorney General's exercise of his national security functions); *Buckley*, 509 U.S. at 274–76 (1993) (no absolute immunity when a prosecutor acts in administrative capacity); *Burns*, 500 U.S. at 492–95 (no absolute immunity for a prosecutor offering legal advice to the police regarding interrogation practices)).

The NRA's selective enforcement claim is premised on two actions: First, Ms. Vullo's decision to enter into the Lockton, Lloyd's and Chubb Consent Orders—and their precise terms.  The NRA's purported comparators are based on violations agreed to in those Consent Orders.  As Ms. Vullo asserts, were it not for those Consent Orders the NRA could

---

[10](...continued)
exercise their discretion unhampered by the fear of retaliatory lawsuits outweighs the benefits to be had from imposing liability. Not all discretionary actions, however, are accorded absolute immunity.

Whether an action receives only qualified immunity [under New York law], shielding the government except when there is bad faith or the action taken is without a reasonable basis, or absolute immunity, where reasonableness or bad faith is irrelevant, requires an analysis of the functions and duties of the particular governmental official or employee whose conduct is in issue.  The question depends not so much on the importance of the actor's position or its title as on the scope of the delegated discretion and whether the position entails making decisions of a judicial nature--i.e., decisions requiring the application of governing rules to particular facts, an exercise of reasoned judgment which could typically produce different acceptable results.

*Arteaga v. State*, 72 N.Y.2d at 216 (citations and quotations marks omitted).

11

SPA-12

not allege selective enforcement based on Ms. Vullo's conduct.  Second, Ms. Vullo's

alleged decision not to bring charges against the purported comparators.  For reasons

discussed below, these are both prosecutorial actions premised on enforcement decisions

intimately associated with the judicial process.

There is not merit to Plaintiff's contention that absolute immunity does not apply

because Ms. Vullo's relevant conduct was investigative in nature.  As the NRA states in its

brief, "the date that DFS opened its investigation into the NRA's insurance programs is

irrelevant. The relevant date or dates is the date DFS took action against the NRA, or its

business partners."  Dkt. 220 at 15.  As explained here, the NRA's selective enforcement

claim is premised on two enforcement decisions.  Plaintiff's argument that "[t]he NRA also

alleges that Vullo violated its Equal Protection rights by selectively targeting the NRA in

DFS's *investigation* of certain affinity programs, but failing to make similar inquiries into

other similar membership affinity programs," *id.* at 18 (emphasis in original), does not

remove the selective enforcement claim and Ms. Vullo's enforcement decisions from

absolute immunity consideration.  A selective investigation claim is not asserted in the SAC,

*see* SAC ¶ 109 (specifically alleging that Ms. Vullo violated the NRA's equal protection

rights by selectively enforcing certain provisions of the Insurance Law against Lockton's

affinity insurance programs for the NRA), and the NRA cannot amend its complaint for the

fourth time through a memorandum of law.[11]  Moreover, there is no merit to Plaintiff's

---

[11]The facts that the NRA cites to support its selective investigation claim, paragraphs 36 and 37 of
the SAC, reference "Defendants" and "DFS's" conduct, focus, and goals, but do not mention Ms. Vullo.
There is no merit to Plaintiff's argument that Ms. Vullo has supervisory liability under the standard announced
in *Colon v. Coughlin*, 58 F.3d 865 (2d Cir. 1995) for DFS's conduct taken "on her watch." *See* Dkt. No. 220 at
9-11 (arguing for supervisory liability under *Colon*); *see also id.* at 9 ("Vullo cannot deny knowledge of, or
escape liability for, actions undertaken by DFS on her watch.").   "[T]he Second Circuit recently held that the
(continued...)

12

argument that prosecutorial immunity only attaches to "the initiation of a prosecution and the presentation of the government's case."  Prosecutorial immunity protects conduct that occurs both before and during the judicial phase. *See Burns*, 500 U.S. at 492 (immunity protects pre-indictment search warrant application during the investigative stage); *Butz*, 438 U.S. at 516 (immunity encompasses "decision to initiate" agency adjudication); *Mangiafico*, 471 F.3d at 396 (immunity encompasses "actions preliminary to the initiation of a prosecution").  The decision to reach a consented-to resolution - analogous to securing a plea bargain in a criminal proceeding - rather than "commit the state's resources, reputation, and prestige to litigation," is a prosecutorial decision.  *Mangiafico*, 471 F.3d 396; *see Knowlton v. Shaw*, 704 F.3d 1, 7–8 (1st Cir. 2013) (in an insurance enforcement proceeding, entering into consent decrees is preparatory to "the initiation of the enforcement proceeding—a proceeding that would have surely followed had no consent agreement been executed" and not "investigative"); *see also Taylor v. Kavanagh*, 640 F.2d 450, 453 (2d Cir.1981)(a prosecutor is entitled to absolute immunity for negotiating a plea bargain in a criminal case); *Powers v. Coe*, 728 F.2d 97, 103–04 (2d Cir. 1984)("The alleged breach of the agreement not to prosecute, while not technically a plea bargain which would render the prosecutor's immunity absolute under *Taylor v. Kavanagh*, 640 F.2d at 453, is so closely analogous to a plea bargain that we think the same principle of absolute immunity apply

---

[11](...continued)

*Colon* test was abrogated by the Supreme Court's decision in *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed.2d 868 (2009)." *Jeanty v. City of Utica*, No. 6:16-CV-00966 (BKS/TWD), 2021 WL 149051, at *33 (N.D.N.Y. Jan. 14, 2021)(citing *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020)).  In *Tangreti,* the Second Circuit "clarified that 'there is no special rule for supervisory liability' and explained that 'a plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution.'" *Doe v. Zucker*, No. 1:20-CV-840 (BKS/CFH), 2021 WL 619465, at *28 (N.D.N.Y. Feb. 17, 2021)(quoting *Tangreti*, 983 F.3d at 612, in turn quoting *Iqbal*, 556 U.S. at 676).  Thus, Plaintiff has not adequately pled a "selective investigation" claim against Ms. Vullo.

13

under the functional analysis of *Kavanagh*.").  As explained below, so too is the decision not to prosecute a violation of the Insurance Law.

To determine whether the process in which the government official acts "share enough of the characteristics of the judicial process, and whether the official[] [herself was] functioning in a manner sufficiently analogous to a judge or prosecutor," the Court assesses the six non-exhaustive factors outlined in *Butz* that are characteristic of the judicial process. *DiBlasio*, 344 F.3d at 344 F.3d 297-98 (citing *Butz*, 438 U.S. at 513; *Cleavinger*, 474 U.S. at 202 (interior quotation marks and brackets omitted).  These factors are:  (a) the need to assure that the individual can perform [her] functions without harassment or intimidation; (b) the presence of safeguards that reduce the need for private damages actions as a means of controlling unconstitutional conduct; (c) insulation from political influence; (d) the importance of precedent; (e) the adversary nature of the process; and (f) the correctability of error on appeal.  *Butz*, 438 U.S. at  at 512.

As Superintendent of DFS, Ms. Vullo was charged with the enforcement of the New York Financial Services Law, Banking Law, and Insurance Law.  The DFS Superintendent, "in the enforcement of relevant statutes and regulations, may undertake an investigation" into activities that may constitute violations of, inter alia, the Financial Services Law, N.Y. Fin. Servs. Law § 404, and/or the Insurance Law, N.Y. Ins. Law. § 308.  If a violation is found, the Superintendent is authorized to bring a statement of charges and initiate a hearing. N.Y. Ins. Law. § 2405(a); N.Y. Fin. Servs. Law §§ 305, 306.  The Superintendent presents evidence of a violation of any of these laws at an administrative hearing in which the alleged violator is given an opportunity to be heard. 23 NYCRR Part 2; N.Y. Fin. Servs.

