# 21-636-cv

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

◆◆◆

NATIONAL RIFLE ASSOCIATION OF AMERICA,

*Plaintiff-Appellee,*

—against—

MARIA T. VULLO, both individually and in her former official capacity,

*Defendant-Appellant,*

ANDREW CUOMO, both individually and in his official capacity,
THE NEW YORK STATE DEPARTMENT OF FINANCIAL SERVICES,

*Defendants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK (SYRACUSE)

## BRIEF FOR PLAINTIFF-APPELLEE

WILLIAM A. BREWER III
SARAH B. ROGERS
MORDECAI GEISLER
BREWER, ATTORNEYS & COUNSELORS
750 Lexington Avenue, 14th Floor
New York, New York 10022
(212) 489-1400

*Attorneys for Plaintiff-Appellee*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

PURSUANT TO FED. R. APP. P. 26.1, PLAINTIFF-APPELLEE STATES AS FOLLOWS:  NATIONAL RIFLE ASSOCIATION OF AMERICA ("NRA") IS A NEW YORK NOT FOR-PROFIT CORPORATION. IT HAS NO PARENT CORPORATION.  THE NRA ISSUES NO STOCK, AND THEREFORE NO PUBLICLY HELD CORPORATION OWNS 10% OR MORE OF ITS STOCK.

# **TABLE OF CONTENTS**

I. PRELIMINARY STATEMENT ...................................................................1

II. JURISDICTIONAL STATEMENT ...........................................................5

III. STATEMENT OF ISSUES PRESENTED FOR REVIEW......................6

IV. STATEMENT OF THE CASE .................................................................7

    A.  Background ........................................................................................7

    B.  DFS Investigation Into the Lockton Carry Guard Insurance
        Program........................................................................................8

    C.  Vullo Makes Backchannel Threats....................................................10

    D.  The Cuomo Press Release and the DFS Guidance Letters...............11

    E.  Lockton and Chubb Restricted From Doing Business
        With  the NRA .................................................................................13

    F.  Vullo Threatens Lloyd's of London  .................................................14

    G.  NRA Commences Action and Amends Complaint .........................17

    H.  The District Court's March 15, 2021 Decision  ...............................19

V. SUMMARY OF ARGUMENT.................................................................23

VI. ARGUMENT .........................................................................................25

    A.  Standard of Review .........................................................................25

    B.  The Appeal Should Be Dismissed Because The Court
        Lacks Jurisdiction ...........................................................................27

        1.    The District Court's Decision Turned
            on Questions of Fact ...............................................................28

        2.    Vullo Disputes the Facts as Alleged ........................................30

C.   The District Court Properly Denied Vullo's Motion
to Dismiss ...................................................................................33

1.   The District Court Correctly Held that the NRA Had
Sufficiently Alleged a Violation of its First Amendment
Rights ...................................................................................35

2.   The District Court Correctly Held that the Law Was
Clearly Established that the NRA's First Amendment
Rights Could Be Violated ........................................................40

3.   Vullo's Self-Serving Demand for a Case Reflecting Her
Counter-Factual Points Misconstrues Controlling Law
and Mischaracterizes the Facts .................................................49

VII. CONCLUSION ......................................................................................54

CERTIFICATE OF COMPLIANCE ...........................................................55

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abrahams v. Inc. Vill. of Hempstead,*
390 F. App'x 4 (2d Cir. 2010) ...............................................................27, 31, 33

*Almonte v. City of Long Beach,*
478 F.3d 100 (2d Cir. 2007) ...........................................................................30

*American Family Ass'n, Inc. v. City and County of San Francisco,*
277 F.3d 1114 (9th Cir. 2002) ........................................................................45

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009)................................................................................*passim*

*Barnett v. Mount Vernon Police Dep't,*
523 F. App'x 811 (2d Cir. 2013) .....................................................................26

*Behrens v. Pelletier,*
516 U.S. 299 (1996) ........................................................................................25

*Bell Atlantic Corp. v. Twombly,*
550 U.S. 544 (2007)........................................................................................26

*Biswas v. Kwait,*
576 F. App'x 58 (2d Cir. 2014) .......................................................................25

*Brown v. Halpin,*
885 F.3d 111 (2d Cir. 2018) ......................................................................27, 29

*Castro v. United States,*
34 F.3d 106 (2d Cir. 1994) .............................................................................34

*Edrei v. Maguire,*
892 F.3d 525 (2d Cir. 2018) ..........................................................26, 30, 34, 39, 51

*Est. of Chamberlain v. City of White Plains,*
960 F.3d 100 (2d Cir. 2020) ............................................................... 26, 33, 40

iv

*Field Day, LLC v. County of Suffolk*,
  463 F.3d 167 (2d Cir. 2006) ........................................................34

*Forras v. Andros*,
  184 F. App'x 33 (2d Cir. 2006) .....................................................30

*Ganek v. Leibowitz*,
  874 F.3d 73 (2d Cir. 2017) ..........................................................35

*Green v. Maraio*,
  722 F.2d 1013 (2d Cir. 1983) .......................................................34

*Hammerhead Enters., Inc. v. Brezenoff*,
  707 F.2d 33 (2d Cir. 1983) ......................................................42, 43

*Hill v. City of New York*,
  45 F.3d 653 (2d Cir. 1995) ..........................................................28

*Hope v. Pelzer*,
  536 U.S. 730 (2002)..................................................................50

*Hyman v. Abrams*,
  630 F. App'x 40 (2d Cir. 2015) .............................................30, 34, 39

*Kass v. City of New York*,
  864 F.3d 200 (2d Cir. 2017)..........................................................25

*McKenna v. Wright*,
  386 F.3d 432 (2d Cir. 2004) ...................................22, 25, 26, 27, 31

*Neary v. Wu*,
  753 F. App'x 82 (2d Cir. 2019) ......................................................35

*Okwedy v. Molinari*,
  333 F.3d 339 (2d Cir. 2003) .........................................................53

*Parkinson v. Cozzolino*,
  238 F.3d 145 (2d Cir. 2001) .........................................................30

*Pearson v. Callahan*,
  555 U.S. 223 (2009)..................................................................33

v

*Penthouse Intern., Ltd. v. Meese*,
    939 F.2d 1011 (D.C. Cir. 1991) ............................................................44

*Pourkavoos v. Town of Avon*,
    823 F. App'x 53 (2d Cir. 2020) ........................................25, 26, 51

*State Emps. Bargaining Agent Coal. v. Rowland*,
    494 F.3d 71 (2d Cir. 2007) ...................................................................28

*United States v. Lanier*,
    520 U.S. 259 (1997)...................................................................50, 51

*Water Works Realty Corp. v. Edwards*,
    469 F. App'x 2 (2d Cir. 2012) ......................................................27, 30

*White v. Pauly*,
    137 S. Ct. 548 (2017)...............................................................26, 51

*Zieper v. Metzinger*,
    474 F.3d 60 (2d Cir. 2007) ................................................ 46, 47, 48

*Zieper v. Metzinger*,
    62 F. App'x 383 (2d Cir. 2003) .................................................48, 49

*Zieper v. Reno*,
    No. 00 CIV. 5594 (RMB), 2002 WL 1380003 (S.D.N.Y. June 26,
    2002) ..........................................................................................................48

**Statutes & Rules**

28 U.S.C. § 1291 ....................................................................*passim*

Fed. R. App. P. 26.1 ....................................................................i

Fed. R. Civ. P. 12(b)(6)...............................................................*passim*

Fed. R. Civ. P. Rule 12(c) ...........................................................18, 26, 30

N.Y. Financial Services Law, Article 3, § 301 ......................................8

# I.

## <u>PRELIMINARY STATEMENT</u>

This interlocutory appeal (the "Appeal") arises from the Decision and Order, dated March 15, 2021 (the "Decision") (SPA-1 - SPA-43) of the District Court for the Northern District of New York (McAvoy, J.), which, in relevant part, denied the motion to dismiss of Appellant-Defendant, Maria T. Vullo ("Vullo"), made pursuant to Federal Rule of Civil Procedure 12(b)(6), on the ground of qualified immunity. For the second time in the underlying case, the District Court upheld the NRA's First Amendment claims against Vullo, as set forth in the NRA's Second Amended Complaint, filed on June 2, 2020 (the "Second Amended Complaint" or "Sec. Am. Comp.") (A-135 - A-264).

The NRA's first cause of action against Vullo, the former Superintendent of the New York State Department of Financial Services ("DFS") and Defendant, New York Governor Andrew Cuomo ("Cuomo"), alleges that through their actions, including issuing threats to insurers and other financial services companies in New York State to pressure them to sever ties with the NRA, they established an implicit censorship regime in violation of the First Amendment. In its second cause of action, the NRA alleges retaliation against the NRA by Vullo and Cuomo based on the content of the NRA's speech, in violation of the First Amendment.

In its Decision, the District Court denied Vullo's motion to dismiss the NRA's First Amendment claims. The court expressly found that material questions of fact exist concerning whether Vullo threatened Lloyd's of London ("Lloyd's") with DFS enforcement action if Lloyd's did not disassociate with the NRA. The court also found an open question of material fact whether Vullo's alleged implied threats to Lloyd's and promises of favorable treatment if Lloyd's cut ties with the NRA could be construed as acts of bad faith in enforcing the Insurance Law in New York. These open factual issues precluded the granting of Vullo's motion to dismiss on the grounds of qualified immunity. Vullo has filed this interlocutory appeal seeking to reverse the District Court's Decision.

First and foremost, this interlocutory Appeal should be dismissed for lack of jurisdiction. The Decision is not an immediately appealable "final decision" under 28 U.S.C. § 1291. Nor is jurisdiction established here pursuant to the collateral order doctrine because it is indisputable that the Decision denying Vullo's motion to dismiss turned on questions of fact, rather than a question of law. Furthermore, in her appeal, as in the court below, Vullo challenges the veracity of the facts as alleged by the NRA in the Second Amended Complaint. That puts the collateral order doctrine and this Court's jurisdiction beyond reach as well.

Nevertheless, even if the Court were to hear this improper interlocutory appeal, Vullo's arguments are meritless. As this Court has observed, a motion to

dismiss under Rule 12(b)(6) is rarely granted based upon a defense of qualified immunity, because determining whether such a defense applies is necessarily a fact intensive inquiry. It is axiomatic that on a motion to dismiss the court must accept as true the facts as alleged and draw inferences in the plaintiff's favor. That is what the District Court did in its Decision, and that is what Vullo futilely struggles against in her Appeal.

