# 21-0636-CV

## United States Court of Appeals

*for the*

## Second Circuit

───────◆───────

NATIONAL RIFLE ASSOCIATION OF AMERICA,

*Plaintiff-Appellee*,

— v. —

MARIA T. VULLO, both individually and in her former official capacity,

*Defendant-Appellant*,

ANDREW CUOMO, both individually and in his official capacity, THE NEW YORK STATE DEPARTMENT OF FINANCIAL SERVICES,

*Defendants.*

───────────────────

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

## REPLY BRIEF FOR DEFENDANT-APPELLANT

ANDREW G. CELLI JR.
DEBRA L. GREENBERGER
MARISSA R. BENAVIDES
EMERY CELLI BRINCKERHOFF ABADY
  WARD & MAAZEL LLP
*Attorneys for Defendant-Appellant*
600 Fifth Avenue, 10th Floor
New York, New York 10020
(212) 763-5000

TABLE OF CONTENTS

PAGE NO.

TABLE OF AUTHORITIES ......................................................................ii-iii

PRELIMINARY STATEMENT ..............................................................1

ARGUMENT ..............................................................................................2

I.    THIS COURT HAS JURISDICTION TO HEAR MS. VULLO'S APPEAL OF THE DENIAL OF QUALIFIED IMMUNITY ..............2

    A.    Whether a Plaintiff Has Stated a Claim Is a Question of Law......................................................................................3

    B.    Whether the Conduct Described in the SAC Violates a "Clearly Established" Constitutional Right Is a Question of Law......................................................................................4

    C.    For Purposes of this Appeal, Ms. Vullo Does Not Dispute the *Well-Pleaded* Allegations in the SAC..................................6

II.    THE NRA'S ALLEGATIONS DO NOT STATE A COLORABLE FIRST AMENDMENT CLAIM AGAINST MS. VULLO.................8

    A.    The NRA Offers No Specific Allegations of Coercive Conduct by Ms. Vullo..................................................................8

III.    THE NRA CANNOT CITE ANY CASE CLEARLY ESTABLISHING THAT MS. VULLO'S ALLEGED CONDUCT VIOLATES THE FIRST AMENDMENT.........................................11

    A.    The NRA Has Not Identified a Single Case that Clearly Establishes the Unconstitutionality of Ms. Vullo's Alleged Conduct ..................................................................................12

    B.    Ms. Vullo's Alleged Conduct Was Protected Speech and a Lawful Exercise of her Duties as Superintendent....................19

CONCLUSION.........................................................................................23

CERTIFICATE OF COMPLIANCE.......................................................25

i

## TABLE OF AUTHORITIES

PAGE NO.

**Cases**

*A Brighter Day, Inc. v. Barnes*,
No. 20-1054, 2021 WL 2411882 (10th Cir. June 14, 2021) ..........................4

*Anderson v. Creighton*,
483 U.S. 635 (1987).......................................................................................5

*Ashcroft v. al-Kidd*,
563 U.S. 731 (2011).....................................................................................11

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009).......................................................................... 3, 4, 6, 11

*Bond v. Floyd*,
385 U.S. 116 (1966).....................................................................................20

*Cowan ex rel. Est. of Cooper v. Breen*,
352 F.3d 756 (2d Cir. 2003) ..........................................................................7

*D.C. v. Wesby*,
138 S. Ct. 577 (2018)............................................................................ 12, 13

*Elder v. Holloway*,
510 U.S. 510 (1994).......................................................................................5

*EM Ltd. v. Banco Central De La Republica Arg.*,
800 F.3d 78 (2d Cir. 2015) ...........................................................................3

*Gravel v. United States*,
408 U.S. 606 (1972).....................................................................................20

*Hammerhead Enterprises, Inc. v. Brezenoff*,
707 F.2d 33 (2d Cir. 1983) ..........................................................................20

*Hope v. Peltzer*,
536 U.S. 730 (2002).....................................................................................13

*Locurto v. Safir*,
    264 F.3d 154 (2d Cir. 2001) .............................................................................5

*Martinez v. City of Schenectady*,
    115 F.3d 111 (2d Cir. 1997) ...........................................................................6

*Morgan v. Dzurenda*,
    956 F.3d 84 (2d Cir. 2020) ...........................................................................10

*O'Bert ex rel. Est. of O'Bert v. Vargo*,
    331 F.3d 29 (2d Cir. 2003) .............................................................................7

*Okwedy v. Molianari*,
    333 F.3d 339 (2d Cir. 2003) .........................................................................22

*Rattner v. Netburn*,
    930 F.2d 204 (2d Cir. 1991) .........................................................................17

*Rondigo, L.L.C. v. Twp. of Richmond*,
    641 F.3d 673 (6th Cir. 2011) ...........................................................................4

*Sound Aircraft Servs., Inc. v. Town of E. Hampton*,
    192 F.3d 329 (2d Cir. 1999) ...........................................................................6

