# 21-0636-cv

# United States Court of Appeals
### *for the*
# Second Circuit

NATIONAL RIFLE ASSOCIATION OF AMERICA,

*Plaintiff-Appellee,*

— v. —

MARIA T. VULLO, both individually and in her former official capacity,

*Defendant-Appellant,*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

**THE NATIONAL RIFLE ASSOCIATION'S
PETITION FOR REHEARING EN BANC**

_____

William A. Brewer III
Sarah B. Rogers
Noah Peters
**Brewer, Attorneys & Counselors**
750 Lexington Ave., 14th Floor
New York, New York 10022
Tel: (212) 489-1400
*Attorneys for Plaintiff-Appellee*

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................ i

TABLE OF AUTHORITIES ..................................................................... ii

INTRODUCTION ..................................................................................... 1

STATEMENT OF THE CASE .................................................................. 4

ARGUMENT ............................................................................................. 8

    I.     The Panel Ignored Testimonial Evidence and Failed to Draw Inferences in NRA's Favor, in Violation of *Tolan*. ......................... 8

    II.    The Panel's Opinion Ignores Clearly-Established Law that Selective Enforcement Regimes Violate the First Amendment .... 13

    III.   The Panel's Suggestion That a Government Regulator Can Threaten Economic Sanctions Against Disfavored Speakers for Their Viewpoints Contravenes Supreme Court Authority and the Holdings of Other Circuits ............................................................ 15

CONCLUSION ........................................................................................ 17

CERTIFICATE OF COMPLIANCE ...................................................... 18

CERTIFICATE OF SERVICE ............................................................... 18

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*A & R Eng'g & Testing, Inc. v. City of Houston,*
  582 F.Supp.3d 415 (S.D. Tex. 2022)................................................16

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007)..........................................................12, 13

*Cornelius v. NAACP Legal Def. & Educ. Fund,*
  473 U.S. 788 (1985)................................................................15

*FCC v. Pacifica Found.,*
  438 U.S. 726 (1978)................................................................16

*Hoye v. City of Oakland,*
  653 F.3d 835 (9th Cir. 2011) ......................................................16

*Lombardo v. City of St. Louis, Missouri,*
  141 S. Ct. 2239 (2021) (per curiam)................................................12

*Matal v. Tam,*
  137 S. Ct. 1744 (2017)........................................................2, 13, 14

*Mirabilio v. Reg'l Sch. Dist. 16,*
  761 F.3d 212 (2d Cir. 2014) .......................................................3, 8

*Nat'l Rifle Ass'n v. Vullo,*
  2022 WL 4372194 (2nd Cir. 2022) .............................................*passim*

*Okwedy v. Molinari,*
  333 F.3d 339 (2d Cir. 2003) .........................................................1

*Peck ex rel. Peck v. Baldwinsville Cent. Sch. Dist.,*
  426 F.3d 617 (2d Cir. 2005) ........................................................15

*Rattner v. Netburn,*
  930 F.2d 204 (2d Cir. 1991) ....................................................10, 12

*Tolan v. Cotton,*
  572 U.S. 650 (2014) (per curiam)..............................................2, 3, 8, 9

## INTRODUCTION

It has long been settled that "a public-official defendant who threatens to employ coercive state power to stifle protected speech violates a plaintiff's First Amendment rights, regardless of whether the threatened punishment comes in the form of the use (or, misuse) of the defendant's direct regulatory or decisionmaking authority over the plaintiff, or in some less-direct form." *Okwedy v. Molinari*, 333 F.3d 339, 344 (2d Cir. 2003).

In defiance of settled law, the panel's opinion allows a state official to "threaten regulated institutions with costly investigations, increased regulatory scrutiny and penalties should they fail to discontinue their arrangements with" the National Rifle Association ("NRA"). (A-135 at ¶ 21). The reason for Vullo's animus—the reason she opened an investigation into the NRA and not the many other entities that similarly market affinity insurance plans—was the NRA's viewpoint. (*Id*. at ¶¶ 14–23, 33–37, 45–53, 58–60, 65–67, 69, 75–79).

Faced with these allegations, the panel boldly dismisses the notion that viewpoint discrimination is unlawful at all. Incredibly, the panel proclaims that a prohibition on viewpoint discrimination by government actors is "antithetical to a healthy representative democracy." *Nat'l Rifle Ass'n v. Vullo*, 2022 WL 4372194 at *8 (2nd Cir. 2022). In so holding, the panel confuses the role of government officials as regulators with their role as speakers. The Supreme Court has been

1

clear that when exercising its regulatory power, "the First Amendment forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others[.]" *Matal v. Tam*, 137 S. Ct. 1744, 1757 (2017) (quoting *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 394 (1993)).

