(Slip Opinion)  OCTOBER TERM, 2023  1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## NATIONAL RIFLE ASSOCIATION OF AMERICA *v.* VULLO

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

No. 22–842.  Argued March 18, 2024—Decided May 30, 2024

Petitioner National Rifle Association (NRA) sued respondent Maria Vullo—former superintendent of the New York Department of Financial Services (DFS)—alleging that Vullo violated the First Amendment by coercing DFS-regulated parties to punish or suppress the NRA's gun-promotion advocacy. The Second Circuit held that Vullo's alleged actions constituted permissible government speech and legitimate law enforcement. The Court granted certiorari to address whether the NRA's complaint states a First Amendment claim.

The NRA's "well-pleaded factual allegations," *Ashcroft* v. *Iqbal*, 556 U. S. 662, 678–679, are taken as true at this motion-to-dismiss stage. DFS regulates insurance companies and financial services institutions doing business in New York, and has the power to initiate investigations and civil enforcement actions, as well as to refer matters for criminal prosecution. The NRA contracted with DFS-regulated entities— affiliates of Lockton Companies, LLC (Lockton)—to administer insurance polices the NRA offered as a benefit to its members, which Chubb Limited (Chubb) and Lloyd's of London (Lloyd's) would then underwrite. In 2017, Vullo began investigating one of these affinity insurance policies—Carry Guard—on a tip passed along from a gun-control advocacy group. The investigation revealed that Carry Guard insured gun owners from intentional criminal acts in violation of New York law, and that the NRA promoted Carry Guard without the required insurance producer license. Lockton and Chubb subsequently suspended Carry Guard. Vullo then expanded her investigation into the NRA's other affinity insurance programs.

On February 27, 2018, Vullo met with senior executives at Lloyd's,

2    NATIONAL RIFLE ASSOCIATION OF AMERICA *v.* VULLO

Syllabus

expressed her views in favor of gun control, and told the Lloyd's executives "that DFS was less interested in pursuing" infractions unrelated to any NRA business "so long as Lloyd's ceased providing insurance to gun groups, especially the NRA." App. to Pet. for Cert. at 199–200, ¶21.  Vullo and Lloyd's struck a deal: Lloyd's "would instruct its syndicates to cease underwriting firearm-related policies and would scale back its NRA-related business," and "in exchange, DFS would focus its forthcoming affinity-insurance enforcement action solely on those syndicates which served the NRA." *Id.,* at 223, ¶69.

On April 19, 2018, Vullo issued letters entitled, "Guidance on Risk Management Relating to the NRA and Similar Gun Promotion Organizations." *Id.*, at 246–251 (Guidance Letters).  In the Guidance Letters, Vullo "encourage[d]" DFS-regulated entities to: (1) "continue evaluating and managing their risks, including reputational risks, that may arise from their dealings with the NRA or similar gun promotion organizations"; (2) "review any relationships they have with the NRA or similar gun promotion organizations"; and (3) "take prompt actions to manag[e] these risks and promote public health and safety." *Id.*, at 248, 251.  Vullo and Governor Cuomo also issued a joint press release echoing many of the letters' statements, and " 'urg[ing] all insurance companies and banks doing business in New York' " to join those " 'that have already discontinued their arrangements with the NRA.' " *Id.*, at 244.  DFS subsequently entered into separate consent decrees with Lockton, Chubb, and Lloyd's, in which the insurers admitted violations of New York's insurance law, agreed not to provide any NRA-endorsed insurance programs (even if lawful), and agreed to pay multimillion dollar fines.

*Held*: The NRA plausibly alleged that respondent violated the First Amendment by coercing regulated entities to terminate their business relationships with the NRA in order to punish or suppress gun-promotion advocacy.  Pp. 8–20.

(a) At the heart of the First Amendment's Free Speech Clause is the recognition that viewpoint discrimination is uniquely harmful to a free and democratic society.  When government officials are "engaging in their own expressive conduct," though, "the Free Speech Clause has no application."  *Pleasant Grove City* v. *Summum*, 555 U. S. 460, 467.  "When a government entity embarks on a course of action, it necessarily takes a particular viewpoint and rejects others," and thus does not need to "maintain viewpoint-neutrality when its officers and employees speak about that venture."  *Matal* v. *Tam*, 582 U. S. 218, 234.  While a government official can share her views freely and criticize particular beliefs in the hopes of persuading others, she may not use the power of her office to punish or suppress disfavored expression.

In *Bantam Books*, *Inc.* v. *Sullivan*, 372 U. S. 58, this Court explored

Syllabus

the distinction between permissible attempts to persuade and impermissible attempts to coerce. The Court explained that the First Amendment prohibits government officials from relying on the "threat of invoking legal sanctions and other means of coercion . . . to achieve the suppression" of disfavored speech. *Id.*, at 67. Although the defendant in *Bantam Books*, a state commission that blacklisted certain publications, lacked the "power to apply formal legal sanctions," the coerced party "reasonably understood" the commission to threaten adverse action, and thus its "compliance with the [c]ommission's directives was not voluntary." *Id.*, at 66–68. To reach this conclusion, the Court considered things like: the commission's authority; the commission's communications; and the coerced party's reaction to the communications. *Id.*, at 68. The Courts of Appeals have since considered similar factors to determine whether a challenged communication is reasonably understood to be a coercive threat. Ultimately, *Bantam Books* stands for the principle that a government official cannot directly or indirectly coerce a private party to punish or suppress disfavored speech on her behalf. Pp. 8–11.

(b) To state a claim that the government violated the First Amendment through coercion of a third party, a plaintiff must plausibly allege conduct that, viewed in context, could be reasonably understood to convey a threat of adverse government action in order to punish or suppress speech. See *Bantam Books*, 372 U. S., at 67–68. Here, the NRA plausibly alleged that Vullo violated the First Amendment by coercing DFS-regulated entities into disassociating with the NRA in order to punish or suppress gun-promotion advocacy.

As DFS superintendent, Vullo had direct regulatory and enforcement authority over all insurance companies and financial service institutions doing business in New York. She could initiate investigations, refer cases for prosecution, notice civil charges, and enter into consent decrees. Vullo's communications with the DFS-regulated entities, particularly with Lloyd's, must be considered against the backdrop of Vullo's authority. Vullo made clear she wanted Lloyd's to disassociate from all gun groups, although there was no indication that such groups had unlawful insurance policies similar to the NRA's. Vullo also told the Lloyd's executives she would "focus" her enforcement actions "solely" on the syndicates with ties to the NRA, "and ignore other syndicates writing similar policies." App. to Pet. for Cert. 223, ¶69. The message was loud and clear: Lloyd's "could avoid liability for [unrelated] infractions" if it "aided DFS's campaign against gun groups" by terminating its business relationships with them. *Ibid.* As the reaction from Lloyd's further confirms, Vullo's alleged communications—whether seen as a threat or as an inducement—were reasonably understood as coercive. Other allegations concerning the Guidance

Syllabus

Letters and accompanying press release, viewed in context of their issuance, reinforce the NRA's First Amendment claim. Pp. 12–15.

