

Hogan Lovells US LLP
Columbia Square
555 Thirteenth Street, NW
Washington, DC 20004
T  +1 202 637 5600
F  +1 202 637 5910
www.hoganlovells.com

July 29, 2024

**BY CM/ECF**

Catherine O'Hagan Wolfe
Clerk of Court
U.S. Court of Appeals for the Second Circuit
40 Foley Square
New York, NY 10007

Re:  *National Rifle Association of America v. Vullo*, No. 21-636-cv

Dear Ms. Wolfe:

Following the Supreme Court's decision in *NRA v. Vullo*, 602 U.S. 175 (2024) (*Vullo II*), this Court requested supplemental letter briefing on "the impact of" that decision on this Court's prior judgment that Maria Vullo "is protected by qualified immunity." Order, ECF No. 135 (July 8, 2024). The Supreme Court's decision does not alter this Court's prior judgment that Vullo is entitled to qualified immunity. This Court should reinstate the portion of its decision granting Vullo qualified immunity and remand for the District Court to enter final judgment in her favor.

This Court previously issued two independent holdings in the alternative. First, the Court held that "the NRA has failed to plausibly allege that Vullo" violated the First Amendment. *NRA v. Vullo*, 49 F.4th 700, 707 (2d Cir. 2022) (*Vullo I*). Second, and independently, the Court held that "even assuming that Vullo's actions and statements were somehow coercive," her conduct "did not violate clearly established law" and Vullo was accordingly entitled to qualified immunity. *Id.*

The Supreme Court granted review of the first holding only, and pointedly did not grant certiorari on the second, though the NRA sought review on both. The Supreme Court held the NRA had plausibly alleged a First Amendment claim against Vullo. *Vullo II*, 602 U.S. at 187. But it did not review this Court's alternative holding that the First Amendment right was not clearly established at the time of

Hogan Lovells US LLP is a limited liability partnership registered in the state of Delaware. "Hogan Lovells" is an international legal practice that includes Hogan Lovells US LLP and Hogan Lovells International LLP, with offices in: Alicante Amsterdam Baltimore Berlin Beijing Birmingham Boston Brussels Colorado Springs Denver Dubai Dusseldorf Frankfurt Hamburg Hanoi Ho Chi Minh City Hong Kong Houston Johannesburg London Los Angeles Luxembourg Madrid Mexico City Miami Milan Minneapolis Monterrey Munich New York Northern Virginia Paris Philadelphia Riyadh Rome San Francisco São Paulo Shanghai Silicon Valley Singapore Sydney Tokyo Warsaw Washington, D.C. Associated Offices: Budapest Jakarta Shanghai FTZ.  Business Service Centers: Johannesburg Louisville.  For more information see www.hoganlovells.com

Vullo's alleged conduct.  Although the Supreme Court stated that this Court "is free to revisit the qualified immunity question in light of" the Supreme Court's opinion, *id.* at 186 n.3, the Supreme Court's decision does not undermine this Court's determination that Vullo is entitled to qualified immunity.  This Court should retain its alternative holding and direct final judgment in Vullo's favor.

The relevant question for qualified-immunity purposes is whether case law in existence *at the time of* Vullo's alleged conduct clearly established that the challenged actions were unconstitutional.  As the Supreme Court and this Court have held, case law that postdates an official's challenged conduct does not bear on the qualified-immunity analysis.  This Court must therefore ask whether precedent at the time Vullo acted clearly established that her alleged conduct was unconstitutional.

This Court already correctly answered that question: "The NRA has not cited, and we are not aware of, any case analogous to this one." *Vullo I*, 49 F.4th at 720.  This Court correctly explained that regardless of whether Vullo's alleged conduct violated the First Amendment, "the contours of that right were not so 'sufficiently clear' that a reasonable official in the circumstances here would have understood that what she was doing violated that right." *Id*. at 719.  Nothing in the Supreme Court's decision changes this conclusion.  Before this case, the Supreme Court had issued only one decision finding impermissible coercion, *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963).  The conduct in *Bantam Books*—a 60-year-old case involving threats to criminally prosecute booksellers for selling publications the state found objectionable—was far different than the allegations here.  Although the Supreme Court in *Vullo II* noted that its holding followed from *Bantam Books*, applying a high-level constitutional principle to novel factual circumstances does not mean that "any reasonable official in the defendant's shoes" would have understood that their conduct was unlawful, as needed to overcome qualified immunity. *Plumhoff v. Rickard*, 572 U.S. 765, 778-779 (2014).

