JONES DAY

51 LOUISIANA AVE. NW • WASHINGTON, DC 20001

TELEPHONE: +1.202.879.3939 • JONESDAY.COM

DIRECT NUMBER: +1.202.879.3939
NJFRANCISCO@JONESDAY.COM

October 1, 2024

VIA ECF

Catherine O'Hagan Wolfe
Clerk of the United States Court of Appeals for the Second Circuit
Thurgood Marshall United States Courthouse
40 Foley Square
New York, New York 10007

Re: *National Rifle Association of America v. Vullo*, No. 21-0636—Rule 28(j) Notice of Supplemental Authority

Dear Ms. O'Hagan Wolfe:

We represent Plaintiff-Appellee National Rifle Association of America ("NRA") in the above-captioned action and write pursuant to Rule 28(j) to draw the Court's attention to the Sixth Circuit's recent decision in *Josephson v. Ganzel*, --- F. 4th ---, 2024 WL 4132233 (6th Cir. Sept. 10, 2024), a copy of which is attached as Exhibit A. In *Josephson*, the plaintiff alleged that the defendant State officials retaliated against him for exercising his First Amendment rights. The defendants argued that they were entitled to summary judgment on qualified immunity because "it was not clearly established that each defendant's conduct … was an adverse action sufficient to show retaliation" under the First Amendment. *Id*. at *11.

The Sixth Circuit disagreed, explaining that defeating qualified immunity does not require a plaintiff to cite "a case on all fours," because existing precedent can clearly establish the relevant legal principles even if the precise facts are not "directly on point." *Id*. The court then identified numerous principles that were "clearly established" by 2017, including that "the First Amendment bars retaliation for protected speech," that "campaigns of harassment, when considered as a whole, may amount to adverse actions," and that "[a]n act taken in retaliation for the exercise of a constitutionally protected right is actionable under Section 1983 even if the act, when taken for a different reason, would have been proper." *Id*. Thus, because the defendants "should have known … that retaliating against Josephson for his speech would violate his First Amendment rights," they were "not entitled to qualified immunity." *Id*. at *12.

The Sixth Circuit's reasoning demonstrates that, contrary to Defendant Maria Vullo's argument (*see* Dkt. 142 at 7), a State official who attempts to punish an individual for exercising First Amendment rights violates clearly established principles of law even if the precise facts at issue have not been "specifically addressed" by a prior case. It thus supports holding that Vullo is not entitled to qualified immunity for her violations of the NRA's First Amendment rights.

Respectfully submitted,

*/s/ Noel J. Francisco*

Noel J. Francisco

cc: Counsel of Record (via ECF)

**CERTIFICATE OF COMPLIANCE**

I certify that the body of this letter contains 332 words as determined by the word-count feature of Microsoft Word.

Dated: October 1, 2024

*/s/ Noel J. Francisco*
Noel J. Francisco

# EXHIBIT A

2024 WL 4132233
Only the Westlaw citation is currently available.
United States Court of Appeals, Sixth Circuit.

Allan M. JOSEPHSON, Plaintiff-Appellee,
v.
Toni M. GANZEL, Interim Executive Dean of Health Affairs and Dean of the School of Medicine at the University of Louisville, in her official and individual capacities; Kimberly A. Boland, Interim Chair of the Department of Pediatrics at the University of Louisville, in her official and individual capacities; Charles R. Woods, former Chair of the Department of Pediatrics at the University of Louisville, in his individual capacity; Jennifer F. Le, former Interim Division Co-Chief of the Division of Child and Adolescent Psychiatry and Psychology and current Chief of the Division of Child and Adolescent Psychiatry and Psychology at the University of Louisville, in her official and individual capacities; Bryan D. Carter, former Interim Division Co-Chief of the Division of Child and Adolescent Psychiatry and Psychology and Chief of the Division of Psychology at the University of Louisville, in his official and individual capacities; William D. Lohr, former Interim Division Co-Chief of the Division of Child and Adolescent Psychiatry and Psychology at the University of Louisville, in his official and individual capacities, Defendants-Appellants.

No. 23-5293
|
Argued: July 23, 2024
|
Decided and Filed: September 10, 2024

**Synopsis**
**Background:** Former public university psychiatry professor brought § 1983 action against university officials alleging that they violated the First Amendment by retaliating against him for his speech when he public expressed his views on medical treatment of children with gender dysphoria by making decision to not renew his contract. The United States District Court for the Western District of Kentucky, Rebecca Grady Jennings, J., 2023 WL 2432024, denied summary judgment grounded on Eleventh Amendment immunity and qualified immunity. Officials appealed.

**Holdings:** The Court of Appeals, Mathis, Circuit Judge, held that:

[1] Eleventh Amendment did not bar claims;

[2] speech was on a public matter that was not part of professor's official duties;

[3] officials presented insufficient evidence that speech had significant disruptive effect on operations; and

[4] professor's rights were clearly established, so that officials were not entitled to qualified immunity.

Affirmed.

**Procedural Posture(s):** Interlocutory Appeal; Motion for Summary Judgment; Motion to Dismiss for Lack of Jurisdiction.

West Headnotes (36)

**[1]** **Federal Courts** As to immunity

Denials of summary judgment on sovereign immunity grounds to public officials are immediately appealable under the collateral-order doctrine.

**[2]** **Federal Courts** Immunity

Court of Appeals reviews a district court's summary judgment sovereign-immunity determination de novo.

**[3]** **Federal Courts** Agencies, officers, and public employees

Eleventh Amendment immunity extends to departments and agencies that are arms of the state and state officers acting in their official capacity. U.S. Const. Amend. 11.

[4] **Federal Courts** Suits for injunctive or other prospective or equitable relief; Ex parte Young doctrine

**Federal Courts** Agencies, officers, and public employees

*Ex parte Young* exception provides that suits against state officials seeking equitable relief for ongoing violations of federal law are not barred by the Eleventh Amendment. U.S. Const. Amend. 11.

[5] **Federal Courts** Suits for injunctive or other prospective or equitable relief; Ex parte Young doctrine

**Federal Courts** Agencies, officers, and public employees

The *Ex parte Young* exception to Eleventh Amendment immunity applies only when a plaintiff seeks and clearly alleges prospective equitable relief to stop a continuing violation of federal law. U.S. Const. Amend. 11.

[6] **Federal Courts** Suits for injunctive or other prospective or equitable relief; Ex parte Young doctrine

*Ex parte Young* exception to Eleventh Amendment immunity does not exist for injunctive relief based entirely upon past acts and not continuing conduct that, if stopped would provide a remedy to the plaintiff. U.S. Const. Amend. 11.

[7] **Federal Courts** Suits for injunctive or other prospective or equitable relief; Ex parte Young doctrine

In determining if *Ex parte Young* exception to Eleventh Amendment immunity applies, court need only conduct a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective. U.S. Const. Amend. 11.

[8] **Federal Courts** Suits for injunctive or other prospective or equitable relief; Ex parte Young doctrine

**Federal Courts** Higher education; colleges and universities

Former public university psychiatry professor whose contract was not renewed after he began publicly discussing his views of medical treatment of childhood gender dysphoria sought equitable, prospective relief, and thus, Eleventh Amendment immunity did not bar his claims against university officials for allegedly retaliating against him for his speech in violation of the First Amendment, where in response to defendants' actions, professor sought reinstatement to his position as a faculty member and to expunge his personnel file of any reference to the nonrenewal of his contract. U.S. Const. Amends. 1, 11.

