23-738-cv
*Tanvir v. Tanzin*

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

————————

August Term, 2023

(Argued: June 20, 2024    Decided: October 29, 2024)

Docket No. 23-738-cv

————————

MUHAMMAD TANVIR, JAMEEL ALGIBHAH, NAVEED SHINWARI,

*Plaintiffs-Appellants*,

— v. —

"JOHN" TANZIN, SPECIAL AGENT, FBI; SANYA GARCIA, SPECIAL AGENT, FBI;
FRANCISCO ARTOUSA, SPECIAL AGENT, FBI; JOHN "LNU," SPECIAL AGENT, FBI;
STEVEN "LNU," SPECIAL AGENT, FBI; JOHN C. HARLEY, III, SPECIAL AGENT, FBI;
MICHAEL "LNU," SPECIAL AGENT, FBI; GREGG GROSSOEHMIG, SPECIAL AGENT, FBI;
WEYSAN DUN, SPECIAL AGENT IN CHARGE, FBI; JAMES C. LANGENBERG, ASSISTANT
SPECIAL AGENT IN CHARGE, FBI; JOHN DOES 1–6, SPECIAL AGENTS, FBI,

*Defendants-Appellees*.[*]

————————

[*] The Clerk of Court is respectfully directed to amend the official caption in this case to
conform with the caption above.

1

B e f o r e:

LYNCH, CARNEY, and PARK, *Circuit Judges.*

_____

Plaintiffs-appellants, three practicing Muslim men, allege that federal agents asked them to serve as government informants in Muslim communities, and that when the plaintiffs refused, the agents pretextually placed or retained them on federal government's "No Fly List," even though none of them posed a threat to civil aviation. Then, the agents suggested that they could remove the plaintiffs from the list, but only if the plaintiffs agreed to work as government informants.

The plaintiffs seek damages from the agents in their personal capacities under the Religious Freedom Restoration Act of 1993 ("RFRA"), 42 U.S.C. § 2000bb *et seq.* The plaintiffs assert that they sincerely hold religious beliefs that preclude them from serving as informants within their communities, and that the agents "substantially burden[ed]" their "exercise of religion" under RFRA by conditioning their removal from the No Fly List on actions that would violate those beliefs.

The district court (Abrams, *J.*) dismissed the complaint on qualified immunity grounds. We agree that the defendants are entitled to qualified immunity. A government official is entitled to qualified immunity from damages unless a reasonable person in her position would have understood that her conduct fell within the scope of a clearly established prohibition. In the RFRA context, that requires that the official had reason to know that her conduct implicated the plaintiff's religious beliefs or practices. Here, the complaint does not plausibly allege that a reasonable person in the defendants' positions would have understood that the plaintiffs possessed a religious belief that precluded them from serving as informants in Muslim communities, because the plaintiffs did not disclose their religious objections to the defendants and the complaint alleges no facts plausibly supporting the conclusion that the defendants knew that the plaintiffs' objections to becoming informants were grounded on their

2

religious beliefs. Accordingly, the defendants are entitled to qualified immunity from damages in their personal capacities. We therefore AFFIRM the judgment of the district court.

———————————

BAHER AZMY, Center for Constitutional Rights, New York, NY (Naz Ahmad, CLEAR Project, Main Street Legal Services, Inc., City University of New York School of Law, Long Island City, NY; Shayana D. Kadidal, Center for Constitutional Rights, New York, NY; Jennifer R. Cowan, Erol N. Gulay, Debevoise & Plimpton LLP, New York, NY, *on the brief*), *for Plaintiffs-Appellants*.

SARAH S. NORMAND (Ellen Blain, Benjamin H. Torrance, *on the brief*), Assistant United States Attorneys *for* Damian Williams, United States Attorney for the Southern District of New York *for Defendants-Appellees*.

Adeel A. Mangi, Jacob I. Chefitz, Sean M. Lau, Patterson Belknap Webb & Tyler LLP, New York, NY, *for Amici Curiae* 26 Religious Organizations *in support of Plaintiffs-Appellants*.

Christina A. Jump, Samira S. Elhosary, Constitutional Law Center for Muslims in America, Richardson, TX, *for Amicus Curiae* Constitutional Law Center for Muslims in America *in support of Plaintiffs-Appellants*.

Naomi Tsu, Reem Subei, Muslim Advocates, Washington, DC; Matthew E. Price, Jenner & Block LLP, Washington, DC; Ali I. Alsarraf, Adam M. Abdel-Mageed, Jenner & Block LLP, Chicago, IL, *for Amici Curiae* Muslim Advocates, American-Arab Anti-Defamation Committee, American Muslim Bar Association, Asian American Legal Defense and Education Fund, Asian

Americans Advancing Justice - Asian Law Caucus, Desis Rising Up & Moving, Muslim Bar Association of Chicago, and Project South *in support of Plaintiffs-Appellants*.

Seth M. Young, Patrick M. Jaicomo, Anya Bidwell, Institute for Justice, Arlington, VA, *for Amicus Curiae* Institute for Justice *in support of Plaintiffs-Appellants*.

———————

GERARD E. LYNCH, *Circuit Judge*:

Plaintiffs-appellants Muhammad Tanvir, Jameel Algibhah, and Naveed Shinwari (together, the "Appellants") are practicing Muslims and citizens or lawful permanent residents of the United States. In this action, they allege that various federal agents (the "Appellees") asked them to serve as government informants within Muslim communities, and that when they refused, the agents pretextually placed or retained them on the federal government's "No Fly List," even though none of them posed a threat to aviation safety. The Appellants now seek damages from the agents in their personal capacities under the Religious Freedom Restoration Act of 1993 ("RFRA"), 42 U.S.C. § 2000bb *et seq.*, arguing that the agents' use of the No Fly List substantially burdened the Appellants' exercise of religion.

