21-0636-cv
*Nat'l Rifle Ass'n of Am. v. Vullo*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

————————————————

August Term 2024

Originally Argued: January 13, 2022
Originally Decided: September 22, 2022
Reversed and Remanded: May 30, 2024
Argued: November 13, 2024
Decided: July 17, 2025

Docket No. 21-0636-cv

————————————————

NATIONAL RIFLE ASSOCIATION OF AMERICA,

*Plaintiff-Appellee*,


- *against* -


MARIA T. VULLO,

*Defendant-Appellant*,


ANDREW CUOMO, THE NEW YORK STATE DEPARTMENT
OF FINANCIAL SERVICES,

*Defendants.**

————————————————

_____

*      The Clerk of Court is respectfully directed to amend the official caption as set forth above.

ON REMAND FROM THE SUPREME COURT OF THE UNITED STATES,
NO. 22-842

_____

Before:

CHIN, CARNEY, and ROBINSON, *Circuit Judges*.[**]

_____

Interlocutory appeal from a decision of the United States District Court for the Northern District of New York (McAvoy, *J.*), denying defendant-appellant state official's motion to dismiss for failure to state a First Amendment claim and for qualified immunity. This Court previously reversed the district court's order and held that plaintiff-appellee, a pro-gun advocacy group, failed to state a First Amendment claim and that the state official was entitled to qualified immunity. The Supreme Court granted certiorari to determine only whether the complaint stated a plausible First Amendment claim. Concluding that it did, the Supreme Court reversed our holding on that issue and remanded the case for further proceedings but noted that this Court was free on remand to reconsider the issue of qualified immunity. We have now reconsidered the issue, and we conclude again that the state official was entitled to qualified immunity.

_____

[**] This Court first heard this case in 2022 with a panel consisting of Judges Pooler, Chin, and Carney. After Judge Pooler passed in 2023, this case returned to us on remand from the Supreme Court, and Judge Robinson was randomly assigned to fill Judge Pooler's seat on the panel.

- 2 -

Although the general principle that a government official cannot coerce a private party to punish or suppress disfavored speech was well established, the law was not clearly established that the conduct alleged here -- regulatory action directed at the nonexpressive conduct of third parties -- constituted coercion or retaliation violative of the First Amendment.  Accordingly, we reverse the district court's qualified immunity ruling and remand for the district court to enter judgment dismissing the remaining claims.

    REVERSED AND REMANDED.

---

   WILLIAM E. HAVEMANN (Neil Kumar Katyal and
     Danielle Desaulniers Stempel, *on the brief*),
     Hogan Lovells US LLP, Washington, D.C.,
     and Mary B. McCord and William Powell,
     Institute for Constitutional Advocacy and
     Protection, Washington, D.C., *on the brief*,
     *for Defendant-Appellant*.

   NOEL J. FRANCISCO, Jones Day, Washington, D.C.,
     and William A. Brewer III, Sarah B. Rogers,
     and Noah Peters, Brewer, Attorneys &
     Counselors, New York, NY, *on the brief*,
     *for Plaintiff-Appellee*.

   Robert Corn-Revere and Joshua A. House, Washington,
     D.C., *for Amicus* Foundation for Individual
     Rights and Expression.

---

CHIN, *Circuit Judge*:

This case involves First Amendment claims brought by Plaintiff-Appellee National Rifle Association of America (the "NRA") against Defendant-Appellant Maria T. Vullo, the former Superintendent of the New York State Department of Financial Services ("DFS") under former Governor Andrew Cuomo. According to the NRA, Vullo violated its rights to free speech and equal protection by engaging in behavior that established an implicit censorship regime and by retaliating against the NRA for its speech through her interactions with various insurers doing business in New York. Vullo argues that she is entitled to qualified immunity, but the NRA maintains that she violated clearly established law prohibiting coercion or retaliation violative of the First Amendment.

Below, the district court denied Vullo's motion pursuant to Fed. R. Civ. P. 12(b)(6) to dismiss the NRA's First Amendment claims for failure to state a claim or, in the alternative, on qualified immunity grounds. *Nat'l Rifle Ass'n of Am. v. Cuomo*, 525 F. Supp. 3d 382, 411 (N.D.N.Y. 2021). On appeal, this Court reversed and held that the NRA failed to state a First Amendment claim and that -- even assuming that the complaint stated a plausible First Amendment claim --

Vullo was entitled to qualified immunity. *See Nat'l Rifle Ass'n of Am. v. Vullo*, 49 F.4th 700, 718-21 (2d Cir. 2022) (*Vullo I*). The NRA then petitioned the Supreme Court for review, which granted certiorari to address only the first issue: whether the NRA stated a plausible First Amendment claim. *See Nat'l Rifle Ass'n of Am. v. Vullo*, 144 S. Ct. 375 (2023) (mem.). Answering in the affirmative, the Supreme Court reversed our holding on that issue and remanded the case for further proceedings. *See Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 199 (2024) (*Vullo II*). It left unanswered whether Vullo was entitled to qualified immunity on the facts alleged, stating that this Court was free to "reconsider" the issue on remand. *Id.* at 199 n.7.

As discussed more fully below, we conclude again that Vullo is entitled to qualified immunity, for the law was not clearly established that the conduct alleged here -- regulatory action directed at the nonexpressive conduct of third parties -- constituted coercion or retaliation violative of the First Amendment. Accordingly, we REVERSE the district court's denial of Vullo's motion to dismiss on the basis of qualified immunity, and we REMAND for the district court to enter judgment dismissing the remaining claims.

BACKGROUND

In this appeal challenging the district court's decision on a motion to dismiss, we accept the material facts in the operative complaint as true and draw all reasonable inferences in the NRA's favor. *See Miller v. United States ex rel. Miller*, 110 F.4th 533, 538 (2d Cir. 2024).

**I.    *The Facts***

**A.    *The Parties***

The NRA is a pro-gun advocacy group and "America's leading provider of gun-safety and marksmanship education for civilians and law enforcement." App'x at 137 ¶ 1. It "spends tens of millions of dollars annually distributing . . . literature to advocate for its views on the Second Amendment and to assist NRA members engaging in national, state, and local firearm dialogue." *Id.* at 140 ¶ 12. The NRA has also contracted with various insurance companies to secure and maintain coverage for its own operational activities as well as to offer various types of affinity-based insurance coverage to its members "on affordable, tailored terms." *Id.* at 147-48 ¶¶ 29, 30. Several of those affinity insurance policies were administered and marketed by Lockton Companies, LLC

("Lockton"), and underwritten by Chubb Limited ("Chubb") and Lloyd's of London ("Lloyd's"). *Id.* at 148-49 ¶¶ 31-32, 162-63 ¶ 69.

DFS regulates all three of those entities and many others like them, in line with its stated policy goal of "'ensur[ing] the continued solvency, safety, [and] soundness' of banks and insurance companies." *Id.* at 146 ¶ 26 (second alteration in original) (quoting N.Y. Fin. Serv. Law § 201). At all times relevant to this case, DFS was led by Vullo, who possessed "broad regulatory and enforcement powers" over entities such as Lockton, Chubb, and Lloyd's. *Id.* at 146 ¶ 25. Those powers included "the ability to initiate civil and criminal investigations" into regulated entities and the authority to refer matters to the New York State attorney general for criminal enforcement. *Id.* At the heart of this case is the NRA's allegation that Vullo used those powers to coerce and retaliate against financial institutions that conducted business with the NRA to deprive the NRA and its members of their First Amendment rights.

