21-636-cv
*National Rifle Association of America v. Maria T. Vullo*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

_____

August Term 2021

(Argued: January 13, 2022     Decided: September 22, 2022)

Docket No. 21-636-cv

_____

NATIONAL RIFLE ASSOCIATION OF AMERICA,

*Plaintiff-Appellee*,

*v.*

MARIA T. VULLO, both individually and in her former official capacity,

*Defendant-Appellant*.[*]

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

Before:     POOLER, CHIN, and CARNEY, *Circuit Judges*.

_____

Interlocutory appeal from that portion of a decision and order of the

United States District Court for the Northern District of New York (McAvoy, *J.*),

_____

[*]     The Clerk of the Court is directed to amend the caption to conform to the above.

denying the motion of defendant-appellant Maria T. Vullo, the former

Superintendent of the New York State Department of Financial Services, to

dismiss certain claims against her for qualified immunity.  Plaintiff-appellee

National Rifle Association of America sued Vullo for violating its rights to free

speech and equal protection when she investigated three insurance companies

that had partnered with it to provide coverage for losses resulting from the use

of guns and encouraged banks and insurance companies to consider

discontinuing their relationships with gun promotion organizations.  The district

court dismissed the equal protection claim on the basis that Vullo was protected

by absolute immunity, but it declined to dismiss the free speech claims,

concluding that the NRA plausibly alleged its claims and issues of fact existed as

to whether she was protected by qualified immunity.

REVERSED AND REMANDED.

_____

ANDREW G. CELLI JR. (Debra L. Greenberger *and* Marissa
R. Benavides, *on the brief*), Emery Celli
Brinckerhoff Abady Ward & Maazel LLP, New
York, NY, *for Defendant-Appellant*.

SARA B. ROGERS (William A. Brewer III *and* Mordecai
Geisler, *on the brief*), Brewer, Attorneys &
Counselors, New York, NY, *for Plaintiff-Appellee*.

_____

2

CHIN, *Circuit Judge*:

In this case, plaintiff-appellee National Rifle Association of America (the "NRA") claims that defendant-appellant Maria T. Vullo, the former Superintendent of the New York State Department of Financial Services ("DFS"), violated its rights to free speech and equal protection when she investigated three insurance companies that had partnered with it to provide coverage for losses resulting from gun use and encouraged banks and insurance companies to consider discontinuing their relationships with gun promotion organizations. The NRA contends that Vullo used her regulatory power to threaten NRA business partners and coerce them into disassociating with the NRA, in violation of its rights.

In October 2017, based on a referral from the New York County District Attorney's Office (the "DA's Office"), DFS opened an investigation into the legality of certain NRA-endorsed insurance programs that provided coverage for losses caused by licensed firearm use, even in circumstances where the insured intentionally killed or injured someone or otherwise engaged in intentional wrongdoing. Eventually, in 2018, three DFS-regulated entities

entered into consent decrees with DFS, whereby they acknowledged that some of their NRA-endorsed insurance programs violated New York law.

In April 2018, in the wake of the tragic school shooting in Parkland, Florida, which resulted in the death of seventeen students and staff, Vullo, in her capacity as Superintendent of DFS, spoke out against gun violence. She did so through industry-directed "guidance letters" and a press statement issued by the New York State Governor's Office. She called upon banks and insurance companies doing business in New York to consider the risks, including "reputational risks," that might arise from doing business with the NRA or "similar gun promotion organizations," and she urged the banks and insurance companies to "join" other companies that had discontinued their associations with the NRA. J. App'x at 181, 184-7.

Thereafter, multiple entities indeed severed their ties or determined not to do business with the NRA. The NRA then brought this action against Vullo, DFS, then-Governor Andrew Cuomo, and Linda A. Lacewell (who had succeeded Vullo as Superintendent of DFS).[1] The district court eventually

---

[1]     Vullo left DFS on February 1, 2019. *See* Statement, Maria T. Vullo, N.Y. State Dep't of Fin. Servs. Superintendent, *Superintendent Maria T. Vullo to Depart DFS After Three Years of Service to New Yorkers* (Dec. 19, 2018), https://www.dfs.ny.gov/reports_and_publications/statements_comments/2018/st1812191.

dismissed all claims except the First Amendment claims against Vullo,

concluding that the NRA plausibly alleged those claims and that issues of fact

existed as to whether she was protected by qualified immunity with respect to

those claims. Vullo appeals.

The First Amendment forbids government officials from "abridging

the freedom of speech." U.S. Const. amend. I; *see Zieper v. Metzinger*, 474 F.3d 60,

66 (2d Cir. 2007). Government officials cannot, for example, use their regulatory

powers to coerce individuals or entities into refraining from protected speech.

At the same time, however, government officials have a right -- indeed, a duty --

to address issues of public concern. Here, for the reasons discussed below, we

conclude that the NRA has failed to plausibly allege that Vullo "crossed the line

'between attempts to convince and attempts to coerce.'" *Zieper*, 474 F.3d at 66

(quoting *Okwedy v. Molinari*, 333 F.3d 339, 344 (2d Cir. 2003) (per curiam)).

Moreover, even assuming that Vullo's actions and statements were somehow

coercive, we conclude further that her conduct here -- taking actions and making

statements in her various capacities as regulator, enforcement official,

policymaker, and representative of New York State -- did not violate clearly

established law. Rather, the only plausible conclusion to be drawn is that Vullo

5

acted reasonably and in good faith in endeavoring to meet the duties and responsibilities of her office.

Accordingly, we REVERSE and REMAND for the district court to dismiss the remaining claims against Vullo.

## STATEMENT OF THE CASE

Where the district court decides a qualified immunity defense on a motion to dismiss, we accept the material facts alleged in the complaint as true and draw all reasonable inferences in favor of the plaintiff -- here, the NRA. *Liberian Cmty. Ass'n of Conn. v. Lamont*, 970 F.3d 174, 186 (2d Cir. 2020).

## I.    *The Facts*

The following facts are drawn from the NRA's second amended complaint (the "Complaint"), the exhibits attached thereto, and documents integral to and referenced in it. *See Cohen v. Rosicki, Rosicki & Assocs., P.C.*, 897 F.3d 75, 80 (2d Cir. 2018).