Law § 305.  Where the hearing officer finds that a violation has occurred, the

Superintendent may impose civil penalties and other remedies.  *See* N.Y. Ins. Law §§

2102(g), 2110, 2117(g), 2127; N.Y. Fin. Servs. Law § 408.  The Superintendent's function is

akin to that of a prosecutor: bringing charges, attempting to negotiate resolutions (*i.e.* the

Consent Orders), and preparing for trial (DFS hearings) before an adjudicator if a

negotiated resolution is not reached.

Absolute immunity protects officials "from personal liability for the performance of

certain discretionary acts.  Such immunity extends to prosecutors [and] to executive officers

initiating administrative proceedings." *Spear v. Town of W. Hartford*, 954 F.2d 63, 66 (2d

Cir. 1992)(citing *Imbler v. Pachtman*, 424 U.S. 409, 430–31 (1976) and *Butz*, 438 U.S. at

515–17)*; see Butz*, 438 U.S. at 516 (absolute immunity encompasses "decision to initiate or

continue a proceeding subject to agency adjudication"); *Mangiafico*, 471 F.3d at 395–96

("[A]gency officials who perform functions analogous to those of a prosecutor are entitled to

absolute immunity from such liability for their participation in the decision to initiate or to

continue agency proceedings.")(citing *Butz*, 438 U.S. at 512–13); *Douglas v. New York*

*State Adirondack Park Agency*, 895 F. Supp. 2d 321, 340 (N.D.N.Y. 2012)(absolute

immunity for park agency officials' initiation of an agency enforcement proceeding).

> The Supreme Court, in extending prosecutorial immunity to the executive
> branch, explained that
>
> > agency officials performing certain functions analogous to those
> > of a prosecutor should be able to claim absolute immunity with
> > respect to such acts. The decision to initiate administrative
> > proceedings against an individual or corporation is very much
> > like the prosecutor's decision to initiate or move forward with a
> > criminal prosecution.... The discretion which executive officials
> > exercise with respect to the initiation of administrative

15

 > proceedings might be distorted if their immunity from damages arising from that decision was less than complete.

*Spear*, 954 F.2d at 66 (quoting *Butz*, 438 U.S. at 515). The targets of a DFS enforcement action—banks and insurance companies—are well resourced and, as Ms. Vullo argues, inclined to bring suit. Without the protection absolute immunity affords, a DFS superintendent's "discretion" in initiating "proceedings might be distorted" due to litigation for purposes of "harassment or intimidation." *Butz*, 438 U.S. at 515; *see id.* at 510–11 (The "public prosecutor, in deciding whether a particular prosecution shall be instituted or followed up," should not be "biased with the fear of being harassed by a vicious suit for acting according to their consciences (the danger of which might easily be insinuated where powerful men are warmly engaged in a cause and thoroughly prepossessed of the justice of the side which they espouse)."). The first *Butz* factor weighs in favor of absolute immunity with regard to Ms. Vullo's decision to initiate enforcement proceedings that resulted in the Consent Orders in issue on the selective enforcement claim.

The Second Circuit has also "consistently afforded absolute immunity to a government attorney's decision whether or not to initiate litigation on behalf of the state." *Mangiafico*, 471 F.3d at 396; *see Ying Jing Gan v. City of New York*, 996 F.2d 522, 530 (2d Cir. 1993) ("A prosecutor thus has absolute immunity in connection with the decision whether or not to commence a prosecution."). "[A]s a matter of logic, absolute immunity must . . . protect the prosecutor from damages suits based on the decision *not* to prosecute." *Schloss v. Bouse*, 876 F.2d 287, 290 (2d Cir. 1989) (emphasis in original)(citing *Dacey v. Dorsey*, 568 F.2d 275, 278 (2d Cir. 1978)(United States Attorney who chose not to seek injunction under 42 U.S.C. § 1986 to restrain alleged civil rights violation was

SPA-17

absolutely immune from damages suit by victim), *cert. denied*, 436 U.S. 906, 98 S. Ct.

2238, 56 L. Ed.2d 405 (1978)).  The Second Circuit explained in *Schloss*:

> Though not all of the concerns discussed in *Imbler* indicate a need for
> absolute immunity with respect to a decision not to prosecute, many of the
> same factors may come into play. For example, the decision not to prosecute
> could expose the prosecutor to a suit by the complainant asserting that the
> complainant was denied the equal protection of the law. Further, absolute
> protection from a damages suit for not prosecuting is warranted simply
> because the decision with respect to any given charge is an either-or
> proposition. A decision to prosecute logically eliminates the nonprosecution
> option, and vice versa. If the prosecutor had absolute immunity only for the
> decision to prosecute and not for a decision not to prosecute, his judgment
> could be influenced in favor of a prosecution that sound and impersonal
> judgment would eschew. Thus, the contours of absolute prosecutorial
> immunity should be drawn to avoid skewing the prosecutor's judgment in
> either direction, both to eliminate the appearance that personal considerations
> may be a factor, *see, e.g., Imbler v. Pachtman*, 424 U.S. at 424–25, 96 S. Ct.
> at 992 ("[t]he public trust of the prosecutor's office would suffer if he were
> constrained in making every decision by the consequences in terms of his own
> potential liability in a suit for damages"), and to avoid establishing a doctrine
> that would "discourage prosecutors from dismissing meritless actions before
> trial, since only by pursuing ... charges would the prosecutor be fully immune,"
> *Haynesworth v. Miller*, 820 F.2d 1245, 1270 n. 200 (D.C. Cir.1987).

*Id.*

These same considerations apply to Ms. Vullo's decision not to prosecute the

Insurance Law violations identified in paragraph 59 of the SAC of which she was

purportedly aware.  Without the protection absolute immunity affords, a DFS

Superintendent's discretion in declining to initiate proceedings might be distorted due to fear

of litigation, such as is the case here. Further, without absolute immunity, the

Superintendent is deprived of discretion to determine whether to invest the State's

resources in the prosecution of a particular matter no matter how inconsequential the matter

may be in the grander scheme of enforcing the Insurance Law in New York, and no matter

whether there is sufficient merit to a particular matter.  As the SAC indicates, DFS learned of the additional violations in the Lockton Consent Order only after investigating whether Lockton, Chubb, and Lloyd's were involved in offering the Carry Guard program involving serious violations of the Insurance Law.  Without absolute immunity protecting the Superintendent's discretion as to which violations to prosecute, the Superintendent would be placed in the position of having to prosecute every ostensible violation so as to be afforded immunity.  Because absolute immunity looks at the function in question and not the motive or intent of the actor in performing that function, the first *Butz* factor also weighs in favor of absolute immunity for Ms. Vullo's decision not to institute enforcement proceedings against the various entities in New York that she was purportedly aware.

As to the second *Butz* factor, the NRA argues that "[a]lthough there are some safeguards to protect parties from unconstitutional conduct by the DFS Superintendent, the efficacy of those safeguards is diminished by other provisions of the Financial Services Law. Specifically, although a party is entitled to notice and a hearing, the 'independence' of any hearing is severely undermined because it is held before the Superintendent or an individual directly designated by the Superintendent. Additionally, the hearing officer only has the power to suggest a course of action, while the Superintendent has the final authority to reject the recommendation and issue whatever order she desires." Dkt. No. 220, at 20 (citing N.Y. Fin. Serv. Law § 305).  From this, the NRA argues that "Vullo has virtually unfettered ability to act in an unconstitutional manner without appropriate safeguards." *Id.* (citing *DiBlasio*, 344 F.3d 299).