Here, the District Court found that, as alleged, a combination of Vullo and Cuomo's actions, over the course of many months, could be interpreted as veiled threats made by Vullo to entities regulated by DFS. These actions included Vullo issuing "guidance" letters in April 2018 to regulated insurance companies and other financial institutions imploring them to reconsider their business relationships with the NRA, and ominously invoking DFS's "risk management" authority. A similar press release was issued by Cuomo at the same time, in addition to personal meetings between Vullo and insurance executives, where such threats were personally conveyed by Vullo.

The District Court held that the NRA has sufficiently pled that Vullo violated the NRA's constitutional rights, and that those rights were clearly established at the time of such alleged violations. Vullo now simply rehashes the same arguments that were correctly rejected by the District Court below. Vullo argues that the NRA failed to sufficiently allege facts of a First Amendment violation under clearly

established law.  However, rather than accept the truth of the allegations set forth in the Second Amended Complaint for purposes of her motion, Vullo mischaracterizes the allegations to argue that the NRA has not even alleged that Vullo made threats, and promises of favorable treatment, to regulated entities in order that they cut ties with the NRA.  The Complaint does allege such threats, as the District Court found.

While ignoring these central allegations, Vullo attempts to distract with red herring arguments trumpeting the First Amendment rights of public officials.  The NRA does not dispute that public officials have a right to speak about political issues.  But they do not have a right to use the levers of state power to *threaten* regulated entities to disassociate from the NRA based on the latter's political viewpoint and advocacy.  That constitutes a violation of the First Amendment.  Vullo further contends that the NRA has failed to cite cases that her actions violated clearly established law, but she does so by putting forward a self-serving, contorted description of the facts of this case, and then arguing that no reported case matches her manufactured strawman.  That gambit is neither supported by the facts nor the law.

But such distractions are not what this case is about and are not what the District Court decided.  The issue here is the alleged threats made by Vullo.  The District Court found that there were questions of fact concerning such threats that

4

must be determined in discovery. Those findings preclude Vullo's qualified immunity defense on a motion to dismiss.

Accordingly, if this Appeal is not dismissed for lack of jurisdiction—as is required by settled law—the District Court's Decision should nevertheless be affirmed.

## II.

## JURISDICTIONAL STATEMENT

As set forth in more detail in Section VI.B., *infra*, the Court lacks jurisdiction to hear this interlocutory appeal. Orders denying motions to dismiss are ordinarily not immediately appealable "final decisions" within the meaning of 28 U.S.C. § 1291. Nevertheless, the Supreme Court has held that, pursuant to the collateral order doctrine, a district court's order rejecting qualified immunity at the motion-to-dismiss stage of a proceeding can be a final decision within the meaning of 28 U.S.C. § 1291, provided it turns on a question of law. *See Ashcroft v. Iqbal*, 556 U.S. 662, 672 (2009). Here, however, the District Court explicitly based its ruling denying Vullo's motion to dismiss on the grounds that questions of material fact exist as to whether she is entitled to qualified immunity under New York law. Accordingly, this Court lacks jurisdiction, and the Appeal should be dismissed.

## III.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1. Whether this interlocutory appeal should be dismissed because the Court lacks jurisdiction over a decision denying a motion to dismiss, which is not an immediately appealable "final decision" under 28 U.S.C. § 1291, nor is the collateral order doctrine applicable because the District Court's decision denying the motion to dismiss turned on questions of fact, rather than a question of law.

2. Whether, accepting as true the Second Amended Complaint's factual allegations, and drawing all reasonable inferences in the NRA's favor, including both those that support its claims and those that defeat Vullo's purported qualified immunity defense, the District Court correctly held that the NRA had sufficiently alleged a violation of its First Amendment rights.

3. Whether, accepting as true the factual allegations, and drawing all reasonable inferences in the NRA's favor, the District Court correctly held that the law was clearly established that the NRA's First Amendment rights could be violated, and that open questions of fact exist precluding Vullo's qualified immunity defense.

## IV.

### STATEMENT OF THE CASE

The following statements of fact are taken from the NRA's Second Amended Complaint and the District Court's Decision.

### A.    Background

The NRA is a nonprofit corporation organized under the laws of New York State.  (A-137 at ¶ 1).  It is the Nation's leading provider of firearms safety and marksmanship education for civilians and law enforcement.  (*Id.*).  The NRA also engages in extensive advocacy and lobbying at all levels of government to promote the Second Amendment rights of its five million members, and all Americans.  (A-140 at ¶ 11).  Its various activities to advocate for its views on the Second Amendment and to assist NRA members engaging in national, state, and local firearm dialogue constitute precisely the type of political speech which rests at the core of the First Amendment.  (*Id.*).

At all relevant times, Cuomo was Governor of the State of New York, and Vullo, once his close aide, was Superintendent of DFS.  (A-142 - A-143).  The mandate of DFS, which consolidated supervisory and enforcement powers previously vested in separate departments, is to "reform the regulation of financial services in New York to keep pace with the rapid and dynamic evolution of these industries, to guard against financial crises and to protect consumers and markets

from fraud." (A-145 - A-146 at ¶ 24). The Superintendent of DFS has broad regulatory and enforcement powers, which encompass the ability to initiate civil and criminal investigations and enforcement actions. (A-146 at ¶ 25). In addition, pursuant to Financial Services Law, Article 3, § 301, the DFS Superintendent has the power to refer matters to the attorney general for criminal enforcement. (*Id.*).

Consistent with his longstanding animus towards the NRA (A-141-143), Cuomo, together with Vullo, embarked on a campaign to chill the political speech of the NRA by leveraging state power to punish financial institutions which maintain business ties with the NRA. (A-143-144 at ¶ 20). To achieve this end, they drew upon the formidable regulatory powers of DFS. (A-144 at ¶ 20).

**B.** **DFS Investigation Into the Lockton Carry Guard Insurance Program**

For seventeen years, the NRA contracted with affiliates of the world's largest privately held insurance broker, Lockton Companies, LLC ("Lockton"), for affinity-program brokerage and administration services. (A-148 at ¶ 31). Lockton entities administered and marketed NRA-endorsed insurance in New York State and across the country without incident. In addition, Lockton served for decades as the NRA's trusted insurance broker for various corporate coverage—such as general liability, umbrella and director and officer insurance. (*Id.*). The NRA-endorsed affinity insurance administered by Lockton consisted primarily of life, health, property, and casualty policies that mirror policies offered by Lockton to other affinity groups.

8

(*Id.* at ¶ 32). In addition, Lockton administered certain products, including a product known as "Carry Guard," that provided coverage for expenses arising out of the lawful self-defense use of a firearm. (A-148 - A-149 at ¶ 32). A subsidiary of Chubb Ltd. ("Chubb") underwrote Carry Guard. (*Id.*).

In or about September 2017, a non-governmental activist organization known as Everytown for Gun Safety ("Everytown") contacted the New York County District Attorney's Office (the "DA's Office"), as well as state and municipal authorities in other jurisdictions, in an effort to prompt a crackdown by sympathetic government officials that would target alleged compliance infirmities in the Carry Guard insurance program. (A-149 at ¶ 34). Following a meeting between representatives from the DA's Office and DFS to effectuate Everytown's agenda, in October 2017, DFS initiated an investigation of the NRA's Carry Guard insurance program, focusing on Lockton and Chubb, for underwriting and administering the program. (A-149-150 at ¶¶ 34-35). The scope of the DFS investigation expanded to target a discrete subset of so called "excess line" property and casualty policies relating to firearms, as well as insurance programs unrelated to firearms, providing coverage similar or identical to coverage endorsed by other New York affinity organizations such as the New York State Bar Association. (A-150 at ¶ 36).

## C.  **Vullo Makes Backchannel Threats**

Throughout its purported investigation of Carry Guard in late 2017 and early 2018, Vullo communicated to banks and insurers with known or suspected ties to the NRA that they would face regulatory action if they failed to terminate their relationships with the NRA.  (A-151 at ¶ 38).  These exhortations extended far beyond Carry Guard and indicated that any business relationship with the NRA would invite scrutiny.  (*Id.*).

For example, beginning in February 2018, Vullo met personally with executives of regulated institutions, including Lloyd's of London and its United States affiliate, Lloyd's America, Inc.  ("LAI").  (A-144 at ¶ 21).  She discussed technical regulatory infractions plaguing the affinity-insurance marketplace.  (*Id.*).  Vullo made clear, however, that DFS would be less interested in pursuing such infractions if Lloyd's ceased providing insurance to the NRA.  (*Id.*).

On or about February 25, 2018, the chairman of Lockton placed a telephone call to the NRA.  (A-152 at ¶ 42).  Although he expressed that Lockton privately wished to continue doing business with the NRA, the chairman confided that Lockton would need to "drop" the NRA entirely for fear of losing its license to do business in New York.  (*Id.*).  On February 26, 2018, Lockton publicly tweeted that it would discontinue providing brokerage services for all NRA-endorsed insurance programs.  (*Id.* at ¶ 43).

10

**D.**    **The Cuomo Press Release and the DFS Guidance Letters**

Cuomo and Vullo's warnings became more public in April 2018. In an April 2018 press release (the "Press Release"), Cuomo directed DFS to publicly "urge insurers and bankers statewide to determine whether any relationship they may have with the NRA or similar organizations sends the wrong message to their clients and their communities who often look to them for guidance and support." (A-152 - A-153 at ¶ 45).

On April 19, 2018, Vullo, then Superintendent of DFS, issued a pair of "guidance" letters (the "Guidance Letters") directed at the chief executives of New York State chartered or licensed financial institutions and all insurers doing business in New York. (A-153 at ¶ 46). The Guidance Letters urged recipients to "review" their relationships with the NRA and other "gun promotion organizations." (A-153; A-184; A-187). The Guidance Letters are suffused with political concerns far afield from DFS's mandate, urging banks and insurers to heed "the voices of the passionate, courageous, and articulate young people" speaking out in favor of gun control, and to reconsider any business relationships with "the [NRA], and similar organizations that promote guns and lead to senseless violence." (A-153; A-183; A-186). The Guidance Letters further invoked the "risk management" obligations of the recipient banks and insurers and directed them to "take prompt actions to manage" purported "reputational risks" arising from "dealings with the NRA or

similar gun promotion organizations." (A-153-154 at ¶ 47; A-183 - A-184; A-186 - A-187).