*Tierney v. Davidson*,
    133 F.3d 189 (2d Cir. 1998) ...........................................................................7

*Tooly v. Schwaller*,
    919 F.3d 165 (2d Cir. 2019) ...........................................................................5

*United States v. Lanier*,
    520 U.S. 259 (1997)......................................................................................13

*Zieper v. Metzinger*,
    62 F. App'x 383 (2d Cir. 2003) ....................................................................19

*Zieper v. Metzinger*,
    474 F.3d 60 (2d Cir. 2007) ...........................................................................19

iii

## PRELIMINARY STATEMENT

The NRA's brief is a case study in missing the point.  Unable to fill the gaping holes that exist in its Second Amended Complaint ("SAC"), Joint Appendix ("JA") 135-78, the NRA falls back on arguments such as "because the District Court said so" and "as alleged in the SAC, 'the threat [from Ms. Vullo] was clear and unambiguous.'"  NRA Br. 36, Dkt. 45 (quoting SAC ¶ 21).  This is *ipse dixit*, and it is not enough—not nearly enough—to satisfy Rule 12.  And, because it cannot deny the constitutional principle that a government official's speech is as weighty and as protected by the First Amendment as anyone else's— and that there is nothing coercive about an official who both exercises her right to speak and faithfully carries out her duty to enforce the law—the NRA simply ignores theses points and drives on.

Three-plus years into this litigation, having been given every opportunity to support its claims with specifics, the NRA offers rhetoric and recriminations—but not a single, specific factual allegation of coercive speech or conduct on the part of Maria Vullo.  Likewise, in more than 50 pages of briefing, the NRA offers not one case that shows that the constitutional rule it relies on to hold Ms. Vullo liable was "clearly established" in 2018 (or since).  No such case exists, and with good reason.  It is not the law—and is certainly not "clearly established"—that a public official's constitutionally-protected speech on an issue

1

of public concern (as the April 2018 Guidance Letters and the Press Release[1]

indisputably were) "becomes coercive" merely because the same official has been

separately engaged in non-public regulatory investigations of entities that

subsequently admitted to violations of law. Such a rule is alien to the

jurisprudence of protected government speech.

No constitutional case can survive without specific factual allegations

of misconduct; and qualified immunity must be granted unless the plaintiff can

show the official's conduct violated "clearly-established" constitutional norms.

Here, both the requisite facts, and the requisite law, are missing. The time has

come for the case against Maria Vullo to end. This brief, along with our Opening

Brief, explains why.

## ARGUMENT

## I.    THIS COURT HAS JURISDICTION TO HEAR MS. VULLO'S APPEAL OF THE DENIAL OF QUALIFIED IMMUNITY

The NRA's argument that this Court lacks appellate jurisdiction over

the instant appeal borders on sanctionable. The law is clear: appellate jurisdiction

exists where an appeal from the denial of qualified immunity raises questions of

law. This appeal raises two questions: *first*, whether, under *Ashcroft v. Iqbal*, 556

_____

[1] In this brief, Appellant relies upon the same terms defined in her Opening Brief, Dkt. 29, dated May 17, 2021 ("Op. Br.").

U.S. 662, 672-75 (2009), the SAC states a claim for First Amendment retaliation;

and *second*, whether it was "clearly established" that the conduct the SAC

attributes to Ms. Vullo—speaking on matters of public concern while overseeing a

separate regulatory investigation—is coercive in violation of the First Amendment.

Both are questions of law and thus both are proper subjects of interlocutory

appellate review.

## A. Whether a Plaintiff Has Stated a Claim Is a Question of Law

The rule of *Iqbal* is well-settled: in evaluating a qualified immunity

defense asserted at the pleading stage, the sufficiency of the complaint—i.e.,

whether a plaintiff has alleged facts sufficient to state a constitutional claim and

overcome a claim of qualified immunity—is an issue of law appropriate for

appellate review under the collateral order doctrine. *Iqbal*, 556 U.S. at 672-75

(collateral order doctrine allows review of denial of qualified immunity on motion

to dismiss when allegations are insufficient to state a constitutional violation); *see*

*EM Ltd. v. Banco Central De La Republica Arg.*, 800 F.3d 78, 88-89 (2d Cir.

2015) (appellate review of denial of motion to dismiss on sovereign immunity

grounds is proper when sufficiency of the pleadings is at issue). *Iqbal* asks

3

whether the plaintiff has "plausibly" alleged a constitutional violation.  That

question is a legal one, and it is for this Court.[2]

 Ms. Vullo's motion to dismiss, and now this appeal, rests initially on

the proposition that the SAC fails to allege facts sufficient to state a claim of First

Amendment retaliation, and to overcome the defense of qualified immunity.  In the

court below, Ms. Vullo argued that the SAC must be dismissed because it does not

specifically or plausibly allege that Ms. Vullo engaged in coercive conduct.  JA

306.  The lower court disagreed, holding that the SAC's allegations met the legal

standard of *Iqbal*.  That is the first issue now on appeal.  Whether the SAC alleges

facts with the specificity and plausibility required by *Iqbal*, in a case involving the

defense of qualified immunity, is a question of law squarely within this Court's

appellate jurisdiction.