That is exactly what NRA's Second Amended Complaint ("the Complaint") alleges that Vullo did—she held private meetings with insurance companies wherein she threatened to use her formal regulatory power as Superintendent of New York's Department of Financial Services ("DFS") to punish them if they did not discontinue existing business relationships with NRA, and then compounded her threats with an official guidance document and press releases that threatened similar reprisals against other businesses that dared to associate with NRA. (A-135 at ¶¶ 19–23, 34–38, 45–53, 61, 67, 69, 75–79, 90–92). Importantly, these threats were specifically designed to chill NRA's gun-rights advocacy. (*Id*. at ¶¶ 19-21, 46–51). And the threats worked—three different insurers terminated their relationships with NRA due to them, and NRA has struggled to obtain even basic banking services. (*Id*. at ¶¶ 21, 54–85).

In addition to upending settled First Amendment law, the panel contradicts the Supreme Court's repeated admonition that in ruling on a motion for summary judgment, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tolan v. Cotton*, 572 U.S. 650, 651 (2014)

(per curiam). This admonition is especially true on a motion to dismiss. *Mirabilio v. Reg'l Sch. Dist. 16*, 761 F.3d 212, 213 (2d Cir. 2014); *see also Tolan*, 572 U.S. at 655–56. In fact, the Supreme Court has cautioned that in evaluating a qualified immunity defense, "**courts must take care not to define a case's 'context' in a manner that imports genuinely disputed factual propositions**." *Tolan*, 572 U.S. at 655–56 (emphasis added).

That is just what the panel did in this case—in defiance of *Tolan*. "The 'context' here was an investigation, commenced months before the meetings, that was triggered by a referral from the DA's Office," the panel states. *Vullo*, 2022 WL 4372194 at *11. However, the panel fails to mention that the "referral" in question came from a gun control advocacy group whose purpose was to advance a political agenda against the NRA. (A-135 at ¶¶ 34–37). The panel's suggestion that Vullo had non-retaliatory motives for investigating the insurance policies at issue is amply rebutted by the facts pleaded in the Complaint. *Id.*

Perhaps most glaring of all, the panel dismisses the importance of meetings between Vullo and the affected insurers where she made "clear and unambiguous" threats that regulated entities "cease[] providing insurance to gun groups, especially the NRA." (A-135 at ¶ 21). The Court criticizes the Complaint's "lack of precision as to what Vullo actually said to make her message clear," ignoring that NRA cannot, and is not required to, plead specific facts regarding statements

3

at a meeting where it was not in attendance. *Vullo*, 2022 WL 4372194 at *11. En banc review is necessary to correct these errors.

## STATEMENT OF THE CASE

The NRA is America's leading provider of gun-safety and marksmanship education for civilians and law enforcement. (A-135 at ¶ 1). It is also the foremost defender of the Second Amendment. *Id*. Former New York Governor Andrew Cuomo has a history of animus towards NRA based on its gun rights advocacy, an animus that is shared by Vullo, his longtime lieutenant and appointee. (*Id*. at ¶¶ 14–20).

Vullo headed DFS, an agency with broad regulatory and enforcement powers to ensure the continued solvency, safety, and soundness of banks and insurance companies. (*Id*. at ¶ 25). Accordingly, DFS directives regarding "risk management" must be heeded by financial institutions. *Id*.

Before 2017, NRA was frequently the target of boycott efforts. (*Id*. at ¶ 33). However, those efforts failed because they were spearheaded by non-governmental groups who lacked the government's coercive power. (*Id*.).

This changed in 2017, when a pro-gun control organization (Everytown for Gun Safety) successfully enlisted Cuomo and Vullo to silence NRA. (*Id*. at ¶¶ 33–34). Everytown contacted the New York County District Attorney's Office as part of its political mission to undermine the NRA, using alleged infirmities in Carry

4

Guard, a concealed-carry insurance program promoted by NRA, as a pretext. (*Id*. at ¶ 34). The DA's Office referred the matter to Vullo, who launched an investigation that was ostensibly focused on Carry Guard but was really motivated by an effort to punish NRA for its gun rights advocacy. (*Id*. at ¶¶ 35–36). The investigation targeted none of the available self-defense insurance products except Carry Guard, which was endorsed by NRA. (*Id*.). Nor did the investigation target any of the many other affinity insurance programs sponsored by other groups that involve most, if not all, of the practices and features referenced by DFS in its investigation of NRA's affinity programs. (*Id*. at ¶ 37).