(c) The Second Circuit concluded that Vullo's alleged communications were "examples of permissible government speech" and "legitimate enforcement action." 49 F. 4th 700, 717–719. The Second Circuit could only reach this conclusion, however, by taking the complaint's allegations in isolation and failing to draw reasonable inferences in the NRA's favor.

Vullo's arguments to the contrary lack merit. The conceded illegality of the NRA-endorsed insurance programs does not insulate Vullo from First Amendment scrutiny under *Bantam Books*. Nor does her argument that her actions targeted "nonexpressive" business relationships change the fact that the NRA alleges her actions were aimed at punishing or suppressing speech. Finally, Vullo claims that the NRA's position, if accepted, would stifle government speech and hamper legitimate enforcement efforts, but the Court's conclusion simply reaffirms the general principle that where, as here, the complaint plausibly alleges coercive threats aimed at punishing or suppressing disfavored speech, the plaintiff states a First Amendment claim. Pp. 15–18.

(d) The NRA's allegations, if true, highlight the constitutional concerns with the kind of strategy that Vullo purportedly adopted. Although the NRA was not the directly regulated party here, Vullo allegedly used the power of her office to target gun promotion by going after the NRA's business partners. Nothing in this case immunizes the NRA from regulation nor prevents government officials from condemning disfavored views. The takeaway is that the First Amendment prohibits government officials from wielding their power selectively to punish or suppress speech, directly or (as alleged here) through private intermediaries. P. 19.

49 F. 4th 700, vacated and remanded.

SOTOMAYOR, J., delivered the opinion for a unanimous Court. GORSUCH, J., and JACKSON, J., each filed a concurring opinion.

Cite as: 602 U. S. ____ (2024)     1

Opinion of the Court

NOTICE: This opinion is subject to formal revision before publication in the
United States Reports. Readers are requested to notify the Reporter of
Decisions, Supreme Court of the United States, Washington, D. C. 20543,
pio@supremecourt.gov, of any typographical or other formal errors.

# SUPREME COURT OF THE UNITED STATES

_____

No. 22–842

_____

## NATIONAL RIFLE ASSOCIATION OF AMERICA, PETITIONER *v.* MARIA T. VULLO

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SECOND CIRCUIT

[May 30, 2024]

JUSTICE SOTOMAYOR delivered the opinion of the Court.

Six decades ago, this Court held that a government entity's "threat of invoking legal sanctions and other means of coercion" against a third party "to achieve the suppression" of disfavored speech violates the First Amendment. *Bantam Books, Inc.* v. *Sullivan*, 372 U. S. 58, 67 (1963). Today, the Court reaffirms what it said then: Government officials cannot attempt to coerce private parties in order to punish or suppress views that the government disfavors. Petitioner National Rifle Association (NRA) plausibly alleges that respondent Maria Vullo did just that. As superintendent of the New York Department of Financial Services, Vullo allegedly pressured regulated entities to help her stifle the NRA's pro-gun advocacy by threatening enforcement actions against those entities that refused to disassociate from the NRA and other gun-promotion advocacy groups. Those allegations, if true, state a First Amendment claim.

## I

### A

Because this case comes to us at the motion-to-dismiss stage, the Court assumes the truth of "well-pleaded factual

allegations" and "reasonable inference[s]" therefrom. *Ashcroft* v. *Iqbal*, 556 U. S. 662, 678–679 (2009). Unless stated otherwise, the allegations aver as follows:

The New York Department of Financial Services (DFS) oversees insurance companies and financial services institutions doing business in the State. See N. Y. Fin. Servs. Law Ann. §201(a) (West 2012). DFS can initiate investigations and civil enforcement actions against regulated entities, and can refer potential criminal violations to the State's attorney general for prosecution. §§301(b), (c)(4). The DFS-regulated entities in this case are insurers that had business relationships with the NRA.

Since 2000, the NRA has offered a variety of insurance programs as a benefit to its members. The NRA contracted with affiliates of Lockton Companies, LLC (Lockton), to administer the various policies of these affinity insurance programs, which Chubb Limited (Chubb) and Lloyd's of London (Lloyd's) would then underwrite. In return, the NRA received a percentage of its members' premium payments. One of the NRA's affinity products, Carry Guard, covered personal-injury and criminal-defense costs related to licensed firearm use, and "insured New York residents for intentional, reckless, and criminally negligent acts with a firearm that injured or killed another person." 49 F. 4th 700, 707 (CA2 2022).

In September 2017, a gun-control advocacy group contacted the New York County District Attorney's office to tip them off to "compliance infirmities in Carry Guard." App. to Pet. for Cert. 206, Second Amended Complaint ¶34. That office then passed on the allegations to DFS. The next month, then-Superintendent of DFS Vullo began investigating Carry Guard, focusing on Chubb and Lockton. The investigation revealed at least two kinds of violations of New York law: that Carry Guard insured intentional criminal acts, and the NRA promoted Carry Guard without an

Opinion of the Court

insurance producer license. By mid-November, upon find-
ing out about the investigation following DFS information
requests, Lockton and Chubb suspended Carry Guard.
Vullo then expanded her investigation into the NRA's other
affinity insurance programs, many of which were under-
written by Lloyd's and administered by Lockton. These
NRA-endorsed programs provided similar coverage and
suffered from the same legal infirmities.

In the midst of the investigation, tragedy struck Park-
land, Florida. On February 14, 2018, a gunman opened fire
at Marjory Stoneman Douglas High School, murdering 17
students and staff members. Following the shooting, the
NRA and other gun-advocacy groups experienced "intense
backlash" across the country. 49 F. 4th, at 708. Major busi-
ness institutions, including DFS-regulated entities, spoke
out against the NRA, and some even cut ties with the or-
ganization. App. to Pet. for Cert. 244. MetLife, for exam-
ple, ended a discount program it offered with the NRA. On
February 25, 2018, Lockton's chairman "placed a dis-
traught telephone call to the NRA," in which he privately
shared that Lockton would sever all ties with the NRA to
avoid "'losing [its] license' to do business in New York." *Id.*,
at 298, Complaint ¶42. Lockton publicly announced its de-
cision the next day. Following Lockton's decision, the
NRA's corporate insurance carrier also severed ties with
the organization and refused to renew coverage at any
price. The NRA contends that Lockton and the corporate
insurance carrier took these steps not because of the Park-
land shooting but because they feared "reprisa[l]" from
Vullo. *Id.*, at 210, ¶44; see *id.*, at 209–210, ¶¶41–43.