The fact that a unanimous panel of this Court previously concluded that Vullo did not violate the First Amendment is compelling evidence that the claimed right was not clearly established.  "It is difficult to ask that a [defendant] identify clearly established law that three judges of this Court could not find." *Terebesi v. Torreso*, 764 F.3d 217, 233 (2d Cir. 2014).  It would be dangerous and anomalous to hold a government official liable for money damages on the ground that the law was "clearly established," when three judges of this Court reached the opposite conclusion.  The purpose of qualified immunity is to provide a zone of freedom for

government officials to operate within their official duties without fear that they will be subject to liability. That freedom cannot exist if qualified immunity holds government officials to a higher standard than members of this Court. As this Court explained, qualified immunity "gives government officials the breathing room to make reasonable, even if mistaken, judgments." *Vullo I*, 49 F.4th at 714. This Court previously concluded that "Vullo acted reasonably and in good faith in endeavoring to meet the duties and responsibilities of her office." *Id.* at 707. The Court should reaffirm that Vullo is entitled to qualified immunity.

## Background

Vullo is the former Superintendent of the New York Department of Financial Services (DFS). While Vullo was serving in that role in 2017, DFS began investigating Carry Guard, an insurance product that the NRA marketed in partnership with Lockton Affinity, LLC, and a subsidiary of Chubb Ltd. JA 149-150, 191, 231.[1] DFS's subsequent investigation revealed multiple serious violations of New York insurance law. Carry Guard provided insurance coverage for unlawful use of a firearm, in violation of New York law and public policy, and the NRA marketed it and received compensation without a required insurance producer license. *See* JA 66-68. DFS also discovered that the NRA had unlawfully marketed other insurance programs underwritten by Lloyd's of London. JA 229. Based on these violations, Lockton, Chubb, and Lloyd's entered consent orders admitting violations of New York law and agreed to penalties. JA 189-208, 210-221, 229-254. After Vullo's departure from DFS, the NRA agreed to penalties in its own consent order. N.Y.S. DFS, Consent Order, *In re The Nat'l Rifle Ass'n of Am.*, No. 2020-0003-C, at 6, 8 (Nov. 13, 2020), https://perma.cc/H2BR-7Q9N.

In February 2018, in the midst of DFS's investigation, a shooter opened fire at a high school in Parkland, Florida, killing 17 students and staff. In the wake of the shooting, the NRA faced intense backlash. In April 2018, two months after the shooting, Vullo sent letters to regulated entities addressing the reputational risk of working with gun groups, including the NRA. JA 182-187. These Guidance Letters discussed the Parkland shooting and "encourage[d]" regulated entities to "continue evaluating and managing their risks, including reputational risks"—"if any"—and to "take prompt actions to manag[e] these risks." JA 184.

---

[1] The Joint Appendix (JA) is available at ECF Nos. 28 and 125. The Special Appendix (SPA) is available at ECF No. 29.

3

The NRA sued, alleging that Vullo's actions violated its rights by coercing insurers and banks to stop doing business with it. The NRA's third complaint included a First Amendment "[c]ensorship" claim, a First Amendment "[r]etaliat[ion]" claim, and a "selective enforcement" claim. JA 168-175. The District Court dismissed the selective-enforcement claim on the ground that "Ms. Vullo's decision to enter into the Lockton, Lloyd's and Chubb Consent Orders," the "precise terms" of the orders, and their "negotiat[ions]," were all entitled to "absolute immunity" because they are "prosecutorial actions premised on enforcement decisions intimately associated with the judicial process." SPA 11-22. The District Court declined to dismiss the censorship and retaliation claims, concluding that Vullo was not entitled to qualified immunity at the motion-to-dismiss stage. SPA 23-28.