[9] **Civil Rights** Good faith and reasonableness; knowledge and clarity of law; motive and intent, in general

Qualified immunity shields government officials in the performance of discretionary functions from standing trial for civil liability unless their actions violate clearly established rights.

[10] **Summary Judgment** Immunity

To defeat qualified immunity at the summary-judgment stage, the plaintiff bears the burden of showing that: (1) the defendants violated his constitutional right that was (2) clearly established.

[11] **Federal Courts** Immunity

Court of Appeals reviews de novo the district court's decision to deny summary judgment grounded on qualified immunity.

[12] **Federal Courts** Summary judgment

In reviewing denial of summary judgment grounded on qualified immunity, Court of Appeals views the evidence in the light most favorable to plaintiff and draw all reasonable inferences in his favor.

**[13]** **Federal Courts** As to immunity

Court of Appeals' jurisdiction on interlocutory appeal of denial of summary judgment grounded on qualified immunity is limited to deciding whether the district court correctly answered the legal questions inherent in its denial of qualified immunity.

**[14]** **Constitutional Law** Retaliation in general

**Constitutional Law** Causation; substantial or motivating factor

To prove a First Amendment retaliation claim, a public employee must show: (1) he engaged in protected speech; (2) the defendant took an adverse action against him; and (3) there is a causal connection between the protected speech and the adverse action. U.S. Const. Amend. 1.

**[15]** **Federal Courts** Constitutional rights, civil rights, and discrimination in general

Determining the protected status of speech is a question of law that is reviewed de novo. U.S. Const. Amend. 1.

**[16]** **Constitutional Law** Public Employees and Officials

Public employers can permissibly limit the speech of their employees in certain circumstances; that is so because when a public employee speaks, such speech pits the employee's interests in speaking freely against the employer's interests in running an efficient workplace. U.S. Const. Amend. 1.

**[17]** **Constitutional Law** Efficiency of public services

Generally, the First Amendment protects a public employee's speech if: (1) the speech was on a matter of public concern, (2) the speech was not made pursuant to the employee's official duties, and, assuming the employee can satisfy the first two elements, (3) the employee's interest in speaking on a matter of public concern outweighs the employer's interest in promoting the efficiency of the public services it performs through its employees. U.S. Const. Amend. 1.

**[18]** **Constitutional Law** Non-renewal of contract

**Education** Medical school faculty

Former public university psychiatry professor's speech was on a matter of public concern, as required for First Amendment protection from retaliation, in action brought against university officials after his university contract was not renewed, when he spoke during a panel discussion about his views on medical treatment of children with gender dysphoria, a controversial subject involving matters of profound value to the public. U.S. Const. Amend. 1.

**[19]** **Constitutional Law** Non-renewal of contract

**Education** Medical school faculty

Former public university psychiatry professor who publicly discussed his views of medical treatment of childhood gender dysphoria as part of a panel discussion on the topic was not speaking as part of his official duties with university, as required for First Amendment protection from retaliation, in action brought against university officials after his contract with university was not renewed; circumstances suggested that impetus or motivation behind professor's panel remarks was desire of panel organizer for professor to share his own opinions on gender dysphoria and not those of university's medical school, as he spoke at an off-campus event, his travel expenses were paid by panel organizer, and his remarks did not involve meeting with other university leaders

or discussing the medical school. U.S. Const. Amend. 1.

[20] **Constitutional Law** Efficiency of public services

To answer question whether public employer's interest in promoting efficient performance of public services outweighed employee's speech interest, for purposes of a First Amendment retaliation claim, court considers several factors, including whether an employee's comments [1] meaningfully interfered with the performance of his duties, [2] undermined a legitimate goal or mission of the employer, [3] created disharmony among co-workers, [4] impaired discipline by superiors, or [5] destroyed the relationship of loyalty and trust required of confidential employees. U.S. Const. Amend. 1.

[21] **Constitutional Law** Efficiency of public services

A stronger showing of government interests in promoting efficient performance of public services may be necessary to overcome a public employee's First Amendment speech retaliation claim if the employee's speech more substantially involves matters of public concern. U.S. Const. Amend. 1.

[22] **Constitutional Law** Non-renewal of contract

**Education** Medical school faculty

Public university medical school officials provided insufficient evidence that former psychiatry professor's public remarks on his views of medical treatment of children with gender dysphoria had significant disruptive effect on operations or school's ability to issue discipline, and thus, balance of interests favored professor on his First Amendment retaliation claim arising from nonrenewal of professor's contract after more than 15 years of employment; while professor's remarks caused disharmony with his colleagues, the remarks did not interfere with professor's chief duties, his care for patients, or school's accreditation, officials were still able to warn professor about his allegedly inadequate work performance, which he improved after the warning, and his remarks did not destroy a relationship of trust and loyalty. U.S. Const. Amend. 1.

[23] **Constitutional Law** Policy-making or other confidential employees

State-run employers generally have more discretion to sanction speech of an employee in a confidential, policymaking, or public contact role than one who performs ministerial functions. U.S. Const. Amend. 1.

[24] **Constitutional Law** Public or private concern

**Education** Medical school faculty

First Amendment protection of free speech rights of professors at public universities, during core activity of teaching, extended to former public university psychiatry professor's remarks on his views of medical treatment of children with gender dysphoria during panel discussion at an off-campus event; although he was not teaching a class, professor's panel remarks were on a topic he taught and wrote about as a child-psychiatry expert. U.S. Const. Amend. 1.

[25] **Constitutional Law** Retaliation in general

An "adverse action" in the First Amendment retaliation context is an action that would chill or silence a person of ordinary firmness from future First Amendment activities. U.S. Const. Amend. 1.

[26] **Civil Rights** Acts or Conduct Causing Deprivation

Government actions, which standing alone do not violate the Constitution, may nonetheless be constitutional torts if motivated in substantial part by a desire to punish an individual for exercise of a constitutional right.

**[27]** **Constitutional Law** Retaliation

Adverse nature of a particular action, for purposes of a public employee's First Amendment retaliation claim, will depend on context. U.S. Const. Amend. 1.

**[28]** **Constitutional Law** Questions of law or fact

Adverse-action inquiry in a public employee's First Amendment speech retaliation case is a question of fact; as a result, retaliation claims based on all but genuinely inconsequential official actions should go to the jury. U.S. Const. Amend. 1.

**[29]** **Constitutional Law** Non-renewal of contract

**Education** Medical school faculty

Public university officials who made decision not to renew psychiatry professor's contract after he spoke publicly about his views of medical treatment of children with gender dysphoria during panel discussion at an off-campus event took an "adverse action" against professor, as required element of professor's First Amendment speech retaliation claim. U.S. Const. Amend. 1.

**[30]** **Civil Rights** Defenses; immunity and good faith

**Summary Judgment** Immunity

Genuine issues of material fact as to whether public university officials took an adverse action against former psychiatry professor by tracking and monitoring his behavior after his public remarks his views of medical treatment of children with gender dysphoria during panel discussion at an off-campus event, giving productivity warning, and asking him to resign, and whether each official was motivated to act by professor's remarks, precluded summary judgment determination that officials retaliated against professor because he engaged in speech protected by the First Amendment as would deprive officials of qualified immunity in professor's § 1983 action. U.S. Const. Amend. 1; 42 U.S.C.A. § 1983.

**[31]** **Constitutional Law** Discharge

Public official's ability to terminate the employment is not dispositive of issue whether a person of ordinary firmness would be deterred from engaging in protected conduct for purposes of the adverse action element of a public employee's First Amendment speech retaliation claim. U.S. Const. Amend. 1.