4

The district court (Ronnie Abrams, *J.*) concluded that the agents are entitled to qualified immunity for their actions and thus dismissed the Appellants' RFRA claims. We agree and therefore AFFIRM the judgment of the district court.

## BACKGROUND

The following facts are taken as true from the operative complaint, and all reasonable inferences are drawn in the Appellants' favor. *See, e.g.*, *Collymore v. Myers*, 74 F.4th 22, 30 (2d Cir. 2023).

### I.     The No Fly List

Since at least 2001, the federal government has targeted Muslims in America for surveillance and intelligence-gathering purposes. As part of those efforts, the Federal Bureau of Investigation ("FBI") sometimes recruits Muslim individuals to serve as government informants in Muslim communities.

The FBI uses a variety of tactics, some more controversial than others, to recruit informants. In some cases, for example, FBI agents offer financial assistance or help with a potential informant's immigration status. In others, agents threaten a would-be informant with criminal prosecution if they decline to serve. And, particularly relevant to the instant litigation, agents have sometimes

5

placed or retained individuals on the government's No Fly List either to pressure

them to agree to work as informants or to retaliate against them for declining to

do so.

The No Fly List is a government watchlist created during the George W.

Bush Administration following the September 11, 2001, terrorist attacks. Those

who appear on the No Fly List are prohibited from boarding an aircraft for any

flight originating from, terminating in, or passing over the United States. Given

those severe consequences, the list is intended to include only "known or

suspected terrorist[s]" who "pose[] a threat of committing a terrorist act with

respect to an aircraft." J. App'x at 39.

During the time of the events giving rise to this litigation, the process for

challenging one's placement on the No Fly List was onerous and opaque.[1] In the

Appellants' view, that allowed FBI agents to use the list as a coercive or

retaliatory tool with little or no meaningful oversight. Specifically, agents could

---

[1] In 2015, after this litigation began, the government revised the procedures for challenging placement on the No Fly List. *See Kashem v. Barr*, 941 F.3d 358, 366 (9th Cir. 2019). Those revised procedures have since been upheld by at least one federal Court of Appeals over various constitutional challenges. *See id.* at 364–65.

illegitimately place individuals on the list and then offer to help remove them from the list if, but only if, they agreed to assist in government investigations.

Each Appellant asserts that, even though the FBI had no basis to think that he was a terrorist or a threat to civil aviation, he was placed or retained on the No Fly List because he declined to serve as an FBI informant in a Muslim community. In addition, each Appellant alleges that he refused to serve as an informant at least in part because he sincerely held "religious and personal objections to spying on innocent members" of the Muslim community and "believed that if he agreed to become an informant, he would be expected to engage with people within his community in a deceptive manner." *Id.* at 48; *see also id.* at 56–57 (similar); *id.* at 66 (similar). (As discussed more extensively below, the complaint does *not* allege that the Appellants told the agents about those beliefs.) Like the Appellants, "[m]any American Muslims," as well as "many other Americans" and many adherents of other religions, hold both "religious and other objections" to serving as informants in their communities. *Id.* at 44.

II.     The Appellants

We outline the specific facts of each Appellant's case below, summarizing only those facts that are relevant to the issues on appeal.

7

A.    Muhammad Tanvir

Appellant Muhammad Tanvir encountered several FBI agents on multiple occasions from 2007 to 2012. In January 2009, some of those agents asked Tanvir to work as an FBI informant in Pakistan and offered him various incentives for doing so. Tanvir declined and told the agents that he "was afraid to work in Pakistan as a United States government informant as it seemed like it would be a very dangerous undertaking." *Id.* at 47. When the agents proposed sending him to work in Afghanistan instead, he "explained that he was similarly concerned about his safety if he were to become an informant in Afghanistan." *Id.* On another occasion in 2009, agents repeated their requests that Tanvir serve as an informant, explaining that "they were specifically interested in people from the 'Desi' (South Asian) communities." *Id.* at 48. He again declined. Tanvir does not allege that he disclosed to any agent in 2009 or at any other time that he did not want to serve as an informant because doing so would conflict with his religious beliefs.

Tanvir believes that he was placed on the No Fly List at some point after his 2009 interactions with government agents because he refused to become an informant. After meeting with other agents (to whom he also did not disclose his

8

religious objection), securing legal counsel, and filing a complaint with the

Department of Homeland Security ("DHS"), Tanvir successfully boarded a flight

in June 2013.

### B. Jameel Algibhah

In December 2009, a different set of FBI agents asked Appellant Jameel

Algibhah "if he would become an informant for the FBI" and "infiltrate a mosque

in Queens," or if he would "participate in certain online Islamic forums and 'act

like an extremist.'" *Id.* at 56. Algibhah declined. When the agents then asked if he

would inform on the community in his neighborhood, he again refused. Like

Tanvir, he does not allege that he disclosed to the agents that working for the

government as an informant would conflict with his religious beliefs.

Algibhah alleges that he was placed on the No Fly List at some point after

that December 2009 interaction. Later, in June 2012, FBI agents approached

Algibhah and again asked him if he would "act extremist" on certain Islamic

websites. *Id.* at 59. This time, Algibhah told the agents that "he needed time to

consider their request." *Id.* Again, Algibhah does not allege that he disclosed any

religious objection to serving as an informant. To the contrary, he alleges that,

hoping to be removed from the No Fly List, he "assured the agents that he would work for them as soon as they took him off" the list. *Id.* at 60.