**B.**   *The "Carry Guard" Investigation*

In September 2017, the New York County District Attorney's Office advised DFS of the apparent illegality of an NRA-endorsed affinity insurance program called "Carry Guard." *Id.* at 149-50 ¶¶ 34-35. As the NRA describes it,

Carry Guard was a program that provided "dynamic, state-of-the-art insurance protection" through "a cutting edge set of features that will help gun owners mitigate the potentially costly financial and legal consequences flowing from armed encounters, even if they did everything right." *Id.* at 190 ¶ 5. But Carry Guard was cutting-edge partly because the program provided high-risk, excess-line coverage that could not be obtained from traditional authorized insurers, *see id.* at 192 ¶¶ 11-12, as "many homeowners' policies [had] severe limitations or exclusions related to intentional acts such as self-defense," *id.* at 191 ¶ 7. Notably, Carry Guard insured New York residents for intentional, reckless, and criminally negligent acts with a firearm that injured or killed another person, even beyond the use of reasonable force to protect persons or property. *See id.* at 192 ¶ 13, 233 ¶ 9.

In October 2017, DFS opened an investigation into the program to consider whether certain features of Carry Guard might violate New York insurance law. *Id.* at 150 ¶ 35. At first, the investigation was primarily directed at the insurance company that administered the policy -- Lockton -- but it expanded to cover also those that underwrote them -- Chubb and Lloyd's. *See id.* at 150 ¶¶ 35-36, 159 ¶ 62, 161 ¶ 67. The investigation also expanded beyond

Carry Guard to cover other excess-line property and casualty policies related to firearms.  *Id.* at 150 ¶¶ 35-36.

Within weeks, the investigation not only confirmed the likely illegality of the scope of coverage under Carry Guard, but it also revealed that the NRA promoted Carry Guard and conducted other insurance business without an insurance producer license, likely in violation of New York insurance law.  *Id.* at 192-93 ¶¶ 13-14 (Lockton); *id.* at 213 ¶¶ 10-12 (Chubb); *id.* at 233 ¶¶ 9-11 (Lloyd's).

**C.    *The Lloyd's Meetings***

In February 2018, a shooting at Marjory Stoneman Douglas High School in Parkland, Florida, left seventeen students and staff dead and galvanized parts of the American public to speak out against gun violence.  *See Vullo I*, 49 F.4th at 708 & nn.3-5 (collecting articles).  As the DFS investigation continued against that backdrop, Vullo began meeting with senior executives at Lloyd's to "present[] [her] views on gun control and [her] desire to leverage [her] powers to combat the availability of firearms, including specifically by weakening the NRA."  App'x at 161 ¶ 67.  At those meetings (the "Lloyd's Meetings"), Vullo allegedly "discussed an array of technical regulatory

infractions plaguing the affinity-insurance marketplace," *id.* at 144 ¶ 21, and specifically addressed issues related to excess-line insurance programs like Carry Guard, *see id.* at 162 ¶ 69.  She also allegedly "made clear that Lloyd's could avoid liability for infractions relat[ed] to" those policies "so long as it aided DFS's campaign against gun groups" like the NRA.  *Id.* at 162-63 ¶ 69.

In the wake of those discussions, Lloyd's agreed to "instruct its syndicates to cease underwriting firearm-related policies" and to "scale back its NRA-related business . . . in exchange" for DFS's decision to focus its forthcoming enforcement efforts "solely on those syndicates which served the NRA."  *Id.*  And indeed, a few months later on May 9, 2018, Lloyd's announced that it had directed its underwriters to terminate all current insurance policies related to the NRA and to cease providing insurance to the NRA in the future. *Id.* at 164 ¶ 72.

**D.**     *Cuomo's Press Release and Vullo's Guidance Letters*

About two months after the Lloyd's Meetings, Cuomo issued a press release on April 19, 2018, entitled, "Governor Cuomo Directs Department of Financial Services to Urge Companies to Weigh Reputational Risk of Business Ties to the NRA and Similar Organizations."  *Id.* at 180 (the "Press Release").  As

its title suggests, the Press Release announced that, upon Cuomo's directive,

Vullo would urge financial services companies to review relationships they had

with the NRA and "consider whether such ties harm their corporate reputations

and jeopardize public safety." *Id.* It also cited DFS as "encouraging regulated

entities to consider reputational risk and promote corporate responsibility," and

reported that "[a] number of businesses have ended relationships with the NRA

following the Parkland, Florida school shooting in order to realign their

company's values." *Id.* at 181. Finally, the Press Release quoted Vullo as stating,

"DFS urges all insurance companies and banks doing business in New York to

join the companies that have already discontinued their arrangements with the

NRA, and to take prompt actions to manage these risks and promote public

health and safety." *Id.*

Per Cuomo's directive, Vullo contemporaneously issued a pair of

memoranda both entitled "Guidance on Risk Management Relating to the NRA

and Similar Gun Promotion Organizations," on April 19, 2018. *Id.* at 183-84, 186-

87 (the "Guidance Letters"). Although they were issued to the leaders of different

types of financial groups, they were essentially identical in content. Both

referenced the Parkland shooting and other recent gun violence tragedies, and

both cited the strength and growing intensity of the "social backlash" against the

NRA and similar gun-promoting organizations.  *Id.* at 183, 186.  Both also

declared that the "tragic devastation caused by gun violence . . . is a public safety

and health issue," and they reminded regulated entities that "engagement in

communities they serve is closely tied to the business they do with their clients

and customers and its impact on such communities."  *Id.* at 183; *see id.* at 186

("The manner by which financial institutions engage in communities they serve is

closely tied to the business they do with their clients and customers and its

impact on such communities.").  Finally, both of the Guidance Letters declared:

> In light of the above, and subject to compliance with
> applicable laws, the Department encourages [regulated
> institutions] to continue evaluating and managing their
> risks, including reputational risks, that may arise from
> their dealings with the NRA or similar gun promotion
> organizations, if any, as well as continued assessment of
> compliance with their own codes of social responsibility.
> The Department encourages regulated institutions to
> review any relationships they have with the NRA or
> similar gun promotion organizations, and to take prompt
> actions to managing these risks and promote public health
> and safety.

*Id.* at 184, 187.

E.     *The Consent Decrees*

Although the Press Release and Guidance Letters did not refer to

any ongoing investigations into -- or enforcement actions against -- any DFS-

regulated institutions, the Carry Guard investigation continued into the spring of

2018.  And it ended only when Lockton, Chubb, and Lloyd's all entered into

consent orders with DFS on May 2, May 7, and December 20, 2018, respectively.

*Id.* at 156 ¶ 54 (Lockton); *id.* at 159 ¶ 62 (Chubb); *id.* at 164 ¶ 74 (Lloyd's)

(together, the "Consent Decrees").

In the Consent Decrees, all three entities admitted that some of the

NRA-endorsed insurance programs they offered violated New York insurance

law and that they engaged in other business with the NRA on terms that violated

New York insurance law.  *See id.* at 199-200 ¶¶ 34-40 (Lockton); *id.* at 215 ¶¶ 18-

19 (Chubb); *id.* at 234-35 ¶¶ 16-17 (Lloyd's).  All three agreed to pay penalties and

to limit substantially -- although not entirely -- the ways in which they did

business with the NRA and similar entities moving forward.  *See id.* at 200-03

¶¶ 41-47 (Lockton); *id.* at 215-17 ¶¶ 20-26 (Chubb); *id.* at 235-38 ¶¶ 18-26

(Lloyd's).