### A.    *The Investigation*

In September 2017, the DA's Office advised DFS of the apparent illegality of an NRA-endorsed affinity insurance program called "Carry Guard." Carry Guard provided coverage for losses caused by licensed firearm use,

including criminal defense costs resulting from using a firearm with excessive

force to protect persons or property, even if the insured was found to have acted

with criminal intent.  In other words, it insured New York residents for

intentional, reckless, and criminally negligent acts with a firearm that injured or

killed another person.  Policies issued through Carry Guard were underwritten

by Illinois Union Insurance Company, a subsidiary of Chubb Limited, doing

business as Chubb ("Chubb"), and administered by Lockton Companies, LLC

("Lockton").

The next month, DFS opened an investigation into Carry Guard,

focusing on Lockton and Chubb.  The investigation revealed that Carry Guard

and at least two other NRA-endorsed programs violated New York insurance

law for providing, among other things, insurance coverage for intentional

criminal acts.  Additionally, it found that the NRA aggressively promoted Carry

Guard without an insurance producer license -- a separate violation of New York

insurance law.  By November 17, 2017, both Lockton and Chubb suspended the

Carry Guard program and stopped offering it to New York residents for

purchase.

The investigation also revealed that a third entity, the insurance marketplace Lloyd's of London and its related syndicates (together, "Lloyd's"), served as underwriter for at least eleven other NRA-endorsed programs with similar policy coverages. Like Carry Guard, the other NRA-endorsed programs provided liability defense coverage for criminal proceedings resulting from firearm use even where the insured acted with criminal intent.[2] Lockton administered these insurance programs for Lloyd's.

### B. The Parkland Shooting

On February 14, 2018, while the investigation was underway, a shooter armed with a semiautomatic weapon opened fire at Marjory Stoneman Douglas High School in Parkland, Florida, killing seventeen high school students and staff.[3] In the wake of the shooting, the NRA and other gun promotion groups faced intense backlash.[4] Many government officials and major American

---

[2] The NRA-endorsed insurance program provided by Lockton and Chubb went by the name "Carry Guard," but similar programs provided by Lloyd's went by other names, including "Self-Defense Insurance," "Second-Call Defense Insurance," and "Retired Law Enforcement Officer Self-Defense Insurance." J. App'x at 231 ¶ 6(a)-(c).

[3] *See, e.g.*, Bernie Woodall & Zachary Fagenson, *Paradise Lost: Massacre Jolts Florida's 'Safest City,'* Reuters (Feb. 15, 2018, 4:50 PM), https://www.reuters.com/article/us-florida-shooting-town/paradise-lost-massacre-jolts-floridas-safest-city-idUSKCN1FZ2WY.

[4] *See, e.g.*, Daniel Trotta, *Shunned by Corporations, U.S. Gun Entrepreneurs Launch Start-Ups*, Reuters (May 5, 2018, 11:04 AM), https://www.reuters.com/article/usa-guns-nra/shunned-by-corporations-u-s-gun-entrepreneurs-launch-start-ups-idUSL1N1S9255.

8

business institutions spoke out against gun violence, and some companies

publicly severed ties with gun promotion organizations like the NRA.[5]

### C. The Lloyd's Meetings

Shortly after the Parkland shooting, in late February 2018, Vullo met

with senior executives of Lloyd's and one of its United States affiliates.[6]  At the

meetings, Vullo "presented [her] views on gun control and [her] desire to

leverage [her] powers to combat the availability of firearms."  J. App'x at 161

¶ 67.  She explained the basis for her belief that Lloyd's was violating several

provisions of New York insurance law.  *Id.* at 144 ¶ 21 (stating that Vullo

"discussed an array of technical regulatory infractions plaguing the affinity-

insurance marketplace").  She then explained how Lloyd's could come into

compliance and "avoid liability" for its regulatory infractions, *id.* at 162 ¶ 69,

---

[5]     *See* Jenna Johnson et al., *Trump, Citing 'Evil Massacre' in Florida, Starts Talking About Gun Control*, Wash. Post (Feb. 20, 2018, 10:37 PM), https://www.washingtonpost.com/politics/trump-citing-evil-massacre-in-florida-starts-talking-about-gun-control/2018/02/20/8da6dd7e-1683-11e8-b681-2d4d462a1921_story.html; *see also* Tim Mak, *NRA Facing Most Formidable Opposition Yet, a Year After Parkland*, NPR (Feb. 14, 2019, 12:02 AM), https://www.npr.org/2019/02/14/693929383/nra-facing-most-formidable-opposition-yet-a-year-after-parkland ("For the National Rifle Association, the year since the Parkland shooting has led to a changing -- and less favorable -- political landscape.").

[6]     Although the Complaint uses the plural "meetings," it seems to describe only one meeting.  J. App'x at 161 ¶ 67.  Drawing all reasonable inferences in the NRA's favor, we conclude that there were multiple meetings held on or about February 27, 2018.

including by no longer "providing insurance to gun groups" like the NRA, *id.* at

144 ¶ 21.  Vullo also sought Lloyd's aid in "DFS's campaign against gun groups."

*Id.* at 162-63 ¶ 69.[7]

### D.    *The Guidance Letters and Press Release*

On April 19, 2018 -- approximately two months after the Parkland

shooting and six months after DFS opened its investigation into the NRA-

endorsed insurance programs -- Vullo weighed in publicly on the issue of gun

violence.  She issued a pair of guidance letters entitled "Guidance on Risk

Management Relating to the NRA and Similar Gun Promotion Organizations";

one was addressed to DFS-regulated insurance entities and the other to DFS-

regulated financial institutions (the "Guidance Letters").  J. App'x at 182-87.  The

Guidance Letters referenced the Parkland shooting and other mass shootings and

condemned the increasing "tragic devastation caused by gun violence" as a

"public safety and health issue."  *Id.* at 183.  The Guidance Letters also advised

that these tragedies had resulted in strong social backlash against the NRA and

---

[7]     The Complaint is replete with conclusory allegations that Vullo's statements and actions were "threatening" and "coercive."  *See, e.g.*, J. App'x at 170 ¶ 92.  As we discuss below, what Vullo did and said are factual assertions; whether the actions were "threatening" and "coercive" in a First Amendment violation sense is a conclusion.  We are free to consider whether that conclusion is plausible in light of the supporting factual assertions.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 681 (2009).

10

similar organizations and predicted that the backlash would increase after the

Parkland shooting.