In *DiBlasio*, in addressing the second *Butz* factor the Second Circuit held that

18

although some procedures of New York Public Health Law § 230 "provide some protection to physicians subjected to summary suspension proceedings, the efficacy of those procedures are seriously diminished by other features of § 230." *DiBlasio*, 344 F.3d at 298–99.  After reviewing these other features of § 230, the Circuit concluded that the Department of Health Commissioner "has virtually unfettered authority to determine whether a physician's license should be summarily suspended pending resolution of misconduct charges—a process that, in this case, took eight months. The absence of meaningful safeguards against arbitrary executive action in a summary suspension proceeding weigh against extending absolute immunity" to the Commissioner and a department fraud investigator who recommended the plaintiff's suspension. *DiBlasio*, 344 F.3d at 299.  In making this decision, the Circuit stated that "we find that § 230 inadequately protects physicians from wrongful deprivation of their professional licenses, the second *Butz* factor." *Id.* at 298.

The procedures involving Insurance Law violations are much different than the procedures involving a summary suspension of a physician's license pending a hearing as examined in *DiBlasio*, and do not give the DFS Superintendent "virtually unfettered ability to act in an unconstitutional manner."  Under applicable law, had Lockton, Lloyd's, or Chubb not admitted liability, each would have had the opportunity to proceed with a DFS evidentiary hearing, be represented by counsel in front of an impartial hearing officer not previously involved in the matter, present evidence, hold the state to its burden of proof, cross-examine witnesses, and dispute the hearing officer's findings, as well as appeal to the state Supreme Court.  At a hearing, the hearing officer must prepare a report detailing the

19

findings from the adversarial hearing, N.Y. Fin. Servs. Law § 305(b), and assuming the Superintendent were to make the decision disregarding the report for political reasons, as the NRA contends, the affected party could seek reversal via a state court Article 78 proceeding on the grounds of an arbitrary and capricious decision. *See, e.g., Mordukhaev v. Daus*, 457 F. App'x 16, 21 (2d Cir. 2012) ("[T]he availability of an Article 78 proceeding to challenge any alleged deficiencies in an administrative adjudication is sufficient to satisfy due process."). As discussed below under the fifth *Butz* factor, an Article 78 proceeding following a DFS administrative proceeding could, if warranted, vacate the liability determination and any penalty imposed. The Court finds here that the second *Butz* factor weighs in favor of immunity

The third *Butz* factor, insulation from political influence, weighs against absolute immunity because Ms. Vullo served at the will of the Governor. *See* N.Y. Fin. Serv. Law § 202(a)("The head of [DFS], . . . shall be appointed by the governor [and] . . . shall hold office at the pleasure of the governor."); *see also DiBlasio*, 344 F.3d at 298 (if "the commissioner of health 'serves at the will of the Governor,' . . . it would be improper to characterize the commissioner as insulated from political influence").

On the fourth *Butz* factor, the importance of precedent, the NRA asserts that no provision of the Financial Services Law or the Insurance Law indicates that DFS or its Superintendent place any value on precedent when making decisions with respect to violations of the Insurance Law. Because Ms. Vullo bears the burden of establishing her entitlement to absolute immunity, and because she has not addressed this issue, the Court finds that the fourth *Butz* factor weighs against absolute immunity.

20

Finally, the fifth *Butz* factor directs the Court to assess the correctability of error on

appeal.  In arguing against this factor, the NRA cites to *DiBlasio* where the Circuit held:

> *Butz* also requires us to consider whether a wrongful summary suspension is
> "correctabl[e] on appeal." *Butz*, 438 U.S. at 512, 98 S.Ct. 2894. The district
> court reasoned that the hearing required by § 230(10)(f) and the availability
> of an Article 78 proceeding provide prompt review of a summary suspension,
> hence weighing in favor of absolute immunity. In the context of determining
> whether absolute immunity is appropriate, the hearing available under § 230,
> while providing an avenue for review of the charges themselves, provides no
> meaningful review of the summary suspension because, as happened here,
> the commissioner is free to ignore the hearing committee's recommendation.
> In addition, in the context of determining whether absolute immunity is
> appropriate, Article 78 proceedings are generally not considered adequate
> avenues for "appeal." *See* [*Young v. Selsky*, 41 F.3d 47, 54 (2d Cir. 1994)].

*DiBlasio*, 344 F.3d at 299.

As explained above, in the DFS Insurance Law enforcement context, a hearing is

held and a decision rendered before adverse consequences can be imposed.  This differs

substantially from the situation addressed in *DiBlasio*.  Further, upon the imposition of an

adverse determination, a respondent is entitled to appeal the determination through an

Article 78 proceeding asking to have the adverse consequences vacated.  While the Circuit

said that Article 78 proceedings are generally not considered adequate avenues for appeal

in the context of determining whether absolute immunity is appropriate, neither the

situations in *DiBlasio* nor *Young*, the case cited by the Circuit for this proposition, fit

squarely with the situation following an adverse Insurance Law determination by the DFS

Superintendent.

As indicated, *DiBlasio* involved a summary suspension before resolution of the

underlying charges.  If Lockton, Lloyd's, or Chubb had declined to admit liability, they would

have had a full evidentiary hearing that mirrors a judicial one, with the significant due

21

process protections described above, before any penalty or suspension could be imposed. And they would have had the right to seek to vacate an adverse decision by an Article 78 proceeding. Unlike in *DiBlasio* where an Article 78 proceeding after the fact of a summary suspension afforded the plaintiff inadequate relief, the same cannot be said of a post-hearing Article 78 proceeding.

*Young* is also distinguishable from the situation here.  In *Young,* the Circuit held that damages, which were the only viable remedy for the due process deprivation in issue, were unavailable in an Article 78 proceeding, rendering it inadequate for appellant. *See Young*, 41 F.3d at 54.[12]  The situation in *Young* is quite different than the situation that would arise if Lockton, Lloyd's, or Chubb had proceeded to a hearing, received an adverse determination, and appealed via an Article 78 proceeding. Unlike in *Young*, such an appeal could afford an entity relief from an unconstitutional or improper decision entered by Ms. Vullo.

The Court finds that an Article 78 proceeding provides a sufficient avenue for a party that receives an adverse decision in a DFS enforcement proceeding to correct an error on appeal.  Accordingly, the Court finds that the fifth *Butz* factor weighs in favor of absolute immunity.

Weighing all of the *Butz* factors, and considering Ms. Vullo's functions that underlie the selective enforcement claim, the Court finds that she is entitled to absolute immunity on the selective enforcement claim.  Accordingly, the claim, under both federal and state law, is

---

[12]("[T]he type of injury plaintiff alleged may not be adequately correctable on appeal. . . . [P]urely prospective relief on administrative appeal does not adequately cure a due process violation in a disciplinary hearing if the prisoner has already served part of his disciplinary sentence in the SHU pending administrative review.  Similarly, if the administrative appeal officer compounds the violation by unreasonably affirming, a later reversal in state court will be inadequate unless it includes monetary damages. . . . [M]onetary damages are not available in [an Article 78] proceeding.")(citations omitted).

22

SPA-23

dismissed.

### First Amendment Claims[13]

Count One of the SAC alleges that "Defendants' actions—including but not limited to the issuance of the April 2018 [Guidance] Letters and the accompanying backroom exhortations, the imposition of the Consent Orders upon Chubb and Lockton, and the issuance of the Cuomo Press Release—established a 'system of informal censorship' designed to suppress the NRA's speech." SAC ¶ 90.[14]  Plaintiff asserts that Defendants took these actions "with the intent to obstruct, chill, deter, and retaliate against the NRA's core political speech." *Id.* ¶ 91.  Count Two alleges that these same actions by Defendants "were in response to and substantially caused by the NRA's political speech regarding the right to keep and bear arms.  Defendants' actions were for the purpose of suppressing the NRA's pro-Second Amendment viewpoint.  Defendants undertook such unlawful conduct with the intent to obstruct, chill, deter, and retaliate against the NRA's core political speech." *Id.* ¶ 101.