Read in the context of the preceding months' private communications by Vullo, the Guidance Letters were threats that deliberately invoked DFS's "risk management" authority to warn of adverse action if institutions failed to support Defendants' efforts to stifle the NRA's speech and to retaliate against the NRA based on its viewpoint. (A-154 at ¶ 48). Importantly, the Guidance Letters were issued contemporaneously with Cuomo's Press Release, containing and endorsing a statement by Vullo that directly "urge[s] all insurance companies and banks doing business in New York to join the companies that have already discontinued their arrangements with the NRA." (A-154 at ¶ 50; A-181). Likewise, on April 20, 2018, Cuomo publicly tweeted: "The NRA is an extremist organization. I urge companies in New York State to revisit any ties they have to the NRA and consider their reputations, and responsibility to the public." (A-155 at ¶ 51). The intended and actual effect of the Press Release, the Guidance Letters, and the actions by Cuomo and Vullo, was to coerce insurance agencies, insurers, and banks into terminating business relationships with the NRA that were necessary to the survival of the NRA as a charitable organization. (*Id.* at ¶ 52).

**E.**     **Lockton and Chubb Restricted From Doing Business With the NRA**

On May 2, 2018, Lockton entered into a consent order with DFS under Articles 21, 23, and 34 of the Insurance Law (the "Lockton Consent Order")—signed by Vullo—which imposed a civil penalty of $7 million. (A-156 at ¶ 54; A-189 - A-208). Although the Lockton Consent Order ostensibly addressed discrete violations of New York's Insurance Law by specific Lockton entities, its provisions go much further. (A-156 at ¶ 54). Most notably, the Lockton Consent Order purports to restrict Lockton's participation in any NRA-endorsed insurance programs in New York State, irrespective of whether such programs comply with the Insurance Law. (*Id.*). Specifically, the Lockton Consent Order requires that Lockton agree "not to participate in . . . any other NRA-endorsed programs with regard to New York State," nor may Lockton "enter into any agreement or program with the NRA to underwrite or participate in any affinity-type insurance program involving any line of insurance to be issued or delivered in New York State or to anyone known to Lockton to be a New York resident." (*Id.* at ¶ 55). As a result, Lockton is prohibited from selling NRA affinity-insurance outside New York to any individual who maintains a New York residence. (*Id.*). Indeed, the DFS press release publicizing the Lockton Consent Order trumpeted that Lockton must "refrain from [e]ntering into any other agreement or arrangement . . . involving the NRA, directly or

indirectly"—including, but not limited to, affinity-insurance. (A-158 - A-159 at ¶ 61).

Shortly thereafter, on May 7, 2018, Chubb entered into a Consent Order with DFS under Sections 1101 and 3420 of the Insurance Law (the "Chubb Consent Order") with DFS—again signed by Vullo—which imposed a civil monetary penalty of $1.3 million. (A-159 at ¶ 62; A-209 - A-221). Similar to the Lockton Consent Order, in the Chubb Consent Order, DFS purports to restrict Chubb's participation in any affinity-type insurance program with the NRA, irrespective of whether such programs comply with the Insurance Law. (A-159 at ¶ 62).

## F.   **Vullo Threatens Lloyd's of London**

Although DFS's investigation of the NRA had originally focused on Carry Guard, that changed by February 2018. (A-161 at ¶ 67). Vullo met with senior executives of Lloyd's and LAI and presented Defendants' views on gun control and their desire to leverage their powers to combat the availability of firearms, including specifically by weakening the NRA. (*Id.*). These backchannel meetings began on or about February 27, 2018, after Vullo spoke at a breakfast meeting of the New York City Bar Association; participants included Vullo herself, along with Inga

Beale of Lloyd's and Joseph Gunset of LAI.[1]  (*Id.*).  During her meetings with Lloyd's executives, Vullo acknowledged widespread regulatory issues in the excess-line marketplace.  (A-162 at ¶69).  Vullo made clear that Lloyd's could avoid liability for infractions relating to other, similarly situated insurance policies, so long as it aided DFS's campaign against organizations promoting the Second Amendment.  (A-162 - A-163 at ¶69).  Lloyd's would agree that it would instruct its syndicates to cease underwriting firearm-related policies and would scale back its NRA-related business; in exchange, DFS would focus its forthcoming affinity-insurance enforcement action solely on those syndicates which served the NRA, and ignore other syndicates writing similar policies.  (A-163 at ¶69).  The first step of this process was a letter from DFS to Gunset sent on April 11, 2018.  (*Id.*).

On May 9, 2018, Lloyd's publicly announced that it had directed its underwriters to terminate all insurance related to the NRA and not to provide any insurance to the NRA in the future, in the wake of DFS's investigations into the NRA and its business partners.  (A-164 at ¶ 72).  On December 20, 2018, ten Lloyd's underwriters, acting through their managing agents, entered into a Consent Order with DFS under Sections 1102 and 3420 of the Insurance Law (the "Lloyd's Consent

---

[1] Sometimes referred to as an insurance underwriter, Lloyd's is actually an insurance marketplace, composed of "members which underwrite insurance (each for their own account) as members of syndicates."  (A-161-162 at ¶68).  Various supervisory bodies and boards within Lloyd's set policies for the Lloyd's syndicates and can issue directives that shape the availability of different types of insurance worldwide.  (*Id.*).

Order")—again signed by Vullo—which imposed a civil monetary penalty of $5 million. (A-164 at ¶ 74; A-228 - A-254). Similar to the Lockton and Chubb Consent Orders, in the Lloyd's Consent Order, DFS purports to restrict Lloyd's participation in any affinity-type insurance program with the NRA, irrespective of whether such programs comply with the Insurance Law. (A-164 at ¶ 74; A-236 at ¶ 20).

Pursuant to the conversations between Vullo and senior officials at Lloyd's and LAI described above, Lloyd's was not subjected to any enforcement action and/or penalties for any violation of the New York Insurance Law related to affinity-insurance programs, other than in connection with the NRA-related insurance programs. (A-165 at ¶ 75).

Furthermore, Defendants' concerted efforts to stifle the NRA's freedom of speech and to retaliate against it based on its viewpoints have caused other insurance, banking, and financial institutions doing business with the NRA to reconsider their mutually beneficial business relationships with the NRA for fear of monetary sanctions or expensive public investigations. (A-167 at ¶ 80). The NRA encountered serious difficulties obtaining replacement corporate insurance coverage. (*Id.* at ¶ 81). Nearly every carrier indicated that it fears transacting with the NRA specifically in light of DFS's actions against Lockton, Chubb, and Lloyd's. (*Id.*). Defendants' threats have also imperiled the NRA's access to basic banking services, despite the absence of any alleged regulatory violations in connection with

16

the NRA's banking activities. (A-167 at ¶ 82). Multiple banks withdrew bids given in response to the NRA's request for proposals following the issuance of the Guidance Letters, based on concerns that any involvement with the NRA would expose them to regulatory reprisals. (*Id.*).

## G.    **NRA Commences Action and Amends Complaint**

On May 11, 2018, the NRA commenced the underlying Action against Cuomo and Vullo, who was then still Superintendent of DFS, in their official and individual capacities, as well as against DFS. (A-7). On July 20, 2018, the NRA filed an amended complaint. (A-12). The NRA asserted seven causes of action, alleging various federal and state constitutional claims, as well as state law claims. (A-133 - A-134).

Following motions to dismiss, in a November 6, 2018 Decision and Order (A-64 - A-134) (the "November 2018 Decision"), the District Court dismissed some claims, but upheld the NRA's First Count, alleging the establishment of an implicit censorship regime in violation of the First and Fourteenth Amendments, and its Second Count, alleging retaliation against the NRA based on the content of its speech in violation of the First and Fourteenth Amendments (the First Count and Second Count, together, are referred to herein as the "First Amendment Claims"). (A-133). In addition, the District Court denied the motion to dismiss the NRA's

claim for money damages for its Fourth Count, alleging selective enforcement of the law in violation of the NRA's rights under the Fourteenth Amendment.  (A-111).

The defendants subsequently moved under Rule 12(c) for judgment on the pleadings.  (SPA-28).  On May 9, 2019, the District Court dismissed the NRA's selective enforcement claim against Vullo and Cuomo, in their individual capacities, without prejudice to repleading, and also ruled that the Eleventh Amendment barred claims for money damages against DFS and against Vullo and Cuomo in their official capacities.[2]  (SPA-28; A-316).  The First Amendment Claims continued against all defendants.

In June 2019, the NRA achieved a breakthrough in discovery wherein LAI provided a small number of documents voluntarily to the NRA.  (A-317).  As a result of that discovery and additional facts that came to light, the NRA moved for leave to file the Second Amended Complaint, which was granted on June 1, 2020, to the extent it permitted a selective enforcement claim against Vullo in her individual capacity.  (A-317 - A-318).  The court also granted the NRA's motion to substitute the current Superintendent of DFS, Linda A. Lacewell, for Vullo, in her official capacity.  (SPA-2 - SPA-3).

---

[2] The NRA withdrew its Section 1983 claims against DFS.  (SPA-28).

The Second Amended Complaint (A-135 - A-177) set forth three causes of action: The First Amendment Claims (Counts One and Two) as against all defendants, and Count Three, the selective enforcement claim against Vullo. (A-173 - A-174).

## H. **The District Court's March 15, 2021 Decision**

Vullo, Cuomo, DFS and Lacewell moved to dismiss the Second Amended Complaint. (SPA-1). Importantly, in its Decision, the District Court noted at the outset that the First Amendment Claims at issue on the motions to dismiss "are essentially the same claims that the Court examined in tandem" in its November 2018 Decision (SPA-23) and relied on its findings and holdings set forth in the November 2018 Decision. (SPA-23 - SPA-28)

The District Court denied Vullo's motion under Rule 12(b)(6) to dismiss the NRA's First Amendment Claims on grounds of qualified immunity.[3] (SPA-43). The court granted Vullo's motion to dismiss Count Three on grounds of absolute immunity, and dismissed the Second Amended Complaint as against DFS, Cuomo, in his official capacity, and Lacewell, in her official capacity, as barred by the Eleventh Amendment. (*Id.*).