### B. Whether the Conduct Described in the SAC Violates a "Clearly Established" Constitutional Right Is a Question of Law

 A government official is entitled to qualified immunity unless it was

"clearly established" at the time she acted that the official's conduct would violate

---

[2] *See, e.g.*, *A Brighter Day, Inc. v. Barnes*, No. 20-1054, 2021 WL 2411882, at *3 (10th Cir. June 14, 2021) ("[C]ircuit courts have jurisdiction to review the sufficiency of the allegations in interlocutory appeals from denials of qualified immunity." (citing *Iqbal*)); *Rondigo, L.L.C. v. Twp. of Richmond*, 641 F.3d 673, 680 (6th Cir. 2011) ("If the state defendants' appeal is reasonably construed as challenging the district court's ruling on the adequacy of the pleadings to state a claim in avoidance of qualified immunity, then, clearly, immediate review is available and we have jurisdiction.").

the Constitution. *Anderson v. Creighton*, 483 U.S. 635, 640 (1987); *see* Op. Br. 33. The question of whether the law was "clearly established" is a legal one, appropriate for interlocutory appellate review. *Locurto v. Safir*, 264 F.3d 154, 164-65 (2d Cir. 2001) ("[A]n appellate court may exercise jurisdiction to review an interlocutory appeal that questions whether—on the plaintiff's version of the facts—defendant's actions violated the plaintiff's clearly established constitutional rights as a matter of law."); *see also Elder v. Holloway*, 510 U.S. 510, 516 (1994) ("Whether an asserted federal right was clearly established at a particular time, so that a public official who allegedly violated the right has no qualified immunity from suit, presents a question of law, not one of 'legal facts.'").[3]

This case presents just such a question: was it "clearly established," in 2018, that a government official with regulatory and investigatory authority would be violating the First Amendment if she made constitutionally-protected statements (the Guidance Letters and the Press Release) critical of the public-policy position of one entity, in the midst of an unrelated and preexisting regulatory investigation of a different entity? This question is a legal one that can only be answered based on a survey of the case law. This Court plainly has jurisdiction to answer it.

---

[3] As this Court has more recently put the matter, the Court of Appeals has jurisdiction over an interlocutory appeal "to decide whether, on the facts alleged by [Plaintiff], [Defendant] is entitled to qualified immunity as a matter of law." *Tooly v. Schwaller*, 919 F.3d 165, 172 (2d Cir. 2019), *cert. denied*, 140 S. Ct. 1221 (2020), *reh'g denied*, 140 S. Ct. 2757 (2020).

5

### C.     For Purposes of this Appeal, Ms. Vullo Does Not Dispute the *Well-Pleaded* Allegations in the SAC

Finally, eager to evade this Court's jurisdiction, the NRA cites the District Court's conclusion that "a question of material fact exists as to whether Ms. Vullo explicitly threatened Lloyd's with enforcement if the entity did not disassociate with the NRA." Special Appendix ("SPA") 27. On this basis, the NRA asserts, this Court lacks jurisdiction to hear the instant appeal.

This is nonsense. As this Court held in *Martinez v. City of Schenectady*, "[s]imply declaring that genuine issues of fact exist is not sufficient, in and of itself, to prevent an appeal." 115 F.3d 111, 114 (2d Cir. 1997).

This Court's review of a district court's denial of motion to dismiss on qualified immunity grounds is *de novo*. *Sound Aircraft Servs., Inc. v. Town of E. Hampton*, 192 F.3d 329, 333 (2d Cir. 1999). That the District Court found that the NRA sufficiently pleaded that Ms. Vullo (somehow) made threats in no way precludes this Court's *de novo* review. As detailed in our Opening Brief, the SAC's allegations of "coercion" are conclusory, are not "well-pled," and do not specifically allege any threat; that is a central issue on appeal. Op. Br. 25-32. Conclusory allegations alone do not create a "fact question" sufficient to warrant denial of qualified immunity at the pleadings stage. That is a central precept of *Iqbal* and its progeny. As the Supreme Court held in *Iqbal*, "Rule 8 . . . does not

unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." 556 U.S. at 678.

Moreover, "even where the district court rules that material disputes of fact preclude summary judgment on qualified immunity, '[this Court] may still exercise interlocutory jurisdiction if the defendant . . . contends that [s]he is entitled to qualified immunity even under plaintiff's version of the facts." *Cowan ex rel. Est. of Cooper v. Breen*, 352 F.3d 756, 761 (2d Cir. 2003) (quoting *Tierney v. Davidson*, 133 F.3d 189, 194 (2d Cir. 1998)).[4] That principle applies here as well. For purposes of this appeal, Ms. Vullo accepts the well-pleaded facts as true.[5] She simply asserts, as is her right, that dismissal is nevertheless required as a matter of law. This Court is empowered to review her appeal on that basis.