Vullo threatened regulated institutions with costly investigations, increased regulatory scrutiny, and penalties should they fail to discontinue their arrangements with NRA. (*Id*. at ¶ 21). These exhortations were not limited to Carry Guard, as she indicated that any business relationship with NRA would invite adverse action. (*Id*. at ¶ 38).

In February 2018, Vullo met with the executives of institutions subject to her regulatory power, where she made clear and unambiguous threats that they must cease providing services to NRA in connection with affinity-insurance programs that NRA endorsed. (*Id*. at ¶ 21). Although Vullo discussed many technical regulatory infractions plaguing the affinity-insurance marketplace, she made clear that her real interest lay in coercing the companies to cease providing insurance to

5

NRA and its members and supporters—not in pursuing these technical regulatory infractions for their own sake. (*Id*.). Indeed, Vullo said that DFS would focus its forthcoming affinity-insurance enforcement action solely on those syndicates which served NRA and its allies, and ignore other syndicates writing similar policies. (*Id*. at ¶ 69).

Within a week, DFS levied multi-million-dollar fines against two insurance firms that dared to do business with NRA. (*Id*. at ¶ 21). Both firms, and later a third, were coerced to terminate their business arrangements with NRA and its members—including arrangements having nothing to do with the allegedly unlawful conduct cited by DFS. (*Id*.).

The fact that these terminations were prompted directly by Vullo's threats is shown by the fact that the Chairman of Lockton—one of the three entities that announced that it was dropping NRA—called NRA in February 2018 and stated that, although Lockton wished to continue doing business with NRA, Lockton must "drop" NRA entirely for fear of "losing [our] license" to do business in New York due to Vullo's backroom threats. (*Id*. at ¶ 42). Lockton had been a close business partner of NRA for nearly twenty years; its commitment to the parties' relationship had not wavered in connection with any previous instance of public controversy relating to gun control. (*Id*.).

Days later, an insurer dropped NRA's General Liability and Umbrella

coverage solely because it learned of Vullo's threats to Lockton and feared it would be subject to similar reprisals. (*Id*. at ¶ 44).

In April 2018, Vullo followed up her backroom threats with a pair of "guidance documents" directed at all New York State financial institutions and insurers. (*Id*. at ¶ 46). The April 2018 Letters were unrelated to NRA-endorsed affinity programs. (*Id*. at ¶¶ 46–50). Instead, they warned recipients to sever ties with NRA and other "gun promotion organizations." (*Id*. at ¶ 46). The April 2018 Letters did not merely express Vullo's political opinions: they invoked the "risk management" obligations of recipients, and directed banks and insurers to "take prompt actions to manage" purported "reputational risks" arising from "dealings with the NRA or similar gun promotion organizations." (*Id*. at ¶ 47). In addition, testimonial statements from three different New York financial services experts or regulated parties reflect that Vullo's public statements in her April 2018 guidance documents were widely perceived within the industry as express threats not to do business with NRA or else. (*Id*. at ¶¶ 53, 81).

Lloyd's recognized at a subsequent Board of Directors meeting that Vullo's interest lay in targeting NRA for reprisal and had nothing to do with any broader interest in the proper marketing of affinity insurance programs. (*Id*. at ¶ 70). Lloyd's believed that its hands were tied: Vullo's investigation had transformed the "gun issue" into a compliance matter, and Lloyd's had to remain in DFS's good

graces. (*Id*.). So on May 9, 2018, Lloyd's publicly announced that it directed its underwriters to terminate all insurance related to NRA and not to provide any insurance to NRA in the future. (*Id*. at ¶ 72).

On May 11, 2018, NRA sued Cuomo and Vullo in their official and individual capacities. Following motions to dismiss, the District Court upheld NRA's First Count, alleging an implicit censorship regime, and its Second Count, alleging retaliation against NRA based on the content of its speech. (A-133). These rulings were subsequently reaffirmed by the District Court.

Vullo appealed; Cuomo did not. (A-362). The panel's September 22, 2022 decision reversed the district court's denial of Vullo's motion to dismiss and remanded the case with directions for the district court to enter judgment for Vullo. *Vullo*, 2022 WL 4372194 at *13.