Around that time, Vullo also began to meet with execu-
tives at the insurance companies doing business with the
NRA. On February 27, Vullo met with senior executives at
Lloyd's. There, speaking on behalf of DFS and then-Gover-
nor Andrew Cuomo, Vullo "presented [their] views on gun
control and their desire to leverage their powers to combat

the availability of firearms, including specifically by weakening the NRA." *Id.*, at 221, ¶67. She also "discussed an array of technical regulatory infractions plaguing the affinity-insurance marketplace" in New York. *Id.*, at 199, ¶21. Vullo told the Lloyd's executives "that DFS was less interested in pursuing the[se] infractions" unrelated to any NRA business "so long as Lloyd's ceased providing insurance to gun groups, especially the NRA." *Id.*, at 199–200, ¶21; accord, *id.*, at 223, ¶69 (alleging that Vullo made it clear to Lloyd's that it "could avoid liability for infractions relating to other, similarly situated insurance policies, so long as it aided DFS's campaign against gun groups").[1] Vullo and Lloyd's struck a deal: Lloyd's "would instruct its syndicates to cease underwriting firearm-related policies and would scale back its NRA-related business," and "in exchange, DFS would focus its forthcoming affinity-insurance enforcement action solely on those syndicates which served the NRA, and ignore other syndicates writing similar policies." *Ibid.*, ¶69.

On April 19, 2018, Vullo issued two virtually identical guidance letters on DFS letterhead entitled, "Guidance on Risk Management Relating to the NRA and Similar Gun Promotion Organizations." *Id.*, at 246–251 (Guidance Letters). Vullo sent one of the letters to insurance companies and the other to financial services institutions. In the letters, Vullo pointed to the "social backlash" against the NRA and other groups "that promote guns that lead to senseless violence" following "several recent horrific shootings, including in Parkland, Florida." *Id.*, at 246, 249. Vullo then cited recent instances of businesses severing their ties with the NRA as examples of companies "fulfilling their corporate social responsibility." *Id.*, at 247, 250.

————————

[1] According to the complaint, other affinity organizations offered similar insurance policies, including the New York State Bar Association, the New York City Bar, and the New York State Psychological Association, among others. See App. to Pet. for Cert. 207–208, Complaint ¶36.

Opinion of the Court

In the Guidance Letters' final paragraph, Vullo "encourage[d]" DFS-regulated entities to: (1) "continue evaluating and managing their risks, including reputational risks, that may arise from their dealings with the NRA or similar gun promotion organizations"; (2) "review any relationships they have with the NRA or similar gun promotion organizations"; and (3) "take prompt actions to manag[e] these risks and promote public health and safety." *Id.*, at 248, 251.[2]

The same day that DFS issued the Guidance Letters, Vullo and Governor Cuomo issued a joint press release that echoed many of the letters' statements. The press release included a quote from Vullo "'urg[ing] all insurance companies and banks doing business in New York'" to join those "'that have already discontinued their arrangements with the NRA.'" *Id.*, at 244. The press release cited Chubb's decision to stop underwriting Carry Guard as an example to emulate. The next day, Cuomo tweeted: "'The NRA is an extremist organization. I urge companies in New York State to revisit any ties they have to the NRA and consider their reputations, and responsibility to the public.'" *Id.*, at 213, Complaint ¶51.

Less than two weeks after the Guidance Letters and press release went out, DFS entered into consent decrees with Lockton (on May 2), and Chubb (on May 7). The decrees stipulated that Carry Guard violated New York insur-

_____

[2] The financial-regulatory term "reputational risk" is "'the risk to current or projected financial condition and resilience arising from negative public opinion,' which 'may impair a bank's competitiveness by affecting its ability to establish new relationships or services or continue servicing existing relationships.'" Brief for United States as *Amicus Curiae* 27–28, and n. 10 (quoting Office of the Comptroller of the Currency, Comptroller's Handbook, Examination Process, Bank Supervision Process 28 (Sept. 2019)). DFS monitors the reputational risk of regulated institutions because of its potential effect on market stability. See Brief for Respondent 6.

Opinion of the Court

ance law because it provided insurance coverage for intentional criminal acts, and because the NRA promoted Carry Guard, along with other NRA-endorsed programs, without an insurance producer license. The decrees also listed other infractions of the State's insurance law. Both Lockton and Chubb admitted liability, agreed not to provide any NRA-endorsed insurance programs (even if lawful) but were permitted to sell corporate insurance to the NRA, and agreed to pay fines of $7 million and $1.3 million respectively. On May 9, Lloyd's officially instructed its syndicates to terminate existing agreements with the NRA and not to insure new ones. It publicly announced its decision to cut ties with the NRA that same day. On December 20, 2018, DFS and Lloyd's entered into their own consent decree, which imposed similar terms and a $5 million fine.

B

The NRA sued Cuomo, Vullo, and DFS. The only claims before the Court today are those against Vullo—namely, claims that Vullo violated the First Amendment by coercing DFS-regulated parties to punish or suppress "the NRA's pro-Second Amendment viewpoint" and "core political speech." *Id.*, at 231, ¶91, 234, ¶101. The complaint asserts both censorship and retaliation First Amendment claims, which the parties and lower courts have analyzed together. Vullo moved to dismiss, arguing that the alleged conduct did not constitute impermissible coercion and that, in the alternative, she was entitled to qualified immunity because she did not violate clearly established law.

The District Court denied Vullo's motion to dismiss the NRA's First-Amendment damages claims. The court held that the NRA plausibly alleged that "the combination of [Vullo's and Cuomo's] actions . . . could be interpreted as a veiled threat to regulated industries to disassociate with the NRA or risk DFS enforcement action." *NRA of Am.* v. *Cuomo*, 525 F. Supp. 3d 382, 402–403 (NDNY 2021). That

threat, the court said, crossed a First Amendment line. The District Court concluded that Vullo was not entitled to qualified immunity at the motion-to-dismiss stage.

The Second Circuit reversed. It concluded that Vullo's alleged actions constituted permissible government speech and legitimate law enforcement, and not unconstitutional coercion. The Second Circuit determined that the Guidance Letters and accompanying press release were not unconstitutionally coercive because they "were written in an even-handed, nonthreatening tone and employed words intended to persuade rather than intimidate." 49 F. 4th, at 717. The court found it significant that Vullo "did not refer to any pending investigations or possible regulatory action" and alluded only to business-related risks "amid growing public concern over gun violence." *Ibid.* As for Vullo's meeting with the Lloyd's executives, the court admitted that the allegations presented a "closer call." *Id.*, at 718. Nonetheless, just as with the consent decrees, it found that Vullo "was merely carrying out her regulatory responsibilities." *Id.,* at 718–719. The Second Circuit also held that, even if the complaint stated a First Amendment violation, the law was not clearly established, and so Vullo was entitled to qualified immunity.