Vullo filed this interlocutory appeal challenging the denial of qualified immunity, and this Court reversed on two alternative grounds. The Court first held that the NRA had failed to plausibly allege a constitutional violation. *See Vullo I*, 49 F.4th at 716-719. Alternatively, the Court held that, "even assuming the NRA sufficiently pleaded that Vullo engaged in unconstitutionally threatening or coercive conduct," she is "entitled to qualified immunity because the law was not clearly established and any First Amendment violation would not have been apparent to a reasonable official at the time." *Id.* at 719. Prior cases addressing First Amendment coercion "did not provide clear and particularized guidance" to an official in Vullo's position, because those cases "involved very different circumstances and much stronger conduct." *Id.* In these circumstances, "Vullo acted reasonably and in good faith in endeavoring to meet the duties and responsibilities of her office." *Id.* at 707.

The NRA petitioned for certiorari on both the First Amendment question and the qualified-immunity question. The Supreme Court granted review on the First Amendment question only and held that the NRA had plausibly alleged a First Amendment claim. *Vullo II*, 602 U.S. at 198. The Supreme Court focused on the NRA's allegation that, in the course of Vullo's investigation of the NRA's illegal insurance products, Vullo had a secret meeting with senior executives from Lloyd's in which she offered leniency if Lloyd's severed ties with the NRA. Vullo vehemently denies that such a meeting occurred or that she ever made any threats but recognizes that these allegations must be accepted as true at the motion-to-dismiss stage. *See Vullo II*, 602 U.S. at 195 (noting further proceedings might show "the allegations of coercion are false").

Taking the NRA's narrative as true, the Supreme Court read the complaint to allege that Vullo "coerced Lloyd's by saying she would ignore unrelated infractions and focus her enforcement efforts on NRA-related business alone, if Lloyd's ceased underwriting NRA policies and disassociated from gun-promotion groups." *Id.* at 193. From this, the Supreme Court held that the NRA had plausibly stated a claim that Vullo had "threatened to wield her power against those refusing to aid her campaign to punish the NRA's gun-promotion advocacy." *Id.* at 194.

Having declined to grant certiorari on qualified immunity, the Court did not address that issue. But, in rejecting the argument that its decision would amount to an advisory opinion, it noted that this Court is "free to reconsider whether Vullo is entitled to qualified immunity" on remand. *Id.* at 199 n.7.

## Argument

"[Q]ualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (citation omitted). "To lose immunity, an official must violate a right, the contours of which are sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Drimal v. Tai*, 786 F.3d 219, 225 (2d Cir. 2015) (quotation marks omitted). Qualified immunity "gives government officials the breathing room to make reasonable, even if mistaken, judgments," *Vullo I*, 49 F.4th at 714, by protecting officials from damages and freeing them from the disruptive consequences of litigation, *Ashcroft v. Iqbal*, 556 U.S. 662, 685 (2009).

The Supreme Court's First Amendment decision in this case clearly establishes law going forward, but it does not retroactively clarify the law at the time of Vullo's alleged actions. As this Court previously held, no prior case from the Supreme Court or this Circuit had recognized a First Amendment coercion claim in circumstances that would have put Vullo on notice that her conduct was unlawful. Although the Supreme Court stated that its opinion followed from *Bantam Books*, the fact that a constitutional holding in new factual circumstances follows from legal precedent does not suggest that that precedent put the question "beyond debate." *White v. Pauly*, 580 U.S. 73, 79 (2017) (per curiam) (quotation marks omitted). Vullo is immune from the NRA's claims.

5

## I. The Supreme Court's Decision Did Not Alter This Court's Judgment On Qualified Immunity.

The Supreme Court's decision did not affect this Court's qualified-immunity ruling because the Supreme Court chose not to review that ruling. A court determining whether an official is entitled to qualified immunity must ask "whether the right at issue was 'clearly established' at the time of [the] defendant's alleged misconduct." *Pearson*, 555 U.S. at 232. "To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent." *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018).

The Supreme Court has therefore rejected attempts by plaintiffs to claim that a legal principle was clearly established by cases decided after an official's alleged conduct. Decisions that "postdate the conduct in question * * * could not have given fair notice to [the official] and are of no use in the clearly established inquiry." *Brosseau v. Haugen*, 543 U.S. 194, 200 n.4 (2004) (per curiam). "[A] reasonable officer is not required to foresee judicial decisions that do not yet exist in instances where the requirements of the [Constitution] are far from obvious." *Kisela v. Hughes*, 584 U.S. 100, 107 (2018) (per curiam). Indeed, the Supreme Court has *summarily reversed* courts of appeals that rely on decisions postdating the challenged conduct to defeat qualified immunity, explaining that such precedent is "of no use in the clearly established inquiry." *Id.* (quotation marks omitted).