**[32]** **Constitutional Law** Retaliation in general

Power to substantially affect a public employee's livelihood could be enough to establish an adverse action, as an element of a First Amendment speech retaliation claim. U.S. Const. Amend. 1.

**[33]** **Constitutional Law** Retaliation in general

Actions designed to threaten a person's economic livelihood are likely to deter a person of ordinary firmness from engaging in protected speech, so as to satisfy the adverse action element of a public employee's First Amendment speech retaliation claim. U.S. Const. Amend. 1.

**[34]** **Civil Rights** Good faith and reasonableness; knowledge and clarity of law; motive and intent, in general

Courts do not require an earlier decision that is directly on point to determine a right was "clearly established" for qualified immunity purposes; at the same time, existing precedent must place the contours of the right beyond debate.

**[35]** **Civil Rights** Employment practices

A reasonable university official during the relevant period would have understood he could not lawfully terminate or threaten the

economic livelihood of a professor because of his protected speech, and thus, public university officials' actions in making decision to not renew professor's contract after he spoke publicly about his views on medical treatment of children with gender dysphoria violated clearly established law, so that officials were not entitled to qualified immunity from professor's First Amendment speech retaliation claim in § 1983 action; under Supreme Court precedent, absent a disruption in government operations a public university could not retaliate against a professor for speaking on issues of social or political concern. U.S. Const. Amend. 1; 42 U.S.C.A. § 1983.

[36] **Civil Rights** Good faith and reasonableness; knowledge and clarity of law; motive and intent, in general

To be "clearly established" for qualified immunity purposes, a legal principle must have a sufficiently clear foundation in then-existing precedent; the principle must be "settled law," meaning that it is dictated by controlling authority or a robust consensus of cases of persuasive authority.

Appeal from the United States District Court for the Western District of Kentucky at Louisville. No. 3:19-cv-00230—Rebecca Grady Jennings, District Judge.

**Attorneys and Law Firms**

ARGUED: Jeremy S. Rogers, DINSMORE & SHOHL LLP, Louisville, Kentucky, for Appellants. Travis C. Barham, ALLIANCE DEFENDING FREEDOM, Lawrenceville, Georgia, for Appellee. ON BRIEF: Jeremy S. Rogers, Donna King Perry, Matthew Barszcz, DINSMORE & SHOHL LLP, Louisville, Kentucky, for Appellants. Travis C. Barham, ALLIANCE DEFENDING FREEDOM, Lawrenceville, Georgia, Tyson C. Langhofer, P. Logan Spena, ALLIANCE DEFENDING FREEDOM, Lansdowne, Virginia, for Appellee. William E. Trachman, MOUNTAIN STATES LEGAL FOUNDATION, Lakewood, Colorado, Edward M. Wenger, Shawn Toomey Sheehy, HOLTZMAN VOGEL BARAN TORCHINSKY & JOSEFIAK PLLC, Washington, D.C., for Amici Curiae.

Before: GILMAN, GRIFFIN, and MATHIS, Circuit Judges.

**OPINION**

MATHIS, Circuit Judge.

***1** The First Amendment protects popular and unpopular speech alike. Allan Josephson worked as a professor of psychiatry at a public university's medical school. After developing an interest in the medical treatment of childhood gender dysphoria, he began publicly discussing his views on that topic. In October 2017, he expressed his thoughts on treating childhood gender dysphoria during a panel discussion sponsored by a conservative think tank. His commentary was unpopular with his coworkers and supervisors. Josephson believes that his superiors retaliated against him for the views he expressed during the panel discussion, ultimately culminating in the nonrenewal of his contract with the university after more than fifteen years of employment. So he sued the individuals that he says violated the First Amendment by retaliating against him.

The defendants argue that they are entitled to Eleventh Amendment immunity and qualified immunity. The district court disagreed, and so do we. For the reasons explained below, we affirm.

**I.**

In 2003, Josephson, a psychiatrist, joined the University of Louisville School of Medicine's (the "Medical School") faculty. [1] Several separate departments make up the Medical School. Josephson worked in the Department of Pediatrics (the "Department"). The Department is further divided into divisions, including the Division of Child and Adolescent Psychiatry and Psychology (the "Division"). The Medical School hired Josephson to lead the Division as its chief.

Josephson served as Division chief without issue until 2017. This changed after he participated in a panel discussion on childhood gender dysphoria with the Heritage Foundation. After Josephson made his panel remarks, the Medical School demoted him and eventually chose not to renew his contract. Then, Josephson sued several Medical School officials,

alleging they retaliated against him for exercising his First Amendment rights. Six of those individuals are relevant to this appeal—Toni Ganzel, Kimberly Boland, Charles Woods, Jennifer Le, Bryan Carter, and William Lohr. They each supervised Josephson at points during the relevant time.

**A.**

Ganzel became the dean of the Medical School in May 2013. In that role, Ganzel oversaw the Medical School's academic mission and the achievement of its objectives. This included her oversight of the Department.

Boland joined the Medical School's faculty in 1997. By 2017, she was the Department's executive vice chair. Her responsibilities included, among other things, assisting with some of the division chiefs' annual reviews and generally assisting the Department's chair as needed. Eventually, she recommended the nonrenewal of Josephson's contract.

Woods, a pediatrician, joined the Medical School faculty in 2006. By October 2017, Woods was the Department's chair. As chair, Woods oversaw the Department's various divisions. He stayed in that role until he left the Medical School in late June 2018.

***2** Le, a psychiatrist, joined the Division faculty in August 2008. She reported to Josephson when he was Division chief. In December 2017, Woods appointed Le to serve as one of three interim co-chiefs of the Division, along with Carter and Lohr. In October 2018, Le became the permanent Division chief, making her Josephson's direct supervisor.

Carter, a psychologist, was also a Division faculty member. Carter reported to Josephson until December 2017, when he was appointed to serve as one of the Division's three interim co-chiefs. He worked in that role until October 2018 when Le was appointed the permanent Division chief.

Lohr was also a Division faculty member who reported to Josephson. Lohr became one of the Division's three interim co-chiefs in December 2017. Like Carter, Lohr worked in that role until October 2018 when Le became the Division chief.

**B.**

Josephson became concerned about the "new treatment for youth experiencing gender dysphoria" through his academic work. R. 19, PageID 219. He began vocalizing these concerns in 2014 by consulting in several lawsuits involving public school children seeking "to use the showers, restrooms, and locker rooms" of those different from their sex assigned at birth. *Id.* In 2016 and 2017, he served as an expert witness in several similar lawsuits involving issues related to childhood gender dysphoria. In those cases, Josephson opined on the causes of gender dysphoria, children's ability to make major medical decisions, the tendency for gender dysphoria to subside by late adolescence, and, as he described it, "a more conservative, comprehensive, developmentally-based treatment for" gender dysphoria in minors. *Id.* at 220.

Sometime in October 2017, the Heritage Foundation invited Josephson to speak on a panel titled: "Gender Dysphoria in Children: Understanding the Science and the Medicine." Josephson accepted, and—on the Heritage Foundation's dime—he traveled to Washington, D.C., to participate in the panel discussion. The panel's moderator explained that each panelist spoke "in his or her individual capacity" and not "on behalf of any organization." R. 66-16, PageID 2304. Still, Josephson was recognized as a professor at the Medical School. Among other statements made during the panel, Josephson explained that "gender dysphoria is a socio-cultural, psychological phenomenon that cannot be fully addressed with drugs and surgery. Thus, doctors and others should explore what causes this confusion and help the child learn how to meet this developmental challenge." The panel discussion was published online.