At the time of filing the complaint in the instant action, Algibhah believed that he remained on the No Fly List. But after this litigation began, Algibhah was informed in a June 8, 2015, letter that he was no longer barred from flying.

### C.   Naveed Shinwari

The last Appellant, Naveed Shinwari, learned that he was on the No Fly List before speaking with any government agents. Specifically, in February 2012, Shinwari attempted to return from abroad to his home in the United States, but he was denied boarding on one leg of the trip. He eventually received a one-time flight clearance and returned to the United States in March 2012. After he arrived in the United States, FBI agents approached him on multiple occasions and asked him questions about his travels and religious activities. During one of their meetings with Shinwari, the agents offered to pay Shinwari to inform on several Muslim communities in and out of the United States. He declined. Like the others, he does not allege that he told the agents that he had a religious objection to serving as an informant.

A few days later, Shinwari sent an email to one of the agents he met, seeking help in being removed from the No Fly List. Agents met with him again and implied that they could remove him from the list if he agreed to be an informant. Still, Shinwari refused. He again did not disclose any religious objection to serving as an informant. Instead, "[h]e told the agents that he believed becoming an informant would put his family in danger." *Id.* at 68.

Eventually, after filing complaints with the DHS, Shinwari successfully boarded a flight in March 2014.

### D.    Summary

To recapitulate, each of the three Appellants in this case encountered various FBI agents who asked him to serve as an informant in Muslim communities, and each was illegitimately placed or retained on the No Fly List when he declined. Each Appellant possessed a belief, allegedly shared by some other Muslims, that precluded him from serving as an informant in a Muslim community. But no Appellant ever disclosed that view to any agent. Instead, each stated that he: (1) refused to work as an informant because being an informant would endanger himself or his family, or (2) would agree to work as an informant under the right circumstances.

11

III.    Procedural History

The Appellants, along with one other plaintiff who is not a party to this appeal,[2] commenced this action in the United States District Court for the Southern District of New York on October 1, 2013, and amended their complaint on April 22, 2014. All four plaintiffs brought claims for injunctive relief against various federal officials in their official capacities under the Administrative Procedure Act and the First and Fifth Amendments of the federal Constitution. They also brought First Amendment claims for damages against a subset of those officials in their personal capacities. In addition, the three Appellants brought RFRA claims for both damages and injunctive relief against another subset of agents – the Appellees here – in their official and personal capacities. The fourth plaintiff did not assert a RFRA claim.

On July 28, 2014, the defendants filed two motions to dismiss the amended complaint. Before the district court ruled on those motions, on June 1, 2015, the defendants moved to stay the official capacity claims. They argued that the

---

[2] That plaintiff, Awais Sajjad, made similar allegations concerning government agents' alleged misuse of the No Fly List as a coercive or retaliatory tool against practicing Muslims. He is not a party to this appeal because, as explained below, unlike the three Appellants, he did not assert a RFRA claim, which is the only cause of action that remains in the litigation.

government had revised the procedures for challenging one's inclusion on the No Fly List and that the plaintiffs had availed themselves of those revised procedures. On June 8, the DHS informed each of the four plaintiffs that the government knew of no reason why he should be unable to fly, so on June 10, the plaintiffs consented to staying the official capacity claims. The district court stayed those claims the same day.

On September 3, 2015, the district court dismissed the personal capacity claims, concluding in part that RFRA did not allow plaintiffs to seek damages from individual officers. *See Tanvir v. Lynch* ("*Tanvir I*"), 128 F. Supp. 3d 756, 774–81 (S.D.N.Y. 2015). Later, on December 28, with the parties' consent, the court dismissed the official capacity claims without prejudice.

The Appellants then appealed to this Court, arguing that the district court erred in concluding that they could not bring RFRA claims for damages against the Appellees in their personal capacities.[3] We agreed and reversed the district court. *See Tanvir v. Tanzin* ("*Tanvir II*"), 894 F.3d 449, 453 (2d Cir. 2018), *reh'g denied*, 915 F.3d 898 (2d Cir. 2019). We reasoned that RFRA's provision

---

[3] The Appellants did not appeal the portion of the district court's opinion dismissing their personal capacity claims under the First Amendment. *See Tanvir v. Tanzin*, 894 F.3d 449, 453 (2d Cir. 2018), *reh'd denied*, 915 F.3d 898 (2d Cir. 2019).

13

authorizing plaintiffs to "obtain appropriate relief against a government," 42 U.S.C. § 2000bb-1(c), permits plaintiffs to recover "money damages against federal officers sued in their individual capacities," *Tanvir II*, 894 F.3d at 463. We pointed out, however, that the Appellees may be entitled to qualified immunity and remanded the case to the district court to decide the qualified immunity issues in the first instance. *Tanvir II*, 894 F.3d at 472.

Before the case returned to the district court, however, the Appellees petitioned the Supreme Court for certiorari, and the Court granted that petition. On December 10, 2020, the Court affirmed our holding in *Tanvir II* that plaintiffs could bring RFRA claims for damages against individual officers. *See Tanzin v. Tanvir* ("*Tanvir III*"), 592 U.S. 43, 52 (2020). Although the Supreme Court did not reach the question of qualified immunity, it pointed out that "[b]oth the Government and respondents agree that government officials are entitled to assert a qualified immunity defense when sued in their individual capacities for money damages under RFRA." *Id.* at 51 n.*. The Court remanded the case for further proceedings.