**II.**     *Procedural History*

The NRA filed suit on May 11, 2018, asserting that DFS, Cuomo, and Vullo violated several of its statutory and constitutional rights by engaging in the conduct described above.

In its second amended complaint (the "SAC") filed June 2, 2020, the NRA again alleged that DFS, then-current DFS superintendent Linda A. Lacewell, Cuomo, and Vullo waged a "campaign [that] involve[d] selective prosecution, backroom exhortations, and public threats with a singular goal -- to deprive the NRA and its constituents of their First Amendment rights to speak freely about gun-related issues and defend their Second Amendment freedoms against encroachment." *Id.* at 135-36.  The NRA specifically alleged that Vullo's "concerted efforts to stifle the NRA's freedom of speech and to retaliate against the NRA" caused "financial institutions doing business with the NRA to rethink their mutually beneficial business relationships with the NRA for fear of monetary sanctions or expensive public investigations." *Id.* at 167 ¶ 80; *see also id.* at 152 ¶¶ 42, 44; *id.* at 168 ¶ 84.  Defendants moved to dismiss the SAC in motions filed on June 23, 2020.  *See id.* at 40.

In an order dated March 15, 2021, the district court dismissed all the claims against DFS, Lacewell, and Cuomo as barred by the Eleventh Amendment, *Cuomo*, 525 F. Supp. 3d at 403-11, and it dismissed the selective enforcement claim against Vullo on the basis of absolute immunity, *id.* at 392-400. The court left intact, however, the NRA's First Amendment claims against Vullo, after holding that Vullo was not entitled to qualified immunity on those claims at the motion-to-dismiss stage. *Id.* at 400-03. Vullo timely appealed that decision on March 22, 2021. App'x at 362.

As noted, this Court reversed the district court's judgment and remanded the case for the district court to enter judgment for Vullo. *Vullo I*, 49 F.4th at 721. We concluded that the SAC "fail[ed] to plausibly allege that Vullo unconstitutionally threatened or coerced Lloyd's or the other entities to stifle the NRA's speech" because the allegations therein "show[ed] that [Vullo] was simply executing her duties as DFS Superintendent and engaging in legitimate enforcement action." *Id.* at 719. And we concluded that, even assuming that the NRA sufficiently pleaded a First Amendment claim, Vullo was "nonetheless entitled to qualified immunity because the law was not clearly established and

any First Amendment violation would not have been apparent to a reasonable

official at the time." *Id.*

The NRA petitioned the Supreme Court for a writ of certiorari on

February 7, 2023, seeking review of our First Amendment and qualified

immunity holdings.  The Supreme Court granted the NRA's petition on a limited

basis, agreeing to hear only its challenge to our First Amendment holding.  *See*

*Vullo*, 144 S. Ct. at 375.  And on May 30, 2024, the Supreme Court vacated our

judgment and remanded the case, concluding that the NRA plausibly alleged a

First Amendment violation.  *Vullo II*, 602 U.S. at 191, 199.  The Supreme Court

held that any other conclusion was foreclosed by its decision in *Bantam Books, Inc.*

*v. Sullivan*, 372 U.S. 58 (1963), which "stands for the principle that a government

official cannot do indirectly what she is barred from doing directly: A

government official cannot coerce a private party to punish or suppress

disfavored speech on her behalf." *Vullo II*, 602 U.S. at 190.  Yet, in reviving the

NRA's First Amendment claim, the Supreme Court noted that, on remand, this

Court was "free to reconsider whether Vullo is entitled to qualified immunity."

*Id.* at 199 n.7.

On remand, we ordered the parties to submit supplemental briefs bearing on the issue of qualified immunity. The parties did so on July 29, 2024. In addition, between October 1 and November 4, 2024, the NRA and Vullo submitted letters citing supplemental authorities pursuant to Federal Rule of Appellate Procedure 28(j). We heard oral argument on November 13, 2024.

## DISCUSSION

Vullo contends on remand that she is entitled to qualified immunity for her challenged conduct notwithstanding the Supreme Court's holding that the NRA plausibly alleged a First Amendment violation. We agree and proceed in two steps. First, although the Supreme Court has held that the NRA plausibly alleged a First Amendment claim, we take up Justice Jackson's invitation to consider separately the NRA's two distinct First Amendment theories: censorship and retaliation. *See Vullo II*, 602 U.S. at 203 (Jackson, *J.*, concurring) ("[T]he complaint in this case alleges both censorship and retaliation theories for how Vullo violated the First Amendment."). Second, we consider whether Vullo is entitled to qualified immunity, and we conclude that she is because the law did not clearly establish that her conduct -- which was directed at the nonexpressive conduct of third-party entities within her regulatory sphere --

- 17 -

constituted impermissible coercion or retaliation in a manner violative of the First Amendment.

## I.    *The First Amendment*

Although the SAC does not clearly set forth separate impermissible coercion and retaliation theories, and the NRA did not argue them as such, it contains sufficient factual allegations to support claims based on both.  *Compare* App'x at 168 (Count One for the "Establishment Of An Implicit Censorship Regime"), *with id.* at 171 (Count Two for "Retaliat[ion] Against The NRA Based On Its Speech").  We differentiate between First Amendment claims based on impermissible coercion and retaliation theories because the two rest on temporally distinct factual allegations.  Coercion involves an attempt to induce or prevent conduct *before* the fact, and it is unlawful when an official attempts to suppress or compel speech by conveying a threat of adverse action if the target does not comply.  *See generally Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963).  Retaliation, by contrast, involves punishment for conduct *after* the fact, and it is unlawful when an official takes adverse action against an entity merely because it engaged in speech that the official does not agree with.  *See generally Mt.*

*Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977).  Given these differences, we evaluate the two theories separately.

### A.  *Impermissible Coercion*

As discussed further below, coercion violative of the First Amendment operates on two planes: *who* is being coerced and *what* conduct is being targeted.  On the first plane, coercion can target the speaker itself (*i.e.*, the person (or entity) engaging in expression), a conduit for the speaker (*i.e.*, a person who disseminates the speech for the speaker), or a third-party associate of the speaker (*i.e.*, a person with whom the speaker interacts or does business).  On the second plane, coercion can be directed at expressive or nonexpressive conduct.  But no matter the permutation, "[t]o state a claim that the government violated the First Amendment through coercion of a third party, a plaintiff must plausibly allege conduct that, viewed in context, could be reasonably understood to convey a threat of adverse government action in order to punish or suppress the plaintiff's speech." *Vullo II*, 602 U.S. at 191 (majority opinion).

In *Zieper v. Metzinger*, 474 F.3d 60 (2d Cir. 2007), for example, we found that a reasonable juror could conclude that the police unlawfully coerced a speaker into removing his dystopian film from the internet.  *Id.* at 66-67.

Concerned about the content of the film and afraid that it "was going to incite a riot," *id*. at 64, law enforcement officials repeatedly called the filmmaker and sent FBI agents and three police officers to his home over his lawyers' objections, *id*. at 67. We found that those actions, and the accompanying comments, might constitute impermissible coercion because they suggested that "there might be legal consequences if he failed to accede to the government's request that he remove his video." *Id*. *Zieper* thus stands as a straightforward example of impermissible coercion: it involved coercing a speaker (the filmmaker) into ceasing his expressive conduct (by removing a film from the internet).