Citing the changing public sentiment and views as to corporate

social responsibility, the Guidance Letters encouraged DFS-regulated entities to

"continue evaluating and managing their risks, including reputational risks, that

may arise from their dealings with the NRA or similar gun promotion

organizations, if any, as well as continued assessment of compliance with their

own codes of social responsibility." *Id.* at 183-84, 186-87. The Guidance Letters

did not refer to any ongoing investigations or enforcement actions, such as those

regarding Carry Guard or its related programs.

The same day, Cuomo issued a press statement announcing that he

had directed DFS to "urge insurers and bankers statewide to determine whether

any relationship they may have with the NRA or similar organizations sends the

wrong message to their clients and their communities who often look to them for

guidance and support." *Id.* at 180-81 (the "Press Release"). Vullo was quoted in

the Press Release as stating that "business can lead the way and bring about the

kind of positive social change needed to minimize the chance that we will

witness more of these senseless tragedies," and urging "all insurance companies

11

and banks doing business in New York to join the companies that have already

discontinued their arrangements with the NRA, and to take prompt actions to

manage these risks and promote public health and safety." *Id.* at 181.

E. *The Consent Decrees*

In May 2018, Lockton and Chubb entered into consent decrees with

DFS. On May 2 and 7, 2018, DFS issued press releases explaining the content of

the Lockton and Chubb consent decrees, respectively, its investigation into Carry

Guard, and the relevant insurance law violations. Lloyd's entered into a consent

decree with DFS a few months later in December 2018 (together with the Lockton

and Chubb consent decrees, the "Consent Decrees").

In the Consent Decrees, the three entities agreed that some NRA-

endorsed insurance programs they offered violated New York insurance law,

they would no longer provide those or other illegal insurance programs to the

NRA or New York residents, and they would pay fines.[8] The Consent Decrees

also imposed numerous prohibitions on the entities' abilities to engage in certain

---

[8]     Lockton agreed to pay a $7,000,000 fine. Chubb agreed to pay a $1,300,000 fine.
Lloyd's agreed to pay a $5,000,000 fine. All three entities agreed to cancel and no longer
offer several NRA insurance programs that violated New York insurance law, and not
to enter into any agreement or program with the NRA to underwrite or participate in
any affinity-type insurance program involving any line of insurance coverage to New
York residents or entities.

insurance programs and required Chubb and Lloyd's to do "reasonable due diligence" to ensure that any entity they do business with in the future "is acting in compliance with the Insurance Law." *Id.* at 216 (Chubb Consent Decree), 236 (Lloyd's Consent Decree).

Notably, each Consent Decree expressly allowed the entities to continue to do business with the NRA. The Lockton Consent Decree provided that "Lockton may assist the NRA in procuring insurance for the NRA's own corporate operations." *Id.* at 201 ¶ 43. The Chubb Consent Decree provided that "the NRA may itself purchase insurance from Chubb for the sole purpose of obtaining insurance for the NRA's own corporate operations." *Id.* at 216 ¶ 22. And the Lloyd's Consent Decree provided that "the NRA may itself purchase insurance from [Lloyd's] for the sole purpose of obtaining insurance for the NRA's own corporate operations." *Id.* at 236 ¶ 20.

F.      *The Market Reaction*

After the Parkland shooting, "multiple financial institutions" severed ties or decided not to do business with the NRA. *Id.* at 136.

For instance, the NRA received a call from Lockton's chairman on February 25, 2018, eleven days after the Parkland shooting, but months before

13

the issuance of the Guidance Letters, Press Release, and Consent Decrees, and

days before Vullo met with the Lloyd's executives.  On the call, the chairman

stated that Lockton privately wished to do business with the NRA but had to

"drop" the NRA for fear of losing its license to do business in New York.  *Id.* at

152 ¶ 42.  The next day, Lockton publicly tweeted that it would discontinue

providing brokerage services for all NRA-endorsed insurance programs.

   About two weeks after the Parkland shooting, but again before any

of Vullo's relevant public statements, the NRA's corporate insurance carrier

withdrew from renewal negotiations and stated that it was "unwilling to renew

coverage at any price."  *Id.* at 152 ¶ 44 (emphasis omitted).  After the carrier's

withdrawal, the NRA "encountered serious difficulties obtaining corporate

insurance coverage to replace" the coverage it lost.  *Id.* at 167 ¶ 81.  "Multiple

banks" also withdrew their bids from the NRA's Request for Proposal process in

the spring of 2018.  *Id.* at 167 ¶ 82.

   Additionally, the NRA cites a blog post and a magazine article for

examples of general market reaction to the Guidance Letters and Press Release.

It first refers to a blog post published by *FinRegRag* on April 22, 2018.  The blog

post opined that the Press Release "could easily be construed as a thinly veiled

threat" and "could also be seen as an attempt to suppress political speech that some New York policy makers disagree with." Brian Knight, *Is New York Using Bank Regulation to Suppress Speech?*, FinRegRag (Apr. 22, 2018), https://finregrag .com/is-new-york-using-bank-regulation-to-suppress-speech-ac61a7cb3bf. The post noted that although Vullo's statement did not indicate that DFS-regulated entities may face adverse regulatory action for failing to cut ties with the NRA, "it [didn't] rule out the possibility either." *Id*.

Next, the NRA refers to a magazine article published by *American Banker* on April 26, 2018. The article reported on the Guidance Letters and surveyed industry reactions:

> The guidance appeared somewhat benign, calling on state-chartered banks and other financial services firms to rethink ties they have with the National Rifle Association and other firearms-industry groups in the wake of the mass shootings. The regulator encouraged banks to weigh reputational risk and other corporate responsibility factors in assessing their relationships.
>
> But bankers say such regulatory guidelines are frustratingly vague, and can effectively compel institutions to cease catering to legal businesses.

Neil Haggerty, *Gun Issue Is a Lose-Lose for Banks (Whatever Their Stance)*, Am. Banker (Apr. 26, 2018, 1:11 PM), https://www.americanbanker.com/news/gun-issue-is-a-lose-lose-for-banks-whatever-their-stance. A senior consulting

15

associate at Capital Performance Group was quoted in the article as saying the following: "Banks increasingly must consider political issues as part of their risk management decision-making process," which requires "more proactive and broader considerations of reputation risk as part of risk models and calculations." *Id.* On the other hand, an anonymous banker from upstate New York was quoted as saying the Guidance Letters "felt somewhat politically motivated" and "[i]t's hard to know what the rules are if I don't know what the rules are." *Id.*

On May 9, 2018, Lloyd's publicly announced its decision to terminate its insurance-related relationship with the NRA. Two days later, the NRA brought this suit.