These are essentially the same claims that the Court examined in tandem in the November 6, 2018 Decision & Order, Dkt. No. 56.  In doing so, the Court found that "[t]he Guidance Letters and Cuomo Press Release, read in isolation, clearly fit into the government-speech doctrine as they address matters of public importance on which New

---

[13]Counts One and Two of the SAC assert violations of the First Amendment of the United States Constitution pursuant to 42 U.S.C. § 1983, and violations of Article 1, Section 8 of the New York Constitution. These claims are subject to the same analysis under federal and state law, *see, Martinez v. Sanders*, 307 F. App'x 467, 468 n.2 (2d Cir. 2008)(citing *Pico v. Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26*, 638 F.2d 404 (2d Cir. 1980), *aff'd*, 457 U.S. 853 (1982)), and are referred to as Plaintiff's First Amendment Claims.

[14]For a more complete discussion of the April 2018 Guidance Letters and the Cuomo Press Release, reference is made to the Court's November 6, 2018 Decision & Order, Dkt. No. 56.

23

York State has a significant interest." *Id.* at 16-17.  But in analyzing these claims, the Court

wrote:

> "'First Amendment rights may be violated by the chilling effect of governmental
> action that falls short of a direct prohibition against speech.'" *Zieper v.
> Metzinger*, 474 F.3d 60, 65 (2d Cir. 2007)(quoting *Aebisher v. Ryan*, 622 F.2d
> 651, 655 (2d Cir.1980)); *see also Dorsett v. Cty. of Nassau*, 732 F.3d 157, 160
> (2d Cir. 2013)("To plead a First Amendment retaliation claim a plaintiff must
> show: (1) he has a right protected by the First Amendment; (2) the defendant's
> actions were motivated or substantially caused by his exercise of that right;
> and (3) the defendant's actions caused him some injury.")).  As applicable to
> the allegations in Counts One and Two, "the First Amendment prohibits
> government officials from encouraging the suppression of speech in a manner
> which 'can reasonably be interpreted as intimating that some form of
> punishment or adverse regulatory action will follow the failure to accede to the
> official's request.'" *Zieper*, 474 F.3d at 65-66 (quoting *Hammerhead Enters.,
> Inc. v. Brezenoff*, 707 F.2d 33, 39 (2d Cir.1983)).  In determining whether
> government statements impede upon First Amendment rights, "what matters is
> the 'distinction between attempts to convince and attempts to coerce.'" *Id.*, at
> 66 (quoting *Okwedy v. Molinari*, 333 F.3d 339, 344 (2d Cir. 2003) *(per curiam)*.

*Id.* at 18.   The Court noted that the First Amendment "require[s] courts to draw fine lines

between permissible expressions of personal opinion [by public officials] and implied threats

to employ coercive state power to stifle protected speech." *Id.* (quoting *Hammerhead*, 707

F.2d at 39)  However, after examining the totality of the allegations, and accepting the

factual allegations as true, the Court found:

> While neither the Guidance Letters nor the Cuomo Press Release specifically
> directs or even requests that insurance companies and financial institutions
> sever ties with the NRA, a plausible inference exists that a veiled threat is
> being conveyed.  Viewed in the light most favorable to the NRA, and given
> DFS's mandate—"effective state regulation of the insurance industry" and the
> "elimination of fraud, criminal abuse and unethical conduct by, and with
> respect to, banking, insurance and other financial services institutions," N.Y.
> Fin. Servs. Law § 102(e), (k) — , the Cuomo Press Release and the Guidance
> Letters, when read objectively and in the context of DFS's regulatory
> enforcement actions against Chubb and Lockton and the backroom
> exhortations, could reasonably be interpreted as threats of retaliatory
> enforcement against regulated institutions that do not sever ties with the NRA.

24

*Id.* at 24-25.

Ms. Vullo argues that she is entitled to qualified immunity on the First Amendment claims because it was objective reasonably for her to believe her statements in the Guidance Letters and press release were lawful, and there "is no case clearly establishing that otherwise protected public statements transform into an unlawful 'threat' because there is an ongoing (and unrelated) regulatory investigation." Dkt. No. 211-1 at 31.  She further maintains that at the time she made her "public statements, DFS had made no public statements about the Carry Guard investigation.   Nor do the NRA's (false) allegations that Ms. Vullo coupled her public statements with 'backroom exhortations' change the analysis, because they are vague and conclusory—there is no specific allegation that Ms. Vullo directly threatened unlawful government enforcement." *Id.*  She argues that "[r]easonable officials would believe it lawful to privately express the sentiments that are lawful to express publicly."  *Id.*  The NRA counters that qualified immunity is a fact-specific inquiry that should be undertaken after fact discovery, and that the conduct alleged by the NRA was not "objectively reasonable" but rather violated clearly established constitutional rights.

The Court is inclined to agree with Ms. Vullo that there is no case clearly establishing that otherwise protected public statements transform into an unlawful threat merely because there is an ongoing, and unrelated, regulatory investigation.  *See Zieper*, 474 F.3d at 68 (granting qualified immunity against First Amendment claim because it was not "apparent to a reasonable officer that defendants' actions crossed the line between an attempt to convince and an attempt to coerce"); *see also Simon v. City of N.Y.*, 893 F.3d 83, 92 (2d Cir. 2018)("A right is clearly established when its 'contours ... are sufficiently clear that every

25

SPA-26

reasonable official would have understood that what he is doing violates that right.'")(quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011))(alteration in original); *Gerard v. City of New York*, No. 19-3102, --- Fed. Appx. ---- , 2021 WL 485722, *1 (2d Cir. Feb. 10, 2021).[15]  But here the Court found that, in the context of the factual allegations asserted in the Amended Complaint, it was plausible to conclude that the combination of Defendants' actions, including Ms. Vullo's statements in the Guidance Letters and Cuomo Press Release as well as the purported  "backroom exhortations," could be interpreted as a veiled threat to regulated industries to disassociate with the NRA or risk DFS enforcement action.  This conclusion is enforced by new allegations in the SAC that can be reasonably interpreted as pre-Guidance Letters backroom threats by Ms. Vullo of DFS enforcement against entities that did not disassociate with the NRA. *See* SAC ¶ 21; ¶ 67; ¶ 69.[16]  As expressed in the Court's previous decision, the law was clearly established at the time that First Amendment rights could be violated by the chilling effect of governmental action that falls short of a direct prohibition against speech but that can reasonably be interpreted as intimating that some form of punishment or adverse regulatory action will follow the failure to accede to the

---

[15]The Circuit in *Gerard* wrote:

"[C]learly established law" cannot be defined "at a high level of generality," [*al-Kidd*, 563 U.S. at 742], but "must be particularized to the facts of the case," *White v. Pauly*, —— U.S. ——, 137 S. Ct. 548, 552, 196 L. Ed.2d 463 (2017) (internal quotation marks omitted), so as to give a reasonable officer "fair notice that [the complained-of] conduct [is] unlawful," *Brosseau v. Haugen*, 543 U.S. 194, 198, 125 S. Ct. 596, 160 L.Ed.2d 583 (2004); *see also Terebesi v. Torreso*, 764 F.3d 217, 231 (2d Cir. 2014) (explaining that, to determine whether the law is clearly established, a court should consider "the specificity with which a right is defined, the existence of Supreme Court or Court of Appeals case law on the subject, and the understanding of a reasonable officer in light of preexisting law").

*Gerard*, 2021 WL 485722, *1.