---

[3] The court also denied Vullo's appeal of the Magistrate Judge's decision granting the NRA leave to amend its Amended Complaint and to file the Second Amended Complaint. (SPA-43).

Accordingly, the NRA's remaining claims are its First Amendment Claims against Vullo and Cuomo, in their respective individual capacities. Vullo now appeals the District Court's denial of her motion to dismiss the NRA's First Amendment Claims. (A-362). Cuomo has not appealed the Decision.

In her motion to dismiss, Vullo argued that she is entitled to qualified immunity on the First Amendment Claims because it was "objectively reasonable" for her to believe her statements in the Guidance Letters and Press Release were lawful, and there "is no case clearly establishing that otherwise protected public statements transform into an unlawful 'threat' because there is an ongoing (and unrelated) regulatory investigation." (SPA-25). She further maintained that the NRA's allegations regarding her public statements, coupled with "backroom exhortations" are "vague and conclusory." (*Id.*). Vullo contended that "[r]easonable officials would believe it lawful to privately express the sentiments that are lawful to express publicly." (*Id.*) (citation omitted). The NRA countered that qualified immunity is a fact-specific inquiry that should be undertaken after fact discovery, and that the conduct alleged by the NRA was not objectively reasonable but rather violated clearly established constitutional rights. (*Id.*).

As discussed below, the District Court rejected Vullo's invocation of qualified immunity, holding, as it had in its November 2018 Decision, that:

> [i]n the context of the factual allegations asserted in the Amended Complaint, it was plausible to conclude that the combination of

20

> Defendants' actions, including Ms. Vullo's statements in the Guidance Letters and Cuomo Press Release, as well as the purported 'backroom exhortations,' could be interpreted as a veiled threat to regulated industries to disassociate with the NRA or risk DFS enforcement action.

(SPA-26). The District Court continued that "[t]his conclusion is enforced by new allegations in the [Second Amended Complaint] that can be reasonably interpreted as pre-Guidance Letters backroom threats by Ms. Vullo of DFS enforcement against entities that did not disassociate with the NRA." (*Id.*, citing Second Amended Complaint at ¶¶ 21, 67, 69). The District Court referred to its November 2018 Decision, stating that:

> [t]he law was clearly established at the time that First Amendment rights could be violated by the chilling effect of governmental action that falls short of direct prohibition against speech but that can reasonably be interpreted as intimating that some form of punishment or adverse regulatory action will follow the failure to accede to the official's request.

(SPA-26 - SPA-27).

The District Court recited the well-established law that "[w]hen a qualified immunity defense is raised on a Rule 12(b)(6) motion, the Court must accept the truth of the allegations in the complaint and may grant qualified immunity only if the facts supporting the defense appear on the face of the complaint." (SPA-27, citing *Hyman v. Abrams*, 630 F. App'x 40, 42 (2d Cir. 2015)). The court further explained that a "defendant presenting an immunity defense on a Rule 12(b)(6) motion instead of a motion for summary judgment must accept [that] ... the plaintiff

is entitled to all reasonable inferences from the facts alleged, not only those that support his claim, but also those that defeat the immunity defense." (*Id.*, citing *Hyman*, 630 F. App'x at 40, 42) (citing *McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir.2004)). Therefore, the court quoted this Court's observation that "usually, the defense of qualified immunity cannot support the grant of a Rule 12(b)(6) motion for failure to state a claim upon which relief can be granted." (*Id.*).

Applying the foregoing standards, the District Court held that "a question of material fact exists as to whether Ms. Vullo explicitly threatened Lloyd's with DFS enforcement if the entity did not disassociate with the NRA." (*Id.*).

> Based on this question of material fact, and even assuming an objectively reasonable person would not have known that the Guidance Letters or Ms. Vullo's statements in the Cuomo Press Release could be construed as implied threats to regulated entities if they did not disassociate with the NRA, qualified immunity on the First Amendment claims must be denied at this time.

(*Id.*). The court further held that

> because Ms. Vullo's alleged implied threats to Lloyd's and promises of favorable treatment if Lloyd's disassociated with the NRA could be construed as acts of bad faith in enforcing the Insurance Law in New York, a question of material fact exists as to whether she is entitled to qualified immunity under New York law.

(*Id.*). Vullo appeals these rulings.

## V.

## <u>SUMMARY OF ARGUMENT</u>

**First**, Vullo's interlocutory appeal should be dismissed for lack of jurisdiction because an order denying a motion to dismiss is ordinarily not an immediately appealable "final decision" within the meaning of 28 U.S.C. § 1291. Nor is the District Court's Decision appealable pursuant to the collateral order doctrine, because the Decision explicitly turned on questions of fact, rather than a question of law. Furthermore, because Vullo challenges the truth of the facts as alleged in the Second Amended Complaint, she is precluded from asserting the collateral order doctrine to establish jurisdiction.

**Second**, even if the Court were to hear the Appeal, the District Court's Decision should be affirmed. A defense of qualified immunity cannot be resolved prior to ascertaining the truth of the factual allegations on which a defense of qualified immunity is premised. Since qualified immunity is an affirmative defense that is typically asserted in an answer, as a general rule, the defense of qualified immunity cannot support the granting of a Rule 12(b)(6) motion.

As with all motions to dismiss, the District Court was required to accept the Second Amended Complaint's factual allegations as true and draw all reasonable inferences in the NRA's favor, including both those that support its claims and those that defeat Vullo's immunity defense. With the benefit of those inferences, the court

23

must determine whether the NRA has sufficiently pled facts showing that: (1) Vullo violated a statutory or constitutional right, and (2) the right was "clearly established" at the time of the challenged conduct.

Here, the District Court held that the NRA had sufficiently pled facts in support of its First Amendment Claims. The court further found that open issues of fact exist that preclude dismissal based on Vullo's purported qualified immunity. Specifically, the District Court correctly held that an issue of fact must be resolved as to whether Vullo explicitly threatened Lloyd's with DFS enforcement if the entity did not disassociate with the NRA. As the District Court held, such threats would violate the NRA's First Amendment rights, which were clearly established at the time Vullo made those threats. To argue that the NRA failed to sufficiently plead facts to preclude a qualified immunity defense, Vullo repeatedly mischaracterizes the facts as alleged by the NRA. The District Court, however, correctly applied the law to the facts as alleged. Finally, Vullo's argument that the NRA failed to cite a relevant case on point to establish that its First Amendment rights were clearly established fails because she again mischaracterizes the facts as alleged and misconstrues the relevant legal authority.

This Appeal should be dismissed for lack of jurisdiction. If the Court retains jurisdiction, however, the District Court's Decision denying Vullo's Rule 12(b)(6) motion to dismiss should be affirmed.

# VI.

# ARGUMENT

## A.  Standard of Review

This Court reviews *de novo* a district court's denial of a motion to dismiss based on qualified immunity. *Biswas v. Kwait*, 576 F. App'x 58, 59 (2d Cir. 2014). Qualified immunity may be granted on a Rule 12(b)(6) motion "only if it is based on facts appearing on the face of the complaint, exhibits to the complaint, documents incorporated by reference, and items of which judicial notice may be taken."  *Id.* (citing *McKenna v. Wright,* 386 F.3d 432, 436 (2d Cir.2004)).  Critically, where, as here, "the availability of qualified immunity cannot [ ] be determined as a matter of law," this Court "lack[s] appellate jurisdiction" to review the denial of that defense. *Id.* (quoting *McKenna,* 386 F.3d at 438) (citing *Behrens v. Pelletier*, 516 U.S. 299, 313, 116 S.Ct. 834 (1996)).

In reviewing *de novo* a district court's denial of a motion under Rule 12(b)(6), the Court must "accept[ ] the allegations contained in the complaint as true and draw [ ] all reasonable inferences in favor of the nonmoving party." *Pourkavoos v. Town of Avon*, 823 F. App'x 53, 58 (2d Cir. 2020) (quoting *Kass v. City of New York*, 864 F.3d 200, 206 (2d Cir. 2017)).  As this Court has stated, "a defendant presenting an immunity defense on a Rule 12(b)(6) motion instead of a motion for summary judgment must accept the more stringent standard applicable to this procedural

route." *Id.* (quoting *McKenna*, 386 F.3d at 436); *Edrei v. Maguire*, 892 F.3d 525, 532 (2d Cir. 2018).

> Not only must the facts supporting the [immunity] defense appear on the face of the complaint, but, as with all Rule 12(b)(6) motions, the motion may be granted only where it appears [that the alleged facts, if true, plausibly state a claim] that would entitle him to relief. Thus, the plaintiff is entitled to all reasonable inferences from the facts alleged, not only those that support his claim, but also those that defeat the immunity defense.

*Est. of Chamberlain v. City of White Plains*, 960 F.3d 100, 110 (2d Cir. 2020) (quoting *McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir. 2004)). Significantly, this Court has also stated: "[w]e see no reason to think the hurdle to be materially less formidable post-*Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)." *Id.* at 111, n.18.

Therefore, this Court "has admonished '[d]efendants moving to dismiss a suit by reason of qualified immunity' that they 'would in almost all cases be well advised to move for summary judgment, rather than for dismissal under Rule 12(b)(6) or 12(c).'" *Pourkavoos*, 823 F. App'x at 58 (quoting *Barnett v. Mount Vernon Police Dep't*, 523 F. App'x 811, 813 (2d Cir. 2013)). Accordingly, "asserting qualified immunity as a defense in the earliest stages of litigation, before development of a relevant factual record, usually fails to result in dismissal of the complaint." *Id.*

**B.**   **The Appeal Should Be Dismissed Because The Court Lacks Jurisdiction**

"Orders denying motions to dismiss are ordinarily not immediately appealable 'final decisions' within the meaning of 28 U.S.C. § 1291." *Water Works Realty Corp. v. Edwards*, 469 F. App'x 2, 2 (2d Cir. 2012). However, "pursuant to the collateral-order doctrine, 'a district court's order rejecting qualified immunity at the motion-to-dismiss stage of a proceeding' can be a final decision within the meaning of § 1291, '[p]rovided it turns on a question of law.'" *Id.* at 2 (quoting *Iqbal*, 556 U.S. at 672). Additionally, "[a] denial of an immunity-based motion is not a final order, however, where issues of fact must be resolved before the immunity defense can be resolved." *Id.* Furthermore, an appellant "may not rely on the collateral order doctrine . . . if [she] dispute[s] the facts as alleged by the plaintiff on appeal." *Abrahams v. Inc. Vill. of Hempstead*, 390 F. App'x 4, 5 (2d Cir. 2010) (holding that the Court lacked jurisdiction over an interlocutory appeal of a denial of a motion to dismiss based on qualified immunity).