---

[4] *See O'Bert ex rel. Est. of O'Bert v. Vargo*, 331 F.3d 29, 38 (2d Cir. 2003) ("[W]here the district court has denied a qualified-immunity-based motion for summary judgment on the ground that there are triable issues as to which party's version of the facts is to be accepted, a defendant may pursue an immediate appeal . . . contending that the facts asserted by the plaintiff entitle [the defendant] to the defense of qualified immunity as a matter of law." (cleaned up)).

[5] The NRA's overwrought protestations to the contrary notwithstanding, Ms. Vullo has consistently and explicitly accepted the proposition that, for purposes of making arguments relevant to this appeal, the well-pleaded allegations of the SAC must be treated as true. Op. Br. 3, 17, 24. Nothing in Ms. Vullo's brief suggests otherwise. As a distinguished lawyer with an unblemished record of service to the public, both in government and private practice, Maria Vullo is entitled to state, in public papers, that the allegations lodged against her by the NRA are false. She does so not because she fails to understand or accept the procedural posture in which this case rests; she does so to protect her hard-earned professional and personal reputation and as a matter of integrity.

7

## II.    THE NRA'S ALLEGATIONS DO NOT STATE A COLORABLE FIRST AMENDMENT CLAIM AGAINST MS. VULLO

Three years, three versions of the complaint, and now a 50-page appellate brief later, the NRA *still* hasn't stated a claim against Maria Vullo, because the core defect of the Second Amended Complaint remains uncured:  the SAC never alleges, specifically, what Ms. Vullo is alleged to have said or done in the (alleged) Lloyd's meeting that was "coercive," or how conduct that allegedly occurred in February 2018 could "become coercive" by virtue of constitutionally-protected statements that Ms. Vullo made two months later (the April 2018 Guidance Letters and the Press Release).  Because the NRA cannot fix this fundamental defect in the SAC, it simply repeats the same vague, passive-voice, and conclusory allegations ("made clear," "less interested," "avoid liability" "the threat was clear and unambiguous") that it has made from Day One.  These allegations simply are not sufficient.

### A.    The NRA Offers No Specific Allegations of Coercive Conduct by Ms. Vullo

The central allegations in the case against Maria Vullo remain as they always have been:  vague and conclusory, devoid of specifics.  The allegations that Ms. Vullo engaged in coercive conduct are as follows: "Vullo *made it clear* . . . that DFS was *less interested* in pursuing the infractions . . ."; and "Vullo and DFS *made clear* that Lloyd's could *avoid liability* . . ."  JA 144, 162 (SAC ¶¶ 21, 69).

8

In its brief, the NRA suggests that these allegations must be understood "in the context" of later-occurring protected statements (the Guidance Letters and the Press Release). But, in the pleading itself, which is what should be judged, the NRA simply does not allege what it is specifically that Maria Vullo said or did that it believes violates constitutional law. The NRA doesn't *plead* these facts because the NRA doesn't *have* any such facts.

The specificity with which the NRA alleges *other* matters—including *lawful* conduct on Ms. Vullo's part—is striking when contrasted with the vague terms that the NRA uses to suggest coercive conduct. In SAC Paragraph 21, for example, the NRA alleges: "During the meetings [with Lloyd's executives] [Vullo] discussed an array of technical regulatory infractions plaguing the affinity-insurance marketplace." JA 144 (SAC ¶ 21). Accepting this allegation as true for present purposes, Paragraph 21 says exactly what Ms. Vullo did that was lawful— she "*discuss*[*ed*]" a law-enforcement topic with Lloyd's—and it explains precisely what that topic was—"regulatory infractions plaguing the affinity-insurance marketplace." But, when the moment comes for the NRA to allege with specificity what Ms. Vullo allegedly did that was "coercive" (or what it would claim later *became* coercive*)*, the NRA all but goes silent. We are offered this: "Vullo *made it clear* that DFS was *less interested* in pursuing the infractions. . ."—language that is devoid of meaning. The NRA never even attempts to explain how "making

9

[something] clear" about having "less interest" in certain "infractions" is related to, much less can "become coercive" because of, hortatory statements made two months later in the Guidance Letters and the Press Release. There is nothing coercive about any of this.