## ARGUMENT

### I.    The Panel Ignored Testimonial Evidence and Failed to Draw Inferences in NRA's Favor, in Violation of *Tolan*.

In ruling on a motion for summary judgment, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tolan*, 572 U.S. at 651. So too on a motion to dismiss. *Mirabilio*, 761 F.3d at 213; *see also Tolan*, 572 U.S. at 655–56. "Our qualified-immunity cases illustrate the importance of drawing inferences in favor of the nonmovant, even

when . . . a court decides only the clearly-established prong of the standard."
*Tolan*, 572 U.S. at 657. The panel violated this command in at least three ways.

*First*, the panel "define[d] [the] case's 'context' in a manner that import[ed]
genuinely disputed factual propositions"—specifically, by contending that Vullo
opened her investigation into NRA in a "plainly reasonable" and "legitimate"
effort to address its role as an "accomplice" in "serious misconduct." *Compare id.*
*with Vullo*, 2022 WL 4372194 at *12–13. The panel's spin cannot be reconciled
with the Complaint's allegations to the contrary. (A-135 at ¶¶ 14–23, 34–37, 45–
53, 58–61, 65–67, 69, 75–79, 90–92). The panel refused to acknowledge that the
Complaint pleads in detail that Vullo selectively targeted NRA for discriminatory
enforcement over minor, technical regulatory infractions that she had no interest in
pursuing except against NRA—and that she opened her investigation in 2017 at the
behest of an activist group with the specific goal of retaliating against NRA for its
gun rights advocacy. (*Id*. at ¶¶ 33–37). In fact, the Complaint pleads that Vullo
confessed her selective focus on NRA to regulated entities and made clear that
similar affinity insurance marketing violations would not be punished. (*Id*. at ¶¶ 21,
69–70). And the Complaint pleads background context illustrating the plausibility
of its allegations that Vullo used threats and not mere persuasion—similar boycott
efforts from activist groups against NRA failed in the past without government
support, and Vullo's overwhelming regulatory power as head of DFS was such that

9

regulated entities could not afford the financial cost of refusing compliance with her expressed regulatory goals. (*Id*. at ¶¶ 25–26, 33).

*Second*, the panel ignored testimonial evidence from witnesses acknowledging that Vullo used threats and not mere persuasion. The Complaint cites testimonial statements from three different industry experts or regulated parties indicating that they perceived Vullo's public statements as threats not to do business with NRA. (*Id*. at ¶¶ 53, 81). The panel did not consider these statements in its analysis. Instead, it engaged in its own, decontextualized parsing of Vullo's Guidance Letters and Press Release and concluded, in defiance of credible testimony from regulated parties and industry experts, that no one could possibly have read them as the insurers themselves did—as threatening regulatory enforcement if the insurers did not immediately cut ties with NRA. *Vullo*, 2022 WL 4372194 at *11. Indeed, NRA cited testimonial evidence—also not discussed by the panel—from the Chairman of one of NRA's insurance partners (Lockton) indicating that he was ending the company's association with NRA solely because of threats from Vullo. (A-135 at ¶ 42). The complaint also presented testimonial evidence indicating that Lloyd's dropped its affiliation with NRA because of direct threats from Vullo. (*Id.* at ¶ 70). Evidence of this sort is the kind that this Court has previously held to be sufficient to establish disputed issues of fact regarding unconstitutional coercion. *Rattner v. Netburn*, 930 F.2d 204, 210 (2d Cir. 1991).

*Third*, and perhaps most egregiously, the panel dismisses the importance of meetings between Vullo and the affected insurers where she made "clear and unambiguous" threats that the regulated "cease[] providing insurance to gun groups, especially the NRA." (A-135 at ¶ 21). The Court criticizes the Complaint's "lack of precision as to what Vullo actually said to make her message clear." *Vullo*, 2022 WL 4372194 at *11. But NRA cannot, and is not required to, plead specific facts regarding statements made by Vullo at a meeting where it was not in attendance.[1]

In its rush to dismiss the case, however, the panel went on to "review the statements in context"—even though it had *no statements to review*. *Id*. Thus the panel, *with no basis*, simply disregarded NRA's well-pleaded allegation that "Vullo and DFS have threatened regulated institutions with costly investigations, increased regulatory scrutiny and penalties should they fail to discontinue their arrangements with the NRA" and found instead, in defiance of the Complaint's detailed allegations, that "the allegations do not plausibly amount to an unconstitutional threat or coercion to chill the NRA's free speech." *Compare id. with* (A-135 at ¶ 21). The panel then bootstraps the insurers' own consent decrees

---

[1] Indeed, the NRA sought to depose Vullo in June 2018—over *four years ago*—and her deposition was authorized by the Court in March 2020. But discovery was stayed "temporarily" beginning in July 2020, and NRA was unable to depose Vullo. (ECF Nos. 228, 234).

in which they agreed to end their relationships with NRA as proof that the entire investigation was "plainly reasonable," "natural" and a "legitimate enforcement action." *Vullo*, 2022 WL 4372194 at *12.