The NRA filed a petition for a writ of certiorari, seeking either summary reversal or review of the First Amendment and qualified immunity holdings. This Court granted certiorari on only the first question presented whether the complaint states a First Amendment claim against Vullo. See 601 U. S. ___ (2023).[3]

——————

[3]Vullo argues that the Court must dismiss the case as improvidently granted because the Court deprived itself of jurisdiction by limiting its review to the First Amendment question and declining to review the Second Circuit's alternative holding that Vullo is entitled to qualified immunity. See Brief for Respondent 21–24. Not so. In this case, "[a]n order limiting the grant of certiorari does not operate as a jurisdictional bar." *Piper Aircraft Co.* v. *Reyno,* 454 U. S. 235, 247, n. 12 (1981). Because the

## II

As discussed below, Vullo was free to criticize the NRA and pursue the conceded violations of New York insurance law. She could not wield her power, however, to threaten enforcement actions against DFS-regulated entities in order to punish or suppress the NRA's gun-promotion advocacy. Because the complaint plausibly alleges that Vullo did just that, the Court holds that the NRA stated a First Amendment violation.

## A

At the heart of the First Amendment's Free Speech Clause is the recognition that viewpoint discrimination is uniquely harmful to a free and democratic society. The Clause prohibits government entities and actors from "abridging the freedom of speech." When government officials are "engaging in their own expressive conduct," though, "the Free Speech Clause has no application." *Pleasant Grove City* v. *Summum*, 555 U. S. 460, 467 (2009). The government can "'say what it wishes'" and "select the views that it wants to express." *Id.*, at 467–468 (quoting *Rosenberger* v. *Rector and Visitors of Univ. of Va.*, 515 U. S. 819, 833 (1995)). That makes sense; the government could barely function otherwise. "When a government entity embarks on a course of action, it necessarily takes a particular viewpoint and rejects others," and thus does not need to "maintain viewpoint-neutrality when its officers and employees speak about that venture." *Matal* v. *Tam*, 582 U. S. 218, 234 (2017).

A government official can share her views freely and criticize particular beliefs, and she can do so forcefully in the

_____

Second Circuit is free to revisit the qualified immunity question in light of this Court's opinion, the NRA still could obtain "'effectual relief'" on remand. *Chafin* v. *Chafin*, 568 U. S. 165, 172 (2013). In such circumstances, it cannot be said that the resolution of the First Amendment question is merely advisory.

Opinion of the Court

hopes of persuading others to follow her lead. In doing so, she can rely on the merits and force of her ideas, the strength of her convictions, and her ability to inspire others. What she cannot do, however, is use the power of the State to punish or suppress disfavored expression. See *Rosenberger*, 515 U. S., at 830 (explaining that governmental actions seeking to suppress a speaker's particular views are presumptively unconstitutional). In such cases, it is "the application of state power which we are asked to scrutinize." *NAACP* v. *Alabama ex rel. Patterson*, 357 U. S. 449, 463 (1958).

In *Bantam Books*, this Court explored the distinction between permissible attempts to persuade and impermissible attempts to coerce. There, a state commission used its power to investigate and recommend criminal prosecution to censor publications that, in its view, were "'objectionable'" because they threatened "youthful morals." 372 U. S., at 59–62, 71. The commission sent official notices to a distributor for blacklisted publications that highlighted the commission's "duty to recommend to the Attorney General" violations of the State's obscenity laws. *Id.*, at 62–63, and n. 5. The notices also informed the distributor that the lists of blacklisted publications "were circulated to local police departments," and that the distributor's cooperation in removing the publications from the shelves would "'eliminate the necessity'" of any referral for prosecution. *Ibid.* A local police officer also conducted followup visits to ensure compliance. In response, the distributor took "steps to stop further circulation of copies of the listed publications" out of fear of facing "'a court action.'" *Id.*, at 63.

The publishers of the blacklisted publications sued the commission, alleging that this scheme of informal censorship violated their First Amendment rights. The commission responded that "it d[id] not regulate or suppress obscenity but simply exhort[ed] booksellers and advise[d] them of their legal rights." *Id.*, at 66. This Court sided with

the publishers, holding that the commission violated their free-speech rights by coercing the distributor to stop selling and displaying the listed publications.

The Court explained that the First Amendment prohibits government officials from relying on the "threat of invoking legal sanctions and other means of coercion . . . to achieve the suppression" of disfavored speech. *Id.,* at 67.  Although the commission lacked the "power to apply formal legal sanctions," the distributor "reasonably understood" the commission to threaten adverse action, and thus the distributor's "compliance with the [c]ommission's directives was not voluntary." *Id.,* at 66–68.  To reach this conclusion, the Court considered things like: the commission's coordination with law enforcement and its authority to refer matters for prosecution; the notices themselves, which were "phrased virtually as orders" containing "thinly veiled threats to institute criminal proceedings" if the distributor did not come around; and the distributor's reaction to the notices and followup visits. *Id.,* at 68.

Since *Bantam Books,* the Courts of Appeals have considered similar factors to determine whether a challenged communication is reasonably understood to be a coercive threat.  Take the decision below, for example.  The Second Circuit purported to consider: "(1) word choice and tone; (2) the existence of regulatory authority; (3) whether the speech was perceived as a threat; and, perhaps most importantly, (4) whether the speech refers to adverse consequences." 49 F. 4th, at 715 (citations omitted).[4]  Other Circuits have taken similarly fact-intensive approaches,

───────────

[4]The NRA posits a three-factor test that looks to: (1) the actor's authority; (2) the content and purpose of the actor's communications; and (3) the reactions of the recipient.  Brief for Petitioner 26.  The NRA concedes, however, that its test is the same as the Second Circuit's, as it considers the fourth factor in the Second Circuit's test of "'whether the speech refers to adverse consequences'" to be an "aspect of the inquiry into the content and purpose of the communication." *Id.,* at 27, n. 8.

utilizing a multifactor test or a totality-of-the-circumstances analysis. See, *e.g.*, *Missouri* v. *Biden*, 83 F. 4th 350, 380 (CA5 2023) ("[T]o help distinguish permissible persuasion from impermissible coercion, we turn to the Second (and Ninth) Circuit's four-factor test"); *Kennedy* v. *Warren*, 66 F. 4th 1199, 1207 (CA9 2023) (applying the Second Circuit's "useful non-exclusive four-factor framework"); *Backpage.com, LLC* v. *Dart*, 807 F. 3d 229, 230–232 (CA7 2015) (considering the same factors as part of a totality-of-the-circumstances analysis); *R. C. Maxwell Co.* v. *New Hope*, 735 F. 2d 85, 88 (CA3 1984) (same). The Courts of Appeals that employ a multifactor test agree that "[n]o one factor is dispositive." 49 F. 4th, at 715; accord, *Kennedy*, 66 F. 4th, at 1210 (explaining that the absence of direct regulatory authority is not dispositive).