This Court agrees. Officials "are not 'expected to predict the future course of constitutional law,' and 'it is unfair to subject [defendants] to money damages for picking the losing side of the controversy.'" *Terebesi*, 764 F.3d at 233. "Only Supreme Court and Second Circuit precedent existing at the time of the alleged violation is relevant in deciding whether a right is clearly established." *Moore v. Vega*, 371 F.3d 110, 114 (2d Cir. 2004). "[C]ases published after the incident should not be considered in determining clearly established law." *Jones v. Treubig*, 963 F.3d 214, 227 (2d Cir. 2020).

That principle applies here. The Supreme Court's analysis of the constitutional merits in 2024 does not bear on whether the asserted right was clearly established when Vullo acted in 2017 and 2018. The Supreme Court's decision did not address whether the right was clearly established at the time Vullo acted, nor can its decision clearly establish the right retroactively.

Although *Kisela*'s bar on citing precedent postdating an official's conduct does not apply when the precedent addresses the step-two question of whether the

6

law was clearly established on some prior date, *Jones*, 963 F.3d at 227, that principle does not apply to the Supreme Court's decision in *Vullo II*. The "Supreme Court's concern" in *Kisela* "specifically relate[s]" to step-one decisions "published after the officer's conduct at issue that establish the right *in the first instance*." *Id*. Here, the Supreme Court's decision in *Vullo II* addressed only the step-one question whether the NRA alleged a First Amendment violation in the first instance. *Vullo II* has no bearing on this Court's alternative step-two qualified-immunity determination.

## II. No Precedent Clearly Established That Vullo's Alleged Conduct Violated The First Amendment.

As this Court correctly held in its prior opinion, no precedent in effect at the time of Vullo's alleged conduct gave clear notice that the conduct violated the First Amendment. Nothing about the Supreme Court's conclusion that the NRA plausibly alleged a constitutional violation alters that conclusion. *Bantam Books* differed from this case in key respects and thus did not clearly establish that the right it recognized would apply here. The same goes for Second Circuit cases addressing First Amendment coercion claims. Vullo is entitled to qualified immunity.

1. In *Vullo II*, the Supreme Court explained that a "government official cannot coerce a private party to punish or suppress disfavored speech on her behalf." 602 U.S. at 190. Applying that high-level legal principle to the allegations in the complaint, the Court concluded that the NRA plausibly alleged a First Amendment violation. *Id.* at 194.

Under settled qualified-immunity principles, it does not suffice for a general legal principle to be clearly established at that level of abstraction. Rather, what must be clearly established at the time of the official's conduct is how that general principle applies to conduct like that in question. *Anderson*, 483 U.S. at 639. For instance, "the right to due process of law is quite clearly established by the Due Process Clause," but that does not mean that "any action that violates that Clause (no matter how unclear it may be that the particular action is a violation) violates a clearly established right." *Id.* Such an approach "would destroy the balance that [the Court's] cases strike between the interests in vindication of citizens' constitutional rights and in public officials' effective performance of their duties." *Id.* (quotation marks omitted). "The dispositive question is whether the violative nature of *particular* conduct is clearly established," "in light of the specific context of the case." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (per curiam) (quotation marks omitted). Accordingly, the Supreme Court has "repeatedly told courts" "not to

7

define clearly established law at a high level of generality." *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011).

To defeat qualified immunity, the existence of the right must be undisputable: "existing precedent must have placed the statutory or constitutional question *beyond debate*." *White*, 580 U.S. at 79 (quotation marks and citations omitted). Qualified immunity applies unless "any reasonable official in the defendant's shoes would have understood that he was violating" the right. *Plumhoff*, 572 U.S. at 778-779.

Defining the right in question with particularity is especially important under the First Amendment. Like the right to due process, freedom of speech is a broad and general standard that cannot itself clearly establish law absent application in analogous factual circumstances. *See Radwan v. Manuel*, 55 F.4th 101, 122 (2d Cir. 2022); *Bacon v. Phelps*, 961 F.3d 533, 545 (2d Cir. 2020). That is particularly true for coercion claims, where precedent is scarce and courts apply a "multifactor test" that provides "useful, though nonexhaustive" "guideposts" rather than a bright-line rule. *Vullo II*, 602 U.S. at 191; *see Radwan*, 55 F.4th at 122 ("[C]ourts have not hesitated to grant qualified immunity" in cases raising difficult questions about how First Amendment precedent applies in novel circumstances.).