Brian Buford, the director of the University of Louisville's LGBT Executive Center, learned about Josephson's remarks a few days later. Buford emailed Ganzel, suspecting Josephson "might be violating the ethical standards for psychiatry." R. 64-5, PageID 1869. Buford also worried that Josephson might be "getting additional national attention" for an opinion "that puts our reputation at risk and runs counter to the messages of inclusion and welcome that we have been sending." *Id.* Ganzel noted that Josephson's remarks did not "reflect the culture" the Medical School was "trying so hard to promote." *Id.* at 1868. She directed Buford to speak with Woods to discuss next steps. Woods agreed that they needed to address this issue, and he referenced "concerning conversations" he had already had with other Department faculty "about this in general." *Id.*

***3** News of Josephson's remarks spread. For example, Carter testified that he learned about what Josephson said during the Heritage Foundation panel from "about three different sources," including Dr. Christine Brady—another faculty member in the Division. R. 59-2, PageID 1102. According to Carter, people were calling the dean to ask if the Medical School's stance on gender dysphoria aligned with Josephson's remarks. Carter further testified that Division faculty became concerned they were "being lumped under [Josephson's] beliefs." *Id.* at 1106.

The concern of Josephson's colleagues continued to grow. In an email to Woods and another Medical School official, Carter worried Josephson's views might "reflect negatively on our division, the department, the university, our training programs (including accreditation, recruitment and retention), and most importantly on the patients and families with whom we provide clinical services." R. 64-7, PageID 1875. Carter further expressed that he was "committed to ensuring" that Josephson's "highly conservative position" did not affect the Medical School's reputation or the work he and his colleagues provided. *Id.* at 1873. He also noted that he would "not stand by and allow [Josephson's] activities" to "go unchallenged." *Id.* at 1874. Officials in the LGBT Center shared similar concerns. Soon, "[v]irtually all" Division faculty learned of and shared concerns about Josephson's activities. R. 64-9, PageID 1881. According to Carter, all Division faculty agreed that Josephson "must cease and desist in these activities in his role as our division chief" and as a Medical School faculty member. R. 64-8, PageID 1877.

By early November 2017, Josephson's colleagues and supervisors were ready to confront him. Woods met with Josephson to discuss, among other things, Josephson's involvement as an expert witness in a case in Florida. Woods told Josephson that he had heard about Josephson's activities from "different corners of campus." R. 58-3, PageID 998. Woods reminded Josephson to do his expert-witness work on his own time and in a way that made it clear that Josephson's opinions were his own and not the Medical School's. When Josephson mentioned his work with the Heritage Foundation, Woods challenged him to consider how the public might perceive his work as an "expert" on these issues. R. 58-4, PageID 1024. This was because, according to Woods, "those on the religious right (who see themselves fighting a culture war and who do not generally exhibit compassion for those with whom they disagree)" could "promote[ ]" Josephson "in ways he might not anticipate" and in ways that might "be hard to disconnect" from Josephson's "day job." *Id.*

In the days that followed, Carter tried to convince Josephson to address the growing tension in the Division at an upcoming faculty meeting. Josephson led that faculty meeting on November 15, 2017. The meeting was contentious.

During the meeting, a few faculty members voiced their concerns about Josephson's conduct. Josephson recalled his colleagues raising "a laundry list" of concerns about his behavior. R. 58-5, PageID 1027. Le, Carter, and other faculty members demanded that Josephson either apologize for his remarks or issue a statement explaining that his opinions were his own and not the Medical School's. Attendees recall Josephson yelling and accusing his colleagues of staging "a coup" against him before abruptly ending the meeting. R. 59-2, PageID 1114.

Woods met with Josephson the next day to discuss his concerns about the rift between Josephson and the Division faculty. Josephson felt confident that his decades of leadership experience would allow him to effectively handle the conflict. Josephson asked if Woods wanted him to step down as Division chief. Woods indicated that he did not want that. Even so, Woods left that meeting thinking Josephson did "not understand how upset everyone is around him on this issue." R. 58-8, PageID 1042.

***4** Woods continued to ponder whether Josephson should continue leading the Division. The day following his meeting with Josephson, Woods met with two Division faculty members to discuss their concerns about Josephson. By that point, Woods no longer believed that Josephson could remain Division chief. A few days after that, on November 22, 2017, Woods requested to meet with Josephson once more. Among other things, Woods again mentioned the rift between Josephson and his colleagues. Josephson assured Woods that he would meet with the faculty to address the tension in the Division.

In a letter dated November 28, 2017, Woods asked Josephson to resign as Division chief. Woods made this request because most Division faculty "disagree[d] with [Josephson's] approach to management of children and adolescents with gender dysphoria." R. 58-9, PageID 1044. Although Woods made the ultimate decision to request Josephson's resignation, he did not do so alone. Boland was a "sounding board" for Woods's decision. R. 63-2, PageID 1615. Boland also recalled attending a meeting with Woods and Josephson where they discussed Woods's request for

Josephson to step down. And Ganzel testified that she also approved Woods's decision to send his letter.

Josephson agreed to resign as Division chief the next day, effective early December 2017. Woods and Boland selected three faculty members to serve as interim co-chiefs in his stead—Le, Carter, and Lohr. In their role as interim co-chiefs, Le, Carter, and Lohr were responsible for developing Josephson's new work assignment. They began doing so soon after stepping into their new positions. Because Josephson no longer had Division chief duties, they knew he needed to increase his clinical load. But it was unclear where to go from there.

Le, Carter, and Lohr floated several ideas about how to craft Josephson's new work assignment. As they planned, Lohr discussed his inclination "to challenge [Josephson's] inductive reasoning as unscientific and ask how much he's earned as an expert witness over the last 2 years on sexuality issues. Gloves could be coming off." R. 65-43, PageID 2138. And during a meeting on December 7, 2017, Woods and Boland instructed Josephson not to treat LGBTQ patients. By February 2018, Josephson was expected, each week, to complete three telepsychiatry shifts, spend sixteen hours seeing patients in person, and bill thirteen hours of patient care.

Apart from planning Josephson's work assignment, Le, Carter, and Lohr also monitored his behavior. In fact, they began tracking Josephson's conduct even before they officially stepped into their roles as interim co-chiefs. Le created what she dubbed her "Allan tracking document," with its first entry made on November 27, 2017—the day before Woods requested Josephson's resignation. Entries recording "concerns and productivity issues" about Josephson were added to this document from November 2017 until at least March 2019. In mid-February 2018, Carter received information that Josephson potentially misreported his legal consultation revenue for Medical School tax purposes. Worried that reporting this issue would make it seem like he was "intentionally looking for" ways "to target" Josephson, Carter sought Le and Lohr's advice. R. 66-29, PageID 2837. Le encouraged Carter to report the issue to Woods, likening it to making a report to Child Protective Services.

Some evidence suggests that Le, Carter, and Lohr monitored Josephson's work performance before they finalized his assignment. A late January 2018 email from Boland stated that Josephson's work assignment was "still a work in progress" and "should be finalized in the next few weeks." R. 66-28, PageID 2834. Nevertheless, in an early February 2018 email sent before they finalized Josephson's new role, the interim co-chiefs noted that Josephson billed only 2.5 hours of patient care per week the month before.