On June 16, 2021, we in turn remanded the case to the district court. Then, on October 15, the Appellees – the only defendants left in the case – moved to

14

dismiss the complaint again, this time on qualified immunity grounds. On February 24, 2023, the district court granted that motion and denied the Appellants leave to amend their complaint.[4] *See Tanvir v. Tanzin* ("*Tanvir IV*"), No. 13-cv-6951 (RA), 2023 WL 2216256, at *14 (S.D.N.Y. Feb. 24, 2023). The court concluded that the Appellees were entitled to qualified immunity because there was no clearly established right "not to be pressured by law enforcement to inform on members of their religious communities through the coercive or retaliatory use of the No Fly List," nor was there a clearly established right "not to be pressured to inform on members of one's religious community through the coercive or retaliatory use of *any* governmental tool." *Id.* at *9 (emphasis in original). Thus, the court dismissed the complaint in its entirety.

This appeal followed.

## DISCUSSION

The Appellants argue that the district court erred in granting the Appellees qualified immunity, particularly at the motion-to-dismiss stage. "When, as here, the district court resolves a qualified immunity issue on a motion to dismiss, we

---

[4] The Appellants do not challenge on appeal the denial of leave to amend their complaint.

review the court's determination de novo, accept as true all the material

allegations of the complaint, and draw all reasonable inferences in the plaintiff's

favor." *Anderson v. Recore*, 317 F.3d 194, 197 (2d Cir. 2003). As explained below,

we agree, albeit on somewhat different grounds, that the Appellees were entitled

to qualified immunity on the face of the complaint. Therefore, we affirm the

judgment of the district court.

     I.     Legal Background

         A.     RFRA

Congress enacted RFRA in 1993 in response to the Supreme Court's

decision in *Employment Division, Department of Human Resources of Oregon v.*

*Smith*, 494 U.S. 872 (1990), which altered the method of analyzing religious free

exercise claims brought under the First Amendment. *City of Boerne v. Flores*, 521

U.S. 507, 512–13 (1997). Under the pre-*Smith* approach to such claims, set forth in

*Sherbert v. Verner*, 374 U.S. 398 (1963), and *Wisconsin v. Yoder*, 406 U.S. 205 (1972),

courts considered whether a government action had "substantially burdened a

religious practice" and, if so, "whether the burden was justified by a compelling

government interest." *Boerne*, 521 U.S. at 513; *see Sherbert*, 374 U.S. at 403–09;

*Yoder*, 406 U.S. at 218–29. *Smith* acknowledged the *Sherbert* test but declined to

apply it, instead upholding a criminal prohibition over a religious free exercise challenge largely on the ground that the prohibition was a "neutral" and "generally applicable" law that did not target religion. *Smith*, 494 U.S. at 878–85.

Following *Smith*, Congress, aiming to provide "broad protection for religious liberty," *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 693 (2014), enacted RFRA with the stated purpose of "restor[ing] the compelling interest test" set forth in *Sherbert* and *Yoder* for "all cases where free exercise of religion is substantially burdened," 42 U.S.C. § 2000bb(b)(1). Thus, RFRA provides that the "[g]overnment shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability," unless the government "demonstrates that [the] application of the burden to the person" is "the least restrictive means of furthering" a "compelling governmental interest." 42 U.S.C. § 2000bb-1(a)–(b).

"To establish a prima facie RFRA violation, the plaintiffs must demonstrate that they sought to engage in the exercise of religion and that the defendant-officials substantially burdened that exercise." *Sabir v. Williams*, 52 F.4th 51, 59 (2d Cir. 2022). The "exercise of religion" is defined broadly as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief."

17

42 U.S.C. §§ 2000bb-2(4), 2000cc-5(7)(A). In considering whether a plaintiff has engaged in the exercise of religion, we "are not permitted to ask whether a particular belief is appropriate or true – however unusual or unfamiliar the belief may be." *Jolly v. Coughlin*, 76 F.3d 468, 476 (2d Cir. 1996). Rather, "[o]ur scrutiny extends only to whether a claimant sincerely holds a particular belief and whether the belief is religious in nature." *Id.*

Likewise, "[a] claimant need not be a member of a particular organized religious denomination to show sincerity of belief." *Jackson v. Mann*, 196 F.3d 316, 320 (2d Cir. 1999). Further, even when a claimant *does* subscribe to a particular organized religion, the claimant's beliefs may be protected under RFRA even if religious authorities opine that those beliefs are not, as a matter of dogma, mandated by the religion in question. *See Sabir*, 52 F.4th at 60 n.4. In sum, to show that an individual's beliefs are part of his exercise of religion, the individual "need only demonstrate that the beliefs professed are sincerely held and in the individual's own scheme of things, religious." *Ford v. McGinnis*, 352 F.3d 582, 588 (2d Cir. 2003) (internal quotation marks omitted), quoting *Fifth Ave. Presbyterian Church v. City of New York*, 293 F.3d 570, 574 (2d Cir. 2002).

A RFRA plaintiff must also show that the defendants "substantially burden[ed]" their exercise of religion. 42 U.S.C. § 2000bb-1(a). RFRA's "substantial burden" test "requires an objective inquiry into the extent of the governmental pressure on the plaintiff's exercise of religion." *Kravitz v. Purcell*, 87 F.4th 111, 126 (2d Cir. 2023). "A substantial burden exists where the state puts substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Newdow v. Peterson*, 753 F.3d 105, 109 (2d Cir. 2014) (internal brackets and quotation marks omitted), quoting *Jolly*, 76 F.3d at 477. Finally, once a plaintiff establishes that the government substantially burdened his exercise of religion, "[t]he government then faces an 'exceptionally demanding' burden to show 'that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting parties . . . .'" *Sabir*, 52 F.4th at 59, quoting *Hobby Lobby Stores, Inc.*, 573 U.S. at 728.