If *Zieper* provides a straightforward example of impermissible coercion against a speaker targeting his or her expressive activity, *Bantam Books*, 372 U.S. at 58, further instructs that a First Amendment claim may exist even where the coercion targets expressive activity but is more indirect because it targets a *conduit* of speech rather than the speaker. In that case, the Supreme Court found to be impermissibly coercive a state commission's letter to a book distributor notifying it that certain publications were deemed to be morally objectionable, requesting that they be removed from circulation, and threatening criminal referral to the state attorney general if the distributor failed to comply.

*Id.* at 59-64. It did not matter that the plaintiffs in that case were the publishers of the books (*i.e.*, the speakers) rather than the distributors themselves, because it was clear that the commission's actions constituted impermissible attempts to coerce the distributors into refusing to serve as a *conduit* for the publishers' expression. In other words, "*Bantam Books* stands for the principle that a government official cannot do indirectly what she is barred from doing directly: A government official cannot coerce a private party to punish or suppress disfavored speech on her behalf." *Vullo II*, 602 U.S. at 190.

Similarly, in *Rattner v. Netburn*, 930 F.2d 204 (2d Cir. 1991), we found to be impermissibly coercive a town official's letter to chamber of commerce members because it suggested that a town-wide boycott of their businesses would ensue unless the chamber removed a businessman's advertisement -- critical of town leadership -- from its periodic newspaper. *Id.* at 209-10. Unlike *Zieper* but like *Bantam Books*, *Rattner* involved coercion against a conduit of speech (the chamber and its newspaper) and targeted expressive activity (the ad in the newspaper). That the chamber removed the advertisement and ceased operations entirely showed that "a threat was perceived and its impact was demonstrable." *Id.* at 210.

Next, in *Okwedy v. Molinari*, 333 F.3d 339 (2d Cir. 2003) (per curiam), we also found to be impermissibly coercive a New York City borough president's letter to a billboard company because -- although the letter did not explicitly threaten enforcement action -- its form and content nevertheless contained "an implicit threat" that retaliation would follow if the company "failed to accede" to the borough president's request to take down a controversial billboard paid for by a local church and its pastor. *Id.* at 344. Crucial to that holding were the facts that the letter was written on official city letterhead, its author "invoked his official authority" as borough president, it directed the billboard company to contact the borough president's "legal counsel" and chair of an "Anti-Bias Task Force," and it highlighted the author's awareness of the "substantial economic benefits" that the company derived from its billboards in the borough. *Id.* We concluded that these facts, taken together, plausibly alleged a claim of impermissible direct coercion because the challenged conduct exceeded mere attempts to convince. *Id.*; *see also Zieper*, 474 F.3d at 66 ("In determining whether a particular request to suppress speech is constitutional, what matters is the 'distinction between attempts to convince and attempts to coerce.'" (quoting *Okwedy*, 333 F.3d at 344)). Like *Bantam Books* and *Rattner*, *Okwedy* involved

impermissible coercion against a conduit of speech (the billboard company) and targeted patently expressive activity (the billboard display).

Finally, while *Zieper*, *Bantam Books*, *Rattner*, and *Okwedy* all stand for the proposition that pushing speakers or conduits of speech to suppress their expressive activity may be unlawful if it becomes impermissible coercion or, indeed, censorship, *Vullo II* further instructs that a First Amendment claim may lie even when the challenged conduct targets a third-party business associate that does not itself engage in expressive activity. *Vullo II*, 602 U.S. at 196. Here, Vullo is not alleged to have targeted a speaker (the NRA) or a conduit for the NRA's speech (for example, a publisher) but third-party, regulated entities. Moreover, the coercive conduct alleged was not directed at speech or expressive conduct but at nonexpressive activity, *i.e.*, underwriting insurance policies. Based on those allegations, *Vullo II* held that "the NRA plausibly alleged that Vullo violated the First Amendment by coercing DFS-regulated entities into disassociating with the NRA in order to punish or suppress the NRA's gun-promotion advocacy." *Id.* at 191.

*Vullo II* thus instructs that Vullo's conduct -- which targeted only the nonexpressive activity of the NRA's third-party business associates -- could form

the basis for a viable First Amendment coercion claim. As the Supreme Court

concluded, the NRA plausibly alleged that Vullo violated its First Amendment

rights by coercing DFS-regulated entities into disassociating with the NRA with

the aim of suppressing the latter's gun-promotion advocacy. *See, e.g.*, App'x at

150-51 ¶¶ 36-37 (alleging that Vullo's goal "was to disrupt any and all business

arrangements between the NRA and any insurance administrator, broker, or

underwriter" and "undermine [its] ability to conduct its affairs in New York").

## B.   *Retaliation*

In addition to coercing the NRA's business partners into cutting

business ties with the NRA, Vullo is alleged to have unlawfully retaliated against

the NRA for its advocacy regarding the Second Amendment. To plead a First

Amendment claim under a theory of unlawful retaliation, a plaintiff must allege

that the defendant "took an adverse action in response to his speech that would

not have been taken absent the retaliatory motive." *Houston Cmty. Coll. Sys. v.*

*Wilson*, 595 U.S. 468, 477 (2022) (internal quotation marks omitted). But "[i]t is

not enough to show that an official acted with a retaliatory motive and that the

plaintiff was injured" -- a plaintiff must allege some "causal connection" between

the alleged retaliatory animus and subsequent injury. *Nieves v. Bartlett*, 587 U.S.

391, 398-99 (2019). The retaliation inquiry therefore proceeds in three steps: the plaintiff must first show that (1) its conduct was constitutionally protected and (2) that same conduct was a substantial or motivating factor in the defendant's decision to undertake the challenged actions, after which (3) the defendant may rebut those allegations by showing that "it would have reached the same decision . . . even in the absence of the protected conduct." *Mt. Healthy*, 429 U.S. at 287; *accord Vullo II*, 602 U.S. at 204 (Jackson, *J.*, concurring).

That final step establishes what is known as a *Mt. Healthy* defense, *see, e.g., Anemone v. Metro. Trans. Auth.*, 629 F.3d 97, 117-18 (2d Cir. 2011), the availability of which is important because it balances the interest in legitimate regulatory enforcement against the need to uphold robust constitutional protections. So, although the First Amendment prohibits retaliation for speech generally, *see Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene of N.Y.*, 746 F.3d 538, 544 (2d Cir. 2014), that prohibition does not impose an absolute bar against legitimate law enforcement. As the Supreme Court noted in *Bantam Books*:

> We do not hold that law enforcement officers must renounce all informal contacts with persons suspected of violating valid laws . . . . Where such consultation is genuinely undertaken with the purpose of aiding the

> [plaintiff] to comply with such laws and avoid prosecution under them, it need not retard the full enjoyment of First Amendment freedoms.