## II.   *The Proceedings Below*

This case comes before us on interlocutory appeal after extensive proceedings spanning more than four years in the lower court. The NRA filed three complaints and Vullo filed four motions to dismiss. We discuss only the proceedings necessary for an understanding of our holding.

The district court issued its decision and order on March 15, 2021, dismissing all claims against Cuomo, Lacewell, and DFS, as well as the selective enforcement claim against Vullo. The district court declined, however, to

16

dismiss two First Amendment claims against Vullo.  The first claim alleges that

Vullo established an unconstitutional implicit censorship regime in an effort to

chill the NRA's protected speech and the second claim alleges that Vullo

unconstitutionally retaliated against the NRA for its protected speech.  The

district court first held that the NRA sufficiently pleaded First Amendment

violations.  It then concluded that Vullo was not entitled to qualified immunity at

the motion-to-dismiss stage, even though it was "inclined to agree with Ms. Vullo

that there is no case clearly establishing that otherwise protected public

statements transform into an unlawful threat merely because there is an ongoing,

and unrelated, regulatory investigation."  Special App'x at 25.  The court

explained that:

> a question of material fact exists as to whether Ms. Vullo explicitly
> threatened Lloyd's with DFS enforcement if the entity did not
> disassociate with the NRA. . . .  Further, because Ms. Vullo's alleged
> implied threats to Lloyd's and promises of favorable treatment if
> Lloyd's disassociated with the NRA could be construed as acts of
> bad faith in enforcing the Insurance Law in New York, a question of
> material fact exists as to whether she is entitled to qualified
> immunity under New York law.

*Id.* at 27.

This appeal followed.

17

## *DISCUSSION*

Vullo contends that she is protected by qualified immunity and thus she asks this Court to reverse the district court's order to the extent it denied her motion to dismiss. The NRA disagrees and argues in addition that this Court lacks jurisdiction to hear this interlocutory appeal. We conclude that, first, we have jurisdiction to hear the appeal and, second, Vullo is entitled to qualified immunity. Accordingly, we reverse the district court's denial of Vullo's motion to dismiss and remand for dismissal of the remaining claims against her.

## I. *Appellate Jurisdiction*

The NRA asks this Court to dismiss Vullo's appeal for lack of jurisdiction, contending the district court's decision turned only on questions of fact and Vullo disputes the facts as alleged.[9]

Generally, a district court's denial of a motion to dismiss is not a "final decision" under 28 U.S.C. § 1291. *Drimal v. Tai*, 786 F.3d 219, 223 (2d Cir.

---

[9] The NRA also complains that Vullo denies meeting privately with the Lloyd's executives in February 2018, contradicting the Complaint and thus precluding interlocutory appeal. But Vullo makes clear that to the extent she asserts "the allegations lodged against her by the NRA are false," she does so "not because she fails to understand or accept the procedural posture in which this case rests" but "to protect her hard-earned professional and personal reputation and as a matter of integrity." Reply. Br. at 7 n.5. We do not consider these statements in deciding the legal issues before us on appeal.

2015).  But qualified immunity is a defense to litigation rather than a mere

defense to liability; it is lost if a case is erroneously permitted to go to trial.

*Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *see also Wood v. Moss*, 572 U.S. 744,

755 n.4 (2014) (noting that the Supreme Court has repeatedly stressed the

importance of deciding immunity questions at the earliest possible stage of

litigation).  Accordingly, we may review the denial of a motion to dismiss based

on qualified immunity, on an interlocutory basis, to the extent it turns on issues

of law.  *See Salim v. Proulx*, 93 F.3d 86, 89 (2d Cir. 1996).

If a district court's decision turns on questions of evidence

sufficiency alone (*i.e.*, which alleged facts a party may, or may not, be able to

prove at trial), it is not immediately appealable.  *Id.*  But a decision is not

insulated from review simply because the district court declared that genuine

issues of fact exist.  *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene*,

746 F.3d 538, 542 (2d Cir. 2014).  "Rather, where a district court denies a

defendant qualified immunity, there is appellate jurisdiction over that

defendant's interlocutory appeal if the defendant contests the existence of a

dispute or the materiality as a matter of law, or contends that he is entitled to

19

qualified immunity even under the plaintiff's version of the facts." *Id*. (cleaned up).

Here, Vullo certainly contests the existence of material issues of fact and contends as well that she is entitled to qualified immunity even under the NRA's version of the facts. At a minimum, we have jurisdiction to determine whether she is right.

Indeed, where a defendant accepts the facts as alleged for purposes of the appeal (thereby removing any issues of fact), we may review the legal issues on interlocutory appeal. *Id.*; *see also Soto v. Gaudett*, 862 F.3d 148, 158 (2d Cir. 2017). We have recognized the following as "strictly legal" questions reviewable on interlocutory appeal: (1) whether the plaintiff sufficiently pleaded the violation of a constitutional right and (2) whether, at the time of the alleged violation, the defendant's actions, as alleged by the plaintiff, violated clearly established law. *Tellier v. Fields*, 280 F.3d 69, 78-79 (2d Cir. 2000). Here, the district court concluded that "a question of material fact exist[ed] as to whether Ms. Vullo explicitly threatened Lloyd's with DFS enforcement if the entity did not disassociate with the NRA," Special App'x at 27, but Vullo has made clear in her briefs on appeal that she accepts the well-pleaded facts of the Complaint for

20

purposes of the appeal.  While she first argues that the Complaint alleges only

conclusions and characterizations, which she need not accept as true, she

assumes in the alternative that the Complaint alleges that she met with the

Lloyd's executives and offered leniency in exchange for help advancing her

policy goals and incorporates that allegation into her merits argument.

Moreover, she does not dispute what she said in the Guidance Letters, the Press

Release, or the Consent Decrees, or that she oversaw the investigation; the public

record captures her words and actions in those respects.  She thus accepts the

facts as alleged, and we may consider her qualified immunity defense based on

these assumed facts.  Hence, we have jurisdiction over this appeal, and we turn

to the merits.