[16]The allegations of Ms. Vullo's statements in this regard took place in February 2018 whereas the Guidance Letters were issued on April 19, 2018.

official's request. *See* Dkt. 56 at 18 (and cases cited threat).  When a qualified immunity

defense is raised on a Rule 12(b)(6) motion, the Court must accept the truth of the

allegations in the complaint and may grant qualified immunity only if the facts supporting the

defense appear on the face of the complaint. *See Hyman v. Abrams*, 630 F. App'x 40, 42

(2d Cir. 2015)("Although, usually, the defense of qualified immunity cannot support the grant

of a Rule 12(b)(6) motion for failure to state a claim upon which relief can be granted, a

district court may grant a Rule 12(b)(6) motion on the ground of qualified immunity if the

facts supporting the defense appear on the face of the complaint. Consequently, a

defendant presenting an immunity defense on a Rule 12(b)(6) motion instead of a motion

for summary judgment must accept [that] ... the plaintiff is entitled to all reasonable

inferences from the facts alleged, not only those that support his claim, but also those that

defeat the immunity defense.")(citing *McKenna v. Wright*, 386 F.3d 432, 435–36 (2d Cir.

2004))(interior quotation marks omitted).  Here, when doing so, a question of material fact

exists as to whether Ms. Vullo explicitly threatened Lloyd's with DFS enforcement if the

entity did not disassociate with the NRA.  Based on this question of material fact, and even

assuming an objectively reasonable person would not have known that the Guidance

Letters or Ms. Vullo's statements in the Cuomo Press Release could be construed as

implied threats to regulated entities if they did not disassociate with the NRA, qualified

immunity on the First Amendment claims must be denied at this time.  Further, because Ms.

Vullo's alleged implied threats to Lloyd's and promises of favorable treatment if Lloyd's

disassociated with the NRA could be construed as acts of bad faith in enforcing the

Insurance Law in New York, a question of material fact exists as to whether she is entitled

to qualified immunity under New York law. *See Gardner v. Robinson*, No.

27

16CIV1548GBDRWL, 2018 WL 722858, at *2–3 n 7 (S.D.N.Y. Feb. 6, 2018)("Although qualified immunity only extends to public officials against whom federal causes of action are asserted, New York common law provides comparable immunity from state law claims unless 'the officials' actions are undertaken in bad faith or without a reasonable basis.'")(quoting *Jones v. Parmley*, 465 F.3d 46, 63 (2d Cir. 2006)(citations omitted)).  For these reasons, the Court will deny qualified immunity to Ms. Vullo on the First Amendment claims at this time.

### b.  Cuomo, DFS, and Lacewell's Motion

#### Relevant Procedural Background

On Defendants' Rule 12(c) motion, in response to Defendants' argument that all Section 1983 claims against DFS must be dismissed because DFS is not a "person" under §1983, Plaintiff withdrew its Section 1983 claims against DFS resulting in dismissal of these claims.  Dkt. No. 112 at 12.  The Court also found that the Eleventh Amendment barred claims for money damages against DFS, and against Gov. Cuomo and Ms. Vullo in their official capacities.  *Id.*  Thus, all such claims were dismissed. *Id.* The Court also dismissed without prejudice the selective enforcement claims against Gov. Cuomo and Ms. Vullo in their individual capacities.  *Id.*  As indicated above, Judge Hummel granted Plaintiff's motion to amend only to the extent it sought to assert a selective enforcement claim against Ms. Vullo in her individual capacity, and to substitute Supt. Lacewell for Ms. Vullo on Plaintiff's claim for injunctive relief.   Thus, as Defendants assert, what remains in Counts One and Two of the SAC, as asserted against DFS, are only claims under the New York State Constitution.  What remains in Counts One and Two of the SAC, as asserted against Gov.

28

Cuomo in his official capacity, are Section 1983 claims of violations of the U.S. Constitution and claims under the New York State Constitution.

**Sovereign Immunity**

Defendants DFS and Gov. Cuomo (collectively "Defendants") argue that all remaining claims against DFS, Supt. Lacewell in her official capacity,[17] and Gov. Cuomo in his official capacity must be dismissed as barred by Eleventh Amendment sovereign immunity. This includes, Defendants contend, Plaintiff's claims against DFS under the New York State Constitution and the claims for injunctive and declaratory relief sought in the SAC. Defendants also assert that "in addition to barring the NRA's claims against DFS, the Eleventh Amendment also bars all claims against the Governor in his official capacity, including requested injunctive relief." Dkt. No. 210-1 at 3. Plaintiff counters that "Defendants' conduct throughout this litigation is wholly incompatible with their belated claim of sovereign immunity." Dkt. No. 219 at 2. Plaintiff contends that "[a]lthough Defendants did assert sovereign immunity regarding certain claims for money damages against DFS, and Cuomo and Vullo in their official capacities, Defendants never asserted sovereign immunity with respect to the NRA's First Amendment claims for declaratory and injunctive relief." *Id.* Plaintiff asserts that there is no valid reason why Defendants "should belatedly be permitted to assert" the Eleventh Amendment defense now, and thus Defendants have waived sovereign immunity. *Id.* Plaintiff also argues that Defendants waived sovereign immunity by appearing in this case and defending on the claims asserted herein.

---

[17]In the motion, Supt. Lacewell in her official capacity is treated collectively with DFS because "[f]or the purpose of the arguments contained [in the motion] there is no difference between the office of the Superintendent and the Department which she oversees." Dkt. No. 210-1 at 1, n. 1.

The Eleventh Amendment bars suits against New York State unless it has consented to be sued, or federal legislation has overridden the State's sovereign immunity. *Will v. Michigan Dep't. of the State Police*, 491 U.S. 58, 64 (1989); *see Gollomp v. Spitzer*, 568 F.3d 355, 366 (2d Cir. 2009)("[A]s a general rule, state governments may not be sued in federal court unless they have waived their Eleventh Amendment immunity, or unless Congress has abrogated the states' Eleventh Amendment immunity."). Eleventh Amendment immunity also extends to suits against state officers in their official capacities. *See Will*, 491 U.S. at 71 ("[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. As such, it is no different from a suit against the State itself.")(citations omitted)). Eleventh Amendment immunity applies whether the claims are asserted under the United States Constitution or a court's pendent jurisdiction. *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 117-118 (1984); *see, e.g., Treistman v. McGinty,* 804 F. App'x 98, 99 (2d Cir. 2020)("'[A] claim that state officials violated state law in carrying out their official responsibilities is a claim against the State that is protected by the Eleventh Amendment.'")(quoting *Pennhurst*, 465 U.S. at 121); *Feng Li v. Lorenzo*, 712 F. App'x 21, 23-24 (2d Cir. 2017)(same); *see also Báez v. New York*, 629 F. App'x 116, 118 (2d Cir. 2015)(affirming dismissal of claims under New York law against the State Office of Temporary and Disability Assistance on the basis of sovereign immunity). "As to the State . . . the Eleventh Amendment bars a suit regardless of the nature of the relief sought." *Feng Li v. Rabner*, 643 F. App'x 57, 58 (2d Cir. 2016)(quotation omitted); *see Everett v. Dean*, No. 3:20-CV-1260 (FJS/ML), 2021 WL 765762, at *6 (N.D.N.Y. Feb. 26, 2021)(Rep. Rec. & Order)("Regardless of the nature of the

30

relief sought, in the absence of the State's consent or waiver of immunity, a suit against the

State or one of its agencies or departments is proscribed by the Eleventh

Amendment.")(citing *Pennhurst*, 465 U.S. at 100).

There is no merit to the argument that sovereign immunity should be denied

because it was belatedly asserted.  Defendants had previously raised the sovereign

immunity defense in their Answer and in a motion to dismiss. *See* Dkt. No. 59, at p. 55; Dkt.