A defendant presenting an immunity defense on a motion to dismiss "must therefore show not only that 'the facts supporting the defense appear on the face of the complaint,' but also that 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief.'" *Brown v. Halpin*, 885 F.3d 111, 117 (2d Cir. 2018) (quoting *McKenna*, 386 F.3d at 436). As this Court has held, "if a factual determination is a necessary predicate to the resolution of

whether immunity is a bar, review is postponed and we dismiss the appeal." *Id.* (quoting *State Emps. Bargaining Agent Coal. v. Rowland*, 494 F.3d 71, 82 (2d Cir. 2007).

In this Appeal, Appellant Vullo asserts, in conclusory fashion, that "[t]his Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291 and the collateral order doctrine" as set forth in *Iqbal*, and that the "denial of an assertion of qualified immunity on a motion to dismiss is an immediately appealable order." (Appellant Br. at 8). Vullo makes no further argument. Vullo is wrong. This Court lacks jurisdiction over this interlocutory appeal, and the Appeal should therefore be dismissed.

### 1.     The District Court's Decision Turned on Questions of Fact

This Court has observed that "[t]o some extent the availability of qualified immunity turns on inquiries into specific facts." *Hill v. City of New York*, 45 F.3d 653, 663 (2d Cir. 1995). Here, the District Court's determination that Vullo is not entitled to qualified immunity at the motion to dismiss stage was based on disputed issues of fact, not on a matter of law. The District Court found that Vullo's entitlement to qualified immunity is necessarily based on whether the facts of this case show that "the combination of Defendants' actions, including Ms. Vullo's statements in the Guidance Letters and Cuomo Press Release as well as the purported

'backroom exhortations'" violated the NRA's clearly established First Amendment rights. (SPA 26-27).

Specifically, the District Court expressly held that, when accepting—as it must—the truth of the allegations set forth in the Second Amended Complaint, several questions of material fact must still be determined:

> [A] question of material fact exists as to whether Ms. Vullo explicitly threatened Lloyd's with DFS enforcement if the entity did not disassociate with the NRA. Based on this question of material fact, and even assuming an objectively reasonable person would not have known that the Guidance Letters or Ms. Vullo's statements in the Cuomo Press Release could be construed as implied threats to regulated entities if they did not disassociate with the NRA, qualified immunity on the First Amendment claims must be denied at this time. Further, because Ms. Vullo's alleged implied threats to Lloyd's and promises of favorable treatment if Lloyd's disassociated with the NRA could be construed as acts of bad faith in enforcing the Insurance Law in New York, a question of material fact exists as to whether she is entitled to qualified immunity under New York law.

(SPA-27). Leaving no doubt, the District Court concluded: "For these reasons, the Court will deny qualified immunity to Ms. Vullo on the First Amendment claims at this time." (SPA-28).

Accordingly, because the District Court based its holding denying qualified immunity on outstanding questions of fact, this Court lacks jurisdiction to hear an interlocutory appeal of that decision. *See Brown*, 885 F.3d at 114 ("We conclude that we lack jurisdiction to consider the qualified immunity defense at this time— when we must accept plaintiff's allegations as true—because it depends on the

resolution of factual disputes."); *see also Water Works Realty Corp.*, 469 F. App'x at 3 (holding that this Court lacked jurisdiction when the district court denied Appellants' motion to dismiss based on qualified immunity because "numerous questions of fact preclude the entry of judgment at this time."); *Almonte v. City of Long Beach*, 478 F.3d 100, 110 (2d Cir. 2007) (when the district court concluded that "further factual development was necessary," denial of qualified immunity did not turn on an issue of law, and therefore "a factual determination is a necessary predicate to the resolution of whether ... immunity is a bar," precluding immediate appellate review) (quoting *Parkinson v. Cozzolino*, 238 F.3d 145, 149 (2d Cir. 2001)); *Forras v. Andros*, 184 F. App'x 33, 34 (2d Cir. 2006) ("appellants moved for a judgment on the pleadings under Federal Rule of Civil Procedure 12(c) . . . on the ground that they were entitled to qualified immunity for their actions[]" and this Court held that because "the District Court expressly found that 'many unanswered questions of intent remain' . . . we lack jurisdiction, at this early stage of litigation, to consider Appellants' appeal." *Id.* at 35).

### 2. <u>Vullo Disputes the Facts as Alleged</u>

At the motion to dismiss stage, the Court and Vullo must "accept the complaint's factual allegations as true and draw all reasonable inferences in the plaintiffs' favor, including both those that support the claim and 'those that defeat the immunity defense.'" *Edrei*, 892 F.3d at 532; *see Hyman*, 630 F. App'x at 42

(quoting *McKenna*, 386 F.3d at 436). If an appellant disputes the truth of the factual allegations as part of her argument, this Court lacks jurisdiction over an interlocutory appeal. *See Abrahams*, 390 F. App'x at 5 (holding that because "defendants continue to argue the facts on appeal, disputing the nature and circumstances of the stigmatizing statements that plaintiff attributes to them[,] . . . we lack jurisdiction to consider defendants' interlocutory appeal").

Vullo does not address the District Court's holdings with respect to the open questions of fact, and the resulting lack of this Court's jurisdiction. Instead, Vullo does precisely what this Court has cautioned against: she disputes the facts as alleged. To be sure, Vullo feigns at accepting the allegations in the Second Amended Complaint as true (*see, e.g.*, Appellant's Br. at 3), but in reality, she rejects the facts as pled.

For example, Vullo asserts that the Second Amended Complaint "does not allege that Ms. Vullo actually said or did—or threatened to do, or not do—anything, much less anything coercive." (*Id.*) She refers dismissively to the "factual" allegations—her quotes—that "are either bereft of concrete meaning altogether, or that cannot plausibly be construed as unlawful First Amendment conduct." (*Id.* at 3-4). Vullo makes plain her disagreement with the veracity of the factual allegations, using scare quotes repeatedly when discussing those facts. (*Id.* at 7) ("[T]he case still must be dismissed because such 'facts' do not give rise to a 'clearly established'

31

constitutional claim under extant law." *Id.*); ("The SAC contained new 'factual'
allegations—including the Alleged Private Indications—in support of the three
remaining claims against Ms. Vullo in her individual capacity." *Id.* at 21). Vullo
expressly denies the truth of the allegations that she made any sort of threat. ("[T]he
Alleged Private Indications, pleaded at Paragraphs 21 and 69 of the SAC, simply do
not constitute 'threats' and 'coercion,' conclusory allegations to the contrary
notwithstanding," *Id.* at 24); ("The other allegations around Ms. Vullo's conduct—
the Alleged Private Indications—are not factual at all, or, if they are, clearly do not
allege coercive speech." *Id.* at 26); ("But the NRA's description of Ms. Vullo's
alleged conduct during the alleged private 'meetings' with Lloyd's—the Alleged
Private Indications, set forth at SAC Paragraphs 21 and 69 . . . are the antithesis of
factual pleading." *Id.* at 27).

Thus, rather than actually concede the truth of the allegations for purposes her
motion, Vullo improperly challenges the facts as alleged.[4] Vullo's protestations
notwithstanding, the District Court found that the Second Amended Complaint did
in fact allege that Vullo made threats:

> But here the Court found that, in the context of the factual allegations
> asserted in the Amended Complaint, it was plausible to conclude that
> the combination of Defendants' actions, including Ms. Vullo's

---

[4] Vullo candidly admits that, while the Court must accept the allegations set forth in the
Second Amended Complaint as true, she "unconditionally denies having held any 'surreptitious
meetings' with Lloyd's or any other regulated entity and denies saying anything of the sort alleged
in Paragraphs 21 and 69." (Appellant's Br. at 17, fn. 9).

statements in the Guidance Letters and Cuomo Press Release as well as the purported "backroom exhortations," could be interpreted as a veiled threat to regulated industries to disassociate with the NRA or risk DFS enforcement action. This conclusion is enforced by new allegations in the SAC that can be reasonably interpreted as pre-Guidance Letters backroom threats by Ms. Vullo of DFS enforcement against entities that did not disassociate with the NRA. *See* SAC ¶ 21; ¶ 67; ¶ 69.

(SPA-26).

Accordingly, because Vullo disputes the facts as alleged by the NRA, she may not rely on the collateral order doctrine, and this Court lacks jurisdiction over this Appeal. *Abrahams*, 390 F. App'x at 5.

For the foregoing reasons, the NRA respectfully submits that the Court should dismiss the Appeal.

## C.   <u>The District Court Properly Denied Vullo's Motion to Dismiss</u>

Even if this Court did not lack jurisdiction to hear Vullo's Appeal—which jurisdiction is plainly lacking—her appeal still fails on the merits.

This Court has stated "that qualified immunity should be resolved 'at the earliest possible stage in litigation.'" *Est. of Chamberlain*, 960 F.3d at 110 (quoting *Pearson v. Callahan*, 555 U.S. 223, 232, (2009). However, this Court has also pointed out that:

> [T]here is an obvious, if rarely expressed, corollary to that principle: The immunity question cannot be resolved before the "earliest possible stage," i.e., prior to ascertainment of the truth of the plausible factual allegations on which a finding of qualified immunity is premised. And since qualified immunity is an affirmative defense that is typically

asserted in an answer, . . . as a general rule, "the defense of qualified immunity cannot support the grant of a [Rule] 12(b)(6) motion[.]"

*Id.* (citing *Green v. Maraio*, 722 F.2d 1013, 1018 (2d Cir. 1983)). *See also Hyman*, 630 Fed. Appx. at 42.