Exactly the same "bait and switch" occurs at Paragraph 69. The NRA is crystal clear in alleging statements by Ms. Vullo that are lawful and clearly part of her responsibilities ("Vullo acknowledged the widespread regulatory issues in the excess-line marketplace"). JA 162 (SAC ¶ 69). But it retreats to the passive voice—and it conflates Ms. Vullo with DFS itself, a 1400-person state agency [6]— when the time comes to describe *specifically* the conduct that is alleged to have been "coercive": "Vullo *and DFS made clear* that Lloyd's could *avoid liability* for

---

[6] In a transparent effort to reconcile the timing problem of complaining about conduct that occurred in an alleged February 2018 meeting based on the content of protected statements that occurred two months later, the NRA alleges that an April 11, 2018 investigatory letter from *DFS* (not Ms. Vullo) to Lloyd's was somehow "choreographed." JA 162 (SAC ¶ 69). Not only is such an allegation bereft of substance (choreographed by whom precisely—and how?) and thus not well-pleaded, it does nothing to give rise to an inference of coercion. To the contrary, if the claim is that Lloyd's and DFS together "choreographed" the sending of an investigatory letter, that would suggest the opposite of "coercion"; it would suggest cooperation.

Moreover, this allegation is an example of the NRA inappropriately seeking to tag Ms. Vullo personally with conduct by her agency—when the law is clear that individual liability requires "personal involvement" in the relevant conduct. *Morgan v. Dzurenda*, 956 F.3d 84, 89 (2d Cir. 2020) ("[G]overnment officials may not be held liable for the unconstitutional conduct of their subordinates" absent allegations of their "personal involvement" in the alleged conduct.).

10

infractions relating to other, similarly situated insurance policies, so long as it aided DFS's campaign against gun groups." *Id.* Here again, the allegations have no substantive meaning.

The allegations in Paragraphs 21 and 69 are the *only* proffered basis for the NRA's claim that Ms. Vullo engaged in coercive conduct. They are not enough.

The NRA cannot cure this fatal defect by waving its "pleading wand." The bald allegation, found at SAC Paragraph 21, that "[t]he threat was clear and unambiguous," does not render specific and factual that which is vague and conclusory. An assertion that "the threat was clear and unambiguous" is neither "factual" nor "well-pleaded," in the terms that *Iqbal*, 556 U.S. at 679, and its progeny require. For Rule 12 purposes, *ipse dixit* just doesn't count. There being no specific, plausible allegations of coercive conduct on the part of Ms. Vullo, the Second Amended Complaint must be dismissed.

## III. THE NRA CANNOT CITE ANY CASE CLEARLY ESTABLISHING THAT MS. VULLO'S ALLEGED CONDUCT VIOLATES THE FIRST AMENDMENT

Far from the circumstance where "existing precedent . . . [has] placed the statutory or constitutional question beyond debate," *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011), here, there is *no* precedent that establishes that conduct of

11

the sort ascribed to Maria Vullo in the SAC gives rise to a First Amendment violation. The NRA cites no case that holds that the constitutionally-protected speech of a high official (the Guidance Letters and the Press Release), coupled with routine enforcement action prompted by admitted violations of law, "become[s] coercive" or can give rise to a "censorship regime," in violation of the First Amendment. Indeed, the case law is entirely to the contrary. Adopting the NRA's novel view of the First Amendment would effect a radical change in the law, chilling government officials both in the lawful exercise of their prosecutorial powers and in their speech, particularly where litigation-inclined advocacy groups and well-financed regulated entities are legitimately the targets of law enforcement scrutiny.

### A. The NRA Has Not Identified a Single Case that Clearly Establishes the Unconstitutionality of Ms. Vullo's Alleged Conduct

The law is clear: an officer may only be deprived of qualified immunity when it is "clearly established," with a "high degree of specificity," that the conduct s/he engaged in is unconstitutional. *D.C. v. Wesby*, 138 S. Ct. 577, 590 (2018). Here, the NRA wrongly urges this Court to "define clearly established law at a high level of *generality*." *Id.* (emphasis added). This is exactly what the Supreme Court said courts "must not" do, "since doing so avoids the crucial

12

question whether the official acted reasonably in the particular circumstances that he or she faced." *Id.*

All but conceding that there is no specific case on point, the NRA cites *Hope v. Peltzer*, 536 U.S. 730, 741 (2002) and *United States v. Lanier*, 520 U.S. 259, 271 (1997), for the proposition that, in rare and extreme situations, general principles of law, as opposed to cases with similar specific fact patterns, can serve to "clearly establish" the illegality of "novel circumstances"—like "a case accusing welfare officials of selling foster children into slavery." *Lanier*, 520 U.S. at 271. This is not that case, and the example offered in *Hope* proves just how far afield the *Hope* exception is. Since the Reconstruction Amendments, American constitutional law has not countenanced the sale of children into slavery, and it never will. That "general principle" is well settled, and no government official acting in good faith could mistakenly believe otherwise. On the other end of the spectrum—the one we are dealing with here—our law has always permitted, even encouraged, high government officials to speak robustly on matters of public concern, even where (as in the case of the US Attorney General, the Chair of the Federal Trade Commission, and the like) those officials also exercise law enforcement and/or regulatory powers. It is in this delicate and unexplored area of constitutional law—where officials wear two or even more hats—that an official in Ms. Vullo's role must operate and is expected to make decisions. In that specific

13

context, it is essential that court cases delineate the boundary lines between what is

lawful and what is not, so that these officials can conform their behavior—or face

the consequences if they do not.  On the facts at issue here, the courts have not yet

done so.