But the fact that the insurers bowed to Vullo's threats and entered consent decrees ending their relationships with NRA does not contradict the Complaint's extensive and well-pleaded allegations that Vullo selectively targeted three insurers having relationships with NRA for enforcement actions. Indeed, under settled law, the fact that the insurers quickly buckled is persuasive evidence confirming NRA's allegations of threats. *Rattner*, 930 F.2d at 210. To use an analogy: taken in a light most favorable to the non-movant, evidence that plaintiff suffered extensive physical injuries would tend to confirm that officers used excessive force—not that officers had good reason to use force on the suspect in the first place. *Cf. Lombardo v. City of St. Louis, Missouri*, 141 S. Ct. 2239, 2241–42 (2021) (per curiam). By dwelling on the fact that the insurers succumbed to the threats, the panel focused on evidence that only *confirmed* that threats were indeed made. *See Vullo*, 2022 WL 4372194 at *9–12.

The panel turned to *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) for support (*see Vullo*, 2022 WL 4372194 at *12), but *Twombly* only shows how far afield the panel went. In *Twombly*, the plaintiffs did **not** "directly allege illegal agreement" but instead relied **entirely** on allegations of parallel conduct to support

12

their claim of an antitrust conspiracy. *Twombly*, 550 U.S. at 565 & n. 11. *Twombly* makes clear that the pleading would have passed muster had the plaintiffs made such direct allegations. *Id*. Here, by contrast, NRA **directly**, and plausibly, alleges that Vullo made "clear and unambiguous" threats to insurers that they "cease[] providing insurance to gun groups, especially the NRA" at meetings in February 2018. (A-135 at ¶ 21). And NRA included direct testimonial evidence from the insurers themselves confirming that threats were made. (*Id.* at ¶¶ 42, 70). Because NRA pleads actual threats, and does not ask the Court to assume such threats merely from "parallel conduct," *Twombly* shows that the panel was wrong in dismissing NRA's claims against Vullo.

## II. The Panel's Opinion Ignores Clearly-Established Law that Selective Enforcement Regimes Violate the First Amendment

Relatedly, the panel adopts an outsized, and unprecedented, view of the "government speech" doctrine that confuses the role of government as regulator with the role of government as speaker—and, in so doing, threatens to eviscerate decades of Supreme Court precedent.

According to the panel, a prohibition on viewpoint discrimination is "antithetical to a healthy representative democracy." *Vullo*, 2022 WL 4372194 at *8 (citing *Matal*, 137 S.Ct. at 1757). But neither *Matal* nor any other case has ever held that the government has a First Amendment right to engage in viewpoint discrimination or otherwise engage in selective enforcement based on political

13

ideology. Instead, the Supreme Court has been clear that "the First Amendment

forbids the government to regulate speech in ways that favor some viewpoints or

ideas at the expense of others[.]" *Matal*, 137 S.Ct. at 1757 (quoting *Lamb's*

*Chapel*, 508 U.S. at 394).

That is exactly what the Complaint alleges that Vullo did—she held private

meetings with insurance companies where she threatened to use her formal

regulatory power as Superintendent of DFS to punish them if they did not

discontinue existing business relationships with NRA, and then compounded her

threats with an official guidance document and press releases that threatened

similar reprisals against other businesses that dared to associate with NRA. (A-135

at ¶¶ 19–23, 34–37, 45–53, 61, 67, 69, 75–79, 90–92). The panel ignores *Matal*'s

warning that "the government-speech doctrine. . . is susceptible to dangerous

misuse"; specifically, that if it were read to allow not only government advocacy,

but also government action, it could be used to "silence or muffle the expression of

disfavored viewpoints." *Matal*, 137 S.Ct. at 1758.