Ultimately, *Bantam Books* stands for the principle that a government official cannot do indirectly what she is barred from doing directly: A government official cannot coerce a private party to punish or suppress disfavored speech on her behalf. See, *e.g.*, 372 U. S., at 67–69; see also *Backpage.com*, 807 F. 3d, at 231 (holding that the First Amendment barred a sheriff from "using the power of his office to threaten legal sanctions against . . . credit-card companies for facilitating future speech"); *Okwedy* v. *Molinari*, 333 F. 3d 339, 344 (CA2 2003) (*per curiam*) (holding that a religious group stated a First Amendment claim against a borough president who wrote a letter "contain[ing] an implicit threat of retaliation" against a billboard company displaying the group's disfavored message); cf. *Penthouse Int'l, Ltd.* v. *Meese*, 939 F. 2d, 1011, 1016 (CADC 1991) ("[W]hen the government threatens no sanction—criminal or otherwise—we very much doubt that the government's criticism or effort to embarrass the [intermediary] threatens anyone's First Amendment rights").

### B

The parties and the Solicitor General, who filed an *amicus* brief supporting vacatur, agree that *Bantam Books* provides the right analytical framework for claims that the government has coerced a third party to violate the First Amendment rights of another. They also embrace the lower courts' multifactor test as a useful, though nonexhaustive, guide. Rightly so. Considerations like who said what and how, and what reaction followed, are just helpful guideposts in answering the question whether an official seeks to persuade or, instead, to coerce. Where the parties differ is on the application of the *Bantam Books* framework. The NRA and the Solicitor General reject the Second Circuit's application of the framework, while Vullo defends it. The Court now agrees with the NRA and the Solicitor General.

To state a claim that the government violated the First Amendment through coercion of a third party, a plaintiff must plausibly allege conduct that, viewed in context, could be reasonably understood to convey a threat of adverse government action in order to punish or suppress the plaintiff's speech. See 372 U. S., at 67–68. Accepting the well-pleaded factual allegations in the complaint as true, the NRA plausibly alleged that Vullo violated the First Amendment by coercing DFS-regulated entities into disassociating with the NRA in order to punish or suppress the NRA's gun-promotion advocacy.

Consider first Vullo's authority, which serves as a backdrop to the NRA's allegations of coercion. The power that a government official wields, while certainly not dispositive, is relevant to the objective inquiry of whether a reasonable person would perceive the official's communication as coercive. See *id.*, at 66–67. Generally speaking, the greater and more direct the government official's authority, the less likely a person will feel free to disregard a directive from the official. For example, imagine a local affinity group in New York that receives a strongly worded letter. One

Opinion of the Court

would reasonably expect that organization to react differently if the letter came from, say, the U. S. Attorney for the Southern District of New York than if it came from an out-of-state school board.

As DFS superintendent, Vullo had direct regulatory and enforcement authority over all insurance companies and financial service institutions doing business in New York. See N. Y. Fin. Servs. Law Ann. §§202, 301. Just like the commission in *Bantam Books*, Vullo could initiate investigations and refer cases for prosecution. Indeed, she could do much more than that. Vullo also had the power to notice civil charges and, as this case shows, enter into consent decrees that impose significant monetary penalties.

Against this backdrop, consider Vullo's communications with the DFS-regulated entities, particularly with Lloyd's. According to the NRA, Vullo brought a variety of insurance-law violations to the Lloyd's executives' attention during a private meeting in February 2018. The violations included technical infractions that allegedly plagued the affinity insurance market in New York and that were unrelated to any NRA business. App. to Pet. for Cert. 199–200, Complaint ¶21; accord, *id.,* at 207–208, ¶¶36–37; *id.*, at 223, ¶69. Vullo allegedly said she would be "less interested in pursuing the[se] infractions . . . so long as Lloyd's ceased providing insurance to gun groups, especially the NRA." *Id.*, at 199–200, ¶21. Vullo therefore wanted Lloyd's to disassociate from all gun groups, although there was no indication that such groups had unlawful insurance policies similar to the NRA's. Vullo also told the Lloyd's executives she would "focus" her enforcement actions "solely" on the syndicates with ties to the NRA, "and ignore other syndicates writing similar policies." *Id.*, at 223, ¶69. The message was therefore loud and clear: Lloyd's "could avoid liability for [unrelated] infractions" if it "aided DFS's campaign against gun groups" by terminating its business relationships with them. *Ibid.*

As alleged, Vullo's communications with Lloyd's can be reasonably understood as a threat or as an inducement.  Either of those can be coercive.  As Vullo concedes, the "threat need not be explicit," Brief for Respondent 47, and as the Solicitor General explains, "[t]he Constitution does not distinguish between 'comply or I'll prosecute' and 'comply and I'll look the other way,'" Brief for United States as *Amicus Curiae* 18, n. 7.  So, whether analyzed as a threat or as an inducement, the conclusion is the same: Vullo allegedly coerced Lloyd's by saying she would ignore unrelated infractions and focus her enforcement efforts on NRA-related business alone, if Lloyd's ceased underwriting NRA policies and disassociated from gun-promotion groups.

The reaction from Lloyd's further confirms the communications' coercive nature.  Cf. *Bantam Books*, 372 U. S., at 63, 68 (noting that the distributor's "reaction on receipt of a notice was to take steps to stop further circulation of copies of the listed publications").  At the meeting itself, Lloyd's "agreed that it would instruct its syndicates to cease underwriting firearm-related policies and would scale back its NRA-related business."  App. to Pet. for Cert. 223, Complaint ¶69.  Minutes from a subsequent board of directors' meeting reveal that Lloyd's thought "the DFS investigation had transformed the gun issue into 'a regulatory, legal[,] and compliance matter.'"  2 App. to Pet. for Cert. 29 (Sealed).  That reaction is consistent with Lloyd's public announcement that it had directed its syndicates to "terminate all insurance related to the NRA and not to provide any insurance to the NRA in the future."  App. to Pet. for Cert. 224, Complaint ¶72; accord, *id*., at 306, ¶20 (consent decree memorializing commitment not to underwrite, or participate in, NRA-endorsed programs).