2. As this Court previously recognized, Vullo is entitled to qualified immunity. At the time of Vullo's alleged conduct, the Supreme Court had only addressed the constitutional right at issue once—60 years ago in *Bantam Books*. Neither *Bantam Books* nor this Court's decisions applying it put the constitutional question "beyond debate." *White*, 580 U.S. at 79 (quotation marks omitted).

*Bantam Books* concerned a state commission tasked with "investigat[ing] and recommend[ing] the prosecution" of publishers whose materials it deemed objectionable. 372 U.S. at 59-60. The commission sent threatening notices to distributors of such publications citing the commission's authority and mandate, noting that the "Chiefs of Police have been given the names" of the publications, and declaring that compliance would "eliminate the necessity of our recommending prosecution to the Attorney General's department." *Id.* at 62-63 & n.5. The notices were "invariably followed up by police visitations." *Id.* at 68. The Supreme Court held that the Commission's tactics constituted "a scheme of state censorship effectuated by extralegal sanctions" that violated the First Amendment. *Id.* at 72.

That conduct is not comparable to the conduct alleged here for at least three reasons.

*First*, this case implicates speech rights in a more attenuated manner than *Bantam Books*. Although *Bantam Books* "stands for the principle that a government official cannot do indirectly what she is barred from doing directly," *Vullo II*, 602 U.S. at 190, the coercion there was indirect only in the sense that the commission targeted third-party distributors, rather than publishers themselves. But unlike here, the commission's enforcement efforts *directly* targeted constitutionally protected expression. By threatening the distributors with criminal prosecution if they continued selling blacklisted publications, the commission "subject[ed] the distribution of publications to a system of prior administrative restraints" and instituted a "system of informal censorship." *Bantam Books*, 372 U.S. at 70-71. Prior cases from this Circuit finding First Amendment coercion likewise involved efforts that directly targeted speech. *See Okwedy v. Molinari*, 333 F. 3d 339, 340-344 (2d Cir. 2003) (per curiam) (government targeting speech on a billboard); *Hammerhead*, 707 F. 2d at 34-38 (government targeting speech in a satirical board game).

The speech connection here is much more attenuated. Vullo allegedly coerced insurance entities and banks to cut business ties with the NRA by bringing enforcement actions against concededly unlawful insurance products, issuing Guidance Letters warning about the reputational risk of working with gun groups, and allegedly pressuring Lloyd's. Notably, the NRA does not allege that Vullo ever asked a third party to suppress the NRA's speech. As Justice Jackson explained in her *Vullo II* concurrence, "[t]he NRA does not contend that its (concededly unlawful) insurance products offered through those business relationships were themselves 'speech,' akin to a billboard, a television ad, or a book." 602 U.S. at 202 (Jackson, J., concurring).

The Supreme Court in *Vullo II* held that it did not matter for First Amendment purposes that Vullo's alleged conduct targeted "nonexpressive activity." *Id.* at 196 (majority op.) (quotation marks omitted). But that distinction *does* matter for purposes of qualified immunity. As Justice Jackson explained, "the effect of Vullo's alleged coercion of regulated entities on the NRA's speech is significantly more attenuated here than in *Bantam Books* or most decisions applying it." *Id.* at 202 (Jackson, J., concurring). Precedent would not have put Vullo on notice that her alleged conduct would violate the Constitution.

*Second*, as this Court previously held, all precedent in effect when Vullo acted "involved very different circumstances and much stronger conduct." *Vullo I*, 49 F.4th at 719. It was therefore not clearly established that Vullo's alleged conduct

9

"could be reasonably understood to convey a threat." *Vullo II*, 602 U.S. at 191. In light of the significant differences between the alleged conduct here and the conduct in *Bantam Books* and its progeny, "the violative nature of *particular* conduct" at issue was not clearly established. *Mullenix*, 577 U.S. at 12.