***5** Once finalized, Le, Carter, and Lohr met with Josephson to further refine his work duties and to discuss his performance. In a tense meeting at the end of March 2018, they agreed to reduce Josephson's weekly clinic hours to twelve based on his increased telepsychiatry caseload. They met with Josephson a few months later, in July 2018, to discuss his apparently insufficient work performance. In a letter memorializing this meeting, Le, Carter, and Lohr noted, among other things, Josephson's failure to meet his outpatient clinical and telepsychiatry hours, attend faculty meetings, and otherwise show up for work. Josephson claims that this letter was the "only formal productivity warning [he] received throughout [his] career in academic medicine." R. 64-3, PageID 1856. And although he "immediately increased [his] productivity," Josephson contends that his superiors "never discussed this improvement with [him] or indicated that it was insufficient between" July 2018 and February 2019, when his contract was not renewed. *Id.* Although Carter, Le, and Lohr continued to record complaints about Josephson after their July 2018 meeting, other evidence confirms they never met with him to discuss those complaints.

The Medical School generally used performance-improvement plans to address employee concerns. Medical School employees were typically placed on an improvement plan when: (1) their performance was "recognized as not meeting expectations and informal discussion ha[d] not brought resolution," or (2) "when an employee receive[d] a 'needs improvement' on a written performance evaluation." *See* Univ. of Louisville Human Resources, *Improvement Plans*, https://louisville.edu/hr/employeerelations/improvement-plans (last accessed June 8, 2024). It seems Boland planned to speak with Josephson about "a timeline for a Performance Improvement Plan," R. 65-26, PageID 2031, but she never did. As Josephson explained, "Defendants did not place [him] on a performance improvement plan or even mention one. They did not suggest that any expressed productivity concerns would be cause for probation, let alone termination without any subsequent discussion." R. 64-3, PageID 1851–52.

By February 2019, Medical School officials had decided to not renew Josephson's contract. At Boland's instruction, Le

told Josephson they needed to meet with him to discuss his annual review. Once at that meeting, Boland and Le told Josephson the "Department was moving in a different direction." R. 65-35, PageID 2055. And they let Josephson know that Ganzel would send him a letter confirming his nonrenewal. Le testified that this news "probably did come off as a little bit of an ambush, but it wasn't [her] decision." R. 68-36, PageID 3796.

About a month later, Josephson filed suit under 42 U.S.C. § 1983. He alleged that Defendants violated his First and Fourteenth Amendment rights by, among other things, retaliating against him for the views he expressed on gender dysphoria. Each Defendant moved for summary judgment, arguing that both sovereign immunity and qualified immunity protected them from suit. Josephson also moved for summary judgment against Defendants. The district court denied all of these motions, finding material fact disputes remained.

Defendants then brought this interlocutory appeal. After that, Josephson moved to dismiss the appeal for lack of jurisdiction.

## II.

**[1]** **[2]** Defendants Ganzel, Le, Lohr, Carter, and Boland argue first that the district court erred by finding that they were not entitled to sovereign immunity. Denials of sovereign immunity to public officials are immediately appealable under the collateral-order doctrine. *Ashford v. Univ. of Mich.*, 89 F.4th 960, 968–69 (6th Cir. 2024) (citing *In re Flint Water Cases*, 960 F.3d 303, 322 (6th Cir. 2020)). We review the district court's sovereign-immunity determination de novo. *T.M. ex rel. H.C. v. DeWine*, 49 F.4th 1082, 1087 (6th Cir. 2022).

**[3]** The Eleventh Amendment makes States immune from private civil actions. U.S. Const. amend. XI; *Whole Woman's Health v. Jackson*, 595 U.S. 30, 39, 142 S.Ct. 522, 211 L.Ed.2d 316 (2021). This immunity "also extends to departments and agencies that are arms of the state" and "state officers acting in their official capacity." *Morgan v. Bd. of Pro. Resp. of the Sup. Ct. of Tenn.*, 63 F.4th 510, 515 (6th Cir. 2023).

***6** **[4]** **[5]** **[6]** **[7]** Still, there are exceptions. Relevant here is the "narrow exception" the Supreme Court first recognized in *Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). *See Whole Woman's Health*, 595 U.S. at 39, 142 S.Ct. 522. This exception provides that "suits against state officials seeking equitable relief for ongoing violations of federal law are not barred by the Eleventh Amendment." *Morgan*, 63 F.4th at 515 (quotation omitted). But the *Ex parte Young* exception applies only when a plaintiff seeks and clearly alleges "prospective" equitable relief to stop "a continuing violation of federal law." *Id.* (quotation omitted). "Nor does the exception exist for injunctive relief based entirely upon past acts and not continuing conduct that, if stopped would provide a remedy to the plaintiff." *Id.* (internal quotation marks omitted). Considering these principles, we "need only conduct a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645, 122 S.Ct. 1753, 152 L.Ed.2d 871 (2002) (internal quotation marks and brackets omitted).

**[8]** Josephson has cleared this straightforward inquiry. Josephson contends Defendants violated his First Amendment rights by retaliating against him for his arguably protected speech. In response to Defendants' actions, he seeks: (1) reinstatement to his position as a faculty member, and (2) to expunge his personnel file of any reference to the nonrenewal of his contract. We have held that "claims for reinstatement are prospective in nature and appropriate subjects for *Ex parte Young* actions." *Carten v. Kent State Univ.*, 282 F.3d 391, 396 (6th Cir. 2002) (citation omitted). We have also "held that expunging disciplinary records is, as a practical matter, prospective relief." *Ashford*, 89 F.4th at 969 (citations omitted). Because Josephson seeks equitable, prospective relief, the Eleventh Amendment does not bar his claims against Defendants. *See Diaz v. Mich. Dep't of Corr.*, 703 F.3d 956, 964 (6th Cir. 2013).

## III.

**[9]** **[10]** Defendants also argue that qualified immunity protects them from suit. "Qualified immunity shields government officials in the performance of discretionary functions from standing trial for civil liability unless their actions violate clearly established rights." *McDonald v. Flake*, 814 F.3d 804, 812 (6th Cir. 2016) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). At the summary-judgment stage, the plaintiff bears the burden of showing that: (1) the defendants violated his constitutional right that was (2) clearly established. *Id.* (citation omitted).

**[11]** **[12]** **[13]** We review de novo the district court's decision to deny qualified immunity. *Sterling Hotels, LLC v. McKay*, 71 F.4th 463, 466 (6th Cir. 2023). We view the evidence in the light most favorable to Josephson and draw all reasonable inferences in his favor. *See Raimey v. City of Niles*, 77 F.4th 441, 447 (6th Cir. 2023). Our jurisdiction is limited to deciding whether the district court correctly answered the legal questions inherent in its denial of qualified immunity. *See DiLuzio v. Village of Yorkville*, 796 F.3d 604, 609 (6th Cir. 2015).

**A. Did Defendants Violate Josephson's First Amendment Rights?**

**[14]** Josephson argues that Defendants violated his First Amendment rights when they retaliated against him based on his remarks at the Heritage Foundation event. To prove a First Amendment retaliation claim, a plaintiff must show: (1) he engaged in protected speech; (2) the defendant took an adverse action against him; and (3) there is a causal connection between the protected speech and the adverse action. *Richards v. Perttu*, 96 F.4th 911, 917 (6th Cir. 2024). We examine each element below.

**1. Protected Speech**

**[15]** We must first decide whether Josephson, a public employee, engaged in protected speech when he spoke as a Heritage Foundation panelist. *See DeCrane v. Eckart*, 12 F.4th 586, 593 (6th Cir. 2021). The First Amendment, applicable to the States through the Fourteenth Amendment, prohibits the government from "abridging the freedom of speech." U.S. Const. amend. I; *Stromberg v. California*, 283 U.S. 359, 368, 51 S.Ct. 532, 75 L.Ed. 1117 (1931). That freedom is, of course, not unlimited. For any violation to have occurred, Josephson must have engaged in protected speech when he spoke at the Heritage Foundation panel. *DeCrane*, 12 F.4th at 593. Determining the protected status of speech is a question of law that we review de novo. *Barger v. United Bhd. of Carpenters & Joiners of Am.*, 3 F.4th 254, 263 (6th Cir. 2021).