B.    Qualified Immunity

Individuals subjected to a RFRA violation "may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government," 42 U.S.C. § 2000bb-1(c), and that relief includes, as relevant to this appeal, "money damages against federal officials in their individual capacities,"

19

*Tanzin III*, 592 U.S. at 52. Any claim for damages against officials in their individual capacities, however, "implicates the doctrine of qualified immunity."[5] *Tripathy v. McKoy*, 103 F.4th 106, 116 (2d Cir. 2024). That doctrine "shields officials from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (internal quotation marks omitted), quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Put differently, the doctrine protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). In short, the law distinguishes the question whether behavior is lawful or appropriate from the question whether an individual government official should be required to pay damages from his own resources; whatever other remedies may be available for illegal

---

[5] *Amicus curiae* the Institute for Justice asks us to hold that the doctrine of qualified immunity does not apply in RFRA suits. It concedes, however, that we have already applied qualified immunity in the RFRA context. *See Sabir*, 52 F.4th at 58–59; *see also Lotes Co., Ltd. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395, 405 (2d Cir. 2014) ("In general, a panel of this Court is 'bound by the decisions of prior panels until such time as they are overruled either by an en banc panel of our Court or by the Supreme Court.'"), quoting *In re Zarnel*, 619 F.3d 156, 168 (2d Cir. 2010). Moreover, the Appellants agree that qualified immunity applies to RFRA claims, they conceded as much before the Supreme Court in this litigation, *see Tanvir III*, 592 U.S. at 51 n.*, and other circuits have applied qualified immunity to RFRA claims, *see, e.g.*, *Mack v. Yost*, 63 F.4th 211, 217 (3d Cir. 2023). Accordingly, we apply the doctrine of qualified immunity here.

conduct, money damages from a government agent are permitted only where any reasonable officer would clearly understand that his actions were unlawful.

In general, we "apply a two-step analysis to determine whether qualified immunity bars a plaintiff's claim against government officials for civil damages related to actions taken in the course of their official duties." *Sabir*, 52 F.4th at 58. Under that test, qualified immunity shields a defendant-official from money damages unless the "plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011), quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "When qualified immunity shields defendants from liability, courts may 'exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.'" *Sabir*, 52 F.4th at 58, quoting *Pearson*, 555 U.S. at 236.

Finally, qualified immunity depends on the facts known to the official at the time of the alleged violation. Thus, "[e]ven when we find a right clearly established," defendants are still immune from damages liability if "reasonable persons in their position would not have understood that their conduct was

21

within the scope of the established prohibition." *Wiggins v. Griffin*, 86 F.4th 987, 994 (2d Cir. 2023), quoting *LaBounty v. Coughlin*, 137 F.3d 68, 73 (2d Cir. 1998); *see also Anderson v. Creighton*, 483 U.S. 635, 646 (1987) (explaining that "qualified immunity is intended to provide government officials with the ability reasonably [to] anticipate when *their conduct* may give rise to liability for damages") (internal quotation marks and citation omitted) (emphasis added); *Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246, 251 (2d Cir. 2001) ("[A] court must consider . . . what a reasonable person in [the government actor's] position should know about the appropriateness of *his conduct* under federal law.") (internal quotation marks and citation omitted) (emphasis added).

## II.    Application

We conclude that, under the facts alleged in the complaint, none of the Appellees had reason to understand that their actions violated clearly established law. As a result, they are entitled to qualified immunity, and the district court properly dismissed the Appellants' RFRA claims for damages.[6]

---

[6] The Appellants seek to defer a decision on qualified immunity until a later stage in the litigation. They argue that, when the district court granted defendants qualified immunity at the motion-to-dismiss stage, it improperly construed the Appellants' complaint against them and did not hold defendants to an appropriately high burden. But the Supreme Court has "stressed the importance of resolving [qualified] immunity

At the outset, the parties disagree over how narrowly to define the religious free exercise right at issue when analyzing whether it was clearly established. The district court defined the right as the "right not to be pressured by law enforcement to inform on members of their religious communities through the coercive or retaliatory use of the No Fly List," or more generally, as "the right not to be pressured to inform on members of one's religious community through the coercive or retaliatory use of *any* government tool." *Tanvir IV*, 2023 WL 2216256, at *9 (emphasis in original). The Appellants, however, argue that the Appellees violated their broader right "to be free from government pressure that forces an individual to participate in behavior in a manner that is at odds with sincerely held religious beliefs," which they contend is established by "RFRA and basic First Amendment jurisprudence." Appellants' Br. at 50.

---

questions at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991). Thus, although we have cautioned that defendants are often unsuccessful in asserting qualified immunity at the motion-to-dismiss stage, *see Sabir*, 52 F.4th at 64, we have also explained that, "[l]ike other affirmative defenses, official immunity may be resolved" at that stage "when the facts establishing it are apparent on the face of the complaint," *Bangs v. Smith*, 84 F.4th 87, 95 (2d Cir. 2023). As explained below, the defendants are entitled to qualified immunity on the face of the complaint, so the district court did not err in deciding qualified immunity at the motion-to-dismiss stage.