372 U.S. at 71-72.  And here, "much of Vullo's alleged conduct, if not done for retaliatory reasons, might otherwise be legitimate enforcement of New York's insurance regulations."  *Vullo II*, 602 U.S. at 203 (Jackson, *J.*, concurring).[1]

At this motion-to-dismiss stage, however, we need not -- and do not -- consider the viability of any *Mt. Healthy* defense.[2]  Here, as the Supreme Court concluded, the NRA sufficiently alleged that it engaged in constitutionally protected conduct, *see, e.g.*, App'x at 140 ¶¶ 12-13, and that Vullo targeted its insurance providers in retaliation for that conduct, *see, e.g.*, *id.* at 143 ¶ 19, 154 ¶ 48, 167-68 ¶¶ 80-85.

## II.    *Qualified Immunity*

Although the NRA plausibly alleged a First Amendment claim, we conclude that Vullo is entitled to qualified immunity because the First

---

[1]    Indeed, the NRA conceded that the affinity insurance programs investigated by Vullo were in fact illegal.  *See* NRA Supp. Br., ECF No. 143, at 7 (citing *Vullo II*, 602 U.S. at 187).

[2]    *Mt. Healthy* defenses are best resolved at the summary judgment stage, when there is sufficient factual material from which to adequately scrutinize not only the challenged decisions but also the proffered reasons supporting them.  *See, e.g.*, *Anemone*, 629 F.3d at 117-20.

Amendment rights asserted were not clearly established at the time of the

challenged conduct.  True, the cases cited above clearly established that coercion

amounting to censorship and retaliation violate the First Amendment as a

general matter, but they did not sufficiently define the contours of that right such

that it would have been clear to every reasonable official in 2017 or 2018 that

Vullo's conduct with respect to a third party -- not a speaker or a speaker's

conduit -- violated that right.

We make two procedural observations before proceeding.  First, we

note that the Supreme Court explicitly left that question for this Court to

"reconsider" on remand.  *Vullo II*, 602 U.S. at 199 n.7.  After all, the question of

whether a plaintiff has adequately alleged a First Amendment violation is

distinct from the question of whether the defendant is entitled to qualified

immunity based on existing precedent.  *See Farid v. Ellen*, 593 F.3d 233, 245 (2d

Cir. 2010) ("For qualified immunity purposes, however, there is a separate

question, which is whether the right violated by this conduct was clearly

established."); *see also McCullough v. Wyandanch Union Free Sch. Dist.*, 187 F.3d

272, 277 (2d Cir. 1999) ("[I]t is not necessary for a district court to determine

whether in fact the First Amendment was violated before deciding whether a

defendant is entitled to qualified immunity.").  We answer only the latter

question here.

Second, resolving the defense at the motion-to-dismiss stage is

appropriate in this case because our conclusion is based on the law, and only

after consideration of the facts as pleaded by the NRA and construed in its favor.

*See, e.g.*, *Matzell v. Annucci*, 64 F.4th 425, 436 (2d Cir. 2023); *Smith v. Garretto*, 147

F.3d 91, 95 (2d Cir. 1998); *Molinelli v. Tucker*, 901 F.2d 13, 15-17 (2d Cir. 1990);

*Vega v. Miller*, 273 F.3d 460, 466-71 (2d Cir. 2001).[3]  We see no need to postpone

ruling on Vullo's qualified immunity defense because this is not a case where

discovery into the claims and allegations would make a difference in the analysis

---

[3]      We generally prefer lower courts to resolve qualified immunity defenses at the summary judgment stage because, at that point, facts uncovered during discovery will have shed more light on the conduct at issue.  *See Walker v. Schult*, 717 F.3d 119, 130 (2d Cir. 2013) ("[Q]ualified immunity is often best decided on a motion for summary judgment when the details of the alleged deprivations are more fully developed.").  But resolving a qualified immunity defense at the motion-to-dismiss stage may be preferable if the defense is based on the law rather than on undiscovered or disputed facts.  *See, e.g.*, *Garcia v. Does*, 779 F.3d 84, 97 (2d Cir. 2015) ("The Supreme Court has made clear that qualified immunity *can* be established by the facts alleged in a complaint, and . . . that the issue should be resolved when possible on a motion to dismiss, before the commencement of discovery, to avoid subjecting public officials to time consuming and expensive discovery." (citations and internal quotations marks omitted)); *accord Drimal v. Tai*, 786 F.3d 219, 225 (2d Cir. 2015).  In those instances, resolving a qualified immunity defense at the earliest possible stage is desirable because it prevents dragging public officials into prolonged and expensive litigation.

of the asserted defense.[4]  In short, the defense is properly asserted and decided at this stage here because "the facts supporting [it] appeared on the face of the complaint." *McKenna v. Wright*, 386 F.3d 432, 435 (2d Cir. 2004).

## A.    *Applicable Law*

Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law," and it generally attaches to conduct that "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *White v. Pauly*, 580 U.S. 73, 78-79 (2017) (per curiam) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11-12 (2015) (per curiam)).  In this Circuit, officials are generally entitled to qualified immunity for their official acts unless the plaintiff "pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Tanvir v. Tanzin*, 120 F.4th 1049, 1060 (2d Cir. 2024) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)).  Courts need not

---

[4]    *See, e.g.*, *Levantino v. Skala*, 56 F. Supp. 3d 191, 202-03 (E.D.N.Y. 2014) (rejecting qualified immunity defense at motion-to-dismiss stage because discovery was required to determine whether defendants had probable cause to arrest and detain the plaintiff); *Kanciper v. Lato*, 989 F. Supp. 2d 216, 232-33 (E.D.N.Y. 2013) (same, as to malicious prosecution and abuse of process claims); *Kaplan v. County of Orange*, 528 F. Supp. 3d 141, 166-71 (S.D.N.Y. 2021) (same, as to unreasonable search and seizure, false imprisonment, and excessive force claims, because discovery was required to determine whether the officers' actions were objectively reasonable).

address these two prongs in a particular order and may "exercise their sound

discretion in deciding which of the two prongs of the qualified immunity

analysis should be addressed first in light of the circumstances in the particular

case at hand." *Id.* (quoting *Sabir v. Williams*, 52 F.4th 51, 58 (2d Cir. 2022)); *see also*

*Pearson v. Callahan*, 555 U.S. 223, 236-37 (2009) (stating that this process prevents

"a substantial expenditure of scarce judicial resources on difficult questions that

have no effect on the outcome of the case").  Accordingly, qualified immunity is

defeated only if *both* requirements are met and applies so long as *one* is not met.

      As the NRA has plausibly alleged that Vullo violated its First

Amendment rights, she is entitled to qualified immunity only if the rights at

issue in this case were not "clearly established" at the time of her challenged

conduct.  *Tanvir*, 120 F.4th at 1060; *see, e.g.*, *Montero v. City of Yonkers*, 890 F.3d

386, 402-03 (2d Cir. 2018); *Smith*, 147 F.3d at 94-95; *Bacon v. Phelps*, 961 F.3d 533,

545 (2d Cir. 2020).

      For a right to be clearly established, "existing precedent must have

placed the statutory or constitutional question *beyond debate*," *al-Kidd*, 563 U.S. at

741 (emphasis added), such that the ensuing rules declare with a "high degree of

specificity" which conduct is permitted and not, *Liberian Cmty. Ass'n v. Lamont*,

970 F.3d 174, 186 (2d Cir. 2020) (internal quotation marks omitted).  In other words, a right alleged to have been violated is clearly established only if it is "sufficiently clear" to "every reasonable official" that the challenged conduct, in the "specific context of the case," violates that right.  *Radwan v. Manuel*, 55 F.4th 101, 114 (2d Cir. 2022) (first quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012); and then quoting *Mullenix*, 577 U.S. at 12).[5]  "In determining if a right is clearly established, this Court looks to whether (1) it was defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has confirmed the existence of the right, and (3) a reasonable defendant would have understood that his conduct was unlawful."  *Id.* (quoting *Doninger v. Niehoff*, 642 F.3d 334, 345 (2d Cir. 2011)).  Absent controlling authority from the Supreme Court or this Circuit, a plaintiff may still show that a right is clearly established if "a robust consensus of cases of persuasive authority" says so.  *Id.* (quoting *De La Rosa v. White*, 852 F.3d 740, 746 (8th Cir. 2017)).