## II.    *The Merits*

We review the denial of a motion to dismiss based on qualified immunity

*de novo*.  *Ganek v. Leibowitz*, 874 F.3d 73, 80 (2d Cir. 2017).

### A.    *Applicable Law*

#### 1.    *Pleading Standards*

To sufficiently plead a constitutional violation, a complaint must

allege "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl.*

21

*Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see Iqbal*, 556 U.S. at 678. We accept as true factual allegations but not conclusions, such as statements concerning a defendant's state of mind. *Iqbal*, 556 U.S. at 681 ("To be clear, we do not reject these bald allegations on the ground that they are unrealistic or nonsensical. . . . It is the conclusory nature of respondent's allegations, rather than their extravagantly fanciful nature, that disentitles them to the presumption of truth."); *see also Whiteside v. Hover-Davis, Inc.*, 995 F.3d 315, 321 (2d Cir. 2021).[10]

　　　　To determine whether a claim is plausible, we must separate the complaint's factual allegations from its conclusions and then determine whether the remaining well-pleaded factual allegations plausibly allege entitlement to relief. *Whiteside*, 995 F.3d at 321. This analysis is "context specific, requiring the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 663-64; *accord Lynch v. City of New York*, 952 F.3d 67, 74 (2d Cir. 2020). A claim is plausibly alleged "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the

---

[10]　　　For further discussion of this issue, see Howard M. Erichson, *What's the Difference Between a Conclusion and a Fact?*, 41 Cardozo L. Rev. 899, 904 (2020) ("[*Twombly* and *Iqbal*] relied on a distinction between factual *conclusions* (whether the *Twombly* defendants agreed not to compete, whether Ashcroft and Mueller intended to discriminate) and factual *supporting allegations* (what the telecommunications companies said and did, what Ashcroft and Mueller said and did).").

misconduct alleged." *Iqbal*, 556 U.S. at 678. But where the facts do not permit us to "infer more than the mere possibility of misconduct," the complaint has not plausibly alleged a claim. *Id.* at 679.

### 2. *Qualified Immunity*

Qualified immunity shields government officials performing discretionary functions from suits for money damages unless their conduct violates clearly established law of which a reasonable official would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). It gives government officials the breathing room to make reasonable, even if mistaken, judgments and protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). It applies unless (1) the plaintiff sufficiently pleaded a constitutional violation and (2) the law the official allegedly violated was clearly established and apparent to a reasonable official at the time of the alleged conduct. *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011); *see also Iqbal*, 556 U.S. at 673 ("[W]hether a particular complaint sufficiently alleges a clearly established violation of law cannot be decided in isolation from the facts pleaded."). Courts have discretion to decide which of the two prongs to address first, *Pearson*, 555 U.S. at 236-37, but if the complaint fails to sufficiently plead the violation of a

23

constitutional right, the second question is moot, *X-Men Sec., Inc. v. Pataki*, 196

F.3d 56, 66 (2d Cir. 1999).[11]

Although qualified immunity defenses are often decided on motions

for summary judgment, in appropriate circumstances a district court may

address qualified immunity at the pleadings stage. *Drimal*, 786 F.3d at 225.

### 3. *The First Amendment*

The NRA's First Amendment claims turn on whether Vullo's

statements at the Lloyd's meetings and in the Guidance Letters, Press Release,

and Consent Decrees were "implied threats to employ coercive state power to

stifle protected speech." *Hammerhead Enters., Inc. v. Brezenoff*, 707 F.2d 33, 39 (2d

Cir. 1983); *see also Zieper*, 474 F.3d at 65 (applying *Hammerhead* to censorship

claim); *Dorsett v. County of Nassau*, 732 F.3d 157, 160 (2d Cir. 2013) (applying

similar standard to retaliation claim).[12]

---

[11]    The district court's qualified immunity analysis was incomplete in this respect. Vullo is entitled to qualified immunity unless the NRA plausibly alleged a First Amendment violation *and* "it would . . . have been clear to a reasonable officer in [her] position that [her] conduct was unlawful." *Zieper*, 474 F.3d at 68. The district court held that issues of fact precluded dismissal, but it did not discuss whether, even if the Complaint stated a First Amendment cause of action, the law was clearly established such that a reasonable officer would have known she was violating the law.

[12]    Two aspects of the NRA's speech are arguably at issue here: (1) the NRA's long-standing gun promotion advocacy and (2) its Carry Guard program and related business associations. The district court assumed without discussing that the protected

Two sets of free speech rights are implicated: those of private individuals and entities and those of government officials. With respect to the latter, the First Amendment does not impose a viewpoint-neutrality requirement on the government's own speech; a government official has the right to speak for herself (and her agency) and to select the views she wishes to express. *Pleasant Grove City v. Summum*, 555 U.S. 460, 467-68 (2009); *Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550, 553 (2005). Under the government speech doctrine, public officials are generally free to favor certain views over others when they speak. *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 207-08 (2015) ("When government speaks, it is not barred by the Free Speech Clause from determining the content of what it says."); *Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 34 (2d Cir. 2018) ("When it acts as a speaker, the government is entitled to favor certain views over others.").

A viewpoint-neutrality requirement is antithetical to a healthy representative democracy, and when a government official embarks on a course

---

speech at issue is the NRA's gun promotion advocacy. Of course, such speech is protected by the First Amendment. The Carry Guard program, however, is not, to the extent it violated the law. As a result, the NRA can sufficiently plead its claims only if the Complaint contains enough facts to plausibly allege that Vullo's actions were taken in retaliation for, or in an effort to chill, its gun promotion advocacy.

25

of action, she may well embrace one viewpoint and reject others. *Matal v. Tam*, 137 S. Ct. 1744, 1757 (2017). The First Amendment does not forbid her from speaking about her preferred course of action; rather, it gives her the freedom to advocate for it. *Id.* Indeed, both parties here agree that Vullo was entitled to advocate for her political views -- to condemn gun violence and to urge DFS-regulated entities to consider what they could do to reduce both gun violence and the reputational risks of doing business with gun promotion groups.