No. 63-1 at pp. 4, 6-7.  The fact that it was not previously addressed to the claims for relief

in the SAC is of no moment.  Sovereign immunity may be asserted at anytime in a

proceeding. *See McGinty v. New York*, 251 F.3d 84, 94 (2d Cir. 2001)("[T]he Supreme

Court and this Court have repeatedly held that a state may assert Eleventh Amendment

sovereign immunity at any time during the course of proceedings.")(citing *Calderon v.

Ashmus*, 523 U.S. 740, 745 n. 2 (1998)(the Eleventh Amendment is jurisdictional in that it

limits a federal court's judicial power, and may be invoked at any stage of the proceedings);

*Pennhurst*, 465 U.S. at 99 n. 8 (same); *Richardson v. N.Y. State Dep't of Corr. Serv.*, 180

F.3d 426, 449 (2d Cir.1999)(the defense of Eleventh Amendment immunity need not be

raised in trial court to be considered on the merits); *Leonhard v. United States*, 633 F.2d

599, 618 n. 27 (2d Cir.1980)(sovereign immunity need not be expressly raised in the district

court or on appeal since it is a jurisdictional defect and may be raised at any time)).  The

fact that the NRA incurred expenses related to discovery and other matters in this hotly

contested matter does not, by itself, provide a basis to deprive New York State of sovereign

immunity. *See Beaulieu v. Vermont*, 807 F.3d 478, 491 (2d Cir. 2015)("It is true that

Defendants changed their strategy and that earlier invocation of Vermont's immunity might

31

have resulted in earlier dismissal, sparing Plaintiffs some burden and expense. But there is

no record of duplicitous conduct by Defendants or of serious unfairness to Plaintiffs

resulting from the tardy invocation of immunity."). Similarly, the fact that Defendants did not

respond to Plaintiff's query whether Defendants would waive sovereign immunity on the

state constitutional claims after Plaintiff conceded that DFS is not a person subject to suit

under § 1983, *see* Dkt. 219 at 5,[18] provides no basis to deprive New York of sovereign

immunity. Defendants had no obligation to respond, and Plaintiff is represented by

experienced counsel. Plaintiff's counsel could have analyzed whether Defendants' silence

indicted a negative response and determined whether, if it did, it was worth continuing in

this court given the possibility that Defendants could later invoke sovereign immunity.

There is also no merit to Plaintiff's argument that Defendants waived sovereign

immunity by litigation in this matter. "Eleventh Amendment immunity is lost only if Congress

unequivocally abrogates states' immunity or a state expressly consents to suit." *Cosby v.*

*LaValley*, 2015 WL 13843440, *4 (N.D.N.Y. Nov. 16, 2015). Because of the "vital role of the

doctrine of sovereign immunity in our federal system[,]" waiver will only be found where it is

"unequivocally expressed." *Pennhurst*, 465 U.S. at 99. The courts that have found that a

State waived its sovereign immunity by litigation occurred in situations where a State

---

[18] Plaintiff argues:

In their third motion to dismiss under Fed. R. Civ. 12(c), Defendants alleged that the NRA's
claims for money damages were barred by the Eleventh Amendment but failed to raise that
same argument for the NRA's request for declaratory and injunctive relief. In its January 8,
2019 opposition to that motion, the NRA specifically raised the issue stating that "[a]t this
stage, the NRA agrees to withdraw its Section 1983 claims under Counts 1, 2, and 4 against
DFS. Should DFS additionally choose not to waive sovereign immunity with respect to the
pending state law claims against it, the NRA will agree to withdraw those claims and will
promptly re-file its claims … in the appropriate State court." Defendants completely ignored
that statement in their reply.

voluntarily and affirmatively invoked a federal court's jurisdiction to resolve a claim presented by the State. *See, e.g., Lapides v. Bd. of Regents of Univ. Sys. of Georgia*, 535 U.S. 613, 619 (2002)("And the Court has made clear in general that 'where a State *voluntarily* becomes a party to a cause and submits its rights for judicial determination, it will be bound thereby and cannot escape the result of its own voluntary act by invoking the prohibitions of the Eleventh Amendment.'")(quoting *Gunter v. Atlantic Coast Line R. Co.*, 200 U.S. 273, 284 (1906) (emphasis added in *Lapides*); *Fifth Ave. Assocs., L.P. v. N.Y. State Dep't of Taxation & Fin.* (*In re 995 Fifth Ave. Assocs., L.P.*), 963 F.2d 503, 506 (2d Cir. 1992)(finding waiver where, after a debtor sought a declaration in bankruptcy court that it was exempt from the tax and entitled to a refund from the state, the State filed an administrative expense claim for additional gains tax liability); *Gulino v. Bd. of Educ. of the City Sch. Dist. of the City of New York*, No. 96 CIV. 8414, 2016 WL 7320775, at *7 (S.D.N.Y. July 18, 2016), *report and recommendation adopted*, No. 96 CIV. 8414 (KMW), 2016 WL 7243544 (S.D.N.Y. Dec. 14, 2016)("[T]he cases involving waiver-by-litigation premise the waiver on a State actually appearing as a party and submitting its rights for judicial determination.")(collecting cases).  By contrast, the courts have found no waiver where a State is involuntarily a defendant in a case but proceeds only to defend itself on a claim brought by a plaintiff.  *See, e.g., McGinty v. New York*, 251 F.3d 84, 94 (2d Cir. 2001)("What distinguishes the present case from *995 Fifth Avenue Associates* is that here no affirmative claim was made by the State of New York, the Department or the Retirement System. Thus, their involvement in the EEOC proceeding constitutes no waiver of sovereign immunity."); *see also Lapides*,  535 U.S. at 622 ("[T]he Eleventh Amendment waiver rules

33

are different when a State's federal-court participation is involuntary.")(citing *Hans v. Louisiana*, 134 U.S. 1, 10 S. Ct. 504, 33 L.Ed. 842 (1890); U.S. Const., Amdt. 11 (discussing suits "commenced or prosecuted against" a State)).  "[T]he crucial considerations are the voluntariness of the state's choice of forum and the functional consequences of that choice."  *Mohegan Tribe v. State of Conn.*, 528 F. Supp. 1359, 1366-1367 (D. Conn. 1982).  New York has not unequivocally expressed waiver of immunity, nor has it waived this immunity simply by defending the claims against it.  To hold otherwise would mean a waiver of sovereign immunity occurs every time a State appears in federal court to defend itself in litigation.  Such a result is not supported by either case law or logic.

The Court finds no reason to deprive New York or its officers acting in their official capacities of sovereign immunity, or to deem that immunity waived.  Accordingly, all claims against DFS are dismissed.  The claims against New York's officers acting in their official capacities are also dismissed unless an exception to Eleventh Amendment immunity applies.

### Ex parte Young

Plaintiff contends that if immunity applies, the exception to Eleventh Amendment immunity articulated in *Ex parte Young* applies to Gov. Cuomo in his official capacity. Under the doctrine of  *Ex Parte Young*, a "plaintiff may avoid the Eleventh Amendment bar to suit and proceed against individual state officers, as opposed to the state, in their official capacities, provided that [the] complaint[:] (a) alleges an ongoing violation of federal law[;] and (b) seeks relief properly characterized as prospective." *Clark v. DiNapoli*, 510 F. App'x

49, 51 (2d Cir. 2013)(internal quotation marks and citation omitted).  The Supreme Court

has declined to extend the reasoning of *Ex Parte Young* to claims for retrospective relief.