It thus follows that a qualified immunity defense presented on a Rule 12(b)(6) motion "faces a formidable hurdle ... and is usually not successful." *Id.* at 111 (quoting *Field Day, LLC v. County of Suffolk*, 463 F.3d 167, 191–92 (2d Cir. 2006)). Otherwise, this Court has reasoned, "plaintiffs alleging a violation of their constitutional rights would face a heightened pleading standard under which they must plead not only facts sufficient to make out their claim but also additional facts to defeat an assertion of qualified immunity." *Id.* (citing *Castro v. United States*, 34 F.3d 106, 111 (2d Cir. 1994) ("[Q]ualified immunity is an affirmative defense that a defendant has the burden of pleading in his answer. A plaintiff, in order to state a claim of constitutional violation, need not plead facts showing the absence of such a defense.")). Put another way, "advancing qualified immunity as grounds for a motion to dismiss is almost always a procedural mismatch." *Id.*

As with all motions to dismiss, the Court must "accept the complaint's factual allegations as true and draw all reasonable inferences in the plaintiffs' favor, including both those that support the claim and 'those that defeat the immunity defense.'" *Edrei*, 892 F.3d at 532; *Hyman*, 630 F. App'x at 42. As this Court has further stated, "[w]ith the benefit of those inferences, we then ask whether the

plaintiff has pled 'facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Neary v. Wu*, 753 F. App'x 82, 84 (2d Cir. 2019) (quoting *Ganek v. Leibowitz*, 874 F.3d 73, 80 (2d Cir. 2017).

Here, Vullo argues: (1) the NRA has not plausibly alleged a First Amendment violation under the *Iqbal* pleading standard, and (2) Vullo's alleged conduct, even if sufficiently pleaded and accepted as true, does not violate a clearly established constitutional right. (Appellant's Br. at 23-25). Vullo, however, misconstrues the Decision of the District Court and the prevailing precedent of this Court. The District Court's Decision should be affirmed.

### 1. The District Court Correctly Held that the NRA Had Sufficiently Alleged a Violation of its First Amendment Rights

Vullo argues that paragraphs 21 and 69 of the Second Amended Complaint are insufficiently pled. She quotes each paragraph, but only in part. Indeed, she grossly mischaracterizes the allegations as "conclusory—and thus unworthy of weight," absurdly contending that paragraph 21 "does not even assert that Ms. Vullo made a verbal statement or even displayed some physical gesture to communicate a point" and that "it is not even alleged that they are intentional communications at all." (Appellant's Br. at 27-28). Vullo makes this misleading assertion, despite paragraph 21 explicitly stating:

> Vullo met personally with executives of regulated institutions including Lloyd's. During the meetings *she discussed* an array of technical regulatory infractions plaguing the affinity-insurance marketplace. Vullo made it clear, however, that DFS was less interested in pursuing the infractions *of which she spoke*, so long as Lloyd's ceased providing insurance to gun groups, especially the NRA. The threat was clear and unambiguous.

(A-144) (emphasis added). Contrary to Vullo's false description, it is beyond cavil that paragraph 21 clearly alleges that Vullo attended meetings with executives of regulated institutions and made verbal threats during those meetings.

Vullo continues with her conclusory opinion that "there's nothing even remotely coercive about what Paragraph 21 does plead." (Appellant's Br. at 28). She further states: "Paragraph 21 studiously avoids alleging that Ms. Vullo stated or implied that DFS would or was threatening to take any action at all, much less coercive action." (*Id.*). This, again, is a mischaracterization of the allegations. Paragraph 21 clearly states that "Vullo and DFS have *threatened* regulated institutions with costly investigations, increased regulatory scrutiny and penalties." (A-144) (emphasis added). Moreover, as alleged, Vullo discussed DFS being "less interested in pursuing" the infractions of the regulated institutions—that is, DFS would give those institutions minimal (or no) scrutiny for such infractions—so long as the NRA could be deprived of lawful insurance services.

Similarly, with regard to paragraph 69 of the Second Amended Complaint, Vullo again simply asserts that it is "content-free" and "does not allege that Ms.

Vullo (or anyone at DFS) actually stated that the agency would affirmatively do anything—much less that they would do anything coercive." (Appellant's Br. at 31). Again, contrary to Vullo's subjective characterization, Paragraph 69 states, in relevant part:

> During her surreptitiously held meetings with Lloyd's executives that commenced in February 2018, Vullo acknowledged the widespread regulatory issues in the excess-line marketplace. ***Vullo and DFS made clear that Lloyd's could avoid liability for infractions relating to other, similarly situated insurance policies, so long as it aided DFS's campaign against gun groups***. Against the specter of this bold abuse of her position, Lloyd's agreed that it would instruct its syndicates to cease underwriting firearm-related policies and would scale back its NRA-related business; in exchange, ***DFS would focus its forthcoming affinity-insurance enforcement action solely on those syndicates which served the NRA, and ignore other syndicates writing similar policies***.

(A-162-163) (emphasis added).

Moreover, despite Vullo's singular focus on paragraphs 21 and 69 of the Second Amended Complaint, importantly, and unacknowledged by Vullo, the District Court did not rely solely on the allegations set forth in those paragraphs, but rather placed those allegations into the broader picture of the totality of the facts as alleged:

> [I]n the context of the factual allegations asserted in the Amended Complaint, it was plausible to conclude that the combination of Defendants' actions, including Ms. Vullo's statements in the Guidance Letters and Cuomo Press Release as well as the purported 'backroom exhortations,' could be interpreted as a veiled threat to regulated industries to disassociate with the NRA or risk DFS enforcement action."

(SPA-26) (emphasis added).  Significantly, the District Court cited paragraphs 21 and 69, as well as paragraph 67, in the Second Amended Complaint, as new allegations that "enforced"—rather than were the basis of—the plausible conclusion of a veiled threat made by Vullo.  (SPA-26).  The court concluded that those allegations "can be reasonably interpreted as pre-Guidance Letters backroom threats by Ms. Vullo of DFS enforcement against entities that did not disassociate with the NRA."  (SPA-26) (citing Sec. Am. Comp. at ¶¶ 21, 67, 69).

On this point, the District Court referred to its November 2018 Decision, which had already denied Vullo's prior motion to dismiss the NRA's First Amendment Claims set forth in the NRA's Amended Complaint.  (*See* A-77-A-91).  The District Court there stressed that "[w]hen Defendants' statements and alleged conduct is examined in its totality, there are sufficient allegations to state plausible freedom-of-speech claims."  (A-84).  The District Court in its Decision quoted its November 2018 Decision at length, stating:

> While neither the Guidance Letters nor the Cuomo Press Release specifically directs or even requests that insurance companies and financial institutions sever ties with the NRA, a plausible inference exists that a veiled threat is being conveyed. Viewed in the light most favorable to the NRA, and given DFS's mandate . . . the Cuomo Press Release and the Guidance Letters, when read objectively and in the context of DFS's regulatory enforcement actions against Chubb and Lockton and the backroom exhortations, could reasonably be interpreted as threats of retaliatory enforcement against regulated institutions that do not sever ties with the NRA.

(SPA-24, quoting A-87 - A-88).  In its November 2018 Decision, the District Court

ultimately held that:

> The allegations in the Amended Complaint are sufficient to create a
> plausible inference that the Guidance Letters and Cuomo Press Release,
> when read together and in the context of the alleged backroom
> exhortations and the public announcements of the Consent Orders,
> constituted implicit threats of adverse action against financial
> institutions and insurers that did not disassociate from the NRA.
>
> .   .   .   .
>
> In the end, the allegations of direct and implied threats to insurers and
> financial institutions because of these entities' links with the NRA, and
> the allegations of resulting harm to the NRA's operations, are sufficient
> to make out plausible First Amendment freedom-of-speech claims.
> While the NRA may not be able to establish the factual predicates for
> these claims, it has presented sufficient allegations to allow them to go
> forward.  Accordingly, those portions of Defendants' motion directed
> to Counts One and Two are denied.

(A-89, A-91).

As a matter of law, the District Court was required, as it had in its November

2018 Decision, to accept the allegations set forth in the Second Amended Complaint

as true for purposes of the motion to dismiss.  It properly drew all "reasonable

inferences" in the NRA's favor, as it was also required to do, including those that

support the NRA's claims and those that defeat Vullo's qualified immunity defense.

*See Edrei*, 892 F.3d at 532; *Hyman*, 630 F. App'x at 42.  Vullo, to the contrary,

would impose a heightened pleading standard, under which the NRA would be

required to plead not only facts sufficient to make out its claims but also additional

facts to defeat Vullo's assertion of qualified immunity.  This Court has rejected such

a standard, which is why a qualified immunity defense presented on a Rule 12(b)(6) motion "is usually not successful." *See Est. of Chamberlain*, 960 F.3d at 111. Significantly, as this Court has further noted, and contrary to Vullo's suggestion, the *Iqbal* decision has not changed the standard applicable to a qualified immunity defense presented on a Rule 12(b)(6) motion. *Id.* at 111, n.18.

### 2. The District Court Correctly Held that the Law Was Clearly Established that the NRA's First Amendment Rights Could Be Violated

The District Court in its Decision referred again to its November 2018 Decision stating that, while the Guidance Letters and the Cuomo Press Release "read in isolation, clearly fit into the government-speech doctrine as they address matters of public importance on which New York State has a significant interest" (SPA-23 - SPA-24, quoting A-79 - A-80):

> [T]he law was clearly established at the time that First Amendment rights could be violated by the chilling effect of governmental action that falls short of a direct prohibition against speech but that can reasonably be interpreted as intimating that some form of punishment or adverse regulatory action will follow the failure to accede to the official's request.

(SPA-27) (citing A-81, citing *Zieper v. Metzinger*, 474 F.3d 60, 65 (2d Cir. 2007)). The District Court quoted its November 2018 Decision, stating that the First Amendment "require[s] courts to draw fine lines between permissible expressions of personal opinion [by public officials] and implied threats to employ coercive state power to stifle protected speech." (SPA-24, quoting A-81). The court concluded

that "after examining the totality of the allegations, and accepting the factual allegations as true," it had found in November 2018 that "[v]iewed in the light most favorable to the NRA," the Cuomo Press Release and the Guidance Letters, in the broader context, "could reasonably be interpreted as threats of retaliatory enforcement against regulated institutions that do not sever ties with the NRA." (*Id.*, quoting A-87 - A-88).