Here, the particular conduct alleged—a convoluted patchwork of

events over many months, involving a horrific tragedy; an ensuing nationwide

public discussion and widespread boycotts; a preexisting regulatory investigation

of third parties who indisputably broke the law that DFS was responsible for

enforcing; vague and conclusory statements about what *might* have occurred in

meetings, and which, at worst, amounts to proposed leniency in enforcement

against illegal conduct in exchange for cooperation;[7] and hortatory public remarks

that are plainly protected government speech—simply does not fit into existing

---

[7] In both the SAC and its brief, the NRA acknowledged two important background facts.  The first is that Lloyd's, in fact, was guilty of having committed what the NRA calls "regulatory infractions" in the sale and marketing of the NRA-backed Carry Guard product.  JA 164 (SAC ¶ 74); NRA Br. 15-16.  The NRA does not argue—because it cannot—that Lloyd's and the other insurers and brokers acted lawfully in the sale and marketing of NRA-branded products.  They didn't.  And Maria Vullo didn't force these companies to break the law; they did that on their own.  Second, the NRA acknowledges that the Spring of 2018—the very period that the SAC suggests was tainted by coercive conduct (the details of which are never articulated)—saw perhaps the greatest level of public outrage at the NRA in recent history, as major American companies disassociated themselves from the NRA in the wake of the Parkland Massacre.  JA 152 (SAC ¶ 42).  It is undisputed that what caused so many companies to "cut ties" with the NRA in this period was Parkland—not Maria Vullo.

14

First Amendment case law. Despite recognizing that the NRA's claim poses *four* separate novel legal questions, each of which would need to be "clearly established" to be actionable to overcome qualified immunity, the NRA cites not one case establishing that *any* is unlawful. *Cf.* NRA Br. 49 (citing Op. Br. 48). Nor does the NRA dispute the District Court's inclination to find that "there is no case clearly establishing that otherwise protected public statements transform into an unlawful threat merely because there is an ongoing, and unrelated, regulatory investigation." SPA 25.

The NRA asserts that its First Amendment right to free expression was violated because Ms. Vullo allegedly communicated to a third party—Lloyd's—that DFS would be "less interested" in Lloyd's' insurance violations if Lloyd's "aided DFS's campaign against gun groups," and then later publicly criticized the NRA in the wake of a gun-related tragedy. JA 162 (SAC ¶ 69); NRA Br. 35. Putting aside the lack of specificity to these allegations, nothing remotely like this has been addressed in the case law—much less resulted in a "clearly established" rule condemning or cabining the conduct of government enforcement officials. Nor does any case establish that a third-party vendor's decision to discontinue a co-branded product line with an advocacy organization—a product line that violated state law and led to a state enforcement action by the agency responsible for enforcing the state's insurance law—in exchange for a more lenient

15

penalty gives rise to a government violation of the organization's First Amendment rights.[8]

For Ms. Vullo's alleged conduct to constitute a clearly-established violation of the NRA's constitutional rights, extant law must find that an appointed government official's protected public communication of a government policy concern regarding certain advocacy groups subject to that official's regulatory oversight is coercive and violates the groups' First Amendment rights, if that communication is "read in the context of" that official's *prior* enforcement communications with a different party involving that party's violations of state law. NRA Br. 43-44. This degree of specificity is necessary to sufficiently establish that the Guidance Letters and the Press Release—government policy statements addressing an ongoing reputational risk to New York financial institutions, made to the entire New York financial industry in accordance with Ms. Vullo's oversight responsibilities—could reasonably form the basis of a First

---

[8] As the Lloyd's Consent Order explicitly states, the DFS enforcement action against Lloyd's led to a prohibition of the sale of NRA affinity products—an appropriate measure given their violation of New York Insurance Law—*not* a prohibition against doing business with the NRA. JA 236 (SAC Exhibit I ¶ 20) ("Underwriters agree that they shall not enter into any agreement or program with the NRA to underwrite or participate in any affinity-type insurance program involving any line of insurance covering persons or entities whose home state is New York; provided, however, that the NRA may itself purchase insurance from Underwriters for the sole purpose of obtaining insurance for the NRA's own corporate operations.").

16

Amendment violation against parties referenced in Ms. Vullo's lawful government speech.

So nuanced and unusual are the circumstances presented here that it's hardly surprising that no cases address them. Plainly, no case exists sufficient to have given Ms. Vullo, or anyone in her shoes, "fair warning" that routine conduct as both a public official-spokesperson and an enforcement agency head could get the official sued and held personally liable. And *that* is the standard that counts for purposes of qualified immunity.