The panel dwells on the fact that the businesses associated with NRA

ultimately admitted to insurance law violations, as though this was dispositive

evidence that no viewpoint discrimination occurred. *Vullo*, 2022 WL 4372194 at

\*11. But it is black-letter law that a public official engages in viewpoint

discrimination when that official applies a facially viewpoint-neutral rule in a

14

viewpoint-discriminatory way. *Peck ex rel. Peck v. Baldwinsville Cent. Sch. Dist.*, 426 F.3d 617, 632–33 (2d Cir. 2005). The Supreme Court has made clear that actions motivated by impermissible viewpoint considerations do not become lawful simply because those actions might be justified on some other viewpoint-neutral ground. *Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788, 811 (1985). Thus, the panel's contention that "in light of the serious insurance law violations, it was only natural for Vullo to take steps – including investigating, negotiating, and resolving apparent violations—to enforce the law" only begs the question. *Vullo*, 2022 WL 4372194 at *12. It does not resolve it. Nor does it, in any way, diminish the force of the Complaint's well-pleaded allegations that Vullo targeted NRA for investigation based on its viewpoint, and coerced "businesses that associated with" NRA drop their affiliation. *Compare id*. at 10 *with* (A-135 at ¶¶ 14–23, 34–37, 45–53, 58–61, 65–67, 69, 75–79, 90–92).

### III. The Panel's Suggestion That a Government Regulator Can Threaten Economic Sanctions Against Disfavored Speakers for Their Viewpoints Contravenes Supreme Court Authority and the Holdings of Other Circuits

Finally, and most disturbingly, the panel opinion seeks to justify Vullo's conduct by expressly invoking the popular "backlash" against NRA, suggesting that Vullo's actions were proper because "a business's response to social issues can directly affect its financial stability in this age of enhanced corporate social responsibility." *Vullo*, 2022 WL 4372194 at *10. This language underscores that

15

the panel accepted that Vullo was acting as a regulator—not merely speaking out as a concerned citizen—in making her threats.

The panel's reasoning would eviscerate the First Amendment, giving government regulators free rein to selectively target unpopular speakers in the name of "tak[ing] action to address key social and environmental issues." *Id*. at 10 n.14; *compare Hoye v. City of Oakland*, 653 F.3d 835, 854 (9th Cir. 2011) (discriminatory enforcement of a content-neutral law violates the First Amendment); *A & R Eng'g & Testing, Inc. v. City of Houston*, 582 F.Supp.3d 415, 436–37 (S.D. Tex. 2022) (striking down Texas law prohibiting the state government from contracting with entities that boycott Israel; "the First Amendment protects all points of view on this issue, even if they do not comport with the economic goals of this State").

This theory of the First Amendment would transform the government from the protector of free speech into a dangerous threat, imbued with almost limitless power to dole out heckler's vetoes and pronounce "guilt by association." The First Amendment makes clear that the government's pursuit of its regulatory goals cannot justify punishing speech, no matter how offensive the speech or how much "backlash" there may be against the speaker. *FCC v. Pacifica Found.*, 438 U.S. 726, 745 (1978) ("the fact that society may find speech offensive is not a sufficient reason for suppressing it. Indeed, if it is the speaker's opinion that gives offense,

16

that consequence is a reason for according it constitutional protection."). The panel committed serious error in suggesting otherwise, and en banc review is necessary to correct its mistake.

## CONCLUSION

The NRA asks the Court to grant rehearing en banc, vacate the panel's decision, and reinstate the District Court's order denying Vullo's motion to dismiss Counts I and II of the Complaint.

Dated: October 6, 2022

Respectfully submitted,

*/s/ Noah Peters*

William A. Brewer III
wab@brewerattorneys.com
Sarah B. Rogers
sbr@brewerattorneys.com
Noah Peters
nbp@brewerattorneys.com
BREWER, ATTORNEYS &
COUNSELORS
750 Lexington Avenue, 14th Floor
New York, New York 10022
Telephone: (212) 489-1400
Facsimile: (212) 751-2849

**ATTORNEYS FOR
PLAINTIFF-APPELLANT
NATIONAL RIFLE
ASSOCIATION
OF AMERICA**

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(B)(i), I hereby certify that this brief is double-spaced (except for extended quotations, headings, and footnotes) and is proportionally spaced, using Times New Roman font, 14-point type. Based on a word count of my word processing system, this brief contains fewer than 3,900 words. It contains 3899 words excluding exempt material.

/s/ Noah Peters

---

## CERTIFICATE OF SERVICE

I hereby certify that on this 6th day of October 2022, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia by using the CM/ECF system. I also certify that the foregoing document is being served on counsel of record and that service will be accomplished by the CM/ECF system.

/s/ Noah Peters