Other allegations, viewed in context, reinforce the NRA's First Amendment claim.  Consider the April 2018 Guidance Letters and accompanying press release, which Vullo issued on official letterhead.  Cf. *Bantam Books*, 372 U. S., at

61–63, and n. 5 (discussing notice issued in "official Commission stationery"). Just like in her meeting with the Lloyd's executives, here too Vullo singled out the NRA and other gun-promotion organizations as the targets of her call to action. This time, the Guidance Letters reminded DFS-regulated entities of their obligation to consider their "reputational risks," and then tied that obligation to an encouragement for "prompt actio[n] to manag[e] these risks." App. to Pet. for Cert. 248, 251. Evocative of Vullo's private conversation with the Lloyd's executives a few weeks earlier, the press release revealed how to manage the risks by encouraging DFS-regulated entities to "'discontinu[e] their arrangements with the NRA,'" just like Chubb did when it stopped underwriting Carry Guard. App. to Pet. for Cert. 244. A follow-on tweet from Cuomo reaffirmed the message: Businesses in New York should "'consider their reputations'" and "'revisit any ties they have to the NRA,'" which he called "'an extremist organization.'" *Id.*, at 213, ¶51.

In sum, the complaint, assessed as a whole, plausibly alleges that Vullo threatened to wield her power against those refusing to aid her campaign to punish the NRA's gun-promotion advocacy. If true, that violates the First Amendment.

## C

In holding otherwise, the Second Circuit found that: (1) the "Guidance Letters and Press Release are clear examples of permissible government speech"; and (2) the Lloyd's meeting was "legitimate enforcement action" in which Vullo was "merely carrying out her regulatory responsibilities" by offering "leniency in the course of negotiating a resolution of the apparent insurance law violations." 49 F. 4th, at 717–719. The Second Circuit could only reach this conclusion by taking the allegations in isolation and failing to draw reasonable inferences in the NRA's favor in violation

of this Court's precedents. Cf. *Iqbal*, 556 U. S., at 678–679; *Bell Atlantic Corp.* v. *Twombly*, 550 U. S. 544, 570 (2007).

For example, the Second Circuit failed to analyze the Guidance Letters and press release against the backdrop of other allegations in the complaint, including the Lloyd's meeting. Moreover, as discussed above, the complaint alleges that Vullo made a not-so-subtle, sanctions-backed threat to Lloyd's to cut all business ties with the NRA and other gun-promotion groups, although there was no sign that other gun groups also had unlawful insurance policies. See *supra*, at 13. It is also relevant that Vullo made this alleged threat in a meeting where she presented her "desire to leverage [her] powers to combat the availability of firearms, including specifically by weakening the NRA." App. to Pet. for Cert. 221, Complaint ¶67; *id.*, at 223, ¶69 (alleging Vullo hoped to enlist DFS-regulated entities in "aid[ing] DFS's campaign against gun groups"). Given the obligation to draw reasonable inferences in the NRA's favor and consider the allegations as a whole, the Second Circuit erred in reading the complaint as involving only individual instances of "permissible government speech" and the execution of Vullo's "regulatory responsibilities." 49 F. 4th, at 717–719.

For the same reasons, this Court cannot simply credit Vullo's assertion that "pursuing conceded violations of the law," Brief for Respondent 29, is an "'obvious alternative explanation'" for her actions that defeats the plausibility of any coercive threat raising First Amendment concerns, *id.*, at 37, 40, 42 (quoting *Iqbal*, 556 U. S., at 682). Of course, discovery in this case might show that the allegations of coercion are false, or that certain actions should be understood differently in light of newly disclosed evidence. At this stage, though, the Court must assume the well-pleaded

Opinion of the Court

factual allegations in the complaint are true.[5]

Moreover, the conceded illegality of the NRA-endorsed insurance programs does not insulate Vullo from First Amendment scrutiny under the *Bantam Books* framework. Indeed, the commission in that case targeted the distribution and display of material that, in its view, violated the State's obscenity laws. Nothing in that case turned on the distributor's compliance with state law. On the contrary, *Bantam Books* held that the commission violated the First Amendment by invoking legal sanctions to suppress disfavored publications, some of which may or may not contain protected speech (*i.e.*, nonobscene material). See 372 U. S., at 64, 67. Here, too, although Vullo can pursue violations of state insurance law, she cannot do so in order to punish or suppress the NRA's protected expression. So, the contention that the NRA and the insurers violated New York law does not excuse Vullo from allegedly employing coercive threats to stifle gun-promotion advocacy.

Vullo next argues that this case does not involve unconstitutional coercion because her challenged actions in fact targeted business practices and relationships, which qualify as "nonexpressive activity." Brief for Respondent 32. The argument is misplaced. That Vullo "regulate[d]" business activities stemming from the NRA's "relationships with insurers and banks," *ibid.*, does not change the allegations that her actions were aimed at punishing or suppressing speech. In *Bantam Books*, the commission interfered with the business relationship between the distributor and

──────────

[5]Vullo also argues that she is entitled to absolute prosecutorial immunity for her enforcement actions. See Brief for Respondent 25–28. Putting aside whether a financial regulator like Vullo is entitled to such immunity in the administrative context, because Vullo did not raise this defense below with respect to the First Amendment claim (or even with respect to allegations unrelated to the consent decrees), the Court declines to consider that argument here in the first instance.

the publishers in order to suppress the publishers' disfavored speech. 372 U. S., at 66–71. Similarly, in *Backpage.com*, a sheriff interfered with a website's business relationships with payments-service providers in order to eliminate the website's "adult section" (if not the website itself). 807 F. 3d, at 230–232, 235–236. In that case, the sheriff wanted to "suffocat[e]" the website, "depriving the company of ad revenues by scaring off its payments-service providers." *Id.*, at 231. "The analogy," the Seventh Circuit explained, "is to killing a person by cutting off his oxygen supply rather than by shooting him." *Ibid.* So too here. One can reasonably infer from the complaint that Vullo coerced DFS-regulated entities to cut their ties with the NRA in order to stifle the NRA's gun-promotion advocacy and advance her views on gun control. See, *e.g.*, *supra*, at 12–15; App. to Pet. for Cert. 221, 230–235, Complaint ¶¶67, 87–105. Vullo knew, after all, that the NRA relied on insurance and financing "to disseminate its message." *Id.*, at 231, ¶92; see *id.*, at 203–204, ¶¶28–29.[6]

Lastly, Vullo falls back on the argument that a ruling in the NRA's favor would interfere with the government's ability to function properly. She claims that the NRA's position, if accepted, would stifle government speech and hamper legitimate enforcement efforts. This argument falls flat for the simple reason that it requires the Court to accept Vullo's limited reading of the complaint. The Court does not break new ground in deciding this case. It only reaffirms the general principle from *Bantam Books* that where, as here, the complaint plausibly alleges coercive threats aimed at punishing or suppressing disfavored speech, the plaintiff states a First Amendment claim.