The alleged Lloyd's meeting, on which the Supreme Court focused, *see Vullo II*, 602 U.S. at 192-193, did not involve anything like the explicit threats of criminal prosecution in *Bantam Books*. Vullo allegedly made Lloyd's an offer of nonenforcement in the context of civil consent order negotiations with an entity that had concededly worked with the NRA to violate the law. As this Court explained, the NRA "has not cited, and we are not aware of, any case like this one, where a government official makes purportedly threatening statements urging an entity to cut ties with what is essentially its accomplice during an ongoing, legitimate investigation into serious misconduct, where the investigation results in consent decrees, and where the entities admit to violations of the law and agree to millions of dollars in fines and other significant relief." *Vullo I*, 49 F.4th at 720. Even "assuming Vullo offered to go easy on Lloyd's if it severed ties with the NRA," neither this Court nor the Supreme Court had ever previously held "that law enforcement officials may not offer leniency in exchange for help advancing their policy goals, especially when those policy goals aim to minimize the influence of a noncompliant business partner that has repeatedly violated the law." *Id.* at 720-721. Thus, any supposed "unlawfulness was not apparent by any means." *Id.* at 721.

The Guidance Letters and accompanying press release, which the Supreme Court found "reinforce[d]" the NRA's claims as to the alleged Lloyd's meeting, *Vullo II*, 602 U.S. at 193, bear even less resemblance to the threats in *Bantam Books*. Unlike in *Bantam Books*, the Guidance Letters did not explicitly invoke Vullo's regulatory authority, direct recipients to take any specific action, reference applicable laws, state that recipients had a legal duty to act, order recipients to meet with her for further discussion, send the police for follow-up visits, or state that compliance would "eliminate the necessity of our recommending prosecution to the Attorney General's department." *Bantam Books*, 372 U.S. at 62-63 & n.5. As this Court explained, the NRA "has not cited, and we are not aware of, any case analogous to this one, where a government official has been held to have violated the First Amendment by making statements like those in the Guidance Letters and Press Release." *Vullo I*, 49 F.4th at 720. "It certainly was not clearly established at the time that any of these statements would violate the First Amendment," particularly given that "many cases emphasized the right of government officials to speak, to take and express views, and to try to persuade." *Id.*

This Court's precedent did not clearly establish that Vullo's alleged conduct was unconstitutional, either. None of this Court's precedent involved an alleged offer of leniency during consent order negotiations in exchange for an entity severing ties with a coconspirator. And before this case, this Court *rejected* a constitutional claim where the head of a regulatory agency "urg[ed] various department stores not to carry the controversial product" with language resembling the language in the Guidance Letters. *Hammerhead Enters., Inc. v. Brezenoff*, 707 F. 2d 33, 35-40 (2d Cir. 1983). This Court's rejection in *Hammerhead* of the argument that "the First Amendment shields" controversial speakers from criticism by regulators, *id.* at 35, means that Vullo's similar conduct cannot have amounted to a violation of clearly established law.

Nothing about the Supreme Court's statement in *Vullo II* that its decision "does not break new ground," 602 U.S. at 197, changes any of this. That a decision breaks no new legal ground in applying a constitutional principle to novel factual circumstances does not mean that "any reasonable official in the defendant's shoes" would have understood that their alleged conduct was impermissible in those novel factual circumstances. *Plumhoff*, 572 U.S. at 778-779. The same goes for the Supreme Court's statement in *Vullo II* that its decision "reaffirms the general principle from *Bantam Books*." 602 U.S. at 197. Reaffirming a "general" legal principle in novel factual circumstances in no way precludes qualified immunity where the "contours of the right" were not "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson*, 483 U.S. at 640. Said differently, whether a constitutional holding follows from precedent at step one of the qualified-immunity analysis is distinct from whether precedent put the issue beyond debate at step two. For the reasons this Court already identified, the material differences between the conduct alleged here and the conduct in *Bantam Books* and related precedent mean that the unlawfulness of Vullo's alleged conduct "was not apparent by any means." *Vullo I*, 49 F.4th at 721.