***7** **[16]** **[17]** Public employers can permissibly limit the speech of their employees in certain circumstances. That is so because when a public employee speaks, "such speech pits the employee's interests in speaking freely against the employer's interests in running an efficient workplace." *Myers v. City of Centerville*, 41 F.4th 746, 760 (6th Cir. 2022). Generally, the First Amendment protects a public employee's speech if: (1) the speech was on a matter of public concern, *Connick v. Myers*, 461 U.S. 138, 146, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983); (2) the speech was not made pursuant to the employee's official duties, *Garcetti v. Ceballos*, 547 U.S. 410, 421, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006); and, assuming the employee can satisfy the first two elements, (3) the employee's interest in speaking on a matter of public concern outweighs the employer's interest "in promoting the efficiency of the public services it performs through its employees," *Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205*, 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968).

**[18]** Josephson spoke on a matter of public concern when he participated in the Heritage Foundation panel. Specifically, he spoke about the treatment of children with gender dysphoria. "[C]ontroversial subjects" like "sexual orientation and gender identity" are "sensitive political topics" that "undoubtedly" involve "matters of profound value and concern to the public." *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 585 U.S. 878, 913–14, 138 S.Ct. 2448, 201 L.Ed.2d 924 (2018) (internal quotation marks omitted).

**[19]** Josephson did not participate in the Heritage Foundation panel as part of his official duties with the Medical School. The Heritage Foundation invited Josephson to speak off campus and paid for his travel expenses to participate. And the moderator advised the audience that Josephson spoke in his individual capacity and not on behalf of an organization. Although Josephson's Division chief duties included giving academic presentations at other universities and before various professional groups, he always did so to "spread the good news" about the Medical School; his panel remarks were therefore unlike his other invited presentations. His panel remarks did not involve meeting with other university leaders or discussing the Medical School. He was not lecturing about his work at another university, nor did he submit his work to the Heritage Foundation for evaluation before receiving an invitation to speak. Simply put, the evidence suggests that the impetus or motivation behind Josephson's panel remarks was the Heritage Foundation's desire for Josephson to share his own opinions on gender dysphoria and not those of the Medical School.

The *Pickering* balancing inquiry favors Josephson as well. Start with Josephson's interests. He presented his ideas and opinions on gender dysphoria, an issue of substantial public concern. The Supreme Court has "often recognized that such speech occupies the highest rung of the hierarchy of First

Amendment values and merits special protection." *Id.* at 914, 138 S.Ct. 2448 (internal quotation marks omitted). Josephson was a professor at the Medical School. His panel remarks on gender dysphoria related to his teaching and scholarship as a child psychiatrist.

**[20]** **[21]** What about the Medical School's interest in punishing Josephson for interfering with its efficient performance of public services? To answer this question, we consider several factors, including "whether an employee's comments [1] meaningfully interfere[d] with the performance of [his] duties, [2] undermine[d] a legitimate goal or mission of the employer, [3] create[d] disharmony among co-workers, [4] impair[ed] discipline by superiors, or [5] destroy[ed] the relationship of loyalty and trust required of confidential employees." *Rodgers v. Banks*, 344 F.3d 587, 601 (6th Cir. 2003) (quotation omitted). "[A] stronger showing [of government interests] may be necessary if the employee's speech more substantially involve[s] matters of public concern." *Lane v. Franks*, 573 U.S. 228, 242, 134 S.Ct. 2369, 189 L.Ed.2d 312 (2014) (second and third alterations in original) (quoting *Connick*, 461 U.S. at 152, 103 S.Ct. 1684).

***8** **[22]** Limited evidence suggests Josephson's panel remarks interfered with the Medical School's operation. As chief, Josephson had to, among other things, manage the Division's clinical activities, recruit faculty, assist in training directors, serve on boards and task forces, and mentor faculty. The evidence shows Josephson's remarks inhibited his ability to mentor and lead his Division colleagues. For example, he led and eventually stormed out of a contentious faculty meeting after some attendees voiced their concerns about Josephson's recent remarks. And there is no doubt that Josephson's remarks caused disharmony between him and his colleagues. But outside of this, the evidence does not suggest that Josephson's panel remarks hampered the Medical School's effective operation.

The other factors tip the balance in Josephson's favor. Outside of his ability to mentor and lead Division faculty, there is nothing to suggest that Josephson's remarks interfered with his remaining chief duties or his duties as a psychiatry professor. No doubt, his colleagues voiced their concerns that Josephson's remarks would affect patient care, faculty recruitment and retention, accreditation, and the Medical School's reputation in general. But Defendants could point to no evidence that their concerns were realized or likely to occur. For example, they could not identify any actual impact Josephson's remarks had on patient care. Nor could they identify any person who left the Medical School or turned down an offer to join the faculty based on Josephson's activities. Defendants also conceded that one professor's remarks rarely affected the Medical School's accreditation, and they did not provide any evidence that the Medical School's accreditation was, in fact, affected by Josephson's activities. So Defendants only had concerns, and "[t]he mere 'fear or apprehension of disturbance is not enough to overcome the right to freedom of expression.' " *Meriwether v. Hartop*, 992 F.3d 492, 511 (6th Cir. 2021) (quoting *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 508, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969)).

Further still, Josephson's remarks did not impair discipline by his superiors. While he was chief, Woods, Boland, and Ganzel were among his superiors. Woods's November 2017 letter asking Josephson to resign as Division chief—a letter approved by Boland and Ganzel—demonstrates his panel remarks did not hamper his superiors' ability to discipline him. Following his demotion, Le, Lohr, and Carter became Josephson's direct superiors. Despite Josephson's remarks, they were able to address his allegedly inadequate work performance in July 2018. Josephson contends that the July 2018 letter was the "only formal productivity warning" he ever received during his career and that, after this warning, his productivity immediately improved. This too demonstrates that his panel remarks did not interfere with his superiors' ability to issue discipline to him.

**[23]** Josephson's remarks do not appear to have destroyed a relationship of loyalty and trust required of confidential employees either. State-run employers generally have more discretion to sanction an employee in a "confidential, policymaking, or public contact role" than one who performs ministerial functions. *Rankin v. McPherson*, 483 U.S. 378, 390–91, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987). This is because employees in such roles often have responsibilities that might allow their statements to "somehow undermine[ ] the mission of the public employer." *Id.* Defendants, however, have not shown that Josephson, by virtue of his position as Division chief, had the power to make policy. When Woods asked Josephson to resign, moreover, Woods focused on the Division faculty's "limited confidence" in Josephson's continued leadership. R. 58-9, PageID 1044. True, Woods also examined how Josephson's "increasingly public promotion of [his] approach as an expert witness" and "the growing national recognition" of his views on gender dysphoria might affect the Division. *Id.* But this does not demonstrate that Division chiefs had different loyalty or

confidentiality duties than that of an ordinary faculty member. Even if Division chiefs had such unique duties or public contact, Josephson resigned as Division chief by December 2017 and continued working as a regular faculty member. Greater discretion therefore does not apply to the Medical School's actions after that time.