"[D]efining a right at the appropriate level of generality is not always straightforward" since "a broadly defined right creates 'virtually unqualified liability,'" but "a too-narrowly defined right 'effectively insulate[s] the government's actions.'" *Wiggins*, 86 F.4th at 994, quoting first *Anderson*, 483 U.S. at 639, and then *LaBounty*, 137 F.3d at 73. Despite the difficulty of that endeavor, we have no trouble stating, as we have many times before, that a government official substantially burdens an individual's free exercise of religion under RFRA when the official "put[s] substantial pressure on [the individual] to modify his behavior and to violate his beliefs." *Newdow*, 753 F.3d at 109 (first bracket in original), quoting *Jolly*, 76 F.3d at 477.

Moreover, we agree with the Appellants that, sometimes, that general proscription alone may be sufficient to clearly establish a violation of RFRA, *see, e.g.*, *Sabir*, 52 F.4th at 65–66, just as general rules against cruel and unusual punishment may sometimes suffice to clearly establish an Eighth Amendment violation, *see, e.g.*, *Taylor v. Riojas*, 592 U.S. 7, 8–9 (2020) (per curiam). Other circumstances may call for a more fact-specific analysis. *See, e.g.*, *Redd v. Wright*, 597 F.3d 532, 536 (2d Cir. 2010). To the extent that the law governing individuals in the Appellants' circumstances is unclear, we now clarify that government

24

officials cannot place a religious adherent on the No Fly List because he refuses to act as a government informant, based on his religious beliefs, and then condition that individual's removal from the list on his taking actions that violate his sincerely held religious beliefs. To do so would put the individual to the impermissible choice "between following the precepts of [his] religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of [his] religion . . . on the other hand." *Sherbert*, 374 U.S. at 404.

But the problem with the Appellants' claims is more fundamental. Even if we accept the Appellants' framing of the right and accept that that right was clearly established at the time of the relevant events, the Appellees are still entitled to immunity from damages. That is because the Appellees had no reason to know that their actions encroached on the Appellants' religious beliefs. As noted above, "[e]ven when we find a right clearly established," officials are still immune from damages liability if "reasonable persons in their position would not have understood that their conduct was within the scope of the established prohibition." *Wiggins*, 86 F.4th at 994, quoting *LaBounty*, 137 F.3d at 73. Thus, an official is entitled to immunity from damages in a RFRA suit unless a reasonable

25

person in the official's position would have understood that her conduct at least implicated an individual's exercise of religion.

In our free exercise precedents, the defendants typically have had reason to know that their conduct implicated the plaintiffs' free exercise of religion because the plaintiffs voiced their religious objections before the litigation began. For example, in *Sabir*, a case on which the Appellants heavily rely, the plaintiffs, inmates at a federal prison, "explained to the [prison] officers that their religion required them to perform congregational prayer five times per day." *Sabir*, 52 F.4th at 56. When the prison's policies effectively prevented them from doing so, "[e]ach plaintiff submitted an administrative grievance asserting that the policy violated his right to freely exercise his religion" and, after prison officials denied their grievances with little justification, the plaintiffs ultimately brought an action in federal court. *Id.* On appeal, we concluded that the officials violated clearly established law by preventing the inmates' practice of congregational prayer without sufficient justification. *Id.* at 66.

In that case, unlike here, the officials had reason to know that their conduct implicated the plaintiffs' exercise of religion because the plaintiffs had told them as much. Moreover, the officials in *Sabir* knew that the plaintiffs were practicing

Muslims, and the law had already clearly established that congregational prayer was a protected religious practice. *See id.* at 65 n.9. Thus, even setting aside the plaintiffs' affirmative statements about the requirements of their religion, a reasonable prison administrator would have known that a Muslim individual's request to engage in congregational prayer amounts to a request to practice his religion.

In *Holland v. Goord*, an inmate brought a religious free exercise claim based on a state prison's requirement that inmates provide a urine sample within three hours of being asked to do so. 758 F.3d 215, 217 (2d Cir. 2014).[7] When an officer at the prison ordered Holland to provide a urine sample, "Holland stated that he was unable to do so, *citing his fast in observance of Ramadan*." *Id.* at 218–19 (emphasis added). He "also refused water on those grounds." *Id.* at 219. Even though "Holland offered to drink water and provide a sample after sunset, when his fast had ended, [the officer] declined to permit an exception to the

_____

[7] *Holland* involved a challenge under the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc *et seq.* 758 F.3d 215, 218 (2d Cir. 2014). *Holland*, and other RLUIPA cases, are "relevant here because the statutory provision in [those] case[s] 'mirrors RFRA and . . . thus allows prisoners to seek religious accommodations pursuant to the same standard as set forth in RFRA.'" *Sabir*, 52 F.4th at 60 n.5, quoting *Holt v. Hobbs*, 574 U.S. 352, 357–58 (2015).

[d]irective." *Id.* As in *Sabir*, we held that it was clearly established that forcing

Holland to choose between "prematurely breaking his fast or facing confinement

in keeplock . . . placed a substantial burden on the free exercise of his religion."

*Id.* at 222. Again, unlike the Appellees in this case, the defendants in *Holland*

knew that their actions infringed on the plaintiff's free exercise of religion

because the plaintiff had affirmatively told them about the relevant religious

practice.[8] The Appellants identify no authority, and we are aware of none, in

which an official was denied immunity from damages where a plaintiff asserted

that the official pressured him to act in violation of his religious beliefs, even

though the plaintiff had never disclosed the relevant beliefs and the official had

no other reason to know of those beliefs.

 Moreover, subjecting officials in their personal capacities to damages

under RFRA, even when the officials had no reason to know that their actions

burdened an individual's exercise of religion, would lead to inequitable results.