---

[5]      *See also Pena v. DePrisco*, 432 F.3d 98, 114 (2d Cir. 2005) ("The relevant, dispositive inquiry in determining whether a federal right is clearly established is whether it would have been clear to a reasonable officer that his conduct was unlawful in the situation he confronted." (alterations adopted) (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001), *overruled in part on other grounds by Pearson*, 555 U.S. at 227)).

An official is thus qualifiedly "immune from liability unless, under the particular circumstances the official faced, any 'reasonable official' would have 'known for certain that the conduct was unlawful' under then-existing precedent." *Lamont*, 970 F.3d at 187 (alteration adopted) (quoting *Ziglar v. Abbasi*, 582 U.S. 120, 152 (2017)).  We have observed that this is generally the case in any of the following three circumstances: First, that right may not be clearly established because the conduct challenged in a case simply *predates* any and all judicial opinions announcing that the specific conduct violated a statutory or constitutional right.[6]  Second, the asserted right may not be clearly established because there is *no controlling law* on the issue.[7]  Or third, that right may not be clearly established because the relevant caselaw, persuasive as it may be, does not *clearly* bar the challenged conduct.[8]  We list these circumstances in order of

---

[6]    *See, e.g.*, *Matzell*, 64 F.4th at 436 (applying qualified immunity because the conduct at issue took place in 2017-2018, predating the 2021 "precedent establishing that [d]efendants' conduct violated" the Constitution).

[7]    *See, e.g.*, *Mudge v. Zugalla*, 939 F.3d 72, 79-80 (2d Cir. 2019) (applying qualified immunity because only federal district and state courts had established the right, and that is "insufficient" to establish "a clear[] . . . substantive *federal* constitutional right"); *Smith*, 147 F.3d at 95 (applying qualified immunity because "[n]o case has previously been decided in which [the conduct at issue] was ruled to be" a violation of Constitutional rights); *Terebesi v. Torreso*, 764 F.3d 217, 233 (2d Cir. 2014) (same).

[8]    *See, e.g.*, *Zieper*, 474 F.3d at 70 (applying qualified immunity because "[t]he defendants' statements and conduct fall considerably short of the thinly veiled threats of prosecution issued in *Bantam Books*"); *Molinelli*, 901 F.2d at 16-17 (applying qualified

theoretical difficulty; that is, it is generally most difficult to establish a qualified

immunity defense under the third circumstance, because the Supreme Court has

made it clear that "officials can still be on notice that their conduct violates

established law even in novel factual circumstances." *Vega v. Semple*, 963 F.3d

259, 277 (2d Cir. 2020) (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)) (rejecting

a defense seeking qualified immunity "absent binding precedent that addresses

the *very same* carcinogen in this case").  In those cases, courts must grapple with

the difficult question of whether the relevant factual circumstances are truly

"novel" under existing precedent.  *Compare, e.g.*, *Zieper*, 474 F.3d at 70 (granting

qualified immunity on a First Amendment coercion claim because the threats at

issue were not as "thinly veiled" as those in *Bantam Books*), *with Semple*, 963 F.3d

at 277 (declining to find that qualified immunity was proper on the basis that "no

binding decision discusses the constitutional implications of *radon* exposure to

inmates," because it was sufficient that precedent had addressed the implications

of toxic environmental substances more generally).

---

immunity because the authorities cited by the parties created a "conflict of opinion" and
at best "express uncertainty as to the state of the law on this issue"); *Miller*, 273 F.3d at
467 (applying qualified immunity because "the available precedents that might usefully
have guided the [d]efendants leave the unlawfulness of their action at least unclear").

**B.**   *Application*

Vullo is entitled to qualified immunity on the NRA's impermissible coercion and retaliation claims because the First Amendment rights at issue were not clearly established at the time of the challenged conduct.  *See Tanvir*, 120 F.4th at 1060.  Reasonable officials in Vullo's position "would [not] have known for certain," *Lamont*, 970 F.3d at 187 (internal quotation marks omitted), based on the cases cited above, that her conduct crossed the line from forceful but permissible persuasion to impermissible coercion and retaliation.

We start with the premise that a state official may "share her views freely and criticize particular beliefs, and she can do so forcefully in the hopes of persuading others to follow her lead," as long as she does not "use the power of the State to punish or suppress disfavored expression."  *Vullo II*, 602 U.S. at 188. The NRA alleges that Vullo crossed that line when she purportedly pressured insurance companies and banks into cutting certain business ties with the NRA and pursued investigations and enforcement actions against its business partners.[9]

---

[9]      The NRA does not dispute that Vullo's responsibilities as DFS superintendent included enforcing the conceded violations of New York insurance law that gave rise to her communications with the third-party insurers.  Indeed, while "DFS's regulatory

To be clear, we do not hold that an official may infringe the statutory or constitutional rights of any person or entity if she can find some sufficiently novel way to use her office and powers to do so.  Rather, we hold here that qualified immunity is proper only because no case (or set of cases) had clearly established, by the time of Vullo's conduct, that exercising regulatory power to pressure third-party regulated entities into refraining from nonexpressive activity and disassociating from a plaintiff crossed the line from persuasion into impermissible coercion and retaliation.  In other words, Vullo is entitled to qualified immunity because the effect of her alleged coercion of and retaliation against these regulated entities on the NRA's speech is significantly *more attenuated here* than in the cases cited above.  We proceed by applying the defense separately to the NRA's impermissible coercion and retaliation theories.

### 1.    *Impermissible Coercion*

The NRA alleges that Vullo engaged in unlawful coercion when she used her regulatory power to pressure insurance companies and banks into cutting business ties with the NRA.  Vullo, however, allegedly targeted only entities over which she had regulatory oversight and pursued only concededly

---

mandate does not include setting gun-control policy," App'x at 146 ¶ 27, it *does* include enforcing state insurance law, *see id.* at 145-46 ¶¶ 24-27.

illegal, nonexpressive activity.  We find that Vullo is entitled to qualified

immunity on this theory because, until *Vullo II*, no case had clearly established

that a regulator could indirectly infringe the First Amendment rights of one

entity (the NRA) by coercing third-party associates (the insurers) into refraining

from nonexpressive, nonspeech activity (writing certain NRA-endorsed policies).

At best, the existing case law before *Vullo II* addressed only coercive

conduct aimed at expressive activity, either through the speaker or some conduit

for the speaker.  *Bantam Books* was literally about banning books -- the regulator

in that case unlawfully coerced a publisher's distributors into removing certain

books and publications from circulation.  372 U.S. at 62-64.  Similarly, in *Rattner*,

the village trustee's letter unlawfully coerced a local newspaper into removing a

local man's advertisement critical of the local government.  930 F.2d at 209-10.