Nevertheless, in certain circumstances, some government speech may infringe on private individuals' free speech rights. *See Hammerhead*, 707 F.2d at 39; *Zieper*, 474 F.3d at 65 ("It is well-established that First Amendment rights may be violated by the chilling effect of governmental action that falls short of a direct prohibition against speech." (internal quotation marks omitted)). Government officials may not engage in unjustified threats or coercion to stifle speech. *Hammerhead*, 707 F.2d at 39. Accordingly, although government officials are free to advocate for (or against) certain viewpoints, they may not encourage suppression of protected speech in a manner that "can reasonably be interpreted as intimating that some form of punishment or adverse regulatory action will follow the failure to accede to the official's request." *Id*.

26

"In determining whether a particular request to suppress speech is constitutional, what matters is the distinction between attempts to convince and attempts to coerce." *Zieper*, 474 F.3d at 66 (internal quotation marks omitted). We have considered the following factors when distinguishing between attempts to convince and attempts to coerce: (1) word choice and tone, *id.*; (2) the existence of regulatory authority, *Okwedy*, 333 F.3d at 343; (3) whether the speech was perceived as a threat, *Rattner v. Netburn*, 930 F.2d 204, 210 (2d Cir. 1991); and, perhaps most importantly, (4) whether the speech refers to adverse consequences, *Hammerhead*, 707 F.2d at 39. No one factor is dispositive. *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963). "[U]nder certain circumstances, oral or written statements made by public officials will require courts to draw fine lines between permissible expressions of personal opinion and implied threats to employ coercive state power to stifle protected speech." *Hammerhead*, 707 F.2d at 39.

As for qualified immunity from these claims, the question whether an official's actions violated clearly established law must be viewed in the light of the specific context of the case, not as a broad general proposition. *Zieper*, 474 F.3d at 67. Indeed, "the fact that the general proposition that the First

Amendment prohibits 'implied threats to employ coercive state power to stifle protected speech' is well-established does not end our inquiry." *Id.* (quoting *Hammerhead*, 707 F.2d at 39). Rather, the "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). While the exact official action need not have been previously held unlawful, its unlawfulness must be apparent in light of pre-existing case law. *Id.*

### B.    *Application*

First, we consider whether the NRA sufficiently pleaded a First Amendment violation. Second, we consider whether, assuming it did, the law was clearly established such that the violation would have been apparent to a reasonable official at the time.

### 1.    *Did the NRA Sufficiently Plead a First Amendment Claim?*

In asserting a violation of its First Amendment rights, the NRA relies principally on Vullo's actions with respect to and statements in the Guidance Letters, Press Release, Consent Decrees, and Lloyd's meetings. We discuss first the Guidance Letters and Press Release and second the Consent Decrees and Lloyd's meetings.

28

### a.      The Guidance Letters and Press Release

The Complaint alleges that Vullo's statements in the Guidance

Letters constituted "threats . . . of adverse action if institutions failed to support

Defendants' efforts to stifle the NRA's speech and to retaliate against the NRA

based on its viewpoint."  J. App'x at 154 ¶ 48.  It alleges that the Press Release

"threatened" regulated entities with "costly investigations, increased regulatory

scrutiny and penalties" if they did not "discontinue[] . . .  their arrangements with

the NRA."  *Id*. at 144 ¶ 21 & n.16.  And it alleges that the Guidance Letters and

actions of Vullo (and Cuomo) were intended to and did "coerce insurance

agencies, insurers, and banks into terminating business relationships with the

NRA." *Id*. at 155 ¶ 52.

We conclude that these allegations fail to plausibly allege

entitlement to relief.  First, whether Vullo "threatened" or "coerced" entities in an

unconstitutional sense are conclusions and characterizations that must be

supported by factual allegations as to what she said and did.  *Whiteside*, 995 F.3d

at 321 ("[A] court should not accept as true allegations that amount to mere legal

conclusions." (internal quotation marks omitted)).  Second, when the Complaint's

factual allegations are separated from its conclusions and characterizations, *see*

*Iqbal*, 556 U.S. at 679, it is apparent that the Complaint fails to plausibly allege

that Vullo engaged in unconstitutional threatening or coercive conduct. *See id.* at

678 ("Threadbare recitals of the elements of a cause of action, supported by mere

conclusory statements, do not suffice.").

   Vullo's words in the Guidance Letters and Press Release speak for

themselves, and they cannot reasonably be construed as being unconstitutionally

threatening or coercive. For example, in the Guidance Letters, Vullo referred to

the "devastation caused by gun violence" as "tragic" and "regrettabl[e]," and

called it "a public safety and health issue that should no longer be tolerated by

the public." J. App'x at 183. She urged DFS-regulated entities "to continue

evaluating and managing their risks, including reputational risks, that may arise

from their dealings with the NRA or similar gun promotion organizations, if any,

as well as continued assessment of compliance with their own codes of social

responsibility." *Id.* at 184. And in the Press Release, she stated:

> Corporations are demonstrating that business can lead the way and
> bring about the kind of positive social change needed to minimize
> the chance that we will witness more of these senseless tragedies.
> DFS urges all insurance companies and banks doing business in
> New York to join the companies that have already discontinued
> their arrangements with the NRA, and to take prompt actions to
> manage these risks and promote public health and safety.

*Id*. at 181.

We conclude, as a matter of law, that these statements do not cross the line between an attempt to convince and an attempt to coerce.  *See Zieper*, 474 F.3d at 66; *see also Bantam Books*, 372 U.S. at 67.  Rather, Vullo's statements in the Guidance Letters and Press Release are clear examples of permissible government speech.  *See, e.g.*, *Walker*, 576 U.S. at 208; *Wandering Dago, Inc.*, 879 F.3d at 34.  She plainly favored gun control over gun promotion and she sought to convince DFS-regulated entities to sever business relationships with gun promotion groups.  Although she did have regulatory authority over the target audience, and even assuming some may have perceived the remarks as threatening, the Guidance Letters and Press Release were written in an even-handed, nonthreatening tone and employed words intended to persuade rather than intimidate.  They did not refer to any pending investigations or possible regulatory action; the only "adverse consequences" alluded to were the "risks, including reputational risks . . . *if any*," of continuing to do business with gun promotion groups amid growing public concern over gun violence and the "social backlash" against "organizations that promote guns that lead to senseless violence."  J. App'x at 183-84, 186-87 (emphasis added).  And those consequences

31

were mentioned only in the context of "encourag[ing]" businesses to evaluate risk. *Id.* at 184, 187. The statements did not "intimat[e] that some form of punishment or adverse regulatory action [would] follow the failure to accede to the [] request" to discontinue arrangements with the NRA and other gun promotion organizations. *Hammerhead*, 707 F.2d at 39.