*See Green v. Mansour*, 474 U.S. 64, 68 (1985) (citations omitted).  "The line between

prospective and retrospective relief is drawn because '[r]emedies designed to end a

continuing violation of federal law are necessary to vindicate the federal interest in assuring

the supremacy of that law,' whereas 'compensatory or deterrence interests are insufficient

to overcome the dictates of the Eleventh Amendment.'"  *Ward v. Thomas*, 207 F.3d 114,

119 (2d Cir. 2000)(quoting *Green*, 474 U.S. at 68).  "Accordingly, suits against states and

their officials seeking damages for past injuries are firmly foreclosed by the Eleventh

Amendment." *Id.* (citations omitted).   "In determining whether the doctrine of *Ex Parte*

*Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a

'straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal

law and seeks relief properly characterized as prospective.'" *Verizon Maryland Inc. v. Public*

*Serv. Comm. Of Maryland*, 553 U.S. 635, 645 (2002)(quoting *Idaho v. Coeur d'Alene Tribe*

*of Idaho*, 521 U.S. 261, 296 (1997)).

### Past Conduct

Defendants contend that *Ex parte Young* is inapplicable because the claims in

the SAC concern only past conduct.  In this regard, Defendants argue that the First

Amendment and State Constitutional free speech claims, the only claims remaining as

to Defendants, challenge the press releases and "backroom exhortations" that

supposedly occurred in the past.  Thus, Defendants maintain, the SAC's claims rely

exclusively on past conduct.  Plaintiff asserts that its suit alleges an ongoing violation

35

of federal law, citing to paragraphs 93 and 102 of the SAC to support this proposition. Dkt. No. 219 at 7 (citing SAC ¶¶ 93,[19] 102[20]).   In addition, Plaintiffs points to the allegations at paragraphs 61, 80, 81, and 82 of the SAC for the proposition that Defendants' conduct is having an ongoing affect on its ability to maintain business relationships with regulated institutions.  Plaintiff also points to an allegation that DFS served a subpoena on an NRA insurance provider, SAC ¶ 79, and the fact that DFS commenced an enforcement proceeding against the NRA, as evidence that Defendants' unconstitutional conduct is ongoing.  Plaintiff also points to the SAC where it alleges that "[i]n addition to the above-described  damages, absent an injunction against Defendants, the NRA will suffer irrecoverable loss and irreparable harm if it is unable to acquire insurance or other banking services due to Defendants' actions." SAC ¶ 97; ¶ 107 (same).

Just as the Court indicated in its decision denying Plaintiff's request for a preliminary injunction, Plaintiff's First Amendment claims are premised upon actions that took place in 2018. *See* Dkt. 218 at pp. 2-4.[21]  Plaintiff's citation to paragraphs 93

---

[19]At paragraph 93, Plaintiff asserts: "Defendants' concerted efforts to stifle the NRA's freedom of speech caused financial institutions doing business with the NRA to end their business relationships, or explore such action, due to fear of monetary sanctions or expensive public investigations.  For example, Defendants coerced and caused Lockton, Chubb, and Lloyd's to cease their participation in NRA-endorsed insurance programs, regardless of whether the insurance programs met all legal qualifications under New York's Insurance Law."

[20]At paragraph 102, Plaintiff asserts: "Defendants' actions have concretely harmed the NRA by causing  financial institutions doing business with the NRA to end their business relationships, or explore such action, due to fear of monetary sanctions or expensive public investigations. For example, Defendants coerced and caused Lockton, Chubb, and Lloyd's to cease their participation in NRA-endorsed insurance programs in New York and elsewhere, regardless of whether the insurance programs met all legal qualifications under New York's Insurance Law."

[21]Although that decision examined the Amended Complaint, the allegations supporting the First Amendment claims in the SAC are essentially the same.

SPA-37

and 102 of the SAC does not change this conclusion as these allegations concern

Defendants' past actions. Similarly, the allegations in paragraphs 61, 80, 81, and 82

of the SAC allege disruptions of the NRA's relationships with regulated industries

caused by Defendants' past conduct. To the extent Plaintiff asserts that it still has

trouble maintaining business relationships with regulated industries, that appears to

be because of Defendants' past alleged unconstitutional acts, not because of similar

ongoing conduct. The fact that DFS issued a subpoena to a regulated entity

associated with the NRA that Plaintiff contends demonstrates a continuation of "DFS's

selective enforcement," SAC ¶ 79, does not indicate that Defendants are continuing to

engage in conduct intended to deprive Plaintiff of its rights to free speech - the claims

that remain against DFS - or selective enforcement. A subpoena seeks information

but it is not an enforcement action like those that form the basis of the claims in this

action. Plaintiff's citation to the DFS enforcement action against the NRA does not

indicate that Defendants are continuing the allegedly illegal conduct that forms the

basis of this lawsuit. Although the NRA was well aware for some time that DFS was

investigating it for Insurance Law violations, *see* Dkt. No. 56 at 4 ("As part of its

investigation, DFS learned that, although it did not have an insurance producer

license from DFS, the NRA engaged in marketing of, and solicitation for, the Carry

Guard program."), there is no allegation in the SAC that this conduct is the basis of

the free speech or equal protection claims asserted therein.[22] Plaintiff's professed

---

[22]It is worth noting that after the enforcement action against the NRA was commenced, the NRA entered a Consent Order in which it agreed to a $2.5 penalty and a five-year ban on doing incurrence business in New York. *See* Dkt. No. 312.

need for an injunction does not provide a factual basis indicating that there is an on-going violation of Plaintiff's right to free speech. Plaintiff's fear that Defendants might repeat their past alleged conduct that violated Plaintiff's rights to free speech is insufficient to conclude that the past conduct is occurring or will occur in the future. In the end, the claims in the SAC are based on Defendants' past actions, not on an ongoing course of action.

### Injunctive Relief[23]

Defendants argue that even if it could be construed that there is an ongoing constitutional violation asserted in the SAC, Plaintiff seeks an improper "obey the law" injunction. The injunction that Plaintiff seeks is, at least in part, an improper "obey the law" injunction. Further, the totality of the sought-after injunction is improper because it violates the specificity requirements set forth at Rule 65(d) of the Federal Rules of Civil Procedure. Under Rule 65(d), "[e]very order granting an injunction and every restraining order must: (A) state the reasons why it issued; (B) state its terms specifically; and (C) describe in reasonable detail--and not by referring to the

---

[23]In its Request for Relief, Plaintiff seeks:

[A] preliminary and permanent injunction . . . ordering DFS, its agents, representatives, employees and servants and all persons and entities in concert or participation with it, Cuomo (in his official capacity) and the current Superintendent of DFS (in her/his official capacity):

(1) to immediately cease and refrain from engaging in any conduct or activity which has the purpose or effect of interfering with the NRA's exercise of the rights afforded to it under the First and Second Amendment to the United States Constitution and Section8 to the New York Constitution; and

(2) to immediately cease and refrain from engaging in any conduct or activity which has the purpose or effect of interfering with, terminating, or diminishing any of the NRA's contracts and/or business relationships with any organizations[.]

SAC at pp. 41-42.

complaint or other document--the act or acts restrained or required." Fed. R. Civ. P.

65(d).  As the Second Circuit has instructed:

> "[U]nder Rule 65(d), an injunction must be more specific than a simple
> command that the defendant obey the law." *Peregrine Myanmar Ltd. v.
> Segal*, 89 F.3d 41, 51 (2d Cir.1996).  "To comply with the specificity and
> clarity requirements, an injunction must 'be specific and definite enough
> to apprise those within its scope of the conduct that is being
> proscribed.'" *N.Y. State Nat'l Org. for Women v. Terry*, 886 F.2d 1339,
> 1352 (2d Cir.1989)(quoting *In re Baldwin–United Corp.*, 770 F.2d 328,
> 339 (2d Cir.1985)). "This rule against broad, vague injunctions 'is
> designed to prevent uncertainty and confusion on the part of those to
> whom the injunction is directed,' and to be sure 'that the appellate court
> knows precisely what it is reviewing.'" *Rosen v. Siegel*, 106 F.3d 28, 32
> (2d Cir.1997)(quoting *Calvin Klein Cosmetics Corp. v. Parfums de
> Coeur, Ltd.*, 824 F.2d 665, 669 (8th Cir.1987)).