The District Court further stated that while it was "inclined to agree" that "there is no case clearly establishing that otherwise protected public statements transform into an unlawful threat merely because there is an ongoing, and unrelated, regulatory investigation," here the court had already previously found that "the context of the factual allegations asserted in the Amended Complaint, it was plausible to conclude that the combination of Defendants' actions, including Ms. Vullo's statements . . . could be interpreted as a veiled threat to regulated industries to disassociate with the NRA or risk DFS enforcement action." (SPA-25 - SPA-26). As noted at SPA-27, the District Court concluded that "a question of material fact exists as to whether Ms. Vullo explicitly threatened Lloyd's with DFS enforcement if the entity did not disassociate with the NRA," and therefore "even assuming an objectively reasonable person would not have known that the Guidance Letters or Ms. Vullo's statements in the Cuomo Press Release could be construed as implied

threats," qualified immunity on the First Amendment claims "must be denied at this time." (SPA-27).

Vullo now makes essentially the same arguments that were rejected below. She claims she is entitled to qualified immunity because the constitutional violation alleged was not "clearly established," "such that it was objectively unreasonable for the official to believe the challenged conduct was lawful." (Appellant's Br. at 33). Vullo, however, mischaracterizes the NRA's allegations and misconstrues the District Court's decision.

Vullo first spends considerable effort arguing that public officials have rights that are protected under the First Amendment. (*See* Appellant's Br. at 34-38). The NRA does not quarrel with this truism. The District Court held as much. (SPA-23 - SPA-24; A-82). However, the District Court correctly held that right does not extend to "implied threats to employ coercive state power to stifle protected speech." (SPA-24) (quoting *Hammerhead Enters., Inc. v. Brezenoff*, 707 F.2d 33, 39 (2d Cir. 1983)). Vullo argues that this Court's decision in *Hammerhead Enters.* is "instructive" because there the Court dismissed the First Amendment claim stating that the plaintiffs sought judicial rescue "from the sparks of controversy they ignited." (Appellant's Br. at 36-37, quoting *Hammerhead Enters.*, 707 F.2d at 35). So too, Vullo contends, she had a right use her "bully pulpit" to articulate her

"political perspective[s]" in opposition to the NRA's public advocacy. (*Id.* at 37-38).

Vullo's argument is a red herring. The NRA has not argued, and the District Court did not hold, that Vullo should have been precluded from stating her political opinions. The issue that Vullo avoids here—when accepting the truth of the allegations in the Second Amended Complaint, and giving the NRA all reasonable inferences from the facts alleged—is that questions of fact exist whether Vullo made *threats* to Lloyd's if it did not disassociate from the NRA, thus precluding Vullo's qualified immunity defense. (SPA-27).[5] As the District Court held, it clearly is established that the making of such threats is not protected speech and is actionable. (SPA-26 - SPA-27).

Similarly irrelevant is Vullo's argument that the law did not, in 2018, "clearly establish" that the Guidance Letters and Press Release were unlawful. (Appellant's Br. at 39-43). As the District Court pointed out in its November 2018 Decision, the NRA does not cite the Guidance Letters and Press Release in isolation, but rather

---

[5] In any event, this Court's decision in *Hammerhead Enters.* is readily distinguishable. That case came before this Court after the district court had dismissed the complaint at the end of a trial, not on a pre-discovery motion to dismiss. 707 F.2d at 38. There, this Court held that the appellants failed to *establish* that the government official could "reasonably be interpreted as intimating that some form of punishment or adverse regulatory action will follow the failure to accede to the official's request. *Id.* at 39. Nor could the appellants *establish* that the entities to whom the alleged threats were made were actually "deterred by official pronouncements." *Id.* Here, to the contrary, the NRA is not required to establish its claims, but rather that it has sufficiently pleaded facts precluding the qualified immunity defense being asserted by Vullo.

they must be read "in the context in which they were issued."  (A-80).  The District Court reiterated this reasoning in its Decision, finding that it was plausible to conclude that "*the combination* of Defendants' actions," including Vullo's statements in the Guidance Letters and Cuomo Press Release, as well as the purported "backroom exhortations," could be interpreted as a veiled threat to regulated entities such Lloyd's.  (SPA-26).

Likewise, a distraction is Vullo's contention that the NRA "cannot identify any case . . . establishing that a government official's criticism of private conduct or advocacy gives rise to a First Amendment retaliation or censorship claim, in the absence of an actual threat of government action."  (Appellant's Br. at 42-43).

First, once again, the NRA has not alleged mere "criticism of private conduct or advocacy" on Vullo's part, but rather, actual threats of governmental retaliatory action.  (SPA-27; A-87 - A-88).

Furthermore, Vullo cites to inapposite authority to advance this non-point.  In *Penthouse Intern., Ltd. v. Meese*, 939 F.2d 1011 (D.C. Cir. 1991), the case came up on appeal after a granting of summary judgment based upon qualified immunity. There, a commission tasked with examining the issue of pornography, appointed by the U.S. Attorney General, sent a letter to certain companies identified as having distributed pornography, advising them of allegations that the companies were "involved in the sale or distribution of pornography."  *Id.* at 1013.  The plaintiff,

Penthouse International, argued that the defendant members of the commission had acted unconstitutionally, but the D.C. Circuit found that the commission lacked prosecutorial power, and never "threatened to use the coercive power of the state against the recipients of the letter." *Id.* at 1015. Here, to the contrary, the NRA's factual allegations, taken in combination, were sufficient to allege that Vullo had made implicit threats of adverse action against financial institutions and insurers that did not disassociate from the NRA. (SPA-26). Moreover, as the District Court held, there are open questions of fact concerning those alleged threats that must be answered in discovery, precluding qualified immunity at the motion to dismiss stage. (SPA-27).[6]

Vullo makes the same argument with respect the allegations of threats set forth in paragraphs 21 and 69 of the Second Amended Complaint. Vullo concedes that "the First Amendment prohibits implied threats to employ coercive state power to stifle protected speech," but that principle does not "clearly establish" the law in the "particular circumstances" of this case. (Appellant's Br. at 45). Vullo relies on this

---

[6] For the same reason, Vullo's reliance on *American Family Ass'n, Inc. v. City and County of San Francisco*, 277 F.3d 1114 (9th Cir. 2002) is unavailing. There, the defendants, the City and County of San Francisco, passed a resolution disapproving of plaintiffs' advertising campaign that espoused negative views regarding homosexuality, and urged television stations not to air such advertisements. 277 F.3d at 1125. The Ninth Circuit held that the district court had properly dismissed plaintiffs' free speech claim because "there was no sanction or threat of sanction" if defendants did not cease their speech or if the television stations did not stop airing the advertisements. *Id.* Here, to the contrary, as discussed above, the NRA has alleged threats of governmental actions by Vullo to the regulated entities.

45

Court's decision in *Zieper* for the proposition that "more than protected hortatory public remarks, and vague and passing private indications, is required to cross the line into patently-unlawful conduct, where the connection between the conduct and the speech it purports to disfavor is so non-specific and highly attenuated." (*Id.* at 46-47). Vullo contends that, in her opinion, the conduct at issue in *Zieper* was "far worse" that what the NRA alleges, yet the Court still applied qualified immunity. (*Id.* at 46).

Vullo's reliance on *Zieper* is fundamentally misplaced. There, unlike in the instant Appeal, this Court was considering an appeal following discovery and the district court's grant of summary judgment to the defendant government officials on the basis of qualified immunity. 474 F.3d at 65. The plaintiff-appellant was a filmmaker who had produced and distributed on the Internet a film depicting a military takeover of Times Square on New Year's Eve of 1999. *Id.* at 63. The plaintiff alleged that the co-defendant, an FBI agent named Metzinger, had visited the plaintiff's home with police. *Id.* at 63. Metzinger asked for information about the film, told the plaintiff that it might upset people and asked if the FBI could prevent people from seeing the film. *Id.* at 63-64. The plaintiff was not forthcoming and the next day, Metzinger spoke with the plaintiff's attorneys. *Id.* at 64. Subsequently, Metzinger and the co-defendant, an Assistant United States Attorney named Korologos, called the co-plaintiff, whose company hosted the website that

featured the film. *Id.* Metzinger and Korologos stated that they feared the film would cause a riot and asked the co-plaintiff to block access to the website, which the co-plaintiff did. *Id.* Neither defendant had any further communication with the plaintiffs, and several days later, the website and the film were again made accessible. *Id.* at 65.

This Court affirmed the district court, engaging in a fact intensive analysis, observing that at the time of the defendants' actions, "it was well-established" that the defendants could "exhort private entities" to "remove speech" so long as they did not engage in "any threat, coercion, or intimidation" when doing so. *Id.* The Court held that "it was clearly lawful for defendants to request that plaintiffs remove from the internet a video which they may have believed posed a danger to the public safety . . . so long as none of their statements or actions might reasonably be interpreted as coercive." *Id.* at 68. The Court held that the defendants were entitled to summary judgment dismissing the action based on qualified immunity because "the cases in which we have held that individuals' First Amendment rights were violated involved conduct more likely to be perceived as threatening than that here." *Id.* at 68. Thus, the defendants "could reasonably believe" that their language "would be interpreted as simply an explanation of why they were concerned about the video and not a threat of prosecution under the criminal statute," falling "considerably short of the thinly veiled threats" present in other cases. *Id.* at 70.

Thus, in *Zieper*, this Court held—on a motion for summary judgment after discovery had been conducted—that the defendants were entitled to qualified immunity because they had made no threats. Contrary to Vullo's unsupportable contention that the facts of *Zieper* are "far worse" than in this Appeal, *Zieper* is therefore readily distinguishable.