*Rattner v. Netburn*, 930 F.2d 204, 208 (2d Cir. 1991), *see* NRA Br. 50 n.8, which the NRA gamely asserts fits the bill of "clearly established law" in this context, is so factually divergent from the instant case as to be irrelevant, as the NRA all but concedes by relegating it to a footnote in its brief. *Rattner* involved a political advertisement published in the newsletter of the local Chamber of Commerce that was critical of village leaders. A village trustee read the ad and responded with an angry letter, demanding a list of businesses that belonged to the Chamber, and stating that the trustee had "made a list of approximately 40 local businesses" that might have been involved in approving the ad—suggesting that he might organize a boycott. There, the Court held that the trustee's conduct constituted an implied "threat" sufficient to deny summary judgment.

17

The critical distinctions between *Rattner* and this case lie in the relative postures of the village trustee and Ms. Vullo.  Unlike the village trustee in *Rattner*—whose sole reason for communicating with the Chamber was blatantly impermissible, namely to complain about the content of a political advertisement he disagreed with—Ms. Vullo's alleged contact with Lloyd's was legitimate, namely as part of a law enforcement investigation that resulted in findings of actual violations of law.  Moreover, unlike the village trustee—whose statements suggested that he might organize an extra-legal boycott of businesses that had criticized his personal leadership—the suggestion in the SAC is that Ms. Vullo offered leniency to Lloyd's in exchange for cooperation in DFS's investigation of the (unlawful) Carry Guard program.  To say that *Rattner*, a case about an angry response to a personalized critique of a village trustee, put Ms. Vullo on notice that an enforcement action against Lloyd's, and alleged negotiations around that action, was a violation of the NRA's First Amendment rights is absurd.  It renders meaningless the requirement that a right be *clearly* established before depriving a state officer of qualified immunity.

The NRA's "discussion" of other cases is no more helpful to their cause.  While it dedicates significant time to attempting to distinguish the authorities cited by Ms. Vullo—complete with pages of analysis—it fails to identify even one Second Circuit precedent that would clearly establish Ms.

18

Vullo's alleged conduct as unconstitutional.[9]  The former amounts to a series of make-weight arguments requiring little response.  The latter is a damning acknowledgment that no such case law exists.  This ends the analysis:  absent "clearly established" law—and the warning it would have provided to a government official in 2018—qualified immunity applies, protecting Ms. Vullo from suit.

### B.  Ms. Vullo's Alleged Conduct Was Protected Speech and a Lawful Exercise of her Duties as Superintendent

Finally, and critically, it is undisputed that, even under the facts as alleged, the acts attributed to Ms. Vullo in the SAC fall within the permissible— and necessary—ambit of Ms. Vullo's First Amendment rights and regulatory powers.  The very purpose of qualified immunity is to protect government officials where the courts have drawn "fine line[s]" between what is not only permissible but encouraged—hortatory speech on matters of public import, and enforcement of

---

[9] NRA's pages of analysis amount to little more than a shell game, as illustrated by its empty critique of Ms. Vullo's citation to *Zieper v. Metzinger*, 474 F.3d 60 (2d Cir. 2007).  In that case, the Second Circuit affirmed a grant of qualified immunity to an FBI agent and Assistant U.S. Attorney.  While it is true that the Court had previously affirmed a denial of qualified immunity in *Zieper v. Metzinger*, 62 F. App'x 383, 384 (2d Cir. 2003) (summary order), that decision predated the Supreme Court's decision in *Iqbal*.  In the pre-answer incarnation of the case, the Second Circuit summarily determined that the plaintiff had alleged sufficient facts under the pre-*Iqbal* legal framework to state a constitutional claim.  It declined to reach the question of qualified immunity based on the presence on disputed issues of fact, a circumstance not present here.

19

the law against those who have traversed it—and what is impermissible—government coercion. *See Hammerhead Enterprises, Inc. v. Brezenoff*, 707 F.2d 33, 39 (2d Cir. 1983). Because the NRA challenges conduct that is entitled to affirmative constitutional protection (the Guidance Letters and the Press Release) and serves legitimate, even noble law enforcement goals (the unrelated DFS investigation into admitted violations of law), qualified immunity is all the more necessary to ensure government officials can do their jobs without fear of facing vindictive litigation.

To begin, as even the NRA does not dispute, Ms. Vullo, as Superintendent of the Department of Financial Services, was fully empowered to issue the Guidance Letters and to comment in the Press Release on matters of public concern—in this case, the scourge of gun violence and the reputational risk (a longstanding regulatory principle) to financial services companies associating with organizations that resist gun reform in a time of significant public outrage on the issue. Op. Br. 42; SPA 23-24.