———————

[6] Vullo's boss, Governor Cuomo, also urged businesses to disassociate with the NRA to put the organization "into financial jeopardy" and "shut them down." App. 21 (Aug. 3, 2018, tweet).

### III

The NRA's allegations, if true, highlight the constitutional concerns with the kind of intermediary strategy that Vullo purportedly adopted to target the NRA's advocacy. Such a strategy allows government officials to "expand their regulatory jurisdiction to suppress the speech of organizations that they have no direct control over." Brief for First Amendment Scholars as *Amici Curiae* Supporting Petitioner 8. It also allows government officials to be more effective in their speech-suppression efforts "[b]ecause intermediaries will often be less invested in the speaker's message and thus less likely to risk the regulator's ire." *Ibid.* The allegations here bear this out. Although "the NRA was not even the directly regulated party," Brief for Respondent 32, Vullo allegedly used the power of her office to target gun promotion by going after the NRA's business partners. Insurers in turn followed Vullo's lead, fearing regulatory hostility.

Nothing in this case gives advocacy groups like the NRA a "right to absolute immunity from [government] investigation," or a "right to disregard [state or federal] laws." *Patterson*, 357 U. S., at 463. Similarly, nothing here prevents government officials from forcefully condemning views with which they disagree. For those permissible actions, the Constitution "relies first and foremost on the ballot box, not on rules against viewpoint discrimination, to check the government when it speaks." *Shurtleff* v. *Boston*, 596 U. S. 243, 252 (2022). Yet where, as here, a government official makes coercive threats in a private meeting behind closed doors, the "ballot box" is an especially poor check on that official's authority. Ultimately, the critical takeaway is that the First Amendment prohibits government officials from wielding their power selectively to punish or suppress speech, directly or (as alleged here) through private intermediaries.

Opinion of the Court

\*    \*    \*

For the reasons discussed above, the Court holds that the NRA plausibly alleged that Vullo violated the First Amendment by coercing DFS-regulated entities to terminate their business relationships with the NRA in order to punish or suppress the NRA's advocacy.

The judgment of the U. S. Court of Appeals for the Second Circuit is vacated, and the case remanded for further proceedings consistent with this opinion.[7]

*It is so ordered.*

——————

[7] On remand, the Second Circuit is free to reconsider whether Vullo is entitled to qualified immunity.

# SUPREME COURT OF THE UNITED STATES

————

No. 22–842

————

## NATIONAL RIFLE ASSOCIATION OF AMERICA, PETITIONER *v.* MARIA T. VULLO

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SECOND CIRCUIT

[May 30, 2024]

JUSTICE GORSUCH, concurring.

I write separately to explain my understanding of the Court's opinion, which I join in full. Today we reaffirm a well-settled principle: "A government official cannot coerce a private party to punish or suppress disfavored speech on her behalf." *Ante,* at 11. As the Court mentions, many lower courts have taken to analyzing this kind of coercion claim under a four-pronged "multifactor test." *Ibid.* These tests, the Court explains, might serve "as a useful, though nonexhaustive, guide." *Ante,* at 12. But sometimes they might not. Cf. *Axon Enterprise, Inc.* v. *FTC,* 598 U. S. 175, 205–207 (2023) (GORSUCH, J., concurring in judgment). Indeed, the Second Circuit's decision to break up its analysis into discrete parts and "tak[e] the [complaint's] allegations in isolation" appears only to have contributed to its mistaken conclusion that the National Rifle Association failed to state a claim. *Ante,* at 15. Lower courts would therefore do well to heed this Court's directive: Whatever value these "guideposts" serve, they remain "just" that and nothing more. *Ante,* at 12. "Ultimately, the critical" question is whether the plaintiff has "plausibly allege[d] conduct that, viewed in context, could be reasonably understood to convey a threat of adverse government action in order to punish or suppress the plaintiff's speech." *Ante,* at 12, 19.

Cite as: 602 U. S. ____ (2024)          1

JACKSON, J., concurring

# SUPREME COURT OF THE UNITED STATES

————————

No. 22–842

————————

## NATIONAL RIFLE ASSOCIATION OF AMERICA, PETITIONER *v.* MARIA T. VULLO

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

[May 30, 2024]

JUSTICE JACKSON, concurring.

Applying our decision in *Bantam Books, Inc.* v. *Sullivan*, 372 U. S. 58 (1963), the Court today explains that a "government official cannot coerce a private party to punish or suppress disfavored speech on her behalf." *Ante,* at 11. I agree. I write separately to stress the important distinction between government coercion, on the one hand, and a violation of the First Amendment, on the other.

I

Coercion of a third party can be the means by which the government violates the First Amendment rights of another. But the fact of coercion, without more, does not state a First Amendment claim. Rather, in addition to finding that the government has crossed a line from persuasion to coercion, courts must assess how that coercion actually violates a speaker's First Amendment rights.

Our decision in *Bantam Books* provides one example of how government coercion of a third party can indirectly bring about a First Amendment violation. As the majority explains, *ante,* at 9–10, *Bantam Books* held that a Rhode Island commission's efforts to coerce intermediary book distributors into pulling certain publications from circulation violated the First Amendment rights of the books' publish-

2    NATIONAL RIFLE ASSOCIATION OF AMERICA *v.* VULLO

JACKSON, J., concurring

ers, 372 U. S., at 61–62, 66–67.  Even though the state commission had not itself "seized or banned" any books, "the threat of invoking legal sanctions and other means of coercion, persuasion, and intimidation" against the distributors "directly and designedly stopped the circulation of publications in many parts of Rhode Island." *Id.*, at 67–68. Essentially, the State's threats to third parties—the distributors—erected through private hands an "effective state regulation . . . of obscenity." *Id.*, at 69.  And the government could not escape responsibility for the distributors' actions merely because the commission did not itself seize any books.  See *id.*, at 66–67.

Notably, however, the government's coercion of the distributors into doing its bidding was not—in and of itself— what offended the First Amendment.  Rather, by threatening those third-party conduits of speech, the state commission had effectively "subject[ed] the distribution of publications to a system of prior administrative restraints" lacking the requisite constitutional safeguards.  *Id.*, at 70.  Put another way, by exerting pressure on a third party, the State had constructed a "system of informal censorship."  *Id.*, at 71.

The lesson of *Bantam Books* is that "a government official cannot do indirectly what she is barred from doing directly." *Ante,* at 11.  That case does *not* hold that government coercion alone violates the First Amendment.  And recognizing the distinction between government coercion and a First Amendment violation is important because our democracy can function only if the government can effectively enforce the rules embodied in legislation; by its nature, such enforcement often involves coercion in the form of legal sanctions.  The existence of an allegation of government coercion of a third party thus merely invites, rather than answers, the question whether that coercion indirectly worked a violation of the plaintiff's First Amendment rights.