*Third*, there is clear evidence that the right asserted in this case was not "beyond debate." *White*, 580 U.S. at 79 (quotation marks omitted). After all, a unanimous panel of this Court concluded the right did not exist. In a detailed published opinion, this Court evaluated the NRA's allegations and concluded that, even with "all reasonable inferences drawn in the NRA's favor," those allegations show that Vullo "was simply executing her duties as DFS Superintendent and engaging in legitimate enforcement action." *Vullo I*, 49 F.4th at 719. "It is difficult to ask that a [defendant] identify clearly established law that three judges of this Court could not find." *Terebesi*, 764 F.3d at 233. The alleged First Amendment

violation therefore cannot have been one that "any reasonable official" would have recognized, *Plumhoff*, 572 U.S. at 778-779, because this Court did not recognize it. Qualified immunity "gives government officials the breathing room to make reasonable, even if mistaken, judgments," *Vullo I*, 49 F.4th at 714.

Qualified immunity is rooted in the important public policy that government officials should not be chilled in the performance of their duties, either by the prospect of damages liability or the heavy burdens of litigation. To find them liable in circumstances in which this Court previously unanimously rejected the NRA's claim that the law was clearly established, and even said the law on the merits favored the defendant, would eviscerate the doctrine, with devastating effects.

### III. Vullo's Entitlement To Absolute Immunity For Her Enforcement Actions Underscores That Immunity Is Warranted.

The District Court correctly held that Vullo is entitled to absolute immunity for conduct related to her enforcement actions, which include the alleged Lloyd's meeting. *See* SPA 11-22. If this Court were to conclude that qualified immunity does not apply, the Court should hold that those actions are shielded by absolute immunity.

The Supreme Court declined to consider absolute immunity on the ground that it had not been raised below as to the First Amendment claims, *Vullo II*, 602 U.S. at 195 n.5, but Vullo has preserved her absolute immunity argument throughout this litigation. By contrast, the NRA's theory of the case has shifted over time. The District Court held that Vullo was "entitled to absolute immunity on the [NRAs'] selective enforcement claim." SPA 22. Critically, in the District Court, the NRA's dismissed selective-enforcement claim was predicated in large part on allegations about the alleged Lloyd's meeting. D.Ct. Dkt 155 at 6 (motion to amend referring to allegations about the Lloyd's meeting as "at the core of the NRA's re-pleaded selective enforcement claim"). By contrast, the NRA's First Amendment claims focused largely on the Guidance Letters. *See* SPA 23. On Vullo's appeal to this Court, the NRA sought to fold its allegations about the enforcement actions and Lloyd's meeting into its surviving First Amendment theories. Vullo explained that she was absolutely immune from any claim based on that conduct. ECF No. 29 at 50 n.20 (the "First Amendment claims cannot serve as a Trojan horse for the selective enforcement claims that it cannot otherwise plead, and which have been dismissed" on grounds of "absolute immunity"); *id.* at 50-51 (allegations regarding Lloyd's meeting are protected by absolute immunity).

Absolute immunity attaches to the action, regardless of the nature of the claim, *Buckley v. Fitzsimmons*, 509 U.S. 259, 271 (1993), and Vullo has consistently maintained her entitlement to absolute immunity for conduct related to the enforcement actions. At the very least, the fact that absolute immunity would attach to her enforcement acts but for the shifting nature of the NRA's legal theories further underscores that the First Amendment violation was not clearly established.[2]

**Conclusion**

For the foregoing reasons, the Court should reinstate its judgment ruling for *Vullo* on qualified immunity. Should the Court question whether qualified immunity is warranted, Vullo respectfully requests oral argument.

Respectfully submitted,

/s/ Neal Kumar Katyal
Neal Kumar Katyal
William E. Havemann
Danielle Desaulniers Stempel
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5600
neal.katyal@hoganlovells.com

Mary B. McCord
William Powell
INSTITUTE FOR CONSTITUTIONAL
ADVOCACY AND PROTECTION
Georgetown University Law Center
600 New Jersey Avenue, N.W.
Washington, DC 20001
*Counsel for Defendant-Appellant Maria Vullo*

cc: All counsel of record (via CM/ECF)

---

[2] Should the Court conclude that the NRA's false allegations about the supposed Lloyd's meeting require denying immunity at this stage, Vullo respectfully requests that the Court enter a limited remand for discovery to refute those allegations.

13

# CERTIFICATE OF COMPLIANCE

1. This document complies with the type-volume limits of this Court's July 8, 2024 Order (Doc. 135) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 4,999 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Times New Roman.

/s/ Neal Kumar Katyal
Neal Kumar Katyal