***9** Considering this, Defendants have provided insufficient evidence that Josephson's remarks had a significant disruptive effect on the Medical School's operations. And any disruptions that followed Josephson's panel remarks were eliminated once Josephson resigned as chief. Given that Josephson spoke on an academic matter of substantial public concern, the Medical School's burden in justifying his February 2019 discharge is heavy. *See Connick*, 461 U.S. at 152, 103 S.Ct. 1684. Accordingly, "the *Pickering* balance strongly favors" Josephson. *See Meriwether*, 992 F.3d at 511.

Defendants do not meaningfully challenge that Josephson spoke on a matter of public concern during the Heritage Foundation panel or that the *Pickering* balance favors him. Instead, they contend that Josephson's participation at the event was "pursuant to" his official duties with the Medical School and was thus unprotected speech. *See Garcetti*, 547 U.S. at 421, 126 S.Ct. 1951. Even if Josephson's participation in the Heritage Foundation panel were part of his official duties, that would not alter our conclusion that he engaged in protected speech at that event.

In *Garcetti*, the Supreme Court held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.* Still, *Garcetti* left open the possibility of an exception to this rule, as the Court declined to address if its analysis "would apply in the same manner to a case involving speech related to scholarship or teaching." *Id.* at 425, 126 S.Ct. 1951.

In *Meriwether*, we answered the question that *Garcetti* left open. We held that "professors at public universities retain First Amendment protections at least when engaged in core academic functions, such as teaching and scholarship." *Meriwether*, 992 F.3d at 505.

**[24]** Defendants argue that Josephson's Heritage Foundation presentation was made pursuant to his official duties because he discussed his work at the Medical School and the patients he treated there. Although he was not teaching a class, Josephson's panel remarks were on a topic he taught and wrote about as a child-psychiatry expert. Put differently, Josephson's speech stemmed from his scholarship and thus related to scholarship or teaching. As such, Josephson engaged in protected speech because it related to core academic functions.

**2. Adverse Action and Causal Connection**

We next consider whether Defendants took adverse actions against Josephson because of his protected speech. The district court concluded that genuine factual disputes remained regarding whether each Defendant retaliated against Josephson because of his protected speech. Specifically, it found:

> Ganzel stated that Josephson's speech ... did not reflect the University's culture and ultimately approved his termination. Woods instructed Josephson to give disclaimers when teaching on matters related to gender dysphoria. Boland recommended Josephson's non-renewal. Le collected complaints against Josephson and included them in a tracking document. Carter also collected complaints for the Josephson tracking document and requested Josephson stop treating LGBTQ patients. Lohr referred to Josephson's opinions about gender dysphoria as "unscientific."

R. 99, PageID 5764. Despite this analysis, Defendants argue that the district court made "no effort" to demonstrate how each official took an adverse action against Josephson based on his protected speech.

***10** **[25]** **[26]** **[27]** To succeed on his First Amendment retaliation claim, Josephson must prove that each Defendant took an adverse action against him "motivated at least in part" by his protected speech. *See Bloch v. Ribar*, 156 F.3d 673, 678 (6th Cir. 1998). An adverse action in the First Amendment retaliation context is an action that "would chill or silence a person of ordinary firmness from future First Amendment

activities." *Benison v. Ross*, 765 F.3d 649, 659 (6th Cir. 2014) (quotation omitted). "It is well established that government actions, which standing alone do not violate the Constitution, may nonetheless be constitutional torts if motivated in substantial part by a desire to punish an individual for exercise of a constitutional right." *Thaddeus-X v. Blatter*, 175 F.3d 378, 386 (6th Cir. 1999) (en banc). Any adverse actions, other than "those that create only de minimis negative consequences," can "offend the Constitution." *Kubala v. Smith*, 984 F.3d 1132, 1139 (6th Cir. 2021). The adverse nature of a particular action "will depend on context." *Bell v. Johnson*, 308 F.3d 594, 602–03 (6th Cir. 2002) (quoting *Thaddeus-X*, 175 F.3d at 388).

**[28]** The adverse-action inquiry is a question of fact. *Wurzelbacher v. Jones-Kelley*, 675 F.3d 580, 583–84 (6th Cir. 2012). As a result, retaliation claims based on all but genuinely "inconsequential" official actions "should go to the jury." *Bell*, 308 F.3d at 603.

Josephson has asserted two potential adverse acts: (1) a "hostile, humiliating work environment" designed to silence his speech on gender dysphoria and threaten his job with the Medical School; and (2) the Medical School's decision not to renew his contract. Not only must Josephson provide evidence that these actions would have chilled an ordinary person's speech, but he must also show that all Defendants acted on his or her own to violate Josephson's First Amendment rights. *Heyne v. Metro. Nashville Pub. Schs.*, 655 F.3d 556, 564 (6th Cir. 2011).

**[29]** Starting with the decision to not renew Josephson's contract, this conduct is a traditional example of an adverse action. *See Fritz v. Charter Township of Comstock*, 592 F.3d 718, 724 (6th Cir. 2010). Josephson has presented evidence that Ganzel, Boland, and Le made the nonrenewal decision.

**[30]** But what about Woods, Carter, and Lohr? A reasonable jury could conclude that they also took adverse actions against Josephson. Woods told Josephson that he had a "duty" to tell students when he was "knowingly espousing approaches and views that differ[ed] from the official curricula." R. 58-9, PageID 1045. Essentially, Woods tried to impact what Josephson said to his students. Carter and Lohr began tracking Josephson's behavior after his Heritage Foundation presentation. A February 2018 email indicates that they monitored Josephson's performance before finalizing his work assignment following his resignation as chief. As early as March 2018, there is evidence that Carter and Lohr were planning for Josephson to leave the Division. For example, Lohr noted in an email that Josephson might be "leaving soon." R. 65-44, PageID 2140. And an email from Carter to Le, Lohr, Woods, and Boland suggested that their tracking was the "strong documentation" they needed "to avoid [Josephson's] reappointment." R. 65-36, PageID 2057. To this, Boland added that "the Dean is supportive of what we and you are doing." *Id.* at 2056. The monitoring led to Le, Carter, and Lohr giving Josephson his first ever "formal productivity warning" in July 2018. R. 64-3, PageID 1856. Although Le was named Division chair in October 2018, Carter and Lohr continued to help her monitor Josephson that fall and winter. By February 2019, the decision had been made to not renew Josephson's contract.

**[31]** **[32]** **[33]** Our analysis in *Fritz* is instructive. There, we held that "[a] person of ordinary firmness would be deterred from engaging in protected conduct, if as a result, a public official encouraged [his] employer to terminate the person's contract or to have [him] change [his] behavior." *Fritz*, 592 F.3d at 726. The public official's ability to terminate the employment is not dispositive. *Id.* The "power to substantially affect" a public employee's livelihood could be enough to establish an adverse action. *Id.* Similarly, actions "designed to threaten" a person's "economic livelihood" are likely to deter a person of ordinary firmness from engaging in protected speech. *Id.* at 728. Simply put, "a credible threat to the nature and existence of one's ongoing employment is of a similar character to the other recognized forms of adverse action—termination, refusal to hire, etc.—even if perpetrated by a third party who is not the employer." *Id.*

***11** A reasonable jury could also find that each Defendant was motivated to act, at least in part, by Josephson's panel remarks. Each Defendant knew about those remarks by November 2017. Within weeks of Josephson's remarks, Le, Lohr, and Carter began tracking his behavior. And Woods, with Ganzel and Boland's support, asked him to resign, in part because of "the growing national recognition" of Josephson's views on gender dysphoria. R. 58-9, PageID 1044.