---

[8] Further, similarly to *Sabir*, Second Circuit precedent indicated that Ramadan was a religious practice and that the dictates of Ramadan were entitled to protection. *See id.* at 221, citing *McEachin v. McGuinnis*, 357 F.3d 197, 201–03 (2d Cir. 2004). Thus, had the defendants in *Holland* been otherwise unaware that Ramadan was a religious holiday, the law itself had already established as much, and a reasonable prison official would have known of the relevant case law. Therefore, by invoking his observance of Ramadan, the *Holland* plaintiff put any reasonable officer on notice that he was invoking his right to religious free exercise.

As explained above, RFRA contains an expansive definition of the "exercise of religion" and protects an individual's beliefs whether or not they are "compelled by, or central to, a system of religious belief." 42 U.S.C. §§ 2000bb-2(4), 2000cc-5(7)(A). Thus, government officials' conduct may easily implicate a person's religious exercise, even if the officials do not know that it does.

For example, a Christian man could observe both the "New Christic Sabbath," prohibiting him from working on Sundays, and the "Old Jewish Sabbath," prohibiting him from working on Saturdays. *See, e.g.*, *Jehovah v. Clarke*, 798 F.3d 169, 173 n.1, 174, 179–80 (4th Cir. 2015). Or, a Muslim man may believe that the Qur'an requires him to consume a kosher diet, even though that diet is more typically associated with Judaism. *See, e.g.*, *Williams v. Wilkinson*, 645 F. App'x 692, 695 (10th Cir. 2016). A government official interacting with either man may know the man's general religious affiliation and may even be familiar with commonly espoused tenets of that religion. But without more information, such as an affirmative disclosure of the particular beliefs at issue, the official may reasonably act in a way that inadvertently encroaches on the man's religious exercise. We doubt that Congress intended RFRA to impose monetary liability on

29

officials in their personal capacities in such circumstances if the officials have no reason to know of the plaintiffs' relevant religious views.[9]

For all those reasons, when evaluating whether a defendant is entitled to qualified immunity from a RFRA damages claim, "it is appropriate for the court to consider the information possessed by the . . . officials at the time of the alleged violations." *May v. Baldwin*, 109 F.3d 557, 562 (9th Cir. 1997). The "fact that [a plaintiff] never asserted a religious [objection] until after the incidents complained of" entitles the defendant to immunity, *id.*, at least unless the

---

[9] Unlike in this case, the plaintiffs in both *Jehovah* and *Williams* disclosed to the defendants the individualized religious beliefs that gave rise to their free exercise claims, and the courts allowed those claims to proceed past the motion-to-dismiss stage. *See Williams*, 645 F. App'x at 695, 703–05 (The plaintiff "requested, '[p]lease change my diet over to Kosher, pursuant to [a specific] Qu'ranic [*sic*] verse.'"); *Jehovah*, 798 F.3d at 174, 179–80 ("Jehovah requested that [officials] accommodate his observance of [both] Sabbaths, but [they] refused[.]"). There are numerous similar examples of plaintiffs who, unlike the Appellants here, brought their free exercise claims only when the defendants encroached on their religious practice after the defendants had been advised of that practice. *See, e.g.*, *West v. Radtke*, 48 F.4th 836, 840 (7th Cir. 2022) (noting that the plaintiff brought his claim after he "objected [to a strip search] on religious grounds but was refused an accommodation"); *Jolly*, 76 F.3d at 472 (recounting that the plaintiff brought his claims after he "refused to submit to a [medical] test, claiming that accepting artificial substances into the body is a sin under the tenets of Rastafarianism"); *Sherbert v. Verner*, 240 S.C. 286, 288–89 (1962) ("The reason given by the appellant for refusing to work on Saturdays was that . . . it was the teaching of her Church that the Sabbath begins at sundown Friday and ends at sundown Saturday, during which time she should not perform work or labor of any kind."), *rev'd on other grounds*, 374 U.S. 398 (1963).

defendant had some other reason to know that his actions implicated the plaintiff's exercise of religion.

Here, it is evident from the face of the complaint that a reasonable person in any of the Appellees' positions would not have known that, by asking the Appellants to work as informants, he was asking the Appellants to act at odds with their religious beliefs. Although each of the Appellants alleges that he sincerely holds a belief, rooted in his understanding of Islam, that prevents him from informing on his own community, none of the Appellants disclosed that belief to any of the Appellees. To the contrary, two of the Appellants – Tanvir and Shinwari – told the agents with whom they met that they did not want to serve as informants because doing so was too dangerous. The third Appellant, Algibhah, told the agents with whom he met that he was willing to serve as an informant, provided that they remove him from the No Fly List first. Thus, the Appellees had no reason to know from their interactions with the Appellants that the Appellants held religious beliefs that precluded them from serving as informants. *Cf. Sabir*, 52 F.4th at 56 (recounting that plaintiffs explained to defendants that "their religion required" congregational prayer).