And in *Okwedy*, the borough president's letter unlawfully coerced a billboard

company into taking down a controversial billboard paid for by a local church

and its pastor.  333 F.3d at 341-44.  In each of these cases, the nexus between the

defendant's coercive conduct and the eventual infringement of the plaintiff's First

Amendment rights was clear -- because the third party was at least a conduit for

the expression sponsored or requested by the plaintiff, coercing the third party

into limiting or ceasing those activities also meant limiting or terminating the

*plaintiff's* speech and expression.  The conduct sought to stop the speech itself.

      After all, a book publisher will clearly have trouble disseminating its

speech if a regulator has coerced its distributor into stopping the circulation of its

books.  *See Bantam Books*, 372 U.S. at 62-64.  Private citizens and public entities,

too, would struggle to express their political views if officials used their influence

to coerce others into refusing to publish those views.  *See Rattner*, 930 F.2d at 206-

07; *Okwedy*, 333 F.3d at 344.  That precedent thus made clear that "[a]lthough an

individual has no right to force a private publication to air his political views, a

government does not have license to *forbid* the publication to air those views."

*Rattner*, 930 F.2d at 208 (citations omitted) (emphasis added).

      This case falls decidedly outside that line of precedent.  Here,

although Vullo is alleged to have coerced third parties who dealt with the NRA,

those third parties were not disseminating speech on the NRA's behalf or

otherwise engaging in expressive activity.  As Justice Jackson pointed out, "[t]he

NRA does not contend that its (concededly unlawful) insurance products offered

through those business relationships were themselves 'speech,' akin to a

billboard [(as in *Okwedy*)], a television ad, or a book [(as in *Bantam Books*)]."  *Vullo*

*II*, 602 U.S. at 202 (Jackson, *J.*, concurring). Thus, the nexus between coercion and infringement is not clear here. Unlike the plaintiffs in *Bantam Books*, *Okwedy*, and *Rattner*, the NRA does not allege that Vullo targeted the means through which the NRA was actually engaging in expressive activity. They do not contend, for example, "that Vullo pressured the printer of American Rifleman (a longstanding NRA periodical) to stop printing the magazine, or coerced a convention center into canceling the NRA's annual meeting." *Id.* Instead, the NRA alleges that Vullo infringed its First Amendment rights in a much more attenuated manner: Vullo coerced insurance companies into "terminat[ing] longstanding, beneficial business relationships with the NRA," which allegedly had the eventual effect of "depriv[ing] [it] of basic bank-depository services, corporate insurance coverage, and other financial services," *thereby* making it difficult for the NRA to maintain its " corporate existence" and pursue "its advocacy mission." App'x at 136.

Those extra causal steps between coercion and infringement mean that traditional coercion cases present "an awkward fit with the facts of this case." *Vullo II*, 602 U.S. at 202 (Jackson, *J.*, concurring) (emphasis omitted); *see also id.* ("[T]he effect of Vullo's alleged coercion of regulated entities on the NRA's speech is *significantly more attenuated here* than in *Bantam Books* or most decisions

applying it." (emphasis added)).  In other words, we can surmise only that a

reasonable officer in Vullo's position likely would have thought that her conduct

-- which targeted regulated entities for concededly illegal, nonexpressive

activities and only indirectly affected the NRA -- was permissible.[10]  Accordingly,

the existing precedent did not adequately define the contours of the First

Amendment right at issue such that Vullo would have been on notice that her

specific conduct violated it.  *See Semple*, 963 F.3d at 274.[11]

---

[10]     Standing alone, the conceded illegality of the affinity insurance programs
certainly "does not excuse Vullo from allegedly employing coercive threats to stifle gun-
promotion advocacy."  *Vullo II*, 602 U.S. at 196.  We nevertheless apply qualified
immunity here because, in addition to the conceded illegality of those programs, Vullo
is not alleged to have dealt directly with the NRA or to have targeted the NRA's own
speech activity.  Taken together, these allegations place the conduct in this case
decidedly outside the scope of the impermissible coercion cases described above.

[11]     The out-of-circuit authorities relied upon by the NRA fall short of that mark as
well.  *See* NRA Oct. 1, 2024 Ltr., ECF No. 177, at 1 (citing *Josephson v. Ganzel*, 115 F.4th
771 (6th Cir. 2024)); NRA Nov. 1, 2024 Ltr., ECF No. 186, at 1 (citing *Backpage.com, LLC v.
Dart*, 807 F.3d 229 (7th Cir. 2015), *cert. denied*, 580 U.S. 816 (2016)).  As the NRA
concedes, *Josephson* involved retaliation, and not coercion, by state officials, and, in any
event, the case centered on allegations that those officials retaliated directly against a
professor by firing him for his speech activity.  *See* 115 F.4th at 777-82.  As a case
involving direct retaliation, *Josephson* cannot clearly establish any right prohibiting the
indirect coercion at issue in this case.  *Backpage* presents a closer call, but it is best
understood as inapposite for the same reason that *Bantam Books*, *Rattner*, and *Okwedy*
are: it involved a more direct incursion on speech.  There, although the official coerced
credit card companies into cutting off business ties with the plaintiff, the precise
method was aimed directly at limiting speech because it consisted of removing
consumers' ability to purchase ads on the plaintiff website's platform.  *See* 807 F.3d at
230 ("The Sheriff of Cook County . . . demand[ed] that firms such as Visa and
MasterCard prohibit the use of their credit cards to purchase any ads on Backpage,

The NRA correctly notes that the "result [in *Vullo II*] flowed from

*Bantam Books*."  NRA Supp. Br., ECF No. 143, at 4.  Indeed, the Supreme Court

emphasized that an official may not engage in "conduct that, viewed in context,

could be reasonably understood to convey a threat of adverse government action

in order to punish or suppress [a] plaintiff's speech."  *Vullo II*, 602 U.S. at 191.  But

under the qualified immunity analysis, general pronouncements of law are not

sufficient to "clearly establish" a right.  Although "[a] court need not have passed

on the identical course of conduct in order for its illegality to be 'clearly

established,'" *Williams v. Greifinger*, 97 F.3d 699, 703 (2d Cir. 1996), the Supreme

Court has "repeatedly told courts . . . not to define clearly established law at a

high level of generality," *al-Kidd*, 563 U.S. at 742.  Instead, the dispositive

question is "whether the violative nature of particular conduct is clearly

established" by existing precedent that has "placed the statutory or constitutional

question beyond debate."  *Id.* at 741-42.

That is not the case here.  A reasonable officer in Vullo's position

would not have been on notice, at the time of her conduct, that such conduct

---

since the ads might be for illegal sex-related products or services, such as prostitution.").
*Backpage* thus does not clearly establish the particular right at issue in this case --
although the First Amendment violation against the plaintiff was similarly indirect, the
incursion on speech was much more direct.

violated the NRA's First Amendment rights. *See Ziglar*, 582 U.S. at 152 (qualified

immunity applies "if a reasonable officer might not have known for certain that

the conduct was unlawful"). Given that even this Court erred in its merits

conclusion in *Vullo I*, it would make little sense to hold that a reasonable officer

in Vullo's position should have known -- in 2017 or 2018 -- that her conduct

violated the NRA's First Amendment rights. *See Terebesi v. Torreso*, 764 F.3d 217,

233 (2d Cir. 2014) ("It is difficult to ask that a [defendant] identify clearly

established law that three judges of this Court could not find."); *cf. Mandala v.*

*NTT Data, Inc.*, 88 F.4th 353, 360 (2d Cir. 2023) (holding that appellant was

entitled to file an amended complaint because dismissal of the original complaint

was affirmed over "vigorous dissent," and a petition for rehearing *en banc* was

denied over the objection of five circuit judges). "[A] reasonable officer is not

required to foresee judicial decisions that do not yet exist," *Kisela v. Hughes*, 584

U.S. 100, 107 (2018), and so Vullo was not required to foresee that the Supreme

Court would rule as it did in *Vullo II*.