The NRA argues on appeal that "[t]he Guidance Letters are suffused with political concerns far afield from DFS's mandate, urging banks and insurers to heed 'the voices of the passionate, courageous, and articulate young people' speaking out in favor of gun control." Appellee's Br. at 11 (quoting the Guidance Letters). In our view, however, it was reasonable for Vullo to speak out about the gun control controversy and its possible impact on DFS-regulated entities. The general backlash against gun promotion groups and businesses that associated with them was intense after the Parkland shooting. It continues today.[13] Such a backlash could (and likely does) directly affect the New York financial markets; as research shows, a business's response to social issues can directly affect its financial stability in this age of enhanced corporate social

---

[13] *See* Michael Martin, *Former Gun Industry Exec Speaks Out Against NRA's Role in Mass Shootings*, NPR (May 28, 2022, 5:19 PM), https://www.npr.org/2022/05/28/1101955074/former-gun-industry-exec-speaks-out-against-nras-role-in-mass-shootings.

responsibility.[14]  As Superintendent of DFS, Vullo was charged with overseeing insurance entities, banks, and other financial institutions in New York, and she surely had the right to raise these concerns to protect DFS-regulated entities and New York residents from financial harm and to preserve stability in the state's financial system.

We conclude, with respect to the Guidance Letters and Press Release, that the Complaint falls short of plausibly alleging unconstitutional threats or coercion.

**b.    The Consent Decrees and Lloyd's Meetings**

Vullo's statements at the Lloyd's meetings present a closer call.  The Complaint alleges that during the meetings Vullo "discussed an array of technical regulatory infractions plaguing the affinity-insurance marketplace" but "made it clear, however, that DFS was less interested in pursuing the infractions

---

[14]    *See* Lily Zheng, *We're Entering the Age of Corporate Social Justice*, Harv. Bus. Rev. (June 15, 2020), https://hbr.org/2020/06/were-entering-the-age-of-corporate-social-justice (explaining that research has shown that companies that have effective corporate social responsibility programs are more profitable than those that do not).  Indeed, according to a study published in 2017 -- less than one year before the Parkland shooting -- seven out of ten Americans believed companies had an obligation to take action to address key social and environmental issues, even if those issues were not relevant to everyday business operations.  *See Americans Willing to Buy or Boycott Companies Based on Corporate Values, According to New Research by Cone Communications*, Cone (May 17, 2017), https://conecomm.com/2017-5-15-americans-willing-to-buy-or-boycott-companies-based-on-corporate-values-according-to-new-research-by-cone-communications/.

of which she spoke, so long as Lloyd's ceased providing insurance to gun groups, especially the NRA." J. App'x at 144. But even putting aside the lack of precision as to what Vullo actually said to make her message "clear," reviewing the statements in context, as we must, *see Iqbal*, 556 U.S. at 663-64, the allegations do not plausibly amount to an unconstitutional threat or coercion to chill the NRA's free speech.

The "context" here was an investigation, commenced months before the meetings, that was triggered by a referral from the DA's Office. DFS had begun an investigation into Carry Guard and related programs in October 2017. The investigation revealed that Lockton, Chubb, and Lloyd's were selling illegal insurance policies -- programs created and endorsed by the NRA. The policies insured New York residents for litigation defense costs resulting from intentional, reckless, and criminally negligent acts with a firearm that resulted in another person's injury or death. This coverage violated New York law and public policy and resulted in three substantial Consent Decrees, whereby the companies agreed to pay a total of more than $13 million in fines and to discontinue the programs. Again, the Consent Decrees speak for themselves -- they explained the violations of law and, contrary to the NRA's assertions, did

34

not require the companies to sever ties with the NRA.  Rather, they explicitly

permitted the companies to continue to do business with the NRA, assuming of

course the programs did not violate New York law.

   The NRA nonetheless argues that the investigation renders Vullo's

other statements threatening.  In other words, it argues that even though Vullo

did not explicitly threaten adverse regulatory action, the fact that she previously

began investigating entities for insurance law violations should render her

nonthreatening government speech threatening.  We are not persuaded.  To the

contrary, the investigation explains the reasonableness of Vullo's actions.

   To the extent Vullo offered Lloyd's leniency in the course of

negotiating a resolution of the apparent insurance law violations, context shows

that she was merely carrying out her regulatory responsibilities.  Even with all

reasonable inferences drawn in the NRA's favor, it is apparent Vullo did not

coerce Lloyd's (or the other entities in question) into severing ties with the NRA;

indeed, the consent decrees explicitly provided otherwise.  Moreover, the Lloyd's

Consent Decree was no more severe than that of Chubb or Lockton; in fact,

Lloyd's was subject to $2 million *less* in fines than Lockton.  And the Complaint

alleges no facts to support the conclusion that Chubb or Lockton were coerced

into settling with DFS. Rather, the well-pleaded facts in the Complaint demonstrate that the entities -- sophisticated companies represented by experienced counsel -- admitted wrongdoing based on their actual insurance law violations and that Vullo was motivated by her duty to address those violations.

*Twombly* provides guidance here. There, the Supreme Court held that allegations of parallel business conduct and a bare assertion of conspiracy were insufficient to state an antitrust conspiracy claim. 550 U.S. at 557-66. The Court reasoned that the defendants' behaviors could be explained by lawful economic incentives and concluded that there was "no reason to infer that the companies had agreed among themselves to do what was only natural anyway." *Id.* at 566 ("[W]e agree with the District Court that nothing in the complaint intimates that the resistance to the upstarts was anything more than the natural, unilateral reaction of each [defendant-company] intent on keeping its regional dominance.").

Here, in light of the serious insurance law violations, it was only natural for Vullo to take steps -- including investigating, negotiating, and resolving apparent violations -- to enforce the law. Her actions were plainly reasonable. The well-pleaded allegations of the Complaint show that she was

36

simply executing her duties as DFS Superintendent and engaging in legitimate enforcement action. All in all, the Complaint fails to plausibly allege that Vullo unconstitutionally threatened or coerced Lloyd's or the other entities to stifle the NRA's speech.