*S.C. Johnson & Son, Inc. v. Clorox Co.*, 241 F.3d 232, 240–41 (2d Cir. 2001).

Plaintiff's request for a injunction requiring Defendants to "immediately cease

and refrain from engaging in any conduct or activity which has the purpose or effect of

interfering with the NRA's exercise of the rights afforded to it under the First and

Second Amendment to the United States Constitution and Section 8 to the New York

Constitution" is vague and does not describe in reasonable detail the act or acts

sought to be restrained.  The injunction is not specific and definite enough to apprise

those within its scope of the conduct that is being proscribed. *See id.*  Further, the

injunction does "not require a defendant to do anything more than that already

imposed by law," subjects the defendants to contempt for unspecified conduct, and is

"not readily capable of enforcement." *See Dublino v. McCarthy*, No. 9:19-CV-0381

(GLS/DJS), 2019 WL 2053829, at *20 (N.D.N.Y. May 9, 2019).  As such, it is an "obey

the law" injunction that is "not favored" in the law, *id.* (citing cases), and fails to comply

39

with Rule 65(d)'s specificity requirements.

      The second part of the requested injunction also seeks an injunction that fails to comply with Rule 65(d)'s specificity requirements.  Plaintiff requests an injunction that requires Defendants to "immediately cease and refrain from engaging in any conduct or activity which has the purpose or effect of interfering with, terminating, or diminishing any of the NRA's contracts and/or business relationships with any organizations[.]"  This does not define with any specificity what conduct or activity could be deemed to have "the purpose or effect of interfering with, terminating, or diminishing any of the NRA's contracts and/or business relationships with any organizations."  While the injunction does not necessarily command that the Defendants comply with some specific provision of law, the injunction is not specific and definite enough to apprise those within its scope of the conduct that is being proscribed, *see S.C. Johnson & Son, Inc.*, 241 F.3d at 240–41, subjects Defendants to contempt for non-specific reasons, and is unenforceable.  As such the sought-after injunction is improper because it fails to comply with Rule 65(d)'s specificity mandate.

      Because the SAC fails to allege an ongoing violation of federal law, and seeks an improper injunction as prospective relief, *Ex parte Young* does not avoid an Eleventh Amendment bar to suit against either Gov. Cuomo or Supt. Lacewell in their official capacities relative to the sought-after injunction.

### Declaratory Relief[24]

      Defendants argue that because Plaintiff's Section 1983 claims against DFS

---

[24]Plaintiff seeks a judgment "[d]eclaring . . . that Defendants have violated the NRA's rights to free speech and equal protection under both the Federal and New York Constitutions."

have been withdrawn and any requests for monetary or injunctive relief are barred by

the Eleventh Amendment, "Plaintiff's bald request for a declaration pursuant to the

[Declaratory Judgment Act (DJA)] that Defendants have violated the NRA's rights to

free speech and equal protection under both the Federal and New York Constitutions

is insufficient to confer subject matter jurisdiction over DFS."  Dkt. 210-1 at 12; *see*

*also id.* at 11-12 (citing cases for the propositions that the DJA does not expand the

jurisdiction of the federal courts, the DJA does not provide an independent basis for

jurisdiction, and a plaintiff seeking relief under the DJA must have an independent

basis for jurisdiction). Based on the cases cited by Defendants, the Court agrees.

Defendants also argue that even if there were a jurisdictional basis to entertain

Plaintiff's request for declaratory relief, the NRA's sought-after declaration would be

barred as against Defendants by the Eleventh Amendment.  *Id.* at 12-13.  The Court

agrees.

As indicated above, the two counts that remain against Defendants allege that

DFS violated the NRA's rights to free speech in the past. The declaration Plaintiff

seeks would declare that Defendants' past conduct violated Plaintiff's rights under

both the Federal and New York Constitutions.  The Second Circuit has explained that

in circumstances like these where a declaration "could say no more than that [a State]

had violated [the] law in the past," that relief is barred by the Eleventh Amendment.

*Ward*, 207 F.3d at 120; *see id.* ("'A declaratory judgment is not available when the

result would be a partial end run around' the Eleventh Amendment's bar on

retrospective awards of monetary relief.")(quoting *Green*, 474 U.S. at 72).  Here,

41

SPA-42

because Plaintiff seeks retrospective declaratory relief against Defendants, it is barred by the Eleventh Amendment. *See Treistman v. McGinty*, 804 F. App'x 98, 99 (2d Cir. 2020)(*"*The complaint sought declaratory relief that was properly characterized as retrospective. Treistman sought a declaration stating that the defendants violated state regulations and that the family courts had a policy to violate state regulations. This is entirely retrospective and is barred by Eleventh Amendment immunity.")(citing *Ward*, 207 F.3d at 120); *Kaminski v. Semple*, 796 F. App'x 36, 38 (2d Cir. 2019), *cert. denied*, 141 S. Ct. 434, 208 L. Ed. 2d 130 (2020)("[A] declaration dealing only with past events would be retrospective and barred.")(citing *Ward,* 207 F.3d at 120 ("Any declaration could say no more than that Connecticut had violated federal law in the past ... [and] would have much the same effect as a full-fledged award of damages or restitution by the federal court, the latter kinds of relief being of course prohibited by the Eleventh Amendment.")(internal quotation marks omitted)); *H.B. v. Byram Hills Cent. Sch. Dist.*, 648 F. App'x 122, 125 (2d Cir. 2016)("[T]he requested declaratory relief is aimed at past conduct, a target that is impermissible.")(citing *Ward*, 207 F. 3d at 120 (declaratory relief unavailable because "[a]ny declaration could say no more than that [the state] had violated federal law in the past"); *Am. Civil Liberties Union of Mass. v. U.S. Conference of Catholic Bishops*, 705 F.3d 44, 53 (1st Cir. 2013)("With limited exceptions, not present here, issuance of a declaratory judgment deeming past conduct illegal is also not permissible as it would be merely advisory.")); *see also Szymonik v. Connecticut*, 807 F. App'x 97, 101 (2d Cir. 2020)("The Eleventh Amendment bars federal courts from issuing retrospective declaratory relief against

42

SPA-43

state officials for past violations of federal law.")(citing *Green*, 474 U.S. at 68; *Ward*, 207 F.3d at 119, 120 (declaratory relief unavailable because "[a]ny declaration could say no more than that Connecticut [and the defendant official] had violated federal law in the past"); *Am. Civil Liberties Union of Mass*., 705 F.3d at 53).

## IV.   CONCLUSION

For the reasons set forth above, the motion by DFS and Gov. Cuomo in his official capacity seeking to dismiss claims in the Second Amended Complaint, Dkt. No. 210, is **GRANTED**.  Plaintiff's claims in the Second Amended Complaint against DFS, Gov. Cuomo in his official capacity, and Supt. Lacewell in her official capacity, including the claims for injunctive and declaratory relief, are **DISMISSED** as barred by the Eleventh Amendment**.**

Ms. Vullo's motion appealing Magistrate Judge Hummel's decision granting leave to amend, and seeking to dismiss the claims against her in the Second Amended Complaint, Dkt. No. 211, is **GRANTED in part** and **DENIED in part**.  The selective enforcement claim against Ms. Vullo is **DISMISSED**, the motion is denied as to the First Amendment claims, and the appeal of Judge Hummel's decision granting leave to amend is denied.

**IT IS SO ORDERED.**

Dated: March 15, 2021

Thomas J. McAvoy
Senior, U.S. District Judge