Moreover, Vullo conspicuously fails to cite an earlier decision of this Court in the same *Zieper* case, which considered the same defendants' *motion to dismiss* on the basis of qualified immunity. *See Zieper v. Metzinger*, 62 F. App'x 383 (2d Cir. 2003). There, this Court held that "[t]o the extent that the appeal challenges the district court's conclusion that discovery is necessary in order to resolve factual issues related to the defendants' qualified immunity defense, we have no jurisdiction to consider the appeal."[7] *Id.* at 386. The Court therefore dismissed the appeal. *Id.* Thus, not only is the *Zieper* decision relied on by Vullo inapposite to the issues

---

[7] Remarkably similar to this Appeal, the district court in *Zieper* denied the defendants' motion to dismiss on the ground of qualified immunity, precisely because discovery was required to determine the issue:

> Whether the conduct of SA Metzinger and AUSA Korologos was objectively reasonable requires an evaluation (discovery) of (several) issues of fact, including, among others: the nature of Defendants' communications to Plaintiffs, the circumstances surrounding Defendants' actions . . . whether such actions were an appropriate and/or proportional response to issues and concerns of public safety; and, the circumstances surrounding the airing of the Film. At this juncture, it is premature to conclude, as a matter of law, that the Defendants' conduct was (or was not) objectively reasonable.

*Zieper v. Reno*, No. 00 CIV. 5594(RMB), 2002 WL 1380003, *8 (S.D.N.Y. June 26, 2002); aff'd in part, dismissed in part *sub nom*. *Zieper v. Metzinger*, 62 F. App'x 383 (2d Cir. 2003).

before the Court, the *Zieper* decision blatantly ignored by Vullo is squarely on point and requires the dismissal of her Appeal for lack of jurisdiction. (*See supra* Section VI.B).

### 3. Vullo's Self-Serving Demand for a Case Reflecting Her Counter-Factual Points Misconstrues Controlling Law and Mischaracterizes the Facts

Finally, Vullo makes another meritless argument, asserting that the NRA "can cite no case . . . that clearly establishes a constitutional violation where the 'particular circumstances,' *id.*, mirror—or are even remotely similar to—the Alleged Private Indications." (Appellant's Br. at 48). Vullo specifically demands a case, where:

> (1) the allegedly coercive speech was not alleged as speech or communication at all—but rather only in vague and conclusory terms ("made clear," "less interested," etc.); (2) the implied threat was of an allegedly retaliatory investigation of conduct that was known and alleged to have been unlawful; (3) the allegedly-coercive statement was a suggestion that the government would refrain from taking entirely lawful action, such as enforcing the law against "technical regulatory infractions;" or (4) an offer of leniency from a law enforcement officer in exchange for cooperation violates the First Amendment.

(*Id.*). Vullo's argument again misconstrues the law and mischaracterizes the factual allegations.

**First**, both the Supreme Court and this Court have held that the NRA is not required to cite a case directly on point to sufficiently allege that Vullo violated

clearly established constitutional rights.[8]  The Supreme Court has held that "officials

can still be on notice that their conduct violates established law even in novel factual

circumstances."  *Hope v. Pelzer*, 536 U.S. 730, 740-41 (2002).   As the Supreme

Court has explained, if the prevailing standard were to the contrary, it would produce

absurd results:

> [G]eneral statements of the law are not inherently incapable of giving
> fair and clear warning, and in other instances a general constitutional
> rule already identified in the decisional law may apply with obvious
> clarity to the specific conduct in question, even though the very action
> in question has [not] previously been held unlawful.... The easiest cases
> don't even arise. There has never been ... a section 1983 case accusing
> welfare officials of selling foster children into slavery; it does not
> follow that if such a case arose, the officials would be immune from
> damages [or criminal] liability.

---

[8] Notwithstanding, *Rattner v. Netburn*, 930 F.2d 204 (2d Cir. 1991) is such a case. *Id*. at 208 (Reversing the District Court's granting summary judgement to defendant on plaintiff's First Amendment claims in circumstances remarkably like this case). In *Rattner*, a local government official sent a letter to a chamber of commerce newspaper protesting that it ran a paid advertisement criticizing the government's use of taxpayer funds. *Id.* at 206. When questioned about the letter, the official read it aloud and listed numerous local businesses at which he regularly shopped. *Id.* The statements "caused consternation among Chamber members, who knew that [the official] was the Mayor's 'right-hand man.'" *Id.* Local officials "testified that they regarded the letter coupled with the official's statement that he had made a list, clearly threatened boycott or other retaliatory action, including discriminatorily strict enforcement of parking and zoning regulations." *Id.* Accordingly, the chamber stopped publishing the newspaper and prevented the advertiser from including his pre-paid advertisement in the newspaper's final issue. *Id.* at 206-07. In reversing the District Court, this Court held that, "[i]n the present case, the record, taken in the light most favorable to Rattner, reveals statements by [the official] that a reasonable factfinder could, in the words of *Hammerhead*, 'interpret[ ] as intimating that some form of punishment or adverse regulatory action w[ould] follow if the Gazette continued to air Rattner's views." *Id.* at 209. Further, this Court noted that "[h]ere, in contrast [to *Hammerhead*], a threat was perceived and its [economic] impact was demonstrable." *Id.* (emphasis added).

*United States v. Lanier*, 520 U.S. 259, 271 (1997). Relying on this precedent, this Court has concluded that "[t]here need not be 'a case directly on point for a right to be clearly established,' so long as existing precedent has 'placed the statutory or constitutional question beyond debate.'" *Pourkavoos*, 823 F. App'x at 61 (citing *White v. Pauly*, 137 S. Ct. 548, 551 (2017)). Thus, this Court has "cautioned against 'convert[ing] the fair notice requirement into a presumption against the existence of basic constitutional rights.'" *Id.* (citing *Edrei*, 892 F.3d at 540).

In *Pourkavoos*, as in this Appeal, the defendant argued that he was entitled to qualified immunity because the plaintiff "'has pointed to no decision from this Court or the United States Supreme Court' that would have put [defendant] on notice that his conduct in pursuing a prosecution of [plaintiff] and causing his arrest was unlawful." *Id.* at 61. This Court rejected that argument, stating that the defendant's "articulation of the legal standard, in which he would require a case that 'involv[es] a warrant application under similar facts and circumstances, regarding similar charges against a physician' to show 'clearly established law,' is far too narrow." *Id.* To hold otherwise, the Court explained, "would be akin to 'saying police officers who run over people crossing the street illegally can claim immunity simply because we have never addressed a Fourteenth Amendment claim involving jaywalkers." *Id.*

Accordingly, Vullo's demand for a narrowly tailored case with precisely similar facts to this one is inconsistent with this Court's precedent.

**Second**, in any event, as she does repeatedly, Vullo mischaracterizes the allegations set forth in the Second Amended Complaint, and the District Court's factual findings. Thus, at this motion to dismiss stage, rather than take the allegations asserted as true—as she is required to do—Vullo instead argues with contrary facts not alleged. Her attempt to set up a strawman case that must be found to have precedent should be rejected.

For example, Vullo again contends that her threats were "not alleged as speech or communication at all." (Appellant's Br. at 48). As discussed above (pp. 35-40), this is false. Furthermore, with respect to Vullo's insistence for a case dealing with an implied threat "of an allegedly retaliatory investigation of conduct that was known and alleged to have been unlawful," the District Court found that the NRA had alleged that "Chubb, Lockton, and Lloyd's 'were coerced to terminate their business arrangements with the NRA and its members—including arrangements having nothing to do with the allegedly unlawful conduct cited by DFS." (SPA-5, citing Sec. Am. Comp. at ¶¶ 21, 93, 102).

Similarly misplaced is Vullo's demand for precedent reflecting "a suggestion that the government would refrain from taking entirely lawful action" and "an offer of leniency from a law enforcement officer in exchange for cooperation." (Appellant's Br. at 48). On this point, the District Court drew no distinction whether an official may threaten retaliatory governmental enforcement action which—

without such threat—may otherwise be lawful: "the First Amendment prohibits government officials from encouraging the suppression of speech in a manner which 'can reasonably be interpreted as intimating that some form of punishment or adverse regulatory action will follow the failure to accede to the official's request.'" (SPA-24, citing *Zieper*, 474 F.3d at 65-66). The District Court further held that:

> [B]ecause Ms. Vullo's alleged implied threats to Lloyd's and promises of favorable treatment if Lloyd's disassociated with the NRA could be construed as acts of bad faith in enforcing the Insurance Law in New York, a question of material fact exists as to whether she is entitled to qualified immunity under New York law.

(SPA-27). Again, the court here was explicitly considering an impermissible alleged offer of leniency made by Vullo in exchange for Lloyd's disassociating with the NRA.[9]

Accordingly, Vullo's self-serving, counter-factual demand for specific case precedent is meritless.

---

[9] Indeed, not only is a threat by a government official to refrain from using her regulatory powers actionable, but this Court has also held a public official "who threatens to employ coercive state power to stifle protected speech violates a plaintiff's First Amendment rights even if the public-official . . . lacks direct regulatory or decisionmaking authority over the plaintiff." *Okwedy v. Molinari*, 333 F.3d 339, 340-41 (2d Cir. 2003).

## VII.

## <u>CONCLUSION</u>

For the reasons set forth above, Plaintiff-Appellee National Rifle Association of America respectfully requests that Vullo's interlocutory Appeal of the Decision of the District Court denying her motion to dismiss pursuant to Rule 12(b)(6) be: (a) dismissed for lack of jurisdiction; or (b) if this Court determines that it has jurisdiction to hear the Appeal, the Decision should be affirmed.

Dated: August 16, 2021
  New York, NY

     Respectfully submitted,

     By: */s/ Mordecai Geisler*
      William A. Brewer III
      wab@brewerattorneys.com
      Sarah B. Rogers
      sbr@brewerattorneys.com
      Mordecai Geisler
      mxg@brewerattorneys.com
      BREWER, ATTORNEYS & COUNSELORS
      750 Lexington Avenue, 14th Floor
      New York, New York 10022
      Telephone: (212) 489-1400
      Facsimile: (212) 751-2849

     **ATTORNEYS FOR**
     **PLAINTIFF-APPELLANT**
     **NATIONAL RIFLE ASSOCIATION**
     **OF AMERICA**

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify pursuant to Federal Rule of Appellate Procedure 32(g), and Local Rule 32.1(a)(4)(A) that the attached brief is proportionally spaced, has a typeface (Times New Roman) of 14 points, and contains 13,032 words (excluding, as permitted by Federal Rule of Appellate Procedure 32(f), the cover page, the table of contents, the table of authorities, the certificate of compliance, and the signature block), as counted by the Microsoft Word processing system used to produce this brief.

Dated: August 16, 2021
New York, NY

By:    */s/ Mordecai Geisler*
Mordecai Geisler