This is classic government speech—hortatory; designed to be persuasive; and certainly not viewpoint-neutral, *see Hammerhead*, 707 F.2d at 40, *Gravel v. United States*, 408 U.S. 606, 625 (1972)—and it is protected by the First Amendment. *Bond v. Floyd*, 385 U.S. 116, 135-36 (1966). Because none of these statements so much as reference DFS's authority as an enforcement agency, much

20

less threatens to deploy that authority against the NRA or those who do business with it, no claim of First Amendment retaliation (or "censorship regime") can arise from these statements, as the District Court found. JA 108.

As described in the SAC, Ms. Vullo was also acting well within her prosecutorial function to engage with Lloyd's regarding its "infractions" (i.e., violations of law), to express concern about future business relationships with an entity that admittedly helped create and promote an illegal insurance product in New York State,[10] and even to offer leniency in return for prompt and full cooperation. This is bread-and-butter government enforcement work, familiar to anyone who has spent time in a prosecutor's or enforcement agency's office, on either side of the table. Converting these kinds of communications into coercive threats—and imposing liability on that basis—would not only be contrary to law and grotesquely unfair to Ms. Vullo; it would effect a sea change in how enforcement lawyers do their work—and not in a good way.

This Court need not, and should not, defer to the District Court's erroneous conclusion that the vague allegations found in the SAC allow the inference of implied "threats" that "could be construed as acts of bad faith." NRA Br. 53. This Court, in the instant posture, reviews the complaint *de novo*. *See*

---

[10] The NRA itself entered into a Consent Order concerning its unlicensed role in the marketing and sale of these illegal insurance products after Ms. Vullo's departure from DFS. Op. Br. 18 n.11.

21

*supra* § I.B.  There is no basis to conclude that Maria Vullo levelled any actual or

implied threat, much less acted of bad faith.  Further, the NRA's citation to

*Okwedy v. Molianari*, 333 F.3d 339, 340-41 (2d Cir. 2003), is inapposite.  There,

not unlike in *Rattner*, the Staten Island Borough President requested that a

billboard company remove a billboard condemning homosexuality because he

found it "unnecessarily confrontational and offensive" and "convey[ing] an

atmosphere of intolerance which is not welcome in our Borough"; the official

supplemented this communication by observing that the company "owns a number

of billboards on Staten Island and derives substantial economic benefits from

them."  *Id.*  There was no evidence in *Okwedy* that the Borough President was

engaged in a proper law enforcement initiative when communicating with the

company.  Here, of course the opposite is true.  The SAC itself, and the consent

orders it references, fully admit that Lloyd's, the other brokers and insurers, and

the NRA all had violated New York's Insurance Law, and that Ms. Vullo and DFS

were engaged in an investigation of these issues in accordance with their duties as

the agency charged with enforcing Insurance Law.  *Okwedy* provides no guidance

here.

Ultimately, all that the NRA has *specifically* alleged is that Ms. Vullo

both exercised her free speech rights and carried out her enforcement duties as

DFS's chief enforcement officer.  For that, she has been wrongly embroiled in this

22

retaliatory litigation. If Ms. Vullo is required to defend this case through

discovery—even if it is ultimately dismissed on summary judgment—other

officials tasked with enforcing state law will think twice before engaging in an

enforcement action that could run up against powerful and well-funded

organizations. That outcome is precisely why the doctrine of qualified immunity

exists, what it seeks to avoid, and why it applies fully here.

## CONCLUSION

Ms. Vullo is entitled to qualified immunity from the NRA's First

Amendment claims. The NRA has neither pled sufficient facts nor identified any

law that clearly establishes Ms. Vullo's alleged conduct as a violation of its First

Amendment rights. Ms. Vullo respectfully requests that the Court reverse the

District Court's denial of her motion to dismiss and hold that she is entitled to

qualified immunity from the NRA's claims against her.

Dated: September 21, 2021
New York, New York

                    EMERY CELLI BRINCKERHOFF
                    ABADY WARD & MAAZEL LLP

                    By:_____/s/ Andrew G. Celli, Jr._____
                         Andrew G. Celli, Jr.
                         Debra L. Greenberger
                         Marissa R. Benavides

23

600 Fifth Avenue, 10th Floor
New York, New York 10020
(212) 763-5000

*Attorneys for Defendant-Appellant Maria
Vullo*

## <u>CERTIFICATE OF COMPLIANCE</u>

1.  This brief complies with the type-volume limitation of FRAP 32(a)(7)(B) and Second Circuit Local Rule 32.1(a)(4)(B).  It contains 4676 words, excluding the parts of the brief exempted by FRAP 32(a)(7)(B)(f).

2.  This brief complies with the typeface requirements of FRAP 32(a)(5) and the type style requirements of FRAP 32(a)(6).  It has been prepared in a proportionally-spaced typeface using Microsoft Word in 14-point Times New Roman font.

      /s/ Andrew G. Celli, Jr.
Andrew G. Celli, Jr.
Attorney for Defendant-Appellant

Dated: September 21, 2021

25