JACKSON, J., concurring

## II

Whether and how government coercion of a third party might violate another party's First Amendment rights will depend on the facts of the case. Indeed, under our precedents, determining whether government action violates the First Amendment requires application of different doctrines that vary depending on the circumstances. Different circumstances—who is being coerced to do what, and why—may implicate different First Amendment inquiries.

In *Bantam Books* and many cases applying it, the coercion and First Amendment inquiries practically merge. This is because those cases tend to follow a similar fact pattern: The plaintiff claims that the government coerced a distributor, purveyor, or conduit of expression—like a billboard company, television station, or book retailer—to shut down the speech of another party that relies on that distributor, purveyor, or conduit to spread its message.* Coercing an entity in the business of disseminating speech to stop disseminating someone else's speech obviously implicates the First Amendment, insofar as it may result in censorship similar to the prior restraint identified in *Bantam Books*.

But, in my view, that censorship theory is an awkward fit with the facts of *this* case. According to the complaint, Vullo coerced various regulated entities to cut business ties with the National Rifle Association (NRA). See *ante,* at 3–5. The

———————

*See, *e.g.*, *Okwedy* v. *Molinari*, 333 F. 3d 339, 340, 342–344 (CA2 2003) (*per curiam*) (billboard company); *R. C. Maxwell Co.* v. *New Hope*, 735 F. 2d 85, 85–88 (CA3 1984) (same); *American Family Assn., Inc.* v. *City and County of San Francisco*, 277 F. 3d 1114, 1119–1120 (CA9 2002) (television stations); *Kennedy* v. *Warren*, 66 F. 4th 1199, 1204–1205 (CA9 2023) (online book retailer); *Penthouse Int'l, Ltd.* v. *Meese*, 939 F. 2d 1011, 1013–1016 (CADC 1991) (convenience stores carrying pornographic magazines); *Hammerhead Enterprises, Inc.* v. *Brezenoff*, 707 F. 2d 33, 34–38 (CA2 1983) (department stores carrying satirical board game); *VDARE Foundation* v. *Colorado Springs*, 11 F. 4th 1151, 1156–1157 (CA10 2021) (resort hosting advocacy group conference).

4   NATIONAL RIFLE ASSOCIATION OF AMERICA *v.* VULLO

JACKSON, J., concurring

NRA does not contend that its (concededly unlawful) insurance products offered through those business relationships were themselves "speech," akin to a billboard, a television ad, or a book.  Nor does the complaint allege that Vullo pressured the printer of American Rifleman (a longstanding NRA periodical) to stop printing the magazine, or coerced a convention center into canceling the NRA's annual meeting.  See *VDARE Foundation* v. *Colorado Springs*, 11 F. 4th 1151, 1157 (CA10 2021).  In other words, the effect of Vullo's alleged coercion of regulated entities on the NRA's speech is significantly more attenuated here than in *Bantam Books* or most decisions applying it.  It is, for instance, far from obvious that Vullo's conduct toward regulated entities established "a system of prior administrative restraints" against the NRA's expression.  *Bantam Books*, 372 U. S., at 70.

Of course, as the majority correctly observes, none of that means that Vullo may target with impunity the NRA's "'nonexpressive'" activity if she is doing so to punish the NRA for its expression.  See *ante,* at 17.  But it does suggest that our First Amendment retaliation cases might provide a better framework for analyzing these kinds of allegations—*i.e.*, coercion claims that are not directly related to the publication or distribution of speech.  And, fortunately for the NRA, the complaint in this case alleges both censorship and retaliation theories for how Vullo violated the First Amendment—theories that, in my opinion, deserve separate analyses.

"'[A]s a general matter,' the First Amendment prohibits government officials from subjecting individuals to 'retaliatory actions' after the fact for having engaged in protected speech." *Houston Community College System* v. *Wilson*, 595 U. S. 468, 474 (2022) (quoting *Nieves* v. *Bartlett*, 587 U. S. 391, 398 (2019)).  "[A] plaintiff pursuing a First Amendment retaliation claim must show, among other things, that the government took an 'adverse action' in response to his

speech that 'would not have been taken absent the retaliatory motive.'" *Wilson*, 595 U. S., at 477 (quoting *Nieves*, 587 U. S., at 399). Although our analysis has varied by context, see *Lozman* v. *Riviera Beach*, 585 U. S. 87, 96–99 (2018), we have generally required plaintiffs claiming First Amendment retaliation to "establish a 'causal connection' between the government defendant's 'retaliatory animus' and the plaintiff's 'subsequent injury,'" *Nieves*, 587 U. S., at 398 (quoting *Hartman* v. *Moore*, 547 U. S. 250, 259 (2006)).

Requiring that causal connection to a retaliatory motive is important, because "[s]ome official actions adverse to . . . a speaker might well be unexceptionable if taken on other grounds." *Id.*, at 256. In this case, for example, analyzing causation matters because much of Vullo's alleged conduct, if not done for retaliatory reasons, might otherwise be legitimate enforcement of New York's insurance regulations.

How a retaliation analysis should proceed in this case was not addressed below, so the Court rightly leaves that question unanswered today. But, importantly, any such analysis requires more than asking simply whether the government's actions crossed the threshold from permissible persuasion to impermissible coercion. The NRA concedes that, at the very least, our burden-shifting framework from *Mt. Healthy City Bd. of Ed.* v. *Doyle*, 429 U. S. 274 (1977), likely applies. See Reply Brief 16–17. Should that test govern, the NRA would have to plausibly allege that a retaliatory motive was a "'substantial'" or "'motivating factor'" in Vullo's targeting of the regulated entities doing business with the NRA. *Mt. Healthy*, 429 U. S., at 287. Vullo, in turn, could rebut that allegation by showing that she would have taken the same action "even in the absence of the [NRA's] protected conduct." *Ibid.*; see *Lozman*, 585 U. S., at 96 ("[E]ven if retaliation might have been a substantial motive for the board's action, still there was no liability unless the alleged constitutional violation was a but-for cause of the employment termination").

JACKSON, J., concurring

\*    \*    \*

The NRA's complaint advances both censorship and retaliation claims, yet the lower courts in this case lumped these claims together and ultimately focused almost exclusively on whether Vullo's conduct was coercive. See *ante,* at 6–7. Consequently, the strength of the NRA's claim under the *Mt. Healthy* framework has received little attention thus far. On remand, the parties and lower courts should consider the censorship and retaliation theories independently, mindful of the distinction between government coercion and the ways in which such coercion might (or might not) have violated the NRA's constitutional rights. That analysis can and should likewise consider which First Amendment framework best captures the NRA's allegations in this case. See, *e.g.*, *VDARE*, 11 F. 4th, at 1159–1175 (separately analyzing censorship and retaliation claims).