True, Defendants adduced evidence from which a jury could find they demoted and eventually terminated him for reasons unrelated to his speech. Consider Defendants' evidence of Josephson's deficient work performance. Although poor productivity could be a permissible basis to terminate an employee, other evidence indicates that Defendants pursued Josephson's termination because of his Heritage Foundation panel remarks. For example, during discussions in March

2018 about losing funding if faculty "retire or resign," Le predicted that the Division would "likely be losing" Josephson "this year." R. 66-7, PageID 2255. As the interim co-chiefs crafted their July 2018 letter, Carter noted in an email received by Le, Lohr, Woods, and Boland that they needed "strong documentation if" they wanted "to avoid [Josephson's] reappointment next summer." R. 65-36, PageID 2057. And Defendants did not place Josephson on a performance-improvement plan, even though Boland planned to do so, and such plans were "generally part of the way that the university deal[t] with employee concerns." There is also evidence to suggest that, for professors with as much experience as Josephson, contract nonrenewals were rare. *See Paterek v. Village of Armada*, 801 F.3d 630, 647 (6th Cir. 2015) ("Circumstantial evidence, like the timing of events or the disparate treatment of similar individuals, may support [the] inference [of a retaliatory motive]." (alterations in original)).

Considering this evidence, a reasonable jury could find that each Defendant retaliated against Josephson because he engaged in speech protected by the First Amendment. *See Richards*, 96 F.4th at 917. We therefore proceed to the next step in our qualified-immunity analysis. *See McDonald*, 814 F.3d at 812.

**B. Were Josephson's Rights Clearly Established?**

Defendants argue that they are entitled to qualified immunity for two main reasons. First, they argue it was not clearly established that each Defendant's conduct, in isolation, was an adverse action sufficient to show retaliation against a professor because of his protected speech. Second, they argue it was not clearly established that the First Amendment protected statements like those Josephson made in October 2017.

**[34]** Resolving Defendants' first argument is not complicated. Defendants argue that Josephson's rights were not clearly established because no court had specifically addressed whether isolated actions against a professor because of his speech were adverse actions. In other words, Defendants believe they can act as they choose until there is a case on all fours. We disagree. As we have explained, "we do not require an earlier decision that is 'directly on point.' " *McElhaney v. Williams*, 81 F.4th 550, 556–57 (6th Cir. 2023) (quoting *Mullenix v. Luna*, 577 U.S. 7, 12, 136 S.Ct. 305, 193 L.Ed.2d 255 (2015)). At the same time, " 'existing precedent' must place the contours of the right 'beyond debate.' " *Id.* (quoting *Mullenix*, 577 U.S. at 12, 136 S.Ct. 305).

**[35]** During the relevant period, it was beyond debate that "the First Amendment bar[red] retaliation for protected speech." *Crawford-El v. Britton*, 523 U.S. 574, 592, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998). By the fall of 2017, both the Supreme Court and this court had held that, absent a disruption of government operations, a public university may not retaliate against a professor for speaking on issues of social or political concern. *Pickering*, 391 U.S. at 574, 88 S.Ct. 1731; *Hardy v. Jefferson Cmty. Coll.*, 260 F.3d 671, 682 (6th Cir. 2001). And we had established that a retaliatory "adverse action" is one that "would deter a person of ordinary firmness from continuing to engage in that conduct." *Thaddeus-X*, 175 F.3d at 394. We had further established that campaigns of harassment, when considered as a whole, may amount to adverse actions. *See Fritz*, 592 F.3d at 724; *Thaddeus-X*, 175 F.3d at 398; *Bloch*, 156 F.3d at 678. It was also established that legitimate threats "to the nature and existence of one's ongoing employment is of a similar character to the other recognized forms of adverse action—termination, refusal to hire, etc.—even if perpetrated by a third party who is not the employer." *Fritz*, 592 F.3d at 728. We have, moreover, "repeatedly held that '[a]n act taken in retaliation for the exercise of a constitutionally protected right is actionable under § 1983 even if the act, when taken for a different reason, would have been proper.' " *Wenk v. O'Reilly*, 783 F.3d 585, 595 (6th Cir. 2015) (alteration in original) (emphasis omitted) (quoting *Bloch*, 156 F.3d at 681–82). Thus, a reasonable university official during the relevant period would have understood that he could not lawfully terminate or threaten the economic livelihood of a professor because of his protected speech.

***12** **[36]** Defendants' second argument does not fare much better. That is because the protected nature of Josephson's speech was also clearly established. "To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent." *District of Columbia v. Wesby*, 583 U.S. 48, 63, 138 S.Ct. 577, 199 L.Ed.2d 453 (2018). The principle "must be settled law." *Id.* (internal quotation marks omitted). Settled law "means it is dictated by controlling authority or a robust consensus of cases of persuasive authority." *Id.* (internal quotation marks omitted).

In the First Amendment retaliation context, "we ask whether any reasonable official would have understood that [Josephson's] speech was protected, and thus that the official could not retaliate against him." *McElhaney*, 81 F.4th at

557. The answer: It is, and has been, clearly established that public employees have a right to speak "on a matter of public concern regarding issues outside of one's day-to-day job responsibilities, absent a showing that *Pickering* balancing favors the government's particular interest in promoting efficiency or public safety." *Ashford*, 89 F.4th at 975 (first citing *Buddenberg v. Weisdack*, 939 F.3d 732, 739–40 (6th Cir. 2019); then citing *Westmoreland v. Sutherland*, 662 F.3d 714, 718–19 (6th Cir. 2011)).

It can no doubt be difficult to determine if speech is public or private. *See DeCrane*, 12 F.4th at 599 ("[W]e have recognized that it can be 'challenging' to distinguish public from private speech." (citation omitted)). Even so, by 2012, "[w]e had held that employees speak as private citizens (not public employees) at least when they speak on their own initiative to those outside their chains of command and when their speech was not part of their official or de facto duties." *Id.* at 599–600 (citing *Handy-Clay v. City of Memphis*, 695 F.3d 531, 542–43 (6th Cir. 2012)). "Would this 'firmly established' rule have 'immediately' alerted a reasonable person that" Josephson spoke in his private capacity? *See id.* at 600 (quoting *Wesby*, 583 U.S. at 64, 138 S.Ct. 577). We think so.

Defendants also argue that Josephson's Heritage Foundation panel remarks were a part of his official duties. Even if that were the case, it was clearly established that such speech is protected. *See Meriwether*, 992 F.3d at 505; *Hardy*, 260 F.3d at 680; *Bonnell v. Lorenzo*, 241 F.3d 800, 823 (6th Cir. 2001) ("[A] professor's rights to academic freedom and freedom of expression are paramount in the academic setting.").

* * *

Viewing the evidence in the light most favorable to Josephson, as we must, Josephson has shown that he engaged in protected speech when he spoke as part of the Heritage Foundation panel. Defendants should have known that Josephson's speech was protected and that retaliating against Josephson for his speech would violate his First Amendment rights. Therefore, Defendants are not entitled to qualified immunity.

## IV.

For these reasons, we **AFFIRM** the district court's denial of Defendants' motions for summary judgment. We **DENY** as moot Josephson's motion to dismiss for lack of jurisdiction.

### All Citations

--- F.4th ----, 2024 WL 4132233

## Footnotes

1 Because this case comes to us on interlocutory appeal from the denial of Defendants' motions for summary judgment, we recite the facts in the light most favorable to Josephson. *See Wilkie v. Robbins*, 551 U.S. 537, 543 n.2, 127 S.Ct. 2588, 168 L.Ed.2d 389 (2007).

End of Document © 2024 Thomson Reuters. No claim to original U.S. Government Works.