31

Of course, in some cases, a defendant may have reason to know that her conduct implicates a plaintiff's religious exercise even if the plaintiff himself does not disclose the relevant religious practices or beliefs. Nothing in this case, however, suggests that a reasonable person in the Appellees' positions would have understood that serving as an informant would conflict with the Appellants' religious beliefs unless the Appellants had disclosed as much. The Appellants do not allege, for example, that all or even most Muslims share their beliefs about serving as an informant,[10] nor do they allege that any of the Appellees knew or should have known that the Appellants possessed those beliefs. Instead, they allege that "[m]any American Muslims, *like many other Americans*, and many followers of other religions, have sincerely held religious *and other* objections against becoming informants in their own communities." J. App'x at 44 (emphases added). Thus, according to the Appellants' own

---

[10] To be sure, a plaintiff's religious exercise may be substantially burdened within the meaning of RFRA regardless of whether all, most, or even *any* of his coreligionists share his particular beliefs. *See, e.g.*, *Sabir*, 52 F.4th at 60 n.4. But to bring a RFRA damages claim against an individual officer, that officer must know that his conduct implicates the plaintiff's exercise of religion. As explained above, the Appellants did not disclose that they possessed a belief against serving as an informant. We therefore address the allegations regarding how common that belief is only to explain why the Appellees had no *other* reason to know that their conduct could have infringed on Appellants' free exercise of religion.

allegations (and their statements to the Appellees), an individual's objection to serving as an informant can have nothing to do with Islam or any other religion. Moreover, the Appellants identify no precedent that might have alerted the officers that the Appellants' beliefs about serving as informants are common tenets of Islam (or any other religion), such that a reasonable officer would expect from their adherence to Islam that serving as an informant within their communities would conflict with their religious convictions or practices. *Cf. Sabir*, 52 F.4th at 65 n.9 (explaining that congregational prayer was clearly established as a protected religious practice). Put simply, we discern nothing in the complaint or the law suggesting that any of the Appellees should have known that, by asking the Appellants to become informants, they were asking the Appellants to violate one of their religious beliefs.

Therefore, regardless of how broadly one defines the right at issue here, the Appellees are entitled to immunity from damages because "reasonable persons in their position would not have understood that their conduct was within the scope of the established prohibition." *Wiggins*, 86 F.4th at 994, quoting *LaBounty*, 137 F.3d at 73.

The Appellants' arguments to the contrary are unpersuasive. They first argue that we should not resolve this case on the ground that the Appellees had no reason to know of the Appellants' religious objections since the district court did not rely on that rationale below. But "[w]e may affirm on any ground with support in the record, including grounds upon which the district court did not rely." *Jusino v. Fed'n of Cath. Tchrs., Inc.*, 54 F.4th 95, 100 (2d Cir. 2022) (internal quotation marks and citations omitted). Therefore, there is no obstacle to resolving the case on that basis.

The Appellants next contend that they did not need to assert their religious objection to the agents because the agents knew that the Appellants were practicing Muslims and, indeed, targeted them *because* they were Muslims. But the mere fact that the agents knew that the Appellants were practicing Muslims is insufficient to plausibly plead that the agents had reason to know that asking them to serve as informants in their communities implicated their religious practice. The Appellants' own allegation that "[m]any" Muslims and other non-Muslim Americans hold such beliefs makes clear that some Muslims do not have such religious objections, or object to serving as informants for other reasons, and that the same is true of non-Muslims. J. App'x 44. The fact that the potential

34

recruit is Muslim thus does not, in itself, imply that serving as an informant would implicate the person's religious practice.

Moreover, RFRA is not a general anti-discrimination statute; it prohibits the government only from "substantially burden[ing]" an individual's "exercise of religion." 42 U.S.C. § 2000bb-1(a); *cf. id.* § 2000e-2(a)(1) (provision of Title VII of the Civil Rights Act of 1964 that prohibits certain employers from, *inter alia*, "discriminat[ing] against any individual . . . because of such individual's . . . religion"). Thus, the mere fact that the government allegedly selected individuals of certain religions for recruitment as informants is not sufficient to state a RFRA damages claim. Instead, for a plaintiff to win damages from an individual officer for violating RFRA, the officer must have known that her conduct implicated the plaintiff's religious beliefs or practices. Otherwise, the official is entitled to qualified immunity. As already explained, the Appellants do not allege that the agents had reason to know of the beliefs that precluded them from informing.

Finally, the Appellants accuse the district court of treating them unfairly relative to adherents of other religions, such as Christianity or Judaism. They speculate, without citation to any authority, that if the government used the No Fly List to coerce "an observant Baptist to infiltrate a Bible study group" or "a

Jew to inform on mourners while sitting shiva," courts would deem the government's action an "obvious" violation of religious free exercise. Appellant's Br. at 53–54.

We recognize the Appellants' view that Muslims in America have been unfairly targeted. But we disagree with their conclusion that a Christian or Jewish plaintiff in like circumstances would have greater success in a RFRA damages suit. No doubt, many would find any effort to recruit informants to infiltrate religious congregations, including Muslim, as well as Christian or Jewish congregations, offensive. We have no reason to assume, however, that a reasonable government official would know that a Christian or Jew could not work with government agents to expose terrorists in her religious community without violating her religious norms. It is far from obvious – indeed, it cannot be the case – that an adherent of either of those (or any) religions could hold an undisclosed religious belief, of which an official had no other reason to know, and then successfully sue the official for monetary damages for pressuring them to act in tension with that undisclosed belief.

Nothing in this ruling should be construed as approving the conduct alleged in the complaint. At its core, the complaint alleges that government

agents pressured individuals to serve as informants – at risk to their own and

their families' safety – and to report on the activities of their neighbors and

community members by falsely and in bad faith accusing them of terrorism to

deny them significant liberties under a program designed to protect lives from

genuine terrorists. That is improper behavior, regardless of whether the agents

knew of the Appellants' particular religious beliefs. But in this case, the

Appellants' only remaining legal claim is that the Appellee agents are personally

liable in damages for violating their free exercise of religion under RFRA. On the

facts alleged, for the reasons discussed above, that claim fails.

## CONCLUSION

We have considered the Appellants' remaining arguments and find them

to be without merit. The Appellees in this case are entitled to qualified immunity,

and the district court therefore did not err in dismissing the complaint.

Accordingly, we AFFIRM the judgment of the district court.