       In summary, qualified immunity on the NRA's coercion theory is

proper because, although *Bantam Books* and the cases applying it made clear that

coercion with the aim of suppressing speech is unlawful generally, they did not

make clear the more particularized application of that principle here -- where the

allegedly coerced party was not itself a publisher or conduit of speech.

A reasonable officer in Vullo's shoes "might not have known *for certain* that the

[challenged coercive] conduct was unlawful," *Ziglar*, 582 U.S. at 152 (emphasis

added), because *Bantam Books* and the cases applying it did not put the question

"beyond debate," *al-Kidd*, 563 U.S. at 741. Vullo is thus entitled to qualified

immunity on the NRA's First Amendment coercion claim.

## 2. *Retaliation*

The NRA also alleges that Vullo engaged in unlawful retaliation

when she pursued investigations and enforcement actions against the NRA's

business partners. But again, qualified immunity is proper here because the

nexus between the alleged retaliation and the alleged eventual infringement of

the NRA's First Amendment rights is too attenuated. Specifically, although the

SAC repeatedly alleges that Vullo retaliated against the NRA for its speech

activity, *see* App'x at 136, 143 ¶ 19, 154 ¶ 48, 167 ¶ 80, 169 ¶ 91, 171-72 ¶ 101, the

reality is that the SAC alleges only that Vullo punished the NRA's business

associates to punish the NRA for its speech. The route from alleged retaliation to

eventual infringement is thus circuitous and indirect, and insufficient to have put

Vullo on notice that her acts would violate First Amendment rights.

At the time of Vullo's conduct, no precedent had clearly established

that indirect retaliation of the kind at issue in this case was unlawful.  At most,

our existing retaliation cases had addressed only instances in which a defendant

retaliated *directly against the plaintiff* and *for the plaintiff's speech activity*, whether

by actively punishing or passively refusing to do something for the plaintiff.[12]

---

[12]     *See, e.g., Tanvir*, 120 F.4th at 1053 (federal agents allegedly retaliated against plaintiffs by pretextually placing or retaining them on the government's "No Fly List" because they refused to serve as government informants within Muslim communities); *Montero*, 890 F.3d at 390-92 (city and police officials allegedly retaliated against an officer and union official by transferring him to a less desirable unit and initiating pretextual investigations against him because he criticized management decisions by the police officials at union meetings); *Matusick v. Erie Cnty. Water Auth.*, 757 F.3d 31, 36-38 (2d Cir. 2014) (a state agency and its officials allegedly retaliated against a white employee by assaulting, harassing, and firing him because he had a romantic relationship with a black woman); *Garcia v. Hartford Police Dep't*, 706 F.3d 120, 123 (2d Cir. 2013) (per curiam) (police officials allegedly retaliated against an officer by failing to promote him and instigating several investigations into his conduct because he spoke to the press about an incident involving excessive force by police officers against a Hispanic citizen); *Anemone*, 629 F.3d at 99 (state agency officials allegedly retaliated against an employee by taking a series of adverse employment actions against him, including termination, because he spoke out against potential corruption within the agency); *Faghri v. Univ. of Conn.*, 621 F.3d 92, 94-96 (2d Cir. 2010) (school officials allegedly retaliated against a dean by firing him because he criticized university leaders for mismanagement of funds and other issues); *Mandell v. County of Suffolk*, 316 F.3d 368, 374-76, 383 (2d Cir. 2003) (police officials allegedly retaliated against an officer by involuntarily transferring him and refusing to promote him on several occasions because he gave a public interview in which he criticized the department); *Smith*, 147 F.3d at 92-93 (local officials allegedly retaliated against a government employee by

Those cases do not address a sufficiently close analogue to the current situation --

one in which a plaintiff alleges an indirect violation of its First Amendment

rights because the defendant exerted pressure relating to the nonexpressive

activities of third parties with whom the plaintiff dealt. That distinction is

arguably a narrow one, but it is nevertheless determinative, especially here,

where a regulator dealt directly with regulated entities, and applicable state laws

were undeniably violated.

In sum, the various cases addressing unlawful retaliation did not

provide the requisite guidance clearly establishing that Vullo *could not* engage in

the conduct at issue in this case. Because the available cases did not place the

question "beyond debate," *al-Kidd*, 563 U.S. at 741, reasonable officials in Vullo's

position likely would not have understood that they were engaging in

impermissible law enforcement, nor would they "have 'known *for certain* that

[Vullo's] conduct was unlawful' under then-existing precedent." *Lamont*, 970

---

criminally prosecuting him on false charges because he publicly exposed corruption
within an agency); *Blue v. Koren*, 72 F.3d 1075, 1078-80 (2d Cir. 1995) (state agency
officials allegedly retaliated against a local nursing home through selective and rigorous
enforcement of regulations because the nursing home prevailed in a prior proceeding);
*Rodriguez v Phillips*, 66 F.3d 470, 478 (2d Cir. 1995) (corrections officer allegedly
retaliated against plaintiff by reporting him for behavior that led to the plaintiff's
placement in administrative segregation because the plaintiff once verbally defended an
inmate whom the officer was disciplining).

F.3d at 187 (quoting *Ziglar*, 582 U.S. at 152) (emphasis added).  Qualified

immunity on the NRA's retaliation claim is therefore proper.

## CONCLUSION

We hold that qualified immunity on the NRA's First Amendment

coercion and retaliation claims is appropriate in this case because of the

markedly attenuated link between facially valid law enforcement against a third-

party associate and an infringement of a plaintiff's First Amendment rights.[13]

Accordingly, we REVERSE the district court's order denying Vullo's motion to

dismiss on the basis of qualified immunity, and we REMAND the case for the

district court to enter judgment dismissing the remaining claims against her.

---

[13]     The district court previously held that Vullo is entitled to absolute immunity on the NRA's selective enforcement claim.  *Cuomo*, 525 F. Supp. 3d at 400.  On remand, Vullo argues that this Court should reject the NRA's attempt "to fold [those] allegations about the enforcement actions . . . into its surviving First Amendment theories" by applying absolute immunity on the NRA's First Amendment claims to the extent they are predicated on similar allegations of selective enforcement.  Vullo Supp. Br., ECF No. 142, at 12-13.  Because the issue of absolute immunity as to the NRA's First Amendment claims was not addressed below, and because we hold in any event that Vullo is entitled to qualified immunity on the NRA's First Amendment claims, we need not rule, and decline to rule, on this issue.  *See Wood v. Kesler*, 323 F.3d 872, 881 n.13 (11th Cir. 2003) ("Because [defendant] is entitled to qualified immunity, we need not address absolute immunity."); *see also Vullo II*, 602 U.S. at 195 n.5 ("[B]ecause Vullo did not raise this defense below with respect to the First Amendment claim . . . the Court declines to consider that argument here in the first instance.").