### 2. *Was the Law Clearly Established?*

Finally, even assuming the NRA sufficiently pleaded that Vullo engaged in unconstitutionally threatening or coercive conduct, we conclude that Vullo is nonetheless entitled to qualified immunity because the law was not clearly established and any First Amendment violation would not have been apparent to a reasonable official at the time.

While it was clearly established, as a general matter, that "the First Amendment prohibits implied threats to employ coercive state power to stifle protected speech," *Zieper*, 474 F.3d at 67 (cleaned up), the contours of that right were not so "sufficiently clear" that a reasonable official in the circumstances here would have understood that what she was doing violated that right. *Anderson*, 483 U.S. at 640. The right alleged to have been violated "must have been 'clearly established' in a more particularized, and hence more relevant, sense." *Id*. The violation must have been apparent in light of pre-existing case law for qualified

37

immunity to be denied. *Id.* Here, the various cases addressing the issue did not

provide clear and particularized guidance but involved very different

circumstances and much stronger conduct. The cases do not clearly establish

that Vullo's statements in this case were unconstitutionally threatening or

coercive. [15]

---

[15]     *See, e.g., Bantam*, 372 U.S. at 62 n.5, 63, 66-67 (finding unconstitutional coercion where the Rhode Island Commission to Encourage Morality sent letters to book distributors citing its legislative mandate, advising that lists of "objectionable" books were being sent to Chief of Police, and warning that the Attorney General "will act" in case of noncompliance); *Okwedy*, 333 F.3d at 344 (holding that a minister who posted a controversial message on a billboard stated a First Amendment retaliation claim where the Staten Island Borough President wrote a letter to the billboard company invoking his official authority, advising that he was aware that the company "derives substantial economic benefits" from their billboards, and instructing the company to contact his "legal counsel and Chair of [his] Anti-Bias Task Force"); *X-Men Sec.*, 196 F.3d at 68 (holding that legislators were protected by qualified immunity from First Amendment claims where the legislators asked government agencies to investigate a private security company, questioned the company's eligibility for an award of a publicly-funded contract, and advocated that it not be retained to provide services to a publicly financed housing complex); *Rattner*, 930 F.2d at 205 (holding that a businessman who wrote a controversial article about a village administrator stated a First Amendment claim against the administrator where the administrator wrote a letter to the businessman's colleagues asking a series of targeted questions about the article, publicly announced that he had written the letter, and publicly warned that he made a list of local businesses at which he regularly shopped); *Hammerhead*, 707 F.2d at 38-39 (holding that First Amendment rights of the creators of a satirical board game were not violated where a city human resources administrator urged stores to refrain from selling the game, appealed to conscience and decency rather than punishment or adverse action, and the request "was nothing more than a well-reasoned and sincere entreaty in support of [the administrator's] own political perspective").

The NRA has not cited, and we are not aware of, any case analogous to this one, where a government official has been held to have violated the First Amendment by making statements like those in the Guidance Letters and Press Release, which use only suggestive language and rely on the power of persuasion. In the Guidance Letters, Vullo commends DFS-regulated entities for their commitment to corporate social responsibility and for being "key players in maintaining and improving public health and safety in the communities they serve." J. App'x at 183. In the Press Release, she praises businesses for "lead[ing] the way and bring[ing] about the kind of positive social change needed to minimize the chance that we will witness more of these senseless tragedies." *Id.* at 181. Moreover, the Press Release states that the Governor was "directing the Department of Financial Services to *urge* insurers and bankers" to assess the risks of doing business with gun promotion groups, *id.* at 180 (emphasis added), not to *investigate* or take any enforcement action against them. It certainly was not clearly established at the time that any of these statements would violate the First Amendment, and indeed, as discussed above, many cases emphasized the right of government officials to speak, to take and express views, and to try to persuade. Furthermore, as the district court acknowledged, we have never held

39

that nonthreatening government speech *becomes* threatening simply because the speaker oversaw an earlier, legitimate law enforcement investigation, and we decline to do so today.

As for the Consent Decrees and Lloyd's meetings, the NRA similarly has not cited, and we are not aware of, any case like this one, where a government official makes purportedly threatening statements urging an entity to cut ties with what is essentially its accomplice during an ongoing, legitimate investigation into serious misconduct, where the investigation results in consent decrees, and where the entities admit to violations of the law and agree to millions of dollars in fines and other significant relief. Moreover, assuming Vullo offered to go easy on Lloyd's if it severed ties with the NRA, we have never held that law enforcement officials may not offer leniency in exchange for help advancing their policy goals, especially when those policy goals aim to minimize the influence of a noncompliant business partner that has repeatedly violated the law. And again, as noted, DFS explicitly permitted Lloyd's (and the other entities) to continue doing business with the NRA.

Qualified immunity balances the need to hold public officials accountable when they exercise their power irresponsibly with the need to shield

40

officials from harassment, distraction, and liability when they perform their

duties responsibly.  *Pearson*, 555 U.S. at 231.  The Complaint's factual allegations

show that, far from acting irresponsibly, Vullo was doing her job in good faith.

She oversaw an investigation into serious violations of New York insurance law

and obtained substantial relief for the residents of New York.  She used her office

to address policy issues of concern to the public.  Even assuming her actions

were unlawful, and we do not believe they were, the unlawfulness was not

apparent by any means.

      Accordingly, even assuming the NRA plausibly alleged a First

Amendment violation, Vullo would be protected by qualified immunity in any

event.[16]

---

[16]    The Complaint also cites the New York state constitution, but it combines the
state law claims with the federal claims and does not assert them as independent
claims.  Moreover, in their briefs on appeal and to the district court, the parties do not
address the state law claims at all and do not cite New York law.  Accordingly, we
deem the NRA's state law claims abandoned.  *See Ernst Haas Studio, Inc. v. Palm Press,
Inc.*, 164 F.3d 110, 112 (2d Cir. 1999) (per curiam).  Moreover, even assuming the claims
are not abandoned, we conclude that Vullo would be entitled to qualified immunity
under New York law because, as discussed above, her actions were reasonable and
there is nothing in the Complaint from which one could reasonably infer bad faith.

## *CONCLUSION*

For the reasons stated above, we REVERSE the district court's denial of Vullo's motion to dismiss and REMAND the case with directions for the district court to enter judgment for Vullo.